2024-1585

_____

# United States Court of Appeals

# for the Federal Circuit

_____

**In re: GESTURE TECHNOLOGY PARTNERS, LLC,**
*Appellant*,

Appeal from the United States Patent and Trademark Office in
*Ex parte* Reexamination Control No. 90/014,902

**OPENING BRIEF OF APPELLANT
GESTURE TECHNOLOGY PARTNERS, LLC**

*/s/ Fred I. Williams*
Fred I. Williams
*Principal Attorney*
WILLIAMS SIMONS & LANDIS PLLC
The Littlefield Building
601 Congress Ave, Suite 600
Austin, TX 78701
512.543.1354 telephone
fwilliams@wsltrial.com

John Wittenzellner
WILLIAMS SIMONS & LANDIS PLLC
1735 Market Street, Suite A#453
Philadelphia, PA 19103
512.543.1373 telephone
johnw@wsltrial.com

July 12, 2024

COUNSEL FOR APPELLANT GESTURE TECHNOLOGY PARTNERS, LLC

# PATENT CLAIMS AT ISSUE

Claims 1-14 of U.S. Patent No. 8,194,924 are the patent claims at issue:

1.     A handheld device comprising:

a housing;

a computer within the housing;

a first camera oriented to view a user of the handheld device and having a first camera output; and

a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view, and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.

2.     The handheld device of claim 1 wherein the handheld device comprises a mobile phone.

3.     The handheld device of claim 1 wherein the first camera is adapted to acquire an image of at least a portion of the user.

4.     The handheld device of claim 1 wherein the second camera is adapted to acquire an image of the object.

5.     The handheld device of claim 1 wherein the second camera is adapted to acquire a video of the object.

6.     The handheld device of claim 1 wherein the computer is operable to determine a gesture based on at least one of the first camera output and the second camera output.

7.     The handheld device of claim 1 wherein the computer is operable to determine a facial expression based on at least one of the first camera output and the second camera output.

8.    The handheld device of claim 1 wherein the computer is adapted to determine at least one of the position and the orientation of the object based on the second camera output.

9.    The handheld device of claim 6 wherein the gesture is performed by a person other than the user of the handheld device.

10.    The handheld device of claim 1 wherein the computer is adapted to recognize the object based on the second camera output.

11.    The handheld device of claim 1 wherein the computer is adapted to generate control instructions for a display that is separate from the handheld device.

12.    The handheld device of claim 1 wherein the computer is adapted to determine a reference frame of the object.

13.    The handheld device of claim 1 wherein the computer is adapted to perform a control function based on the first camera output and based on the second camera output.

14.    The handheld device of claim 1 wherein the computer is adapted to transmit information over an internet connection.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 24-1585 |
| **Short Case Caption** | In re Gesture Technology Partners, LLC |
| **Filing Party/Entity** | Gesture Technology Partners, LLC |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/12/2024

Signature: /s/ Fred Williams

Name: Fred Williams

**FORM 9. Certificate of Interest**

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Gesture Technology Partners, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable           ☐    Additional pages attached

| | | |
|---|---|---|
| Mark J.E. McCarthy of Williams Simons & Landis PLLC | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable           ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

I.    STATEMENT OF RELATED CASES............................................1

II.   JURISDICTIONAL STATEMENT ...............................................1

III.  STATEMENT OF THE ISSUES ...................................................2

IV.  STATEMENT OF THE CASE AND FACTS ...............................2

     A.    Procedural Background ........................................................2

     B.    Subject Matter of the '924 Patent.......................................4

     C.    The Board's Decision On Appeal ........................................5

V.    SUMMARY OF THE ARGUMENT .............................................8

VI.  STANDARD OF REVIEW..........................................................10

VII. ARGUMENT..............................................................................12

     A.    The Board Erred In Construing The Claims. .....................12

          1.    The Board improperly construed the term "handheld device" in claim 1..................................................................12

          2.    The Board improperly construed the term "mobile phone" in claim 2.....................................................................18

     B.    The Board Erred In Determining That *Liebermann* Anticipates Claims 1 And 2.......................................................................19

          1.    *Liebermann* does not anticipate independent claim 1...............19

              a.    *Liebermann* fails to disclose the preamble of independent claim 1......................................................19

              b.    *Liebermann* fails to disclose claim element 1[e]............27

          2.    *Liebermann* does not anticipate claim 2. .................................32

     C.    The Board Erred In Determining That *Liebermann* Renders Obvious Claims 1 And 2. ....................................................34

    1.    *Liebermann* is non-analogous art............................................34

        a.    *Liebermann* fails the first test for analogous art.............35

        b.    *Liebermann* fails the second test for analogous art. .......37

    2.    *Liebermann* does not render obvious independent claim 1. .....38

        a.    *Liebermann* fails to teach or suggest the preamble of independent claim 1.......................................................38

        b.    *Liebermann* fails to teach or suggest claim element 1[e]................................................................................39

    3.    *Liebermann* does not render obvious claim 2..........................40

D.    The Board Erred In Determining That *Liebermann* And *Sears* Render Obvious Dependent Claims 6, 7, 8, and 10. ..........................41

    1.    *Sears* is non-analogous art. ......................................................41

        a.    *Sears* fails the first test for analogous art. ......................41

        b.    *Sears* fails the second test for analogous art..................43

    2.    *Liebermann* and *Sears* do not render obvious claim 6. ...........45

        a.    The Board's combination of *Liebermann* and *Sears* relies on impermissible hindsight and changes *Liebermann's* principle of operation. ............................46

        b.    The Board's combination of *Liebermann* and *Sears* is not a simple substitution of one known element for another. ........................................................................52

        c.    The Board's combination of *Liebermann* and *Sears* lacks rational underpinnings..........................................55

    3.    *Liebermann* and *Sears* do not render obvious claim 7. ............56

    4.    *Liebermann* and *Sears* do not render obvious claims 8 and 10...............................................................................................58

E.    The Board Erred In Determining That The Cited Art Anticipates Or Renders Obvious Dependent Claims 3-5, 9, and 11-14. ..................... 60

F.    The Board Erred By Not Vacating The Reexam Order Because No Substantial New Question (SNQ) Of Patentability Exists ................. 60

G.    The USPTO Does Not Have Jurisdiction Over the Expired '924 Patent. ................................................................................................ 61

VIII.  CONCLUSION AND RELIEF SOUGHT .................................................. 64

# TABLE OF AUTHORITIES

## Cases

*Airbus S.A.S. v. Firepass Corp.*,
  941 F.3d 1374 (Fed. Cir. 2019) .................................................. 36, 42

*Donner Technology, LLC v. Pro Stage Gear, LLC*,
  979 F.3d 1353 (Fed. Cir. 2020) .................................................. 35, 37

*Eon-Net LP v. Flagstar Bancorp*,
  653 F.3d 1314 (Fed. Cir. 2011) ......................................................51

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l*,
  222 F.3d 951 (Fed. Cir. 2000) ........................................................25

*In re Abbott Diabetes Care, Inc.*,
  696 F.3d 1142 (Fed. Cir. 2012) ......................................................10

*In re Berg*,
  320 F.3d 1310 (Fed. Cir. 2003) ......................................................51

*In re Klein*,
  647 F.3d 1343 (Fed. Cir. 2011) .................................................. 11, 34

*In re Man Mach. Interface Techs. LLC*,
  822 F.3d 1282 (Fed. Cir. 2016) ......................................................11

*In re Rambus, Inc.*,
  753 F.3d 1253 (Fed. Cir. 2014) ......................................................10

*In re Ratti*,
  270 F.2d 810 (CCPA 1959) ............................................................50

*In re Recreative Techs. Corp.*,
  83 F.3d 1394 (Fed. Cir. 1996) ........................................................60

*In re Suitco Surface, Inc.*,
  603 F.3d 1255 (Fed. Cir. 2010) ......................................................11

*In re Vivint, Inc.*,
  14 F.4th 1342 (Fed. Cir. 2021) ......................................................11

iv

*IntelCorp. v. Qualcomm Inc.*,
  21 F.4th 801 (Fed. Cir. 2021) ..............................................................10

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*,
  821 F.3d 1359 (Fed. Cir. 2016) ...........................................................11

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
  672 F.3d 1350 (Fed. Cir. 2012) (en banc) ...........................................51

*Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*,
  50 F.4th 147 (Fed. Cir. 2022) ..............................................................11

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014).............................................................................51

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
  138 S. Ct. 1365 (2018) ................................................................... 62, 63

*P&G v. Kraft Foods Global, Inc.*,
  549 F.3d 842 (Fed. Cir. 2008) .............................................................60

*Par Pharm., Inc. v. TWi Pharms., Inc.*,
  773 F.3d 1186 (Fed. Cir. 2014) ...........................................................11

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..................................... 12, 17

*Spectra-Physics, Inc. v. Coherent, Inc.*,
  827 F.2d 1524 (Fed. Cir. 1987) ...........................................................18

*Verdegaal Bros. v. Union Oil Co. of California*,
  814 F.2d 628 (Fed. Cir. 1987) .............................................................26

*Wasica Fin. GmbH v. Cont'l Auto. Sys.*,
  853 F.3d 1272 (Fed. Cir. 2017) ...........................................................30

### Statutes

28 U.S.C. §1295 ...................................................................................1, 4

35 U.S.C. § 134 .......................................................................................3

35 U.S.C. § 141 ...................................................................................1, 4

35 U.S.C. § 303 ................................................................................................60

35 U.S.C. § 306 ..................................................................................................3

35 U.S.C. § 6 ......................................................................................................1

### Regulations

37 C.F.R. § 41.37 ................................................................................................3

37 C.F.R. § 41.41 ................................................................................................3

## I.     STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Gesture Technology Partners, LLC ("GTP") states that no other appeal in or from the same proceeding in the originating tribunal was previously before this or any other appellate court.

Cases pending in this or any other court which will directly affect or be directly affected by this Court's decision in the pending appeal are listed below.

- *Apple Inc., v. Gesture Technology Partners, LLC*, 2023-1494 (Court of Appeals for the Federal Circuit)

- *Gesture Technology Partners, LLC v. Apple Inc.*, 4:22-cv-04806-YGR (U.S. District Court for the Northern District of California)

- *Gesture Technology Partners, LLC v. Motorola Mobility LLC*, 1:22-cv-03535 (U.S. District Court for the Northern District of Illinois)

- *Gesture Technology Partners, LLC v. LG Electronics Inc. et al.*, 2:21-cv-19234-EP-MAH (U.S. District Court for the District of New Jersey)

## II.     JURISDICTIONAL STATEMENT

Pursuant to 35 U.S.C. § 6(b), the Patent Trial and Appeal Board (the "Board") issued its Decision on Appeal on January 19, 2024 (the "Decision").  Appx0001-0044.  Patent Owner timely filed a Notice of Appeal on March 20, 2024.  Appx1198-1200.  This Court has jurisdiction pursuant to 28 U.S.C. §1295(a)(4)(A) and 35 U.S.C. § 141(b).

## III.    STATEMENT OF THE ISSUES

1.    Whether the claim term "handheld device" is properly construed to mean a device designed for operation by a user while being held in at least one of the user's hands?

2.    Whether the ordinary meaning of the claim term "mobile phone" excludes mobile phones for the deaf?

3.    Whether U.S. Patent No. 5,982,853 ("*Liebermann*") discloses or renders obvious claims 1-5 and 13?

4.    Whether the combination of *Liebermann* and U.S. Patent No. 6,115,482 ("*Sears*") renders obvious dependent claims 6-10 and 12?

5.    Whether a substantial new question of patentability exists to order *ex parte* reexamination?

6.    Whether the USPTO has jurisdiction over expired patents?

## IV.    STATEMENT OF THE CASE AND FACTS

### A.    Procedural Background

This appeal involves one patent owned by GTP:  U.S. Patent No. 8,194,924 (the "'924 Patent").  The '924 Patent was filed on March 18, 2011, as U.S. Patent Application No. 13/051,698.  Appx0140.  The '924 Patent issued on June 5, 2012. *Id*.  The '924 Patent claims priority to several patent applications, including U.S. Provisional Patent Application No. 60/142,777, which was filed on July 8, 1999. Appx0164.  The '924 Patent expired in July 2020.  *See id*.

Samsung Electronics Co., Ltd. filed a request for *ex parte* reexamination of the '924 Patent on November 11, 2021.  Appx0049-0138.  The USPTO issued an

order granting *ex parte* reexamination of the '924 Patent on December 2, 2021 (the "Reexam Order").  Appx0794-0814.

During the reexamination proceeding, the Examiner issued a Final Office Action on July 22, 2022 (the "Final OA"), rejecting claims 1-14 of the '924 Patent. Appx0893-0958.  Appellant filed a Notice of Appeal pursuant to 35 U.S.C. §§ 134 and 306 on September 22, 2022 (*see* Appx0969), and then filed an Appeal Brief pursuant to 37 C.F.R. § 41.37 on November 22, 2022 ("Appeal Br.").  Appx0971-1034.  The Examiner issued an Answer on March 15, 2023 ("Answer") (Appx1040-1084), and Appellant filed a Reply Brief pursuant to 37 C.F.R. § 41.41 on May 15, 2023.  *See* Appx1099-1135.  An Oral Hearing was conducted on November 27, 2023.  *See* Appx1183-1197.

On January 19, 2024, the Board issued its Decision on Appeal (the "Decision").  Appx0001-0044.  The Board affirmed the Examiner's rejections of claims 1-14 of the '924 Patent.  Appx0042 (Decision, p. 42).

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 1–5, 13 | 102 | Liebermann | 1–5, 13 | |
| 1–5, 13 | 103 | Liebermann | 1–5, 13 | |
| 6–10, 12 | 103 | Liebermann, Sears | 6–10, 12 | |
| 11 | 103 | Liebermann, Tryding | 11 | |
| 14 | 103 | Liebermann, Gershman | 14 | |
| 14 | 103 | Liebermann, Kimball | 14 | |
| Overall Outcome | | | 1–14 | |

Appx0043 (Decision, p. 43).  Pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(b), a Notice of Appeal was filed with this Court on March 20, 2023. Appx1198-1200.

**B.    Subject Matter of the '924 Patent**

The '924 Patent is titled "Camera based sensing in handheld, mobile, gaming or other devices."  Appx0140 ('924 Patent, Title).  The '924 Patent is directed to a handheld device (i.e., a device designed for operation by a user while being held in at least one of the user's hands).  Figure 8A of the '924 Patent is reproduced below:



Appx0150 ('924 Patent, Fig. 8A) (excerpted and annotated).  The handheld device includes a computer, a first camera having a first output, and a second camera having a second output.  *See, e.g.*, Appx0169-0170 ('924 Patent, 11:65-12:12, 12:62-13:47), Appx0176 ('924 Patent, 25:40-26:43), Appx0150 ('924 Patent, Figs. 8A, 8B), Appx0163 ('924 Patent, Fig. 18 (elements 1901, 1902a, 1910)).  The first camera is oriented to view a user of the handheld device, and the second camera is oriented to view an object other than the user of the device, wherein the first and second cameras

4

have non-overlapping fields of view.  Figure 18 of the '924 Patent is reproduced below:



Appx0163 ('924 Patent, Fig. 18) (excerpted and annotated).  *See also* Appx0165 (3:11-14) ("FIG. 18 illustrates an improved <u>handheld</u> computer embodiment of the invention, in which the camera or <u>cameras</u> may be used to <u>look at objects</u>, screens and the like <u>as well as look at the user</u>.") (emphasis added).  The computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.  *See, e.g.*, Appx0169-0170 ('924 Patent, 11:65-12:12, 12:62-13:47), Appx0176 ('924 Patent, 25:40-26:43), Appx0163 ('924 Patent, Fig. 18 (elements 1901, 1902a, 1910)).

## C.    The Board's Decision On Appeal

The Final OA asserted six grounds of unpatentability based on five prior art references:  (1) anticipation of claims 1-5 and 13 by U.S. Patent No. 5,982,853 ("*Liebermann*") (*see* Appx0913-0921 (Final OA, pp. 20-28)), (2) obviousness of claims 1-5 and 13 in view of *Liebermann* (*see* Appx0913-0921 (Final OA, pp. 20-

28)), (3) obviousness of claims 6-10 and 12 in view of *Liebermann* and U.S. Patent No. 6,115,482 ("*Sears*") (*see* Appx0921-0925 (Final OA, pp. 28-32)), (4) obviousness of claim 11 in view of *Liebermann* and U.S. Patent No. 5,880,732 ("*Tryding*") (*see* Appx0925-0927 (Final OA, pp. 32-34)), (5) obviousness of claim 14 in view of *Liebermann* and U.S. Patent No. 6,401,085 ("*Gershman*") (*see* Appx0927-0928 (Final OA, pp. 34-35)), and (6) obviousness of claim 14 in view of *Liebermann* and U.S. Patent No. 5,953,322 ("*Kimball*") (*see* Appx0928-0929 (Final OA, pp. 35-36)).

In its Decision, the Board affirmed the Examiner's rejections and mainly adopted the Examiner's positions and reasoning:  "we adopt as our own (1) the findings and reasons set forth by the Examiner in the [Final OA] from which this appeal is taken and (2) the reasons set forth by the Examiner in the Examiner's Answer."  Appx0007 (Decision, p. 7).

First, the Board incorrectly construed the claim term "handheld device" to mean a device "small enough to be used or operated while being held in the hand."  Appx0014 (Decision, p. 14); *see also* Appx0009 (Decision, p. 9).  In doing so, the Board improperly relied on a generic dictionary from 1983, and gave insufficient weight to how a POSITA would understand the term upon reading the entire '924 Patent.

Second, the Board incorrectly construed the claim term "mobile phone" to include mobile phones for the deaf, even though mobile phones for the deaf do not have audio outputs like an ordinary mobile phone of the '924 Patent. *See* Appx0012 (Decision, p. 12). The Board also failed to consider that mobile phones for the deaf are highly specialized devices with LCDs for displaying signing animation— something not found in an ordinary mobile phone of the '924 Patent.

Third, the Board incorrectly determined that *Liebermann* discloses a "handheld device" even though *Liebermann's* "portable transmitter/receiver" is not designed for operation while being held in at least one of the user's hands. *See* Appx0012-0013 (Decision, pp. 12-13). The Board also incorrectly determined that *Liebermann's* "portable transmitter/receiver" is small enough to be held in a user's hand even though *Liebermann* is silent on its dimensions and weight.

Fourth, the Board incorrectly determined that *Liebermann's* "portable transmitter/receiver" device has two cameras by relying on a passage referring to fixed (i.e., non-portable) devices. *See* Appx0015-0016 (Decision, pp. 15-16).

Fifth, to make a finding that *Liebermann* is analogous art, the Board improperly excluded "telephones for the deaf" from *Liebermann's* field of endeavor and failed to identify the problem being solved by *Liebermann*. *See* Appx0018-0022 (Decision, pp. 18-22).

Sixth, to make a finding that *Sears* is analogous art, the Board improperly excluded "electronic reading machines" from *Sears'* field of endeavor and improperly characterized the problem being solved by the '924 Patent. *See* Appx0023-0026 (Decision, pp. 23-26).

Seventh, to make a finding that *Liebermann* and *Sears* render claims 6, 7, 8, and 10 obvious, the Board drastically modified *Liebermann* by changing its principle of operation and dismantling its distributed architecture. *See* Appx0026-0029 (Decision, pp. 26-29). The Board's improper reasoning required performing claim differentiation on the cited art *Liebermann*. *See id.*

Eighth, the Board incorrectly determined that the USPTO has jurisdiction over expired patents. *See* Appx0038-0041 (Decision, pp. 38-41). But the Board did not consider the *Oil States* case from the Supreme Court in reaching that conclusion. *See id*.

## V.    SUMMARY OF THE ARGUMENT

The Board's decision affirming the Examiner's rejections cannot be sustained. The claimed "handheld device" is a device designed for operation by a user while being held in at least one of the user's hands. But cited art *Liebermann* never discloses that its "portable transmitter/receiver" meets that requirement. To the contrary, *Liebermann* expressly discloses that its "portable transmitter/receiver" films both hands of the deaf user while he or she is signing. *Liebermann* also fails

to disclose the dimensions or weight of its "portable transmitter/receiver" and thus there is no evidence that it is small enough to even be held by the user during operation. As a result, *Liebermann* cannot anticipate or render obvious independent claim 1.

The Board erred by determining that *Liebermann* discloses the claimed "mobile phone." There is no reasonable dispute that the claimed "mobile phone" necessarily has an audio output (e.g., speaker) so that the user of the claimed "mobile phone" can listen to another individual (speaking into another phone device) during a voice telephone call. By virtue of being a telephone for the deaf, *Liebermann's* "portable transmitter/receiver" lacks that necessary audio output. Instead, *Liebermann's* "portable transmitter/receiver" has an LCD screen for displaying signing animation to the deaf user. Accordingly, *Liebermann* cannot anticipate or render obvious claim 2.

The Board also erred in determining that the combination of *Liebermann* and *Sears* renders claims 6-10 obvious. Because *Liebermann* is directed to telephones for the deaf and *Sears* is directed to electronic reading machines, neither is analogous art and thus neither can be cited in an obviousness rejection. Further, the Board's proposed modification requires completely dismantling *Liebermann's* distributed architecture and relocating the sophisticated computer equipment, databases, and neural networks from *Liebermann's* "central processing facility" (i.e., the "Center")

to *Liebermann's* "portable transmitter/receiver." Even assuming that modification is technically feasible, that modification changes *Liebermann's* principle of operation and is thus too drastic to be obvious. That modification is also far from being a simple substitution.

Finally, the USPTO does not have jurisdiction over expired patents, therefore, the Board's decision should be vacated.

## VI.   STANDARD OF REVIEW

"Claim construction is ultimately a question of law, decided *de novo* on review, as are the intrinsic-evidence aspects of a claim-construction analysis. But we review any underlying fact findings about extrinsic evidence, such as extra-patent usage, for substantial-evidence support when the appeal comes from the Board." *IntelCorp. v. Qualcomm Inc.*, 21 F.4th 801, 808 (Fed. Cir. 2021) (cleaned up). The Board's decision may be vacated and remanded to the Board to consider the patentability grounds under the proper construction. *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142, 1150 (Fed. Cir. 2012).

Anticipation is a question of fact, reviewed for substantial evidence on appeal. *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014). Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence . . . and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259

(Fed. Cir. 2010) (cleaned up). Anticipation determinations that are based on an improper construction should be vacated. *See id*. at 1259-61.

"Obviousness is a mixed question of law and fact, and we review the Board's ultimate obviousness determination *de novo* and underlying fact-findings for substantial evidence." *Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*, 50 F.4th 147, 152 (Fed. Cir. 2022) (cleaned up). Obviousness determinations that are based on an improper construction should be vacated. *In re Man Mach. Interface Techs. LLC*, 822 F.3d 1282, 1288-89 (Fed. Cir. 2016). "What a reference teaches and whether it teaches toward or away from the claimed invention are questions of fact." *Par Pharm., Inc. v. TWi Pharms., Inc.*, 773 F.3d 1186, 1196-97 (Fed. Cir. 2014) (cleaned up). "The presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact. The presence or absence of a reasonable expectation of success is also a question of fact." *Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016) (cleaned up). The Board's determination that a prior art reference is analogous art presents an issue of fact, reviewed for substantial evidence. *In re Klein*, 647 F.3d 1343, 1347 (Fed. Cir. 2011).

"The ultimate question of whether the reexamination is based on a substantial new question of patentability remains a question of law." *In re Vivint, Inc.*, 14 F.4th 1342, 1348 (Fed. Cir. 2021) (cleaned up).

## VII.  ARGUMENT

### A.     The Board Erred In Construing The Claims.

The words of a claim "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). The "ordinary meaning" of a claim term "is its meaning to the ordinary artisan after reading the <u>entire</u> patent." *Id*. at 1321 (emphasis added).  The specification "is the single best guide to the meaning of a disputed term." *Id*. at 1315 (cleaned up).  "Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Id*. at 1321 (cleaned up).

#### 1.     The Board improperly construed the term "handheld device" in claim 1.

The Board improperly construed the term "handheld device" to mean a device "small enough to be used or operated while being held in the hand."  Appx0014 (Decision, p. 14); *see also* Appx0009 (Decision, p. 9).  Appellant asserts that the term "handheld device" properly means a device "designed for operation by a user while being held in at least one of the user's hands."  Appx1114 (Reply, p. 11).

The '924 Patent identifies a "cell phone" and a "TV remote control" as examples of handheld devices.  *See* Appx0169 ('924 Patent, 11:65-67, 12:64), Appx0174 ('924 Patent, 21:63-64).  It is undisputed that an ordinary "cell phone"

and "TV remote control" are devices designed for operation by a user while being held in at least one of the user's hands.

Further, the '924 Patent discloses that Figure 8 "illustrates control of functions with the invention, using a <u>handheld device</u> which itself has functions." Appx0164 ('924 Patent, 2:54-55) (emphasis added). Figure 8A is reproduced below:



Appx0150 ('924 Patent, Fig. 8A) (excerpted and annotated). As explained by the '924 Patent, the

> basic idea here is that <u>a device which one holds in ones hand for use in its own right</u>, can also be used with the invention herein to perform a control function by determining its position, orientation, pointing direction or other variable with respect to one or more external objects, using . . . a camera located in the handheld device, to sense datums or other information external for example to the device . . .
>
> As one illustrative example, to signal a fax unit 824 in the car to print data coming through on the phone, <u>the user just points (as illustrated in position 2) the cell phone toward the fax</u> . . .

Appx0169 ('924 Patent, 12:4-48) (emphasis added). Figure 8B is reproduced below:



Appx0150 ('924 Patent, Fig. 8B) (excerpted and annotated).  As explained by the

'924 Patent,

> Another version has a camera and requisite computer (and or transmission capability to an external computer) <u>in the handheld device, such as a cell phone or whatever.  When pointed at an object</u>, the camera can acquire the image of the object and/or any natural features or special datums on the object which are needed to perform the function desired.
>
> One function is just to acquire an image for transmission via for example the cell phones own connection.  <u>This is illustrated in FIG. 8B, where an image of object 849 acquired by camera 850 of cell phone 851 held by user 852</u> is transmitted over mobile phone link 853 to a remote location and displayed, for example.  While this image can be of the user, or someone or something of interest, for example a house, if a real estate agent is making the call, it is also possible to acquire features of an object and use it to determine something.
>
> For example, one purpose is recognition, for example <u>one can point at the object, and let the computer recognize what it is from its TV image.  Or point around in space</u> taking multiple TV frames aiming in different directions, and when computer recognition of a desired object in one of the images takes place, transmit certain data to the object.

Appx0169-0170 ('924 Patent, 12:62-13:16) (emphasis added).

Further still, the '924 Patent discloses that Figure 18 "illustrates an improved

<u>handheld computer</u> embodiment of the invention, in which the camera or cameras

14

may be used to look at objects, screens and the like as well as look at the user."

Appx0165 ('924 Patent, 3:11-14) (emphasis added).  Figure 18 is reproduced below:



Appx0163 ('924 Patent, Fig. 18) (excerpted and annotated).  As explained by the

'924 Patent,

> If one works with a screen on a wall, <u>one can aim the handheld unit</u> with camera at it, and determine its reference frame to the handheld unit.  Also can have two cameras operating together, one looking at wall thing, other at you (as 1902 and 1902a) in this manner, one can dynamically compare ref frames of the display to the human input means in determining display parameters. This can be done in real time, and if so <u>one can actually wave the handheld unit around</u> while still imputing accurate data to the display using ones fingers, objects or whatever.

Appx0176 ('924 Patent, 26:34-43) (emphasis added).

In all examples, the disclosed handheld device is designed for operation by a

user while being held in at least one of the user's hands.  Because the specification

repeatedly, consistently, and exclusively discloses the claimed "handheld device" as

a device designed for operation by a user while being held in at least one of the user's

hands, that is how a POSITA would understand that the term. Accordingly, that is the "ordinary meaning" of the term "handheld device."

The Board's Decision relied on extrinsic evidence in the form of a non-contemporaneous, generic dictionary for its definition of the "handheld device" term. *See* Appx0009 (Decision, p. 9) (citing The Random House Dictionary of the English Language — Unabridged (1983) ("1983 Dictionary")). According to that 1983 Dictionary, the general definitions of the adjective "handheld" include:

> 1) held in the hand or hands: *a handheld torch*.
> 2) small enough to be used or operated while being held in the hand or hands: *a handheld hair drier*.
> 3) Something small enough to be used or operated while held in the hand or hands.

*Id*. The Board relied specifically on the second definition for its position. *See id*.

As a threshold matter, in the Appeal Brief under 37 C.F.R. § 41.37, Appellant referenced the readily available online dictionary https://www.merriam-webster.com/. Appx0986 (Appeal Br., p. 11). That online dictionary defines "handheld" as "<u>designed to be operated</u> while being held in the hand." https://www.merriam-webster.com/dictionary/handheld (emphasis added). It also gives the specific example of "handheld computers." *Id*. In other words, the definition provided by that online dictionary is virtually identical to the "ordinary meaning" of the term "handheld device." But instead of relying on that readily available online dictionary cited by Appellant, the Board inexplicably selected a

16

dictionary from 1983, when handheld devices with computers (e.g., ordinary cellphones) were much less prevalent.  Regardless, this Court has held that the extrinsic evidence should be disregarded when it conflicts with the intrinsic record.  *See Phillips*, 415 F.3d at 1322-23.  Based on that alone, Appellant's construction should be favored over that of the Board.

Further, the Board concedes its construction partially overlaps with Appellant's construction:  "Appellant's argument is consistent with the second definition of 'handheld.'"  Appx0009 (Decision, p. 9).  That is because Appellant's construction is the cause while the Board's construction is the effect.  Specifically, the fact that a "handheld device" is a device "small enough to be used or operated while being held in the hand" does not happen by chance; it is designed as such.  The 1983 Dictionary expressly discloses the example of a "handheld hair dryer."  *See* Appx0009 (Decision, p. 9).  A "handheld hair dryer" is a hair dryer "small enough to be used or operated while being held in the hand" because the "hair dryer" is "designed for operation by a user while being held in at least one of the user's hands."

For the aforementioned reasons, the Board's improper construction of the "handheld device" term in independent claim 1 should be vacated.

### 2. The Board improperly construed the term "mobile phone" in claim 2.

Dependent claim 2 recites "a mobile phone." The "mobile phone" of claim 2 should have its ordinary meaning, which necessarily includes (i) being capable of answering a voice telephone call from another individual operating another phone device, and (ii) having an audio output (e.g., built-in speaker) so that the user of the claimed "mobile phone" can listen to the other individual (speaking into the other phone device) during the voice telephone call. There is no reasonable dispute that a POSITA would recognize that a "mobile phone" includes those two capabilities. At the time of the invention, voice calling was the main feature of a mobile phone. Accordingly, it would be illogical for the ordinary meaning of the "phone" portion of "mobile phone" to exclude such an audio output. Even if the specification of the '924 Patent does not expressly disclose features (i) and (ii), there is no need for such a disclosure: features (i) and (ii) are fundamental and well-known features/capabilities of an ordinary "mobile phone," and a "patent need not teach, and preferably omits, what is well known in the art." *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1534 (Fed. Cir. 1987).

According to the Board, "Appellant attempts to restrict the term 'mobile phone' to exclude mobile phones for deaf persons" and "[w]e therefore conclude that a . . . (POSITA) would have understood the claimed 'mobile phone' as including mobile phones for the hearing impaired." Appx0012 (Decision, p. 12). Appellant

disagrees. As a threshold matter, mobile phones for deaf persons would be lacking feature (ii). Further, mobile phones for deaf persons are highly specialized devices requiring LCD screens for displaying signing animation. *See* Appx1266 (*Liebermann*, 6:15-23). Considering the terms "deaf," "hearing impaired," "hearing loss," "hard of hearing," "sign language," and "signing" are completely absent from the '924 Patent, and considering that the '924 Patent expressly discloses "it might just say the message <u>to the user</u> of the phone <u>through the speaker of the cellphone</u>," Appx0170 ('924 Patent, 13:43-45) (emphasis added), a POSITA would not understand the term "mobile phone," as recited by claim 2, to include mobile phones for the deaf.

For the aforementioned reasons, the Board's improper construction of the "mobile phone" term in claim 2 should be vacated.

### B.    The Board Erred In Determining That *Liebermann* Anticipates Claims 1 And 2.

#### 1.    *Liebermann* does not anticipate independent claim 1.

*Liebermann* fails to disclose every limitation of independent claim 1.

##### a.    *Liebermann* fails to disclose the preamble of independent claim 1.

The preamble of claim 1 recites: "A handheld device comprising." Appx0176 ('924 Patent, 26:54). Both the Board and Appellant agree that the preamble is limiting. *See* Appx0009 (Decision, p. 9). As discussed above in Section VII.A.1, a

"handheld device" is a device designed for operation by a user while being held in at least one of the user's hands.

The fundamental disagreement between Appellant and the Board is whether *Liebermann* discloses a "handheld device," as required by the preamble of claim 1. *Liebermann* discloses "a portable transmitter/receiver . . . for use by a deaf person." Appx1266 (*Liebermann*, 5:62-63). Figure 6 of *Liebermann* is reproduced below:



Appx1253 (*Liebermann*, Fig. 6) (annotated). The "portable transmitter/receiver" of Figure 6 is "supported in a stable position and the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the

camera are converted into digital data for processing." Appx1266 (*Liebermann*, 6:2-7).

Liebermann also discloses that the deaf user should wear a different colored glove for each hand (e.g., green glove for the right hand, blue glove for the left hand) because "[m]any times the hands are overlapping or touching each other" during signing and there is a need to distinguish between the two hands and "discriminat[e] the hands from the background." *See* Appx1269 (*Liebermann*, 12:34-52). The use of gloves is shown in *Liebermann's* Figure 13A, reproduced below:



Appx1260 (*Liebermann*, Fig. 13A). As shown, the user is wearing gloves and the user's two hands are being captured by the "portable transmitter/receiver." *See* Appx1265 (*Liebermann,* 4:42-44) ("FIGS. 13 illustrates a user of the device wearing

21

special gloves to enhance the ability of the system to identify the signing of the deaf person").

The Board/Examiner mapped the "portable transmitter/receiver" in *Liebermann's* Figure 6 to the claimed "handheld device." Appx0914 (Final OA, p. 21). But *Liebermann's* "portable transmitter/receiver" is <u>not</u> a handheld device because it is <u>not</u> designed for operation by a user while being held in at least one of the user's hands. Again, *Liebermann* discloses the "device is supported in a <u>stable</u> position and the deaf person is positioned so that the camera lens 10 will record the signing movement of the <u>hands</u> and fingers and body and facial motions and expressions." Appx1266 (*Liebermann*, 6:2-6) (emphasis added). *Liebermann* also discloses wearing a different color glove on each hand because "[m]any times the <u>hands</u> are overlapping or touching each other." Appx1269 (*Liebermann*, 12:43-44) (emphasis added). Because *Liebermann's* "portable transmitter/receiver" is recording, with a camera, the movement of <u>both "hands"</u> of the deaf person, *Liebermann's* "portable transmitter/receiver" is <u>not</u> designed for operation by a user while being held in at least one of the user's hands, and thus *Liebermann's* "portable transmitter/receiver" is <u>not</u> a handheld device, as claim 1 requires. And "portable" does not equate to "handheld." There are many "portable" things in the world, for example a suitcase, that cannot be "handheld."

Further, as shown in Figure 6, the "base portion 13" of *Liebermann's* "portable transmitter/receiver" is designed to rest on a flat/stable surface that can support *Liebermann's* "portable transmitter/receiver" in "a stable position." Appx1266 (*Liebermann*, 5:65-6:6). Because a user's hand is not a flat/stable surface, *Liebermann's* "portable transmitter/receiver" would not be placed there. That only reinforces that *Liebermann's* "portable transmitter/receiver" is not the claimed "handheld device."

According to the Board/Examiner, there is "insufficient teaching, requirement or suggestion [in *Liebermann*] of placing the portable transmitter/receiver telephone 8 on a flat surface for stability." Appx0932 (Final OA, p. 39). Even if this is true, *Liebermann* still does not disclose that a user's hand (or even multiple hands) can keep *Liebermann's* "device [] supported in a stable position." Appx1266 (*Liebermann*, 6:2-6). At bottom, the term "stable position" appears exactly once within *Liebermann*, to describe a device that is designed to be positioned on a flat surface during use. Appx1266 (*Liebermann*, 6:2-6); *see also* Appx1253 (*Liebermann,* Fig. 6). In the very same sentence, *Liebermann* also discloses the "deaf person is positioned so that camera lens 10 will record the signing movement of the <u>hands</u>." *Id*. (emphasis added). If "camera lens 10" is recording both "hands" of the deaf user, the device is not being held in either of the deaf user's hands.

Accordingly, the "stable position" does not correspond to holding *Liebermann's* "portable transmitter/receiver" in one hand.

According to the Board/Examiner, "Liebermann provides no teaching, requirement or suggestion that both hands are always required for signing. To support the Examiner's position, the Examiner finds that Liebermann discloses a full image being taken by the portable transmitter/receiver telephone 8 of a single hand/right half of the body." Appx0932 (Final OA, p. 39) (citing Appx1261 (*Liebermann*, Fig. 14A, 14B)). But even if that is true, *Liebermann* still fails to disclose that *Liebermann's* "portable transmitter/receiver" is held in the user's free hand (i.e., non-signing hand). Indeed, there is no indication in Appx1261 (*Liebermann,* Figs. 14A and 14B), which allegedly show the user performing "finger spelling" with his right hand, that *Liebermann's* "portable transmitter/receiver" is in the user's left hand. Again, *Liebermann's* "portable transmitter/receiver" is not a handheld device. That is contrary to what claim 1 requires.

As discussed above in Section VII.A.1, the Board improperly construed the term "handheld device" to mean a device "small enough to be used or operated while being held in the hand." Appx0014 (Decision, p. 14); *see also* Appx0009 (Decision, p. 9). But even if that construction is proper, the Board provided no evidence that *Liebermann's* "portable transmitter/receiver" meets that requirement. *Liebermann* never discloses its "portable transmitter/receiver" (the Board-identified "handheld

device") is small enough to be held in a user's hand. While the Board cites to Figure

6 of *Liebermann* to support that characterization, Figure 6 merely shows

*Liebermann's* "portable transmitter/receiver" without any measurements and

without a reference item of known size. *See* Appx0014 (Decision, p. 14) (citing

Appx1253 (*Liebermann,* Fig. 6)). Accordingly, it is impossible to determine the

dimensions of *Liebermann's* "portable transmitter/receiver" from *Liebermann's*

Figure 6. And the Board's reliance on Figure 6 is impermissible under this Court's

precedent. *See Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l*, 222 F.3d 951, 956

(Fed. Cir. 2000) ("Under our precedent, however, it is well established that patent

drawings do not define the precise proportions of the elements and may not be relied

on to show particular sizes if the specification is completely silent on the issue.").

   *Liebermann* never discloses the dimensions or weight of its "portable

transmitter/receiver." The Board's citation to the Oral Hearing transcript also does

not provide the required evidence. *See* Appx0015 (Decision, p. 15) (citing

Appx1186-1187 (Oral Hr'g Tr., pp. 3-4)). Accordingly, the Board's conclusion that

*Liebermann's* "portable transmitter/receiver" is "small enough to be used or

operated while being held in the hand" is pure speculation. That falls drastically

short of the requirements for anticipation: "A claim is anticipated only if each and

every element as set forth in the claim is found, either <u>expressly or inherently</u>

described, in a single prior art reference." *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987) (emphasis added).

According to the Board/Examiner, *Liebermann* "discloses a portable transmitter/receiver telephone 8 for the deaf which is a 'cellular telephone' unit. The Examiner finds that one of ordinary skill in the art would recognize that a cellular telephone is recognized as a handheld mobile radiotelephone." Appx0931-0932 (Final OA, pp. 38-39) (cleaned up). While an ordinary cellphone may be recognized as "handheld" when operated by a hearing user, *Liebermann's* "portable transmitter/receiver" is not an ordinary cellphone. But more importantly, there are no embodiments disclosed in *Liebermann* that show *Liebermann's* "portable transmitter/receiver" being operated while being held in a user's hand. The fact that the title of *Liebermann* is, in part, "telephone for the deaf," Appx1247 (*Liebermann*, Title) is of no import. Nowhere in *Liebermann* is the "portable transmitter/receiver" used by a person holding it. The Board's/Examiner's position contradicts the express teachings of *Liebermann* that the "portable transmitter/receiver" must be in a "stable position" when in use. The Board's/Examiner's position also contradicts the undisputed fact that deaf users use both hands to communicate via sign language, so the device cannot be "handheld" during use.

For the aforementioned reasons, the Board's findings that *Liebermann* discloses the preamble of claim 1 are not supported by substantial evidence.

26

Accordingly, the Board's determination that *Liebermann* anticipates independent claim 1 should be vacated or reversed.

### b.    *Liebermann* fails to disclose claim element 1[e].

Claim element 1[e] recites "a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view," whereas claim element 1[d] recites "a first camera oriented to view a user of the handheld device." Accordingly, the plain language of the claim requires that the "handheld device" have a first camera and a second camera, and that the fields of view associated with the first and second cameras have zero overlap.

*Liebermann* fails to disclose a "handheld device" having at least two cameras, as claim element 1[e] requires. While attempting to meet the multiple camera requirement, the Board/Examiner referenced Appx1270 (*Liebermann*, 13:4-20). *See* Appx0016 (Decision, p. 16) (citing Appx0916 (Final OA, p. 23)). That cited passage discloses an "<u>installation</u>" with "more than one camera." *See* Appx1270 (*Liebermann*, 13:4-20). *Liebermann* uses the term "installation" for its fixed (i.e., non-portable) devices for the deaf: "FIGS. 5a-5c are perspective views of a deaf person's receiver/transmitter <u>installation</u> embodying the present invention in three different forms using a personal computer and video camera, using a television set with a video camera, and as a public telephone kiosk." Appx1265 (*Liebermann*,

4:15-19) (emphasis added). But *Liebermann* <u>never</u> uses the term "installation" for its "portable transmitter/receiver" in Figure 6 (the Board/Examiner-identified "handheld device"). *See* Appx1265 (*Liebermann*, 4:20-21). Accordingly, that cited passage is disclosing a fixed (i.e., non-portable) device with multiple cameras, <u>not</u> *Liebermann's* "portable transmitter/receiver" (the Board/Examiner-identified "handheld device") with multiple cameras. Thus, *Liebermann* does not disclose the requirements of claim element 1[e].

Even if the cited passage disclosed that *Liebermann's* "portable transmitter/receiver" has multiple cameras, the cited passage also discloses that more than one camera "allow[s] the <u>signing person 'free' movement in his or her environment</u> to track down spatial positions in that environment." Appx1270 (*Liebermann*, 13:5-8) (emphasis added). That would mean *Liebermann's* "portable transmitter/receiver" (allegedly with multiple cameras) is stationary, while the "signing person" can move around (e.g., walk around) his or her environment and continue to sign, and still have the signing captured by the cameras. But that would also mean *Liebermann's* "portable transmitter/receiver" (allegedly with multiple cameras) is not designed to be held by the "signing person" during operation (i.e., it is not a "handheld device"). In fact, if the "signing person" has been granted "'free' movement in his or her environment," *Liebermann's* "portable transmitter/receiver" (allegedly with multiple cameras) is likely beyond the physical reach of the "signing

person" who is moving around. At bottom, all of this confirms that *Liebermann's* "portable transmitter/receiver" (allegedly with multiple cameras) is not designed for operation by a user while being held in at least one of the user's hands. Thus, *Liebermann's* "portable transmitter/receiver" is <u>not</u> a "handheld device" with two cameras, as claim element 1[e] requires.

Further, claim element 1[e] requires that the two cameras have "non-overlapping fields of view." Appx0176 ('924 Patent, 26:61-62). But *Liebermann* does not even discuss "field of view," much less disclose any embodiment describing, discussing or analyzing fields of view. According to the Board/Examiner, *Liebermann* "discloses 'more than one camera' may be utilized with each camera covering a separate <u>angle</u>, operating independently of the other(s), in which <u>angle</u> overlap may or may not be permitted." Appx0016 (Decision, p. 16) (quoting Appx0916 (Final OA, p. 23)) (emphasis added). But the meaning of "angle" and its relationship, if any, to "field of view" is unclear and undisclosed. That falls drastically short of the requirements for anticipation: "Anticipation requires that a single reference describe the claimed invention with sufficient precision and detail to establish that the subject matter existed in the prior art. For this reason, it has long been understood that ambiguous references do not, as a matter of law, anticipate a claim." *Wasica Fin. GmbH v. Cont'l Auto. Sys.*, 853 F.3d 1272,

1284 (Fed. Cir. 2017) (cleaned up).  Accordingly, *Liebermann* does not disclose claim element 1[e].

Further, claim element 1[e] requires that the second camera be "oriented to view an object <u>other than</u> the user of the [handheld] device" while claim element 1[d] requires that the first camera be "oriented to view [the] user of the handheld device."  Appx0176 ('924 Patent, 26:57-60) (emphasis added).  As discussed in the Appeal Brief, the phrase "other than" means "with the exception of."  Appx0986-0987     (Appeal     Br.,     pp.     11-12)     (citing     https://www.merriam webster.com/dictionary/other%20than).     Synonyms for "other than" include "except," "except for," "excluding," and "exclusive of."  *See id*.  Thus, under the plain meaning of the phrase "other than," the field of view of the second camera must exclude the user.  *See id*.

The purpose of the camera(s) in *Liebermann* is to capture images of the deaf person signing.  *See* Appx1265 (*Liebermann*, 3:28-30 ("a video apparatus for observing and digitizing the signing motions, and means for translating the digitized motions into words and phrases"), 4:60-61 ("the deaf person uses sign language in front of a device containing a video camera")), Appx1266 (*Liebermann*, 6:4-6 ("camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions"), 6:42-46 ("[t]he deaf person uses sign language in front of the transmitter/receiver device containing the camera.  The

images captured by the camera are of the finger and hand motions and of body motions and of facial expressions and motions")).  Accordingly, even if *Liebermann* discloses a "handheld device" comprising a "first camera" and a "second camera" with "non-overlapping fields of view," the different cameras in *Liebermann* would be oriented to view different, non-overlapping portions of the signing user.  In other words, both cameras would still be oriented to view the user.

For example, as shown in *Liebermann's* Figure 14A, one camera could be oriented to view the right side of the user, while another camera (not shown) could be oriented to view the left side of the user.  Appx1261 (*Liebermann,* Fig. 14A). *Liebermann* even discloses "[i]ntegration of input from multiple camera[s] is performed" to capture the user in his or her environment.  Appx1270 (*Liebermann*, 13:15).  Accordingly, even if *Liebermann* discloses a "handheld device" comprising a first camera and a second camera, *Liebermann's* system cannot perform the claimed function of "being oriented to view an object other than the user," as claim element 1[e] requires.

For the aforementioned reasons, the Board's findings that *Liebermann* discloses claim element 1[e] are not supported by substantial evidence. Accordingly, the Board's determination that *Liebermann* anticipates independent claim 1 should be vacated or reversed.

### 2. *Liebermann* does not anticipate claim 2.

As discussed above, *Liebermann* fails to anticipate claim 1. Claim 2 depends from and adds limitations to independent claim 1. Accordingly, for the reasons set forth above regarding independent claim 1, the Board's determination that *Liebermann* anticipates claim 2 is not supported by substantial evidence and should be vacated or reversed.

Further, as discussed above in Section VII.A.2, the "mobile phone" of claim 2 should be given its ordinary meaning, which necessarily includes (i) being capable of answering a voice telephone call from another individual operating another phone device, and (ii) having an audio output (e.g., built-in speaker, earphone jack, etc.) so that the user of the claimed "mobile phone" can listen to the other individual (speaking into the other phone device) during the voice telephone call. The Board/Examiner mapped *Liebermann's* "portable transmitter/receiver" in Figure 6 to the claimed "mobile phone" of claim 2. Appx0919 (Final OA, p. 26). That is incorrect.

*Liebermann's* "portable transmitter/receiver" is a specialized telephone for the deaf. *See* Appx1266 (*Liebermann*, 5:62-63) ("A portable transmitter/receiver . . . for use by a deaf person is shown in Fig. 6.") (emphasis added). *See also* Appx1247 (*Liebermann*, Title) ("Telephone for the deaf and method of using same") (emphasis added). As discussed above in Section VII.A.2, a POSITA would not interpret the

claimed "mobile phone" to include mobile phones for the deaf. Further, *Liebermann's* "portable transmitter/receiver" does not include an audio output for the user (i.e., a deaf person) to listen to the other individual (speaking into the other phone device) during a voice telephone call. *Liebermann* is unsurprisingly silent regarding this specialized "portable transmitter/receiver" including an audio output for the deaf user. Instead, *Liebermann's* "portable transmitter/receiver" has an "LCD display panel" for communicating with the deaf user. *See* Appx1266 (*Liebermann*, 6:15-23) ("verbal expressions are translated by the artificial intelligence into digital data for signs. These signs are displayed on the LCD panel 14."). Accordingly, *Liebermann* does not disclose a "mobile phone" as recited by claim 2, and thus does not anticipate claim 2.

The Board/Examiner "finds that Liebermann explicitly discloses the portable transmitter/receiver telephone 8 comprising a microphone and speaker to function as a <u>communicator</u> to 'double the usefulness of the device.'" Appx0938 (Final OA, p. 45) (quoting Appx1267 (*Liebermann*, 7:29-39)) (emphasis added). That is misleading. *Liebermann* discloses

> When the phone for the deaf is equipped with a microphone and a speaker instead of, or in addition to a second telephone channel, it may be turned into a <u>communicator</u> . . . The <u>communicator</u> enables the deaf person to conduct a "conversation" with any normally hearing person in the <u>close proximity</u>. The signing motion of the deaf person are <u>processed by the center</u> and is transmitted back to the device as a normal voice transmission which the speaker renders as speech to the normally hearing person.

Appx1267 (*Liebermann*, 7:33-40) (emphasis added). Accordingly, the built-in "speaker" is not involved when a voice telephone call is received from another individual operating another phone device, and the built-in "speaker" does not render the voice of the other individual (speaking into the other phone device) during the voice telephone call. Accordingly, even when *Liebermann's* "portable transmitter/receiver" is acting as a "communicator," *Liebermann's* device still does not meet requirements (i) and (ii) of the claimed "mobile phone." Thus, *Liebermann* fails to anticipate claim 2.

For the aforementioned reasons, the Board's finding that *Liebermann* discloses the claimed "mobile phone" is not supported by substantial evidence. Accordingly, the Board's determination that *Liebermann* anticipates claim 2 should be vacated or reversed.

### C.    The Board Erred In Determining That *Liebermann* Renders Obvious Claims 1 And 2.

#### 1.    *Liebermann* is non-analogous art.

*Liebermann* is non-analogous art and thus it cannot be used in an obviousness rejection of any claim of the '924 Patent. A reference qualifies as prior art for an obviousness determination only when it is analogous to the claimed invention. *See In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011). Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor,

34

regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved. *Donner Technology, LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1359 (Fed. Cir. 2020).

> a.    ***Liebermann* fails the first test for analogous art.**

According to the Board, "Liebermann is directed to an input device for optically sensing human positions or orientations." Appx0019 (Decision, p. 19). That is an improper interpretation of *Liebermann's* field of endeavor because it does not expressly include "phones for the deaf." *Liebermann* is replete with references to "phones for the deaf:" *Liebermann's* Title, Abstract, "Background Art" section, "Brief Description of the Drawings" section, "Detailed Description" section, drawings, and independent claims all disclose or reference phones for the deaf. *See, e.g.*, Appx1247 (*Liebermann*, Title ("Telephone for the deaf and method of using same"), Abstract ("An electronic communications system for the deaf") (emphasis added)), Appx1264 (*Liebermann*, 1:10-15) ("The present invention relates to electronic apparatus for communication by the deaf, and, more particularly, to such apparatus which enables the deaf person to communicate through use of sign language.") (emphasis added), Appx1265 (*Liebermann*, 3:14-18 ("It is also an object to provide such an electronic communication system wherein the deaf person and the person communicating with the deaf person do so through a central facility")

(emphasis added), 4:12-17 ("FIG. 4 is a schematic presentation of the several steps in the intervention and operation of the processing center when <u>a call is received by the deaf person's telephone</u>; FIGS. 5a-5c are perspective views of a <u>deaf person's receiver/transmitter installation</u> embodying the present invention") (emphasis added)), Appx1266 (*Liebermann* 6:64-65 ("The normally hearing person who <u>calls a deaf person</u> dials the deaf person's phone number.") (emphasis added), Appx1270 (*Liebermann*, 13:37-38 ("The system may function as a <u>telephone for the deaf</u>") (emphasis added), independent claim 1 ("An electronic communications system for the <u>deaf</u>") (emphasis added), independent claim 12 ("In a method for electronic communication for the <u>deaf</u>") (emphasis added), independent claim 26 ("An electronic communications system <u>for the deaf</u>") (emphasis added)).  In fact, the term "deaf" appears <u>more than 120 times</u> within *Liebermann*.  Accordingly, *Liebermann's* field of endeavor must expressly include "phones for the deaf."  *See Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1380-81 (Fed. Cir. 2019) (the court finding the PTAB's reliance on the title, specification, and claims of a prior art reference to determine the reference's field of endeavor reasonable).

In contrast, Appellant maintains that the field of endeavor for the '924 Patent is controlling functions of handheld devices using images captured by the handheld devices.  *See, e.g.*, Appx0140 ('924 Patent, Title), Appx0169-0170 ('924 Patent, 11:65-12:12, 12:62-13:47), Appx0176 ('924 Patent, 25:40-26:43, independent claim

1), Appx0150 ('924 Patent, Figs. 8A, 8B), Appx0163 ('924 Patent, Fig. 18). Phones

for the deaf do not belong to this field of endeavor. In fact, the terms "deaf," "hearing

impaired," "hearing loss," and "hard of hearing" are completely absent from the '924

Patent. Thus, *Liebermann* fails the first test for analogous art.

### b. *Liebermann* fails the second test for analogous art.

Regarding the second test for analogous art, as explained by this Court,

> the dividing line between reasonable pertinence and less-than-reasonable pertinence is context dependent, it ultimately rests on the extent to which the reference of interest and the claimed invention relate to a similar problem or purpose . . . Thus, when addressing whether a reference is analogous art with respect to a claimed invention under a reasonable-pertinence theory, the problems to which both relate must be identified and compared.

*Donner Tech., LLC*, 979 F.3d at 1359 (emphasis added). In other words, under the

second test for analogous art, the Board/Examiner must identify the problem being

solved by the '924 Patent, identify the problem being solved by *Liebermann*, and

compare the two problems.

The Board did not even identify the problem being solved by *Liebermann*.

*See* Appx0021-0022 (Decision, pp. 21-22). But *Liebermann* states that "deaf

persons have <u>substantial difficulties</u> in communicating with persons at remote

locations," Appx1264 (*Liebermann*, 1:30-31 (emphasis added)), and then discloses

solutions to the "substantial difficulties" including "an electronic communication

system wherein the deaf person and the person communicating with the deaf person

do so through a central facility containing a translating means for processing elements of digitized image data" and "a system in which a hearing person may have his speech converted into digitized signing motions which are displayed to the deaf person." Appx1265 (*Liebermann*, 3:14-24). Accordingly, *Liebermann* is directed towards solving the problems faced by deaf persons trying to communicate with other persons at remote locations.

According to the Board, "Appellant's claims define the particular problem of the '924 Patent's claim 1 as performing a function based on a camera output." Appx0021 (Decision, p. 21). Even assuming *arguendo* the Board-identified problem is proper, as discussed above, that is not the problem to which *Liebermann* relates, thus *Liebermann* fails the second test for analogous art.

Because *Liebermann* fails both tests for analogous art, it is non-analogous art and cannot be cited in any obviousness rejections. Accordingly, the Board's determinations that *Liebermann*, either alone or in combination with another reference, renders obvious claims 1-14 should be vacated or reversed.

### 2.    *Liebermann* does not render obvious independent claim 1.

*Liebermann* fails to teach or suggest every limitation of independent claim 1.

#### a.    *Liebermann* fails to teach or suggest the preamble of independent claim 1.

Neither the Board nor the Examiner provides any arguments regarding the preamble of claim 1 that are specific to 35 U.S.C. § 103. *See* Appx0022-0023

(Decision, pp. 22-23), Appx0913-0918 (Final OA, pp. 20-25).  Appellant asserts that *Liebermann* fails to teach or suggest the preamble of claim 1 for all the reasons set forth above in Section VII.B.1.a.

Accordingly, the Board's findings that *Liebermann* teaches or suggests the preamble of claim 1 are not supported by substantial evidence, and the Board's determination that *Liebermann* renders obvious independent claim 1 should be vacated or reversed.

**b.    *Liebermann* fails to teach or suggest claim element 1[e].**

*Liebermann* fails to teach or suggest claim element 1[e] for all the reasons set forth above in Section VII.B.1.b.  Further, to meet the requirements of claim element 1[e], the Board/Examiner argued that a "person of ordinary skill in the art would be motivated to incorporate a second camera . . . such a modification would have provided a that [*sic*] can effectively communicat[e] in <u>any environment independent of a user's movement</u>."  Appx0917 (Final OA, p. 24) (emphasis added).  As a threshold matter, the meaning of that sentence is not completely clear.  But the Examiner's argument seems to imply that the proposed modification gives the user considerable movement in his or her environment, including movement where *Liebermann's* "portable transmitter/receiver" is beyond the physical reach of the user.  Again, that only reinforces that *Liebermann's* "portable transmitter/receiver" is not designed for operation by a user while being held in at least one of the user's

hands, and thus *Liebermann's* "portable transmitter/receiver" is not the claimed "handheld device."

Accordingly, the Board's findings that *Liebermann* teaches or suggests claim element 1[e] are not supported by substantial evidence, and the Board's determination that *Liebermann* renders obvious independent claim 1 should be vacated or reversed.

### 3.    *Liebermann* does not render obvious claim 2.

*Liebermann* does not render obvious claim 1.  Claim 2 depends from and adds limitations to claim 1.  Accordingly, for the reasons set forth above regarding claim 1, the Board's determination that *Liebermann* renders dependent claim 2 obvious is not supported by substantial evidence and should be vacated or reversed.

Further, neither the Board nor the Examiner provides any arguments regarding claim 2 that are specific to 35 U.S.C. § 103.  *See* Appx0022 (Decision, p. 22), Appx0919 (Final OA, p. 26).  Appellant asserts that *Liebermann* fails to teach or suggest the claimed "mobile phone" for all the reasons set forth above in Section VII.B.2.

Accordingly, the Board's determination that *Liebermann* renders dependent claim 2 obvious is not supported by substantial evidence and should be vacated or reversed.

**D.    The Board Erred In Determining That *Liebermann* And *Sears* Render Obvious Dependent Claims 6, 7, 8, and 10.**

**1.    *Sears* is non-analogous art.**

*Sears*, like *Liebermann*, is non-analogous art and thus *Sears* cannot be used in an obviousness rejection of any claim of the '924 Patent.

**a.    *Sears* fails the first test for analogous art.**

According to the Board, "Appellant too narrowly interprets Sears' field of endeavor to limit it to be 'an electronic reading system.'" Appx0024 (Decision, p. 24). The Board's position is contrary to the *Sears* reference itself, which is replete with references to "electronic reading machines:" *Sears'* Title, Abstract, "Technical Field" section, "Background Art" section, "Summary of the Invention" section, and independent claims all disclose or reference electronic reading machines. *See* Appx1273 (*Sears*, Title, Abstract ("An optical-input print reading device with voice output for people with impaired or no vision") (emphasis added)), Appx1280 (*Sears*, 1:23-29) ("The present invention relates to an electronic reading system for converting text to synthesized speech") (emphasis added), Appx1281 (*Sears*, 3:12-15 ("It was our intention to solve the problems of the prior art, both with regards to OCR-based electronic reading machines as well as electronic magnifying systems") (emphasis added), 4:12-19 ("The present invention is also directed to an electronic reading apparatus for converting text to spoken words for a user.") (emphasis added)), Appx1293 (*Sears*, independent claim 1) ("A method for electronically

41

reading text") (emphasis added), Appx1294 (*Sears*, independent claim 31 ("An electronic reading apparatus for converting text to spoken words for a user") (emphasis added), independent claim 33 ("A method for electronically reading aloud text under interactive control by a user with a computer-based system") (emphasis added)). It was improper for the Board to disregard the substance of the *Sears* reference to maintain a baseless position. Accordingly, *Sears'* field of endeavor is electronic reading machines. *See Airbus S.A.S.*, 941 F.3d at 1380-81 (the court finding the PTAB's reliance on the title, specification, and claims of a prior art reference to determine the reference's field of endeavor reasonable).

Further, the term "optical character recognition" or "OCR" appears more than 40 times in *Sears*, and the terms "text-to-speech," "text-to-voice," "text to spoken word," or "speech synthesis" appear at least 10 times in *Sears*. It is well-known that electronic reading machines perform these processes (i.e., "OCR," "text-to-speech," etc.). *See* Appx1280 (*Sears*, 1:45-51). The numerous references to "OCR," "text-to-speech," etc., reinforce that *Sears'* field of endeavor is electronic reading machines.

In contrast, Appellant maintains that the field of endeavor for the '924 Patent is controlling functions of handheld devices using images captured by the handheld devices. *See, e.g.*, Appx0140 ('924 Patent, Title), Appx0169-0170 ('924 Patent, 11:65-12:12, 12:62-13:47), Appx0176 ('924 Patent, 25:40-26:43, independent claim

42

1), Appx0150 ('924 Patent, Figs. 8A, 8B), Appx0163 ('924 Patent, Fig. 18). Electronic reading machines do not belong to that field of endeavor. Thus, *Sears* fails the first test for analogous art.

### b.     *Sears* fails the second test for analogous art.

As discussed above, under the second test for analogous art, the Board/Examiner must identify the problem being solved by the '924 Patent, identify the problem being solved by *Sears*, and compare the two problems.

The Board did not even identify the problem being solved by *Sears*. *See* Appx0025-0026 (Decision, pp. 25-26). But *Sears* expressly discloses:

> reading machine systems, unfortunately, suffer from a variety of operational insufficiencies that limit their effectiveness. For instance, before the reading machine can begin to read a page, the user must typically wait over a minute. . .
>
> Another insufficiency of conventional reading machines is that scanners are limited in the size of page they can process, and reading a newspaper page would require multiple passes through the scanner. Furthermore, the keypad navigation of current reading machines requires that the user move through the text in the same order in which the computer organizes the data . . .
>
> For example, the mechanisms [in conventional magnifying systems] for tracking lines of text are often difficult to use, since they are manually-guided mechanical systems that require relatively precise and steady hand movements to guide the movement.
>
> This requirement is difficult for certain people, especially the elderly who have fine motor problems, but also because it involves cognitive feedback control at the same time that considerable effort is being devoted to interpreting the images on the screen. Furthermore, when short columns of text are being read, the user must engage in

frequent control of both vertical and horizontal mechanical guiding systems. Also, because of the small field of view of the camera and the limited movement of the mechanical system, the page must often be repositioned on the mechanical guides. Because of the small field of view of these systems, it is difficult for the user to understand the overall structure of text and graphics on a complexly formatted page. In addition, the system depends entirely on the user's vision, even though this vision may be adequate only for very slow reading . . .

It was <u>our intention to solve the problems of the prior art, both with regards to OCR-based electronic reading machines as well as electronic magnifying systems,</u> that gave rise to the current invention.

Appx1280-1281 (*Sears*, 1:66-3:15) (emphasis added). Accordingly, *Sears* is directed towards solving the problems associated with existing electronic reading machines and magnifying systems.

According to the Board, "Appellant's claims define the particular problem of the '924 Patent's claim 1 as optically sensing human positions or orientations." Appx0026 (Decision, p. 26). But that is far too generic a problem statement. Appellant asserts the problems to which the '924 Patent relates include determining touchless user input commands to handheld devices and controlling functions within handheld devices. *See, e.g.*, Appx0140 ('924 Patent, Title), Appx0169-0170 ('924 Patent, 11:65-12:12, 12:62-13:47), Appx0176 ('924 Patent, 25:40-26:43, independent claim 1), Appx0150 ('924 Patent, Figs. 8A, 8B), Appx0163 ('924 Patent, Fig. 18). Those are not the problems to which *Sears* relates, and thus *Sears* fails the second test for analogous art.

44

Because *Sear*s fails both tests for analogous art, it is non-analogous art and cannot be cited in any obviousness rejections. Accordingly, the Board's determination that the combination of *Sears* and *Liebermann* renders obvious claims 6-10 and 12 should be vacated or reversed.

### 2. *Liebermann* and *Sears* do not render obvious claim 6.

As discussed above, *Liebermann* does not render claim 1 unpatentable. *Sears* does not cure the deficiencies of *Liebermann* with respect to claim 1. Claim 6 depends from and adds limitations to claim 1. Accordingly, for the reasons set forth above regarding claim 1, the Board's determination that *Liebermann* and *Sears* render claim 6 obvious is not supported by substantial evidence and should be vacated or reversed.

Further, dependent claim 6 recites "[t]he handheld device of claim 1 wherein the computer is operable to determine a gesture based on at least one of the first camera output and the second camera output." Appx0177 ('924 Patent, 27:7-9). The "computer" is a component of the "handheld device." *See* Appx0176 ('924 Patent, 26:54-56*)*. As discussed above, the Board/Examiner mapped *Liebermann's* "portable transmitter/receiver" to the claimed "handheld device." Appx0914 (*See* Final OA, p. 21).

Although the Board/Examiner acknowledged that *Liebermann's* "portable transmitter/receiver" itself does not "determine a gesture," as claim 6 requires, the

Board/Examiner argued that *Liebermann* teaches "a separate central processing facility (i.e., the Center) to perform the . . . processing of gesturing." Appx0923 (Final OA, p. 30). The Board/Examiner also argued that *Sears* teaches "the processing of gesturing . . . locally instead of on a separate [computer]." *See* Appx0924 (Final OA, p. 31). To meet claim 6, the Board/Examiner found it would have been obvious, based on those teachings of *Liebermann* and *Sears*, to incorporate the "processing of gesturing" into *Liebermann's* "portable transmitter/receiver" instead of *Liebermann's* "central processing facility (i.e., the Center)." *See* Appx0924-0925 (Final OA, p. 31-32).

Accordingly, the fundamental disagreement between Appellant and the Board is whether it would be obvious to relocate *Liebermann's* "sophisticated computer equipment, databases, and neural networks," Appx1266 (*Liebermann*, 5:37-38), from *Liebermann's* "central processing facility" (also referred to as "the Center") to *Liebermann's* "portable transmitter/receiver." Appellant asserts it is not.

> a.    **The Board's combination of *Liebermann* and *Sears* relies on impermissible hindsight and changes *Liebermann's* principle of operation.**

Appellant asserts that the Board's/Examiner's proposed combination would not be obvious, especially when obviousness must be evaluated "at the time the invention was made." 35 U.S.C. § 103(a) (pre-AIA). The effective filling date of the '924 Patent is July 8, 1999, so the Board's/Examiner's rejection rests on the

46

assertion that it would have been obvious in 1999 to condense the "sophisticated equipment, databases, and neural networks" that occupied a physical building (i.e., the "Center") into *Liebermann's* "portable transmitter/receiver" (the Examiner Board-identified "handheld device"). That assertion is untenable, which is why the Examiner cites no evidence in support. *See* Appx0922-0925 (Final OA, pp. 29-32). The Examiner's/Board's assertion is nothing more than impermissible hindsight.

Further, *Liebermann* is a distributed system in which the processing, including gesture recognition, occurs in the physically separate "central processing facility." Figures 2 and 3 of *Liebermann* are reproduced below:



Appx1249 (*Liebermann*, Fig. 2) (annotated).



Appx1250 (*Liebermann*, Fig. 3). *Liebermann* discloses it is an "<u>object</u> [of the invention] to provide such an electronic communication system wherein the deaf person and the person communicating with the deaf person <u>do so through a central facility</u> containing a translating means for processing elements of digitized image data." Appx1265 (*Liebermann*, 3:14-18) (emphasis added). *Liebermann's* "<u>present invention</u> includes <u>a processing center</u> containing the sophisticated computer equipment, databases and neural networks to effect the signing/verbal translations, and the communications are <u>conducted through this center</u>. As seen in FIG. 2, a caller (or receiver) and deaf person are <u>actually communicating through such a center</u>." Appx1266 (*Liebermann*, 5:35-41) (emphasis added). The "<u>center</u> receives

the input from the video device of the deaf person and provides an audible output to the hearing person who is using a telephone. The hearing person speaks into the telephone and the center provides a video output to the video device of the deaf person." Appx1266 (*Liebermann*, 5:53-47) (emphasis added). *See also* Appx1266 (*Liebermann*, 6:50-54) ("the resulting information is sent as data on a regular and designated phone line using an internal modem in the device to the data processing center. The rest of the processing is completed at the center.") (emphasis added). Even when *Liebermann's* "portable transmitter/receiver" is acting as a "communicator," the "central processing facility" is still required: "The communicator enables the deaf person to conduct a 'conversation' with any normally hearing person in the close proximity. The signing motion of the deaf person are processed by the center and is transmitted back to the device as a normal voice transmission." Appx1267 (*Liebermann*, 7:35-38) (emphasis added).

In short, the existence and use of *Liebermann's* "central processing facility" as a necessary intermediary between the deaf user and the hearing user is found in every disclosed embodiment. Thus, the "central processing facility," its functions, and the exchange of data between the "central processing facility" and the deaf user and the hearing user are key features of *Liebermann's* distributed architecture and thus key features of *Liebermann's* principle of operation. Modifying *Liebermann* by abolishing the "central processing facility," as proposed by the Board/Examiner,

would change *Liebermann's* principle of operation. Accordingly, the required modification of *Liebermann* is far too drastic to be considered obvious: combinations that change the "basic principles under which the [prior art] was designed to operate" fail to support a conclusion of obviousness. *In re Ratti*, 270 F.2d 810, 813 (CCPA 1959).

The Board argued that *Liebermann's* "central processing facility" is optional and thus not part of *Liebermann's* principle of operation. *See* Appx0028-0029 (Decision, pp. 28-29). According to the Board,

> We find Liebermann's independent claim 12, for example, to be silent as to the argued intermediary "central processing facility" . . . although Liebermann's dependent claim 16 recites "transmitting . . . to a central station where said <u>translating</u> steps are performed," the independent claim from which it depends (method claim 12) does not recite any such "central station." Under the <u>doctrine of claim differentiation</u>, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim . . . Thus, the "central station" of Liebermann's dependent claim is an option in the independent claim, not a requirement.

Appx0028-0029 (Decision, pp. 28-29) (emphasis added). That position is wholly improper.

As a threshold matter, it is telling that the Board could not find a single instance in *Liebermann's* specification where the "central processing facility" is optional. Instead, the Board had to rely on one of *Liebermann's* independent claims

50

which, as the Board conceded, does not exclude use of the "central processing facility." *See id.*

Further, what the prior art teaches is a question of fact. *In re Berg*, 320 F.3d 1310, 1312 (Fed. Cir. 2003). The doctrine of claim differentiation is a canon of claim construction, which "is a matter of law reserved for court decision." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 905 (2014) (cleaned up). Moreover, claim construction is performed on the patent being reexamined or litigated, not on the prior art. Accordingly, a factfinder would not be performing claim differentiation to determine the teachings of *Liebermann*.

Further still, even if it is proper to perform claim differentiation on the prior art, "claim differentiation is not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history." *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1359 (Fed. Cir. 2012) (en banc) (cleaned up). Claim differentiation is "a rule of thumb that does not trump the clear import of the specification." *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1323 (Fed. Cir. 2011) (cleaned up). In other words, claim differentiation is a rebuttable presumption. Because every single disclosed embodiment in *Liebermann* requires the "central processing facility" (i.e., the "Center"), and it is the primary component in *Liebermann's* distributed architecture, that presumption is rebutted;

claim differentiation does <u>not</u> render the "central processing facility" (i.e., the "Center") optional.

For the aforementioned reasons, the Board's determination that the combination of *Liebermann* and *Sears* renders dependent claim 6 obvious is not supported by substantial evidence and should be vacated.

> **b.    The Board's combination of *Liebermann* and *Sears* is not a simple substitution of one known element for another.**

The Board/Examiner argued that the proposed combination of *Liebermann* and *Sears*, discussed above, is obvious because it is merely the "simple substitution of one known element for another to obtain predictable results." Appx0949-0952 (Final OA, pp. 56-59). *See also* Appx0033 (Decision, p. 33) ("We agree with the Examiner that the proposed combination is merely the simple substitution for the numerous reasons set forth by the Examiner in the Final Office Action"). Appellant disagrees.

The Board's/Examiner's proposed modification to *Liebermann* results in a complete dismantling of *Liebermann's* distributed architecture. It is unclear what, if any, purpose *Liebermann's* "central processing facility" would serve following the Board's/Examiner's proposed modification. Accordingly, the proposed combination cannot be considered a "<u>simple</u> substitution."

The Board dismissed Appellant's argument because "Appellant elevates Liebermann's disclosed 'central processing facility' to the status of an immovable critical element.   Appellant is mistaken . . . When viewed in the context of Liebermann's claims, we conclude Liebermann's distributed processing architecture is not mandatory." Appx0033 (Decision, p. 33).  But it is the Board's reasoning that is flawed:  *Liebermann's* "central processing facility" is not optional; it is a critical element and thus mandatory (discussed above).

The Board/Examiner argued that substituting the processing of gesturing at *Liebermann's* "central processing facility" with the processing of gesturing locally on *Liebermann's* "portable transmitter/receiver," as allegedly described by *Sears*, would be "both successful and entirely predictable."  Appx0951 (Final OA, p. 58).  Appellant disagrees.  *Liebermann* expressly discloses "[f]rom cost and <u>portability standpoints</u>, the translating means is at a remote location or <u>central station</u> and there is included transmission means for <u>transmitting</u> the digitized signing motions or their digital identifiers <u>to the translating means</u>."  Appx1265 (*Liebermann*, 3:38-41) (emphasis added).   In other words, *Liebermann* expressly warns that the "sophisticated   computer   equipment,   databases,   and   neural   networks"   of *Liebermann's* "central   processing   facility"   cannot   exist   as   components   of *Liebermann's* "portable transmitter/receiver" without jeopardizing its portability. Based on that warning, there is no guarantee that the Board's/Examiner's proposed

substitution would be "both successful and entirely predictable." That only reinforces that the Board's/Examiner's combination is not a simple substitution.

Further, the Board's/Examiner's reliance on *Sears* for the substitution is misplaced. *Sears* is only processing a very small set of navigation command gestures involving one hand. *See* Appx1284-1285 (*Sears*, 10:66-11:7) ("we have described a number of gestural movements that can be distinguished by processing of visual images by a computer (e.g. one, two or more fingers placed flat, wiggling one or more fingers left to right, tapping a finger, curling a finger inwards, making a fist, etc.)"). In contrast, *Liebermann* is processing the "signing movement of the hands and fingers and body and facial motions and expressions" corresponding to all the words of an entire language. Appx1266 (*Liebermann*, 6:4-6). Because *Sears* and *Liebermann* are processing different types and quantities of gestures, they require different processing power. While the processing power required by *Sears* may permit its gesture processing to be performed locally on a Pentium chip, the same is not necessarily true for *Liebermann*. In other words, there is no guarantee that the processing power of *Liebermann's* "central processing facility," including "sophisticated computer equipment, databases, and neural networks," can be installed/executed locally on *Liebermann's* "portable transmitter/receiver," even if it has a Pentium chip. That only reinforces that the Board's/Examiner's combination is not a simple substitution.

The Board argued that "[n]one of 'a processing center containing sophisticated computer equipment, databases, or neural networks' is required by Liebermann's independent claim 12 (see instead Liebermann's dependent claim 16)." Appx0034 (Decision, p. 34).  Again, it is telling that the Board could not find a single instance in *Liebermann's* specification where "sophisticated computer equipment, databases, or neural networks" (i.e., the "Center") is not required for gesture processing.  Instead, the Board had to rely on claim differentiation.  But as discussed above, to the extent that it is proper to perform claim differentiation on the prior art, claim differentiation here does not render the "Center," with its sophisticated computer equipment, databases, and neural networks," optional.

For the aforementioned reasons, the Board's determination that the combination of *Liebermann* and *Sears* renders dependent claim 6 obvious is not supported by substantial evidence and should be vacated.

### c.    The Board's combination of *Liebermann* and *Sears* lacks rational underpinnings.

*Liebermann's* "central processing facility" is accessible to multiple deaf users and hearing users who wish to communicate with the deaf users.  *Liebermann's* "central processing facility" performs its functions, including gesture processing, using a "database" and "translation means [which] includes artificial intelligence" (e.g., algorithms).  Appx1265 (*Liebermann*, 3:44-48).  By performing the processing (e.g., gesture recognition, facial expression recognition, etc.) at the "central

processing facility," any update to the "database" or "translation means" (e.g., algorithms) only needs to be done in one place.

Following the Board's/Examiner's proposed modification, any update/patch to the "database" and/or "translation means" would need to be propagated to every deaf user's "portable transmitter/receiver."  That would unnecessarily complicate the update process and risk different users having different and out-of-date versions of the "database" and "translation means." Thus, the proposed modification is not rational.

For the aforementioned reasons, the Board's determination that the combination of *Liebermann* and *Sears* renders dependent claim 6 obvious is not supported by substantial evidence and should be vacated.

### 3.    *Liebermann* **and** *Sears* **do not render obvious claim 7.**

As discussed above, *Liebermann* does not render claim 1 unpatentable.  *Sears* does not cure the deficiencies of *Liebermann* with respect to claim 1.  Claim 7 depends from and adds limitations to claim 1.  Accordingly, for the reasons set forth above regarding claim 1, the Board's determination that *Liebermann* and *Sears* renders claim 7 obvious is not supported by substantial evidence and should be vacated or reversed.

Further, to meet dependent claim 7, the Board/Examiner uses the same reasoning that was relied upon for dependent claim 6.  *See* Appx0922-0925 (Final

OA, pp. 29-32).  As discussed above, no motivation exists to combine *Liebermann* and *Sears*, and thus *Liebermann* and *Sears* do not render dependent claim 6 obvious. *Liebermann* and *Sears* do not render dependent claim 7 obvious for at least the same reasons (e.g., proposed combination changes *Liebermann's* principle of operation, proposed combination is not a simple substitution, etc.).

Further still, claim 7 recites "[the] handheld device of claim 1 wherein the computer is operable to determine a <u>facial expression</u> based on at least one of the first camera output and the second camera output."  Appx0177 ('924 Patent, 27:10-12) (emphasis added).  The Board/Examiner argued that "processing . . . facial expression information locally instead of on a separate hardware/software combination is known in the art."  Appx0923-0924 (Final OA, pp. 30-31).  But the Board/Examiner provided no evidence of such.  The Board/Examiner argued that *Sears* "utilizes a hardware/software combination on the computer of the device . . . [for processing] facial expression information locally."  Appx0950 (Final OA, p. 57).  But that is simply not true.  *Sears* does not process facial expressions at all. That is unsurprising considering *Sears* is directed to OCR-based electronic reading machines.  Appx1273 (*Sears*, Abstract), Appx1281 (*Sears*, 3:12-15).  That is a fatal flaw in the Board's/Examiner's obviousness rejection, especially under the simple substitution approach.

For the aforementioned reasons, the Board's determination that the combination of *Liebermann* and *Sears* renders dependent claim 7 obvious is not supported by substantial evidence and should be vacated.

### 4.  *Liebermann* and *Sears* do not render obvious claims 8 and 10.

As discussed above, *Liebermann* does not render claim 1 unpatentable. *Sears* does not cure the deficiencies of *Liebermann* with respect to claim 1. Claims 8 and 10 depend from and add limitations to claim 1. Accordingly, for the reasons set forth above regarding claim 1, the Board's determinations that *Liebermann* and *Sears* renders dependent claims 8 and 10 obvious are not supported by substantial evidence and should be vacated or reversed.

Further, to meet dependent claims 8 and 10, the Board/Examiner uses the same reasoning that was relied upon for dependent claim 6. *See* Appx0922-0925 (Final OA, pp. 29-32). As discussed above, no motivation exists to combine *Liebermann* and *Sears*, and thus *Liebermann* and *Sears* do not render dependent claim 6 obvious. *Liebermann* and *Sears* do not render dependent claims 8 and 10 obvious for at least the same reasons (e.g., proposed combination changes *Liebermann's* principle of operation, proposed combination is not a simple substitution, etc.).

Further, claim 8 recites "the computer is adapted to determine at least one of the position and the orientation of the object based on the second camera output."

Appx0177 ('924 Patent, claim 8). Claim 10 recites "the computer is adapted to

recognize the object based on the second camera output." Appx0177 ('924 Patent,

claim 10). The "object" in claims 8 and 10 is something "other than the user of the

device." *See* Appx0176 (claim 1) ("a second camera oriented to view an object other

than the user of the device and having a second camera output"). The

Board/Examiner mapped *Liebermann's* "background object" or "gloves" to the

"object other than the user." Appx0920 (Final OA, p. 27). Both mappings fail.

First, *Liebermann* does not teach "determine[ing] at least one of the position

and the orientation of the" background object, as claim 8 requires. *Liebermann* also

does not teach "recogniz[ing] the [background] object," as claim 10 requires.

*Liebermann* only recognizes or determines the position/orientation of a user, not a

background object. *Sears* does not cure the deficiencies of *Liebermann*.

Second, *Liebermann's* "gloves" are worn by the user (i.e., encasing the user's

hand). Appx1260 (*Liebermann*, Figs. 13A, 13B). Accordingly, the gloves are not

an object other than the user, as claims 8 and 10 require.

Accordingly, the Board's determinations that *Liebermann* and *Sears* render

dependent claims 8 and 10 obvious are not supported by substantial evidence and

should be vacated or reversed.

59

### E.    The Board Erred In Determining That The Cited Art Anticipates Or Renders Obvious Dependent Claims 3-5, 9, and 11-14.

As discussed above, *Liebermann* neither discloses nor renders obvious independent claim 1. *Sears, Tryding*, *Gershman*, and *Kimball* do not cure the deficiencies of *Liebermann* with respect to claim 1. Claims 3-5, 9, and 11-14 depend from and add limitations to claim 1. Accordingly, for the reasons set forth above regarding claim 1, the Board's determinations that claims 3-5, 9, and 11-14 are anticipated or rendered obvious by the cited art are not supported by substantial evidence and should be vacated or reversed.

### F.    The Board Erred By Not Vacating The Reexam Order Because No Substantial New Question (SNQ) Of Patentability Exists

Section 303 of Title 35 "requires the examiner to determine whether a 'substantial new question of patentability' is raised by the reexamination request. Only if a new question of patentability is raised, can the patent be reexamined." *In re Recreative Techs. Corp.*, 83 F.3d 1394, 1396 (Fed. Cir. 1996). The USPTO "considers the standard for reexamination met when there is a substantial likelihood that a reasonable examiner would consider the prior art patent or printed publication important in deciding whether or not the claim is patentable." *P&G v. Kraft Foods Global, Inc.*, 549 F.3d 842, 848 (Fed. Cir. 2008) (cleaned up).

In the Reexam Order for the '924 Patent, the USPTO noted that the "<u>key features</u> missing from the prior art at the time of allowance [of the '924 Patent] of

independent claim 1 was the computer being adapted to perform a control function based upon the output of at least one of the first or second cameras, which have non overlapping fields of view." Appx0800 (Reexam Order, p. 5) (emphasis added).  The USPTO asserted that *Liebermann* or a combination of *Liebermann* and *Sears* raises a SNQ of patentability because *Liebermann* or the combination of *Liebermann* and *Sears* appears to teach the key features of independent claim 1 missing from the art cited during the original prosecution.  Appx0802-0808 (Reexam Order, pp. 7-13).  Appellant disagrees.

As discussed above, *Liebermann* does not disclose a handheld device with two cameras having non-overlapping fields of view.  In other words, *Liebermann* does not provide the "key features" that were missing from the art during the original prosecution of the '924 Patent.  As also discussed above, *Sears* does not cure the deficiencies of *Liebermann*.  Thus, a reasonable examiner would not consider *Liebermann* and/or *Sears* to be important in deciding whether one or more claims of the '924 Patent are patentable, and *Lieberman* alone or combined with *Sears* does not raise a SNQ of patentability.  The order for *ex parte* reexamination should be vacated.

**G.    The USPTO Does Not Have Jurisdiction Over the Expired '924 Patent.**

In *Oil States*, the Supreme Court explained that the "decision to <u>grant</u> a patent is a matter involving public rights—specifically, the grant of a public franchise." *Oil*

*States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) (emphasis in original). "Specifically, patents are public franchises that the Government grants to the inventors of new and useful improvements." *Id*. (internal quotation marks omitted). The Court explained that "Congress [has] significant latitude to assign [the] adjudication of public rights to entities other than Article III courts." *Id*. at 1368. In exercising its "significant latitude," Congress grants public franchises "subject to the qualification that the PTO has the authority to reexamine— and perhaps cancel—a patent claim in an inter partes review." *Id*. at 1368, 1374 (internal quotation marks omitted). Accordingly, so long as the public franchise exists, the Patent Office may have jurisdiction to amend and cancel the claims of the patent (e.g., via *ex parte* reexamination).

When a patent expires, however, the public franchise ceases to exist and the franchisee (e.g., the patent owner) no longer has the right to exclude others. At most, the franchisee may be entitled to collect damages arising from the public franchise that formerly existed through an infringement action in district court. But because the public franchise no longer exists after the patent expires, the Patent Office has nothing in its authority to cancel or amend. Expiration thus removes the patent from the Patent Office's jurisdiction and returns it to the sole jurisdiction of the Article III courts, which have exclusive authority to govern claims for damages. If this were not so, the Patent Office would purport to have authority to retroactively modify a

public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

The '924 Patent issued in June 2012, and expired in July 2020, long before the *ex parte* reexamination request was filed in November 2021. With the expiration of the '924 Patent in July 2020, the USPTO ceased to have jurisdiction over the '924 Patent, and the order granting reexamination should be vacated as a result.

In rejecting Patent Owner's argument, the Board argued "we disagree that Appellant has no rights under the expired patent." Appx0040 (Decision, p. 40). Appellant never argued that it had no rights under the expired patent. Appellant argued that the USPTO loses its jurisdiction to cancel or amend the patent when the patent expires. *See* Appx1027-1028 (Appeal Br., pp. 52-53).

Further, in rejecting Patent Owner's argument, the Board relied on Title 35 of the United States Code and identified several cases where this Court reviewed the Board's decision even though the patent under reexamination expired prior to the Board issuing its decision. *See* Appx0040-0041 (Decision, pp. 40-41). But the Board failed to address the fundamental issue of whether the Patent Office has jurisdiction over expired patents in view of the *Oil States* decision. *See id*. It does not, for the foregoing reasons.

63

## VIII. CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Appellant respectfully requests that the Court (1) vacate or reverse the Board's determinations that claims 1-14 of the '924 Patent are anticipated or rendered obvious by the cited art, (2) vacate the order granting *ex parte* reexamination of the '924 Patent, and (3) vacate the Board's Decision because the USPTO does not have jurisdiction over expired patents such as the '924 Patent.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on July 12, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:       July 12, 2024                    *<u>/s/ Fred I. Williams</u>*
                                                     Fred I. Williams

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  24-1585

**Short Case Caption:**  In re: Gesture Technology Partners, LLC

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [✔] the filing has been prepared using a proportionally-spaced typeface and includes 13,351 words.

- [ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

- [ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 07/12/2024

Signature:  /s/ Fred I. Williams

Name:  Fred I. Williams

Save for Filing

# ADDENDUM

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

*Ex parte* GESTURE TECHNOLOGY PARTNERS, LLC
Patent Owner and Appellant

_____

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2
Technology Center 3900

_____

Before ALLEN R. MacDONALD, MICHAEL J. ENGLE, and
BRENT M. DOUGAL, *Administrative Patent Judges*.

MacDONALD, *Administrative Patent Judge*.

DECISION ON APPEAL[1]

STATEMENT OF THE CASE

Pursuant to 35 U.S.C. §§ 134(b) and 306, Gesture Technology
Partners, LLC[2] appeals from the final rejection of claims 1–14. Appeal Br.
5–55. We have jurisdiction under 35 U.S.C. § 6(b).

We affirm.

_____

[1] On November 27, 2023, a hearing directed to this appeal was held.

[2] "Appellant" refers to "applicant" as defined in 37 C.F.R. § 1.42 (2022).
Appellant identifies the real party in interest as Gesture Technology
Partners, LLC. Appeal Br. 1.

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

CLAIMED SUBJECT MATTER

Claims 1, 2, and 6–8 are illustrative of the claimed subject matter (bracketed material according to Appellant's labeling of claim limitations, emphasis, and formatting added):

[1.a.] 1. A *handheld* device comprising:

[1.b.] a housing;

[1.c.] a computer within the housing;

[1.d.] a first camera oriented to view *a user of the handheld device* and having a first camera output; and

[1.e.] a second camera oriented to view *an object other than the user of the device* and having a second camera output,

wherein the first and second cameras include *non-overlapping* fields of view, and

wherein the computer is adapted to *perform a control function* of the handheld device based on at least one of the first camera output and the second camera output.

2. The handheld device of claim 1 wherein the handheld device comprises a *mobile phone*.

6. The handheld device of claim 1 wherein the computer is operable to *determine a gesture* based on at least one of the first camera output and the second camera output.

7. The handheld device of claim 1 wherein the computer is operable to *determine a facial expression* based on at least one of the first camera output and the second camera output.

8. The handheld device of claim 1 wherein the computer is adapted to *determine at least one of the position and the orientation of the object* based on the second camera output.

2

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

## REFERENCES[3]

The Examiner relies on the following references:

| Name | Reference | Date |
|------|-----------|------|
| Tryding | US 5,880,732 | Mar. 9, 1999 |
| Kimball | US 5,953,322 | Sept. 14, 1999 |
| Liebermann | US 5,982,853 | Nov. 9, 1999 |
| Sears | US 6,115,482 | Sept. 5, 2000 |
| Gershman | US 6,401,085 B1 | June 4, 2002 |

## REJECTIONS[4]

### A.

The Examiner rejects claims 1—5 and 13 under pre-AIA 35 U.S.C.
§ 102 as being anticipated by Liebermann.[5]  Final Act. 20–24, 26–28.

For this rejection, Appellant presents arguments for claims 1 and 2.
Appeal Br. 5–26.  Appellant does not present separate arguments for claims
3—5 and 13.  We select claim 1 as the representative claim for the § 102
rejection of claims 3—5 and 13.  Except for our ultimate decision, we do not
address the merits of this § 102 rejection of claims 3—5 and 13 further
herein.

---

[3] All citations herein are by the first named inventor.

[4] For simplicity herein, we refer to the Examiner's rejection under § 102(b)
as a rejection under § 102; and we refer to the Examiner's rejections under
§ 103(a) as rejections under § 103.

[5] Although the Examiner states that Liebermann is prior art under pre-AIA
§ 102(b) (Final Act. 2, 4, 20), Liebermann is prior art under pre-AIA
§ 102(e).  We deem this to be a harmless error.

3

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

## B.

The Examiner rejects claims 1−5 and 13 under 35 U.S.C. § 103 as being unpatentable over Liebermann. Final Act. 24−28.

For this rejection, Appellant presents separate arguments for claims 1 and 2. Appeal Br. 26–31. Appellant does not present separate arguments for claims 3−5 and 13. We select claim 1 as the representative claim for the § 103 rejection of claims 3−5 and 13. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 3−5 and 13 further herein.

## C.

The Examiner rejects claims 6−10 and 12 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Sears. Final Act. 28–32.

For this rejection, Appellant presents separate arguments for claims 6−8. Appeal Br. 31−48. To the extent that Appellant discusses this rejection of claim 10 (Appeal Br. 48−49), Appellant merely repeats (or references) the argument directed to claim 8. Appeal Br. 47−48. Such a repeated (or referenced) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claim 10. Appellant does not present separate arguments for claims 9 and 12.

We select claim 6 as the representative claim for the § 103 rejection of claims 9 and 12. We select claim 8 as the representative claim for the § 103 rejection of claim 10. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 9, 10, and 12 further herein.

4

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

### D.

The Examiner rejects claim 11 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Tryding. Final Act. 32–34.

To the extent that Appellant discusses this rejection of claim 11, Appellant merely references (or repeats) the argument directed to claim 1. Appeal Br. 50–51. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claim 11. Therefore, this rejection of claim 11 turns on our decision as to the rejection of claim 1. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claim 11 further herein.

### E.

The Examiner rejects claim 14 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Gershman. Final Act. 34–35.

The Examiner also rejects claim 14 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Kimball. Final Act. 35–36.

To the extent that Appellant discusses these rejections of claims 14, Appellant merely references (or repeats) the arguments directed to claim 1. Appeal Br. 51–52. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for these rejections of claim 14. Therefore, these rejections of claim 14 turns on our decision as to the rejection of claim 1.

5

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Except for our ultimate decision, we do not address the merits of these § 103 rejections of claim 14 further herein.

PRINCIPLES OF LAW – CLAIM CONSTRUCTION

A. <em>Phillips</em>[6]

During examination of a patent application, a claim normally is given its broadest reasonable construction consistent with the specification. *In re Prater*, 415 F.2d 1393, 1404–1405 (CCPA 1969). However, "[w]hen a patent expires during a reexamination proceeding, the PTO should thereafter apply the *Phillips* [v. *AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)] standard for claim construction." *In re CSB-Sys. Int'l, Inc.*, 832 F.3d 1335, 1341 (Fed. Cir. 2016).

B. Ordinary And Customary Meaning

Under *Phillips*, "the words of a claim are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (quotation omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313.

C. In View Of The Specification

"[I]t is fundamental that claims are to be construed in the light of the specifications." *United States v. Adams*, 383 U.S. 39, 49 (1966). However,

---

[6] The subject '924 Patent of this appeal expired in July 2020 before the filing of the November 11, 2021 Request for Reexamination. *See* Appeal Br. 53. Also, the Examiner acknowledges "the patent term has expired." Final Act. 8; Ans. 11.

6

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

"limitations are not to be read into the claims from the specification." *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993) (citing *In re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989)).

### C. Capable Of

The patentability of an apparatus depends on the actual structure claimed, not on the use, function, or result thereof. *In re Danly*, 263 F.2d 844, 848 (CCPA 1959). Because an apparatus is a structure, the apparatus must be distinguished from the prior art on the basis of structure, and where there is reason to conclude that the structure of the prior art is inherently capable of performing the claimed function, the burden shifts to the applicant or patent owner to show that the claimed function patentably distinguishes the claimed structure from the prior art structure. *See In re Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997); *In re Hallman*, 655 F.2d 212, 215 (CCPA 1981).

### OPINION

We have reviewed the Examiner's rejections in light of Appellant's arguments (Appeal Brief) that the Examiner has erred. We disagree with Appellant's conclusions. Except as noted below, we adopt as our own (1) the findings and reasons set forth by the Examiner in the action from which this appeal is taken and (2) the reasons set forth by the Examiner in the Examiner's Answer in response to Appellant's Appeal Brief.

7

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

### A. Claim Construction

Appellant raises the following arguments in contending that the Examiner erred in construing the claims. *See* Appeal Br. 5–14. Although we agree with Appellant as to several of these claim construction arguments, for the reasons discussed in below sections B and C, we deem these Examiner claim constructions to be harmless errors that do not change the result of our review of the Examiner's rejections.

### A.1. Claim Construction – Claim 1, "handheld"

Appellant argues:

> The Examiner contends that "the term 'handheld' modifies the device with a purpose and/or intended use of a device since 'the body of a claim fully and intrinsically sets forth all of the limitations of the claimed invention.'" Final Office Action dated July 22, 2022 ("Action"), p. 38 (quoting MPEP § 2111.02). Although not entirely clear, the Examiner seems to be relying on *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999), to argue that the preamble of claim 1 merely states the purpose or intended use of the invention and thus is not a claim limitation. See Action, p. 38. The Examiner is misguided.
>
> . . . [I]n the present case, as discussed above, the preamble of claim 1 provides the antecedent basis for "the handheld device." Thus, the body of claim 1 does not fully and intrinsically set forth the complete invention. Accordingly, the preamble of claim 1 should be limiting.
>
> . . .
>
> Further, by virtue of reciting "handheld device," the preamble of claim 1 *places size requirements/restrictions on the claimed components* (i.e., housing, specifically configured computer, and specifically configured two cameras). This is even acknowledged by the Examiner. See Action, p. 38 ("one of ordinary skill in the art would recognize that a device being 'handheld' does require <u>certain size constraints</u> in order for it to

8

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

be handheld") (emphasis added). Thus, the preamble does <u>not</u> merely state the purpose or intended use of the invention, but rather imposes structural limitations on the claimed apparatus.

Appeal Br. 6–7 (emphasis added).

We agree with Appellant's argument that the term "handheld" is limiting as to size constraints. Regardless of whether the preamble alone is limiting, the body of the claim twice recites "the *handheld* device," so this term must be a limitation. *See* claim 1 ("a first camera oriented to view a user of the *handheld* device"; "the computer is adapted to perform a control function of the *handheld* device"). Although we are unable to find where Appellant cites either a reference (e.g., dictionary) or case law defining the term "handheld," we determine the general definitions of the adjective "handheld" include:[7]

1) held in the hand or hands: *a handheld torch*.
2) small enough to be used or operated while being held in the hand or hands: *a handheld hair drier*.
3) Something small enough to be used or operated while held in the hand or hands.

Appellant's argument is consistent with the second definition of "handheld." We conclude that the proper interpretation of "handheld" in claim 1 is as a size requirement that the device small enough to be used while being held in the hand or hands.

---

[7] The Random House Dictionary of the English Language – Unabridged (1983).

9

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

A.2. Claim Construction –
Claim 1, element 1[e],
"the first and second cameras include non-overlapping fields of view"

Appellant argues:

> Claim element 1[e] recites, in part, "a second camera . . .
> wherein the first and second cameras include <u>non-overlapping</u>
> fields of view." *Id.* (emphasis added). Patent Owner asserts a
> POSITA would interpret this claim language to mean there is
> <u>zero</u> overlap between the field of view of the first camera and the
> field of view of the second camera.

Appeal Br. 7–8.

Appellant also argues that for two cameras A and B, each with a field

of view ($FOV_A$ and $FOV_B$ respectively), there are three possible

configurations: (1) $FOV_A$ and $FOV_B$ are the same/identical field of view;

(2) $FOV_A$ and $FOV_B$ *partially* overlap; and (3) $FOV_A$ and $FOV_B$ are

non-overlapping, meaning there is 0% overlap. Appeal Br. 8.

We need not resolve whether "include" is an open-ended term that

permits other overlapping fields of view (*see, e.g.*, '924 patent, 9:20–30)

because we determine that the prior art discloses this limitation even under

Appellant's interpretation, as discussed in more detail below.

A.3. Claim Construction – Claim 1, element 1[d],
"oriented to view an object ***other than*** the user"

Appellant argues:

> Claim element 1[d] recites, in part, "a first camera oriented
> to <u>view a user</u>." '924 Patent, claim 1 (emphasis added). Claim
> element 1[e] recites "a second camera oriented to <u>view an object</u>
> <u>other than the user</u> . . . wherein the first and second cameras
> include non-overlapping fields of view." *Id.* (emphasis added).
> The phrase "other than" means "with the exception of." *See, e.g.*,
> https://www.merriamwebster.com/dictionary/other%20than.
> Synonyms for "other than" include "except," "except for,"

10

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> "excluding," and "exclusive of." *See id.* Thus, under the plain meaning of the phrase "other than," the field of view of the second camera ***must exclude the user***. *See id.* This is consistent with the requirement that the claimed first and second cameras have non-overlapping fields of view (discussed above).

Appeal Br. 11–12 (emphasis added).

As above, we need not resolve whether a camera can be "oriented to view an object other than the user" while still being able to view part or all of the user (e.g., a camera focused on a basketball might also see part of the user's hand) because we determine that the prior art discloses this limitation even under Appellant's interpretation, as discussed in more detail below.[8]

A.4. Claim Construction – Claim 2, "mobile phone"

Appellant argues:

> Dependent claim 2 recites "wherein the handheld device comprises a mobile phone." A POSITA would understand the ordinary meaning of "mobile phone" as being a handheld computing device capable of at least answering a voice telephone call from another individual operating another phone device. . . . A POSITA would also understand that the claimed "mobile phone" has an audio output (e.g., built-in speaker, earphone jack, etc.) so that the user of the claimed "mobile phone" can listen to the other individual (speaking into the other phone device) during the voice telephone call.
>
> The Examiner takes the remarkable position that it is "not required for the mobile phone . . . to have an audio output for the user to listen to." Action, p. 45.

Appeal Br. 13.

---

[8] To the extent that Appellant's argument(s) relies on "the user" limitation, we disagree and address that issue in section B.1.b. below.

11

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Appellant also argues:

> [T]he "mobile phone" of claim 2 should have its plain and
> ordinary meaning, which necessarily includes *(i)* being capable
> of answering a voice telephone call from another individual
> operating another phone device, and *(ii)* having an audio output
> (e.g., built-in speaker, earphone jack, etc.) so that the user of the
> claimed "mobile phone" can listen to the other individual
> (speaking into the other phone device) during the voice telephone
> call.

Appeal Br. 14.

We are not persuaded by Appellant's argument. Appellant attempts to restrict the term "mobile phone" to exclude mobile phones for deaf persons. Appeal Br. 13–14. We find no meaningful basis for such a restriction and it is contradicted by the record. For example, Liebermann labels item 8 in figure 6 as a "Cellular Telephone Device." At column 5, lines 62–63, Liebermann describes this device as "[a] portable transmitter/receiver generally designated by the numeral 8 for use by a deaf person is shown in FIG. 6[.]" Appellant's attorney argument, on the other hand, fails to point to anything in the claim, the rest of the Specification, or the extrinsic evidence supporting its myopic view that the term "mobile phone" excludes mobile phones for deaf persons. We therefore conclude that a person of ordinary skill in the art (POSITA) would have understood the claimed "mobile phone" as including mobile phones for the hearing impaired.

## B. Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claims 1 and 2 under 35 U.S.C. § 102 as being anticipated. *See* Appeal Br. 14–26.

12

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Additionally, at the footnote on page 23 of the Appeal Brief, Appellant argues "The Examiner's reliance on extrinsic evidence of the Abowd Declaration[9], rather than the express disclosure of Liebermann, to support an anticipation rejection is also improper." We disagree. The Examiner's section 102 rejection simply references the Abowd Declaration's analysis (Decl. ¶¶ 64−65, 70−71) of the Liebermann reference − in effect the Examiner adopts this portion of the Abowd analysis as his own. Although uncommon, we know of no case law or office policy (nor does Appellant cite any) that precludes this form of Examiner analysis when the underlying analysis in the Abowd Declaration is unchallenged.

### B.1. Claim 1 − Section 102 − Liebermann

### B.1.a. First Argument − Claim 1, preamble, "handheld"

Appellant argues:

> The fundamental disagreement between Patent Owner and the Examiner is whether Liebermann discloses a "handheld device," as required by the preamble of claim 1.

Appeal Br. 15.

> Because *Liebermann's* "portable transmitter/receiver" is recording, with a camera, the movement of both "hands" of the deaf person, *Liebermann's* "portable transmitter/receiver" is not being held in either of the deaf person's hands, and thus *Liebermann's* "portable transmitter/receiver" is <u>not</u> a handheld device, as required by claim 1, because ***it cannot be operated while being handheld.*** *Id.* And "portable" does not equate to "handheld." There are many "portable" things in the world, for example a suitcase, that cannot be "handheld."

Appeal Br. 16 (emphasis added).

---

[9] The Abowd Declaration was submitted together with the third-party request for Reexamination.

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> The Examiner's position also contradicts the undisputed fact that deaf users use both hands to communicate via sign language, so the device cannot be "handheld" during use.

Appeal Br. 19.

> *Liebermann's* "portable transmitter/receiver" is <u>not</u> ***designed*** to be operated while in the hand of a user and thus is not a "handheld device," as independent claim 1 requires.

Reply Br. 11 (emphasis added).

We are not persuaded by Appellant's argument. First, unlike Appellant's argument discussed above in section A.1. that the "handheld device" in claim 1 places size requirements/restrictions on the claimed components, Appellant here argues to further restrict "handheld" to require that it be "designed" to be held in a hand while being operated. Again, the general definition of the term "handheld" (an adjective) includes:

> 1. held in the hand or hands: *a handheld torch*.
>
> 2. small enough to be used or operated while being held in the hand or hands: *a handheld hair drier*.
>
> 3. something small enough to be used or operated while held in the hand or hands.

However, we do not find any requirement that "handheld" be so "designed." Rather, it is sufficient that the device be "small enough to be used or operated while being held in the hand," whether explicitly "designed" so or not.

Second, even if we adopt Appellant's additional requirement that the device not merely be of a certain size, but must also be "designed" to be held in a hand while being operated, we conclude that Liebermann's "Cellular Telephone Device" (item 8 in figure 6) is designed to be a certain size that permits it to be held in one hand while signing with the other hand.

14

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Although Appellant presented an argument, at the November 27, 2023

hearing (Pages 3–4), that such single hand signing usage of Liebermann's

device is not reasonable, we disagree. We conclude nothing in the structure

or function of Liebermann's device precludes such single hand signing use

of Liebermann's device.

> B.1.b. Claim 1 – Second Argument – Section 102 – Liebermann –
> Claim 1, elements 1[d] & 1[e], "oriented to view an object
> other than the user" & "non-overlapping fields of view"

Appellant argues:

> Claim element 1[e] recites "a second camera oriented to
> view an object other than the user of the device and having a
> second camera output, wherein the first and second cameras
> include non-overlapping fields of view," whereas claim element
> 1[d] recites "a first camera oriented to view *a user of the
> handheld device.*" As discussed above . . . , the claim language
> requires that the fields of view associated with the first and
> second cameras do not overlap, and that the user is excluded from
> the field of view of the second camera.

Appeal Br. 19–20 (emphasis added).

> The Examiner also appears to disregard the claim
> language that requires that "the first and second cameras include
> <u>non-overlapping</u> fields of view." '924 Patent, claim 1 (emphasis
> added). This claim language requires that the fields of view
> associated with each of the first and second cameras do not
> overlap. ***The Action cites no portions** of Liebermann **pertaining
> to the field of view of the alleged first and second cameras,*** let
> alone the relationship therebetween. *See* Action, pp. 23–24.

Appeal Br. 21–22 (emphasis added).

We are not persuaded by Appellant's argument.

As to "non-overlapping fields of view," we disagree with Appellant's

argument that "[t]he Action cites no portions of Liebermann pertaining to

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

the field of view of the alleged first and second cameras." At page 23 of the Final Office Action, the Examiner finds that Liebermann at column 13, lines 4–20, "discloses 'more than one camera' may be utilized with each camera covering a separate angle, operating independently of the other(s), in which angle overlap may or may not be permitted." We agree with the Examiner that an artisan would have understood non-overlapping camera angles to result in non-overlapping fields of view.

As to "oriented to view an object other than the user," our decision does not turn on this Examiner interpretation of "oriented to view an object other than the user." Rather, the Examiner's prima facie showing need only explain why the device is *capable of* the function of being "oriented to view an object other than the user." *See also* Ans. 6 ("one of ordinary skill in the art can agree that the first and second cameras must have the ability to be configured to have 'non-overlapping field of views'"). Because the Examiner finds that Liebermann at column 13, lines 4–20, "discloses 'more than one camera' may be utilized with each camera covering a separate angle, operating independently of the other(s), in which angle overlap may or may not be permitted," the Examiner has found a reason to believe that the apparatus of Liebermann would have been *capable of* performing the claimed function. Appellant, however, provides no convincing evidence or explanation in support of their argument that Liebermann is not so capable. Appellant has the burden of demonstrating either that the asserted prior art is incapable of performing the claimed functions or that the claimed functions necessarily require that the claimed device have a structure that is patentably distinct from the prior art. Appellant has not met this burden.

16

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

B.2. Claim 2 – Section 102 – Liebermann –
"Mobile Phone" Argument

Appellant raises the following argument in contending that the

Examiner erred in rejecting claim 2 under 35 U.S.C. § 102 as being

anticipated.

> The Examiner mapped *Liebermann's* "portable transmitter/
> receiver" in Figure 6 to the claimed "mobile phone" of claim 2.
> Action, p. 26. ***This is improper***.
>
> *Liebermann's* "portable transmitter/receiver" is a
> ***specialized telephone*** for the deaf. *See Liebermann*, 5:62–63
> ("A portable transmitter/receiver . . . *for use by a deaf person* is
> shown in Fig. 6."). See also Liebermann, Title ("Telephone *for
> the deaf* and method of using same"). Accordingly,
> *Liebermann's* "portable transmitter/receiver" does not include an
> audio output for the user (i.e., a deaf person) to listen to the other
> individual (speaking into the other phone device) during a voice
> telephone call.

Appeal Br. 24–25 (emphasis added).

We are not persuaded by Appellant's argument. We reach the same

conclusion as in above section A.4. Contrary to Appellant's argument, a

POSITA would have understood item 8 of Liebermann's Figure 6 to be a

mobile phone for the hearing impaired. The title of Liebermann refers to a

"telephone for the deaf" and Figure 6 expressly shows a "CELLULAR

TELEPHONE VERSION." Even Appellant refers to Liebermann's device

as "a specialized telephone" that is "portable." Appeal Br. 24–25.

Appellant fails to persuade us that the term "mobile phone" somehow

excludes a portable telephone for the deaf that communicates through a

cellular telephone network.

17

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

### C. Claim 1 – Section 103 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claims 1 and 2 under 35 U.S.C. § 103. Appeal Br. 26–31

#### C.1. Claim 1 – Section 103 – Liebermann –
#### First Argument – Liebermann is Non-Analogous Art

> *Liebermann* is non-analogous art and thus *Liebermann* cannot be cited in an obviousness rejection of any claim in the '924 Patent. A reference qualifies as prior art for an obviousness determination only when it is analogous to the claimed invention. . . . Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved.

Appeal Br. 26–27 (emphasis and formatting added).

#### C.1.a. Whether Liebermann is Analogous Art – First Test

As to claims 1 and 2, Appellant argues:

> Regarding the first test for analogous art, *Liebermann* discloses the
>
> > "present invention relates to electronic apparatus for communication by the deaf, and, more particularly, to such apparatus which enables the deaf person to communicate through use of sign language."
>
> *Liebermann*, 1:10–15. In contrast, the field of endeavor for the [Pryor] '924 Patent is
>
> > controlling functions of handheld devices using images captured by the handheld devices.
>
> *See generally*, '924 Patent, Title, 11:65–12:12, 12:62–13:47, 25:40–26:43, Figs. 8A, 8B, 18, claim 1. This is not the same

18

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

field of endeavor as *Liebermann*, and thus *Liebermann* fails the
first test for analogous art.

Appeal Br. 27 (formatting added).

We are not persuaded by Appellant's argument. Appellant starts from
the wrong perspective—the field of endeavor of Liebermann—and then
looks to see if the '924 Patent is in that field. As Appellant notes in its
citation of the law, the focus of the first test is whether the prior art is
"within the field of the inventor's endeavor," not the other way around.
Appeal Br. 27; *see also In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011)
(citing *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004); *In re Clay*, 966
F.2d 656, 658 (Fed. Cir. 1992)). Thus, even if Liebermann is focused on a
subset of the field of endeavor of the '924 Patent, it can still be within the
same field of the '924 Patent.

Here, the '924 Patent defines its field of invention broadly:

> 1. Field of the Invention

> ***The invention relates to simple input devices for
> computers***, particularly, but not necessarily, intended for use
> with 3-D graphically intensive activities, ***and operating by
> optically sensing a human input to a display screen or other
> object and/or the sensing of human positions or orientations***.

'924 Patent, 2:7–11 (emphasis added).

Like the '924 Patent, Liebermann is directed to an input device for
optically sensing human positions or orientations.

> It is an object of the present invention to provide a novel
> electronic communication system for use by deaf ***persons*** to
> enable them to communicate by ***signing***.

Liebermann, 3:11–13 (emphasis added).

19

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> It has now been found that the foregoing and related objects may be readily attained in an electronic communications system for the deaf comprising a video apparatus for ***observing and digitizing the signing motions***, and means for translating the digitized motions into words and phrases.

Liebermann, 3:26–30 (emphasis added). Also, Liebermann's Abstract states his invention's concern with optically sensing human positions or orientations.

> An electronic communications system for the deaf includes a video apparatus for observing and digitizing the facial, body and hand and finger signing motions of a deaf person, an electronic translator for translating the digitized signing motions into words and phrases, and an electronic output for the words and phrases.

Liebermann, Abstr.

Thus, although Liebermann's optical sensing of human input is directed at a specific area within the '924 Patent's field of invention (i.e., Liebermann optically senses signing motions for deaf persons), it still fits comfortably within the '924 Patent's defined field of invention of input devices for optically sensing a human input from human positions or orientations.

Therefore, we conclude that Liebermann is within the field of endeavor of the claimed invention and thus, is analogous art.

C.1.b. Whether Liebermann is Analogous Art – Second Test

Turning to the second test for analogous art, Appellant argues as follows:

> [T]he problems to which the '924 Patent relates include determining touchless user input commands to handheld devices and controlling functions within handheld devices. *See generally*, '924 Patent, 2:6–13, 11:65–12:12, 12:62–13:47,

20

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> 25:40–26:43, Figs. 8A, 8B, 18, claim 1. These are not the
> problems to which *Liebermann* relates, thus Liebermann fails the
> second test for analogous art.

Appeal Br. 28.

We are not persuaded by Appellant's argument. In *Donner*, the
Federal Circuit held that the Board defined the field of endeavor too
"narrowly." *Donner Tech., LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353,
1360 (Fed. Cir. 2020). The analysis of "[t]he problems to which the claimed
invention and reference at issue relate" "must be carried out from the
vantage point of a PHOSITA who is considering turning to the teachings of
references outside her field of endeavor" and therefore must not "rule out all
such art" that is "outside her field of endeavor." *Id.* Contrary to Appellant's
argument, the Federal Circuit held that "if the two references have 'pertinent
similarities' such that [the prior art reference] is reasonably pertinent to one
or more of the problems to which the [patent-in-suit] pertains, then [the prior
art reference] is analogous art." *Donner*, 979 F.3d at 1361. Such is the case
here with Liebermann.

We determine that Liebermann is "reasonably pertinent to the
particular problem with which the inventor is involved" because Appellant's
claims define the particular problem of the '924 Patent's claim 1 as
performing a function based on a camera output. Appeal Br. 27. As we
determine above, Liebermann is directed to "an input device for optically
sensing human positions or orientations." In Liebermann, the output of the
sensing is then used to control the functioning (control the particular output)
of Liebermann's "means for translating the digitized motions into words and
phrases." Appeal Br. 29. Even if we limit the inventor's particular problem

21

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

to the handheld environment, we still determine that Liebermann is "reasonably pertinent to the particular problem with which the inventor is involved." Appeal Br. 27. Liebermann solving the problem for a specific niche (e.g., sensing signing motions for deaf persons) shows that it falls within the same broad problem of the '924 Patent, not outside it.

Therefore, we again conclude that Liebermann is analogous art.

### C.2. Claim 1 – Section 103 – Liebermann – Second Argument – Element 1[e]

Also, as to claim 1, Appellant argues:

> [T]o meet claim element 1[e], the Examiner contends that a "person of ordinary skill in the art would be motivated to incorporate a second camera . . . such a modification would have provided a that [sic] can effectively communicat[e] in any environment independent of a user's movement." Action, p. 24. Even if this is true, the purpose of the camera(s) in *Liebermann* is to capture images of the deaf person signing. . . . [*Liebermann's*] second camera is not oriented to view "an object other than the user," as required by claim element 1[e]. The Action fails to identify any support in *Liebermann* in which a camera is "oriented to view an object other than *the user of the device*" related to the alleged motivations identified by the Examiner. Thus, *Liebermann* fails to teach or suggest claim element 1[e].

Appeal Br. 29–30 (emphasis added).

We are not persuaded by Appellant's arguments. We reach the same conclusion as in above section B.1.b. As discussed above, the Examiner has found a reason to believe that the apparatus of Liebermann would have been *capable of* performing the claimed function, and Appellants have not met the burden of demonstrating otherwise. For example, Liebermann discloses "[e]ach camera is covering a separate angle"; "[e]ach camera operates

22

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

independently of the other(s)"; and "[a]ngle overlap may or may not
permitted according to the pre-signing calibration." Liebermann 13:11–14.

### C.3. Claim 2 – Section 103 – Liebermann

Further, as to claim 2, Appellant argues:

> Claim 2 depends from and adds limitations to claim 1. As
> discussed above, *Liebermann* does not render claim 1 obvious.
> Accordingly, *Liebermann* does not render dependent claim 2
> obvious for at least the same reasons.
>
> Further, as discussed above in Section IV(B)(2),
> *Liebermann* fails to teach or suggest the claimed "mobile device"
> of claim 2.   Accordingly, *Liebermann* does not render claim 2
> obvious.

Appeal Br. 31.

We are not persuaded by Appellant's arguments.  Again, we reach the
same conclusion as in above section A.4. (also section B.2).  Contrary to
Appellant's argument, a POSITA would have understood item 8 of
Liebermann's Figure 6 (i.e., "CELLULAR TELEPHONE") to be a mobile
phone for the hearing impaired.

### D. Claims 6–8 – Section 103 – Liebermann and Sears

Appellant raises the following arguments in contending that the
Examiner erred in rejecting claims 6–8 under 35 U.S.C. § 103 over the
combination of Liebermann and Sears.  Appeal Br. 31–49.

### D.1. Claims 6–8 – Section 103 – Liebermann and Sears – Non-Analogous Art Argument

Appellant asserts:

> ***Sears is non-analogous art*** and thus Sears cannot be cited
> in an obviousness rejection of any claim in the '924 Patent.

Appeal Br. 32 (emphasis added).

23

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

D.1.a. Whether Sears is Analogous Art – First Test

Appellant argues:

> Regarding the first test for analogous art, *Sears* describes itself as relating to
>
>> an electronic reading system for converting text to synthesized speech that may be used by low-vision and blind people . . . and more particularly relat[ing] to an electronic reading system that includes improved functionality for allowing the user to navigate within the text.
>
> *Sears*, 1:23–29. In contrast, the . . . [Pryor] '924 Patent is
>
>> controlling functions of handheld devices using images captured by the handheld devices.
>
> *See generally*, '924 Patent, Title, 11:65–12:12, 12:62–13:47, 25:40–26:43, Figs. 8A, 8B, 18, claim 1. This is not the same field of endeavor as *Sears*, and thus *Sears* fails the first test for analogous art.

Appeal Br. 32 (formatting added).

We are not persuaded by Appellant's argument. Again, Appellant starts from the wrong perspective—the field of endeavor of Sears—and then looks to see if the '924 Patent is in that field. We reiterate, the '924 Patent states:

> 1. Field of the Invention
>
> ***The invention relates to simple input devices for computers***, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, ***and operating by optically sensing object or human positions and/or orientations***.

'924 Patent, 2:7–11 (emphasis added).

Appellant too narrowly interprets Sears' field of endeavor to limit it to be "an electronic reading system." Appeal Br. 32. Like the '924 Patent,

24

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Sears points out that "[i]t is an object of the invention . . . ***to specify control system parameters through manual gestures***." Sears, 3:19–21 (emphasis added). Also, Sears' title states his invention's concern with "Gesture-Based Navigation." Further, Sears' states:

> An optical-input print reading device with voice output for people with impaired or no vision in which the user provides input to the system from hand gestures. Images of the text to be read, on which the user performs finger- and hand-based gestural commands, are input to a computer, which decodes the text images into their symbolic meanings through optical character recognition, and further tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning.

Sears, Abstr. Furthermore, Sears at column 4, lines 3–7, states, "[t]he method includes . . . determining a command signal from a sequence of user-generated spatial configurations of at least one pointer[.]" Also further, Sears claims:

> capturing a temporal sequence of digital images of user-generated spatial configurations of at least one pointer;
>
> determining a command signal from the temporal sequence of digital images;

Sears claim 1, 28:39–42.

Thus, we conclude that Sears is within the field of endeavor of the claimed invention and hence analogous art.

> D.1.b. Whether Sears is Analogous Art – Second Test

Appellant also argues:

> Regarding the second test for analogous art, *Sears* discloses it is solving "the problems of the prior art, both with regards to OCR-based electronic reading machines as well as electronic magnifying system." *Sears*, 3:12–15. In contrast, the

25

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

problems to which the '924 Patent relates include determining touchless user input commands to handheld devices and controlling functions within handheld devices. See generally, '924 Patent, 2:6–13, 11:65–12:12, 12:62–13:47, 25:40–26:43, Figs. 8A, 8B, 18, claim 1. These are not the problems to which *Sears* relates, thus *Sears* fails the second test for analogous art.

Appeal Br. 32–33.

We are not persuaded by Appellant's argument. Again, Appellant starts from the wrong perspective—the particular problem of Sears—and then looks to see if the '924 Patent involves that particular problem.

We determine that Sears is "reasonably pertinent to the particular problem with which the inventor is involved" because Appellant's claims define the particular problem of the '924 Patent's claim 1 as optically sensing human positions or orientations. Appeal Br. 27. Even if we limit the inventor's particular problem to the handheld environment, we still determine that Sears is "reasonably pertinent to the particular problem with which the inventor is involved." *Id.*

Therefore, we again conclude that Sears is analogous art.


### D.2. Claim 6 – Section 103 – Liebermann and Sears
### D.2.a. First Argument – By Dependency from Claim 1

As discussed above, *Liebermann* does not teach or suggest each and every limitation of claim 1. *Sears* does not cure the deficiencies of *Liebermann* regarding claim 1 and the Action does not so assert. *See* Action, pp. 28–32. Accordingly, the combination of *Liebermann* and *Sears* does not render claim 1 obvious. Claim 6 depends from and adds limitations to claim 1. Accordingly, the combination of *Liebermann* and *Sears* also does not render dependent claim 6 obvious for at least the same reasons.

26

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Appeal Br. 33–34.

As discussed above, we find no deficiency in Liebermann, therefore, we are not persuaded by Appellant's dependency argument for claim 6.

### D.2.b. Claim 6 – Section 103 – Liebermann and Sears
### Second Argument – Principle of Operation & Hindsight

> The fundamental disagreement between Patent Owner and the Examiner is whether it would be obvious to *relocate Liebermann's* "sophisticated computer equipment, databases, and neural networks," Liebermann, 5:37–38, *from Liebermann's* "*central processing facility*" (also referred to as "the Center") to *Liebermann's* "portable transmitter/receiver" to meet the requirements of claim 6. . . . The effective filling date of the '924 Patent is July 8, 1999, so the Examiner's rejection rests on the assertion that it would have been obvious in 1999 to condense the "sophisticated equipment, databases, and neural networks" that occupied a physical building (i.e., the "Center") into a "handheld device." That assertion is *untenable*, which is why the Examiner cites no evidence in support. *See* Action, pp. 29–32.

Appeal Br. 35 (emphasis added).

> [T]he existence and use of *Liebermann's* "*central processing facility*" as a necessary intermediary between the deaf user and the hearing user is found in every disclosed embodiment. Thus, the "central processing facility," its functions, and the exchange of data between the "central processing facility" and the deaf user and the hearing user are key features of *Liebermann's* distributed architecture and thus *key features of Liebermann's principle of operation*. Modifying *Liebermann* by abolishing the "central processing facility," as proposed by the Examiner, *would violate Liebermann's principle of operation*.

Appeal Br. 38–39 (emphasis added).

> In the Answer, the Examiner argued while "*Liebermann* disclose[s] the cellular telephone of the deaf person providing

27

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

image capture and initial image processing and *a central processing facility* (i.e., the Center) performing further processing (id. at c.4, 11.60 – c.5, 1.48), the ***Examiner finds that this is just a design preference***. To support the Examiner's position, the Examiner finds that *Liebermann* discloses a design choice to perform the sophisticated translation processing at a designated off-line processing center *for economic reasons*, not the requirement to." Answer, p. 30 (emphasis added). Patent Owner disagrees.

Liebermann expressly discloses "[f]rom ***cost and portability*** standpoints, the translating means is at a remote location or central station and there is included transmission means for transmitting the digitized signing motions or their digital identifiers to the translating means." *Liebermann*, 3:38-43 (emphasis added). In other words, for *Liebermann's* portable embodiments including *Liebermann's* "portable transmitter/ receiver," which the Examiner relies on extensively, *Liebermann* discloses that it is a requirement that the "sophisticated translation processing" take place at ***Liebermann's*** "central processing facility." Contrary to the Examiner's contentions, it ***is not a design choice***.

Reply Br. 26 (Appellant's emphasis omitted; Panel emphasis added).

We are not persuaded by Appellant's arguments. First, abolishing the "central processing facility" does not violate Liebermann's principle of operation. We find Liebermann's independent claim 12, for example, to be silent as to the argued intermediary "central processing facility." *Id.* Contrary to Appellant's argument, the Examiner's proposed modification does not change the overall principle of operation of Liebermann's ***claimed*** device. *See In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012) ("[T]his difference does not affect the operability of Mouttet's broadly claimed device."). For example, although Liebermann's dependent claim 16 recites "transmitting . . . *to a central station* where said translating steps are

28

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

performed," the independent claim from which it depends (method claim 12) does not recite any such "central station." Under the doctrine of claim differentiation, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314–15 (Fed. Cir. 2005) (en banc). "This presumption is especially strong where the limitation in dispute is the only meaningful difference" between the two claims. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014). Thus, the "central station" of Liebermann's dependent claim is an option in the independent claim, not a requirement.

Second, although Appellant (in the Reply Brief) and the Examiner (in the Answer) engage in a lengthy discussion of whether Liebermann's central processing facility is a mere design preference, we fail to see the relevance of this entire exchange. As we noted above, we find Liebermann's claim 1 silent as to the argued intermediary "central processing facility."

### D.2.c. Claim 6 – Section 103 – Liebermann and Sears
### Third Argument – Articulated Reason & Motivation

The Examiner's rejection of claim 6 determines that multiple reasons exist to combine the references. Because we find the Examiner's "simple substitution" analysis to be determinative, we do not address the Examiner's alternative determination that Sears teaches a ***time saving reason*** (Final Act. 31–32). In the below sections, we first outline the different positions and arguments, before providing our analysis in the final section.

### D.2.c.i. Claim 6 – Third Argument – Final Office Action

The Examiner determines that the reference combination involves the ***simple substitution*** of one known element/method for another to obtain

29

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

predictable results (Final Act. 32). Additionally, the Examiner supports the reason to combine analysis by referencing (Final Act. 31) the Abowd Declaration's motivation analysis (Decl. ¶¶ 149–152, 70–71) for Liebermann, Sears, and other prior art – in effect the Examiner adopts this portion of the Abowd analysis as the Examiner's own.[10] These paragraphs of the Abowd Declaration explain why "[a] person of ordinary skill would have been motivated to include a computer, similar to as disclosed in Sears, within the housing to perform local image processing and gesture recognition when implementing a cellular telephone similar to as disclosed in Liebermann." Decl. ¶ 149.

### D.2.c.ii. Claim 6 – Third Argument – Appeal Brief

Appellant presents the following argument:

> The Examiner also contends that the proposed combination of *Liebermann* and *Sears* is obvious because it is merely the "*simple substitution* of one known element for another to obtain predictable results." Action, pp. 56–59 (citing MPEP § 2143(I)(B)). Patent Owner disagrees. The Examiner's proposed modification to *Liebermann* **results in a complete dismantling of Liebermann's distributed architecture**. It is unclear what, if any, purpose *Liebermann's* "*central processing facility*" would serve following the Examiner's proposed modification. This cannot be considered a "simple substitution."

> ... By performing gesture processing at the "*central processing facility*," any update to the "database" or "translation means" (e.g., algorithms) only needs to be done in one place.

> As discussed above, the Examiner's proposed modifications to *Liebermann* include moving the gesture

---

[10] Again, although uncommon, we know of no case law or office policy (nor does Appellant cite any) that precludes this form of Examiner analysis in the circumstances here.

30

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

processing from *Liebermann's* "**central processing facility**" to the "portable transmitter/receiver" of each deaf user. Following such a modification, any update/patch to the "database" and/or "translation means" would need to be propagated to every deaf user's "portable transmitter/receiver." This would unnecessarily complicate the update process and risk different users having different and out-of-date versions of the "database" and "translation means."

Appeal Br. 44–45 (emphasis added).

D.2.c.iii. Claim 6 – Third Argument – Examiner's Answer

In response, as to the simple substitution argument, the Examiner further points out:

[The] July 2022 Final Office Action provided additional support including the rationale of "simple substitution of one known element for another to obtain predictable results" (See July 2022 Final Office Action at 57–59).

In response to Appellant's argument that the sophisticated components of *Sears* cannot exist in *Liebermann*; and the modification of *Liebermann* would require a complete dismantling of *Liebermann*, the test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981).

From this perspective, *Sears* teaches

[in] general, any *Intel Pentium or compatible chip* of 150 MHz speed will be sufficient, *although a faster speed will provide improved results*. In addition, other non-Intel processors, such as those that are used in Windows CE systems, will suffice if they are of a similar performance.

31

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> (*Sears* at c.7, 11.1-7). The Examiner finds that this is similar to
> the PC and processor the '924 Patent discloses. ('924 Patent at
> c.2, 11.20−23; c.3, 11.32−34, 400 Mhz Pentium II). The
> Examiner concludes this must be the CPU designated in the
> instant invention of the '924 Patent of Figure 18 of the handheld
> device. The Examiner finds that one of ordinary skill in the art
> would recognize the process of placing a Pentium processor or
> compatible chip, performing the required claim requirements, in
> the *Liebermann* device, at the time of invention, would simply
> be engineering expediency, as is evidenced by *Sears*. "While the
> proposed modification may have required more expensive
> hardware, such as skilled person would have appreciated that
> customers would desire highly-integrated smart phone devices
> that could perform additional functions, e.g., local gesture
> recognition". (See Nov 2021 Abowd Declaration at 149, and
> citation to *Gershman*, "currently, more integration in mobile
> computing is desired").

Ans. 34−35.

### D.2.c.iv. Claim 6 − Third Argument − Reply Brief

In reply, Appellant further argues the Examiner's reasoning "is wrong
for multiple reasons." Reply Br. 30.

> First, it is unclear how this renders the Examiner's
> proposed modification to Liebermann obvious (i.e., relocating
> *Liebermann's* "sophisticated computer equipment, databases,
> and neural networks" (*Liebermann*, 5:37−38) from
> *Liebermann's* ***central processing facility***" to *Liebermann's*
> "portable transmitter/receiver").

> Second, the Examiner provides zero evidence that
> *Liebermann's* "sophisticated computer equipment, databases,
> and neural networks" are comparable to and/or could be executed
> on "a Pentium processor or compatible chip."

> Third, the Examiner provides zero evidence that
> *Liebermann's* "portable transmitter/receiver" is compatible with
> "a Pentium processor or compatible chip."

32

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> And Fourth, the Examiner cannot rely on the '924 Patent
> for evidence that a POSITA would have combined *Liebermann*
> and *Sears*: "It is improper, in determining whether a person of
> ordinary skill would have been led to this combination of
> references, simply to [use] that which the inventor taught against
> its teacher." *In re Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002)
> (cleaned up).

Reply Br. 30–31 (formatting and emphasis added).

### D.2.c.v. Claim 6 – Third Argument – Panel Analysis

We are not persuaded by Appellant's arguments. In the Appeal Brief, to rebut the Examiner's simple substitution analysis, essentially, Appellant elevates Liebermann's disclosed "central processing facility" to the status of an immovable critical element. Appellant is mistaken. As we discuss above at section D.2.b., we find Liebermann's independent claim 12 to be silent as to the argued intermediary "central processing facility," and instead it is dependent claim 16 which introduces "a central station." When viewed in the context of Liebermann's claims, we conclude Liebermann's ***distributed processing architecture*** is not mandatory and is merely one of the well-known in the art optional processing architectures that may be substituted for each other with predictable results (well-known trade-offs). We agree with the Examiner that the proposed combination is merely the simple substitution for the numerous reasons set forth by the Examiner in the Final Office Action and in the Abowd Declaration's motivation analysis (Decl. ¶¶ 149–152, 70–71) as referenced by the Examiner (cited in Final Action at page 31 in the rejection of claim 6). Also, we do not find where Appellant's Appeal Brief acknowledges and addresses the Abowd Declaration's reason to combine analysis.

33

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

In the Reply Brief, first, Appellant restates (to no effect) the mistaken "central processing facility" Appeal Brief argument which we discuss above.

Second, in the Reply Brief, Appellant points to "a preferred form of [Liebermann's] invention [which] includes a processing center containing the sophisticated computer equipment, databases, and neural networks to effect the signing/verbal translations" (Liebermann, 5:35–39) and presumes this embodiment is required by Liebermann's claimed invention. Appellant then argues the Examiner must provide evidence that Liebermann's "sophisticated" embodiment is comparable to and/or could be executed on a Pentium processor. We disagree with Appellant. None of "a processing center containing sophisticated computer equipment, databases, or neural networks" is required by Liebermann's independent claim 12 (see instead Liebermann's dependent claim 16). We conclude that Liebermann contemplates other forms of his invention. We find no basis for Appellant's demand that the Examiner provide further evidence.

Third, in the Reply Brief, Appellant argues the Examiner must provide additional evidence that *Liebermann's* portable transmitter/receiver is compatible with a Pentium processor. The Examiner already (a) cites (Ans. 34) to the Sears teaching of using a Pentium processor for processing gesture-based visual inputs, and (b) points out (Ans. 34; Final Act. 31 referencing Abowd Decl. ¶ 152) that Appellant discloses using the same class of processor in the claimed invention (Spec. 3:33–34). Appellant's conclusory assertion does not explain why the Examiner must provide additional evidence. We find no reasonable basis for Appellant's demand that the Examiner provide such evidence.

34

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Fourth, in the Reply Brief, Appellant argues the Examiner relies on the '924 Patent for evidence that a POSITA would have combined *Liebermann* and *Sears*. We disagree. Rather, the Examiner relies on the '924 Patent to show the class of processor (Intel Pentium) used in Appellant's invention, and relies on Sears to teach that it was known to use that same class of processor in similar systems. Contrary to Appellant's argument that the Examiner is "simply" using that which the inventor taught against the teacher, Appellant did not invent the Pentium processor and the Examiner properly cited to Sears for its teaching of using a Pentium processor. We conclude that this argument does not show the Examiner errs.

### D.2.d. Claim 6 – Conclusion

We conclude the Examiner sets forth a proper articulated reasoning with a rational underpinning to support the legal conclusion of obviousness for claim 6.

### D.3. Claim 7 – Section 103 – Liebermann and Sears – "Facial Expressions" Argument

### D.3.a. Claim 7 – Final Action

The Examiner determines:

> [T]he Examiner finds that *Liebermann* discloses the portable transmitter/receiver telephone 8: a) capturing finger/hand motions, body motions and ***facial expression*** motions by cameras[.]

Final Act. 29 (emphasis added).

> [T]he the Examiner finds that *Liebermann* discloses the preference of utilizing hardware/software modules at a separate central processing facility (i.e., the Center) to perform the

35

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> translation/conversion into equivalent text content; and
> processing of gesturing, object position/orientation, frame
> reference and *facial expression information*. (*Liebermann* at
> c.4, 1.60−c.5, 1.13; c.6, 11.6−12, 42−52; c.7, 1.44−c.12, 1.6).

Final Act. 30 (emphasis added).

### D.3.b. Claim 7 – Appeal Brief

Appellant argues "*Sears* does not cure the deficiencies of

*Liebermann*." Appeal Br. 46.  Appellant then argues:

> The Examiner contends, while performing the analysis under
> rationale (B), that *Sears* "utilizes a hardware/software
> combination on the computer of the device . . . [for processing]
> facial expression information locally." Action, p. 57. But this is
> simply not true. *Sears* does not process facial expressions at all.
> This is unsurprising considering *Sears* is directed to OCR-based
> electronic reading machines. *Sears*, Abstract, 3:12-15.

Appeal Br. 47.

### D.3.c. Claim 7 – Examiner's Answer & Reply Brief

The Examiner further determines:

> In response to Appellant's arguments against the
> references individually (*i.e.*, *Sears* does not teach facial
> expression analysis), one cannot show nonobviousness by
> attacking references individually where the rejections are based
> on combinations of references. See *In re Keller*, 642 F.2d 413. . .
> (CCPA 1981); *In re Merck & Co.*, 800 F.2d 1091. . . (Fed. Cir.
> 1986).

> . . . [T]he Examiner finds that *Liebermann* discloses the
> preference of utilizing hardware/software modules at a separate
> central processing facility (i.e., the Center) to perform the
> translation/conversion into equivalent text content; and
> processing of gesturing, object position/orientation, frame
> reference *and facial expression information*. . . . Specifically, the
> Examiner finds that *Liebermann* discloses tracking the
> position/orientation motion of objects, finger/hand motions,

36

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> body motions and facial expression motions utilizing the
> hardware/software modules. . . .

> The Examiner finds that *Sears*, for example, teaches a
> main system **35** comprising either a personal computer *separate
> from* the system **35** or an embedded computer *within* the system
> **35** for the use of capturing image data, digitizing the image data
> and processing the image data (*i.e.*, conversion into text and
> analyzing the image data for the presence, orientation and
> movement of objects in the image data[)].

Ans. 35–36.

In the Reply Brief, we do not find where Appellant further disputes
the above Examiner's finding.

### D.3.e. Claim 7 – Panel Analysis

We are not persuaded by Appellant's argument. We agree with the
Examiner (Ans. 35–36) that Appellant ineffectively attacks Sears for lacking
a teaching (facial expressions) where that teaching is found in Liebermann.

### D.4. Claim 8 – Section 103 – Liebermann and Sears –
### "Other than the user" Argument

As to claim 8, Appellant argues:

> Claim 8 recites "[t]he handheld device of claim 1 wherein
> the computer is adapted to determine at least one of the position
> and the orientation of the object based on the second camera
> output." . . . [T]o meet dependent claim 8, *the Examiner uses
> the same reasoning that was relied upon for dependent claim
> 6*. *See* Action, pp. 29–32. As discussed above, no motivation
> exists to combine *Liebermann* and *Sears*, and thus *Liebermann*
> and *Sears* do not render dependent claim 6 obvious. *Liebermann*
> and *Sears* do not render dependent claim 8 obvious for at least
> the same reasons.

> Further, the "object" in claim 8 is something "other than
> the user of the device." Compare dependent claim 8 *with*
> independent claim 1 ("a second camera oriented to view an

37

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

object other than the user of the device and having a second camera output"). *Liebermann* does not teach "determine[ing] at least one of the position and the orientation of the object based on the second camera output," as required by claim 8. The "gloves" in *Liebermann* are being worn by the user of the system. *Liebermann*, Figs. 13A and 13B. **They are not an <u>object other than the</u> user**. *Sears* also does not teach this requirement. Accordingly, the combination of *Liebermann* and *Sears* does not render claim 8 obvious.

Appeal Br. 47–48 (emphasis added).

We are not persuaded by Appellant's argument. First, Appellant does not dispute that the Examiner has shown determining at least one of the position and the orientation of an object. Rather, Appellant disputes that the prior art object is not an object "other than *the user*" as required by claim 1.

Second, for the reasons already set forth above as to "the user" limitation, we conclude the Examiner sets forth a proper articulated reasoning with a rational underpinning to support the legal conclusion of obviousness for claim 8.

## E. No Jurisdiction

Appellant raises the following jurisdictional argument in contending that the Examiner erred in granting the reexamination request filed in November 2021 on a patent that expired in July 2020.

In *Oil States*, the Supreme Court explained that the "decision to *grant* a patent is a matter involving public rights-specifically, the grant of a public franchise." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) (emphasis in original). "Specifically, patents are public franchises that the Government grants to the inventors of new and useful improvements." *Id.* (internal quotation marks omitted). The Court explained that "Congress [has] significant

38

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

latitude to assign [the] adjudication of public rights to entities other than Article III courts." *Id.* at 1368[, 1373]. In exercising its "significant latitude," Congress grants public franchises "subject to the qualification that the PTO has the authority to reexamine and perhaps cancel—a patent claim in an inter partes review." *Id.* at 1368, 1374 (internal quotation marks omitted). Accordingly, so long as the public franchise exists, the PTO may have jurisdiction to amend and cancel the claims of the patent (e.g., via *ex parte* reexamination).

When a patent expires, however, *the public franchise ceases to exist* and the franchisee (e.g., the patent owner) no longer has the right to exclude others. At most, the franchisee may be entitled to collect damages from the public franchise that formerly existed through an infringement action in district court. But because the public franchise no longer exists, *the USPTO has nothing in its authority to cancel or amend*. Expiration removes the patent from the USPTO's jurisdiction and returns it to the sole jurisdiction of the Article III courts, which have exclusive authority to govern claims for damages. If this were not so, the USPTO would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

Appeal Br. 52–53 (emphasis added).

We are not persuaded by Appellant's argument. First, the Supreme Court in *Oil States* expressly stated that "[p]atents thus remain subject to the Board's authority to cancel outside of an Article III court." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1374 (2018) (quotation omitted). Moreover, the rejected claims here are the claims as issued; they have not been amended in reexamination.

39

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Second, the statute authorizing reexamination does not limit the timing of a reexamination in the manner argued by Appellant. To the contrary, the statute states:

> Any person ***at any time*** may file a request for reexamination by the Office of any claim of a patent on the basis of any prior art cited under the provisions of section 301.

35 U.S.C. § 302 (emphasis added). The regulation more specifically states a request for an *ex parte* reexamination may be filed "at any time *during the period of enforceability of a patent.*" 37 C.F.R. § 1.510(a) (emphasis added). MPEP § 2211 further explains that "[t]he period of enforceability is generally determined by adding 6 years to the date on which the patent expires but the period may be extended if there is pending litigation." *See also* 35 U.S.C. § 286.

Third, we disagree that Appellant has no rights under the expired patent.

> It is well-established that [the Federal Circuit's] decision (and the Board's decision on remand) would have a consequence on any infringement that occurred during the life of the . . . patent. *See Genetics Inst. v. Novartis Vaccines*, 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286."); *see also Keranos, LLC v. Silicon Storage Tech., Inc.*, 797 F.3d 1025, 1033 (Fed. Cir. 2015) (Although "the patentee has fewer rights to transfer when the patent has expired," the owner of an expired patent can license the rights or transfer title to an expired patent.); *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1372 (Fed. Cir. 2008) ("Title to . . . an expired patent . . . includes more than merely the right to recover damages for past infringement.").

*Sony Corp. v. Iancu*, 924 F.3d 1235, 1238 n.1 (Fed. Cir. 2019).

40

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Fourth, our reviewing court regularly reviews Board decisions where a patent under reexamination expired prior to the Board issuing its decision. In none of these cases has the Federal Circuit found a lack of jurisdiction before the United States Patent and Trademark Office (USPTO). *See, e.g.*, *In re Rambus, Inc.*, 753 F.3d 1253 (Fed. Cir. 2014) (involving appeal of an *inter partes* reexamination of expired U.S. patent 6,034,918)[11]; *see also CSB-Sys. Int'l*, 832 F.3d at 1338 ("[T]he '953 patent expired during the reexamination.").

Finally, Appellant provides no citations or support for its assertion that the USPTO's jurisdiction ends at the time of expiration despite the patentee still being able to assert that its patent was valid and infringed within the statute of limitations. *See* 35 U.S.C. § 286.

We conclude the USPTO has jurisdiction for this reexamination so long as any right remains under the expired patent.

### F. No Substantial New Question (SNQ)

Appellant raises the following SNQ argument in contending that the Examiner erred in granting this reexamination request.

> Patent Owner respectfully asserts that no SNQs of patentability exist and thus the reexamination order should be vacated. . . .

> As discussed above, *Liebermann* does not disclose a handheld device with two cameras having non-overlapping fields

---

[11] The Board noted in a related *ex parte* reexamination appeal that "[t]he '918 patent term expired during the reexamination proceedings." *Ex parte Rambus, Inc.*, Appeal 2010-011178, 2011 WL 121775, at *6 (BPAI Jan. 12, 2011).

41

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

of view. In other words, *Liebermann* does not provide the "key features" that were missing from the art during the original prosecution of the '924 [challenged] Patent. As also discussed above, *Sears* does not cure these deficiencies of *Liebermann*. Thus, a reasonable examiner would not consider *Liebermann* and/or Sears to be important in deciding whether one or more claims of the '924 [challenged] Patent are patentable, and *Lieberman* alone or combined with Sears does not raise a SNQ of patentability.

Appeal Br. 54–55.

We are not persuaded by Appellant's argument. For the reasons already set forth above, we determine that Liebermann and Sears do provide the teachings that were missing from the art considered during the original prosecution of the challenged '924 Patent, and thus, does raise a SNQ of patentability.


## CONCLUSIONS

The Examiner has not erred in rejecting claims 1–5 and 13 as being anticipated under 35 U.S.C. § 102.

We **affirm** the Examiner's rejection of claims 1–5 and 13 as being anticipated under 35 U.S.C. § 102.

The Examiner has not erred in rejecting claims 1–14 as being unpatentable under 35 U.S.C. § 103.

We **affirm** the Examiner's rejections of claims 1–14 as being unpatentable under 35 U.S.C. § 103.

42

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

## DECISION SUMMARY

In summary:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 1–5, 13 | 102 | Liebermann | 1–5, 13 | |
| 1–5, 13 | 103 | Liebermann | 1–5, 13 | |
| 6–10, 12 | 103 | Liebermann, Sears | 6–10, 12 | |
| 11 | 103 | Liebermann, Tryding | 11 | |
| 14 | 103 | Liebermann, Gershman | 14 | |
| 14 | 103 | Liebermann, Kimball | 14 | |
| Overall Outcome | | | 1–14 | |

## REQUESTS FOR EXTENSIONS OF TIME

Requests for extensions of time in this ex parte reexamination proceeding are governed by 37 C.F.R. § 1.550(c). *See* 37 C.F.R. § 41.50(f).

## AFFIRMED

43

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

PATENT OWNER:

WILLIAMS SIMONS & LANDIS PLLC/GTP
THE LITTLEFIELD BUIDLING
601 CONGRESS AVE., STE 600
AUSTIN, TX  78701


THIRD PARTY REQUESTER:

PAUL HASTINGS LLP
2050 M. STREET NW
WASHINGTON, DC 20036

44

**Exhibit PAT-A**

**U.S. Patent No. 8,194,924 ("the '924 patent")**

US008194924B2

(12) **United States Patent**
Pryor

(10) **Patent No.:** **US 8,194,924 B2**
(45) **Date of Patent:** **Jun. 5, 2012**

(54) **CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING OR OTHER DEVICES**

(76) Inventor: **Timothy R. Pryor**, Sylvania, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/051,698**

(22) Filed: **Mar. 18, 2011**

(65) **Prior Publication Data**

US 2011/0170746 A1     Jul. 14, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 12/834,281, filed on Jul. 12, 2010, now Pat. No. 7,933,431, which is a continuation of application No. 11/980,710, filed on Oct. 31, 2007, now Pat. No. 7,756,297, which is a continuation of application No. 10/893,534, filed on Jul. 19, 2004, now Pat. No. 7,401,783, which is a continuation of application No. 09/612,225, filed on Jul. 7, 2000, now Pat. No. 6,766,036.

(60) Provisional application No. 60/142,777, filed on Jul. 8, 1999.

(51) **Int. Cl.**
*G06K 9/00* (2006.01)

(52) **U.S. Cl.** ........................ **382/103**; 382/154; 382/312

(58) **Field of Classification Search** ................. 382/103, 382/154, 312
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,909,002 A | 9/1975 | Levy | |
| 4,219,847 A | 8/1980 | Pinkney et al. | |
| 4,339,798 A | 7/1982 | Hedges et al. | |
| 4,631,676 A | 12/1986 | Pugh | |
| 5,008,946 A | 4/1991 | Ando | |
| 5,088,928 A | 2/1992 | Chan | |
| 5,227,986 A | 7/1993 | Yokota et al. | |
| 5,297,061 A | 3/1994 | Dementhon et al. | |
| 5,388,059 A | 2/1995 | DeMenthon | |
| 5,491,507 A * | 2/1996 | Umezawa et al. | 348/14.02 |
| 5,581,276 A | 12/1996 | Cipolla et al. | |
| 5,594,469 A | 1/1997 | Freeman et al. | |
| 5,616,078 A | 4/1997 | Oh | |
| 5,624,117 A | 4/1997 | Ohkubo et al. | |
| 5,781,647 A | 7/1998 | Fishbine et al. | |
| 5,828,770 A * | 10/1998 | Leis et al. | 382/103 |
| 5,845,006 A * | 12/1998 | Sumi et al. | 382/154 |
| 5,853,327 A | 12/1998 | Gilboa | |
| 5,878,174 A | 3/1999 | Stewart et al. | |
| 5,926,168 A | 7/1999 | Fan | |
| 5,940,126 A * | 8/1999 | Kimura | 348/294 |
| 6,204,852 B1 * | 3/2001 | Kumar et al. | 345/419 |
| 6,342,917 B1 | 1/2002 | Amenta | |
| 6,373,472 B1 | 4/2002 | Palalau et al. | |
| 6,442,465 B2 | 8/2002 | Breed et al. | |
| 6,508,709 B1 | 1/2003 | Karmarkar | |
| 6,597,817 B1 | 7/2003 | Silverbrook | |
| 6,775,361 B1 * | 8/2004 | Arai et al. | 379/93.17 |
| 6,788,336 B1 * | 9/2004 | Silverbrook | 348/207.2 |
| 6,911,972 B2 * | 6/2005 | Brinjes | 345/175 |
| 7,489,863 B2 * | 2/2009 | Lee | 396/429 |

* cited by examiner

*Primary Examiner* — Tom Y Lu
(74) *Attorney, Agent, or Firm* — Warner Norcross & Judd LLP

(57) **ABSTRACT**

Method and apparatus are disclosed to enable rapid TV camera and computer based sensing in many practical applications, including, but not limited to, handheld devices, cars, and video games. Several unique forms of social video games are disclosed.

**14 Claims, 23 Drawing Sheets**





**FIG. 1A**



**FIG. 1B**

**FIG. 1C**



**FIG. 2A**

**FIG. 2B**



**FIG. 2C**



## FIG. 2D



## FIG. 4A



## FIG. 3A



## FIG. 4B



## FIG. 3B



## FIG. 3C



## FIG. 5A



## FIG. 5B



**FIG. 6**



**FIG. 7**

**FIG. 9**



**FIG. 8A**

**FIG. 8B**



FIG. 10A



**FIG. 10B**



**FIG. 11A**



FIG. 11B



*FIG. 12*



*FIG. 13*



FIG. 14A



## FIG. 14B



## FIG. 14C



*FIG. 15*



*FIG. 16*



FIG. 17C



FIG. 17A



*FIG. 17B*



Fig. 18

US 8,194,924 B2

1

# CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING OR OTHER DEVICES

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 12/834,281, filed Jul. 12, 2010 (now U.S. Pat. No. 7,933,431), which is a continuation of application Ser. No. 11/980,710, filed Oct. 31, 2007 (now U.S. Pat. No. 7,756,297), which is a continuation of application Ser. No. 10/893,534, filed Jul. 19, 2004 (now U.S. Pat. No. 7,401,783), which is a continuation of application Ser. No. 09/612,225, filed Jul. 7, 2000 (now U.S. Pat. No. 6,766,036), which claims the benefit of U.S. Provisional Application No. 60/142,777, filed Jul. 8, 1999.

Cross references to related co-pending US applications by the inventor having similar subject matter.

1. Touch TV and other Man Machine Interfaces: Ser. No. 09/435,854 filed Nov. 8, 1999, now U.S. Pat. No. 7,098,891; which was a continuation of application Ser. No. 07/946,908, now U.S. Pat. No. 5,982,352;

2. More Useful Man Machine Interfaces and Applications: Ser. No. 09/433,297 filed Nov. 3, 1999, now U.S. Pat. No. 6,750,848;

3. Useful Man Machine interfaces and applications: Ser. No. 09/138,339, Pub.Appln. 2002-0036617, now abandoned;

4. Vision Target based assembly: Ser. No. 08/469,907 filed Jun. 6, 1995, now U.S. Pat. No. 6,301,783;

5. Picture Taking method and apparatus: provisional application 60/133,671, and regular application Ser. No. 09/568,552 filed May 11, 2000, now U.S. Pat. No. 7,015,950;

6. Methods and Apparatus for Man Machine Interfaces and Related Activity: Provisional Application: provisional application 60/133,673 filed May 11, 1999; and regular application Ser. No. 09/568,554 filed May 11, 2000, now U.S. Pat. No. 6,545,670;

7. Tactile Touch Screens for Automobile Dashboards, Interiors and Other Applications: provisional application Ser. No. 60/183,807; and regular application Ser. No. 09/789,538, now U.S. Pat. No. 7,084,859; and

8. Apparel Manufacture and Distance Fashion Shopping in Both Present and Future: provisional application 60/187,397 filed Mar. 7, 2000.

The disclosures of the following U.S. patents and co-pending patent applications by the inventor, or the inventor and his colleagues, are incorporated herein by reference:

1. "Man machine Interfaces": U.S. application Ser. No. 09/435,854 and U.S. Pat. No. 5,982,352, and U.S. application Ser. No. 08/290,516, filed Aug. 15, 1994, now U.S. Pat. No. 6,008,000, the disclosure of both of which is contained in that of Ser. No. 09/435,854;

2. "Useful Man Machine Interfaces and Applications": U.S. application Ser. No. 09/138,339, now Pub. Appln. 2002-0036617;

3. "More Useful Man Machine Interfaces and Applications": U.S. application Ser. No. 09/433,297, now U.S. Pat. No. 6,750,848;

4. "Methods and Apparatus for Man Machine Interfaces and Related Activity": U.S. Appln. Ser. No. 60/133,673 filed as regular application Ser. No. 09/568,554, now U.S. Pat. No. 6,545,670;

5. "Tactile Touch Screens for Automobile Dashboards, Interiors and Other Applications": U.S. provisional Appln. Ser. No. 60/183,807, filed Feb. 22, 2000, now filed as reg. application Ser. No. 09/789,538; and

2

6. "Apparel Manufacture and Distance Fashion Shopping in Both Present and Future": U.S. Appln. Ser. No. 60/187, 397, filed Mar. 7, 2000.

## FIELD OF THE INVENTION

The invention relates to simple input devices for computers, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, and operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations. The invention herein is a continuation in part of several inventions of mine, listed above.

This continuation application seeks to provide further useful embodiments for improving the sensing of objects. Also disclosed are new applications in a variety of fields such as computing, gaming, medicine, and education. Further disclosed are improved systems for display and control purposes.

The invention uses single or multiple TV cameras whose output is analyzed and used as input to a computer, such as a home PC, to typically provide data concerning the location of parts of, or objects held by, a person or persons.

## DESCRIPTION OF RELATED ART

The above mentioned co-pending applications incorporated by reference discuss many prior art references in various pertinent fields, which form a background for this invention. Some more specific U.S. Patent references are for example:

DeMenthon—U.S. Pat. Nos. 5,388,059; 5,297,061; 5,227,985

Cipolla—U.S. Pat. No. 5,581,276

Pugh—U.S. Pat. No. 4,631,676

Pinckney—U.S. Pat. No. 4,219,847

## DESCRIPTION OF FIGURES

FIG. 1 illustrates a basic computer terminal embodiment of the invention, similar to that disclosed in copending applications.

FIG. 2 illustrates object tracking embodiments of the invention employing a pixel addressable camera.

FIG. 3 illustrates tracking embodiments of the invention using intensity variation to identify and/or track object target datums.

FIG. 4 illustrates tracking embodiments of the invention using variation in color to identify and/or track object target datums.

FIG. 5 illustrates special camera designs for determining target position in addition to providing normal color images.

FIG. 6 identification and tracking with stereo pairs.

FIG. 7 illustrates use of an indicator or co-target.

FIG. 8 illustrates control of functions with the invention, using a handheld device which itself has functions.

FIG. 9 illustrates pointing at an object represented on a screen using a finger or laser pointer, and then manipulating the represented object using the invention.

FIG. 10 illustrates control of automobile or other functions with the invention, using detected knob, switch or slider positions.

FIG. 11 illustrates a board game embodiment of the invention.

FIG. 12 illustrates a generic game embodiment of the invention.

FIG. 13 illustrates a game embodiment of the invention, such as might be played in a bar.

US 8,194,924 B2

**3**

FIG. **14** illustrates a laser pointer or other spot designator embodiment of the invention.

FIG. **15** illustrates a gesture based flirting game embodiment of the invention.

FIG. **16** illustrates a version of the pixel addressing camera technique wherein two lines on either side of a 1000 element square array are designated as perimeter fence lines to initiate tracking or other action.

FIG. **17** illustrates a 3-D acoustic imaging embodiment of the invention.

FIG. **18** illustrates an improved handheld computer embodiment of the invention, in which the camera or cameras may be used to look at objects, screens and the like as well as look at the user.

THE INVENTION EMBODIMENTS

FIG. **1**

The invention herein and disclosed in portions of other copending applications noted above, comprehends a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use. It also comprehends the combination of these functions with the basic task of generating, storing and/or transmitting a TV image of the scene acquired—either in two or three dimensions.

The embodiment depicted in FIG. **1**A illustrates the basic embodiments of many of my co-pending applications above. A stereo pair of cameras **100** and **101** located on each side of the upper surface of monitor **102** (for example a rear projection TV of 60 inch diagonal screen size) with display screen **103** facing the user, are connected to PC computer **106** (integrated in this case into the monitor housing), for example a 400 Mhz Pentium II. For appearances and protection a single extensive cover window may be used to cover both cameras and their associated light sources **110** and **111**, typically LEDs.

The LEDs in this application are typically used to illuminate targets associated with any of the fingers, hand, feet and head of the user, or objects such as **131** held by a user, **135** with hands **136** and **137**, and head **138**. These targets such as circular target **140** and band target **141** on object **131** are desirably, but not necessarily, retro-reflective, and may be constituted by the object features themselves (e.g., a finger tip, such as **145**), or by features provided on clothing worn by the user (e.g., a shirt button **147** or polka dot **148**, or by artificial targets other than retroreflectors.

Alternatively, a three camera arrangement can be used, for example using additional camera **144**, to provide added sensitivity in certain angular and positional relationships. Still more cameras can be used to further improve matters, as desired. Alternatively, and or in addition, camera **144** can be used for other purposes, such as acquire images of objects such as persons, for transmission, storage or retrieval independent of the cameras used for datum and feature location determination.

For many applications, a single camera can suffice for measurement purposes as well, such as **160** shown in FIG. **1**B for example, used for simple 2 dimensional (2D) measurements in the xy plane perpendicular to the camera axis (z axis), or 3D (xyz, roll pitch yaw) where a target grouping, for example of three targets is used such as the natural features formed by the two eyes **164**, **165** and nose **166** of a human **167**. These features are roughly at known distances from each other, the data from which can be used to calculate the approximate position and orientation of the human face. Using for example the photogrammetric technique of

**4**

Pinkney described below, the full 6 degree of freedom solution of the human face location and orientation can be achieved to an accuracy limited by the ability of the camera image processing software utilized to determine the centroids or other delineating geometric indicators of the position of the eyes and nose, (or some other facial feature such as the mouth), and the accuracy of the initial imputing of the spacing of the eyes and their respective spacing to the nose. Clearly if a standard human value is used (say for adult, or for a child or even by age) some lessening of precision results, since these spacings are used in the calculation of distance and orientation of the face of human **167** from the camera **160**.

In another generally more photogrammetrically accurate case, one might choose to use four special targets (e.g., glass bead retro-reflectors, or orange dots) **180-183** on the object **185** having known positional relationships relative to each other on the object surface, such as one inch centers. This is shown in FIG. 1C, and may be used in conjunction with a pixel addressable camera such as described in FIG. **2** below, which allows one to rapidly determine the object position and orientation and track its movements in up to 6 degrees of freedom as disclosed by Pinkney U.S. Pat. No. 4,219,847 and technical papers referenced therein. For example, the system described above for FIGS. **1** and **2** involving the photogrammetric resolution of the relative position of three or more known target points as viewed by a camera is known and is described in a paper entitled "A Single Camera Method for the 6-Degree of Freedom Sprung Mass Response of Vehicles Redirected by Cable Barriers" presented by M. C. van Wijk and H. F. L. Pinkney to The Society of Photo-optical Instrumentation Engineers.

The stereo pair of cameras can also acquire a two view stereo image of the scene as well, which can be displayed in 3D using stereoscopic or auto-stereoscopic means, as well as transmitted or recorded as desired.

In many applications of the foregoing invention it is desirable not just to use a large screen but in fact one capable of displaying life size images. This particularly relates to human scaled images, giving a life-like presence to the data on the screen. In this way the natural response of the user with motions of hands, head, arms, etc., is scaled in "real" proportion to the data being presented.

FIG. **2**

This embodiment and others discloses special types of cameras useful with the invention. In the first case, that of FIG. **2**A, a pixel addressable camera such as the MAPP2200 made by IVP corporation of Sweden is used, which allows one to do many things useful for rapidly determining location of objects, their orientation and their motion.

For example, as shown in FIG. **2**A, an approximately circular image **201** of a target datum such as **180** on object **185** of FIG. 1C may be acquired by scanning the pixel elements on a matrix array **205** on which the image is formed. Such an array in the future will have for example 1000.times.1000 pixels, or more (today the largest IVP makes is 512.times.512. The IVP also is not believed to be completely randomly addressable, which some future arrays will be).

As an illustration, computer **220** determines, after the array **205** has been interrogated, that the centroid "x, y" of the pixel elements on which the target image lies is at pixel x=500, y=300 (including a sub-fraction thereof in many cases). The centroid location can be determined for example by the moment method disclosed in the Pinkney patent, referenced above.

The target in this case is defined as a contrasting point on the object, and such contrast can be in color as well as, or

US 8,194,924 B2

5

instead of, intensity. Or with some added preprocessing, it can be a distinctive pattern on the object, such as a checkerboard or herringbone.

Subsequent Tracking

To subsequently track the movement of this target image, it is now only necessary to look in a small pixel window composed of a small number of pixels around the target. For example the square **230** shown, as the new position x'y' of the target image cannot be further distant within a short period of time elapsed from the first scan, and in consideration of the small required time to scan the window.

For example, if the window is 100.times.100 pixels, this can be scanned in 1 millisecond or less with such a pixel addressing camera, by interrogating only those pixels in the window, while still communicating with the camera over a relatively slow USB serial link of 12 mb transmission rate (representing 12,000 pixel gray level values in one millisecond).

One thus avoids the necessity to scan the whole field, once the starting target image position is identified. This can be known by an initial scan as mentioned, or can be known by having the user move an object with a target against a known location with respect to the camera such as a mechanical stop, and then indicate that tracking should start either by verbally saying so with voice recognition, or by actuating a control key such as **238** or whatever.

It is noted that if the tracking window is made large enough, then it can encompass a whole group of datums, such as **180-183** on an object.

FIG. 2B Reduction in Acquisition Time

Another application of such a pixel addressing camera is shown in FIG. 2B. One can look at the whole field, x y of the camera, **240**, but only address say every 10.sup.th pixel such as **250**, **251** and **252**, in each direction, i.e., for a total 10,000 pixels in a field of 1 million (1000.times.1000, say).

In this case computer **220** simply queries this fraction of the pixels in the image, knowing apriori that the target image such as **260** will have an image size larger than 10.times.10pixels, and must be detectable, if of sufficient contrast, by one of the queried pixels. (For smaller or larger target images, the number and spacing of queried pixels can be adjusted accordingly). This for example, allows one to find approximate location of targets with only 1/100 the pixel interrogation time otherwise needed, for example, plus any gain obtained as disclosed above, by knowing in what region of the image to look (for example during tracking, or given some apriori knowledge of approximate location due to a particular aspect of the physical arrangement or the program in question).

Once a target has been approximately found as just described, the addressing can be optimized for that region of the image only, as disclosed in subsequent tracking section above.

Given the invention, the potential for target acquisition in a millisecond or two thus is achievable with simple pixel addressable CMOS cameras coming on stream now (today costing under $50), assuming the target points are easily identifiable from at least one of brightness (over a value), contrast (with respect to surroundings), color, color contrast, and more difficult, shape or pattern (e.g., a plaid, or a herringbone portion of a shirt). This has major ramifications for the robustness of control systems built on such camera based acquisition, be they for controlling displays, or machines or whatever.

It's noted that with new 2000.times.2000 cameras coming on stream, it may only be necessary to look at every 15.sup.th or 20.sup.th pixel in each direction to get an adequate feel for target location. This means every 200.sup.th to 400.sup.th

6

pixel, not enough to cause image rendition difficulties even if totally dark grey (as it might be in a normal white light image if set up for IR wavelengths only).

FIG. 2C

Another method for finding the target in the first place with limited pixel interrogation is to look at pixels near a home point where a person for example indicates that the target is. This could be for example, placing ones fingernail such as **270**, whose natural or artificial (e.g., reflective nail polish) features are readily seen by the camera **275** and determined to be in the right corner of a pad **271** in FIG. 2C which approximately covers the field of view **274** of the camera **275**. The computer **220** analyzes the pixels in the right corner **278** of the image field **279** representing the pad portion **271** with the camera **275**, either continuously, or only when the finger for example hits a switch such as **280** at the edge of the pad, or on command (e.g., by the user pushing a button or key, or a voice message inputted via microphone **285** for example). After such acquisition, the target is then tracked to other locations in xy space of the pad, for example as described above. Its noted that it helps to provide a beep or other sound or indication when acquisition has been made.

Pick Windows in Real Time

Another aspect of the invention is that one can also pick the area of the image to interrogate at any desired moment. This can be done by creating a window of pixels with in the field to generate information, for example as discussed relative to a specific car dashboard application of FIG. **10**.

FIG. 2D—Scan Pattern

A pixel addressing camera also allows a computer such as **220** to cause scans to be generated which are not typical raster scans. For example circular or radial, or even odd shapes as desired. This can be done by providing from the computer the sequential addresses of the successive pixels on the camera chip whose detected voltages are to be queried.

A circular scan of pixels addressed at high speed can be used to identify when and where a target enters a field enclosed by the circular pixel scan. This is highly useful, and after that, the approximate location of the target can be determined by further scans of pixels in the target region.

For example consider addressing the pixels c1 c2 c3 . . . cn representing a circle **282** at the outer perimeter of the array, **285**, of 1000.times.1000 elements such as discussed above. The number of pixels in a full circle is approximately 1000 pi, which can be scanned even with USB (universal serial bus) limits at 300 times per second or better. For targets of 1/100 field in width, this means that a target image entering the field such as circular target image **289** (which is shown intersecting element cm and its neighbors) would have to travel 1/100 the field width in 0.0033 seconds to be totally missed in a worst case. If the image field corresponds to 20 inches in object field width this is 0.2 inches.times.300/sec or 60 inches/second, very fast for human movement, and not likely to be exceeded even where smaller targets are used.

Alternative shapes to circular "trip wire" perimeters may be used, such as squares, zig-zag, or other layouts of pixels to determine target presence. Once determined, a group of pixels such as group **292** can be interrogated to get a better determination of target location.

FIG. 3

Since many applications of the invention concern, or at least have present a human caused motion, or motion of a part of a human, or an object moved by a human, the identification and tracking problem can be simplified if the features of interest, either natural or artificial of the object provide some kind of change in appearance during such motion.

US 8,194,924 B2

7

FIG. 3 illustrates tracking embodiments of the invention using intensity variation to identify and/or track object target datums. In a simple case, a subtraction of successive images can aid in identifying zones in an image having movement of features as is well known. It is also useful to add pixel intensities of successive images in computer 220 for example. This is particular true with bright targets (with respect to their usual surroundings) such as LEDs or retro-reflectors. If the pixels in use by the camera are able to gather light preferentially at the same time a special illumination light is on, this will accentuate the target with respect to background. And if successive frames are taken in this way, not only will a stationary image of the special target build up, but if movement takes place the target image then will blur in a particular direction which itself can become identify-able. And the blur direction indicates direction of motion as well, at least in the 2-D plane of the pixel array used.

Another form of movement can take place artificially, where the target is purposely moved to provide an indication of its presence. This movement can be done by a human easily by just dithering ones finger for example (if a portion of the finger such as the tip is the target in question), or by vibrating an object having target features of interest on it, for example by moving the object up and down with ones hand.

For example consider FIG. 3A, where a human 301 moves his finger 302 in a rapid up and down motion, creating different image positions sequentially in time of bright target ring 320, 320′ on his finger, as seen by camera 325. If the camera can read quickly enough each of these positions such as 326 and 327 in image field 328 can be resolved, other wise a blur image such as 330 is registered on the camera and recorded in the computer 335.

Instead of using ones finger, it is also possible to create movement of a target for example with a tuning fork or other mechanism mechanically energizing the target movement, on what otherwise might be a static object say. And it is possible for the human, or a computer controlling the movement in question to create it in such a manner that it aids identification. For example, a certain number of moves of ones finger (e.g., 4), or 2 moves/sec of ones finger, or horizontal moves of ones finger etc., any or all of these could indicate to the computer upon analysis of the camera image, that a target was present.

The invention comprehends this as a method for acquiring the datum to be tracked in the first place, and has provided a camera mechanism for tracking fast enough not to lose the data, assuming a sufficiently distinct feature. For example, it is desirable to not require sophisticated image processing routines and the like if possible, to avoid the time it takes to execute same with affordable equipment. And yet in many scenes, finding a target can be done easily today without some aid, either a high contrast target (contrasting brightness or color or both, for example). Or the aid can be movement as noted, which allows the search for the target to be at least localized to a small region of the field of view, and thence take much less time to run, even if a sophisticated algorithm is employed.

FIG. 3B illustrates an embodiment wherein a target which blinks optically is used. The simplest case is a modulated LED target such 340 on object 341 shown. Successive frames taken with camera 345 looking at pixel window 346 at 300 scans of the pixels within the window per second where the image 347 of the LED target is located, can determine, using computer 349 (which may be separate from, or incorporated with the image sensor), 5 complete blinks of target 340, if blinked at a 60 hz rate. Both blink frequency, blink spacing,

8

blink pulse length can all be determined if the scan rate is sufficiently faster than the blink rate, or pulse time.

It should be noted that if the target 340 is a retro-reflector as in FIG. 1, with an illumination source such as 355 near the axis of the camera, then the LEDs (or other sources) of the illuminator can be modulated, causing the same effect on the target.

Somewhat more sophisticated is the situation shown in FIG. 3C where a target 380 (on object 360) illuminated by a light source 365 provides a time variant intensity change in the camera image 368 obtained by camera 370 as the target moves its position and that of the image. This can be achieved naturally by certain patterns of material such as herringbone, or by multifaceted reflectors such as cut diamonds (genuine or glass), which "twinkle" as the object moves. A relative high frequency "twinkle" in the image indicates then the presence of the target in that area of the image in which it is found.

When analog sensors such as PSD (position sensing diode) sensor 369 described in a copending application is used in addition to, or instead of a matrix array in camera 370, the variation in light intensity or twinkle can be obtained directly from the detected output voltage from the signal conditioning of the sensor as shown in trace 375 corresponding to the movement of diamond target 380 a distance in the camera field. From the PSD one can also determine the position of the detected target image, theoretically at least independent of the intensity fluctuation.

For digital array detectors, the intensity variation can also be detected by subtracting images and observing the difference due to such variation. Such images need to be taken frequently if the twinkle frequency is high, and this can cause problems unless high speed camera scanning is possible. For example, in a twinkle mode, a pixel addressable camera using the invention herein could scan every 5.sup.th pixel in both x and y. This would allow a 1000 frame per second operation of a camera which would normally go 40 frames per second. Such a rate should be able to capture most twinkle effects with the assumption that the light field changes on more than 25 pixels. If less, then scan density would need to be increased to every 3.sup.rd pixel say, with a corresponding reduction in twinkle frequency detection obtainable.

FIG. 4

FIG. 4A illustrates identification and tracking embodiments of the invention using color and color change in a manner similar in some aspects to the intensity variation from object datums described above.

Color can be used as has been noted previously to identify a target, as can a change in color with time. For example, a target can change its color in order to identify itself to successive interrogations of pixels on a color TV camera. This can be accomplished by having a retro-reflector which is illuminated in succession by light from different colored LEDs for example, in the arrangement of FIG. 1. For example red led 401 illuminates retro reflector target 405 on object 406 during frame 1 (or partial frame, if not all pixels addressed) taken by camera 410. Then yellow led 402 illuminates target 405 on the next frame, and so forth. For any reading of successive frames, one point in the image will appear to distinctly change color, while all other points will be more or less the same due to the room lighting overwhelming the led source illumination and the natural color rendition of the objects themselves.

To return color variation when moved, one can employ a target which changes color naturally as it moves, even with illumination of constant color. Such a target can contain a diffractive, refractive, or interference based element, for example, a reflective diffraction grating for example, which

US 8,194,924 B2

9 10

splits white light illumination into colors, which are seen differently as the target moves and changes angle with respect to the observer and/or illumination source.

For example, consider FIG. 4B showing reflective grating **440** on object **445** at initial position P. When illuminated by white light for example from lamp **450**, it reflects the spectrum such that when the object has moved to a new position P' the color (or colors, depending on the grating type, and angles involved) returning to camera **460** is changed. Such gratings can be purchased from Edmund Scientific company, and are typically made as replicas of ruled or holographic gratings.

Some types of natural features which change color are forms of jewelry which have different colored facets pointing in different directions. Also some clothes look different under illumination from different angles. This could be called then "color twinkle".

FIG. 5

FIG. **5** illustrates special camera designs for determining target position in addition to providing normal color images. As was pointed out in a co-pending application, it may be desirable to have two cameras looking at an object or area one for producing images of a person or scene, the other for feature location and tracking. These may be bore-sighted together using beam splitters or the like to look at the same field, or they may just have largely overlapping image fields. The reason this is desirable is to allow one to obtain images of activity in the field of view (e.g., a human playing a game) while at the same time ideally determine information concerning position or other aspects of features on the human or objects associated with him.

It is now of interest to consider a matrix array chip equipped with a special color filter on its face which passes a special wavelength in certain pixel regions, in addition to providing normal color rendition via RGB or other filtering techniques in the remaining regions. The chip could be pixel addressable, but does not have to be.

Version FIG. 5A

One version would have one special pixel filter such as **505**, for each square group of 4 pixels in an array **500** (one special pixel filter **505**, and 3 pixels, **510-512** filtered for RGB (red green blue) or similar, as is commonly used now for example. In one functional example, the special pixel **505** is purposely not read during creation of the normal image of a scene, but rather read only on alternate frames (or as desired) to determine target locations. If the array can be addressed pixel wise, the actual time lost doing this can be low. Since 25% of the pixels are effectively dead in forming the image in this example, and assuming all pixels are of equal area (not necessarily required), then 25% of the image needs to be filled in. This can be done advantageously in the image displayed, by making the color and intensity of this pixel the same as the resultant color and average intensity value of the other 3 in the cluster.

Version FIG. 5B

In this version, related to FIG. **2** above, and shown in FIG. **5**b, isolated pixels such as **530** (exaggerated in size for clarity) on array **531** or clusters of pixels such as **540-543**, are used to rapidly find a target with low resolution, such as round dot target image **550**. These pixels can ideally have special filters on their face, for example having near IR bandpass filters (of a wavelength which can still be seen by the camera, typically up to 1 um wavelength max). If takes only a few pixels to see the rough presence of a target, then in an image field of 1000.times.1000 pixels there could be one or more target images occupying 10.times.10 pixels or more. Thus in any group of 10.times.10, you could have 5 near IR filtered receptive pixels say, i.e., only 5% of the total pixel count but

sufficient to see the IR targets location to a modest accuracy. Once found, one can also use the "normal" pixels on which the target image also falls to aid in more precise determination of its location, for example using pixel group **555** composed of numerous pixels.

In short by having a camera with certain pixels responsive to selected wavelengths and/or scanned separately one can very rapidly scan for target features, then when found, take a regular picture if desired. Or just take regular pictures, until the necessity arises to determine target location.

Similarly the special filtered pixels such as **505** or **530** could be laser wavelength bandpass filtered for this purpose, used by the array for preferentially detecting laser light projected on an object (while ignoring other wavelengths). In a normal image, such a pixel would be nearly black as little white light passes (except that centered on the laser wavelength). To provide a normal picture using such a camera, the special IR or laser wavelengths pixels readings would be filed in with values and colors of light from the surrounding regions.

Such a laser wavelength filter can be extremely effective, even if a relatively weak laser is used to illuminate a large area, especially where retro-reflectors are used, and the light returned is concentrated by 1000 times or more.

FIG. 6

The embodiments above have dealt with finding just one target, and generally with just one camera, even though two or more cameras may be used for stereo imaging. Where stereo pairs of cameras are used, clearly each camera must see the target, if range via image disparity (the shift in location of a feature in the image in two camera views separated by a baseline) is to be determined.

Using the invention, one camera can be considered a master, the other a slave. The master camera determines target location by any of the means described above. Then the slave need only look at the expected pixel location of the target assuming some a priori knowledge of range which can come from previous target readings, or known range zones where the target has to lie in a given application.

Consider cameras **600** (master) with lens **603** and **601** (slave) having lens **604**, the axes of the two cameras separated by baseline **602** and with interfaced to computer **605**. The image of target **610** on object **615** is formed at position **620** on array **630** of camera **600**, and at position **621** on array **631** of camera **601**. The difference in position x in the direction of the baseline, in this simple situation is directly proportional to range z. The knowledge then of target image position **620** found by interrogating some or all of the pixels of camera **600** can as mentioned be used to more rapidly find image **621** in the image field of the "slave" camera **601**, and thus the z location of the target **610**.

For example if range is known to be an approximate value of z, one can look in the image field of the camera **601** along a line of points at a calculated value x away from the edge of the field, assuming **620** has been found to lie as shown near the corresponding edge of the field of camera **600**.

Two or more cameras may be used for stereo image analysis including object range and orientation data as discussed in FIGS. 1 and 6. Range can also be determined via triangulation with a single camera and one target if projected on to the object in question at an angle to the camera axis from a laser say, or by using a single camera and 3 or more points on an object whose relative relationship is known (including the case of a line of points and an external point).

FIG. 7

As stated above, the TV camera of the invention can be used to see either natural or artificial features of objects. The

US 8,194,924 B2

11

former are just the object features, not those provided on the object especially for the purpose of enhancing the ability to determine the object location or other variable using computer analysis of TV camera images. Such natural features, as has been pointed out in many of the co-pending referenced applications, can be holes, corners, edges, indentations, protrusions, and the like of fingers, heads, objects held in the hand, or whatever.

But using simple inexpensive equipment it is often hard to determine the presence or location of such features in a rapid reliable enough manner to insure function of the application in question. In this case, one can employ one or more artificial features, provided on the object by attaching an artificial target onto the object, or manufacturing the object with such a target.

At least three types of artificial features can be employed.

1. The first is to provide special features required for object location, or orientation determination. Such a special feature can be of an optically contrasting material at the wavelength used to that of the object, for example a bright color, or a retroreflector;

2. The second is to provide one artificial feature (typically capable of more easily being found in an image than natural features of the object), and by finding it, localize to the region of that target environs the problem of finding any other features needed nearby; and

3. The third is to find an artificial feature on an object that actually by its shape, location, or coded features, provides a guide to the location of natural or other artificial features which are to be sensed in order to determine position or orientation of the same or related objects. This has been dubbed by me a co-target in co-pending applications incorporated by reference.

As shown in FIG. **7**, object **700** has co-target **701** at one end, visible to camera **705**. The co-target in this particular instance is a diamond shape, and is of high contrast for easy acquisition. For example it could be a yellow plastic retroreflector formed of molded corner cubes similar to those used on cars for taillights and other safety purposes.

The diamond shape in this case is significant for two reasons. First it is unusual relative to the object or background when used in the context intended, and makes the target still more identifiable (that is novel color, shape and brightness are all present). In addition, in this particular instance it has been chosen that a diamond shape, should indicate that the corners of the object are to be used for 6 axis position and orientation determination and that the choice of color for example, signifies that the object corners are within some predetermined distance from the target. If desired the target location on the object can also point to the corners. For example, in the drawing, the four corners of the diamond, **720**-**723**, point in the general direction of the four corners **730**-**733** of the rectangular object **700**.

FIG. **8**

The invention herein and disclosed in portions of other copending applications noted above, comprehends a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use. It also comprehends the combination of these functions with the basic task of generating, storing and/or transmitting a TV image of the scene acquired either in two or three dimensions.

FIG. **8**A illustrates control of functions with the invention, using a handheld device which itself has functions (for example, a cell phone). The purpose is to add functionality to

12

the device, without complicating its base function, and/or alternatively add a method to interact with the device to achieve other purposes.

The basic idea here is that a device which one holds in ones hand for use in its own right, can also be used with the invention herein to perform a control function by determining its position, orientation, pointing direction or other variable with respect to one or more external objects, using an optical sensing apparatus such as a TV camera located externally to sense the handheld device, or with a camera located in the handheld device, to sense datums or other information external for example to the device.

This can have important safety and convenience aspects to it, particularly when the device is used while driving a car or operating other machinery. To date voice recognition has been the only alternative to keying data in to small handheld devices, and voice is limited in many cases very limited if some physical movement is desired of the thing being communicated with.

A cellular phone **800** held in the hand of a user can be used to also signal functions in a car using a projected laser spot from built in laser spot projector **801** as in FIG. **14**, in this case detected by detector **802** on the dashboard **803**. Alternatively and or in conjunction, one may use features such as round dot targets **805**-**807** on the cell phone which are sensed, for example, by a TV camera **815** located in the car headliner **816** or alternatively for example in the dashboard (in this case the targets would be on the opposite end of the cell phone). More than one set of targets can be used, indeed for most generality, they would be an all sides which point in any direction where a camera could be located to look at them.

Remote control units and dictating units are also everyday examples of some devices of this type which can serve control purposes according to the invention. One of the advantages here is that it keeps the number of switches etc on the device proper to a minimum, while allowing a multitude of added functions, also in noisy environments where voice recognition could be difficult or undesirable for other reasons.

Use of specialized target datums or natural features of devices held in the hand, or used with cameras on such devices, allows photogrammetric techniques such as described in FIG. **1** to be used to determine the location in 6 degrees of freedom of the device with respect to external objects.

As one illustrative example, to signal a fax unit **824** in the car to print data coming through on the phone, the user just points (as illustrated in position **2**) the cell phone toward the fax, and the TV camera **815** scans the images of targets **805**-**807** on the face toward the camera, and the computer **830** connected to the camera analyzes the target images (including successive images if motion in a direction for example is used as an indicator, rather than pointing angle for example), determines the cell phone position and/or orientation or motion and commands the fax to print if such is signaled by the cell phone position orientation or motion chosen. The knowledge in space of the cell phone location and its pointing direction (and motion as pointed out above) provides information as to the fact that the fax was the intended target of the effort. Such data can be taught to the system, after the fact even if the fax or any other item desired to be controlled is added later.

Another version has a camera and requisite computer (and or transmission capability to an external computer) in the handheld device, such as a cell phone or whatever. When pointed at an object, the camera can acquire the image of the object and/or any natural features or special datums on the object which are needed to perform the function desired.

US 8,194,924 B2

13

One function is just to acquire an image for transmission via for example the cell phones own connection. This is illustrated in FIG. 8B, where an image of object **849** acquired by camera **850** of cell phone **851** held by user **852** is transmitted over mobile phone link **853** to a remote location and displayed, for example. While this image can be of the user, or someone or something of interest, for example a house, if a real estate agent is making the call, it is also possible to acquire features of an object and use it to determine something.

For example, one purpose is recognition, for example one can point at the object, and let the computer recognize what it is from its TV image. Or point around in space taking multiple TV frames aiming in different directions, and when computer recognition of a desired object in one of the images takes place, transmit certain data to the object. Or it can be used to acquire and transmit to remote locations, only that data from recognized objects.

Thus the invention can provided on a hand held object for a variety of purposes,

To take images of things;
To determine datums on things; and
To automatically read things.

The combination of any or all of these functions in addition with other object functions such as hand held cell phones, dictation units, telephones, wearable computer devices and the like.

An alternative, shown with phantom lines in FIG. 8A, to the some aspects of the above described operation of the embodiment is to use a laser pointer **801** in for example a cell phone to designate say the fax machine as shown. Then the TV camera **815** simply detects the presence of the laser pointer **820** on the fax, and via computer memory it is known that this is a device to be energized or connected in connection with the cell phone.

The camera located in a handheld device can also be used to point at a TV screen, such as that on the dashboard of a car, and to utilize data presented there for some purpose. For example, if pointed at a screen saying email message number **5**, the camera of the device can be used to obtain this image, recognize it through known character recognition techniques, and process it for transmission if desired. Or it might just say the message to the user of the phone through the speaker of the cell phone. Such a technique is not required if means exist to directly transmit the incoming information to the cell phone, but this may not be possible.

FIG. 9

FIG. 9 illustrates pointing at a displayed image of an object represented on a screen using a finger or laser pointer, and then manipulating the represented object or a portion thereof using the invention. For example, consider user **901** pointing a laser pointer **905** at an image generated by computer **910** on display **912**, typically a large screen display (e.g., 5 feet diagonal or more) where control features here disclosed are of most value.

The user with the pointer, can point to an image or portion of the displayed image to be controlled, and then using the action of the pointer move the controlling portion of the image, for example a "virtual" slider control **930** projected on the screen whose lever **935** can be moved from left to right, to allow computer **910** sensing the image (for example by virtue of TV camera **940** looking at the screen as disclosed in copending applications) to make the appropriate change, for example in the heat in a room.

Alternatively one can also point at the object using ones fingers and using other aspects of the invention sense the

14

motions of ones fingers with respect to the virtually displayed images on the screen, such as turning of a knob, moving of a slider, throwing a switch etc.

Such controls are not totally physical, as you don't feel the knob, so to speak. But they are not totally virtual either, as you turn it or other wise actuate the control just as if it was physical. For maximum effect, the computer should update the display as you make the move, so that you at least get visual feedback of the knob turning. You could also get an appropriate sound if desired, for example from speaker **950**, like an increase in pitch of the sound as the knob is "moved" clockwise.

FIG. **10**

The above control aspects can in some forms be used in a car as well even with a small display, or in some cases without the display.

Or it can be a real knob which is sensed, for example by determining position of a target on a steering wheel or the fingers turning it tracked (as disclosed in co-pending application references).

For example, consider car steering wheel rim **1000** in FIG. **10**A. In particular, consider hinged targeted switch, **1010** (likely in a cluster of several switches) on or near the top of the wheel, when the car is pointed straight ahead, and actuated by the thumb of the driver **1011**. A camera **1020** located in the headliner **1025**, and read out by microcomputer **1025** senses representative target **1030** on switch **1010**, when the switch is moved to an up position exposing the target to the camera (or one could cover the target with ones fingers, and when you take a finger off, it is exposed, or conversely one can cover the target to actuate the action).

The camera senses that target **1010** is desired to be signaled and accordingly computer **1025** assures this function, such as turning on the radio. As long as the switch stays in the position, the radio is on. However other forms of control can be used where the switch and target snap back to an original position, and the next actuation, turns the radio off. And too, the time the switch is actuated can indicate a function, such as increasing the volume of the radio until one lets off the switch, and the target is sensed to have swung back to its original position and the increase in volume thus terminated.

In operating the invention in this manner, one can see position, velocity, orientation, excursion, or any other attribute of actuation desired. Because of the very low cost involved in incremental additions of functions, all kinds of things not normally sensed can be economically provided. For example the position of a datum **1040** on manually or alternatively automatically movable plastic air outlet **1041** in the dashboard **1042** can be sensed, indicative of the direction of airflow. The computer **1025** can combine this with other data concerning driver or passenger wishes, other outlets, air temperature and the like, to perfect control of the ambiance of the car interior.

It is also noted that the same TV camera used to sense switch positions, wheel position, duct position, seat position (for example using datum **1045**), head rest position (for example using datum **1046**), and a variety of other aspects of physical positions or motions of both the car controls and the driver or passengers. And it can do this without wires or other complicating devices such as rotary encoders which otherwise add to the service complexity and cost.

When the camera is located as shown, it can also see other things of interest on the dashboard and indeed the human driver himself, for example his head **1048**. This latter aspect has significance in that it can be used to determine numerous aspects such as:

US 8,194,924 B2

15

1. The identity of the driver. For example, if a certain band of height isn't reached, such as point P on the drivers head, the ignition can be interlocked. Much simpler than face recognition, but effective if properly interlocked to prevent repeated retries in a short time period.

2. The position of the head of the driver in case of an accident. As detailed in reference **4**, a camera or cameras can be used to determine head location, and indeed location of the upper torso if the field of view is large enough. This information can be used to control airbag deployment, or head rest position prior to or during an accident (noting too that head-rest position can also be monitored without adding any hardware). Particularly of interest is that the pixel addressing camera of the invention can have the frequency response to be useful in a crash, sensing the movement of the person (particularly severe if unrestrained) within a millisecond or two, and providing a measure of the position for airbag deployment. Additional cameras may also be used to aid the determination, by providing other views or observing other features, for example.

Using a pixel addressing camera for camera **1020** confers additional advantages. For example consider the image of the car interior produced by the camera lens **1021**, on matrix of pixels **1061**, whose addressing and processing is controlled by computer **1025**. In the first instance one can confine the window of view of a certain group of pixels of the total matrix **1061** to be only in the region of the steering wheel, as in window **1065** shown. This allows much faster readout of the more limited number of pixels, and thus of the steering wheel switches, at the expense of not seeing anywhere else in that particular reading. But this may be desirable in some cases, since it may only be required to scan for heater controls or seat positions, every 10 seconds say, while scanning for other more immediate items a hundred times per second or more. A good example are safety related functions. 5 per second might suffice for seeing where the turn signal or windshield washer control was, as an example. Window **1066** dotted lines is illustrative of a window specialized for head, headrest and seat positions, say.

Scans in certain areas of the image can also depend on information obtained. For example one may initiate a scan of a control position, based on the increasing or decreasing frequency of an event occurrence. For example if the persons head is in a different location for a significant number of scans made at 15 second intervals for example, then in case of a crash, this data could be considered unreliable. Thus the camera window corresponding to pixels in the zone of the head location **1048** could be scanned more frequently henceforward, either until the car stopped, or until such action settled down for example. Such action is often the case of a person listening to rock music, for example.

Similarly, if someone is detected operating the heater controls, a scan of predominately heater function controls and related zones like air outlets can be initiated. Thus while normal polling of heater controls might be every 2 seconds say, once action is detected, polling can increase in the window(s) in question to 40 times per second for example. The detection of action can be made first via the camera, or via input from some other input device such as a convention heater knob and electric circuit operable therewith.

Scans in certain areas of the image can also depend on information obtained in other areas of scan, or be initiated by other control actions or by voice. For example, if hard deceleration was detected by an accelerometer, but before a crash occurred, the camera could immediately be commanded to begin scanning as fast as possible in the region of the image occupied by the driver and/or any other humans in

16

its field of view. This would be for the purpose of monitoring movements in a crash, if a crash came, in order to deploy an airbag for example.

One might utilize the invention to actuate a function, based on positions of people or other objects in the vehicle. As one example, suppose the drivers hand is resting on a console mounted gear lever. By scanning the image of this region, one can determine from the image the position of the console shift lever, and use the image thereof to control gear change via computer **1025**. However if the driver rests his hands on the windshield wiper stalk, it could in the same manner, become a column mounted gear lever so to speak. Or just be used for up down gear changes, like a paddle shifter on a racing car. In fact in the latter sense, the camera could be instructed to detect ones finger or hand movement to do this function for example, wherever one desired to rest ones hand (within the camera field of view at least). This function is also useful for physically disabled persons wishing to drive the car. And it can be different for different persons as well, via programming of the control functions associated with any given hand, switch or other position or movement.

FIG. **10**B illustrates alternative types of control mechanisms which can be used with the invention, in this case illustrated on the steering wheel of a car, although as can be appreciated, any suitable function or location may be used or created. And too, combinations of functions can be used. The invention is generic to car steering wheel controls, dishwashers, audio systems in ones home, heating and air conditioning elements and virtually all other forms of human related control functions. The key is that the camera computer combination makes a very inexpensive way to share a wide variety of functions with one or just a few basic systems and over a large population base.

As shown in FIG. **10**B, the steering wheel **1070** has two additional types of controls visible to camera **1020** and able to be sensed and generate the appropriate control function via computer. These are rotating device **1072** built to rotate around the steering wheel rim circular cross section, and expose a continuously variable, or digital or step wise increment component to the camera. For example, three bars are shown, short **1075**, medium **1076**, and long **1077**. The computer senses which of the three is visible by comparing the length to pre-stored values (or taught values, see below), and causes the desired action to occur.

The second control **1080** is a sliding device **1081** which can be slid clockwise, or counterclockwise along a circumferential section of the steering wheel at the top, sides or wherever. As before, Its position is determined by camera **1020** again providing more data than just a switch up or down as shown before.

While illustrated on the steering wheel where it is readily at hand, it can be appreciated that the position of either the slider **1081** or the rotary device **1072**, or other similar devices for the purpose at hand could be elsewhere than the wheel, for example on stalk or on a piece of the dash, or other interior component indeed wherever a camera of the invention can view them without excessive obscuration by persons or things in the car. It need not be on a car either, controls of this type can be in the home or elsewhere. Indeed a viewable control datum can even be on a portable component such as ones key chain, phone, or article of clothing apparel, or whatever. Similarly the camera **1020** can view these items for other purposes as well.

The teach-ability of the invention is achieved by showing the camera the code marker in question (e.g., a short bar located on the wheel), and in the computer recording this data along with what it is supposed to signify as a control function

US 8,194,924 B2

17

for example, turn rear wiper on to first setting. This added functionality of being easily changed after manufacture is an important advantage in some cases, as for example, today after-market addition of wired in accessories is difficult.

Games Using the Invention

The co-pending referenced applications have described games which can be played with target sensing and touch screen based devices, typically but not necessarily, electro-optically based (e.g., TV camera). The cameras of the invention can be used to, for example: Sense the player or players in the game or portions thereof; sense objects held or manipulated by the players (e.g., a ball, a pistol); sense physical tokens used in the game, such as monopoly game tokens; and sense game accessories such as checkerboards, croquet wickets; compare positions of objects with respect to other objects or players.

In addition, the cameras can be used to take images which can be displayed also a major feature given the ability to create life size displays. And the computer of the invention can be used to control the presentation of background image data from stored images, or even images downloaded from the internet for example.

Some or all of these aspects will now be illustrated in some representative game illustrations (again noting that some more are in the co-pending applications).

FIG. 11 Board Game

Even today, popular board games such as Monopoly and the like are being provided in computer playable form, with the "board" represented on the screen of the computer monitor. The invention here builds on this by providing various added features which allow a physical nature of the game just as the real game, but with new aspects and providing physical game play which can be transmitted over the internet to others. These features also can be turned off or on at as desired.

In one version shown in FIG. 11A, the player tokens such as 1101 and 1102 are observed by camera of the invention 1110 placed directly overhead of the play board 1115, which can for example be a traditional monopoly board (chess board, checker board, etc). points on the board such as corners 1130, 1131, 1132, and 1133 can also be observed to establish a reference coordinate system for the computer 1140 to track the moves of the markers, either from their natural features, or from specialized datums thereon (e.g., retro-reflective hat top 1141 on marker 1101). For example a train shape 1102 of a marker can be called from memory, or taught to the computer by showing it to the camera. Rotation invariant image analysis programs such as the PATMAX program from Cognex company can be used to identify the marker in any normal orientation, together with its location on the board (the board itself can be taught to the computer using the camera, but is preferably called up from memory).

The board position and relative scale in the field of view is determined easily by knowing the spacing of the corner points 1130-1133 and using this to calibrate the camera (to provide extra contrast, the corners can have retro-reflective glass bead edging or beading as shown). For example if the points are spaced 20 inch on corners of the board, and the camera is positioned so that 20 inches occupies 80% of its field of view, then the field of view is 25 inches square (for a square matrix of camera pixels), and each pixel of 1000 pixels square, occupies 0.025 inches in the object field.

The play of both players (or as desired) can be displayed on the monitor 1150, along with an image of the board (which also can be called from computer memory). But other displays can be provided as well. For example to lend more realism to the game, the display (and if desired sound

18

from speaker 1155 connected to computer 1140) can also be programmed to show an image or sound that corresponds to the game. For example, when the camera image has provided information that one player has landed on "Boardwalk" (the most valuable property) a big building could be caused to be shown on the screen, corresponding to it also suitable sounds like wow or something provided).

The camera can be used to see monopoly money (or other game accessories) as well, and to provide input so the computer can count it or do whatever.

A large, wall sized for example, screen can add added realism, by allowing one to actually get the feeling of being inside the property purchased, for example.

One of the exciting aspects of this game is that it can be used to turn an existing board game into something different. For example, in the original monopoly the streets are named after those in Atlantic City. By using the computer, and say a DVD disc such as 1160 stored images of any city desired can be displayed, together with sounds. For example, one could land on the Gritti Palace Hotel in Venice, instead of Boardwalk. As shown in FIG. 11B, the TV camera senses the image of train marker 1101, and conveys this information to computer 1140, which causes the display 1150 and speaker of the invention to display the information desired by the program in use.

Making the game in software in this way, allows one to bring it home to any city desired. This is true of a pure (virtual) computer game as well, where the board only exists on the computer screen.

For added fun, for example in a small town context, local stores and properties could be used, together with local images, local personages appearing on the screen hawking them, and the like. A local bank could be displayed to take your money, (even with sounds of the local banker, or their jingle from the radio) etc. This makes the game much more local and interesting for many people. Given the ease of creating such local imagery and sounds with cameras such as digital camcorder 1151 used as an input of display imagery (e.g., from local celebrity 1158) to the game program, one can make any monopoly experience more interesting and fun at low cost.

The same holds true with other well known games, such as Clue, where local homes could be the mystery solving location, for example. One can also create games to order, by laying out ones own board. If one of the persons is remote, their move can be displayed on the screen 1150.

In the above, the display has been treated as sort of backdrop or illustration related. However, one can also create a whole new class of games in which the display and/or computer and the board are intertwined. For example as one takes a trip around the monopoly board, several chance related drawings opportunities occur during play. In this new game, such could be internet addresses one draws, which, via modem 1152, send the board game computer 1140 to any of a large number of potential internet sites where new experiences await, and are displayed in sight and sound on the display.

It should also be noted that the board can be displayed on the screen as well, or alternatively projected on a wall or table (from overhead). A particularly neat mixture of new and old is shown in FIG. 11B, where the board is displayed on a screen pointed vertically upward just as it would be on a table, and indeed in this case physically resident on a table 1165. The board is displayed (from software images or cad models of the board in computer 1166) on a high resolution table top HDTV LCD screen 1167 with a suitable protective plastic shield (not shown for clarity). Play can proceed just as before using

US 8,194,924 B2

19

physical tokens such as **1101** and **1102**. In this case the display used to augment the game can actually be shown on the same screen as the board, if desired.

The TV camera **1110** in this context is used to see the tokens and any other objects of the game, the people as desired, and the play, as desired. The camera can be used to see the display screen, but the data concerning the board configuration displayed may be best imputed to the computer program from direct data used to create the display.

A beauty of the invention is that it allows the interaction of both computer generated images and simulations, with the play using real objects, such as one might be accustomed to for example, or which give a "real" feel, or experience to the game.

FIG. **12** Sports Game

FIG. **12** illustrates a generic physical game of the invention using points such as **1201-1205** on the human (or humans) **1210** sensed by a TV camera such as stereo camera pair **1215** and transmitted to the computer of the invention **1220**. While points can be sensed in 2D, this illustration uses as stereo camera pair located on large screen display **1225** as shown to provide a unitary package built into the screen display (pointed out in other co-pending applications). In this particular instance a 3D display is illustrated, though this isn't necessary to obtain value and a good gaming experience. The human optionally wears red and green filter glasses **1235** such that red images on the screen are transmitted to one eye, green to another, so as to provide a 3D effect. Similarly crossed polarized filter glasses (with appropriate display), and any other sort of stereoscopic, or autostereoscopic method can also be used, but the one illustrated is simple, requires no connecting wires to the human, and can be viewed by multiple uses, say in a gym aerobics room.

The game is generic, in that it totally depends on the program of the computer. For example, it can be an exercise game, in which one walks on a treadmill **1250**, but the image displayed on screen **1225** and sound from speakers **1255** and **1266** carry one through a Bavarian forest or the streets of New York as one walks, for example.

Or it can be a parasail game in which one flies over the water near Wakiki beach, with suitable images and sounds. In any case action determined by sensing position, velocity acceleration, or orientation of points **1201-1206** on the player, **1210** is converted by computer **1220** into commands for the display and sound system. Note in the figure this player is shown viewing the same screen as the treadmill walker. This has been shown for illustration purposes, and it is unlikely the same game could be applied to both, but it is possible.

It is noted that fast sensing, such as provided by the pixel addressing camera method disclosed above is highly desirable to allow realistic responses to be generated. This is especially true where velocities or accelerations need to be calculated from the point position data present in the image (and in comparison to previous images).

For example, consider points **1201** and **1202** on player **1210**. If point **1201** moves to **1201***a*, and **1202** moves to **1202***a* indicative of a quick jerk movement to turn the displayed parasail, this movement could occur in a 0.1 second. But the individual point movements to trace the action would have to be sensed in 0.01 second or quicker for example to even approximately determine the acceleration and thus force exerted on the glider, to cause it to move.

It is important to note that the invention is not only generic in so far as the variety of these games are concerned, but it also achieves the above with virtually no mechanical devices requiring maintenance and creating reliability problems

20

which can eliminate profits from arcade type businesses especially with ever more sophistication required of the games themselves.

FIG. 13 Bar Game

FIG. **13** illustrates a game which is in a class of gesture based games, in which the flirting game of FIG. **15** is also an example. In such games one senses the position, velocity or acceleration of a part of a person, or an object associated with the person. This can also include a sequence of positions, itself constituting the gesture. The detected data is then related to some goal of the contest. Consider FIG. **13**, wherein the object in ones hand is monitored using the invention, and a score or other result is determined based on the position, velocity, orientation or other variable of the object determined. For example, in a bar one can monitor the position, orientation, and rate of change thereof of drinking glasses.

A two person game is illustrated, but any reasonable number can play as long as the targets can all be tracked sufficiently for the game (in one test over 200 targets were acquired, but as can be appreciated this uses most of the field of view of the camera, and thus speed improvements made possible by pixel addressing become more difficult.

As shown, a single camera **1301** observes one or more targets such as **1305** on glass **1310** held by contestant **1315**, and target **1320** on glass **1325** of contestant **1330**. On a signal, each drinks, and a score is calculated by program resident in computer **1350** based on the time taken to raise the glass, and place it back empty on table **1355**. A display of the score, and an image desired, for example of the winner (taken with camera **1301** or another camera), or a funny image called from computer memory, is displayed on monitor display **1370**.

If the glass features are sufficiently distinct for reliable and rapid acquisition and tracking, for example as might be provided by an orange color, or a distinct shape, then specialized target features are not required.

Alternatively the velocity, path of movement of the glass (or other object), acceleration, or any other variable from which target data is sufficient to calculate, can be used to determine a score or other information to be presented or used.

FIG. **14**

The referenced co-pending applications have described a game where by laser pointers can be used to designate images on a TV screen. In this case of FIG. **14**A, the TV camera of the invention such as **1410** is used in a two player game to see laser pointer spots such as **1420** and **1421** projected by players **1430** and **1431** respectively, using laser pointers **1440** and **1441** respectively. When one player's spot hits the other, the event is recorded in memory of computer **1450** for further analysis and display.

In a somewhat different context, a person can use a laser pointer to point at an object to designate it for some purpose, for example for action. For example consider FIG. **14**B, in which housewife **1460** who points with laser pointer **1462** so as to provide a laser spot **1465** on dishwasher **1470**. TV camera of the invention **1475** in corner of the kitchen **1480** picks up all laser spots in an image of the room (made easier to process in terms of signal to background imagery if one locates a laser wavelength band-pass interference filter **1481** in front of the TV camera as shown) and compares via computer **1483**, the location of the spot detected in the image to stored memory locations of objects such as the dishwasher **1470** or fridge **1485** in the camera field of view, so as to identify the object needing action. In this case too, housewife may signal via a spatially variant laser pointer projection image (see copending referenced applications for further

US 8,194,924 B2

21          22

examples in other applications), or a series of spots in time, what action is desired, for example to turn the washer on. In this case the computer **1483** can cause a command to do so to be sent to the washer.

Any one with a simple laser pointer can make these commands effective. No learning is needed just point at the item desired, with the TV camera and computer of the invention acquiring the data and interpreting it. This is much simpler than remote controls of today, and a major advantage for those who have difficulty or inclination to learn complex electronic devices and procedures. It should be noted that these pointing procedures can easily be combined with voice recognition to further define the desired control activity for example inputting the housewife's voice in this example by virtue of microphone **1476**.

The stored locations can be taught. For example in a setup mode, one can point a laser pointer at the dishwasher, and indicate to the computer that that spot is the dishwasher. The indication can be provided by keyboard, voice recognition or any other means that is satisfactory.

Clearly other items can be monitored or controlled in this manner. The camera can also detect optical indications provided by other means, for example lights in the appliance itself. And one can detect whether light have been left on at night (or not left on) and cause them to be turned off or on as desired.

Such a camera if it is responsive to normal illumination as well as that of the laser wavelength, can also be used to see movements and locations of people. For example, it can look at the top of the stove, and assure that no movement is near the stove **1486**, or objects on it if programmed to do so, thus sounding an alarm if an infant should get near the stove, for example.

The housewife in the kitchen can also point at a board on which preprogrammed actions are represented. For example consider board **1490**, shown in greater detail in FIG. **14**C, in which 3 squares **1491-1493** are to represent different functions. Thus if **1491** is programmed (via keyboard, voice or whatever) to represent turning on the clothes dryer in the laundry, when the TV camera sees, and via the computer, identifies spot **1496** projected by the user on square **1491**, it causes the dryer to turn on. Operated in this manner, the board **1490**, in combination with a TV camera of the invention (such as **1475** or a more dedicated one for the board alone) and computer such as **1483** can be considered a form of touch screen, where the user, in this case in the kitchen can point at a portion of the board with a finger, or a laser pointer, and register a choice, much like touching an icon on a conventional computer touch screen.

Similarly, squares or other zones representing choices or the like can be on the item itself. For example, a stove can have four areas on its front, which can be pointed at individually for control purposes, what ever they are (e.g., representing heat settings, burner locations or the like). For security, it could be that only a coded sequence of laser pulses would be seen, or as pointed out in co-pending reference Ser. No. 60/133,673, a spatial code, for example representing the user such as an initial could be projected, and sensed on the object by the TV camera.

The laser pointer can be held in the hand of the user, or, like **1497** attached for example to a finger, such as forefinger **1498**. Or it can be on or in another object, desirably one which is often hand held in the normal course of work, such as a TV remote control, a large spoon, or the like. Or using other aspects of the invention, the finger of the user can be observed to point directly, and the object being pointed at determined. For example if finger **1498** is moved 4 times, it could indicate

to the TV camera and thence computer that channel four was desired on a TV display not shown.

If a special pointer is used, it can be any workable optical device, not necessarily a laser. The camera and computer of the invention can also be used to observe the user pointing directly, and compute the pointing vector, as has been described in my co-pending applications.

FIG. **15** A "Flirting" Game

Another game type is where the camera looks at the human, and the humans expressions are used in the game. In this case it is facial expressions, hand or body gestures that are the thing most used.

For example, one idea is to have a scene in a restaurant displayed on a display screen **1500**, preferably a large HDTV screen or wall projection to be as lifelike as possible, and preferably life size as well which lends extra realism to some games, such as this one due to the human element involved.

Let us consider that seated at the table in the restaurant displayed on the screen is a handsome man **1501** whose picture (likely a 3D rendered animation, or alternatively photo-imagery called from memory), and the goal for the girl **1510** playing the game is to flirt with this man until he gets up and comes over to say hello, ask her out or what ever (what he does, could be a function of the score obtained, even!).

Player **1510** seated at table **1511** (for authenticity, for example) is observed by TV camera **1515** (or stereo pair as desired, depending whether 3D information is thought required) and computer of the invention **1520**, which through software determines the position of eyebrows, lips, hands, fingers and any other features needed for the game. If necessary, specialized targets can be used as disclosed herein and elsewhere to augment this discrimination, for example such as optically contrasting nail polish, lipstick, eyeliner or other. Contrast can be in a color sense, or in a reflectivity sense such as even retro-reflective materials such as Scotchlite 7615 by 3M company. Even special targets can be used to enhance expressions if desired.

This can be a fun type game, as the response of the displayed person can be all kinds of things even contrary to the actual gestures if desired. Sounds, such as from speaker **1530** can also be added. And voice recognition of players words sensed by microphone **1550** can also be used, if verbal as well as expressive flirting is used.

While the game here has been illustrated in a popular flirting context, it is more generally described as a gesture based game. It can also be done with another contestant acting as the other player. And For example, the contestants can be spaced by the communication medium of the internet. The displayed characters on the screen (of the other player) can be real, or representations whose expressions and movements change due to sensed data from the player, transmitted in vector or other form to minimize communication bandwidth if desired.

Other games of interest might be:

"Down on the Farm" in which a farmer with live animals is displayed on a life size screen, and the children playing the game are to help the farmer by calling the animals to come over to them. This would use recognition of voice and gesture to make the animal images move and make sounds.

A player can find someone in a display and point at him, like the "Whereas Waldo" puzzle game. Then the subject moves, child runs to peek at him, and to find him, say running down a street whose image is displayed on the screen.

One can also use the camera of the invention to monitor the progress made by a child building blocks, and show an Video displayed image of a real skyscraper progressing as he builds

US 8,194,924 B2

23

his little version. Note the benefit of group activity like a board game and children's play with each other.

FIG. 16

FIG. **16** illustrates a version of the pixel addressing camera technique wherein two lines on either side of a 1000 element square array are designated as perimeter fence lines to initiate tracking or other action.

Some "pixel addressing" cameras such as the IVP MAPP 2500 512.times.512 element camera, are smart, that is can process on the same chip. However, in some cases the control of such a camera may not allow one to actually read just one pixel, say, but rather one must read the whole line on which the pixel rests. Now some processing can be in parallel such that no speed is lost, at least in many instances.

If however, one does have to read a whole line serially into a computer portion, then to fully see a 10.times.10 pixel round target say, one would have to read at least 10 lines.

If two targets both were located on the same lines, the time involved to read would be the same.

In the same vein, if lines of data must be scanned, then the approach of 2*b* wherein every 20.sup.th pixel say is interrogated can be specialized to having such pixels fall on scan lines wherever possible. And where one is restricted to reading all pixels on a scan line and where a target entry zone is anticipated, one can have a scan line oriented to be crossed by such entry. For example in FIG. **16**, the two lines **1601** (line of pixels **3**) and **1602** (line of pixels **997**) of a 1000.times.1000 element pixel array **1610** are designated as perimeter fence lines, to trigger a target tracking or other function on the entry of a target image on to the array, such as **1615** from either the right or left side in the drawing. This is often the case where entry from top or bottom is precluded by constraints of the application, such as a table top at the bottom, or the height of a person at the top. Or in a stereo example such as FIG. **6**, the baseline defines the direction of excursion of a target as z is varied again calling for crossing of scan lines out of the plane of the paper at some point.

The invention herein has provided an exciting method by which common board games can become more fun. The invention provides a link with that past, as well as all of the benefits of the video and computer revolution, also via the internet.

It is envisioned that the same approach may be applied to many card games as well. It is also thought that the invention will find use in creating ones own games, or in downloading from the internet others creations. For example, common everyday objects can become the tokens of the games, and taught to the game computer by presenting them to the video camera. Similarly, the people playing the game can be taught, including their names and interests.

FIG. 17

FIG. **17** illustrates a 3D acoustic imaging embodiment of the invention which at low cost may generate accurate 3D images of the insides of objects, when used in conjunction with ultrasonic transducers and particularly a matrix array of ultrasonic transducers.

As shown in FIG. **17**A, the position in xyz of the ultrasonic imaging head **1700** on wand **1701** held in a users hand **1702** is monitored electro-optically as taught in FIG. **1**, using a single camera **1710** and a simple four dot target set **1715** on the head **1700** at the end of the transducer wand **1701** in contact with the object to be examined **1720**. Alternatively, as also taught in FIG. **1**, a stereo pair for example providing higher resolution in angle can be employed.

Computer **1725** combines ultrasonic ranging data from the ultrasound transducer head **1700** and from the sensor of transducer location (in this case performed optically by camera

24

**1710** using the optically visible targets on the transducer head) in order to create a range image of the internal body of the object **1720** which is thus referenced accurately in space to the external coordinate system in the is case represented by the camera co-ordinates xy in the plane of the TV camera scan, and z in the optical axis of the camera.

In many cases it is also desirable to know the pointing angles of the transducer. One instance is where it is not possible to see the transducer itself due to obscuration, in which case the target may alternately be located at the end **1704** of the wand for example. Here the position and orientation of the wand is determined from the target data, and the known length of the wand to the tip is used, with the determined pointing angle in pitch and yaw (obtained from the foreshortening of the target spacings in the camera image field) to calculate the tip position in space.

This pitch and yaw determination also has another use however, and that is to determine any adjustments that need to be made in the ultrasonic transduction parameters or to the data obtained, realizing that the direction of ultrasound propagation from the transducer is also in the pointing direction. And that the variation in ultrasound response may be very dependent on the relation of this direction **1730** with respect to the normal **1735** of the surface **1736** of the object (the normal vector is shown for clarity pointing inward to the object).

The difference in direction can be calculated by using the TV camera (which could be a stereo pair for greater angular resolution) as well to determine the surface normal direction. This can, for example, be done by placing a target set such as **1740** on the surface in the field of the camera as shown. This can be dynamically or statically accomplished using the photogrammetric method described in the Pinkney references.

Differences in direction between the surface normal and the transducer pointing direction are then utilized by software in the computer **1725** of the invention in analysis of the ultrasound signals detected. The pointing angle and the position of the transducer on the surface of the object are used by the computer in predicting the location of various returns from internal points within the object, using a suitable coordinate transformation to relate them to the external coordinate reference of the TV camera.

All data, including transducer signals and wand location is fed to computer **1725** which then allows the 3D image of the inside of the body to be determined as the wand is moved around, by a human, or by a robot. This is really neat as all the images sequentially obtained in this manner can be combined in the computer to give an accurate 3D picture **1745** displayed on monitor **1750**.

In one preferred embodiment as shown in FIG. **17**C, the transducer head **1700** is comprised of a matrix **1755** of 72 individual transducer elements which send and receive ultrasound data at for example, 5 MHZ. This allows an expanded scan capability, since the sensor can be held steady at each discrete location xyz on the object surface, and a 3D image obtained with out movement of the transducer head, by analyzing the outputs of each of the transducers. Some earlier examples are described in articles such as: Richard E. Davidsen, 1996 IEEE Ultrasonics Symposium, A Multiplexed Two-Dimensional Array For Real Time Volumetric and B-Mode; Stephen W. Smith, 1995 IEEE Ultrasonics Symposium, Update On 2-D Array Transducers For Medical Ultrasound, 1995.

If the wand is now moved in space, fine scan resolution is obtained, due to the operation of the individual elements so positioned with out the need to move the wand in a fine pitch manner to all points needed for spatial resolution of this order.

US 8,194,924 B2

25      26

This eases the operators task, if manually performed, and makes robotization of such examination much easier from a control point of view.

Consider FIG. 17B which illustrates a transducer as just described, also with automatic compensation at each point for pointing angle, robotically positioned by robot, **1785** with respect to object **1764**. In this case a projection technique such as described in U.S. Pat. No. 5,854,491 is used to optically determine the attitude of the object surface, and the surface normal direction **1760** from the position of target set **1765** projected on the surface by diode laser set **1770**, and observed by TV Camera **1775** located typically near the working end of the robot. Differences between the normal direction and the transducer propagation direction (typically parallel to the housing of the transducer) is then used by computer **1777** to correct the data of the ultrasonic sensor **1780** whose pointing direction in space is known through the joint angle encoders and associated control system **1782** of robot **1785** holding the sensor. Alternatively the pointing direction of this sensor can be monitored by an external camera such as **1710** of FIG. 17A.

It should be noted that the data obtained by TV camera **1775** concerning the normal to the surface and the surface range from the robot/ultrasonic sensor, can be used advantageously by the control system **1782** to position the robot and sensor with respect to the surface, in order to provide a fully automatic inspection of object **1764**. Indeed the camera sensor operating in triangulation can be used to establish the coordinates of the exterior surface of object **1764** as taught for example in U.S. Pat. No. 5,854,491, while at the same time, the acoustic sensor can determine the range to interior points which can be differentiated by their return signal time or other means. In this manner, a complete 3D map of the total object, interior and exterior, can be obtained relative to the coordinate system of the Robot, which can then be transformed to any coordinate system desired.

The invention has a myriad of applications beyond those specifically described herein. The games possible with the invention in particular are limited only by the imagination.

Consider hand held computer **1901** of FIG. 18, incorporating a camera **1902** which can actually be rotated about axis **1905** so as to look at the user or a portion thereof such as finger **1906**, or at objects at which it is pointed. Optionally, and often desirably, a stereo pair of cameras to further include camera **1910** can also be used. It too may rotate, as desired. Alternatively fixed cameras can be used when physical rotation is not desired, for ruggedness, ease of use, or other reasons (noting that fixed cameras have fixed fields of view, which limit versatility in some cases).

When aimed at the user, as shown, it can be used, for example, to view and obtain images of:

Ones self—facial expression etc, also for image reasons—id etc. combined effect.

Ones fingers (any or all), one finger to other and the like. This in turn allows conversing with the computer in a form of sign language which can replace the keyboard of a conventional computer.

One or more objects in ones hand. Includes a pencil or pen—and thus can be used rather than having a special touch screen and pencil if the pencil itself is tracked as disclosed in the above figure. It also allows small children to use the device, and those who cannot hold an ordinary stylus.

Ones gestures.

The camera **1902** (and **1910** if used, and if desired), can also be optionally rotated and used to view points in space ahead of the device, as shown in dotted lines **1902**a. In this position for example it can be used for the purposes described in the previous application. It can also be used to observe or point at (using optional laser pointer **1930**) Points such as **1935** on a wall or a mounted

LCD or projection display such as **1940** on a wall or elsewhere such as on the back of an airline seat.

With this feature of the invention, there is no requirement to carry a computer display with you as with an infrared connection (not shown) such as known in the art one can also transmit all normal control information to the display control computer **1951**. As displays become ubiquitous, this makes increasing sense—other wise the displays get bigger the computers smaller trend doesn't make sense if they need to be dragged around together. As one walks into a room, one uses the display or displays in that room (which might themselves be interconnected).

The camera unit **1902** can sense the location of the display in space relative to the handheld computer, using for example the four points **1955-1958** on the corners of the display as references. This allows the handheld device to become an accurate pointer for objects displayed on the screen, including control icons. And it allows the objects on the screen to be sensed directly by the camera—if one does not have the capability to spatially synchronize and coordinate the display driver with the handheld computer.

The camera can also be used to see gestures of others, as well as the user, and to acquire raw video images of objects in its field.

A reverse situation also exists where the cameras can be on the wall mounted display, such as cameras **1980** and **1981** can be used to look at the handheld computer module **1901** and determine its position and orientation relative to the display.

Note that a camera such as **1902**, looking at you the user, if attached to hand held unit, always has reference frame of that unit. If one works with a screen on a wall, one can aim the handheld unit with camera at it, and determine its reference frame to the handheld unit. Also can have two cameras operating together, one looking at wall thing, other at you (as **1902** and **1902**a) in this manner, one can dynamically compare ref frames of the display to the human input means in determining display parameters. This can be done in real time, and if so one can actually wave the handheld unit around while still imputing accurate data to the display using ones fingers, objects or whatever.

Use of a laser pointer such as **1930** incorporated into the handheld unit has also been disclosed in the referenced copending applications. For example, a camera on the hand held computer unit such as **1902** viewing in direction **1902**a would look at laser spot such as **1990** (which might or might not have come from the computers own laser pointer **1930**) on the wall display say, and recognized by color and size/shape reference to edge of screen, and to projected spots on screen.

The invention claimed is:

**1**. A handheld device comprising:

a housing;

a computer within the housing;

a first camera oriented to view a user of the handheld device and having a first camera output; and

a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view, and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.

**2**. The handheld device of claim **1** wherein the handheld device comprises a mobile phone.

US 8,194,924 B2

27

3. The handheld device of claim **1** wherein the first camera is adapted to acquire an image of at least a portion of the user.

4. The handheld device of claim **1** wherein the second camera is adapted to acquire an image of the object.

5. The handheld device of claim **1** wherein the second camera is adapted to acquire a video of the object.

6. The handheld device of claim **1** wherein the computer is operable to determine a gesture based on at least one of the first camera output and the second camera output.

7. The handheld device of claim **1** wherein the computer is operable to determine a facial expression based on at least one of the first camera output and the second camera output.

8. The handheld device of claim **1** wherein the computer is adapted to determine at least one of the position and the orientation of the object based on the second camera output.

9. The handheld device of claim **6** wherein the gesture is performed by a person other than the user of the handheld device.

28

10. The handheld device of claim **1** wherein the computer is adapted to recognize the object based on the second camera output.

11. The handheld device of claim **1** wherein the computer is adapted to generate control instructions for a display that is separate from the handheld device.

12. The handheld device of claim **1** wherein the computer is adapted to determine a reference frame of the object.

13. The handheld device of claim **1** wherein the computer is adapted to perform a control function based on the first camera output and based on the second camera output.

14. The handheld device of claim **1** wherein the computer is adapted to transmit information over an internet connection.

\*  \*  \*  \*  \*