2024-1585

---

# United States Court of Appeals

# for the Federal Circuit

**In re: GESTURE TECHNOLOGY PARTNERS, LLC,**
*Appellant*,

---

Appeal from the United States Patent and Trademark Office in
*Ex parte* Reexamination Control No. 90/014,902

---

## JOINT APPENDIX

Fred I. Williams
WILLIAMS SIMONS & LANDIS
PLLC
601 Congress Ave., Suite 600
Austin, TX 78701
(512) 543-1354
fwilliams@wsltria.com

John Wittenzellner
WILLIAMS SIMONS & LANDIS
PLLC
1735 Market Street, Suite A#453
(512) 543-1373
johnw@wsltrial.com

Counsel for Appellant Gesture
Technology Partners, LLC

FARHEENA Y. RASHEED
*Solicitor*

AMY J. NELSON
*Senior Counsel for Patent Policy and
Litigation*

JUSTIN BOVA
PETER J. SAWERT
*Associate Solicitors*

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

*Attorneys for the Director of the U.S.
Patent and Trademark Office*

# TABLE OF CONTENTS

| Description | APPX Cites |
|---|---|
| Decision on Appeal | APPX0001 – APPX0044 |
| Certified List | APPX0045 – APPX0046 |
| All Rejected Claims of U.S. Patent No. 8,194,924 | APPX0047 – APPX0048 |
| Request for *Ex Parte* Reexamination of U.S. Patent No. 8,194,924 | APPX0049 – APPX0138 |
| U.S. Patent No. 8,194,924 | APPX0139 – APPX0177 |
| Certificate of Service of Request for *Ex Parte* Reexamination | APPX0187 – APPX0188 |
| Exhibit CC-2 – Claim Construction Memorandum and Order (Dkt. 93) in *Gesture Technology Partners, LLC v. Huawei Device Co.*, C.A. No. 2:21-cv-00040 (E.D. Tex. Oct. 12, 2021) | APPX0228 – APPX0229, APPX0272 – APPX0276 |
| Exhibit PA-DEC – Declaration of Dr. Gregory D. Abowd | APPX0339 – APPX0480 |
| Order Granting Request for *Ex Parte* Reexamination | APPX0794 – APPX0814 |
| Final Office Action | APPX0893 – APPX0957 |
| Office Action Cover Sheet | APPX0958 |
| Notice of Appeal | APPX0969 – APPX0970 |
| Appeal Brief Under 37 C.F.R. § 41.37 | APPX0971 – APPX1034 |
| Examiner's Answer | APPX1040 – APPX1084 |
| Reply Brief Under 37 C.F.R. § 41.41 | APPX1099 – APPX1135 |
| Record of Oral Hearing | APPX1183 – APPX1197 |

| Description | APPX Cites |
|---|---|
| Patent Owner's Notice of Appeal to the Court of Appeals for the Federal Circuit | APPX1198 – APPX1200 |
| Exhibit PA-1 – U.S. Patent No. 5,982,853 ("*Liebermann*") | APPX1246 – APPX1271 |
| Exhibit PA-2 – U.S. Patent No. 6,115,482 ("*Sears*") | APPX1272 – APPX1294 |

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

*Ex parte* GESTURE TECHNOLOGY PARTNERS, LLC
Patent Owner and Appellant

---

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2
Technology Center 3900

---

Before ALLEN R. MacDONALD, MICHAEL J. ENGLE, and
BRENT M. DOUGAL, *Administrative Patent Judges*.

MacDONALD, *Administrative Patent Judge*.


DECISION ON APPEAL[1]

STATEMENT OF THE CASE

Pursuant to 35 U.S.C. §§ 134(b) and 306, Gesture Technology
Partners, LLC[2] appeals from the final rejection of claims 1–14.  Appeal Br.
5–55.  We have jurisdiction under 35 U.S.C. § 6(b).

We affirm.

---

[1] On November 27, 2023, a hearing directed to this appeal was held.

[2] "Appellant" refers to "applicant" as defined in 37 C.F.R. § 1.42 (2022).
Appellant identifies the real party in interest as Gesture Technology
Partners, LLC.  Appeal Br. 1.

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

## CLAIMED SUBJECT MATTER

Claims 1, 2, and 6–8 are illustrative of the claimed subject matter (bracketed material according to Appellant's labeling of claim limitations, emphasis, and formatting added):

[1.a.] 1. A *handheld* device comprising:

    [1.b.] a housing;

    [1.c.] a computer within the housing;

    [1.d.] a first camera oriented to view *a user of the handheld device* and having a first camera output; and

    [1.e.] a second camera oriented to view *an object other than the user of the device* and having a second camera output,

        wherein the first and second cameras include *non-overlapping* fields of view, and

        wherein the computer is adapted to *perform a control function* of the handheld device based on at least one of the first camera output and the second camera output.

2. The handheld device of claim 1 wherein the handheld device comprises a *mobile phone*.

6. The handheld device of claim 1 wherein the computer is operable to *determine a gesture* based on at least one of the first camera output and the second camera output.

7. The handheld device of claim 1 wherein the computer is operable to *determine a facial expression* based on at least one of the first camera output and the second camera output.

8. The handheld device of claim 1 wherein the computer is adapted to *determine at least one of the position and the orientation of the object* based on the second camera output.

2

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

REFERENCES[3]

The Examiner relies on the following references:

| Name | Reference | Date |
|------|-----------|------|
| Tryding | US 5,880,732 | Mar. 9, 1999 |
| Kimball | US 5,953,322 | Sept. 14, 1999 |
| Liebermann | US 5,982,853 | Nov. 9, 1999 |
| Sears | US 6,115,482 | Sept. 5, 2000 |
| Gershman | US 6,401,085 B1 | June 4, 2002 |

REJECTIONS[4]

A.

The Examiner rejects claims 1–5 and 13 under pre-AIA 35 U.S.C. § 102 as being anticipated by Liebermann.[5] Final Act. 20–24, 26–28.

For this rejection, Appellant presents arguments for claims 1 and 2. Appeal Br. 5–26. Appellant does not present separate arguments for claims 3–5 and 13. We select claim 1 as the representative claim for the § 102 rejection of claims 3–5 and 13. Except for our ultimate decision, we do not address the merits of this § 102 rejection of claims 3–5 and 13 further herein.

---

[3] All citations herein are by the first named inventor.

[4] For simplicity herein, we refer to the Examiner's rejection under § 102(b) as a rejection under § 102; and we refer to the Examiner's rejections under § 103(a) as rejections under § 103.

[5] Although the Examiner states that Liebermann is prior art under pre-AIA § 102(b) (Final Act. 2, 4, 20), Liebermann is prior art under pre-AIA § 102(e). We deem this to be a harmless error.

3

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

B.

The Examiner rejects claims 1–5 and 13 under 35 U.S.C. § 103 as being unpatentable over Liebermann. Final Act. 24–28.

For this rejection, Appellant presents separate arguments for claims 1 and 2. Appeal Br. 26–31. Appellant does not present separate arguments for claims 3–5 and 13. We select claim 1 as the representative claim for the § 103 rejection of claims 3–5 and 13. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 3–5 and 13 further herein.

C.

The Examiner rejects claims 6–10 and 12 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Sears. Final Act. 28–32.

For this rejection, Appellant presents separate arguments for claims 6–8. Appeal Br. 31–48. To the extent that Appellant discusses this rejection of claim 10 (Appeal Br. 48–49), Appellant merely repeats (or references) the argument directed to claim 8. Appeal Br. 47–48. Such a repeated (or referenced) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claim 10. Appellant does not present separate arguments for claims 9 and 12.

We select claim 6 as the representative claim for the § 103 rejection of claims 9 and 12. We select claim 8 as the representative claim for the § 103 rejection of claim 10. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claims 9, 10, and 12 further herein.

4

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

### D.

The Examiner rejects claim 11 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Tryding. Final Act. 32–34.

To the extent that Appellant discusses this rejection of claim 11, Appellant merely references (or repeats) the argument directed to claim 1. Appeal Br. 50–51. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for this rejection of claim 11. Therefore, this rejection of claim 11 turns on our decision as to the rejection of claim 1. Except for our ultimate decision, we do not address the merits of this § 103 rejection of claim 11 further herein.

### E.

The Examiner rejects claim 14 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Gershman. Final Act. 34–35.

The Examiner also rejects claim 14 under 35 U.S.C. § 103 as being unpatentable over the combination of Liebermann and Kimball. Final Act. 35–36.

To the extent that Appellant discusses these rejections of claims 14, Appellant merely references (or repeats) the arguments directed to claim 1. Appeal Br. 51–52. Such a referenced (or repeated) argument is not an argument for "separate patentability." Thus, Appellant does not present separate arguments for these rejections of claim 14. Therefore, these rejections of claim 14 turns on our decision as to the rejection of claim 1.

5

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Except for our ultimate decision, we do not address the merits of these § 103

rejections of claim 14 further herein.

## PRINCIPLES OF LAW – CLAIM CONSTRUCTION

### A. *Phillips*[6]

During examination of a patent application, a claim normally is given

its broadest reasonable construction consistent with the specification. *In re*

*Prater*, 415 F.2d 1393, 1404–1405 (CCPA 1969). However, "[w]hen a

patent expires during a reexamination proceeding, the PTO should thereafter

apply the *Phillips* [v. *AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)]

standard for claim construction." *In re CSB-Sys. Int'l, Inc.*, 832 F.3d 1335,

1341 (Fed. Cir. 2016).

### B. Ordinary And Customary Meaning

Under *Phillips*, "the words of a claim are generally given their

ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (quotation

omitted). "[T]he ordinary and customary meaning of a claim term is the

meaning that the term would have to a person of ordinary skill in the art in

question at the time of the invention, i.e., as of the effective filing date of the

patent application." *Id.* at 1313.

### C. In View Of The Specification

"[I]t is fundamental that claims are to be construed in the light of the

specifications." *United States v. Adams*, 383 U.S. 39, 49 (1966). However,

---

[6] The subject '924 Patent of this appeal expired in July 2020 before the filing
of the November 11, 2021 Request for Reexamination. *See* Appeal Br. 53.
Also, the Examiner acknowledges "the patent term has expired." Final Act.
8; Ans. 11.

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

"limitations are not to be read into the claims from the specification." *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993) (citing *In re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989)).

### C. Capable Of

The patentability of an apparatus depends on the actual structure claimed, not on the use, function, or result thereof. *In re Danly*, 263 F.2d 844, 848 (CCPA 1959). Because an apparatus is a structure, the apparatus must be distinguished from the prior art on the basis of structure, and where there is reason to conclude that the structure of the prior art is inherently capable of performing the claimed function, the burden shifts to the applicant or patent owner to show that the claimed function patentably distinguishes the claimed structure from the prior art structure. *See In re Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997); *In re Hallman*, 655 F.2d 212, 215 (CCPA 1981).

### OPINION

We have reviewed the Examiner's rejections in light of Appellant's arguments (Appeal Brief) that the Examiner has erred. We disagree with Appellant's conclusions. Except as noted below, we adopt as our own (1) the findings and reasons set forth by the Examiner in the action from which this appeal is taken and (2) the reasons set forth by the Examiner in the Examiner's Answer in response to Appellant's Appeal Brief.

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

## A. Claim Construction

Appellant raises the following arguments in contending that the Examiner erred in construing the claims. *See* Appeal Br. 5–14. Although we agree with Appellant as to several of these claim construction arguments, for the reasons discussed in below sections B and C, we deem these Examiner claim constructions to be harmless errors that do not change the result of our review of the Examiner's rejections.

### A.1. Claim Construction – Claim 1, "handheld"

Appellant argues:

> The Examiner contends that "the term 'handheld' modifies the device with a purpose and/or intended use of a device since 'the body of a claim fully and intrinsically sets forth all of the limitations of the claimed invention.'" Final Office Action dated July 22, 2022 ("Action"), p. 38 (quoting MPEP § 2111.02). Although not entirely clear, the Examiner seems to be relying on *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999), to argue that the preamble of claim 1 merely states the purpose or intended use of the invention and thus is not a claim limitation. See Action, p. 38. The Examiner is misguided.
>
> . . . [I]n the present case, as discussed above, the preamble of claim 1 provides the antecedent basis for "the handheld device." Thus, the body of claim 1 does not fully and intrinsically set forth the complete invention. Accordingly, the preamble of claim 1 should be limiting.
>
> . . .
>
> Further, by virtue of reciting "handheld device," the preamble of claim 1 *places size requirements/restrictions on the claimed components* (i.e., housing, specifically configured computer, and specifically configured two cameras). This is even acknowledged by the Examiner. See Action, p. 38 ("one of ordinary skill in the art would recognize that a device being 'handheld' does require <u>certain size constraints</u> in order for it to

8

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> be handheld") (emphasis added). Thus, the preamble does <u>not</u> merely state the purpose or intended use of the invention, but rather imposes structural limitations on the claimed apparatus.

Appeal Br. 6–7 (emphasis added).

We agree with Appellant's argument that the term "handheld" is limiting as to size constraints. Regardless of whether the preamble alone is limiting, the body of the claim twice recites "the *handheld* device," so this term must be a limitation. *See* claim 1 ("a first camera oriented to view a user of the *handheld* device"; "the computer is adapted to perform a control function of the *handheld* device"). Although we are unable to find where Appellant cites either a reference (e.g., dictionary) or case law defining the term "handheld," we determine the general definitions of the adjective "handheld" include:[7]

1) held in the hand or hands: *a handheld torch*.
2) small enough to be used or operated while being held in the hand or hands: *a handheld hair drier*.
3) Something small enough to be used or operated while held in the hand or hands.

Appellant's argument is consistent with the second definition of "handheld." We conclude that the proper interpretation of "handheld" in claim 1 is as a size requirement that the device small enough to be used while being held in the hand or hands.

---

[7] The Random House Dictionary of the English Language – Unabridged (1983).

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

A.2. Claim Construction –
Claim 1, element 1[e],
"the first and second cameras include non-overlapping fields of view"

Appellant argues:

> Claim element 1[e] recites, in part, "a second camera . . . wherein the first and second cameras include <u>non-overlapping</u> fields of view." *Id.* (emphasis added). Patent Owner asserts a POSITA would interpret this claim language to mean there is <u>zero</u> overlap between the field of view of the first camera and the field of view of the second camera.

Appeal Br. 7–8.

Appellant also argues that for two cameras A and B, each with a field of view ($FOV_A$ and $FOV_B$ respectively), there are three possible configurations: (1) $FOV_A$ and $FOV_B$ are the same/identical field of view; (2) $FOV_A$ and $FOV_B$ *partially* overlap; and (3) $FOV_A$ and $FOV_B$ are non-overlapping, meaning there is 0% overlap. Appeal Br. 8.

We need not resolve whether "include" is an open-ended term that permits other overlapping fields of view (*see, e.g.,* '924 patent, 9:20–30) because we determine that the prior art discloses this limitation even under Appellant's interpretation, as discussed in more detail below.

A.3. Claim Construction – Claim 1, element 1[d],
"oriented to view an object ***other than*** the user"

Appellant argues:

> Claim element 1[d] recites, in part, "a first camera oriented to <u>view a user</u>." '924 Patent, claim 1 (emphasis added). Claim element 1[e] recites "a second camera oriented to <u>view an object other than the user</u> . . . wherein the first and second cameras include non-overlapping fields of view." *Id.* (emphasis added). The phrase "other than" means "with the exception of." *See, e.g.,* https://www.merriamwebster.com/dictionary/other%20than. Synonyms for "other than" include "except," "except for,"

10

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> "excluding," and "exclusive of." *See id.* Thus, under the plain meaning of the phrase "other than," the field of view of the second camera ***must exclude the user***. *See id.* This is consistent with the requirement that the claimed first and second cameras have non-overlapping fields of view (discussed above).

Appeal Br. 11–12 (emphasis added).

As above, we need not resolve whether a camera can be "oriented to view an object other than the user" while still being able to view part or all of the user (e.g., a camera focused on a basketball might also see part of the user's hand) because we determine that the prior art discloses this limitation even under Appellant's interpretation, as discussed in more detail below.[8]

### A.4. Claim Construction – Claim 2, "mobile phone"

Appellant argues:

> Dependent claim 2 recites "wherein the handheld device comprises a mobile phone." A POSITA would understand the ordinary meaning of "mobile phone" as being a handheld computing device capable of at least answering a voice telephone call from another individual operating another phone device. . . . A POSITA would also understand that the claimed "mobile phone" has an audio output (e.g., built-in speaker, earphone jack, etc.) so that the user of the claimed "mobile phone" can listen to the other individual (speaking into the other phone device) during the voice telephone call.
>
> The Examiner takes the remarkable position that it is "not required for the mobile phone . . . to have an audio output for the user to listen to." Action, p. 45.

Appeal Br. 13.

---

[8] To the extent that Appellant's argument(s) relies on "the user" limitation, we disagree and address that issue in section B.1.b. below.

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

>Appellant also argues:

>>[T]he "mobile phone" of claim 2 should have its plain and ordinary meaning, which necessarily includes *(i)* being capable of answering a voice telephone call from another individual operating another phone device, and *(ii)* having an audio output (e.g., built-in speaker, earphone jack, etc.) so that the user of the claimed "mobile phone" can listen to the other individual (speaking into the other phone device) during the voice telephone call.

Appeal Br. 14.

We are not persuaded by Appellant's argument. Appellant attempts to restrict the term "mobile phone" to exclude mobile phones for deaf persons. Appeal Br. 13–14. We find no meaningful basis for such a restriction and it is contradicted by the record. For example, Liebermann labels item 8 in figure 6 as a "Cellular Telephone Device." At column 5, lines 62–63, Liebermann describes this device as "[a] portable transmitter/receiver generally designated by the numeral 8 for use by a deaf person is shown in FIG. 6[.]" Appellant's attorney argument, on the other hand, fails to point to anything in the claim, the rest of the Specification, or the extrinsic evidence supporting its myopic view that the term "mobile phone" excludes mobile phones for deaf persons. We therefore conclude that a person of ordinary skill in the art (POSITA) would have understood the claimed "mobile phone" as including mobile phones for the hearing impaired.

## B. Section 102 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claims 1 and 2 under 35 U.S.C. § 102 as being anticipated. *See* Appeal Br. 14–26.

12

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Additionally, at the footnote on page 23 of the Appeal Brief, Appellant argues "The Examiner's reliance on extrinsic evidence of the Abowd Declaration[9], rather than the express disclosure of Liebermann, to support an anticipation rejection is also improper." We disagree. The Examiner's section 102 rejection simply references the Abowd Declaration's analysis (Decl. ¶¶ 64–65, 70–71) of the Liebermann reference – in effect the Examiner adopts this portion of the Abowd analysis as his own. Although uncommon, we know of no case law or office policy (nor does Appellant cite any) that precludes this form of Examiner analysis when the underlying analysis in the Abowd Declaration is unchallenged.

### B.1. Claim 1 – Section 102 – Liebermann

#### B.1.a. First Argument – Claim 1, preamble, "handheld"

Appellant argues:

> The fundamental disagreement between Patent Owner and the Examiner is whether Liebermann discloses a "handheld device," as required by the preamble of claim 1.

Appeal Br. 15.

> Because *Liebermann's* "portable transmitter/receiver" is recording, with a camera, the movement of both "hands" of the deaf person, *Liebermann's* "portable transmitter/receiver" is not being held in either of the deaf person's hands, and thus *Liebermann's* "portable transmitter/receiver" is <u>not</u> a handheld device, as required by claim 1, because **it cannot be operated while being handheld.** *Id.* And "portable" does not equate to "handheld." There are many "portable" things in the world, for example a suitcase, that cannot be "handheld."

Appeal Br. 16 (emphasis added).

---

[9] The Abowd Declaration was submitted together with the third-party request for Reexamination.

13

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> The Examiner's position also contradicts the undisputed fact that deaf users use both hands to communicate via sign language, so the device cannot be "handheld" during use.

Appeal Br. 19.

> *Liebermann's* "portable transmitter/receiver" is <u>not</u> ***designed*** to be operated while in the hand of a user and thus is not a "handheld device," as independent claim 1 requires.

Reply Br. 11 (emphasis added).

We are not persuaded by Appellant's argument. First, unlike Appellant's argument discussed above in section A.1. that the "handheld device" in claim 1 places size requirements/restrictions on the claimed components, Appellant here argues to further restrict "handheld" to require that it be "designed" to be held in a hand while being operated. Again, the general definition of the term "handheld" (an adjective) includes:

> 1. held in the hand or hands: *a handheld torch*.
>
> 2. small enough to be used or operated while being held in the hand or hands: *a handheld hair drier*.
>
> 3. something small enough to be used or operated while held in the hand or hands.

However, we do not find any requirement that "handheld" be so "designed." Rather, it is sufficient that the device be "small enough to be used or operated while being held in the hand," whether explicitly "designed" so or not.

Second, even if we adopt Appellant's additional requirement that the device not merely be of a certain size, but must also be "designed" to be held in a hand while being operated, we conclude that Liebermann's "Cellular Telephone Device" (item 8 in figure 6) is designed to be a certain size that permits it to be held in one hand while signing with the other hand.

14

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Although Appellant presented an argument, at the November 27, 2023
hearing (Pages 3–4), that such single hand signing usage of Liebermann's
device is not reasonable, we disagree. We conclude nothing in the structure
or function of Liebermann's device precludes such single hand signing use
of Liebermann's device.

> B.1.b. Claim 1 – Second Argument – Section 102 – Liebermann –
> Claim 1, elements 1[d] & 1[e], "oriented to view an object
> other than the user" & "non-overlapping fields of view"

Appellant argues:

> Claim element 1[e] recites "a second camera oriented to
> view an object other than the user of the device and having a
> second camera output, wherein the first and second cameras
> include non-overlapping fields of view," whereas claim element
> 1[d] recites "a first camera oriented to view *a user of the
> handheld device*." As discussed above . . . , the claim language
> requires that the fields of view associated with the first and
> second cameras do not overlap, and that the user is excluded from
> the field of view of the second camera.

Appeal Br. 19–20 (emphasis added).

> The Examiner also appears to disregard the claim
> language that requires that "the first and second cameras include
> non-overlapping fields of view." '924 Patent, claim 1 (emphasis
> added). This claim language requires that the fields of view
> associated with each of the first and second cameras do not
> overlap. *The Action cites no portions of Liebermann pertaining
> to the field of view of the alleged first and second cameras,* let
> alone the relationship therebetween. *See* Action, pp. 23–24.

Appeal Br. 21–22 (emphasis added).

We are not persuaded by Appellant's argument.

As to "non-overlapping fields of view," we disagree with Appellant's

argument that "[t]he Action cites no portions of Liebermann pertaining to

15

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

the field of view of the alleged first and second cameras." At page 23 of the
Final Office Action, the Examiner finds that Liebermann at column 13, lines
4–20, "discloses 'more than one camera' may be utilized with each camera
covering a separate angle, operating independently of the other(s), in which
angle overlap may or may not be permitted." We agree with the Examiner
that an artisan would have understood non-overlapping camera angles to
result in non-overlapping fields of view.

As to "oriented to view an object other than the user," our decision
does not turn on this Examiner interpretation of "oriented to view an object
other than the user." Rather, the Examiner's prima facie showing need only
explain why the device is *capable of* the function of being "oriented to view
an object other than the user." *See also* Ans. 6 ("one of ordinary skill in the
art can agree that the first and second cameras must have the ability to be
configured to have 'non-overlapping field of views'"). Because the
Examiner finds that Liebermann at column 13, lines 4–20, "discloses 'more
than one camera' may be utilized with each camera covering a separate
angle, operating independently of the other(s), in which angle overlap may
or may not be permitted," the Examiner has found a reason to believe that
the apparatus of Liebermann would have been *capable of* performing the
claimed function. Appellant, however, provides no convincing evidence or
explanation in support of their argument that Liebermann is not so capable.
Appellant has the burden of demonstrating either that the asserted prior art is
incapable of performing the claimed functions or that the claimed functions
necessarily require that the claimed device have a structure that is patentably
distinct from the prior art. Appellant has not met this burden.

16

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

B.2. Claim 2 – Section 102 – Liebermann –
"Mobile Phone" Argument

Appellant raises the following argument in contending that the
Examiner erred in rejecting claim 2 under 35 U.S.C. § 102 as being
anticipated.

> The Examiner mapped *Liebermann's* "portable transmitter/
> receiver" in Figure 6 to the claimed "mobile phone" of claim 2.
> Action, p. 26. ***This is improper***.
>
> *Liebermann's* "portable transmitter/receiver" is a
> ***specialized telephone*** for the deaf. *See Liebermann*, 5:62–63
> ("A portable transmitter/receiver . . . *for use by a deaf person* is
> shown in Fig. 6."). See also Liebermann, Title ("Telephone *for
> the deaf* and method of using same"). Accordingly,
> *Liebermann's* "portable transmitter/receiver" does <u>not</u> include an
> audio output for the user (i.e., a deaf person) to listen to the other
> individual (speaking into the other phone device) during a voice
> telephone call.

Appeal Br. 24–25 (emphasis added).

We are not persuaded by Appellant's argument. We reach the same
conclusion as in above section A.4. Contrary to Appellant's argument, a
POSITA would have understood item 8 of Liebermann's Figure 6 to be a
mobile phone for the hearing impaired. The title of Liebermann refers to a
"telephone for the deaf" and Figure 6 expressly shows a "CELLULAR
TELEPHONE VERSION." Even Appellant refers to Liebermann's device
as "a specialized telephone" that is "portable." Appeal Br. 24–25.
Appellant fails to persuade us that the term "mobile phone" somehow
excludes a portable telephone for the deaf that communicates through a
cellular telephone network.

17

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

### C. Claim 1 – Section 103 – Liebermann

Appellant raises the following arguments in contending that the Examiner erred in rejecting claims 1 and 2 under 35 U.S.C. § 103.  Appeal Br. 26–31

#### C.1. Claim 1 – Section 103 – Liebermann –
#### First Argument – Liebermann is Non-Analogous Art

> *Liebermann* is non-analogous art and thus *Liebermann* cannot be cited in an obviousness rejection of any claim in the '924 Patent.  A reference qualifies as prior art for an obviousness determination only when it is analogous to the claimed invention. . . . Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved.

Appeal Br. 26–27 (emphasis and formatting added).

#### C.1.a. Whether Liebermann is Analogous Art – First Test

As to claims 1 and 2, Appellant argues:

> Regarding the first test for analogous art, *Liebermann* discloses the
>
>> "present invention relates to electronic apparatus for communication by the deaf, and, more particularly, to such apparatus which enables the deaf person to communicate through use of sign language."
>
> *Liebermann*, 1:10–15.  In contrast, the field of endeavor for the [Pryor] '924 Patent is
>
>> controlling functions of handheld devices using images captured by the handheld devices.
>
> *See generally*, '924 Patent, Title, 11:65–12:12, 12:62–13:47, 25:40–26:43, Figs. 8A, 8B, 18, claim 1.  This is not the same

18

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> field of endeavor as *Liebermann*, and thus *Liebermann* fails the
> first test for analogous art.

Appeal Br. 27 (formatting added).

We are not persuaded by Appellant's argument. Appellant starts from the wrong perspective—the field of endeavor of Liebermann—and then looks to see if the '924 Patent is in that field. As Appellant notes in its citation of the law, the focus of the first test is whether the prior art is "within the field of the inventor's endeavor," not the other way around. Appeal Br. 27; *see also In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011) (citing *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004); *In re Clay*, 966 F.2d 656, 658 (Fed. Cir. 1992)). Thus, even if Liebermann is focused on a subset of the field of endeavor of the '924 Patent, it can still be within the same field of the '924 Patent.

Here, the '924 Patent defines its field of invention broadly:

> 1. Field of the Invention
>
> ***The invention relates to simple input devices for computers***, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, ***and operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations***.

'924 Patent, 2:7−11 (emphasis added).

Like the '924 Patent, Liebermann is directed to an input device for optically sensing human positions or orientations.

> It is an object of the present invention to provide a novel electronic communication system for use by deaf ***persons*** to enable them to communicate by ***signing***.

Liebermann, 3:11−13 (emphasis added).

19

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> It has now been found that the foregoing and related
> objects may be readily attained in an electronic communications
> system for the deaf comprising a video apparatus for ***observing
> and digitizing the signing motions***, and means for translating the
> digitized motions into words and phrases.

Liebermann, 3:26–30 (emphasis added). Also, Liebermann's Abstract
states his invention's concern with optically sensing human positions or
orientations.

> An electronic communications system for the deaf
> includes a video apparatus for observing and digitizing the facial,
> body and hand and finger signing motions of a deaf person, an
> electronic translator for translating the digitized signing motions
> into words and phrases, and an electronic output for the words
> and phrases.

Liebermann, Abstr.

Thus, although Liebermann's optical sensing of human input is
directed at a specific area within the '924 Patent's field of invention (i.e.,
Liebermann optically senses signing motions for deaf persons), it still fits
comfortably within the '924 Patent's defined field of invention of input
devices for optically sensing a human input from human positions or
orientations.

Therefore, we conclude that Liebermann is within the field of
endeavor of the claimed invention and thus, is analogous art.

C.1.b. Whether Liebermann is Analogous Art – Second Test

Turning to the second test for analogous art, Appellant argues as
follows:

> [T]he problems to which the '924 Patent relates include
> determining touchless user input commands to handheld devices
> and controlling functions within handheld devices. *See
> generally*, '924 Patent, 2:6–13, 11:65–12:12, 12:62–13:47,

20

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> 25:40–26:43, Figs. 8A, 8B, 18, claim 1.   These are not the
> problems to which *Liebermann* relates, thus Liebermann fails the
> second test for analogous art.

Appeal Br. 28.

We are not persuaded by Appellant's argument.  In *Donner*, the
Federal Circuit held that the Board defined the field of endeavor too
"narrowly."  *Donner Tech., LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353,
1360 (Fed. Cir. 2020).  The analysis of "[t]he problems to which the claimed
invention and reference at issue relate" "must be carried out from the
vantage point of a PHOSITA who is considering turning to the teachings of
references outside her field of endeavor" and therefore must not "rule out all
such art" that is "outside her field of endeavor."  *Id.*  Contrary to Appellant's
argument, the Federal Circuit held that "if the two references have 'pertinent
similarities' such that [the prior art reference] is reasonably pertinent to one
or more of the problems to which the [patent-in-suit] pertains, then [the prior
art reference] is analogous art."  *Donner*, 979 F.3d at 1361.  Such is the case
here with Liebermann.

We determine that Liebermann is "reasonably pertinent to the
particular problem with which the inventor is involved" because Appellant's
claims define the particular problem of the '924 Patent's claim 1 as
performing a function based on a camera output.  Appeal Br. 27.  As we
determine above, Liebermann is directed to "an input device for optically
sensing human positions or orientations."  In Liebermann, the output of the
sensing is then used to control the functioning (control the particular output)
of Liebermann's "means for translating the digitized motions into words and
phrases."  Appeal Br. 29.  Even if we limit the inventor's particular problem

21

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

to the handheld environment, we still determine that Liebermann is "reasonably pertinent to the particular problem with which the inventor is involved." Appeal Br. 27. Liebermann solving the problem for a specific niche (e.g., sensing signing motions for deaf persons) shows that it falls within the same broad problem of the '924 Patent, not outside it.

Therefore, we again conclude that Liebermann is analogous art.

### C.2. Claim 1 – Section 103 – Liebermann – Second Argument –Element 1[e]

Also, as to claim 1, Appellant argues:

> [T]o meet claim element 1[e], the Examiner contends that a "person of ordinary skill in the art would be motivated to incorporate a second camera . . . such a modification would have provided a that [sic] can effectively communicat[e] in any environment independent of a user's movement." Action, p. 24. Even if this is true, the purpose of the camera(s) in *Liebermann* is to capture images of the deaf person signing. . . . [*Liebermann's*] second camera is not oriented to view "an object other than the user," as required by claim element 1[e]. The Action fails to identify any support in *Liebermann* in which a camera is "oriented to view an object other than ***the user of the device***" related to the alleged motivations identified by the Examiner. Thus, *Liebermann* fails to teach or suggest claim element 1[e].

Appeal Br. 29–30 (emphasis added).

We are not persuaded by Appellant's arguments. We reach the same conclusion as in above section B.1.b. As discussed above, the Examiner has found a reason to believe that the apparatus of Liebermann would have been ***capable of*** performing the claimed function, and Appellants have not met the burden of demonstrating otherwise. For example, Liebermann discloses "[e]ach camera is covering a separate angle"; "[e]ach camera operates

22

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

independently of the other(s)"; and "[a]ngle overlap may or may not

permitted according to the pre-signing calibration." Liebermann 13:11–14.

### C.3. Claim 2 – Section 103 – Liebermann

Further, as to claim 2, Appellant argues:

> Claim 2 depends from and adds limitations to claim 1. As discussed above, *Liebermann* does not render claim 1 obvious. Accordingly, *Liebermann* does not render dependent claim 2 obvious for at least the same reasons.

> Further, as discussed above in Section IV(B)(2), *Liebermann* fails to teach or suggest the claimed "mobile device" of claim 2. Accordingly, *Liebermann* does not render claim 2 obvious.

Appeal Br. 31.

We are not persuaded by Appellant's arguments. Again, we reach the same conclusion as in above section A.4. (also section B.2). Contrary to Appellant's argument, a POSITA would have understood item 8 of Liebermann's Figure 6 (i.e., "CELLULAR TELEPHONE") to be a mobile phone for the hearing impaired.

### D. Claims 6–8 – Section 103 – Liebermann and Sears

Appellant raises the following arguments in contending that the Examiner erred in rejecting claims 6–8 under 35 U.S.C. § 103 over the combination of Liebermann and Sears. Appeal Br. 31–49.

### D.1. Claims 6–8 – Section 103 – Liebermann and Sears – Non-Analogous Art Argument

Appellant asserts:

> ***Sears is non-analogous art*** and thus Sears cannot be cited in an obviousness rejection of any claim in the '924 Patent.

Appeal Br. 32 (emphasis added).

23

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

### D.1.a. Whether Sears is Analogous Art – First Test

Appellant argues:

> Regarding the first test for analogous art, *Sears* describes itself as relating to
>
> > an electronic reading system for converting text to synthesized speech that may be used by low-vision and blind people . . . and more particularly relat[ing] to an electronic reading system that includes improved functionality for allowing the user to navigate within the text.
>
> *Sears*, 1:23–29.  In contrast, the . . . [Pryor] '924 Patent is
>
> > controlling functions of handheld devices using images captured by the handheld devices.
>
> *See generally*, '924 Patent, Title, 11:65–12:12, 12:62–13:47, 25:40–26:43, Figs. 8A, 8B, 18, claim 1.  This is not the same field of endeavor as *Sears*, and thus *Sears* fails the first test for analogous art.

Appeal Br. 32 (formatting added).

We are not persuaded by Appellant's argument.  Again, Appellant starts from the wrong perspective—the field of endeavor of Sears—and then looks to see if the '924 Patent is in that field.  We reiterate, the '924 Patent states:

> 1. Field of the Invention
>
> ***The invention relates to simple input devices for computers***, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, ***and operating by optically sensing object or human positions and/or orientations***.

'924 Patent, 2:7–11 (emphasis added).

Appellant too narrowly interprets Sears' field of endeavor to limit it to be "an electronic reading system." Appeal Br. 32.  Like the '924 Patent,

24

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Sears points out that "[i]t is an object of the invention . . . *to specify control system parameters through manual gestures*." Sears, 3:19–21 (emphasis added). Also, Sears' title states his invention's concern with "Gesture-Based Navigation." Further, Sears' states:

> An optical-input print reading device with voice output for people with impaired or no vision in which the user provides input to the system from hand gestures. Images of the text to be read, on which the user performs finger- and hand-based gestural commands, are input to a computer, which decodes the text images into their symbolic meanings through optical character recognition, and further tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning.

Sears, Abstr. Furthermore, Sears at column 4, lines 3–7, states, "[t]he method includes . . . determining a command signal from a sequence of user-generated spatial configurations of at least one pointer[.]" Also further, Sears claims:

> capturing a temporal sequence of digital images of user-generated spatial configurations of at least one pointer;
>
> determining a command signal from the temporal sequence of digital images;

Sears claim 1, 28:39–42.

Thus, we conclude that Sears is within the field of endeavor of the claimed invention and hence analogous art.

### D.1.b. Whether Sears is Analogous Art – Second Test

Appellant also argues:

> Regarding the second test for analogous art, *Sears* discloses it is solving "the problems of the prior art, both with regards to OCR-based electronic reading machines as well as electronic magnifying system." *Sears*, 3:12–15. In contrast, the

25

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> problems to which the '924 Patent relates include determining touchless user input commands to handheld devices and controlling functions within handheld devices. See generally, '924 Patent, 2:6–13, 11:65–12:12, 12:62–13:47, 25:40–26:43, Figs. 8A, 8B, 18, claim 1. These are not the problems to which *Sears* relates, thus *Sears* fails the second test for analogous art.

Appeal Br. 32–33.

We are not persuaded by Appellant's argument. Again, Appellant starts from the wrong perspective—the particular problem of *Sears*—and then looks to see if the '924 Patent involves that particular problem.

We determine that *Sears* is "reasonably pertinent to the particular problem with which the inventor is involved" because Appellant's claims define the particular problem of the '924 Patent's claim 1 as optically sensing human positions or orientations. Appeal Br. 27. Even if we limit the inventor's particular problem to the handheld environment, we still determine that *Sears* is "reasonably pertinent to the particular problem with which the inventor is involved." *Id.*

Therefore, we again conclude that *Sears* is analogous art.

### D.2. Claim 6 – Section 103 – Liebermann and Sears
### D.2.a. First Argument – By Dependency from Claim 1

> As discussed above, *Liebermann* does not teach or suggest each and every limitation of claim 1. *Sears* does not cure the deficiencies of *Liebermann* regarding claim 1 and the Action does not so assert. *See* Action, pp. 28–32. Accordingly, the combination of *Liebermann* and *Sears* does not render claim 1 obvious. Claim 6 depends from and adds limitations to claim 1. Accordingly, the combination of *Liebermann* and *Sears* also does not render dependent claim 6 obvious for at least the same reasons.

26

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Appeal Br. 33–34.

As discussed above, we find no deficiency in Liebermann, therefore, we are not persuaded by Appellant's dependency argument for claim 6.

### D.2.b. Claim 6 – Section 103 – Liebermann and Sears
### Second Argument – Principle of Operation & Hindsight

> The fundamental disagreement between Patent Owner and the Examiner is whether it would be obvious to *relocate Liebermann's* "sophisticated computer equipment, databases, and neural networks," Liebermann, 5:37–38, *from Liebermann's* "*central processing facility*" (also referred to as "the Center") to *Liebermann's* "portable transmitter/receiver" to meet the requirements of claim 6. . . . The effective filling date of the '924 Patent is July 8, 1999, so the Examiner's rejection rests on the assertion that it would have been obvious <u>in 1999</u> to condense the "sophisticated equipment, databases, and neural networks" that occupied a physical building (i.e., the "Center") into a "handheld device." That assertion is *untenable*, which is why the Examiner cites no evidence in support. *See* Action, pp. 29–32.

Appeal Br. 35 (emphasis added).

> [T]he existence and use of *Liebermann's* "*central processing facility*" as a necessary intermediary between the deaf user and the hearing user is found in every disclosed embodiment. Thus, the "central processing facility," its functions, and the exchange of data between the "central processing facility" and the deaf user and the hearing user are key features of *Liebermann's* distributed architecture and thus *key features of Liebermann's principle of operation.* Modifying *Liebermann* by abolishing the "central processing facility," as proposed by the Examiner, *would violate Liebermann's principle of operation.*

Appeal Br. 38–39 (emphasis added).

In the Answer, the Examiner argued while "*Liebermann* disclose[s] the cellular telephone of the deaf person providing

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

image capture and initial image processing and *a central processing facility* (i.e., the Center) performing further processing (id. at c.4, 11.60 – c.5, 1.48), the ***Examiner finds that this is just a design preference***. To support the Examiner's position, the Examiner finds that *Liebermann* discloses a design choice to perform the sophisticated translation processing at a designated off-line processing center ***for economic reasons***, not the requirement to." Answer, p. 30 (emphasis added). Patent Owner disagrees.

Liebermann expressly discloses "[f]rom ***cost and portability*** standpoints, the translating means is at a remote location or central station and there is included transmission means for transmitting the digitized signing motions or their digital identifiers to the translating means." *Liebermann*, 3:38-43 (emphasis added). In other words, for *Liebermann's* portable embodiments including *Liebermann's* "portable transmitter/ receiver," which the Examiner relies on extensively, *Liebermann* discloses that it is a requirement that the "sophisticated translation processing" take place at ***Liebermann's*** "central processing facility." Contrary to the Examiner's contentions, it ***is not a design choice***.

Reply Br. 26 (Appellant's emphasis omitted; Panel emphasis added).

We are not persuaded by Appellant's arguments. First, abolishing the "central processing facility" does not violate Liebermann's principle of operation. We find Liebermann's independent claim 12, for example, to be silent as to the argued intermediary "central processing facility." *Id.* Contrary to Appellant's argument, the Examiner's proposed modification does not change the overall principle of operation of Liebermann's ***claimed*** device. *See In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012) ("[T]his difference does not affect the operability of Mouttet's broadly claimed device."). For example, although Liebermann's dependent claim 16 recites "transmitting . . . *to a central station* where said translating steps are

28

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

performed," the independent claim from which it depends (method claim 12) does not recite any such "central station." Under the doctrine of claim differentiation, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314–15 (Fed. Cir. 2005) (en banc). "This presumption is especially strong where the limitation in dispute is the only meaningful difference" between the two claims. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014). Thus, the "central station" of Liebermann's dependent claim is an option in the independent claim, not a requirement.

Second, although Appellant (in the Reply Brief) and the Examiner (in the Answer) engage in a lengthy discussion of whether Liebermann's central processing facility is a mere design preference, we fail to see the relevance of this entire exchange. As we noted above, we find Liebermann's claim 1 silent as to the argued intermediary "central processing facility."

### D.2.c. Claim 6 – Section 103 – Liebermann and Sears
### Third Argument – Articulated Reason & Motivation

The Examiner's rejection of claim 6 determines that multiple reasons exist to combine the references. Because we find the Examiner's "simple substitution" analysis to be determinative, we do not address the Examiner's alternative determination that Sears teaches a *time saving reason* (Final Act. 31–32). In the below sections, we first outline the different positions and arguments, before providing our analysis in the final section.

### D.2.c.i. Claim 6 – Third Argument – Final Office Action

The Examiner determines that the reference combination involves the *simple substitution* of one known element/method for another to obtain

29

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

predictable results (Final Act. 32). Additionally, the Examiner supports the reason to combine analysis by referencing (Final Act. 31) the Abowd Declaration's motivation analysis (Decl. ¶¶ 149–152, 70–71) for Liebermann, Sears, and other prior art – in effect the Examiner adopts this portion of the Abowd analysis as the Examiner's own.[10] These paragraphs of the Abowd Declaration explain why "[a] person of ordinary skill would have been motivated to include a computer, similar to as disclosed in Sears, within the housing to perform local image processing and gesture recognition when implementing a cellular telephone similar to as disclosed in Liebermann." Decl. ¶ 149.

D.2.c.ii. Claim 6 – Third Argument – Appeal Brief

Appellant presents the following argument:

> The Examiner also contends that the proposed combination of *Liebermann* and *Sears* is obvious because it is merely the "***simple substitution*** of one known element for another to obtain predictable results." Action, pp. 56–59 (citing MPEP § 2143(I)(B)). Patent Owner disagrees. The Examiner's proposed modification to *Liebermann* ***results in a complete dismantling of Liebermann's distributed architecture***. It is unclear what, if any, purpose *Liebermann's* "***central processing facility***" would serve following the Examiner's proposed modification. This cannot be considered a "simple substitution."

> . . . By performing gesture processing at the "***central processing facility***," any update to the "database" or "translation means" (e.g., algorithms) only needs to be done in one place.

> As discussed above, the Examiner's proposed modifications to *Liebermann* include moving the gesture

---

[10] Again, although uncommon, we know of no case law or office policy (nor does Appellant cite any) that precludes this form of Examiner analysis in the circumstances here.

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> processing from *Liebermann's* "**central processing facility**" to the "portable transmitter/receiver" of each deaf user. Following such a modification, any update/patch to the "database" and/or "translation means" would need to be propagated to every deaf user's "portable transmitter/receiver." This would unnecessarily complicate the update process and risk different users having different and out-of-date versions of the "database" and "translation means."

Appeal Br. 44–45 (emphasis added).

>    D.2.c.iii. Claim 6 – Third Argument – Examiner's Answer

In response, as to the simple substitution argument, the Examiner

further points out:

> [The] July 2022 Final Office Action provided additional support including the rationale of "simple substitution of one known element for another to obtain predictable results" (See July 2022 Final Office Action at 57–59).

> In response to Appellant's argument that the sophisticated components of *Sears* cannot exist in *Liebermann*; and the modification of *Liebermann* would require a complete dismantling of *Liebermann*, the test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981).

> From this perspective, *Sears* teaches

>> [in] general, any *Intel Pentium or compatible chip* of 150 MHz speed will be sufficient, *although a faster speed will provide improved results*. In addition, other non-Intel processors, such as those that are used in Windows CE systems, will suffice if they are of a similar performance.

31

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

(*Sears* at c.7, 11.1-7). The Examiner finds that this is similar to the PC and processor the '924 Patent discloses. ('924 Patent at c.2, 11.20−23; c.3, 11.32−34, 400 Mhz Pentium II). The Examiner concludes this must be the CPU designated in the instant invention of the '924 Patent of Figure 18 of the handheld device. The Examiner finds that one of ordinary skill in the art would recognize the process of placing a Pentium processor or compatible chip, performing the required claim requirements, in the *Liebermann* device, at the time of invention, would simply be engineering expediency, as is evidenced by *Sears*. "While the proposed modification may have required more expensive hardware, such as skilled person would have appreciated that customers would desire highly-integrated smart phone devices that could perform additional functions, e.g., local gesture recognition". (See Nov 2021 Abowd Declaration at 149, and citation to *Gershman*, "currently, more integration in mobile computing is desired").

Ans. 34−35.

> D.2.c.iv. Claim 6 − Third Argument − Reply Brief

In reply, Appellant further argues the Examiner's reasoning "is wrong for multiple reasons." Reply Br. 30.

First, it is unclear how this renders the Examiner's proposed modification to Liebermann obvious (i.e., relocating *Liebermann's* "sophisticated computer equipment, databases, and neural networks" (*Liebermann*, 5:37−38) from *Liebermann's* **central processing facility**" to *Liebermann's* "portable transmitter/receiver").

Second, the Examiner provides zero evidence that *Liebermann's* "sophisticated computer equipment, databases, and neural networks" are comparable to and/or could be executed on "a Pentium processor or compatible chip."

Third, the Examiner provides zero evidence that *Liebermann's* "portable transmitter/receiver" is compatible with "a Pentium processor or compatible chip."

32

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> And Fourth, the Examiner cannot rely on the '924 Patent
> for evidence that a POSITA would have combined *Liebermann*
> and *Sears*: "It is improper, in determining whether a person of
> ordinary skill would have been led to this combination of
> references, simply to [use] that which the inventor taught against
> its teacher." *In re Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002)
> (cleaned up).

Reply Br. 30–31 (formatting and emphasis added).

### D.2.c.v. Claim 6 – Third Argument – Panel Analysis

We are not persuaded by Appellant's arguments. In the Appeal Brief, to rebut the Examiner's simple substitution analysis, essentially, Appellant elevates Liebermann's disclosed "central processing facility" to the status of an immovable critical element. Appellant is mistaken. As we discuss above at section D.2.b., we find Liebermann's independent claim 12 to be silent as to the argued intermediary "central processing facility," and instead it is dependent claim 16 which introduces "a central station." When viewed in the context of Liebermann's claims, we conclude Liebermann's ***distributed processing architecture*** is not mandatory and is merely one of the well-known in the art optional processing architectures that may be substituted for each other with predictable results (well-known trade-offs). We agree with the Examiner that the proposed combination is merely the simple substitution for the numerous reasons set forth by the Examiner in the Final Office Action and in the Abowd Declaration's motivation analysis (Decl. ¶¶ 149–152, 70–71) as referenced by the Examiner (cited in Final Action at page 31 in the rejection of claim 6). Also, we do not find where Appellant's Appeal Brief acknowledges and addresses the Abowd Declaration's reason to combine analysis.

33

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

In the Reply Brief, first, Appellant restates (to no effect) the mistaken "central processing facility" Appeal Brief argument which we discuss above.

Second, in the Reply Brief, Appellant points to "a preferred form of [Liebermann's] invention [which] includes a processing center containing the sophisticated computer equipment, databases, and neural networks to effect the signing/verbal translations" (Liebermann, 5:35–39) and presumes this embodiment is required by Liebermann's claimed invention. Appellant then argues the Examiner must provide evidence that Liebermann's "sophisticated" embodiment is comparable to and/or could be executed on a Pentium processor. We disagree with Appellant. None of "a processing center containing sophisticated computer equipment, databases, or neural networks" is required by Liebermann's independent claim 12 (see instead Liebermann's dependent claim 16). We conclude that Liebermann contemplates other forms of his invention. We find no basis for Appellant's demand that the Examiner provide further evidence.

Third, in the Reply Brief, Appellant argues the Examiner must provide additional evidence that *Liebermann's* portable transmitter/receiver is compatible with a Pentium processor. The Examiner already (a) cites (Ans. 34) to the Sears teaching of using a Pentium processor for processing gesture-based visual inputs, and (b) points out (Ans. 34; Final Act. 31 referencing Abowd Decl. ¶ 152) that Appellant discloses using the same class of processor in the claimed invention (Spec. 3:33–34). Appellant's conclusory assertion does not explain why the Examiner must provide additional evidence. We find no reasonable basis for Appellant's demand that the Examiner provide such evidence.

34

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Fourth, in the Reply Brief, Appellant argues the Examiner relies on the '924 Patent for evidence that a POSITA would have combined *Liebermann* and *Sears*. We disagree. Rather, the Examiner relies on the '924 Patent to show the class of processor (Intel Pentium) used in Appellant's invention, and relies on Sears to teach that it was known to use that same class of processor in similar systems. Contrary to Appellant's argument that the Examiner is "simply" using that which the inventor taught against the teacher, Appellant did not invent the Pentium processor and the Examiner properly cited to Sears for its teaching of using a Pentium processor. We conclude that this argument does not show the Examiner errs.

### D.2.d. Claim 6 – Conclusion

We conclude the Examiner sets forth a proper articulated reasoning with a rational underpinning to support the legal conclusion of obviousness for claim 6.

### D.3. Claim 7 – Section 103 – Liebermann and Sears – "Facial Expressions" Argument

### D.3.a. Claim 7 – Final Action

The Examiner determines:

> [T]he Examiner finds that *Liebermann* discloses the portable transmitter/receiver telephone 8: a) capturing finger/hand motions, body motions and ***facial expression*** motions by cameras[.]

Final Act. 29 (emphasis added).

> [T]he the Examiner finds that *Liebermann* discloses the preference of utilizing hardware/software modules at a separate central processing facility (i.e., the Center) to perform the

35

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> translation/conversion into equivalent text content; and processing of gesturing, object position/orientation, frame reference and *facial expression information*. (*Liebermann* at c.4, 1.60−c.5, 1.13; c.6, 11.6−12, 42−52; c.7, 1.44−c.12, 1.6).

Final Act. 30 (emphasis added).

### D.3.b. Claim 7 – Appeal Brief

Appellant argues "*Sears* does not cure the deficiencies of *Liebermann*." Appeal Br. 46. Appellant then argues:

> The Examiner contends, while performing the analysis under rationale (B), that *Sears* "utilizes a hardware/software combination on the computer of the device . . . [for processing] facial expression information locally." Action, p. 57. But this is simply not true. *Sears* does not process facial expressions at all. This is unsurprising considering *Sears* is directed to OCR-based electronic reading machines. *Sears*, Abstract, 3:12-15.

Appeal Br. 47.

### D.3.c. Claim 7 – Examiner's Answer & Reply Brief

The Examiner further determines:

> In response to Appellant's arguments against the references individually (*i.e.*, *Sears* does not teach facial expression analysis), one cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references. See *In re Keller*, 642 F.2d 413. . . (CCPA 1981); *In re Merck & Co.*, 800 F.2d 1091. . . (Fed. Cir. 1986).

> . . . [T]he Examiner finds that *Liebermann* discloses the preference of utilizing hardware/software modules at a separate central processing facility (i.e., the Center) to perform the translation/conversion into equivalent text content; and processing of gesturing, object position/orientation, frame reference *and facial expression information*. . . . Specifically, the Examiner finds that *Liebermann* discloses tracking the position/orientation motion of objects, finger/hand motions,

36

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

body motions and facial expression motions utilizing the
hardware/software modules. . . .

The Examiner finds that *Sears*, for example, teaches a
main system **35** comprising either a personal computer *separate
from* the system **35** or an embedded computer *within* the system
**35** for the use of capturing image data, digitizing the image data
and processing the image data (*i.e.*, conversion into text and
analyzing the image data for the presence, orientation and
movement of objects in the image data[)].

Ans. 35–36.

In the Reply Brief, we do not find where Appellant further disputes
the above Examiner's finding.

### D.3.e. Claim 7 – Panel Analysis

We are not persuaded by Appellant's argument. We agree with the
Examiner (Ans. 35–36) that Appellant ineffectively attacks Sears for lacking
a teaching (facial expressions) where that teaching is found in Liebermann.

### D.4. Claim 8 – Section 103 – Liebermann and Sears –
### "Other than the user" Argument

As to claim 8, Appellant argues:

Claim 8 recites "[t]he handheld device of claim 1 wherein
the computer is adapted to determine at least one of the position
and the orientation of the object based on the second camera
output." . . . [T]o meet dependent claim 8, ***the Examiner uses
the same reasoning that was relied upon for dependent claim
6***. *See* Action, pp. 29–32. As discussed above, no motivation
exists to combine *Liebermann* and *Sears*, and thus *Liebermann*
and *Sears* do not render dependent claim 6 obvious. *Liebermann*
and *Sears* do not render dependent claim 8 obvious for at least
the same reasons.

Further, the "object" in claim 8 is something "other than
the user of the device." Compare dependent claim 8 *with*
independent claim 1 ("a second camera oriented to view an

37

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

> object other than the user of the device and having a second
> camera output"). *Liebermann* does not teach "determine[ing] at
> least one of the position and the orientation of the object based
> on the second camera output," as required by claim 8.    The
> "gloves" in *Liebermann* are being worn by the user of the system.
> *Liebermann*, Figs. 13A and 13B. **They are not an *object other**
> **than the* user**.    *Sears* also does not teach this requirement.
> Accordingly, the combination of *Liebermann* and *Sears* does not
> render claim 8 obvious.

Appeal Br. 47–48 (emphasis added).

We are not persuaded by Appellant's argument.    First, Appellant does
not dispute that the Examiner has shown determining at least one of the
position and the orientation of an object.    Rather, Appellant disputes that the
prior art object is not an object "other than *the user*" as required by claim 1.

Second, for the reasons already set forth above as to "the user"
limitation, we conclude the Examiner sets forth a proper articulated
reasoning with a rational underpinning to support the legal conclusion of
obviousness for claim 8.

## E. No Jurisdiction

Appellant raises the following jurisdictional argument in contending
that the Examiner erred in granting the reexamination request filed in
November 2021 on a patent that expired in July 2020.

> In *Oil States*, the Supreme Court explained that the
> "decision to *grant* a patent is a matter involving public rights-
> specifically, the grant of a public franchise." *Oil States Energy*
> *Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373
> (2018) (emphasis in original).    "Specifically, patents are public
> franchises that the Government grants to the inventors of new
> and useful improvements."    *Id.* (internal quotation marks
> omitted).    The Court explained that "Congress [has] significant

38

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

latitude to assign [the] adjudication of public rights to entities other than Article III courts." *Id.* at 1368[, 1373]. In exercising its "significant latitude," Congress grants public franchises "subject to the qualification that the PTO has the authority to reexamine and perhaps cancel—a patent claim in an inter partes review." *Id.* at 1368, 1374 (internal quotation marks omitted). Accordingly, so long as the public franchise exists, the PTO may have jurisdiction to amend and cancel the claims of the patent (e.g., via *ex parte* reexamination).

When a patent expires, however, *the public franchise ceases to exist* and the franchisee (e.g., the patent owner) no longer has the right to exclude others. At most, the franchisee may be entitled to collect damages from the public franchise that formerly existed through an infringement action in district court. But because the public franchise no longer exists, *the USPTO has nothing in its authority to cancel or amend*. Expiration removes the patent from the USPTO's jurisdiction and returns it to the sole jurisdiction of the Article III courts, which have exclusive authority to govern claims for damages. If this were not so, the USPTO would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

Appeal Br. 52–53 (emphasis added).

We are not persuaded by Appellant's argument. First, the Supreme Court in *Oil States* expressly stated that "[p]atents thus remain subject to the Board's authority to cancel outside of an Article III court." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1374 (2018) (quotation omitted). Moreover, the rejected claims here are the claims as issued; they have not been amended in reexamination.

39

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Second, the statute authorizing reexamination does not limit the timing of a reexamination in the manner argued by Appellant. To the contrary, the statute states:

> Any person ***at any time*** may file a request for reexamination by the Office of any claim of a patent on the basis of any prior art cited under the provisions of section 301.

35 U.S.C. § 302 (emphasis added). The regulation more specifically states a request for an *ex parte* reexamination may be filed "at any time *during the period of enforceability of a patent.*" 37 C.F.R. § 1.510(a) (emphasis added). MPEP § 2211 further explains that "[t]he period of enforceability is generally determined by adding 6 years to the date on which the patent expires but the period may be extended if there is pending litigation." *See also* 35 U.S.C. § 286.

Third, we disagree that Appellant has no rights under the expired patent.

> It is well-established that [the Federal Circuit's] decision (and the Board's decision on remand) would have a consequence on any infringement that occurred during the life of the . . . patent. *See Genetics Inst. v. Novartis Vaccines*, 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286."); *see also Keranos, LLC v. Silicon Storage Tech., Inc.*, 797 F.3d 1025, 1033 (Fed. Cir. 2015) (Although "the patentee has fewer rights to transfer when the patent has expired," the owner of an expired patent can license the rights or transfer title to an expired patent.); *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1372 (Fed. Cir. 2008) ("Title to . . . an expired patent . . . includes more than merely the right to recover damages for past infringement.").

*Sony Corp. v. Iancu*, 924 F.3d 1235, 1238 n.1 (Fed. Cir. 2019).

40

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

Fourth, our reviewing court regularly reviews Board decisions where a patent under reexamination expired prior to the Board issuing its decision. In none of these cases has the Federal Circuit found a lack of jurisdiction before the United States Patent and Trademark Office (USPTO). *See, e.g.,* *In re Rambus, Inc.*, 753 F.3d 1253 (Fed. Cir. 2014) (involving appeal of an *inter partes* reexamination of expired U.S. patent 6,034,918)[11]; *see also CSB-Sys. Int'l*, 832 F.3d at 1338 ("[T]he '953 patent expired during the reexamination.").

Finally, Appellant provides no citations or support for its assertion that the USPTO's jurisdiction ends at the time of expiration despite the patentee still being able to assert that its patent was valid and infringed within the statute of limitations. *See* 35 U.S.C. § 286.

We conclude the USPTO has jurisdiction for this reexamination so long as any right remains under the expired patent.

## F. No Substantial New Question (SNQ)

Appellant raises the following SNQ argument in contending that the Examiner erred in granting this reexamination request.

> Patent Owner respectfully asserts that no SNQs of patentability exist and thus the reexamination order should be vacated. . . .

> As discussed above, *Liebermann* does not disclose a handheld device with two cameras having non-overlapping fields

---

[11] The Board noted in a related *ex parte* reexamination appeal that "[t]he '918 patent term expired during the reexamination proceedings." *Ex parte Rambus, Inc.*, Appeal 2010-011178, 2011 WL 121775, at *6 (BPAI Jan. 12, 2011).

41

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

of view.  In other words, *Liebermann* does not provide the "key
features" that were missing from the art during the original
prosecution of the '924 [challenged] Patent.  As also discussed
above, *Sears* does not cure these deficiencies of *Liebermann*.
Thus, a reasonable examiner would not consider *Liebermann*
and/or Sears to be important in deciding whether one or more
claims of the '924 [challenged] Patent are patentable, and
*Lieberman* alone or combined with Sears does not raise a SNQ
of patentability.

Appeal Br. 54–55.

We are not persuaded by Appellant's argument.  For the reasons
already set forth above, we determine that Liebermann and Sears do provide
the teachings that were missing from the art considered during the original
prosecution of the challenged '924 Patent, and thus, does raise a SNQ of
patentability.

## CONCLUSIONS

The Examiner has not erred in rejecting claims 1–5 and 13 as being
anticipated under 35 U.S.C. § 102.

We **affirm** the Examiner's rejection of claims 1–5 and 13 as being
anticipated under 35 U.S.C. § 102.

The Examiner has not erred in rejecting claims 1–14 as being
unpatentable under 35 U.S.C. § 103.

We **affirm** the Examiner's rejections of claims 1–14 as being
unpatentable under 35 U.S.C. § 103.

42

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

## DECISION SUMMARY

In summary:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 1–5, 13 | 102 | Liebermann | 1–5, 13 | |
| 1–5, 13 | 103 | Liebermann | 1–5, 13 | |
| 6–10, 12 | 103 | Liebermann, Sears | 6–10, 12 | |
| 11 | 103 | Liebermann, Tryding | 11 | |
| 14 | 103 | Liebermann, Gershman | 14 | |
| 14 | 103 | Liebermann, Kimball | 14 | |
| Overall Outcome | | | 1–14 | |

## REQUESTS FOR EXTENSIONS OF TIME

Requests for extensions of time in this ex parte reexamination

proceeding are governed by 37 C.F.R. § 1.550(c).  *See* 37 C.F.R. § 41.50(f).

## AFFIRMED

43

Appeal 2023-002523
Reexamination Control 90/014,902
Patent 8,194,924 B2

PATENT OWNER:

WILLIAMS SIMONS & LANDIS PLLC/GTP
THE LITTLEFIELD BUIDLING
601 CONGRESS AVE., STE 600
AUSTIN, TX  78701


THIRD PARTY REQUESTER:

PAUL HASTINGS LLP
2050 M. STREET NW
WASHINGTON, DC 20036

44

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

April 29, 2024
(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the contents of the electronic file of the *Ex Parte* Reexamination Application identified below; said contents being a list of the papers comprising the record before the United States Patent and Trademark Office for the *Ex Parte* Reexamination Application of:

*Ex Parte* **GESTURE TECHNOLOGY PARTNERS, LLC**
Patent Owner and Appellant

Appeal 2023-002523
Reexamination Control No. 90/014,902
U.S. Patent No. 8,194,924 B2

By authority of the
**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

Huyen H. Nguyen
*Certifying Officer*



## Prosecution History for Reexamination Control No. 90/014,902

| Date | Document |
|------|----------|
| 11/11/2021 | Request for *Ex Parte* Reexamination of U.S. Patent No. 8,194,924 (and accompanying exhibits) |
| 11/11/2021 | Fee Worksheet |
| 11/11/2021 | Information Disclosure Statement |
| 11/11/2021 | Title Report |
| 11/16/2021 | Notice of Assignment of Reexamination Request |
| 11/16/2021 | Notice of Reexamination Request Filing Date |
| 11/19/2021 | Assignee Showing of Ownership |
| 11/19/2021 | Power of Attorney |
| 11/23/2021 | Notice of Acceptance of Power of Attorney |
| 11/23/2021 | Notice Regarding Change of Power of Attorney |
| 11/26/2021 | Examiner Interview Summary Record |
| 12/02/2021 | Order Granting Request for *Ex Parte* Reexamination |
| 04/08/2022 | Non-Final Office Action |
| 06/08/2022 | Reply under 37 C.F.R. 1.111 |
| 07/18/2022 | Examiner Interview Summary Record |
| 07/22/2022 | Final Office Action |
| 08/01/2022 | Patent Owner's Summary of Interview with Examiner |
| 09/22/2022 | Notice of Appeal Filed |
| 09/22/2022 | Fee Worksheet |
| 11/22/2022 | Appeal Brief Filed |
| 03/15/2023 | Examiner's Answer to Appeal Brief |
| 03/17/2023 | Patent Owner's Update to Mandatory Notices |
| 03/31/2023 | Mail Returned to USPTO as Undelivered |
| 05/15/2023 | Reply Brief Filed |
| 05/15/2023 | Request for Oral Hearing |
| 05/15/2023 | Certification and Transmittal of Appeal Forwarding Fee |
| 05/15/2023 | Fee Worksheet |
| 05/24/2023 | Appeal Docketing Notice |
| 08/29/2023 | Notice of Hearing |
| 09/01/2023 | Appellant's Response to Notice of Hearing |
| 09/05/2023 | Order Granting Video Hearing |
| 11/16/2023 | Appellant's Demonstratives for Oral Hearing |
| 12/06/2023 | Oral Hearing Transcript |
| 01/19/2024 | Patent Trial and Appeal Board - Decision on Appeal |
| 03/19/2024 | Notice of Appeal to The Court of Appeals for the Federal Circuit |

APPX0046

# All Rejected Claims of U.S. Patent No. 8,194,924

Claims 1-14 were rejected in the *ex parte* reexamination of U.S. Patent No. 8,194,924 (Control No. 90/014,902):

1.    A handheld device comprising:

    a housing;

    a computer within the housing;

    a first camera oriented to view a user of the handheld device and having a first camera output; and

    a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view, and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.

2.    The handheld device of claim 1 wherein the handheld device comprises a mobile phone.

3.    The handheld device of claim 1 wherein the first camera is adapted to acquire an image of at least a portion of the user.

4.    The handheld device of claim 1 wherein the second camera is adapted to acquire an image of the object.

5.    The handheld device of claim 1 wherein the second camera is adapted to acquire a video of the object.

6.    The handheld device of claim 1 wherein the computer is operable to determine a gesture based on at least one of the first camera output and the second camera output.

7.    The handheld device of claim 1 wherein the computer is operable to determine a facial expression based on at least one of the first camera output and the second camera output.

8.    The handheld device of claim 1 wherein the computer is adapted to determine at least one of the position and the orientation of the object based on the second camera output.

9.    The handheld device of claim 6 wherein the gesture is performed by a person other than the user of the handheld device.

10.    The handheld device of claim 1 wherein the computer is adapted to recognize the object based on the second camera output.

11.    The handheld device of claim 1 wherein the computer is adapted to generate control instructions for a display that is separate from the handheld device.

12.    The handheld device of claim 1 wherein the computer is adapted to determine a reference frame of the object.

13.    The handheld device of claim 1 wherein the computer is adapted to perform a control function based on the first camera output and based on the second camera output.

14.    The handheld device of claim 1 wherein the computer is adapted to transmit information over an internet connection.

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| In re *Ex Parte* Reexamination of: | ) | |
| | ) | |
| U. S. Patent No. 8,194,924 | ) | Control No.: *To be assigned* |
| | ) | |
| Issue Date: Jun. 5, 2012 | ) | Group Art Unit: *To be assigned* |
| | ) | |
| Inventor: Timothy R. Pryor | ) | Examiner: *To be assigned* |
| | ) | |
| Appl. No. 13/051,698 | ) | Confirmation No.: *To be assigned* |
| | ) | |
| Filing Date: Mar. 18, 2011 | ) | |
| | ) | |
| For:  CAMERA BASED SENSING IN | ) | |
|        HANDHELD, MOBILE, GAMING, | ) | |
|        OR OTHER DEVICES | ) | |

Mail Stop *Ex Parte* Reexam
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

## REQUEST FOR *EX PARTE* REEXAMINATION OF U.S. PATENT NO. 8,194,924

# TABLE OF CONTENTS

I.      Introduction ................................................................................................ 1

II.     Identification of Claims and Citation of Prior Art Presented ........................... 2

III.    Overview of the '924 Patent ......................................................................... 2

        A.      Specification and Drawings of the '924 Patent.................................... 2

        B.      Claims of the '924 Patent.................................................................... 4

        C.      Prosecution History of the '924 Patent ............................................... 4

        D.      The Effective Priority Date of Claims 1-14 of the '924 Patent ........... 5

IV.     Claim Construction ...................................................................................... 6

        A.      "oriented to view" of claim 1 ............................................................. 9

        B.      "a computer within the housing . . . wherein the computer is adapted to
                perform a control function of the handheld device based on at least one of
                the first camera output and the second camera output" of claims 1, 6-8, 10,
                12, and 14 ........................................................................................ 9

        C.      "gesture" of claims 6 and 9 ............................................................. 10

        D.      "adapted to" of claims 1, 3-5, 8-9, 12, and 14 .................................. 11

V.      Statement of Substantial New Questions of Patentability ............................... 11

        A.      SNQ1: *Liebermann* ........................................................................ 13

                1.      Overview of *Liebermann* ....................................................... 13

                2.      Claim 1 ................................................................................ 14

                3.      Claim 2 ................................................................................ 25

                4.      Claim 3 ................................................................................ 25

                5.      Claim 4 ................................................................................ 26

                6.      Claim 5 ................................................................................ 27

                7.      Claim 13 ............................................................................... 27

        B.      SNQ2: *Liebermann* in view of *Tryding* ......................................... 28

                1.      Overview of *Tryding* ........................................................... 28

                2.      Claim 11 ............................................................................... 29

        C.      SNQ3: *Liebermann* in view of *Gershman* ...................................... 32

                1.      Overview of *Gershman* ......................................................... 32

APPX0050

|  |  |  |  |
|---|---|---|---|
| | 2. | Claim 14 | 32 |
| D. | | SNQ4: *Liebermann* in view of *Himmel* | 34 |
| | 1. | Overview of *Himmel* | 34 |
| | 2. | Claim 1 | 35 |
| | 3. | Claim 2 | 41 |
| | 4. | Claim 3 | 41 |
| | 5. | Claim 4 | 41 |
| | 6. | Claim 5 | 41 |
| | 7. | Claim 6 | 42 |
| | 8. | Claim 7 | 43 |
| | 9. | Claim 8 | 43 |
| | 10. | Claim 10 | 44 |
| | 11. | Claim 12 | 45 |
| | 12. | Claim 13 | 48 |
| E. | | SNQ5: *Liebermann* in view of *Himmel* and *Tryding* | 48 |
| | 1. | Claim 11 | 48 |
| F. | | SNQ6: *Liebermann* in view of *Himmel* and *Gershman* | 49 |
| | 1. | Claim 14 | 49 |
| G. | | SNQ7: *Liebermann* in view of *Sears* | 49 |
| | 1. | Overview of *Sears* | 49 |
| | 2. | Claim 1 | 52 |
| | 3. | Claim 2 | 62 |
| | 4. | Claim 3 | 62 |
| | 5. | Claim 4 | 62 |
| | 6. | Claim 5 | 63 |
| | 7. | Claim 6 | 63 |
| | 8. | Claim 7 | 64 |
| | 9. | Claim 8 | 65 |
| | 10. | Claim 10 | 66 |
| | 11. | Claim 12 | 67 |
| | 12. | Claim 13 | 68 |

H.  SNQ8: *Liebermann* in view of *Sears* and *Tryding* ............................ 69

    1.  Claim 11 ........................................................................................... 69

I.  SNQ9: *Liebermann* in view of *Sears* and *Gershman* ......................... 69

    1.  Claim 14 ........................................................................................... 69

J.  SNQ10: *Liebermann* in view of *Kimball* ............................................. 69

    1.  Overview of *Kimball* ...................................................................... 70

    2.  Claim 14 ........................................................................................... 70

K.  SNQ11: *Liebermann* in view of *Himmel* and *Kimball* ....................... 72

    1.  Claim 14 ........................................................................................... 72

L.  SNQ12: *Liebermann* in view of *Sears* and *Kimball* ........................... 73

    1.  Claim 14 ........................................................................................... 73

M.  SNQ13: *Liebermann* in view of *Himmel* .............................................. 73

    1.  Claim 9 ............................................................................................. 73

N.  SNQ14: *Liebermann* in view of *Sears* ................................................. 75

    1.  Claim 9 ............................................................................................. 75

VI.  Detailed Explanation of the Pertinence and Manner of Applying the Prior Art to
the Claims ........................................................................................................... 78

A.  Bases for Proposed Rejections of the Claims ..................................... 78

B.  Proposed Rejections ............................................................................ 80

    1.  Proposed Rejection #1 ..................................................................... 80

    2.  Proposed Rejection #2 ..................................................................... 80

    3.  Proposed Rejection #3 ..................................................................... 80

    4.  Proposed Rejection #4 ..................................................................... 80

    5.  Proposed Rejection #5 ..................................................................... 81

    6.  Proposed Rejection #6 ..................................................................... 81

    7.  Proposed Rejection #7 ..................................................................... 81

    8.  Proposed Rejection #8 ..................................................................... 81

    9.  Proposed Rejection #9 ..................................................................... 81

    10.  Proposed Rejection #10 ................................................................... 81

    11.  Proposed Rejection #11 ................................................................... 81

    12.  Proposed Rejection #12 ................................................................... 81

13.     Proposed Rejection #13 .......................................................................... 82

14.     Proposed Rejection #14 .......................................................................... 82

VII.    Conclusion ...................................................................................................... 82

Request for *Ex Parte* Reexamination
U.S. Patent No. 8,194,924

**LIST OF EXHIBITS:**

| | |
|---|---|
| Ex. PA-SB08 | USPTO form SB/08 |
| Ex. PAT-A | U.S. Patent No. 8,194,924 ("the '924 patent") |
| Ex. PAT-B | Prosecution History of the '924 patent |
| Ex. PAT-C | U.S. Patent No. 8,878,949 to Pryor |
| Ex. PAT-D | U.S. Patent No. 6,750,848 to Pryor |
| Ex. PA-DEC | Declaration of Dr. Gregory D. Abowd |
| Ex. PA-DEC CV | Curriculum vitae of Dr. Gregory D. Abowd |
| Ex. PA-1 | U.S. Patent No. 5,982,853 to Liebermann ("*Liebermann*") |
| Ex. PA-2 | U.S. Patent No. 6,115,482 to Sears *et al.* ("*Sears*") |
| Ex. PA-3 | U.S. Patent No. 6,622,015 to Himmel *et al.* ("*Himmel*") |
| Ex. PA-4 | U.S. Patent No. 6,434,403 to Ausems *et al.* ("*Ausems*") |
| Ex. PA-5 | U.S. Patent No. 6,401,085 to Gershman *et al.* ("*Gershman*") |
| Ex. PA-6 | Microsoft Announces Release of Windows CE 2.0 - Stories |
| Ex. PA-7 | U.S. Patent No. 5,880,732 to Tryding ("*Tryding*") |

v

| | |
|---|---|
| Ex. PA-8 | Ca. Patent App. 2,175,288 to Bushnag ("*Bushnag*") |
| Ex. PA-9 | Bushnag Bibliographic Summary, Canadian Patents Database |
| Ex. PA-10 | Logic Reference Guide |
| Ex. PA-11 | U.S. Patent No. 5,953,322 to Kimball ("*Kimball*") |
| Ex. PA-12 | V. Pavlovic *et al.*, *Visual Interpretation of Hand Gestures for Human-Computer Interaction: A Review*, 19 IEEE TRANSACTIONS ON PATTERN ANALYSIS AND MACHINE INTELLIGENCE 677 (1997). |
| Ex. PA-13 | U.S. Patent No. 5,454,043 to Freeman ("*Freeman*") |
| Ex. PA-14 | U.S. Patent No. 6,256,033 to Nguyen ("*Nguyen*") |
| Ex. PA-15 | RESERVED |
| Ex. PA-16 | U.S. Patent No. 4,988,981 to Zimmerman ("*Zimmerman*") |
| Ex. PA-17 | U.S. Patent No. 6,147,678 to Kumar ("*Kumar*") |
| Ex. PA-18 | U.S. Patent No. 5,594,469 to Freeman ("*Freeeman-469*") |
| Ex. PA-19 | U.S. Patent No. to 6,144,366 to Numazaki ("*Numazaki*") |
| Ex. COMPLAINT-1 | Complaint (Dkt. #1) in *Gesture Partners, LLC v. Samsung Elecs. Co.*, No 2-21-CV-00041 (E.D. Tex. Feb. 4, 2021) |

| Ex. CC-1 | GTP's Opening Claim Construction Brief (Dkt. #64) in *Gesture Partners, LLC v. Huawei Device Co.*, No 2-21-CV-00040 (E.D. Tex. Aug. 15, 2021) (consolidated with *Gesture Partners, LLC v. Samsung Elecs. Co.*, No 2-21-CV-00041) |
|---|---|
| Ex. CC-2 | Claim Construction Memorandum and Order (Dkt. #93) in *Gesture Partners, LLC v. Huawei Device Co.*, No 2-21-CV-00040 (E.D. Tex. Oct. 12, 2021) (consolidated with *Gesture Partners, LLC v. Samsung Elecs. Co.*, No 2-21-CV-00041) |

vii

## I.    Introduction

An *ex parte* reexamination is requested on claims 1-14 ("the challenged claims") of U.S. Patent No. 8,194,924 that issued on June 5, 2012 to Pryor ("the '924 patent," Ex. PAT-A), for which the U.S. Patent and Trademark Office ("Office") files identify Gesture Technology Partners, LLC ("GTP") as the assignee.  In accordance with 37 C.F.R. § 1.510(b)(6), Requester Samsung Electronics Co., Ltd. ("Requester") hereby certifies that the statutory estoppel provisions of 35 U.S.C. § 315(e)(1) and 35 U.S.C. § 325(e)(1) do not prohibit it from filing this *ex parte* reexamination request.

This request raises substantial new questions of patentability based on prior art that the Office did not have before it or did not fully consider during the prosecution of the '924 patent, and which discloses the features recited in the challenged claims.[1]  The Office should find the claims unpatentable over this art.

On February 4, 2021, Patent Owner ("PO") initiated a litigation campaign asserting, *inter alia*, infringement of the '924 patent against five defendants across two different venues in *Gesture Technology Partners, LLC v. Huawei Device Co., Ltd.*, Case No. 2-21-cv-00040 (EDTX), *Gesture Technology Partners, LLC* v. *Samsung Electronics Co., Ltd.*, Case No. 2-21-cv-00041 (EDTX), *Gesture Technology Partners, LLC v. Apple Inc.*, Case No. 6-21-cv-00121 (WDTX), *Gesture Technology Partners, LLC v. Lenovo Group Ltd.*, Case No. 6-21-cv-00122 (WDTX), and *Gesture Technology Partners, LLC v. LG Electronics, Inc.*, Case No. 6-21-cv-00123 (WDTX).  The *LG* case was transferred to *Gesture Technology Partners, LLC v. LG Electronics Inc.*, Case No. 2-21-cv-19234 (DNJ).  Requester respectfully urges that this Request be granted and that reexamination be conducted with "special dispatch" pursuant to 35 U.S.C. § 305.

In accordance with 37 C.F.R. § 1.20(c), the fee for *ex parte* reexamination (non-streamlined) is submitted herewith.  If this fee is missing or defective, please charge the fee as well as any additional fees that may be required to Deposit Account No. 50-2613.

---

[1] At the time of filing of this Request, there are two pending *inter partes* reviews, *Apple Inc. v. Gesture Technology Partner, LLC*, IPR2021-00923 (filed May 26, 2021), and *LG Electronics, Inc. et al. v. Gesture Technology Partners, LLC*, IPR2022-00093 (filed November 5, 2021), challenging the claims of the '924 patent based on prior art not presented in this Request.

1

## II.    Identification of Claims and Citation of Prior Art Presented

Requester respectfully requests reexamination of claims 1-14 of the '924 patent in view of the following prior art references, which are also listed on the attached PTO Form SB/08 (Ex. PA-SB08).

| | |
|---|---|
| Ex. PA-1 | U.S. Patent No. 5,982,853 to Liebermann ("*Liebermann*") |
| Ex. PA-2 | U.S. Patent No. 6,115,482 to Sears *et al.* ("*Sears*") |
| Ex. PA-3 | U.S. Patent No. 6,622,015 to Himmel *et al.* ("*Himmel*") |
| Ex. PA-5 | U.S. Patent No. 6,401,085 to Gershman *et al.* ("*Gershman*") |
| Ex. PA-7 | U.S. Patent No. 5,880,732 to Tryding ("*Tryding*") |
| Ex. PA-11 | U.S. Patent No. 5,953,322 to Kimball ("*Kimball*") |

A copy of each of the above-listed references is attached to this request pursuant to 37 C.F.R. § 1.510(b)(3).  A copy of the '924 patent is also attached to this request as Exhibit PAT-A pursuant to 37 C.F.R. § 1.510(b)(4).

## III.   Overview of the '924 Patent

### A.    Specification and Drawings of the '924 Patent

The '924 patent generally relates to "simple input devices" for "optical[] sensing."  (Ex. PAT-A, 2:7-11.)  The devices operate by "optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations."  (*Id.*, 2:8-11.)  The optical sensing devices may use "single or multiple TV cameras whose output is analyzed and used as input to a computer, such as a home PC, to typically provide data concerning the location of parts of, or objects held by, a person or persons." (*Id.*, 2:20-23.)  Alternatively, "suitable electro-optical sensors" may be used in place of the TV cameras.  (*Id.*, 3:21-22.)

The embodiment disclosed in the context of Figure 18 (reproduced below) "illustrates an improved handheld computer embodiment of the invention, in which the camera or cameras may be used to look at objects, screens and the like as well as look at the user." (*Id.*, 3:11-14.)



Fig. 18

(*Id.*, FIG. 18.)  As shown in Figure 18, the handheld computer incorporates "a camera 1902 which can optionally be rotated about axis 1905 so as to look at the user or a portion thereof such as finger 1906, or at objects at which it is pointed." (*Id.*, 25:40-43.)  The camera arrangement can optionally incorporate "a stereo pair of cameras to further include camera 1910," and both cameras can rotate. (*Id.*, 25:43-45.)  "Alternatively fixed cameras can be used when physical rotation is not desired, for ruggedness, ease of use, or other reasons." (*Id.*, 25:45-49.)  "When aimed at the user," the cameras can "view and obtain images of: [o]nes self," including facial expressions, "[o]nes fingers," "[o]ne or more objects in ones hand," or "[o]nes gestures." (*Id.*, 25:50-63.)

"The camera 1902 (and 1910 if used, and if desired), can also be optionally rotated and used to view points in space ahead of the device." (*Id.*, 25:64-66.)  When rotated, "[t]he camera can also be used to see gestures of others, as well as the user, and to acquire raw video images of objects in its field." (*Id.*, 26:25-27.)  Additionally, the stereo cameras can be positioned in this way "to observe or point at (using optional laser pointer 1930) Points such as 1935 on a wall or a mounted LCD or projection display such as 1940 on a wall or elsewhere such as on the back of an airline seat." (*Id.*, 25:64-26:5.)  "The camera unit 1902 can sense the location of the display in space relative to the handheld computer, using for example the four points 1955-1958 on the

3

corners of the display as references. This allows the handheld device to become an accurate pointer for objects displayed on the screen including control icons." (*Id.*, 26:16-21.)  It also "allows the objects on the screen to be sensed directly by the camera," such that sensing can occur even "if one does not have the capability to spatially synchronize and coordinate the display driver with the handheld computer." (*Id.*, 26:21-24.)  In one instance, the '924 patent discloses that a computer may be a processing unit such as a "400 MHz Pentium II" processor.  (*Id.*, 3:32-34.)  In another instance, a computer may be a device "such as a home PC" that is capable of "providing data concerning the location of parts of, or objects held by, a person or persons." (*Id.*, 2:20-23.)

**B.    Claims of the '924 Patent**

The '924 patent includes fourteen claims total and claim 1 is the only independent claim. (*Id.*, 26:54-28:14.)  Independent claim 1, among other claim features, recites a handheld device comprising a housing, a computer, a first camera, and a second camera.  (*Id.*, 26:54-65.)  The first camera is "oriented to view a user of the handheld device and ha[s] a first camera output." (*Id.*) The second camera is "oriented to view an object other than the user of the device and ha[s] a second camera output.  (*Id.*)  The claim also recites that "wherein the first and second cameras include non-overlapping fields of view, and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output." (*Id.*)

The dependent claims further specify, among other limitations, a mobile phone device; types of images the cameras are adapted to acquire; various computer determinations based on one or more camera outputs; persons that perform gestures; a computer recognition processes based on the second camera output; the computer is adapted to generate control instructions for a display; the computer is adapted to determine a reference frame of the object; the computer is adapted to perform a control function based on camera outputs; and the computer is adapted to transmit information over an internet connection.  (*Id.*, 26:66-28:14.)

**C.    Prosecution History of the '924 Patent**

The Examiner initially rejected the claims under 35 U.S.C. § 112, first paragraph as failing to comply with the written description requirement.  (Ex. PAT-B, 107-10.)  In response, the Applicant asserted that the originally filed claims were supported by an application that was

incorporated by reference.  (*Id.*, 128-29.)  The Examiner then withdrew the written description rejection and turned to the merits of the originally filed claims.  (*Id.*, 134-42.)

Originally filed claim 24 was amended during prosecution and issued as the only independent claim of the '924 patent.  (Ex. PAT-B; Ex. PAT-A.)  In originally filed claim 24, the Applicant claimed a handheld device comprising a housing, a computer within the housing, "a first camera oriented to view a user of the handheld device" and "a second camera oriented to view an object other than the user of the device."  (Ex. PAT-B, 55-58.)  The Examiner rejected claim 24 based on a combination of *Silverbrook* and *Kimura*.  (*Id.*, 134-42.)  Specifically, the Examiner found it would have been obvious to orient two camera sensors on two sides of a device to capture the user and another object as claimed because *Kimura* taught two cameras that were positioned on different sides of a device.  (*Id.*)  In response, the Applicant did not dispute that, as a matter of physical positioning, a camera on one side of a device was oriented to view a user and a camera on a different side of the device was oriented to view an object other than the user as claimed.  (*Id.*, 159-62.)  Instead, the Applicant amended its claims to require the first and second cameras to have outputs and non-overlapping fields of view, and amended the computer to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.  (*Id.*, 157-58.)  It also argued that neither *Silverbrook* nor *Kimura* taught a computer adapted to perform a control function based on a camera output as claimed because "Kimura merely transfers video data to a user."  (*Id.*, 159-62.)  In fact, *Kimura* did no more than display a video.  (*Id.*)  The Applicant asserted that "[b]y contrast, the present invention provides a handheld device with added functionality and an enhanced method of interacting with the handheld device." (*Id.*, 160-61.)  After these amendments and arguments, the '924 patent issued.  (*Id.*, 166-72.)

The references forming the substantial new questions of patentability ("SNQ")— *Liebermann*, *Tyding*, *Gershman*, *Himmel*, *Kimball*, and *Sears*—were not cited or considered during prosecution of the '924 patent.  (Ex. PAT-A, Cover; Ex. PAT-B.)  Likewise, these references are not cited and will not be considered in the pending IPRs.  *Apple Inc. v. Gesture Technology Partners, LLC*, IPR2021-00923 (filed May 26, 2021); *LG Electronics, Inc. et al. v. Gesture Technology Partners, LLC*, IPR2022-00093 (filed November 5, 2021).

**D.    The Effective Priority Date of Claims 1-14 of the '924 Patent**

For purposes of this reexamination only, Requester assumes that claims 1-14 are entitled to the filing date of Provisional Application No. 60/142,777 identified on the cover of the '924 patent, which is July 8, 1999.  (Ex. PAT-A, Cover.)

*Liebermann* issued on November 9, 1999 from Application No. 08/653,732 filed May 23, 1996; *Himmel* issued on September 16, 2003 from Application No. 09/240,960 filed January 29, 1999; *Gershman* issued on June 4, 2002 from Application No. 09/263,969 filed March 5, 1999; *Tryding* issued on March 9, 1999 from Application No. 845,937 filed April 29, 1997; *Sears* issued on September 5, 2000 from Application No. 09/176,999 filed October 22, 1998; *Kimball* issued on September 14, 1999 from Application No. 08/792,532 filed January 31, 1997.   Thus, *Liebermann*, *Himmel*, *Tryding*, *Gershman*, *Sears*, and *Kimball* qualify as prior art at least under pre-AIA 35 U.S.C. § 102(e).

## IV.    Claim Construction

In a reexamination proceeding involving claims of an expired patent, claim construction pursuant to the principle set forth by the court in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316, 75 U.S.P.Q.2.d 132, 1329 (Fed. Cir. 2005) (words of a claim 'are generally given their ordinary and customary meaning' as understood by a person of ordinary skill in the art in question at the time of the invention) should be applied since the expired claim[s] are not subject to amendment.  MPEP § 2258 I.(G) (citing *Ex Parte Papst-Motoren*, 1 U.S.P.Q.2.d 1655 (Bd. Pat. App. & Inter. 1986)).  The '924 patent, which lists July 7, 2000 as the date of the earliest related continuation and does not list any term extensions or adjustments, has expired.  *See* Ex. PAT-A; 35 U.S.C. § 154.  Therefore, the claim interpretations submitted or implied herein for the purpose of this reexamination adhere to the *Phillips* standard.  *See In re CSB-System Int'l, Inc.*, 832 F.3d 1335, 1340-42 (Fed. Cir. 2016).[2]

---

[2] Requester reserves all rights to raise claim constructions and other arguments in other venues. For example, Requester has not necessarily raised all challenges to the '924 patent in this proceeding, including those under 35 U.S.C. § 112, given the limitations placed by the Rules governing this proceeding.  For example, Requester has alleged some terms are indefinite in district court proceedings.  But given how closely the prior art maps to the claims (as explained below), those issues do not need to be resolved to assess patentability in this proceeding.  In addition, a comparison of the claims to any accused products in litigation may raise controversies that need to be resolved through claim construction that are not presented here given the similarities between the references and the '924 patent.  Thus, the SNQs presented herein should not be interpreted to (and do not) conflict with Requester's indefiniteness positions in other proceedings regarding the '924 patent (and how the Court ruled on such positions) (Ex. CC-2).

The district court in the related Eastern District of Texas cases recently construed/considered several terms recited in the claims of the '924 patent under the *Phillips* standard. (Ex. CC-2.) A summary of the district court constructions/interpretations and the constructions advanced by the parties in the litigation is listed in the following table.

| '924 Patent Terms | E.D. Texas Construction | Construction Advanced by Defendant(s) | Construction Advanced by PO |
|---|---|---|---|
| "oriented to view" of claim 1 | plain meaning (Ex. CC-2, 41-44) | "having a field of view encompassing" (Ex. CC-2, 41-44) | no construction necessary (Ex. CC-2, 41-44) |
| "oriented to view a user" of claim 1 | plain meaning (Ex. CC-2, 44-46) | indefinite (Ex. CC-2, 44-46)[3] | no construction necessary (Ex. CC-2, 44-46) |
| "oriented to view an object other than the user" of claim 1 | plain meaning (Ex. CC-2, 47-48) | indefinite (Ex. CC-2, 47-48)[4] | no construction necessary (Ex. CC-2, 47-48) |
| "wherein the gesture is performed by a person other than the user of the handheld device" of claim 9 | indefinite (Ex. CC-2, 48-50)[5] | indefinite (Ex. CC-2, 48-50) | No construction necessary (Ex. CC-2, 48-50) |

[3] While the district court declined to find this term indefinite, Requester does not concede the claim is definite by demonstrating how the prior art discloses/suggests this limitation below. Instead, as noted, Requester presents how a substantial new question of patentability is raised by the prior art where the term is interpreted under the district court's (and PO's) plain meaning interpretation of the claimed term.

[4] While the district court declined to find this term indefinite, Requester does not concede the claim is definite by demonstrating how the prior art discloses/suggests this limitation below. Instead, as noted, Requester presents how a substantial new question of patentability is raised by the prior art where the term is interpreted under the district court's (and PO's) plain meaning interpretation of the claimed term.

[5] While the district court found this term indefinite, and thus claim 9 indefinite, Requester presents SNQs separately for claim 9 (SNQs 13-14) under the assumption that the Office does not agree with the district court that the term is indefinite to preclude a finding of a SNQ for claim 9. (*See infra* Sections V.M-V.N). However, should the Office determine that this term precludes the Office from determining the scope of claim 9 to support a finding of a SNQ as to claim 9 (as proposed herein), such denial (e.g. a finding against SNQs 13-14) would not preclude reexamination of the other claims challenged in the SNQs presented (*see e.g.,* Sections V.A-L (SNQs 1-11).)

| | | | |
|---|---|---|---|
| "a computer within the housing . . . wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output" of claims 1, 6-8, 10, 12, and 14 | plain meaning (Ex. CC-2, 51-54) | terms invoke 35 U.S.C. § 112 ¶ 6: function = e.g., "perform a control function of the handheld device based on at least one of the first camera output and the second camera output"; structure = indefinite[6] (Ex. CC-2, 51-54) | no construction necessary and the terms do not invoke 35 U.S.C. § 112 ¶ 6 (Ex. CC-2, 51-54) |
| "gesture" of claims 6 and 9 | "movement of hands or other body parts that conveys meaning" (Ex. CC-2, 54-57) | "a sequence of positions that conveys a meaning" (Ex. CC-2, 54-57) | no construction necessary (Ex. CC-2, 54-57) |
| "adapted to" of claims 1, 3-5, 8, 10, 12, and 14 | plain meaning (Ex. CC-2, 57-60) | computer: "programmed to"; first and second cameras: "designed to" (Ex. CC-2, 57-60) | no construction necessary (Ex. CC-2, 57-60) |

The prior art mappings found in Section V of this Request explain how the claims of the '924 patent are unpatentable under the constructions of the district court as well as the constructions advanced by both PO and the Defendants. Indeed, the claims would be unpatentable under any reasonable construction of the terms given how closely the prior art maps to the claims. More generally, Section V demonstrates how the prior art meets the limitations of the challenged claims under their plain meaning (as adopted by the district court) unless otherwise noted. Specific information regarding disputed terms in the Eastern District of Texas litigation concerning the '924 patent follows.

---

[6] While the district court declined to find this term indefinite, Requester does not concede the claim is definite by demonstrating how the prior art discloses/suggests this limitation below. Instead, as noted, Requester presents how a substantial new question of patentability is raised by the prior art where the term is interpreted under the district court's (and PO's) plain meaning interpretation of the claimed term, and also as construed below.

### A.    "oriented to view" of claim 1

Defendants have contended that the claimed "oriented to view" limitation should be construed to mean "having a field of view encompassing."  Indeed, this understanding is supported by the teachings of the specification.  For example, the patent explains that a camera is oriented to view a user at whom it is pointed, and may be rotated if needed: "Consider hand held computer 1901 of FIG. 18, incorporating a camera 1902 which can optionally be rotated about axis 1905 so as *to look* at the user or a portion thereof such as finger 1906, or at objects *at which it is pointed*." (Ex. PAT-A, 25:40-63 (emphasis added); *see also id*., 25:64-26:5 (emphasis added) ("The camera 1902 (and 1910 if used, and if desired), can also optionally be rotated and used *to view points in space ahead of the device*, as shown in dotted lines 1902a.  *In this position* for example it can be used for the purposes described in the previous application.").)  The patent also explains that "*[w]hen aimed at the user*, as shown, [the camera 1902] can be used, for example, *to view* and obtain images of: Ones self . . . Ones fingers . . . Ones gestures."  (*Id*. at 25:40-63 (emphasis added).)  The patent further explains that "[t]he camera can also be used *to see* gestures of others, as well as *the user*, and to acquire raw video images of objects *in its field*."  (*Id*., 26:25-27 (emphasis added).)  In the only two-camera embodiment, the patent explains that one camera *is looking* at the wall display, while the other *is looking* at the user: "Also can have two cameras operating together, *one looking at wall thing, other at you* (as 1902 and 1902a) . . . ."  (*Id*., 26:36-40 (emphasis added).)  Thus, the '924 patent supports that "oriented to view" means "having a field of view encompassing."  Requester demonstrates below in Section V how the prior art addresses this limitation under this interpretation.

PO has not expressed that the "oriented to view" limitations require construction.  (Ex. CC-1, 15-16.)  Requester demonstrates below in Section V how the prior art addresses this limitation under PO's interpretation, which also reflects the plain meaning interpretation given by the district court's construction order.

### B.    "a computer within the housing . . . wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output" of claims 1, 6-8, 10, 12, and 14

PO has argued in district court that the "computer" limitations do not require construction and do not invoke §112, ¶ 6.  (Ex. CC-1, 18-19.)  Under PO's interpretation, Requester

demonstrates below in Section V how the prior art addresses the limitations in addition to under the plain meaning given by the district court's construction order.

To the extent this limitation is found to be subject to 35 U.S.C. § 112, ¶ 6, Requester proposes the following construction (under the assumption the Office determines appropriate structure is provided in the '924 patent, which Requester does not concede).

Construing a means-plus-function claim term requires that the function recited in the claim term be first identified; then, the written description of the specification must be consulted to identify the corresponding structure that performs the identified function and equivalents thereof. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351 (Fed. Cir. 2015); *see also Gracenote, Inc. v. Iceberg Indus., LLC*, IPR2013-00551, Paper No. 6 at 15 (Feb. 28, 2014).

For claim 1, the identified function is to "perform a control function of the handheld device based on at least one of the first camera output and the second camera output." The dependent claims add to the function, including: (1) "determine a gesture based on at least one of the first camera output and the second camera output" (Claim 6); (2) "determine a facial expression based on at least one of the first camera output and the second camera output" (Claim 7); (3) "determine at least one of the position and the orientation of the object based on the second camera output" (Claim 8); (4) "recognize the object based on the second camera output" (Claim 10); (5) "determine a reference frame of the object" (Claim 12); and (6) "transmit information over an internet connection" (Claim 14).

A structure disclosed in the specification qualifies as corresponding structure only if it is clearly linked by the patent's specification (or possibly the prosecution history) to performing the claimed function. *See Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). Where a means-plus-function term is directed to software, the specification must "disclose an algorithm for performing the claimed function." *Williamson*, 792 F.3d at 1352. For purposes of this proceeding only, Requester interprets the corresponding structure of the above-identified function as software running on a computer configured to performed the identified function or equivalents thereof given the lack of relevant disclosure in the '924 patent specification. (*See also supra* footnote 2.).

Requester demonstrates below in Section V how the prior art addresses this limitation under this interpretation.

**C.    "gesture" of claims 6 and 9**

10

Defendants have contended that the claimed "gesture" should be construed to mean "a sequence of positions that conveys a meaning."  For example, the '924 patent supports the understanding that a gesture is a sequence of positions, *i.e.*, a particular type of movement.  (Ex. PAT-A, 20:5-10 ("This can also include a sequence of positions, itself constituting the gesture.").)  The patent also distinguishes gestures from expressions that do not require movement, such as facial expressions (e.g., a smile).  (*Id.*, 22:9-12 ("In this case, it is facial expressions, hand or body gestures that are the thing most used."), 25:40-63 (describing "ones self—facial expressions" separately from "ones gestures"); *compare* Claim 6 ("operable to determine a gesture") *with* Claim 7 ("operable to determine a facial expression").)  Requester demonstrates below in Section V how the prior art addresses this limitation under this interpretation.

PO has contended that the "gesture" limitations do not require construction.  (Ex. CC-1, 19.)  Requester likewise demonstrates below in Section V how the prior art addresses this limitation under both PO's interpretation (i.e., plain meaning) and the district court's construction order.

### D.    "adapted to" of claims 1, 3-5, 8-9, 12, and 14

Defendants have contended that the claimed computer that is "adapted to" operate as claimed should be construed to mean a computer that is "programmed to" operate as claimed.  The claimed first and second cameras that are "adapted to" operate as claimed should be construed to mean that the first and second cameras, respectively, are "designed to" operate as claimed.  For example, the PO's use of "adapted to" in lieu of the broader "operable to" phrase recited in Claims 6 supports Requester's construction.

PO has contended that the "adapted to" limitations do not require construction.  (Ex. CC-1, 19-20.)  Requester likewise demonstrates below in Section V how the prior art addresses this limitation under PO's interpretation, which also reflects the plain meaning interpretation given by the district court's construction order.

### V.    Statement of Substantial New Questions of Patentability

As mentioned above, *Liebermann*, *Himmel*, *Sears, Tryding*, *Kimball*, and *Gershman* were never made of record or considered by the Office during original prosecution of the '924 patent. But the references (in various combinations for respective claims, as discussed below) disclose or suggest all of the features of claims 1-14.

**SNQ1**: *Liebermann* raises a substantial new question of patentability (SNQ1) with respect to claims 1-5 and 13 of the '924 patent.

**SNQ2**: *Liebermann* and *Tryding* raise a substantial new question of patentability (SNQ2) with respect to claim 11 of the '924 patent.

**SNQ3**: *Liebermann* and *Gershman* raise a substantial new question of patentability (SNQ3) with respect to claim 14 of the '924 patent.

**SNQ4**: *Liebermann* and *Himmel* raise a substantial new question of patentability (SNQ4) with respect to claims 1-8, 10, and 12-13 of the '924 patent.

**SNQ5**: *Liebermann*, *Himmel*, and *Tryding* raise a substantial new question of patentability (SNQ5) with respect to claim 11 of the '924 patent.

**SNQ6**: *Liebermann*, *Himmel*, and *Gershman* raise a substantial new question of patentability (SNQ6) with respect to claim 14 of the '924 patent.

**SNQ7**: *Liebermann* and *Sears* raise a substantial new question of patentability (SNQ7) with respect to claims 1-8, 10, and 12-13 of the '924 patent.

**SNQ8**: *Liebermann*, *Sears*, and *Tryding* raise a substantial new question of patentability (SNQ8) with respect to claim 11 of the '924 patent.

**SNQ9**: *Liebermann*, *Sears*, and *Gershman* raise a substantial new question of patentability (SNQ9) with respect to claim 14 of the '924 patent.

**SNQ10**: *Liebermann* and *Kimball* raise a substantial new question of patentability (SNQ10) with respect to claim 14 of the '924 patent.

**SNQ11**: *Liebermann*, *Himmel*, and *Kimball* raise a substantial new question of patentability (SNQ11) with respect to claim 14 of the '924 patent.

**SNQ12**: *Liebermann*, *Sears*, and *Kimball* raise a substantial new question of patentability (SNQ12) with respect to claim 14 of the '924 patent.

**SNQ13**: *Liebermann* and *Himmel* raise a substantial new question of patentability (SNQ13) with respect to claim 9 of the '924 patent.

**SNQ14**: *Liebermann* and *Sears* raise a substantial new question of patentability (SNQ14) with respect to claim 9 of the '924 patent.

Thus, for these reasons and the reasons discussed below and in the accompanying declaration of Dr. Gregory D. Abowd (Ex. PA-DEC), *Liebermann* raises a substantial new question of patentability (SNQ1) with respect to claims 1-5 and 13 of the '924 patent; *Liebermann*

and *Tryding* raise a substantial new question of patentability (SNQ2) with respect to claim 11 of the '924 patent; *Liebermann* and *Gershman* raise a substantial new question of patentability (SNQ3) with respect to claim 14 of the '924 patent; *Liebermann* and *Himmel* raise a substantial new question of patentability (SNQ4) with respect to claims 1-10 and 12-13 of the '924 patent; *Liebermann*, *Himmel*, and *Tryding* raise a substantial new question of patentability (SNQ5) with respect to claim 11 of the '924 patent; *Liebermann*, *Himmel*, and *Gershman* raise a substantial new question of patentability (SNQ6) with respect to claim 14 of the '924 patent; *Liebermann* and *Sears* raise a substantial new question of patentability (SNQ7) with respect to claims 1-10 and 12-13 of the '924 patent; *Liebermann*, *Sears*, and *Tryding* raise a substantial new question of patentability (SNQ8) with respect to claim 11 of the '924 patent; *Liebermann*, *Sears*, and *Gershman* raise a substantial new question of patentability (SNQ9) with respect to claim 14 of the '924 patent; *Liebermann* and *Kimball* raise a substantial new question of patentability (SNQ10) with respect to claim 14 of the '924 patent; *Liebermann*, *Himmel*, and *Kimball* raise a substantial new question of patentability (SNQ11) with respect to claim 14 of the '924 patent; *Liebermann*, *Sears*, and *Kimball* raise a substantial new question of patentability (SNQ12) with respect to claim 14 of the '924 patent; *Liebermann* and *Himmel* raise a substantial new question of patentability (SNQ13) with respect to claim 9 of the '924 patent; *Liebermann* and *Sears* raise a substantial new question of patentability (SNQ14) with respect to claim 9 of the '924 patent.[7]

A.    **SNQ1: *Liebermann***

As explained below and in the attached declaration of Dr. Abowd (Ex. PA-DEC), *Liebermann* discloses or suggests the limitations of claims 1-5 and 13 of the '924 patent. (Ex. PA-DEC, ¶ 54.)

1.    **Overview of *Liebermann***

Like the '924 patent, *Liebermann* discloses a handheld device that uses one or more cameras to sense hand gestures. (Ex. PA-1, 13:5-16; FIGs. 1 and 6.) Specifically, *Liebermann* discloses a cellular telephone device and a corresponding housing. (*Id.*, FIG. 6.) The cellular telephone may include multiple cameras, with the first camera being oriented to view the "hands and fingers and body and facial motions and expression" of a user. (*Id.*, 5:62-6:10; 13:5-16.) A second camera may be positioned at a different angle so as to view a different object. (*Id.*, 13:5-

---

[7] *See supra* n.5.

16.)  The cellular telephone performs various imaging functions, displays data, etc.  (*Id.*, 5:62-6:10, 6:40-52, FIG. 8; Ex. PA-DEC, ¶ 44.)  Moreover, the cellular telephone controls the hardware of the device to perform various functions based on camera data.  (Ex. PA-1, 5:63-6:10, 6:40-52, FIG. 8; Ex. PA-DEC, ¶ 44.)

Thus, *Liebermann* is in the same or similar technical field as the '924 patent, and a person of ordinary skill in the art ("POSITA") would have had reason to consider the teachings of *Liebermann*.  (Ex. PAT-A, 2:7-21 ("The invention relates to simple input devices for computers . . . . The invention uses single or multiple TV cameras whose output is analyzed and used as input to a computer."); Ex. PA-DEC, ¶ 45.)  To the extent *Liebermann* is not within the field of endeavor of the '924 patent (it is), *Liebermann* is reasonably pertinent to problems associated with detecting gestures and/or inputting information to a portable device, problems with which the inventor was involved.  (Ex. PA-1, FIG. 1, 5:62-6:52; Ex. PAT-A, 2:5-35; Ex. PA-DEC, ¶ 45.)

## 2.    Claim 1

### a.    [1.a] A handheld device comprising:

To the extent the preamble is limiting, *Liebermann* discloses this limitation.  (Ex. PA-DEC, ¶ 55.)  For example, *Liebermann* discloses a "cellular telephone."  (Ex. PA-1, 4:20-21; *see also* Ex. PAT-A, 11:65-67 (describing a "cell phone" as a handheld device).)

14



(Ex. PA-1, FIG. 6 (annotated).)  As can be seen in Figure 6, the cellular telephone of *Liebermann* is in a handheld form factor, and indeed *Liebermann* describes the cellular telephone as being a "portable" device.  (*Id.*, 5:62-65.)

### b.    [1.b] a housing;

*Liebermann* discloses this limitation.  (Ex. PA-DEC, ¶ 57-58.)  For example, the external surfaces of the cellular telephone depicted in Figure 6 comprise "a housing" for the internal circuitry of the cellular telephone.  (Ex. PA-1, FIG. 6; Ex. PA-DEC, ¶ 58)  *Liebermann* describes the housing of the cellular telephone as including an "upright portion 12" and a "base portion 13." (Ex. PA-1, 5:62-67.)

### c.    [1.c] a computer within the housing;

*Liebermann* discloses this limitation.  (Ex. PA-DEC, ¶ 59.)  In particular, *Liebermann* discloses that the cellular telephone includes hardware that works with one or more cameras or sensors to view and obtain images of hand signs (i.e., one's gestures), performs related "initial processing," and populates a phone display, among other things.  (Ex. PA-1, 5:62-6:10, 6:40-52, FIG. 8; Ex. PA-DEC, ¶ 60.)  Specifically, the cellular telephone performs functions that a POSITA would have understood were performed by a computer, such as to control cameras, drive a display,

15

transmit information, receive information, process data, process touchless function buttons, etc. (*Id.*, 5:62-6:47, FIGs 1, 8.)  *See* MPEP § 2114 ("[T]he term 'computer' is commonly understood by one of ordinary skill in the art to describe a variety of devices with varying degrees of complexity and capabilities. *In re Paulsen*, 30 F.3d 1475, 1479-80, 31 USPQ2d 1671, 1674 (Fed. Cir. 1994).  Therefore, a claim containing the term 'computer' should not be construed as limited to a computer having a specific set of characteristics and capabilities, unless the term is modified by other claim terms or clearly defined in the specification to be different from its common meaning.").

To enable a sign-language friendly device, *Liebermann* discloses that the computer hardware performs the "initial processing" in which "each of the frames containing a captured image undergoes a process whereby the image is collapsed into a small set of fixed identifiers.  At the end of the initial processing, the resulting information is sent as data."  (Ex. PA-1, 6:40-52.)  A POSITA would have appreciated that the computer hardware can also control the screens of the cellular telephone to display "text of what was signed," etc., as computing hardware is necessary to perform such a function.  (*Id.*, FIG. 8; Ex. PA-DEC, ¶61.)

16



(Ex. PA-1, FIG. 8.)  Furthermore, a POSITA would have understood that the computing hardware of the phone is within the cellular telephone and thus within the cell phone housing because the cellular telephone (rather than a remote computer) performs initial processing, controls a display, etc.  (*Id.*, 5:62-6:10, 6:40-52, FIG. 8; Ex. PA-DEC, ¶ 61.)

> **d.      [1.d] a first camera oriented to view a
> user of the handheld device and having a
> first camera output; and**

*Liebermann* discloses this limitation.  (Ex. PA-DEC, ¶ 62.)  *Liebermann* discloses that the cellular telephone includes a video camera ("first camera") that outputs image data ("having a first camera output").  (Ex. PA-1, 5:62-6:10 (emphasis added) ("A portable transmitter/receiver generally designated by the numeral 8 . . . is shown in FIG. 6 and it contains a video **camera**, the lens 10 of which is disposed in the upright portion 12. . . . **The signing motions captured by the camera are converted into digital data for processing** by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences.").)

17



(*Id.*, FIG. 6.)

The video camera is "oriented to view a user of the handheld device," as claimed, to detect sign language gestures. (Ex. PA-DEC, ¶ 64.) Specifically, "camera lens 10" of the video camera views a user and "will record the signing movement of the hands and fingers and body and facial motions and expressions," where "**[a] deaf person uses sign language in front of the transmitter/receiver device containing the camera**" and "[t]he **images captured by the camera are of the finger and hand motions and of body motions and of facial expressions** and motions captured by a digital device which does initial processing." (Ex. PA-1, 6:4-47 (emphasis added); Ex. PA-DEC, ¶ 64.) The cellular telephone camera, which views the face, hands, and body of a person using the cellular telephone (to process hand gestures) and thus has a field of view encompassing the person using the cellular telephone, is "oriented to view a user of the handheld device." (Ex. PA-DEC, ¶ 64.) To be sure, the '924 patent refers to a finger as a "portion" of a user. (Ex. PAT-A, 25:40-43.) However, the '924 patent does not require a camera that is "oriented to view a user" to necessarily view a person from head to toe. (*See generally* Ex. PAT-A; *see also* Ex. PAT-A, claim 3 (emphasis added) ("The handheld device of claim 1 wherein the first camera is adapted to acquire an image of at least a *portion* of the user").) Therefore, a POSITA would have understood the *Liebermann* camera, which views the face, hands, and body of a person using

a device, is "oriented to view a user of the handheld device." (Ex. PA-1, 6:4-47; Ex. PA-DEC, ¶ 64.)

For similar reasons, *Liebermann* discloses that the first camera is "oriented to view" a user under Requester's construction discussed above. (Ex. PA-DEC, ¶ 65.) For example, the first camera records the "movement of the hands and fingers and body and facial motions and expressions. . . . [A] deaf person uses sign language in front of the transmitter/receiver device containing the camera. The images captured by the camera are of the finger and hand motions and of body motions and of facial expressions and motions captured by a digital device which does initial processing." (Ex. PA-1, 6:4-47; Ex. PA-DEC, ¶ 65.) For similar reasons, *Liebermann* discloses these features under the plain meanings proposed by PO and found by the district court's claim construction order. (*See infra* Section IV; CC-2.)

   e.  **[1.e] a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view, and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.[8]**

*Liebermann* discloses or suggests this limitation. (Ex. PA-DEC, ¶ 66.) As discussed above in Section V.A.2.d, *Liebermann* discloses a "first camera" as claimed. (Section V.A.2.d.) *Liebermann* further discloses that "[i]t may be **desirable to utilize more than one camera** to allow the signing person 'free' movement in his or her environment to track down spatial positions in that environment." (Ex. PA-1, 13:4-8 (emphasis added).) As such, a POSITA would have been motivated to include a second camera in a cellular telephone similar to as disclosed in *Liebermann*'s Figure 6 embodiment. (Ex. PA-DEC, ¶ 67.)

---

[8] Based on the claim language of the '924 patent, the claimed "at least one of" X and Y language is in the disjunctive form. (*Compare* Ex. PAT-A, claim 1 ("perform a control function of the handheld device based on at least one of the first camera output and the second camera output") *with id.*, claim 13 ("The handheld device of claim 1 wherein the computer is adapted to perform a control function based on the first camera output and based on the second camera output.").)

For instance, *Liebermann* explains that when utilizing more than one camera, "the installation [of multiple cameras] should follow the following criteria," including, among other things, that (1) each camera is covering a separate angle, (2) each camera operates independently of the other(s), (3) angle overlap may or may not be permitted according to the pre-signing calibration, (4) integration of input from multiple camera is performed.  (Ex. PA-1, 13:9-12.)  Accordingly, a POSITA would have understood that a configuration with two cameras would have provided a larger field of view or multiple fields of view, with the output of the cameras integrated, for capturing the signing person's hands, finger, body movements as well as facial expressions.  (Ex. PA-DEC, ¶ 68.)  Indeed, *Liebermann* expressly discloses that having multiple cameras is beneficial as it would have "allow[ed] the signing person 'free' movement in his or her environment to track down spatial positions in that environment."  (Ex. PA-1, 13:5-6; Ex. PA-DEC, ¶ 68)

A POSITA would have had a reasonable expectation of success in such an implementation because *Liebermann* itself expressly states that two-camera embodiments were "desirable," Ex. PA-1, 13:4-8, and provides applicable criteria for such "installation[s]," *id.*, 13:9-28 ("the installation should follow the following criteria").  (Ex. PA-DEC, ¶ 69.)  Similar multi-camera arrangements were explicitly recognized in the art, as a POSITA would have appreciated.  (Ex. PA-DEC, ¶ 69.)  For example, *Sears*[9] teaches a multiple-camera reading device, wherein the cameras sense gestures to control the device.  (Ex. PA-2, Abstract, 20:65-21:16; *id.*, 22:5-8 ("[I]n these embodiments, the camera received commands, at least in part, from hand and finger gestures of the user that were captured by the camera or cameras.").)  In another example, *Bushnag*[10]

---

[9] *Sears* (Ex. PA-2) is cited as evidence supporting the knowledge of a POSITA before the time of the alleged invention.

[10] *Bushnag* (Ex. PA-8) is cited as evidence supporting the knowledge of a POSITA before the time of the alleged invention.  *Bushnag* is a publication of a patent application laid "Open to Public Insp[ection]" (i.e., publically accessible as a printed publication) by the Canadian Intellectual Property Office on October 30, 1997.  *See eBay v. MoneyCat*, CBM2014-00092, Paper 12 at 12 (P.T.A.B. Sep. 24, 2014) (crediting "Open to Public Insp." date as establishing Canadian laid-open patent application as publicly accessible printed publication) (citing *In re Wyer*, 655 F.2d 221 (C.C.P.A. 1981)); *In re Wyer*, 655 F.2d 221 (C.C.P.A. 1981); *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374 (Fed. Cir. 2006) (determining a Canadian patent application was publically accessible and thus a printed publication); *see also* Ex. PA-8, 1 (listing an October 30, 1997 date); Ex. PA-9 (listing the open to public inspection date of the *Bushnag* reference as October 30, 1997).  Thus, *Bushnag* qualifies as prior art at least under pre-AIA 35 U.S.C. § 102(b).

teaches a dual camera, gesture-controlled laptop device.  (Ex. PA-8, FIG. 9; *id.,* 22 (disclosing a laptop computer 70 that includes digital cameras 12 and 14); *id.*, 17 (disclosing that specific functions of the system are triggered when the cameras detect specific, unnatural eye gestures); *id.*, 13 ("Figure 9 illustrates an embodiment of the eye-controlled command system used in conjunction with a conventional portable computer.").)

Moreover, such a modification would have involved applying known technologies (e.g., known gesture detection technology and known criteria of installing multiple cameras in a device like those described in *Liebermann*) according to known methods (e.g., known multi-camera gesture detection techniques like those also described in *Liebermann*) to yield the predictable result of a cellular phone implemented with multiple cameras for use in an electronic communication system. *See KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).  Accordingly, *Liebermann* discloses or suggests a handheld device comprising "a first camera . . .; and **a second camera**." (Ex. PA-DEC, ¶ 70.)

Furthermore, *Liebermann* discloses or suggests that the "second camera" is "oriented to view an object other than the user of the device."  For example, in the configuration of *Liebermann* discussed above where multiple cameras (including the "second camera") are used, the multiple cameras are positioned at different angles and may be used to define "any objects" or "alive, stationary or moving entities, such as animals" as well as to interpret the signing motions of multiple "person(s)."  (Ex. PA-1, 13:4-16; *see also* Ex. PAT-A, 3:53-54 (describing that "objects" include "persons"); Ex. PA-DEC, ¶ 71.)  Thus, the additional cameras are oriented to view "an object other than the user of the device," as claimed.  Moreover, *Liebermann* also discloses that a camera may recognize special gloves ("an object other than the user of the device") and gestures depicted by the glove.  (Ex. PA-1, 12:40-43, 13:4-16.)  For this additional reason, *Liebermann* discloses or suggests that "a second camera oriented to view an object other than the user of the device."  (Ex. PA-DEC, ¶71.)  For similar reasons, *Liebermann* discloses or suggests that the second camera is "oriented to view" an object other than the user of the device under Requester's construction discussed above.  (Ex. PA-DEC, ¶ 71; *supra* Section IV.A.)  In particular, because *Liebermann*'s "second camera" defines or recognizes various objects or persons (either of which being "an object other than the user of the device") as well as their signing motions (*see, e.g.*, Ex. PA-1, 12:40-43, 13:4-16), *Liebermann*'s "second camera" has to have "a field of view encompassing" these "object[s]."  (Ex. PA-DEC, ¶ 71.)    Accordingly, *Liebermann* discloses or

21

suggests this limitation under the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court. (*See infra* Section IV; Ex. CC-2.)

The "second camera" disclosed by *Liebermann* includes "a second camera output" as claimed. (Ex. PA-DEC, ¶ 72.) For example, *Liebermann* discloses that an input is provided from its second camera, which as a POSITA would have understood, corresponds to the claimed "second camera output." (Ex. PA-1, 13:4-16 ("Integration of input from multiple camera is performed."); Ex. PA-DEC, ¶ 72.) *Liebermann* also discloses that "the first and second cameras include non-overlapping fields of view." (Ex. PA-DEC, ¶ 72.) For example, *Liebermann* discloses that each of the multiple cameras (including the first camera) **cover[s] a separate angle**," Ex. PA-1, 13:11, and the cameras may not have angle overlap, *id.*, 13:13-14 ("Angle overlap may or may not be permitted according to the pre-signing calibration."). That is, the two cameras may have: (1) some overlap in FOV, but also include non-overlapping FOVs; or (2) no overlap in their FOVs. (*Id.*, 13:4-14.) Accordingly, *Liebermann* discloses "a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view." (Ex. PA-DEC, ¶ 72.)

*Liebermann* also discloses that "the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output." (Ex. PA-DEC, ¶ 73.) With respect to this claimed feature, the '924 patent discloses that a control function of a handheld device includes controlling the device "itself" to perform a function, e.g., a base function of the device or a method to interact with the device to achieve other purposes. (Ex. PAT-A, 11:65-12:3 (emphasis added) ("FIG. 8A illustrates control of functions with the invention, using **a handheld device which *itself* has functions** (for example, a cell phone). The purpose is to add functionality to the device, without complicating its **base function**, and/or alternatively **add a method to interact with the device to achieve other purposes**.").)

*Liebermann* discloses that the phone performs initial processing based on the camera images and also discloses that the phone screen is controlled to display the "text of what was signed." (Ex. PA-1, 6:30-52, FIG. 8 (showing at the bottom of the figure that the phone displays "text of what was signed").)

22



*(Id.*, FIG. 8.)  *Liebermann* discloses a computer for the reasons explained for limitation [1.c] above.

A POSITA would have understood that *Liebermann*'s in-phone computer (which drives the display, performs initial processing of camera images, etc., *supra* Section V.A.2.c) is adapted to **control the text that is displayed** based on **what was signed**.  (Ex. PA-1, 6:30-52, FIG. 8; Ex. PA-DEC, ¶ 74.)  Consistent with the '924 patent (Ex. PAT-A, 11:65-13:26 (disclosing that the "function" controlled may be a "base function" of the device)), displaying text is a base function of the cellular telephone in *Liebermann*.  (Ex. PA-DEC, ¶ 74.)  Because **what text to display** is controlled based on the output of the at least one of *Liebermann*'s cameras associated with the signs/gestures, Ex. PA-1, FIG. 8, 6:30-52, *Liebermann* discloses "the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output."  To the extent performing a control function of the handheld device "based on at least one of the first camera output and the second camera output" requires performing a display function based on one image as opposed to two or more images (it does not—the claim does not make such a specific distinction and only requires the system to perform a control function based on at least one camera output), *Liebermann* explains that a single sign (and corresponding word in the text that is displayed) may correlate with a single image frame.  (*See id.*, 6:30-57, 7:19-21, FIG. 8.)  For instance, "[t]he camera in **the cellular phone transmits the image** for initial

processing in the cellular phone." (*Id.*, 7:19-21.)  This image is transmitted as data to the center wherein "[t]he rest of the processing is completed at the center. This includes identification of the letters, numbers and words, conversion to standard sign language." (*Id.*, 6:40-57.)  That is, a POSITA would have understood that an image may be translated to a letter, number or word in accordance with sign language, *id.*, and accordingly displayed on the cellular telephone as claimed, *id.*, FIG. 8.

*Liebermann*'s telephone computer also allows a user to interact with the device to achieve the purpose of sign language calling communication ("the computer is adapted to perform a control function of the handheld device") based on the camera outputs associated with the signs/gestures. (Ex. PA-1, FIG. 8, 5:62-6:14, 6:53-59.)  *Liebermann* for this additional reason discloses that "the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output," as the '924 patent discloses that the "function" controlled may be "a method to interact with the device to achieve other purposes." (Ex. PAT-A, 11:65-12:3; Ex. PA-DEC, ¶ 76.)

*Liebermann* discloses that the claimed "computer is adapted to" perform identified functions under Requester's construction discussed above, i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof.  (*See supra* Section IV.B, D; Ex. PA-DEC, ¶ 77.)  For example, *Liebermann* discloses that the applicable cellular telephone hardware—which a POSITA would have understood as a computer—runs "software" and performs the initial processing required to control what text to display based on the camera output associated with the signs/gestures.  (Ex. PA-1, 6:40-52, 7:10-49; Ex. PA-DEC, ¶ 77.)  Indeed, *Liebermann* explains that the disclosed device includes "processing hardware and software" required to operate the cellular telephone.  (Ex. PA-1, 13:40-66; Ex. PA-DEC, ¶ 77.)  Thus, as a POSITA would have understood, *Liebermann*'s cellular telephone computer is programmed with software to perform the various functions, including the claimed "perform[ing] a control function of the handheld device based on at least one of the first camera output and the second camera output."  (Ex. PA-DEC, ¶ 77.)  Accordingly, *Liebermann* discloses the claimed "computer" that is "adapted to" perform the identified functions under Requester's construction. (Ex. PA-DEC, ¶ 77.)  Thus, *Liebermann* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See infra* Section IV; Ex. CC-2.)

Request for *Ex Parte* Reexamination
U.S. Patent No. 8,194,924

### 3.  Claim 2

#### a.  The handheld device of claim 1 wherein the handheld device comprises a mobile phone.

*Liebermann* discloses this limitation.  (Ex. PA-DEC, ¶ 78.)  For example, *Liebermann* discloses that the handheld device disclosed in the context of FIG. 6 is a "cellular telephone."  (Ex. PA-1, 4:20-21.)



(*Id.*, FIG. 6.)

### 4.  Claim 3

#### a.  The handheld device of claim 1 wherein the first camera is adapted to acquire an image of at least a portion of the user.

*Liebermann* discloses this limitation.  (Ex. PA-DEC, ¶ 79.)  As discussed in claim element 1[d], *Liebermann* discloses a "first camera" is oriented to view a user of the device to detect sign

25

language gestures. (*Supra* Section V.A.2.d.) Furthermore, *Liebermann* discloses that the first camera "record[s] the signing movement of the hands and fingers and body and facial motions and expressions," where "[a] deaf person uses sign language in front of the transmitter/receiver device containing the camera" and "[t]he **images captured by the camera are of the finger and hand motions and of body motions and of facial expressions** and motions captured by a digital device which does initial processing." (Ex. PA-1, 6:4-47 (emphasis added); *see also id.*, 4:60-62 ("the deaf person uses sign language in front of a device containing a video camera.").) Moreover, *Liebermann* likewise discloses the claimed limitation under Requester's construction, where that the first camera is "designed to" acquire an image of at least a portion of the user for similar reasons described above. (Ex. PA-DEC, ¶ 80.) Thus, *Liebermann* discloses this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court. (*See supra* Section IV; Ex. CC-2.)

### 5.    Claim 4

#### a.    The handheld device of claim 1 wherein the second camera is adapted to acquire an image of the object.

*Liebermann* discloses this limitation. (Ex. PA-DEC, ¶ 82.) As discussed above, *Liebermann* discloses that the multiple cameras (including the "second camera") may be used to define "any objects" or "alive, stationary or moving entities, such as animals" as well as to interpret the signing motions of multiple "person(s)." (*Supra* Section V.A.2.e; Ex. PA-1, 13:4-16; *see also* Ex. PAT-A, 3:53-54; Ex. PA-DEC, ¶ 83.) Furthermore, *Liebermann* discloses that "[i]ntegration of input from multiple camera is performed." (Ex. PA-1, 13:4-16.) A POSITA would have understood that, in the context of *Liebermann*'s disclosure, *Liebermann*'s "second camera" is adapted to acquire an image of the object in order to perform the above noted processes associated with the second camera (e.g., defining any objects as well as to interpret the signing motions of multiple "person(s)"). This is particularly true given that *Liebermann* performs an "initial processing" that involves processing "each of the frames containing a captured image." (*Id.*, 6:47-48.) Thus, *Liebermann* discloses this limitation. (Ex. PA-DEC, ¶ 83.) Moreover, *Liebermann* likewise discloses the claimed limitation under Requester's construction, where that the second camera is "designed" to acquire an image of the object for similar reasons described above. (Ex. PA-DEC, ¶ 83.) Thus, *Liebermann* discloses this limitation under both the Requester's proposed

constructions, and the plain meaning proposed by PO and found by the district court. (*See supra* Section IV; Ex. CC-2.)

### 6. Claim 5

#### a. The handheld device of claim 1 wherein the second camera is adapted to acquire a video of the object.

*Liebermann* discloses or suggests this limitation. (Ex. PA-DEC, ¶ 85.) As a backdrop, *Liebermann* discloses that the first camera of the cellular telephone is a video camera. (Ex. PA-1, 13:4-8 ("The illustrated embodiments all utilize a single video cameras").) As discussed above, the second camera of the cellular telephone is oriented to view an object. (*Supra* Section V.A.2.e.) A POSITA would have understood that when *Liebermann* refers to utilizing more than one camera, as compared to embodiments that "all utilize a *single video camera*," it refers to utilizing multiple *video* cameras. (Ex. PA-1, 13:4-8; Ex. PA-DEC, ¶ 86.) For instance, *Liebermann* discloses that the additional camera (e.g., the claimed "second camera") would "allow the signing person 'free' movement in his or her environment to track down spatial positions in that environment." (Ex. PA-1, 13:4-8; Ex. PA-DEC, ¶ 86.) As such, a POSITA would have understood that the second camera, like the first camera, is a video camera that can detect gestures and can increase the field of view a user could sign. (Ex. PA-1, 13:4-8; *id.*, 5:62-65, 13:29-31 (use of multiple "three dimensional video cameras"); Ex. PA-DEC, ¶ 86.) Thus, *Liebermann* discloses this limitation. (Ex. PA-DEC, ¶ 86.) Moreover, *Liebermann* likewise discloses the claimed limitation under Requester's construction, where that the second camera is "designed" to acquire a video of the object for similar reasons described above. (Ex. PA-DEC, ¶ 86.)    Thus, *Liebermann* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court. (*See supra* Section IV; Ex. CC-2.)

### 7. Claim 13

#### a. The handheld device of claim 1 wherein the computer is adapted to perform a control function based on the first camera output and based on the second camera output.

*Liebermann* discloses this limitation. (Ex. PA-DEC, ¶ 89.) As discussed above for claim 1, *Liebermann* discloses a two-camera system where each camera has a respective camera output. (*Supra* Section V.A.2.) The outputs of the cameras are "integrat[ed]," and gesture data is "integrated into a single observable signing" and/or "[s]igning content." (Ex. PA-1, 13:4-21, 7:49-8:26; Ex. PA-DEC, ¶ 90.) As such, the system is capable of detecting gestures when the user moves across multiple cameras' fields of view (the "first camera" and the "second camera" fields of view) when making signs. (Ex. PA-1, 13:4-21 (disclosing "utilize[ing] more than one camera to allow the signing person 'free' movement in his or her environment"); Ex. PA-DEC, ¶ 90.) Furthermore, as discussed in Section V.A.2.e, *Liebermann* discloses that the cellular phone computer (discussed above for limitation [1.c]) is adapted to **control what text to display** based on the **text of what was signed**. (Ex. PA-1, 6:30-52, FIG. 8; Ex. PA-DEC, ¶ 90.) As discussed, *Liebermann* discloses that the output of the two cameras is integrated and the cameras (i.e., both cameras) capture signing/gesture motions. (*Supra* Section V.A.2.e.) Accordingly, *Liebermann* discloses that the "computer is adapted to perform a control function based on the first camera output and based on the second camera output." (Ex. PA-DEC, ¶ 90.) Moreover, *Liebermann* likewise discloses that "the computer is adapted to perform" the claimed control function under Requester's construction discussed above, i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof. (*Supra* Section IV.B, D; Ex. PA-DEC, ¶ 90.) For example, as discussed in Section V.A.2.e, *Liebermann* discloses that its computer runs "software" and performs the initial processing required to control what text to display based on the camera output associated with the signs/gestures, Ex. PA-1, 6:40-52, 7:10-49, and that the disclosed device includes "processing hardware and software" required to operate the cellular telephone, *id.*, 13:40-66. (Ex. PA-DEC, ¶ 90.) Thus, *Liebermann* discloses this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court. (*See supra* Section IV; Ex. CC-2.)

## B.   SNQ2: *Liebermann* in view of *Tryding*

As explained below and in the attached declaration of Dr. Abowd (Ex. PA-DEC), *Liebermann* and *Tryding* disclose or suggest the limitations of claim 11 of the '924 patent. (Ex. PA-DEC, ¶ 91.)

### 1.   Overview of *Tryding*

*Tryding* relates to user interfaces for mobile telephones, and more particularly, using a portable computer to control a display. (Ex. PA-7, 1:8-11 "The present invention relates to user interfaces for mobile telephones, and more particularly, to the display of data associated with the mobile telephone display on an external electronic display.").) Thus, *Tryding* is in the same or similar technical field as *Liebermann* and the '924 patent, and a POSITA would have had reason to consider the teachings of *Tryding* when implementing the *Liebermann* system. (*Supra* Section V.A; Ex. PA-DEC, ¶ 46.) To the extent *Tryding* is not within the field of endeavor of the '924 patent (it is), *Tryding* is reasonably pertinent to problems associated with displaying data when portable devices were becoming smaller and smaller, a problem with which the inventor was involved. (Ex. PA-7, 1:28-33 (discussing a problem with producing "smaller and smaller hand-held units" is displaying the data); Ex. PAT-A, 26:4-15 (discussing problems of displaying data in light of "the computers smaller trend"); Ex. PA-DEC, ¶ 46.)

## 2.    Claim 11

### a.    The handheld device of claim 1 wherein the computer is adapted to generate control instructions for a display that is separate from the handheld device.

As discussed above in Section V.A.2, *Liebermann* discloses the handheld device of claim 1 and that the computer controls the cellular phone to display data, communicate information, etc. (*supra* Section V.A.2), however, *Liebermann* does not explicitly disclose that "the computer is adapted to generate control instructions for a display that is separate from the handheld device." Nevertheless, it would have been obvious to implement these features in view of *Tryding*. (Ex. PA-DEC, ¶ 92.)

*Tryding* discloses a mobile telephone that "generate[s] control instructions for a display that is separate from [a] handheld device." *Tryding*, like *Liebermann*, discloses a "mobile telephone" 10. (Ex. PA-7, 2:27-31.) It additionally discloses a "display monitor" 15 that is separate from mobile device 10 ("a display that is separate from [a] handheld device). (*Id.*, 2:38-44.)



(*Id.*, FIG. 1 (annotated).)

*Tryding* explains that "[t]he mobile telephone 10 includes a display monitor communications function 40 enabling the generation of the communications link 5 with the monitor 15." (*Id.*, 2:39-41.) Through this link, the mobile telephone 10 sends "commands" ("control instructions") to monitor 15 to control what is displayed on remote monitor 15. (*Id.*, 3:17-47; Ex. PA-DEC, ¶ 94.) For example, the cell phone commands can cause the remote display 15 to show "menu text 80, SMS menu text 85, all text 90, and incoming call data 95." (Ex. PA-7, 3:17-33.)



30

(*Id.*, FIG. 1 (annotated excerpt); *id.*, 2:27-51.)

In light of *Tryding*'s disclosures, a POSITA would have been motivated to include a display that is separate from a handheld device when implementing the handheld device similar to as disclosed in *Liebermann*, where the computer of the handheld device is adapted to generate control instructions for the display. (Ex. PA-DEC, ¶ 95.) For instance, *Tryding* explains that because "the small size of the mobile telephones necessarily causes an associated display to be rather small," "use of small font characters or abbreviations" may be required to "fully present visual information to the user of the cellular telephone." (Ex. PA-7, 1:23-27; *see also id.*, 1:8-33.) However, such configuration "makes the displayed data difficult to read or interpret." (*Id.*, 1:28-30.) As such, a POSITA would have understood that using a separate display similar to as disclosed in *Tryding* (which is controlled by the handheld device, e.g., controlling what to present on the separate display) would have been beneficial. (Ex. PA-DEC, ¶ 95.) This is because, for example, a separate display, which may be made relatively larger compared to the display on the handheld device (e.g., *Liebermann*'s cellular phone), would have been able to present the data at a size that makes it easier for a user to read. (Ex. PA-DEC, ¶ 95.)

A POSITA would have had a reasonable expectation of success when implementing the above-described configuration. (Ex. PA-DEC, ¶ 96.) Indeed, *Tryding* expressly discloses how to control and communicate with a separate display using a handheld device, e.g., by the use of "a display monitor communications function 40" that enables the generation of the communication link 5 with the monitor 15. (Ex. PA-7, 2:39-40; *see also id.*, 2:52-61 (explaining that the communication link 5 is based on known communication technology, e.g., infrared communication link or RF communications).) A POSITA would have understood that functions and configurations to control the separate display (e.g., display monitor communications function 40 as disclosed in *Tryding*) would have been implemented in *Liebermann*'s computer based on software programming, particularly when *Liebermann* already discloses using software in the device to perform various functions. (Ex. PA-1, 6:40-52, 7:10-49; *id.*, 13:40-66 (disclosing that the device includes "processing hardware and software" required to operate the cellular telephone).) Such configuration would have involved a combination of known technologies (e.g., as in *Liebermann* and *Tryding*) according to known methods (e.g., known processes to control a separate display) to yield a predictable result, where a computer of a handheld device is adapted to generate control instructions for a display that is separate from the handheld device. *See KSR*

*Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).  Accordingly, the *Liebermann-Tryding* combination discloses and/or suggests this limitation.  (Ex. PA-DEC, ¶ 96.)  Moreover, *Liebermann* likewise discloses that "the computer is adapted to perform" the claimed control function under Requester's construction discussed above, i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons and as discussed above in *supra* Section V.A.2.e.  (*Supra* Section V.A.2.e (explaining how the *Liebermann* cellular telephone computer is programmed with software to operate).)    Thus, *Liebermann-Tryding* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See supra* Section IV; Ex. CC-2.)

### C.    SNQ3: *Liebermann* in view of *Gershman*

As explained below and in the attached declaration of Dr. Abowd (Ex. PA-DEC), *Liebermann* and *Gershman* disclose or suggest the limitations of claim 14 of the '924 patent.  (Ex. PA-DEC, ¶ 93.)

### 1.    Overview of *Gershman*

*Gershman* relates to mobile telephones and display systems, and more particularly, using a mobile phone to connect to the internet.  (Ex. PA-5, 1:35-40 "The present invention relates to agent based systems and more particularly to a mobile computing environment that accesses the Internet . . . ."); *id.*, Abstract ("A system is disclosed that facilitates web-based information retrieval and display system. A wireless phone or similar hand-held wireless device with Internet Protocol capability is combined with other peripherals to provide a portable portal into the Internet.").)  Thus, *Gershman* is in the same or similar technical field as *Liebermann* and the '924 patent, and a POSITA would have had reason to consider the teachings of *Gershman* when implementing the *Liebermann* system.  (*Supra* Section V.A; Ex. PA-DEC, ¶ 47.)  To the extent *Gershman* is not within the field of endeavor of the '924 patent (it is), *Gershman* is reasonably pertinent to problems associated with increasing mobile computing applications and/or communicating targeted information. (Ex. PA-5, 2:50-3:11; Ex. PAT-A, 23:38-42 ("The invention provides . . . all of the benefits of the video and computer revolution, also via the internet."); Ex. PA-DEC, ¶ 47.)

### 2.    Claim 14

### a. The handheld device of claim 1 wherein the computer is adapted to transmit information over an internet connection.

While not expressly disclosed by *Liebermann*, a POSITA would have found it obvious to adapt a computer of a cellular telephone (such as the *Liebermann* computer) to transmit information over an internet connection in view of *Gershman*. (Ex. PA-DEC, ¶ 97.) *Gershman* discloses a wireless phone having a computer that is adapted to transmit information over an internet connection. (Ex. PA-DEC, ¶ 98.) In particular, *Gershman* discloses that wireless phones were known to be connected to the Internet before the time of invention, e.g., the Nokia 9000 is capable of "access[ing] information through the World Wide Web." (Ex. PA-5, 2:1-18, FIG. 1A (showing a mobile phone that connects to Internet Service Provider 12 and a phone company 22); *id.*, 1:62-2:35 (discussing "wireless phones" that had web browsers and mobile computing solutions that "utilize an Internet service provider (ISP) 12 to gain access to a web portal 14" and connect to a phone company 22).)

A POSITA would have been motivated to include internet access capability when implementing a cellular phone similar to as disclosed in *Liebermann* such that the computer in the cellular phone is adapted to transmit information over the internet connection. (Ex. PA-DEC, ¶ 99.) A POSITA would have understood connecting the cellular telephone computer to the internet would "permit a user to access vast amounts of information and services without, essentially, geographical boundaries." (Ex. PA-5, 2:66-3:2.) Moreover, connecting the computer to the internet similar to as described in *Gershman* would increase user convenience and provide a "rich environment to perform a large number of tasks on behalf of the user." (*Id.*, 3:2-4.) For instance, *Gershman* discloses that "a software agent" may perform a large number of tasks for the user, e.g., the software agent "could scan the Internet and obtain information ranging from the latest sports news to a particular graduate thesis in applied physics." (*Id.*, 2:61-3:9; *see also id.*, 43:55-60 ("A Personal Digital Assistant (PDA) with Internet access can synchronize the person's calendar, email, contact list, task list and notes on the PDA with the version stored in the Internet site.").) As such, a POSITA would have been motivated to implement a cellular phone computer (similar to as disclosed in *Lieberman*), e.g., by including a software agent (like that of *Gershman*) such that the computer is adapted to transmit information over an internet connection. (Ex. PA-DEC, ¶ 99.) Further, persons of ordinary skill in the art understood that consumers wanted devices that could

connect to the internet before the time of invention and would have been motivated to include the claimed internet feature for similar reasons.  (Ex. PA-DEC, ¶ 99.)  Indeed, such a skilled person would have been motivated to include an internet connection at least because it could conveniently and quickly communicate various data on demand.  (Ex. PA-DEC, ¶ 99.)

A POSITA would have had a reasonable expectation of success in implementing the internet access in a cellular phone computer.  (Ex. PA-DEC, ¶ 100.)  Such an implementation was well-known at the time of invention.  For example, the Nokia 9000 phone is capable of "access[ing] information through the World Wide Web."  (Ex. PA-5, 2:1-18.)  Furthermore, such an implementation would have involved a combination of known technologies (e.g., as in *Liebermann* and *Gershman*) according to known methods (e.g., known processes to transmit information over the Internet) to yield a predictable cell phone computer that is adapted to transmit information over an internet connection.  (Ex. PA-DEC, ¶ 100.)  *See KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).  Accordingly, the *Liebermann-Gershman* combination discloses and/or suggests this limitation.  (Ex. PA-DEC, ¶ 100.).

Moreover, the *Liebermann-Gershman* combination likewise discloses that "the computer is adapted to perform" the claimed control function under Requester's construction discussed above, i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons and as discussed above in *supra* Section V.A.2.e. (*Supra* Section V.A.2.e (explaining how the *Liebermann* cellular telephone computer is programmed with software to operate); Ex. PA-DEC, ¶ 101.)  Thus, *Liebermann-Gershman* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See supra* Section IV; Ex. CC-2.)

### D.    SNQ4: *Liebermann* in view of *Himmel*

As explained below and in the attached declaration of Dr. Abowd (Ex. PA-DEC), *Liebermann* and *Himmel* disclose or suggest the limitations of claims 1-8, 10, and 12-13 of the '924 patent.  (Ex. PA-DEC, ¶ 102.)

### 1.    Overview of *Himmel*

*Himmel* relates to processing data on mobile telephones.  (Ex. PA-3, 1:15-16 ("The present invention relates generally to an improved data processing system . . . ."); *id.*, 5:19-21 (In "FIG. 3, a block diagram of a wireless phone computing platform is depicted in accordance with a preferred

embodiment of the present invention.").)  Thus, *Himmel* is in the same or similar technical field as *Liebermann* and the '924 patent, and a POSITA would have had reason to consider the teachings of *Himmel* when implementing the *Liebermann* system.  (*Supra* Section V.A; Ex. PAT-A, 11:64-12:3 ("FIG. 8A illustrates control of functions with the invention, using a handheld device which itself has functions (for example, a cell phone). The purpose is to add functionality to the device, without complicating its base function, and/or alternatively add a method to interact with the device to achieve other purposes."); Ex. PA-DEC, ¶ 48.)  To the extent *Himmel* is not within the field of endeavor of the '924 patent (it is), *Himmel* is reasonably pertinent to problems associated with mobile computing and its applications.  (Ex. PA-3, 1:15-16 ("The present invention relates generally to an improved data processing system."); *id.*, 5:19-21 (disclosing "a wireless phone computing platform"); Ex. PAT-A, 23:38-42 ("The invention provides . . . all of the benefits of the video and computer revolution."); Ex. PA-DEC, ¶ 48.)

### 2.    Claim 1

#### a.    [1.a] A handheld device comprising:

To the extent the preamble is limiting, *Liebermann* discloses this limitation for the reasons discussed *supra* in Section V.A.2.a.

#### b.    [1.b] a housing;

*Liebermann* discloses and/or suggests this limitation for the reasons discussed *supra* in Section V.A.2.b.

#### c.    [1.c] a computer within the housing;

While *Liebermann* discloses that the cellular telephone performs "initial processing" and populates a phone display, among other things, *supra* Section V.A.2.c; Ex. PA-1, 5:62-6:10, 6:40-52, FIG. 8, it also discloses that aspects of gesture recognition occur on a network server, Ex. PA-1, 6:41-63, FIG. 1.  To the extent *Liebermann* does not explicitly disclose a computer within the housing of the cellular telephone, this feature would have been obvious.  (Ex. PA-DEC, ¶ 105.)  For example, it would have been obvious to perform all processing steps, including the initial processing and the gesture recognition process, locally on a computer of the cellular telephone. (Ex. PA-DEC, ¶ 105.)

In *Liebermann*, the cellular telephone performs initial gesture processing but uses a network computer to perform the rest of the gesture recognition process.  (Ex. PA-1, 6:41-63; Ex.

PA-DEC, ¶ 106.)  The *Liebermann* communication system converts sign language gestures to speech that can be transmitted to a person on the other side of a call.  (Ex. PA-1, FIG. 1; *id.*, 12:30-36 (referring to hand signs as "gesture[s]").)  To do so, at least one camera of a cellular telephone records a user making hand sign gestures.  (*Id.*, 5:62-6:9 (describing how the cellular telephone camera records the signing movement of user hands); *id.*, 13:4-16 (teaching a two-camera embodiment); *id.*, FIG. 6.)  After performing "initial processing" to collapse gesture images into small sets of fixed identifiers, the cellular telephone outsources a networked computer to determine which hand gestures a user makes.  (*Id.*, 6:41-63 (describing how a network data processing center identifies signing movements to convert the signs to text); *id.*, 12:30-36 (referring to hand signs as "gesture[s]"); Ex. PA-DEC, ¶ 106.)



FIG. 1

(*Id.*, FIG. 1 (annotated and blurred for emphasis) (disclosing a telephone for the deaf that captures images of hand sign gestures and a center computer that determines what hand sign gestures were made).)

It would have been obvious to process camera outputs locally within a cellular telephone computer instead of at the networked computer.  (Ex. PA-DEC, ¶ 107.)  *See In re Yufa*, 452 F. App'x. 998, 1001 (Fed. Cir. 2012) (citing *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007)) (affirming obviousness because the prior art disclosed "every element of the claims except" the location for "the processing of" data, which was "nothing more than a reconfiguration of a known system").  Indeed, *Liebermann* itself suggests that the location where processing occurs is a matter of design choice.  Specifically, *Liebermann* discloses that it uses a network computer to process gesture information because it is "economic[]" to do so.  (Ex. PA-1, 6:10-12; *see also id.*, 3:38-42 ("From cost and portability standpoints, the translating means is at a remote location or central station.").)  While a network computer was an economic solution envisioned by *Liebermann*, *id.*, 6:10-12, a POSITA would have understood that other processing options were also available, and that there would have been reasons motivating such alternatives.  (Ex. PA-DEC, ¶ 107.)

Before the time of invention, POSITAs understood that smart phones with computer units were handling a variety of sophisticated processing tasks.  (Ex. PA-3, 5:18-29, FIG. 3)  For example, *Himmel* discloses a "smart phone" that included an Intel "Pentium" processing unit 302 (a "computer").  (*Id.*, 5:18-29, FIG. 3.)  The processor is "located within a cell phone." (*Id.*)  Thus, *Himmel* discloses "a computer within the housing," as claimed.  (*Id.*, 5:20-22; Ex. PA-DEC, ¶ 108.)  The "computer" disclosed in *Himmel* is of a small form factor that is capable of running a Windows operating system and performing a variety of complex processes, such as processing voice commands, electronic documents, display information, etc.  (Ex. PA-3, 5:42-63, FIG. 3.)  A POSITA would have understood that *Himmel*'s computer, as integrated in the smart phone, like others at the time of the alleged invention, was "capable of running a variety of application software packages," such as text and/or image editors, web browsers, calculators, and others at the time of invention.  (Ex. PA-4, 1:12-24, 8:2-6; *see also* Ex. PA-5, 1:43-2:18 (citing the Nokia 9000 as a smart phone that included a small keyboard, a specialized web browser, and a small VGA monitor); Ex. PA-DEC, ¶ 108.)  Indeed, at the time of the alleged invention, it was known that "[m]obile computing technology. . . allow[s] the individual to access computer related information

37

at all times and in all environments." (Ex. PA-5, 1:44-48.)  For instance, a mobile computer of, e.g., "[a] PDA allowed a user to access computer related information, yet fitted in the palm of the hand." (*Id.*, 1:49-50.)  Furthermore, a POSITA would have understood that "**more integration in mobile computing is desired**." (*Id.*, 2:3-4 (emphasis added); Ex. PA-DEC, ¶ 108.)  "By utilizing computer technology, users or callers have access to computing functions and resources in a personal, portable device." (Ex. PA-3, 1:24-27.)  Additionally, at the time of the alleged invention, it was known to "integrat[e] . . . personal computer technology into phones." (*Id.*, 1:22-24.)   In this fashion, a POSITA would have understood that, at the time of the alleged invention, smart phones may at least have possessed processing/computing capability of personal computers.  (Ex. PA-DEC, ¶ 108.)

The '924 patent does not disclose anything critical about the claimed "computer within the housing." (Ex. PA-DEC, ¶ 109.)  Indeed, the '924 patent admits that the alleged invention "uses single or multiple TV cameras whose output is analyzed and used as input to a computer, such as a home PC." (Ex. PAT-A, 2:20-23; *see also id.*, 3:32-34 (disclosing use of "PC computer")).)  The '924 patent even identified that an Intel Pentium processor that was widely used in a personal computer (like the Intel Pentium processor used in *Himmel*'s smart phone) was capable of executing software for performing the claimed features, e.g., recognizing various poses and gestures in images.  (*Id.*, 3:29-34 (disclosing use of "PC computer 106 (integrated in this case into the monitor housing), for example a 400 Mhz Pentium II"); Ex. PAT-C, 6:6-19 (discussing that an "Intel Pentium 2" processor was suitable to execute pose analysis software and analyze when a user made a specific pose).)  Thus, a POSITA would have similarly understood that the computing capacity of the Intel Pentium processor used in the *Himmel* smart phone would have provided a cellular telephone, similar to as discussed in *Liebermann*, the capability of performing various claimed features, e.g., "perform[ing] a control function of the handheld device based on at least one of the first camera output and the second camera output." (*Infra* Section V.D.2.e; Ex. PA-DEC, ¶ 109.)

A POSITA would have found it obvious to include a computer, similar to as disclosed in *Himmel*, within the housing to perform local image processing and gesture recognition when implementing a cellular telephone similar to as disclosed in *Liebermann*.  (Ex. PA-DEC, ¶ 110.)  As a POSITA would have understood, performing the process sign translation or gesture recognition at a remote server was no more than a design choice based on an economic decision.

38

(Ex. PA-1, 6:10-12.)    While the proposed modification may have required more expensive hardware, a POSITA would have appreciated that customers desired highly-integrated smart phone devices that could perform additional functions, e.g., local gesture recognition.  (Ex. PA-5, 2:3-4 (emphasis added) ("**more integration in mobile computing is desired**."); Ex. PA-DEC, ¶ 110.) Moreover, a potential increase in cost of hardware in implementing a local processing capability does not foreclose a finding of obviousness here.  *See In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983) (finding additional expense associated with a particular combination would not discourage one of ordinary skill in the art from seeking the benefit expected therefrom).  In fact, *Liebermann* itself discloses that the cellular telephone device can function as "an **on-site** translator" rather than just a telephone for the deaf.  (Ex. PA-1, 13:37-39 (emphasis added); Ex. PA-DEC, ¶ 110.)

Additionally and alternatively, a POSITA would have understood that the image processing and gesture recognition features could be implemented using known software based on existing hardware.  (Ex. PA-1, 4:6-9 (disclosing that the remote processing center provides "computer software for translating functions…"); *id.*, 6:6-10 ("The signing motions captured by the camera are converted into digital data for processing by the translation software…to produce data representing numbers, words and phrases which are then combined into coherent sentences."); *id.*, 7:14-17, 7:48-49 ("Software presently used for this purpose is appended hereto and is utilized with Borland C++.").)  Given that, at the time of the alleged invention, it was becoming "more and more pervasive" to integrate "personal computer technology into phones," a POSITA would have understood that the software-driven features for image process and gesture recognition would have been implemented on those phones having the requisite computing power to operate those features. (Ex. PA-3, 1:23-25; Ex. PA-DEC, ¶ 111.)  A POSITA would have been motivated to do so as it would have not only provided additional features and applications to the then-existing cellular phone after-market but also substantially avoided the cost of implementing a computer in a cellular phone for the sole purpose of performing the imaging processing and gesture recognition.  (Ex. PA-DEC, ¶ 111.)

Furthermore, as a POSITA would have understood, the proposed modification would have reduced network communication demands because the cellular telephone could communicate with another individual directly instead of through an intervening network computer and would have

also improved user conveniences for not requiring communication with a remote processing center that could require additional telecommunication bandwidth.  (Ex. PA-DEC, ¶ 112.)

A POSITA would have had a reasonable expectation of success in modifying *Liebermann* in view of *Himmel.*  (Ex. PA-DEC, ¶ 113.)  Indeed, the '924 patent discloses that "a home PC" has the processing power required to execute gesture, pose, etc. recognition software.  (Ex. PAT-A, 2:20-23.)  The '924 patent even identified that an Intel Pentium processor that was widely used in a personal computer (like the Intel Pentium processor used in *Himmel*'s smart phone) was capable of executing software for performing the claimed features, e.g., recognizing various poses and gestures in images.  (*Id.*, 3:29-34 (disclosing use of "PC computer 106 (integrated in this case into the monitor housing), for example a 400 Mhz Pentium II"); Ex. PAT-C, 6:6-19 (discussing that an "Intel Pentium 2" processor was suitable to execute pose analysis software and analyze when a user made a specific pose).)   A POSITA would have had the skill to implement and expectation of success in achieving such a modification because it would have involved applying known technologies (e.g., cellular telephone cameras and processors) according to known methods (e.g., using processors to detect gestures based on camera data) to yield the predictable result of a cellular phone computer that detects user gestures.  (Ex. PA-DEC, ¶ 113.)  *See KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).

> **d.**     **[1.d] a first camera oriented to view a user of the handheld device and having a first camera output; and**

*Liebermann* discloses and/or suggests this limitation for the reasons discussed *supra* in Section V.A.2.d.

> **e.**     **[1.e] a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view, and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.**

*Liebermann* in view of *Himmel* discloses and/or suggests this limitation for the reasons discussed *supra* in Section V.A.2.e.  (*Supra* Section V.A.2.e.)  The modification discussed in claim

element 1[c] (where *Liebermann* is modified in view of *Himmel* (*supra* Section V.D.2.c)) only affects the disclosure discussed *supra* in Section V.A.2.e to the extent it specifies *where* the control "computer" is implemented (i.e., on the cellular telephone to control the cellular telephone, recognize gestures, etc.).

Likewise, the *Liebermann-Himmel* combination discloses or suggests that the claimed "computer is adapted to" perform identified functions under Requester's construction discussed above (*supra* Section IV.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the reasons discussed *supra* in Section V.A.2.e. (*Supra* Section V.A.2.e.)  Thus, *Liebermann-Himmel* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See supra* Section IV; Ex. CC-2.)

### 3. Claim 2

a. **The handheld device of claim 1 wherein the handheld device comprises a mobile phone.**

*Liebermann* discloses and/or suggests this limitation for the reasons discussed *supra* in Sections V.A.3 and V.D.2.

### 4. Claim 3

a. **The handheld device of claim 1 wherein the first camera is adapted to acquire an image of at least a portion of the user.**

*Liebermann* discloses and/or suggests this limitation for the reasons discussed *supra* in Sections V.A.4 and V.D.2.

### 5. Claim 4

a. **The handheld device of claim 1 wherein the second camera is adapted to acquire an image of the object.**

*Liebermann* discloses and/or suggests this limitation for the reasons discussed *supra* in Sections V.A.5 and V.D.2.

### 6. Claim 5

a. **The handheld device of claim 1 wherein**

41

> **the second camera is adapted to acquire a
> video of the object.**

*Liebermann* discloses and/or suggests this limitation for the reasons discussed *supra* in Sections V.A.6 and V.D.2.

### 7.    Claim 6

> **a.    The handheld device of claim 1 wherein
> the computer is operable to determine a
> gesture based on at least one of the first
> camera output and the second camera
> output.**

*Liebermann* in view of *Himmel* discloses and/or suggests this limitation. (Ex. PA-DEC, ¶ 121.) As discussed in Sections V.A.2.e and V.D.2, the computer in the *Liebermann-Himmel* combination can determine gestures based on one or more cameras (i.e., the "first camera," the "second camera" or both) to determine signing motions and gestures. (*Supra* Sections V.A.2.e and V.D.2.) For example, *Liebermann* discloses that the camera "will record the signing movement of the hands and fingers and body and facial motions and expressions," where "**[a] deaf person uses sign language in front of the transmitter/receiver device containing the camera**" and "[t]he **images captured by the camera are of the finger and hand motions and of body motions and of facial expressions** and motions captured by a digital device which does initial processing." (Ex. PA-1, 6:4-47 (emphasis added); Ex. PA-DEC, ¶ 121.) Furthermore, *Liebermann* discloses that a camera may recognize special gloves and gestures performed thereby. (Ex. PA-1, 12:40-43, 13:4-16.) Thus, the computer in the *Liebermann-Himmel* combination (which performs network processing locally as explained above) would have been operable to determine a gesture based on at least one of the first camera output and the second camera output, as claimed in claim 6.

Likewise, the *Liebermann-Himmel* combination discloses or suggests that the claimed "gesture" under Requester's construction discussed above (*supra* Section IV.C), i.e., a sequence of positions that conveys a meaning, as the various "finger and hand motions" to convey sign language, *id.*, 6:4-47; *id.*, 12:30-36 (referring to hand signs as "gesture[s]"), are gestures.

Likewise, the *Liebermann-Himmel* combination discloses or suggests the claimed "gesture" under the district court's construction discussed above (*supra* Section IV.C), i.e., movement of hands or other body parts that conveys meaning, as the various "finger and hand

motions" to convey sign language, Ex. PA-1, 6:4-47; *id.*, 12:30-36 (referring to hand signs as "gesture[s]"), are gestures.  Thus, *Liebermann* discloses or suggests these limitations under the Requester's proposed constructions, the meanings proposed by PO, and the meanings found by the district court.  (*See supra* Section IV; Ex. CC-2.)

### 8.  Claim 7

**a.  The handheld device of claim 1 wherein the computer is operable to determine a facial expression based on at least one of the first camera output and the second camera output.**

*Liebermann* in view of *Himmel* discloses "the computer is operable to determine a facial expression based on at least one of the first camera output and the second camera output." (Ex. PA-DEC, ¶ 123.)  For example, *Liebermann* discloses that "**images captured by the camera are of the . . . facial expressions**" of a user.  (Ex. PA-1, 6:42-47 (emphasis added).)  And the facial expressions of a hearing challenged user are analyzed to determine raised eyebrow facial expressions, teeth exposed facial expressions, etc.  (*Id.,* 8:30-9:22; Ex. PA-DEC, ¶ 123.)   Thus, the computer in the modified *Liebermann* cellular phone (which performs network processing locally as explained above) would have been operable to determine a facial expression based on at least one of the first camera output and the second camera output, like that claimed here.

### 9.  Claim 8

**a.  The handheld device of claim 1 wherein the computer is adapted to determine at least one of the position and the orientation of the object based on the second camera output.**

*Liebermann* in view of *Himmel* discloses "the computer is adapted to determine at least one of the position and the orientation of the object based on the second camera output." (Ex. PA-DEC, ¶ 124.)  For example, *Liebermann* discloses "[i]t may be desirable to utilize more than one camera to allow the signing person 'free' movement in his or her environment to **track down spatial positions** in that environment." (Ex. PA-1, 13:5-8 (emphasis added); *see also id.*, 13:4-23 (explaining that the two-camera embodiment may determine "coordinates" of an object); *id.*, 13:4-23, 7:19-8:26 (explaining that a second camera may sense signs from another person and location

43

data is determined); Ex. PAT-A, 3:53-54 (describing a camera that acquires images of "objects such as persons").)  Consistent with the analysis discussed above in claim 1 associated with using two cameras (*supra* Section V.D.2.e), a POSITA would have understood that *Liebermann*'s disclosure of "utiliz[ing] more than one camera" includes using its first and second cameras.  (Ex. PA-DEC, ¶ 124.)  Thus, the computer in the modified *Liebermann* cellular phone (which performs network processing locally as explained above) would have been adapted to determine at least one of the position and the orientation of the object based on the second camera output, as claimed here.

Likewise, the *Liebermann-Himmel* combination discloses or suggests that the claimed "computer is adapted to" perform identified functions under Requester's construction discussed above (*supra* Section IV.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the reasons discussed *supra* in Section V.A.2.e.  (*Supra* Section V.A.2.e.)  Thus, *Liebermann* in view of *Himmel* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See supra* Section IV; Ex. CC-2.)

### 10.    Claim 10

#### a.    The handheld device of claim 1 wherein the computer is adapted to recognize the object based on the second camera output.

*Liebermann* in view of *Himmel* discloses and/or suggests this limitation.  (Ex. PA-DEC, ¶ 129.)  As discussed in Sections V.A.2.e and V.D.2.e, the computer in the *Liebermann-Himmel* combination can determine gestures based on one or more cameras (i.e., the "first camera," the "second camera" or both) to determine signing motions and gestures.  (*Supra* Sections V.A.2.e and V.D.2.e.)  For example, *Liebermann* discloses that the multiple cameras (including the "second camera") may be used to define "any objects" or "alive, stationary or moving entities, such as animals" as well as to interpret the signing motions of multiple "person(s)."  (Ex. PA-1, 13:4-16; *see also* Ex. PAT-A, 3:53-54 (describing that "objects" include "persons"); Ex. PA-DEC, ¶ 129.)  Furthermore, *Liebermann* discloses that a camera may recognize special gloves and gestures performed thereby.  (Ex. PA-1, 12:40-43, 13:4-16.)  Accordingly, the *Liebermann-Himmel* computer (which performs network processing locally as explained above) is adapted to perform

this limitation.  (Ex. PA-DEC, ¶ 129.)

Likewise, the *Liebermann-Himmel* combination discloses or suggests that the claimed "computer is adapted to" perform identified functions under Requester's construction discussed above (*supra* Section IV.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the reasons discussed *supra* in Section V.A.2.e. (*Supra* Section V.A.2.e.)  Thus, *Liebermann* in view of *Himmel* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See supra* Section IV; Ex. CC-2.)

### 11.    Claim 12

#### a.    The handheld device of claim 1 wherein the computer is adapted to determine a reference frame of the object.

*Liebermann* in view of *Himmel* discloses or suggests this limitation for at least two reasons. (Ex. PA-DEC, ¶ 131.)  **First**, *Liebermann* discloses "us[ing] special gloves which allow discrimination of the hands from the background for the image processing system."  (Ex. PA-1, 12:37-39.)  A POSITA would have understood that the background is a "reference frame" of the special glove objects.  (Ex. PA-DEC, ¶ 131.)  Given that the *Liebermann* system is capable of distinguishing hands/gloves from a background, which requires determining the background from the gloves that perform signing motions/gestures, and that the computer performs network processing locally as explained above, the *Liebermann-Himmel* combination discloses that "the computer is adapted to determine a reference frame of the object."  (Ex. PA-DEC, ¶ 131.)

Requester's analysis of the claimed "reference frame of the object" is consistent with the '924 patent.  (Ex. PA-DEC, ¶ 132.)  For example, the '924 patent describes that a reference frame can be a wall-mounted screen that is separate/distinctive from the object/person that performs gestures.  (Ex. PAT-A, 26:32-40 (emphasis added) ("Note that a camera such as 1902, looking at you the user, if attached to hand held unit, always has reference frame of that unit. If one works with **a screen on a wall**, one can aim the handheld unit with camera at it, and determine its reference frame to the handheld unit. Also can have two cameras operating together, **one looking at wall thing**, **other at you** (as 1902 and 1902a) in this manner, one can dynamically **compare ref frames of the display to the human input means** in determining display parameters.").)

 *Liebermann* in view of *Himmel* discloses this limitation for a **second** reason.  (Ex. PA-DEC, ¶ 133.)  As discussed above in Sections V.A.2.e and V.D.2.e, the second camera is oriented to view an object other than the user of the device.  (*Supra* Sections V.A.2.e and V.D.2.e.)  Furthermore, *Liebermann* details how the system recognizes various objects and corresponding hand gestures in Figures 9 and 10.  (Ex. PA-1, 7:44-46 ("The modules for the software effect translation of the signing into and from digital text are set forth in FIGS. 9 and 10.").)  Specifically, the system performs an XOR operation on the image frames to detect pauses and movement as a part of the gesture determination process.  (*Id.*, FIGs. 9, 10.)



*FIG. 9*

(*Id.*, FIG. 9 (annotated and blurred for emphasis).)



*FIG. 10*

(*Id.*, FIG. 10 (annotated and blurred for emphasis).)  A POSITA would have understood that the XOR operation disclosed by *Liebermann* involves a comparison between a first data set (e.g., from a first image frame) and a second data set (e.g., from a second data frame).  (*See generally* Ex. PA-10, 8 ("Note that the XOR function is true if and only if the operands are different.").)  Accordingly, a POSITA would have understood that XOR operation disclosed by *Liebermann* refers to a comparison function between image frames to determine pauses and movement.  (Ex. PA-1, FIGs. 9, 10; Ex. PA-DEC, ¶ 133.)  When the system performs the XOR operation (as the cellular telephone computer performs network processing locally as explained above), a POSITA would have understood that one of the frames is deemed as the reference frame to be compared with another frame for the XOR comparison operation.  Thus, the computer in the *Liebermann-Himmel* combination would have been adapted to determine a reference frame of the object and thus discloses the limitations of claim 12.  (Ex. PA-DEC, ¶ 133.)  Thus, *Liebermann* in view of

47

*Himmel* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See supra* Section IV; Ex. CC-2.)

### 12.    Claim 13

> a.    **The handheld device of claim 1 wherein the computer is adapted to perform a control function based on the first camera output and based on the second camera output.**

*Liebermann* in view of *Himmel* discloses and/or suggests this limitation for the reasons discussed above in Sections V.A.7 and V.D.2.  The computer in the *Liebermann-Himmel* cellular phone would have been adapted to perform the control function based on the first camera output and second camera output, like that claimed here.  (*Supra* Sections V.A.7 and V.D.2.)  Specifically, the *Liebermann* cellular telephone displays the text of what was signed in accordance with data from two cameras as claimed, *supra* Section V.A.7; Ex. PA-1, 13:4-21, 7:49-8:26, FIG. 8, and, as modified, the *Himmel* computer of the *Liebermann* cellular telephone powers/controls the phone the perform the claimed operation, *supra* Section V.D.2, Ex. PA-3, 5:42-63, FIG. 3 (discussing how the cellular telephone computer controls display information, processes gestures from cameras, etc.).

Likewise, the *Liebermann-Himmel* combination discloses or suggests that the claimed "computer is adapted to" perform identified functions under Requester's construction discussed above (*supra* Section IV.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the reasons discussed *supra* in Section V.A.2.e.  (*Supra* Section V.A.2.e.)  Thus, *Liebermann* in view of *Himmel* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See* Section IV.)

### E.    SNQ5: *Liebermann* in view of *Himmel* and *Tryding*

### 1.    Claim 11

> a.    **The handheld device of claim 1 wherein the computer is adapted to generate control instructions for a display that is separate from the handheld device.**

*Liebermann* in view of *Himmel* and *Tryding* discloses and/or suggests this limitation for the reasons discussed *supra* in Sections V.B and V.D.2.  (Ex. PA-DEC, ¶ 136.)  The analysis for modifying *Liebermann* in light of *Tryding* (Section V.B) is applicable to the modified *Liebermann-Himmel* combination discussed above for claim 1 (Section V.D.2).  Thus, given that the computer in the modified *Liebermann-Himmel* cellular phone would have controlled the cellular telephone, *supra* Section V.D.2; Ex. PA-DEC, ¶ 137, a POSITA would have been motivated to configure the computer such that it is adapted to perform the display function, like that described by *Tryding*, for the reasons discussed.  (Ex. PA-DEC, ¶ 137.)

### F.    SNQ6: *Liebermann* in view of *Himmel* and *Gershman*

#### 1.    Claim 14

##### a.    The handheld device of claim 1 wherein the computer is adapted to transmit information over an internet connection.

*Liebermann* in view of *Himmel* and *Gershman* discloses this limitation for the reasons discussed *supra* in Sections V.C and V.D.2.  (Ex. PA-DEC, ¶ 138.)  The analysis for modifying *Liebermann* in light of *Gershman* (Section V.C) is applicable to the modified *Liebermann-Himmel* combination discussed above for claim 1 (Section V.D.2).  Thus, given that the computer in the modified *Liebermann-Himmel* cellular phone would have controlled the cellular telephone, *supra* Section V.D.2; Ex. PA-DEC, ¶ 139, a POSITA would have been motivated to configure the computer such that it is adapted to perform the internet function, like that described by *Gershman*, for the reasons discussed.  (Ex. PA-DEC, ¶ 139.)   Thus, *Liebermann* in view of *Himmel*  and *Gershman* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See supra* Section IV; Ex. CC-2.)

### G.    SNQ7: *Liebermann* in view of *Sears*

As explained below and in the attached declaration of Dr. Abowd (Ex. PA-DEC), *Sears* discloses or suggests the limitations of claims 1-8, 10, and 12-13 of the '924 patent.  (Ex. PA-DEC, ¶ 140.)

#### 1.    Overview of *Sears*

*Sears* discloses reading machines that are controlled with natural "hand gestures." (Ex. PA-2, Abstract.) Similar to *Liebermann*, *Sears* teaches "portable," gesture-controlled machines with multiple cameras. (Ex. PA-2, Abstract (emphasis added)) ("An optical-input print reading device with voice output for people with impaired or no vision in which the user provides input to the system from hand gestures. . . . [A] computer . . . tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning. . . . **Multiple cameras** of the same or different field of view can improve performance. In addition, alternative device configurations allow **portable** operation, including the use of cameras located on worn platforms, such as eyeglasses, or on a fingertip system.").) For example, Figures 3 and 4 of *Sears* detail embodiments of various portable reading machines. (*Id.*, 20:67-21:16 (discussing a "portable" version of the reading machine depicted in Figure 3); *id.*, (describing an example of a worn reading machine depicted in Figure 4); *id.*, FIGs. 1, 3-4.)



(*Id.*, FIG. 3.)



(*Id.*, FIG. 4.)

    *Sears* teaches using gestures to control cameras, turn a device off, and otherwise control the portable reading device. In one instance, a fist gesture triggers a control function that instructs the device to power down. (*Id.*, 10:29-30 (emphasis added) ("A closed fist could be used to direct the electronic reader to **shut itself off**.").) In another instance, a gesture triggers a control function that instructs the device to stop operating. (*Id.*, 11:7-9 (emphasis added) ("The particular linkage of a gesture with a command may be cognitively linked—e.g. a flat hand, like **a "stop" motion, may be used to stop reading.**").) In another instance, a gesture triggers the device to snap an image/picture to assist those who may have a disability. (*Id.*, 15:47-56 (emphasis added) ("In addition, or alternatively, the text and images captured by the system of the present invention can be used to input the text and images for storage and use on the main system 35 computer. This might be used, for instance, as a **low-resolution scanner and text input mechanism for general application by users who may or may not have a disability**. For example, home or business users can **make manual gestures to copy portions of letters, bills, and advertisements into computer storage files**.").) Indeed, *Sears* discloses that "many different gestures may be linked with different commands within the spirit of the present invention" to control the device itself. (*Id.*, 11:10-12.)

    More generally, *Sears* discloses various gesture detecting devices and is in the same or similar technical field as the '924 patent. (*Id.*, Abstract, FIGs. 1, 3-4; Ex. PAT-A, 2:7-21 ("The invention relates to simple input devices for computers . . . . The invention uses single or multiple

51

TV cameras whose output is analyzed and used as input to a computer."); Ex. PA-DEC, ¶ 51.)  To the extent *Sears* is not in the field of endeavor of '924 patent (it is), *Sears* is reasonably pertinent to problems associated with controlling devices according to user gestures, problems with which the inventor was involved.  (Ex. PA-2, FIGs. 3 and 4; Ex. PAT-A, 11:9-11; Ex. PA-DEC, ¶ 51.)

### 2.    Claim 1

#### a.    [1.a] A handheld device comprising:

*Liebermann* discloses and/or suggests this limitation for the reasons discussed *supra* in Section V.A.2.a.

#### b.    [1.b] a housing;

*Liebermann* discloses and/or suggests this limitation for the reasons discussed *supra* in Section V.A.2.b.

#### c.    [1.c] a computer within the housing;

While *Liebermann* discloses that the cellular telephone performs "initial processing" and populates a phone display, among other things (*supra* Section V.A.2.c; Ex. PA-1, 5:62-6:10, 6:40-52, FIG. 8), it discloses that aspects of gesture recognition occur on a network server, Ex. PA-1, 6:41-63, FIG. 1.  To the extent *Liebermann* is read not to disclose a computer within the housing of the cellular telephone, this feature would have been obvious in view of *Sears*.  (Ex. PA-DEC, ¶ 143.)  For example, it would have been obvious to perform all processing steps, including the initial processing and the gesture recognition process, locally on a computer of the cellular telephone.  (Ex. PA-DEC, ¶ 143.)

The *Liebermann* communication system converts sign language gestures to speech that can be transmitted to a person on the other side of a call.  (Ex. PA-1, FIG. 1; *id.*, 12:30-36 (referring to hand signs as "gesture[s]").)  To do so, one or more cameras in the cellular telephone record a user making hand sign gestures.  (*Id.*, 5:62-6:9 (describing how the cellular telephone camera records the signing movement of user hands); *id.*, 13:4-16 (teaching a two-camera embodiment); *id.*, FIG. 6.)  After performing "initial processing" to collapse gesture images into small sets of fixed identifiers, the cellular telephone outsources a networked computer to determine which hand gestures a user makes.  (*Id.*, 6:41-63 (describing how a network data processing center identifies signing movements to convert the signs to text); *id.*, 12:30-36 (referring to hand signs as "gesture[s]"); Ex. PA-DEC, ¶ 144.)



(*Id.*, FIG. 1 (annotated and blurred for emphasis) (disclosing a telephone for the deaf that captures images of hand sign gestures and a center computer that determines what hand sign gestures were made).)

It would have been obvious to process camera outputs locally within a cellular telephone computer instead of at the networked computer. (Ex. PA-DEC, ¶ 145.) *See In re Yufa*, 452 F. App'x. 998, 1001 (Fed. Cir. 2012) (citing *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007)) (affirming obviousness because the prior art disclosed "every element of the claims except" the location for "the processing of" data, which was "nothing more than a reconfiguration of a known system"). Indeed, *Liebermann* itself suggests that the location where processing occurs is a matter of design choice. Specifically, *Liebermann* discloses that it uses a network computer to process gesture information because it is "economic[]" to do so. (Ex. PA-1, 6:10-12; *see also*

53

*id.*, 3:38-42 ("From cost and portability standpoints, the translating means is at a remote location or central station.").)  While a network computer was an economic solution envisioned by *Liebermann* (*id.*, 6:10-12), a POSITA would have understood that other processing options were also available, and that there would have been reasons motivating such alternatives.  (Ex. PA-DEC, ¶ 145.)

For instance, *Sears* discloses a computer that analyzes images to determine when a user makes a hand gesture.  *Sears* discloses that main system 35 includes a "computer."  (Ex. PA-2, 7:1 ("main system 35 computer"); *id.*, 18:11-12 ("the computer located in the main system 35").)  *Sears* also discloses that main system 35 analyzes images from a camera.  (*Id.*, 5:51-54 ("The output digital image, consisting of a two-dimensional array of pixel values (generally either 8-bit gray-scale or 24-bit color) is then sent to a digital computer where the image is analyzed in at least two modes."); *id.*, 18:9-15 (explaining that main system 35 is coupled to cameras and is "engaged in the analysis of images").)  Pertinent to the *Liebermann* gesture-detecting system, the computer in *Sears* determines whether a gesture has been performed based on camera images.  (*Id.*, 17:55-58 (describing that gestures are tracked "using algorithms previously described"); *id.*, 5:44-6:10, 6:52-7:2 (explaining that main system 35 analyzes camera images to determine when various "gestures" have been performed); Ex. PA-DEC, ¶ 146.)[11]

Furthermore, the computer disclosed by *Sears* was capable of being implemented in a variety of portable housings.  *Sears* discloses that the computer can be implemented using a processor "chip."  (Ex. PA-2, 7:1-7 (emphasis added) ("The main system 35 computer should be of sufficient power to perform the remaining steps of the process. In general, any **Intel Pentium** or compatible **chip** of 150 MHz speed will be sufficient, although a faster speed will provide improved results. In addition, other **non-Intel processors**, such as those that are used in **Windows CE Systems**, will suffice if they are of a similar performance.").)  A POSITA would have understood that a discrete computer chip, such an "Intel Pentium" or "non-Intel" processor, *id.*, would have been implemented in a variety of portable devices.  (Ex. PA-DEC, ¶ 147.)  Indeed, the "Windows CE" (Windows Embedded Compact) and processor platform identified by *Sears* was

---

[11] *Sears* discloses with reference to the Figure 3 embodiment that gestures are tracked "using algorithms previously described." (Ex. PA-1, 17:55-58.) Thus, a POSITA would have understood that disclosures associated with gesture determinations disclosed with reference in the preceding embodiments apply to the embodiment associated with Figure 3. (Ex. PA-DEC, ¶ 146 n.3.)

designed for such portable purposes. (Ex. PA-2, 7:1-7; Ex. PA-6, 1 ("Windows CE was designed and built from the ground up as an embedded platform to empower the development of a new range of emerging computing appliances, including highly portable and personal computing devices.").) And *Sears* discloses several examples of portable housings that include the computer chip. (Ex. PA-2, FIGs. 1a, 3; *id.*, 20:65-21:16 (describing portable reading machines (which include a computer)); *id.*, 21:30-33 ("The cords 113 lead to a computer that may be carried in various means, including backpacks, hip packs, shoulder bags or an article of clothing such as a vest.").)



(*Id.*, FIG. 1a (illustrating a housing which includes a main system 35 computer).)



(*Id.*, FIG. 3 (excerpt) (illustrating a housing which includes a main system 35 computer).)

The '924 patent does not disclose anything special about the claimed "computer within the housing." (Ex. PA-DEC, ¶ 148.) Indeed, the '924 patent admits that the alleged invention "uses single or multiple TV cameras whose output is analyzed and used as input to a computer, such as a home PC." (Ex. PAT-A, 2:20-23; *see also id.*, 3:32-34 (disclosing use of "PC computer").) The '924 patent even identified that an Intel Pentium processor that was widely used in a personal computer (like the Intel Pentium processor disclosed by *Sears*) was capable of executing software for performing the claimed features, e.g., recognizing various poses and gestures in images. (*Id.*, 3:29-34 (disclosing use of "PC computer 106 (integrated in this case into the monitor housing), for example a 400 Mhz Pentium II"); Ex. PAT-C, 6:6-19 (discussing that an "Intel Pentium 2" processor was suitable to execute pose analysis software and analyze when a user made a specific pose).) Thus, a POSITA would have similarly understood that the computing capacity of the Intel Pentium processor would have provided a cellular telephone, similar to as discussed in *Liebermann*, the capability of performing various claimed features, e.g., "perform[ing] a control function of the handheld device based on at least one of the first camera output and the second camera output." (*Infra* Section V.G.2.e; Ex. PA-DEC, ¶ 148.)

A POSITA would have found it obvious to include a computer, similar to as disclosed in *Sears*, within the housing to perform local image processing and gesture recognition when implementing a cellular telephone similar to as disclosed in *Liebermann*. (Ex. PA-DEC, ¶ 149.) As a POSITA would have understood, performing the process sign translation or gesture recognition at a remote server was no more than a design choice based on an economic decision. (Ex. PA-1, 6:10-12.) While the proposed modification may have required more expensive hardware, a POSITA would have appreciated that customers would desire highly-integrated smart phone devices that could perform additional functions, e.g., local gesture recognition. (Ex. PA-5, 2:3-4 (emphasis added) ("**more integration in mobile computing is desired**."); Ex. PA-DEC, ¶ 149.) Moreover, a potential increase in cost of hardware in implementing a local processing capability does not foreclose a finding of obviousness here. *See In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983) (finding additional expense associated with a particular combination would not discourage one of ordinary skill in the art from seeking the benefit expected therefrom). In fact, *Liebermann* itself discloses that the cellular telephone device can function as "an **on-site**

translator" rather than just a telephone for the deaf.  (Ex. PA-1, 13:37-39 (emphasis added); Ex. PA-DEC, ¶ 149.)

Additionally and alternatively, a POSITA would have understood that the image processing and gesture recognition features could be implemented using known software based on existing hardware.  (Ex. PA-1, 4:6-9 (disclosing that the remote processing center provides "computer software for translating functions…"); *id.*, 6:6-10 ("The signing motions captured by the camera are converted into digital data for processing by the translation software…to produce data representing numbers, words and phrases which are then combined into coherent sentences."); *id.*, 7:14-17, 7:48-49 ("Software presently used for this purpose is appended hereto and is utilized with Borland C++.").)  At the time of the alleged invention, it was becoming "more and more pervasive" to integrate "personal computer technology into phones," Ex. PA-3, 1:23-25, and a POSITA would have understood that the software-driven features for image process and gesture recognition would have been implemented on various computer chips having the requisite computing power to operate those features (such as those described by *Sears*).  (Ex. PA-2, 7:1-7; Ex. PA-DEC, ¶ 150.)  A POSITA would have been motivated to do so as it would have not only provided additional features and applications to the then-existing cellular phone after-market but also substantially avoided the cost of implementing a computer in a cellular phone for the sole purpose of performing the imaging processing and gesture recognition.  (Ex. PA-DEC, ¶ 150.)

Furthermore, as a POSITA would have understood, the proposed modification would have reduced network communication demands because the cellular telephone could communicate with another individual directly instead of through an intervening network computer and would have also improved user conveniences for not requiring communication with a remote processing center that could require additional telecommunication bandwidth.  (Ex. PA-DEC, ¶ 151.)

A POSITA would have had a reasonable expectation of success in modifying *Liebermann* in view of *Sears*.  (Ex. PA-DEC, ¶ 152.)  Indeed, the '924 patent discloses that "a home PC" has the processing power required to execute gesture, pose, etc. recognition software.  (Ex. PAT-A, 2:20-23.)  The '924 patent even identified that an Intel Pentium processor that was widely used in a personal computer (like the Intel Pentium processor used in *Sears*) was capable of executing software for performing the claimed features, e.g., recognizing various poses and gestures in images.  (*Id.*, 3:29-34 (disclosing use of "PC computer 106 (integrated in this case into the monitor housing), for example a 400 Mhz Pentium II"); Ex. PAT-C, 6:6-19 (discussing that an "Intel

57

Pentium 2" processor was suitable to execute pose analysis software and analyze when a user made a specific pose).)   A POSITA would have had the skill to implement, and expectation of success in achieving such a modification because it would have involved applying known technologies (e.g., cellular telephone cameras and processors) according to known methods (e.g., using processors to detect gestures based on camera data) to yield the predictable result of a cellular phone computer that detects user gestures.  (Ex. PA-DEC, ¶ 152.)  *See KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).

> **d.    [1.d] a first camera oriented to view a user of the handheld device and having a first camera output; and**

*Liebermann* discloses this limitation for the reasons discussed *supra* in Section V.A.2.d.

> **e.    [1.e] a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view, and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.**

As discussed above, *Liebermann* discloses this limitation.  (*Supra* Section V.A.2.e.)  To the extent *Liebermann* is read not to disclose "a second camera oriented to view an object other than the user of the device . . . and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output," the limitation would have been obvious in light of *Sears*.  (Ex. PA-DEC, ¶ 154.)

Similar to *Liebermann*, *Sears* teaches "portable," gesture-controlled machines with multiple cameras.  (Ex. PA-2, Abstract (emphasis added) ("An optical-input print reading device with voice output for people with impaired or no vision in which the user provides input to the system from hand gestures. . . . [A] computer . . . tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning. . . . **Multiple cameras** of the same or different field of view can improve performance. In addition, alternative device configurations allow **portable** operation, including the use of cameras located on worn platforms, such as eyeglasses, or on a fingertip system.").)  For instance, *Sears* discloses that the

multiple-camera reading machine disclosed in Figure 3 may be implemented as a "portable version." (*Id.*, 20:67-21:7, 16:14-15; *id.*, FIG. 3 (illustrating a reading machine with cameras 87 and 89).) In the "portable version" of the reading machine, the device "may be supported on collapsible or hinged legs, or may even be available in forms without leg supports, and be worn by the user." (*Id.*, 20:67-21:7.) Moreover, "the cameras, illuminators and scanners, or some subset of these, may be worn on a head-mount, such as on a pair of glasses, telephone headset, headphones, or cap" in the portable version. (*Id.*) The reading machine disclosed in Figure 4 discloses one such portable glasses embodiment. (*Id.*, 21:7-9 ("An example of such a worn reading machine is shown in FIG. 4, a perspective diagram of an eyeglass reading machine 100."); *id.*, FIG. 4 (illustrating a reading machine with cameras 103 and 105).)

In particular, *Sears* discloses a first camera that senses user "gestures." *Sears* discloses in the context of Figure 3 that camera 87 of the reading machine is configured to detect the gestures of a user. (Ex. PA-2, 16:14-18 ("A low-magnification wide-angle FOV camera 87 is used to track command gestures.").) Camera 103 performs a similar function in the embodiment associated with Figure 4. (*Id.*, 21:11-13 ("A wide-field camera 103 on one eyeglass earpiece provides functionality similar to that of the wide-field camera 87 of FIG. 3."); Ex. PA-DEC, ¶ 156.)

*Sears* discloses a main system computer analyzes camera images for gestures. In *Sears*, the main system 35 computer within a housing analyzes images from a camera. (*Supra* Section V.G.2.c (explaining that 35 includes a computer chip inside of a housing); Ex. PA-2, 18:9-38 (explaining that 35 analyzes camera images).) The images are analyzed by the computer to determine when a gesture has been made. (Ex. PA-2, 22:5-8 ("[I]n these embodiments, the camera received commands, at least in part, from hand and finger gestures of the user that were captured by the camera or cameras."); *id.*, 17:55-58 (describing that gestures are tracked "using algorithms previously described"); *id.*, 5:44-6:10, 6:52-7:2 (explaining that main system 35 analyzes camera images to determine when various "gestures" have been performed); Ex. PA-DEC, ¶ 157.)

*Sears* discloses that various control functions of the device are triggered when the computer detects a specific command gesture using the camera(s). (Ex. PA-DEC, ¶ 158.) Thus, *Sears* discloses "the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output," as claimed. With respect to this claimed feature, the '924 patent discloses that a control function of a handheld device includes

controlling the device "itself" to perform a function, e.g., a base function of the device or a method to interact with the device to achieve other purposes. (Ex. PAT-A, 11:65-12:3 (emphasis added) ("FIG. 8A illustrates control of functions with the invention, using **a handheld device which *itself* has functions** (for example, a cell phone). The purpose is to add functionality to the device, without complicating its **base function**, and/or alternatively **add a method to interact with the device to achieve other purposes**.").) *Sears* teaches using gestures to control cameras, turn the device off, and otherwise control the portable device. In one instance, a fist gesture triggers a control function that instructs the device to power down. (Ex. PA-2, 10:29-30 ("A closed fist could be used to direct the electronic reader to shut itself off.").) In another instance, a gesture triggers a control function that instructs the device to stop operating. (*Id.*, 11:7-9 ("The particular linkage of a gesture with a command may be cognitively linked—e.g. a flat hand, like a "stop" motion, may be used to stop reading.").) In another instance, a gesture triggers a control function that instructs the device to snap an image/picture for those who may have a disability. (*Id.*, 15:47-56 ("In addition, or alternatively, the text and images captured by the system of the present invention can be used to input the text and images for storage and use on the main system 35 computer. This might be used, for instance, as a low-resolution scanner and text input mechanism for general application by users who may or may not have a disability. For example, home or business users can make manual gestures to copy portions of letters, bills, and advertisements into computer storage files."); Ex. PAT-A, 13:20-26 (explaining that a control function includes instructing a device camera to "take images of things").) Indeed, *Sears* discloses that "many different gestures may be linked with different commands within the spirit of the present invention" to control the device itself. (*Id.*, 11:10-12.) A POSITA would have understood that the computer, which processes and responds to gestures, *id*, 18:9-38; *id.,* 22:5-8; *id.*, 17:55-58; *id.*, 5:44-6:10, 6:52-7:2, at least includes the hardware to perform these control functions based off camera data. (Ex. PA-DEC, ¶ 158.) Moreover, such control functions may occur as a result of a single gesture image. (Ex. PA-2, 5:51-58 ("The output digital image, consisting of a two-dimensional array of pixel values (generally either 8-bit gray-scale or 24-bit color) is then sent to a digital computer where the image is analyzed in at least two modes. In the first mode, the image is converted into its text representation in an optical character recognition step 55, whereas in the second mode, the image is analyzed for the presence, orientation and movement of a pointer object (e.g. a finger 34, shown

in FIG. 1).”); *id.*, 18:9-14, 18:25-45, 22:5-8, 17:55-58 (discussing how the computer performs image analysis of gestures and the image capture steps).)

It would have been obvious to implement *Liebermann*’s computer such that it performs a control function of the handheld device based on at least one of the first camera output and the second camera output in view of *Sears*. (Ex. PA-DEC, ¶ 159.) For example, one or more of the cameras disclosed in the *Liebermann-Sears* combination (the “first camera,” the “second camera,” or both) would detect gestures based on the images captures by the camera(s) and the cellular telephone computer would, in response, perform control functions to turn the device off, stop operating, snap a picture, etc. (Ex. PA-DEC, ¶ 159.) A POSITA would have been motivated to control the device with gestures for the increased conveniences associated with natural gesture control. (Ex. PA-2, Abstract (“The use of gestural commands is natural.”); Ex. PA-DEC, ¶ 159.) Furthermore, as a POSITA would have understood, such implementation would have provided additional ways to control the cellular phone device, providing flexibility when operating the device. For example, being able to stop the operation of device with gestures would have prevented incorrect sign communications from being transmitted to the receiving party. (Ex. PA-DEC, ¶ 159.)

A POSITA would have had a reasonable expectation of success in modifying *Liebermann* in view of *Sears*. Like *Liebermann*, which discloses a software-driven scheme for gesture detection implemented on its computer, *Sears* discloses using software programs to detect various gestures and perform a host of other functions. (Ex. PA-2, 27:30-34 (“Because the computer of the main system is generally high performance, this allows considerable ‘intelligence’ to reside in the software program for tracking text, rather than requiring the user to track it manually.”); *id.*, 16:24 (explaining that the computer of main system runs “software”); *id.*, 7:1-11 (expressing that main system may run Windows and other programs); 18:9-15 (explaining that main system 35 controls the cameras); *id.*, 16:17-19 (describing that camera 87 tracks gestures); *id.*, 18:9-13 (describing that main system 35 analyzes images from camera 87); *id.*, 17:55-58 (describing that gestures are tracked “using algorithms previously described”); *id.*, 7:66-67 (referencing “commonly used tracking algorithms”).) Thus, a POSITA would have been motivated to implement these software-driven features (e.g., as in *Sears*) in *Liebermann* and would have reasonable expectation of success in doing so. Moreover, the modification would have involved known technologies (e.g., a handheld device with multiple cameras) according to known methods

61

(e.g., using cameras to control a device with gestures) to yield the predictable result of using the cellular telephone cameras and computer to perform various control functions for the device itself. (Ex. PA-DEC, ¶ 160.)  *See KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).  The *Liebermann* cellular telephone includes dual camera hardware, a computer, and detects gestures as explained above.  Using gestures to command the system as described by *Sears* would have done no more than provide another predictable way to control the functions of the cellular telephone (turn the device off, etc.).  (Ex. PA-DEC, ¶ 160.)

Likewise, the *Liebermann-Sears* combination discloses that the claimed "computer is adapted to" perform identified functions under Requester's construction discussed above (*supra* Section IV.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons discussed herein.  (*See also supra* Section V.A.2.e.)  Thus, *Liebermann* in view of *Sears* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See* Section IV.)

### 3. Claim 2

a. **The handheld device of claim 1 wherein the handheld device comprises a mobile phone.**

*Liebermann* discloses and/or suggests this limitation for the reasons discussed *supra* in Sections V.A.3 and V.G.2.

### 4. Claim 3

a. **The handheld device of claim 1 wherein the first camera is adapted to acquire an image of at least a portion of the user.**

*Liebermann* discloses this limitation for the reasons discussed *supra* in Sections V.A.4 and V.G.2.

### 5. Claim 4

a. **The handheld device of claim 1 wherein the second camera is adapted to acquire an image of the object.**

*Liebermann* discloses and/or suggests this limitation for the reasons discussed *supra* in Sections V.A.5 and V.G.2. Regardless of the object that is acquired, *supra* Sections V.A.5, V.G.2, the *Liebermann* cameras are adapted to acquire an image of the object.

### 6.  Claim 5

**a.    The handheld device of claim 1 wherein the second camera is adapted to acquire a video of the object.**

*Liebermann* discloses this limitation for the reasons discussed *supra* in Sections V.A.6 and V.G.2. Regardless of the object that is acquired, *supra* Sections V.A.5, V.G.2, *Liebermann* discloses the cameras are adapted to acquire a video of the object.

### 7.  Claim 6

**a.    The handheld device of claim 1 wherein the computer is operable to determine a gesture based on at least one of the first camera output and the second camera output.**

The analysis above for limitations [1.c] and [1.e] explain how and why it would have been obvious for the computer in the modified cellular telephone to be operable to determine a gesture based on camera images like that claimed here ("computer is operable to determine a gesture based on at least one of the first camera output and the second camera output"). (*Supra* Sections V.G.2.c, V.G.2.e (explaining how the "computer" in the modified *Liebermann* cellular phone would have been operable to perform a control function of the handheld device based on at least one of the first camera output and the second camera output).) Such operations would have included determining a gesture based on camera outputs because the *Liebermann* computer—as modified—processes camera data for gestures to determine when to turn off, stop operating, take a picture, etc. (*Supra* Section V.G.2.e.) As explained, *Sears* discloses that main system computer 35 analyzes camera images for gestures. (*Id.*) When the computer detects a specific command gesture using the camera(s), various control functions of the device (turn off, stop operating, take a picture, etc.) are triggered. (*Id.*) The *Sears* computer teachings modify *Liebermann* such that the cellular telephone computer—upon detecting a gesture—can perform a control function of the handheld device based on at least one of the first camera output and the second camera output. (*Id.*) Indeed, the gesture control is based off at least one camera output because the cameras sense the gestural

63

inputs. (*Id.* (explaining how cameras sense gestures and the system responds to various gestures); *see also* Ex. PA-1, 6:6-6:10 (describing how hand gestures "captured by the camera are converted into digital data for processing"); *id.*, 13:4-16 (suggesting a multiple camera embodiment); Ex. PA-2*,* 22:5-8 ("[I]n these embodiments, the camera received commands, at least in part, from hand and finger gestures of the user that were captured by the camera or cameras."); *id.*, 5:44-6:10, 6:52-7:2 (explaining that main system 35 analyzes camera images to determine when various "gestures" have been performed); 10:29-11:15 (describing various gestures that can control the system).)

Likewise, the *Liebermann-Sears* combination discloses or suggests that the claimed "gesture" under Requester's construction discussed above (*supra* Section IV.C), i.e., a sequence of positions that conveys a meaning, as the various "finger and hand motions" to convey sign language, which are detected in addition to *Sears* hand gesture controls, Ex. PA-1, 6:4-47; *id.*, 12:30-36 (referring to hand signs as "gesture[s]"); *supra* Section V.G.2, are gestures.

Likewise, the *Liebermann-Sears* combination discloses or suggests the claimed "gesture" under the district court's construction discussed above (*supra* Section IV.C), i.e., movement of hands or other body parts that conveys meaning, as the various "finger and hand motions" to convey sign language, which are detected in addition to *Sears* hand gesture controls, Ex. PA-1, 6:4-47; *id.*, 12:30-36 (referring to hand signs as "gesture[s]"); *supra* Section V.G.2, are gestures. Thus, *Liebermann* in view of *Sears* discloses or suggests this limitation under the Requester's proposed construction, the meaning proposed by PO, and the meaning found by the district court. (*See* Section IV.)

### 8.     Claim 7

      a.      **The handheld device of claim 1 wherein the computer is operable to determine a facial expression based on at least one of the first camera output and the second camera output.**

*Liebermann* in view of *Sears* discloses "the computer is operable to determine a facial expression based on at least one of the first camera output and the second camera output." (Ex. PA-DEC, ¶ 168.) In one embodiment, "**images captured by the camera are of the . . . facial expressions**" of a user. (Ex. PA-1, 6:42-47 (emphasis added).) And the facial expressions of a hearing challenged user are analyzed to determine raised eyebrow facial expressions, teeth exposed facial expressions, etc. *(Id.,* 8:30-9:22; Ex. PA-DEC, ¶ 168.) Accordingly, the computer in the

modified *Liebermann* cellular phone (which performs network processing locally as explained above) would have been operable to perform such processing locally, and thus determine a facial expression based on at least one of the first or second camera output discussed above. (*Supra* Section V.G.2; Ex. PA-DEC, ¶ 168.)

### 9.    Claim 8

a.    **The handheld device of claim 1 wherein the computer is adapted to determine at least one of the position and the orientation of the object based on the second camera output.**

To the extent *Liebermann* does not disclose or suggest this limitation, it would have been obvious to configure the computer in the modified *Liebermann* cellular phone to be adapted to determine at least one of the position and the orientation of the object based on the second camera output. (Ex. PA-DEC, ¶ 169-73.)

The '924 patent explains that objects include persons, hands, and fingers. (Ex. PAT-A, 3:52-54 (emphasis added) ("[C]amera 144 can be used for other purposes, such as acquire images of **objects such as persons.**"); Ex. PAT-D, 1:67-2:2 (incorporated into the '924 patent by reference) (emphasis added) ("cameras according to the invention located on the keyboard surface to observe **objects such as fingers and hands**").)

When a second person controls the *Sears* device with gestures, the system determines the position and/or orientation of a finger object. (Ex. PA-DEC, ¶ 171.) Like *Liebermann*, *Sears* also discloses that multiple cameras can track user gestures. (Ex. PA-2, 22:5-8 ("Furthermore, in these embodiments, the camera received commands, at least in part, from hand and finger gestures of the user that were captured by the camera or cameras.").) *Sears* further discloses that multiple persons can control the device with gestures. (*Id.*, 6:34 (disclosing that "[m]any users" can use the system).) And *Sears* discloses that the main system computer determines the "position" and/or "orientation" of a finger object when determining whether a gesture has been made. (*Id.*, 5:54-61 ("[I]n the second mode, the image is analyzed for the presence, orientation and movement of a pointer object (e.g. a finger 34, shown in FIG. 1) which is under the influence of the user and which is located on top of the printed material 33, in a pointer tracking step 57."); *id.*, 13:48-51 ("Control for this feedback is provided in a feedback generation step 65, which accepts input from pointer tracking 57 and text selection 59, which contain information about the position and movement of

the finger 34."); *id.*, 17:55-58 ("Once the user's hand or finger is identified using algorithms previously described, the hand can be tracked until a command is received, either through hand movement, finger orientation or position, or other input modality."); *see also supra* Section V.G.2.c (explaining how the computer determines gestures based on camera images).) So when a second person other than the user makes a gesture, a POSITA would have understood that the computer determines the position and/or orientation of a finger object. (Ex. PA-DEC, ¶ 171.)

It would have been obvious before the time of invention to have the system computer be adapted to determine at least one of the position and the orientation of the object based on the second camera output. (Ex. PA-DEC, ¶ 172.) Given that *Liebermann* and *Sears* disclose and/or suggest using two cameras to sense gestures, Ex. PA-1, 13:4-7 ("The illustrated embodiments all utilize a single video cameras. It may be desirable to utilize more than one camera to allow the signing person 'free' movement in his or her environment."); Ex. PA-2, 22:5-8, a POSITA would have appreciated that the exact algorithm used for gesture detection was a design choice motivated by needs for "accura[cy]," "computing resources," and/or other tradeoffs. (Ex. PA-2, 9:19-26.) Here a POSITA would have been motivated to use the specific gesture detecting algorithm disclosed by *Sears* for the benefits associated therewith. (Ex. PA-DEC, ¶ 172.) Further, a POSITA would have been motivated to use the *Sears* gesture-detecting algorithm as claimed because it would have increased user convenience by allowing persons to control the device with natural gestures. (*Supra* Section V.G.2.e.) A POSITA would have had a reasonable expectation of success in such an implementation because the combination would have involved known technologies (e.g., devices with multiple cameras) according to known methods (e.g., using various algorithms to recognize hand gestures) to yield the predictable result of a device with two cameras that sense gestures. (Ex. PA-DEC, ¶ 172.) *See KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).

Likewise, the *Liebermann-Sears* combination discloses that the claimed "computer is adapted to" perform identified functions under Requester's construction discussed above (*supra* Section IV.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons discussed herein. (*Supra* Sections V.A.2.e and V.G.2.e.) Thus, *Liebermann* in view of *Sears* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court. (*See* Section IV.)

      **10.**    **Claim 10**

      **a.**    **The handheld device of claim 1 wherein the computer is adapted to recognize the object based on the second camera output.**

*Liebermann* in view of *Sears* discloses and/or suggests this limitation.  (Ex. PA-DEC, ¶ 177.)  As modified, the computer of the cellular telephone senses and distinguishes among a variety of different types of user gestures.  (*Supra* Section V.G.2.)  Further, the second camera is oriented to view objects (including the fingers and hands of another person).  (*Supra* Section V.G.2.e.)  When the computer distinguishes a first hand gesture object from another gesture based on data from the second camera, a POSITA would have understood that the computer is adapted to recognize the hand object as a hand making a specific gesture.  (Ex. PA-1, 6:4-10 ("[C]amera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences."); Ex. PA-2, 10:29-30, 11:7-9, 15:47-56 (explaining that a variety of hand gestures can control the system); Ex. PA-DEC, ¶ 177.)  Accordingly, the computer in the modified *Liebermann* cellular phone would have been adapted to recognize the object based on the second camera output, as claimed.

Likewise, the *Liebermann-Sears* combination discloses that the claimed "computer is adapted to" perform identified functions under Requester's construction discussed above (*supra* Section IV.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons discussed herein.  (*Supra* Sections V.A.2.e and V.G.2.e.)  Thus, *Liebermann* in view of *Sears* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See* Section IV.)

    **11.**    **Claim 12**

      **a.**    **The handheld device of claim 1 wherein the computer is adapted to determine a reference frame of the object.**

*Liebermann* in view of *Sears* discloses and/or suggests this limitation for the reasons discussed *supra* in Sections V.D.11 and V.G.2.  Specifically, *Liebermann* discloses two ways to determine a reference frame of the object, *supra* Section V.D.1, and the *Sears* modification

specifies that the computer is located on the cellular telephone, *supra* Section V.G.2.  Thus, a POSITA would have found it obvious for the same reasons explained above to configure the computer in the modified *Liebermann* cellular phone to be adapted to determine a reference frame of the object, as claimed.

Likewise, the *Liebermann-Sears* combination discloses that the claimed "computer is adapted to" perform identified functions under Requester's construction discussed above (*supra* Section IV.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons discussed herein.  (*Supra* Sections V.A.2.e and V.G.2.e.)  Thus, *Liebermann* in view of *Sears* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See* Section IV.)

### 12.    Claim 13

> **a.    The handheld device of claim 1 wherein the computer is adapted to perform a control function based on the first camera output and based on the second camera output.**

To the extent *Liebermann* does not disclose or suggest this limitation, *supra* Section V.A.7, *Liebermann* in view of *Sears* suggests this limitation.  (Ex. PA-DEC, ¶ 181.)  For instance, both cameras in *Liebermann* may be used to sense user gestures in the modified system.  (*Supra* Section V.G.2.e; Ex. PA-2, 22:5-8 ("Furthermore, in these embodiments, the camera received commands, at least in part, from hand and finger gestures of the user that were captured by the camera or cameras.").)  And based on the outputs of the gesture-detecting cameras, the computer in the modified *Liebermann* would have been configured to perform a variety of control functions based on such camera outputs.  (*Supra* Section V.G.2.e.)  Accordingly, for the reasons explained, the computer in the modified *Liebermann* cellular phone would have been adapted to perform a control function based on the first camera output and based on the second camera output, as claimed.

Likewise, the *Liebermann-Sears* combination discloses that the claimed "computer is adapted to" perform identified functions under Requester's construction discussed above (*supra* Section IV.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons discussed herein.  (*Supra* Sections V.A.2.e and V.G.2.e.)  Thus, *Liebermann* in view of *Sears* discloses or suggests this limitation under both

the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See* Section IV.)

### H.    SNQ8: *Liebermann* in view of *Sears* and *Tryding*

#### 1.    Claim 11

##### a.    The handheld device of claim 1 wherein the computer is adapted to generate control instructions for a display that is separate from the handheld device.

*Liebermann* in view of *Sears* and *Tryding* discloses and/or suggests this limitation for the reasons discussed *supra* in Sections V.B and V.G.2.  The analysis for modifying *Liebermann* in light of *Tryding* (Section V.B) are applicable to the modified *Liebermann-Sears* combination discussed above for claim 1 (Section V.G.2).  Thus, given that the computer in the modified *Liebermann-Sears* cellular phone would have controlled the cellular telephone, *supra* Section V.G.2; Ex. PA-DEC, ¶ 184, a POSITA would have been motivated to configure the computer such that it is adapted to perform the display function, like that described by *Tryding*, for the reasons discussed.  (Ex. PA-DEC, ¶ 184.)

### I.    SNQ9: *Liebermann* in view of *Sears* and *Gershman*

#### 1.    Claim 14

##### a.    The handheld device of claim 1 wherein the computer is adapted to transmit information over an internet connection.

*Liebermann* in view of *Sears* and *Gershman* discloses and/or suggests this limitation for the reasons discussed *supra* in Sections V.C and V.G.2.  The analysis for modifying *Liebermann* in light of *Gershman* (Section V.C) are applicable to the modified *Liebermann-Sears* combination discussed above for claim 1 (Section V.G.2).  Thus, given that the computer in the modified *Liebermann* cellular phone would have controlled the cellular telephone, *supra* Section V.G.2; Ex. PA-DEC, ¶ 186, a POSITA would have been motivated to configure the computer such that it is adapted to transmit information over an internet connection, like that described by *Gershman*.  (Ex. PA-DEC, ¶ 186.)

### J.    SNQ10: *Liebermann* in view of *Kimball*

As explained below and in the attached declaration of Dr. Abowd (Ex. PA-DEC), *Liebermann* and *Kimball* disclose or suggest the limitations of claim 14 of the '924 patent.  (Ex. PA-DEC, ¶ 187.)

### 1.     Overview of *Kimball*

*Kimball* relates to mobile telephones, and more particularly to using a mobile phone to connect to the internet.  (Ex. PA-11, 1:6-9 "The present invention pertains to the field of telephones. More particularly, this invention relates to a cellular telephone that includes functionality for performing both cellular telephone calls and Internet telephone calls.").)  Thus, *Kimball* is in the same or similar technical field as *Liebermann* and the '924 patent, and a POSITA would have had reason to consider the teachings of *Kimball* when implementing the *Liebermann* system.  (*Supra* Section V.A; Ex. PA-DEC, ¶ 52.)  To the extent *Kimball* is not within the field of endeavor of the '924 patent (it is), *Kimball* is reasonably pertinent to problems associated with communicating information over the internet.  (Ex. PA-11, 1:33-53; Ex. PAT-A, 23:38-42 ("The invention provides . . . all of the benefits of the video and computer revolution, also via the internet."); Ex. PA-DEC, ¶¶ 52.)

### 2.     Claim 14

#### a.     The handheld device of claim 1 wherein the computer is adapted to transmit information over an internet connection.

While not expressly disclosed, a POSITA would have found it obvious to adapt a computer of a cellular telephone (such as the *Liebermann* computer) to transmit information over an internet connection in view of *Kimball*.  (Ex. PA-DEC, ¶ 188.)  For example, *Kimball* discloses a wireless phone that is adapted to transmit information over an internet connection.  (Ex. PA-11, Abstract ("A cellular telephone that provides the capability of performing Internet telephone calls without the bulk and expense of Internet telephone computer systems."); *id.*, 6:51-55, FIG. 4.)  Specifically, *Kimball* describes how conventional cell phone hardware could be programmed with "internet telephony code" to make or receive internet calls, communicate data packets, etc. over a cellular transceiver.  (*Id.*, 7:14-23 ("FIG. 5 illustrates the software elements of the cellular telephone 10 in one embodiment. The software elements includes cellular telephony code 60 that provides the functionality of the cellular call subsystem 20 and Internet telephony code 62 that provides the

functionality of the Internet call subsystem 22. The Internet telephony code 62 may be added to an existing cellular telephone 10 to provide Internet telephone functionality without requiring hardware upgrades to the cellular telephone 10."); *id.*, 2:62-64, FIGs. 2A-C (describing various data packets that are communicated over the internet via a cell phone); *id.*, FIG. 4 (illustrating that the cellular telephone includes processor 50 and a transceiver).)



(*Id.*, FIG. 5 (illustrating the "internet telephony code" software 62 that allows a cell phone to communicate over the internet).)

It would have been obvious before the time of invention to have the *Liebermann* cellular telephone computer perform an internet communication as claimed. As explained above, computer hardware of the *Liebermann* cellular telephone operates the device, controls displays, communicates data, etc. (*Supra* Section V.A.2.c.) So the internet communication software described by *Kimball* would have been processed on the *Liebermann* computer to communicate over an internet connection (as the software of a device is executed on the hardware of the device). (Ex. PA-11, 7:19-23 ("The Internet telephony code 62 may be added to an existing cellular telephone 10 to provide Internet telephone functionality without requiring hardware upgrades to the cellular telephone 10."); Ex. PA-DEC, ¶ 189.)

A POSITA would have been motivated to include internet access capability when implementing a cellular phone similar to as disclosed in *Liebermann* such that the computer in the cellular phone is adapted to transmit information over the internet connection. (Ex. PA-DEC, ¶ 190.) For instance, a POSITA would have been motivated to modify *Liebermann* to communicate calls over the internet as claimed because consumers desired the flexibility and convenience associated with internet calling. (Ex. PA-11, 1:9-53.) *Liebermann* describes a cellular telephone that communicates data to make a call, Ex. PA-1, 7:21-28, and *Kimball* suggests a beneficial way

71

of communicating data over the internet to make a call, Ex. PA-11, 1:9-53, 7:21-28. Additionally, using the software techniques disclosed by *Kimball* would have reduced the size and costs associated with communicating data over the internet. (Ex. PA-11, 1:9-53.) Further, persons of ordinary skill in the art understood that consumers wanted devices that could connect to the internet before the time of invention and would have been motivated to include the claimed internet feature for similar reasons. (Ex. PA-DEC, ¶ 190.) Indeed, such a skilled person would have been motivated to include an internet connection at least because it could conveniently and quickly communicate various data on demand. (Ex. PA-DEC, ¶ 190.)

A POSITA would have had a reasonable expectation of success in implementing Internet access in a cellular phone computer. (Ex. PA-DEC, ¶ 191.) Indeed, *Kimball* discloses that communicating information over an internet connection of a cell phone required no more than appropriate programming. (Ex. PA-11, 7:14-23.) Furthermore, such an implementation would have involved a combination of known technologies (e.g., as in *Liebermann* and *Kimball*) according to known methods (e.g., known processes to transmit information over the Internet) to yield a predictable cell phone computer that is adapted to transmit information over an internet connection. (Ex. PA-DEC, ¶ 191.) *See KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).

Finally, the *Liebermann-Kimball* combination likewise discloses that "the computer is adapted to perform" the claimed control function under Requester's construction discussed above, i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons and as discussed above in *supra* Section V.A.2.e. (*Supra* Section V.A.2.e (explaining how the *Liebermann* cellular telephone computer is programmed with software to operate); Ex. PA-DEC, ¶ 192.) Further, *Kimball* discloses that communicating information over an internet connection of a cell phone as claimed required no more than appropriate software programming. (Ex. PA-11, 7:14-23.) Thus, *Liebermann* in view of *Kimball* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court. (*See supra* Section IV; Ex. CC-2.)

### K.    SNQ11: *Liebermann* in view of *Himmel* and *Kimball*

#### 1.    Claim 14

**a.    The handheld device of claim 1 wherein the computer is adapted to transmit information over an internet connection.**

72

*Liebermann* in view of *Himmel* and *Kimball* discloses and/or suggests this limitation for the reasons discussed *supra* in Sections V.K and V.D.2.  The analysis for modifying *Liebermann* in light of *Kimball* (Section V.K) is applicable to the modified *Liebermann-Himmel* combination discussed above for claim 1 (Section V.D.2).  Thus, given that the computer in the modified *Liebermann* cellular phone would have controlled the cellular telephone, *supra* Section V.D.2; Ex. PA-DEC, ¶ 194, a POSITA would have been motivated to configure the computer such that it is adapted to transmit information over an internet connection, like that described by *Kimball*.  (Ex. PA-DEC, ¶ 194.)   Thus, *Liebermann* in view of *Himmel* and *Kimball* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See supra* Section IV; Ex. CC-2.)

**L.    SNQ12: *Liebermann* in view of *Sears* and *Kimball***

**1.    Claim 14**

**a.    The handheld device of claim 1 wherein the computer is adapted to transmit information over an internet connection.**

*Liebermann* in view of *Sears* and *Kimball* discloses and/or suggests this limitation for the reasons discussed *supra* in Sections V.K and V.G.2.  The analysis for modifying *Liebermann* in light of *Kimball* (Section V.K) is applicable to the modified *Liebermann-Sears* combination discussed above for claim 1 (Section V.G.2).  Thus, given that the computer in the modified *Liebermann* cellular phone would have controlled the cellular telephone, *supra* Section V.G.2; Ex. PA-DEC, ¶ 196, a POSITA would have been motivated to configure the computer such that it is adapted to transmit information over an internet connection, like that described by *Kimball*.  (Ex. PA-DEC, ¶ 196.)   Thus, *Liebermann* in view of *Sears* and *Kimball* discloses or suggests this limitation under both the Requester's proposed constructions, and the plain meaning proposed by PO and found by the district court.  (*See supra* Section IV; Ex. CC-2.)

**M.    SNQ13: *Liebermann* in view of *Himmel***

**1.    Claim 9**

**a.    The handheld device of claim 6 wherein the gesture is performed by a person other than the user of the handheld**

**device.**

As explained, the district court in the *GTP v. Samsung* litigation found the term "wherein the gesture is performed by a person other than the user of the handheld device" indefinite.  (*See supra* Section IV; Ex. CC-2, 48-50.)  As also explained, while the district court found this term indefinite, and thus claim 9 indefinite, Requester presents this SNQ separately for claim 9 under the assumption that the Office does not agree with the district court that the above term is indefinite to preclude a finding of a SNQ for claim 9.  Indeed, although the district court correctly analyzed claim 9, PO has argued that claim 9 meets the requirements of 35 U.S.C. § 112 (Ex. CC-1, 18; Ex. CC-2, 48-50).  Thus, for purposes of this SNQ, Requester demonstrates how the prior art discloses/suggests the limitations of claim 9 under PO's position and to the extent the Office does not agree with the district court's findings.   In such instance, the terms in claim 9 not expressly agreed upon by the parties or construed by the district court, are interpreted under their plain meanings based on the words of the claim.  As noted, to the extent the Office determines that issues associated with the above-identified term precludes it from determining the scope of claim 9 to support a finding of a SNQ as to claim 9 (as proposed herein) for reasons similar to those presented by the district court (Ex. CC-2, 48-50), such denial (e.g. a finding against SNQ 13) would not preclude reexamination of the other claims challenged in the SNQs presented  (*see e.g.,* Sections V.A-L (SNQs 1-11).)

Under the above assumptions, *Liebermann* in view of *Himmel* discloses and/or suggests the limitations of claims 1 and 6 from which claim 9 depends.  As discussed above in claims 1 and 6, the *Liebermann-Himmel* combination suggests the claimed two-camera system that responds to user gestures.  (*Supra* Section V.D.7 (claim 6); Section V.D.2 (claim 1).)

As to claim 9, *Liebermann* discloses that the device can be used by multiple persons.  (Ex. PA-1, 13:4-23 ("[a] defined Figure with signing motions . . . is rendered in conformity with allowable images (for **persons**).").)  A POSITA would have understood that the cellular telephone could accept signing gestures from multiple persons, including a person not the user of the device.  (*Id.*, 12:30-36 (referring to hand signs as "gesture[s]"); Ex. PA-DEC, ¶ 199.)  Moreover, a POSITA would have understood that a user could hold the phone to image a signing person who is not the user of the phone.  (Ex. PA-DEC, ¶ 199.)

Moreover, the requirement that the "gesture is performed by a person other than the user of the handheld device" should not be given patentable weight because the manner of operating a

74

device does not differentiate an apparatus claim from the prior art.  Indeed, a claim containing a "recitation with respect to the manner in which a claimed apparatus is intended to be employed does not differentiate the claimed apparatus from a prior art apparatus" if the prior art apparatus teaches all the structural limitations of the claim.  *Ex parte Masham*, 2 U.S.P.Q.2d 1647 (Bd. Pat. App. & Inter. 1987); *see also ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354, 1361 (Fed. Cir. 2018) ("[A] prior art reference may anticipate or render obvious an apparatus claim . . . if the reference discloses an apparatus that is reasonably capable of operating so as to meet the claim limitations, even if it does not meet the claim limitations in all modes of operation.").

Likewise, the *Liebermann-Himmel* combination discloses that the claimed "computer is adapted to" perform identified functions under Requester's construction discussed above (*supra* Section IV.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons discussed herein.  (*Supra* Sections V.A.2.e and V.D.2.e.).

Likewise, the *Liebermann-Himmel* combination discloses or suggests the claimed "gesture" under Requester's construction discussed above (*supra* Section IV.C), i.e., a sequence of positions that conveys a meaning, as the various "finger and hand motions" to convey sign language, Ex. PA-1, 6:4-47; *id.*, 12:30-36 (referring to hand signs as "gesture[s]"), are gestures.

Likewise, the *Liebermann-Himmel* combination discloses or suggests the claimed "gesture" under the district court's construction discussed above (*supra* Section IV.C), i.e., movement of hands or other body parts that conveys meaning, as the various "finger and hand motions" to convey sign language, Ex. PA-1, 6:4-47; *id.*, 12:30-36 (referring to hand signs as "gesture[s]"), are gestures.  Thus, *Liebermann* in view of *Himmel* discloses or suggests these limitations under the Requester's proposed constructions, the meanings proposed by PO, and the meanings found by the district court.  (*See* Section IV.)

N.     **SNQ14:** *Liebermann* in view of *Sears*

1.     **Claim 9**

a.     **The handheld device of claim 6 wherein the gesture is performed by a person other than the user of the handheld device.**

As explained, the district court in the *GTP v. Samsung* litigation found the term "wherein the gesture is performed by a person other than the user of the handheld device" indefinite.  (*See supra* Section IV; Ex. CC-2, 48-50.)  As also explained, while the district court found this term indefinite, and thus claim 9 indefinite, Requester presents this SNQ separately for claim 9 under the assumption that the Office does not agree with the district court that the above term is indefinite to preclude a finding of a SNQ for claim 9.  Indeed, although the district court correctly analyzed claim 9, PO has argued that claim 9 meets the requirements of 35 U.S.C. § 112 (Ex. CC-1, 18; Ex. CC-2, 48-50).  Thus, for purposes of this SNQ, Requester demonstrates how the prior art discloses/suggests the limitations of claim 9 under PO's position and to the extent the Office does not agree with the district court's findings.   In such instance, the terms in claim 9 not expressly agreed upon by the parties or construed by the district court, are interpreted under their plain meanings based on the words of the claim.  As noted, to the extent the Office determines that issues associated with the above-identified term precludes it from determining the scope of claim 9 to support a finding of a SNQ as to claim 9 (as proposed herein) for reasons similar to those presented by the district court (Ex. CC-2, 48-50), such denial (e.g. a finding against SNQ 13) would not preclude reexamination of the other claims challenged in the SNQs presented  (*see e.g.,* Sections V.A-L (SNQs 1-11).)

*Liebermann* in view of *Sears* discloses and/or suggests the limitations of claims 1 and 6 from which claim 9 depends.  As discussed above in claims 1 and 6, the *Liebermann-Sears* combination suggests the claimed two-camera system that responds to user gestures.  (*Supra* Section V.G.7 (claim 6); Section V.G.2 (claim 1).)

In addition to the *Lieberamnn-Himmel* combination that renders claim 9 obvious, claim 9 would have been obvious in view of *Liebermann* and *Sears*.  As explained above, *Liebermann* discloses that the device can be used by multiple persons.  (Ex. PA-1, 13:4-23 ("[a] defined Figure with signing motions . . . is rendered in conformity with allowable images (for **persons**).").)  Similarly, a POSITA would have understood that the cellular telephone could accept signing gestures from multiple persons, including a non-user person operating the device.  (*Id.*, 12:30-36 (referring to hand signs as "gesture[s]"); Ex. PA-DEC, ¶ 205.)  Further, a POSITA would have understood that a user could hold the phone to image a signing person who is not the user of the phone.  (Ex. PA-DEC, ¶ 205.)  Moreover, *Sears* discloses that multiple persons can control the device with gestures.  (Ex. PA-2, 6:34 (disclosing that "[m]any users" can use the system).)  A

76

POSITA would have thus been motivated to configure the *Liebermann-Sears* cellular phone to detect gestures from multiple users to benefit from the convenience associated with having multiple persons being able to input signing gestures.  (Ex. PA-DEC, ¶ 205.)  A POSITA would have had a reasonable expectation of success in such implementation, given it would have involved known technologies (e.g., hardware for recognizing hand gestures from persons) according to known methods (e.g., recognizing hand gestures from persons) to yield the predictable result of a gesture being performed by a person other than the user of the handheld device.  (Ex. PA-DEC, ¶ 205.)  *See KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).

Further, the requirement that the "gesture is performed by a person other than the user of the handheld device" should not be given patentable weight because the manner of operating a device does not differentiate an apparatus claim from the prior art.  Indeed, a claim containing a "recitation with respect to the manner in which a claimed apparatus is intended to be employed does not differentiate the claimed apparatus from a prior art apparatus" if the prior art apparatus teaches all the structural limitations of the claim.  *Ex parte Masham*, 2 U.S.P.Q.2d 1647 (Bd. Pat. App. & Inter. 1987); *see also ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354, 1361 (Fed. Cir. 2018) ("[A] prior art reference may anticipate or render obvious an apparatus claim . . . if the reference discloses an apparatus that is reaso0nably capable of operating so as to meet the claim limitations, even if it does not meet the claim limitations in all modes of operation.").

Thus, the *Liebermann-Sears* combination discloses and/or suggests claim 9.

Likewise, the *Liebermann-Sears* combination discloses that the claimed "computer is adapted to" perform identified functions under Requester's construction discussed above (*supra* Section IV.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons discussed herein.  (*Supra* Sections V.A.2.e and V.G.2.e.).

Likewise, the *Liebermann-Sears* combination discloses or suggests the claimed "gesture" under Requester's construction discussed above (*supra* Section IV.C), i.e., a sequence of positions that conveys a meaning, as the various "finger and hand motions" to convey sign language, which are detected in addition to *Sears* hand gesture controls, Ex. PA-1, 6:4-47; *id.*, 12:30-36 (referring to hand signs as "gesture[s]"); *supra* Section V.G.2, are gestures.

Likewise, the *Liebermann-Sears* combination discloses or suggests the claimed "gesture" under the district court's construction discussed above (*supra* Section IV.C), i.e., movement of

hands or other body parts that conveys meaning, as the various "finger and hand motions" to convey sign language, which are detected in addition to *Sears* hand gesture controls, Ex. PA-1, 6:4-47; *id.*, 12:30-36 (referring to hand signs as "gesture[s]"); *supra* Section V.G.2, are gestures. Thus, *Liebermann* in view of *Sears* discloses or suggests these limitations under the Requester's proposed constructions, the meanings proposed by PO, and the meanings found by the district court.  (*See* Section IV.)

## VI.    Detailed Explanation of the Pertinence and Manner of Applying the Prior Art to the Claims

### A.    Bases for Proposed Rejections of the Claims

The following is a quotation of pre-AIA 35 U.S.C. § 102 that forms the basis for all of the identified prior art:

> A person shall be entitled to a patent unless . . .

> (e) the invention was described in — (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for the purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language . . . .

The following is a quotation of pre-AIA 35 U.S.C. § 103(a) that forms the basis of all of the following obviousness rejections:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negative by the manner in which the invention was made.

The question under 35 U.S.C. § 103 is whether the claimed invention would have been obvious to one of ordinary skill in the art at the time of the invention.  In *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), the Court mandated that an obviousness analysis allow for "common sense" and "ordinary creativity," while at the same time not requiring "precise teachings

Request for *Ex Parte* Reexamination
U.S. Patent No. 8,194,924

directed to the specific subject matter of the challenged claim[s]." *KSR Int'l Co.*, 550 U.S. at 418, 420-421. According to the Court, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416. In particular, the Court emphasized "the need for caution in granting a patent based on the combination of elements found in the prior art." *Id.* at 401. The Court also stated that "when a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* at 417.

The Office has provided further guidance regarding the application of *KSR* to obviousness questions before the Office.

> If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

MPEP § 2141(I) (quoting *KSR* at 417.)

The MPEP identifies many exemplary rationales from *KSR* that may support a conclusion of obviousness. Some examples that may apply to this reexamination include:

- Combining prior art elements according to known methods to yield predictable results;

- Simple substitution of one known element for another to obtain predictable results;

- Use of a known technique to improve similar devices in the same way;

- Applying a known technique to improve devices in the same way;

- Choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success ("obvious to try")

MPEP § 2141(III).

In addition, the Office has published *Post-KSR* Examination Guideline Updates. *See* Fed. Reg. Vol. 75, 53464 (the "Guideline Updates"). The Guideline Updates discuss developments after *KSR* and provide teaching points from recent Federal Circuit decisions on obviousness. Some examples are listed below:

> A claimed invention is likely to be obvious if it is a combination of known prior art elements that would reasonably have been expected

> to maintain their respective properties or functions after they have
> been combined.

*Id.* at 53646.

> A combination of known elements would have been prima facie
> obvious if an ordinary skilled artisan would have recognized an
> apparent reason to combine those elements and would have known
> how to do so.

*Id.* at 53648.

> Common sense may be used to support a legal conclusion of
> obviousness so long as it is explained with sufficient reasoning.

*Id.*

### B.    Proposed Rejections

Pursuant to 37 C.F.R. § 1.510(b)(2), Requester identifies claims 1-14 as the claims for which reexamination is requested. The proposed rejections below, in conjunction with the analysis in Sections IV-V above and the attached declaration of Dr. Abowd (Ex. PA-DEC), provide a detailed explanation of the pertinence and manner of applying the prior art to each of claims 1-14.

### 1.    Proposed Rejection #1

Claims 1-5 and 13 are obvious over *Liebermann* in view of the knowledge of a POSITA under 35 U.S.C. § 103(a), as shown by the discussion above in Section V.A and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 2.    Proposed Rejection #2

Claim 11 is obvious over *Liebermann* in view of *Tryding* under 35 U.S.C. § 103(a), as shown by the discussion above in Section V.B and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 3.    Proposed Rejection #3

Claim 14 is obvious over *Liebermann* in view of *Gershman* under 35 U.S.C. § 103(a), as shown by the discussion above in Section V.C and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 4.    Proposed Rejection #4

Claims 1-8, 10, and 12-13 are obvious over *Liebermann* in view of *Himmel* under 35 U.S.C. § 103(a), as shown by the discussion above in Section V.D and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 5. Proposed Rejection #5

Claim 11 is obvious over *Liebermann* in view of *Himmel* and *Tryding* under 35 U.S.C. § 103(a), as shown by the discussion above in Section V.E and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 6. Proposed Rejection #6

Claim 14 is obvious over *Liebermann* in view of *Himmel* and *Gershman* under 35 U.S.C. § 103(a), as shown by the discussion above in Section V.F and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 7. Proposed Rejection #7

Claims 1-8, 10, and 12-13 are obvious over *Liebermann* in view of *Sears* under 35 U.S.C. § 103(a), as shown by the discussion above in Section V.G and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 8. Proposed Rejection #8

Claim 11 is obvious over *Liebermann* in view of *Sears* and *Tryding* under 35 U.S.C. § 103(a), as shown by the discussion above in Section V.H and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 9. Proposed Rejection #9

Claim 14 is obvious over *Liebermann* in view of *Sears* and *Gershman* under 35 U.S.C. § 103(a), as shown by the discussion above in Section V.I and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 10. Proposed Rejection #10

Claim 14 is obvious over *Liebermann* in view of *Kimball* under 35 U.S.C. § 103(a), as shown by the discussion above in Section V.J and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 11. Proposed Rejection #11

Claim 14 is obvious over *Liebermann* in view of *Himmel* and *Kimball* under 35 U.S.C. § 103(a), as shown by the discussion above in Section V.K and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 12. Proposed Rejection #12

Claim 14 is obvious over *Liebermann* in view of *Sears* and *Kimball* under 35 U.S.C. § 103(a), as shown by the discussion above in Section V.L and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 13.    Proposed Rejection #13

Claim 9 is obvious over *Liebermann* in view of *Himmel* under 35 U.S.C. § 103(a), as shown by the discussion above in Section V.M and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

### 14.    Proposed Rejection #14

Claim 14 is obvious over *Liebermann* in view of *Sears* under 35 U.S.C. § 103(a), as shown by the discussion above in Section V.N and the declaration of Dr. Abowd provided in Exhibit PA-DEC.

## VII.    Conclusion

For the reasons set forth above, the Requester has established at least one substantial new question of patentability with respect to claims 1-14 of the '924 patent. The analysis provided in this Request and in the declaration of Dr. Abowd (Ex. PA-DEC) demonstrates the invalidity of claims 1-14 in view of prior art that was not substantively considered by the Patent Office. Therefore, it is requested that this request for reexamination be granted and claims 1-14 be cancelled.

As identified in the attached Certificate of Service and in accordance with 37 C.F.R. §§ 1.33(c) and 1.510(b)(5), a copy of this Request has been served, in its entirety, to the address of the attorney of record.

Respectfully submitted,

PAUL HASTINGS LLP

Dated: November 11, 2021          By:  /Joseph E. Palys/
                                       Joseph E. Palys
                                       Reg. No. 46,508

82

# Exhibit PAT-A

# U.S. Patent No. 8,194,924 ("the '924 patent")

US008194924B2

(12) **United States Patent**
Pryor

(10) Patent No.: **US 8,194,924 B2**
(45) Date of Patent: **Jun. 5, 2012**

(54) **CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING OR OTHER DEVICES**

(76) Inventor: **Timothy R. Pryor**, Sylvania, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/051,698**

(22) Filed: **Mar. 18, 2011**

(65) **Prior Publication Data**

US 2011/0170746 A1    Jul. 14, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 12/834,281, filed on Jul. 12, 2010, now Pat. No. 7,933,431, which is a continuation of application No. 11/980,710, filed on Oct. 31, 2007, now Pat. No. 7,756,297, which is a continuation of application No. 10/893,534, filed on Jul. 19, 2004, now Pat. No. 7,401,783, which is a continuation of application No. 09/612,225, filed on Jul. 7, 2000, now Pat. No. 6,766,036.

(60) Provisional application No. 60/142,777, filed on Jul. 8, 1999.

(51) **Int. Cl.**
*G06K 9/00* (2006.01)

(52) **U.S. Cl.** ........................ **382/103**; 382/154; 382/312

(58) **Field of Classification Search** .................. 382/103, 382/154, 312
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,909,002 A | 9/1975 | Levy | |
| 4,219,847 A | 8/1980 | Pinkney et al. | |
| 4,339,798 A | 7/1982 | Hedges et al. | |
| 4,631,676 A | 12/1986 | Pugh | |
| 5,008,946 A | 4/1991 | Ando | |
| 5,088,928 A | 2/1992 | Chan | |
| 5,227,986 A | 7/1993 | Yokota et al. | |
| 5,297,061 A | 3/1994 | Dementhon et al. | |
| 5,388,059 A | 2/1995 | DeMenthon | |
| 5,491,507 A * | 2/1996 | Umezawa et al. | 348/14.02 |
| 5,581,276 A | 12/1996 | Cipolla et al. | |
| 5,594,469 A | 1/1997 | Freeman et al. | |
| 5,616,078 A | 4/1997 | Oh | |
| 5,624,117 A | 4/1997 | Ohkubo et al. | |
| 5,781,647 A | 7/1998 | Fishbine et al. | |
| 5,828,770 A * | 10/1998 | Leis et al. | 382/103 |
| 5,845,006 A * | 12/1998 | Sumi et al. | 382/154 |
| 5,853,327 A | 12/1998 | Gilboa | |
| 5,878,174 A | 3/1999 | Stewart et al. | |
| 5,926,168 A | 7/1999 | Fan | |
| 5,940,126 A * | 8/1999 | Kimura | 348/294 |
| 6,204,852 B1 * | 3/2001 | Kumar et al. | 345/419 |
| 6,342,917 B1 | 1/2002 | Amenta | |
| 6,373,472 B1 | 4/2002 | Palalau et al. | |
| 6,442,465 B2 | 8/2002 | Breed et al. | |
| 6,508,709 B1 | 1/2003 | Karmarkar | |
| 6,597,817 B1 | 7/2003 | Silverbrook | |
| 6,775,361 B1 * | 8/2004 | Arai et al. | 379/93.17 |
| 6,788,336 B1 * | 9/2004 | Silverbrook | 348/207.2 |
| 6,911,972 B2 * | 6/2005 | Brinjes | 345/175 |
| 7,489,863 B2 * | 2/2009 | Lee | 396/429 |

* cited by examiner

*Primary Examiner* — Tom Y Lu

(74) *Attorney, Agent, or Firm* — Warner Norcross & Judd LLP

(57) **ABSTRACT**

Method and apparatus are disclosed to enable rapid TV camera and computer based sensing in many practical applications, including, but not limited to, handheld devices, cars, and video games. Several unique forms of social video games are disclosed.

**14 Claims, 23 Drawing Sheets**





# FIG. 1A



# FIG. 1B

# FIG. 1C

APPX0141



**FIG. 2A**

**FIG. 2B**



**FIG. 2C**

APPX0143



## FIG. 2D



## FIG. 4A



**FIG. 3A**



**FIG. 4B**



## FIG. 3B



## FIG. 3C



## FIG. 5A



## FIG. 5B



**FIG. 6**



**FIG. 7**

**FIG. 9**



**FIG. 8A**

**FIG. 8B**



FIG. 10A



**FIG. 10B**



**FIG. 11A**



*FIG. 11B*

APPX0154



FIG. 12



*FIG. 13*



FIG. 14A



## FIG. 14B



## FIG. 14C



*FIG. 15*



*FIG. 16*



1755
1700

*FIG. 17C*



1745
1750
1725
COMP.
1710
1704
1702
1701
1700
1715
1740
1736
1720
1735
1730

*FIG. 17A*



*FIG. 17B*



Fig. 18

US 8,194,924 B2

1

# CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING OR OTHER DEVICES

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 12/834,281, filed Jul. 12, 2010 (now U.S. Pat. No. 7,933,431), which is a continuation of application Ser. No. 11/980,710, filed Oct. 31, 2007 (now U.S. Pat. No. 7,756,297), which is a continuation of application Ser. No. 10/893,534, filed Jul. 19, 2004 (now U.S. Pat. No. 7,401,783), which is a continuation of application Ser. No. 09/612,225, filed Jul. 7, 2000 (now U.S. Pat. No. 6,766,036), which claims the benefit of U.S. Provisional Application No. 60/142,777, filed Jul. 8, 1999.

Cross references to related co-pending US applications by the inventor having similar subject matter.

1. Touch TV and other Man Machine Interfaces: Ser. No. 09/435,854 filed Nov. 8, 1999, now U.S. Pat. No. 7,098,891; which was a continuation of application Ser. No. 07/946,908, now U.S. Pat. No. 5,982,352;

2. More Useful Man Machine Interfaces and Applications: Ser. No. 09/433,297 filed Nov. 3, 1999, now U.S. Pat. No. 6,750,848;

3. Useful Man Machine interfaces and applications: Ser. No. 09/138,339, Pub.Appln. 2002-0036617, now abandoned;

4. Vision Target based assembly: Ser. No. 08/469,907 filed Jun. 6, 1995, now U.S. Pat. No. 6,301,783;

5. Picture Taking method and apparatus: provisional application 60/133,671, and regular application Ser. No. 09/568,552 filed May 11, 2000, now U.S. Pat. No. 7,015,950;

6. Methods and Apparatus for Man Machine Interfaces and Related Activity: Provisional Application: provisional application 60/133,673 filed May 11, 1999; and regular application Ser. No. 09/568,554 filed May 11, 2000, now U.S. Pat. No. 6,545,670;

7. Tactile Touch Screens for Automobile Dashboards, Interiors and Other Applications: provisional application Ser. No. 60/183,807; and regular application Ser. No. 09/789,538, now U.S. Pat. No. 7,084,859; and

8. Apparel Manufacture and Distance Fashion Shopping in Both Present and Future: provisional application 60/187,397 filed Mar. 7, 2000.

The disclosures of the following U.S. patents and co-pending patent applications by the inventor, or the inventor and his colleagues, are incorporated herein by reference:

1. "Man machine Interfaces": U.S. application Ser. No. 09/435,854 and U.S. Pat. No. 5,982,352, and U.S. application Ser. No. 08/290,516, filed Aug. 15, 1994, now U.S. Pat. No. 6,008,000, the disclosure of both of which is contained in that of Ser. No. 09/435,854;

2. "Useful Man Machine Interfaces and Applications": U.S. application Ser. No. 09/138,339, now Pub. Appln. 2002-0036617;

3. "More Useful Man Machine Interfaces and Applications": U.S. application Ser. No. 09/433,297, now U.S. Pat. No. 6,750,848;

4. "Methods and Apparatus for Man Machine Interfaces and Related Activity": U.S. Appln. Ser. No. 60/133,673 filed as regular application Ser. No. 09/568,554, now U.S. Pat. No. 6,545,670;

5. "Tactile Touch Screens for Automobile Dashboards, Interiors and Other Applications": U.S. provisional Appln. Ser. No. 60/183,807, filed Feb. 22, 2000, now filed as reg. application Ser. No. 09/789,538; and

2

6. "Apparel Manufacture and Distance Fashion Shopping in Both Present and Future": U.S. Appln. Ser. No. 60/187, 397, filed Mar. 7, 2000.

## FIELD OF THE INVENTION

The invention relates to simple input devices for computers, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, and operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations. The invention herein is a continuation in part of several inventions of mine, listed above.

This continuation application seeks to provide further useful embodiments for improving the sensing of objects. Also disclosed are new applications in a variety of fields such as computing, gaming, medicine, and education. Further disclosed are improved systems for display and control purposes.

The invention uses single or multiple TV cameras whose output is analyzed and used as input to a computer, such as a home PC, to typically provide data concerning the location of parts of, or objects held by, a person or persons.

## DESCRIPTION OF RELATED ART

The above mentioned co-pending applications incorporated by reference discuss many prior art references in various pertinent fields, which form a background for this invention. Some more specific U.S. Patent references are for example:

DeMenthon—U.S. Pat. Nos. 5,388,059; 5,297,061; 5,227,985

Cipolla—U.S. Pat. No. 5,581,276

Pugh—U.S. Pat. No. 4,631,676

Pinckney—U.S. Pat. No. 4,219,847

## DESCRIPTION OF FIGURES

FIG. 1 illustrates a basic computer terminal embodiment of the invention, similar to that disclosed in copending applications.

FIG. 2 illustrates object tracking embodiments of the invention employing a pixel addressable camera.

FIG. 3 illustrates tracking embodiments of the invention using intensity variation to identify and/or track object target datums.

FIG. 4 illustrates tracking embodiments of the invention using variation in color to identify and/or track object target datums.

FIG. 5 illustrates special camera designs for determining target position in addition to providing normal color images.

FIG. 6 identification and tracking with stereo pairs.

FIG. 7 illustrates use of an indicator or co-target.

FIG. 8 illustrates control of functions with the invention, using a handheld device which itself has functions.

FIG. 9 illustrates pointing at an object represented on a screen using a finger or laser pointer, and then manipulating the represented object using the invention.

FIG. 10 illustrates control of automobile or other functions with the invention, using detected knob, switch or slider positions.

FIG. 11 illustrates a board game embodiment of the invention.

FIG. 12 illustrates a generic game embodiment of the invention.

FIG. 13 illustrates a game embodiment of the invention, such as might be played in a bar.

US 8,194,924 B2

3

FIG. **14** illustrates a laser pointer or other spot designator embodiment of the invention.

FIG. **15** illustrates a gesture based flirting game embodiment of the invention.

FIG. **16** illustrates a version of the pixel addressing camera technique wherein two lines on either side of a 1000 element square array are designated as perimeter fence lines to initiate tracking or other action.

FIG. **17** illustrates a 3-D acoustic imaging embodiment of the invention.

FIG. **18** illustrates an improved handheld computer embodiment of the invention, in which the camera or cameras may be used to look at objects, screens and the like as well as look at the user.

THE INVENTION EMBODIMENTS

FIG. **1**

The invention herein and disclosed in portions of other copending applications noted above, comprehends a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use. It also comprehends the combination of these functions with the basic task of generating, storing and/or transmitting a TV image of the scene acquired—either in two or three dimensions.

The embodiment depicted in FIG. **1**A illustrates the basic embodiments of many of my co-pending applications above. A stereo pair of cameras **100** and **101** located on each side of the upper surface of monitor **102** (for example a rear projection TV of 60 inch diagonal screen size) with display screen **103** facing the user, are connected to PC computer **106** (integrated in this case into the monitor housing), for example a 400 Mhz Pentium II. For appearances and protection a single extensive cover window may be used to cover both cameras and their associated light sources **110** and **111**, typically LEDs.

The LEDs in this application are typically used to illuminate targets associated with any of the fingers, hand, feet and head of the user, or objects such as **131** held by a user, **135** with hands **136** and **137**, and head **138**. These targets, such as circular target **140** and band target **141** on object **131** are desirably, but not necessarily, retro-reflective, and may be constituted by the object features themselves (e.g., a finger tip, such as **145**), or by features provided on clothing worn by the user (e.g., a shirt button **147** or polka dot **148**, or by artificial targets other than retroreflectors.

Alternatively, a three camera arrangement can be used, for example using additional camera **144**, to provide added sensitivity in certain angular and positional relationships. Still more cameras can be used to further improve matters, as desired. Alternatively, and or in addition, camera **144** can be used for other purposes, such as acquire images of objects such as persons, for transmission, storage or retrieval independent of the cameras used for datum and feature location determination.

For many applications, a single camera can suffice for measurement purposes as well, such as **160** shown in FIG. **1**B for example, used for simple 2 dimensional (2D) measurements in the xy plane perpendicular to the camera axis (z axis), or 3D (xyz, roll pitch yaw) where a target grouping, for example of three targets is used such as the natural features formed by the two eyes **164**, **165** and nose **166** of a human **167**. These features are roughly at known distances from each other, the data from which can be used to calculate the approximate position and orientation of the human face. Using for example the photogrammetric technique of

4

Pinkney described below, the full 6 degree of freedom solution of the human face location and orientation can be achieved to an accuracy limited by the ability of the camera image processing software utilized to determine the centroids or other delineating geometric indicators of the position of the eyes and nose, (or some other facial feature such as the mouth), and the accuracy of the initial imputing of the spacing of the eyes and their respective spacing to the nose. Clearly if a standard human value is used (say for adult, or for a child or even by age) some lessening of precision results, since these spacings are used in the calculation of distance and orientation of the face of human **167** from the camera **160**.

In another generally more photogrammetrically accurate case, one might choose to use four special targets (e.g., glass bead retro-reflectors, or orange dots) **180-183** on the object **185** having known positional relationships relative to each other on the object surface, such as one inch centers. This is shown in FIG. 1C, and may be used in conjunction with a pixel addressable camera such as described in FIG. **2** below, which allows one to rapidly determine the object position and orientation and track its movements in up to 6 degrees of freedom as disclosed by Pinkney U.S. Pat. No. 4,219,847 and technical papers referenced therein. For example, the system described above for FIGS. **1** and **2** involving the photogrammetric resolution of the relative position of three or more known target points as viewed by a camera is known and is described in a paper entitled "A Single Camera Method for the 6-Degree of Freedom Sprung Mass Response of Vehicles Redirected by Cable Barriers" presented by M. C. van Wijk and H. F. L. Pinkney to The Society of Photo-optical Instrumentation Engineers.

The stereo pair of cameras can also acquire a two view stereo image of the scene as well, which can be displayed in 3D using stereoscopic or auto-stereoscopic means, as well as transmitted or recorded as desired.

In many applications of the foregoing invention it is desirable not just to use a large screen but in fact one capable of displaying life size images. This particularly relates to human scaled images, giving a life-like presence to the data on the screen. In this way the natural response of the user with motions of hands, head, arms, etc., is scaled in "real" proportion to the data being presented.

FIG. **2**

This embodiment and others discloses special types of cameras useful with the invention. In the first case, that of FIG. **2**A, a pixel addressable camera such as the MAPP2200 made by IVP corporation of Sweden is used, which allows one to do many things useful for rapidly determining location of objects, their orientation and their motion.

For example, as shown in FIG. **2**A, an approximately circular image **201** of a target datum such as **180** on object **185** of FIG. **1**C may be acquired by scanning the pixel elements on a matrix array **205** on which the image is formed. Such an array in the future will have for example 1000.times.1000 pixels, or more (today the largest IVP makes is 512.times.512. The IVP also is not believed to be completely randomly addressable, which some future arrays will be).

As an illustration, computer **220** determines, after the array **205** has been interrogated, that the centroid "x, y" of the pixel elements on which the target image lies is at pixel x=500, y=300 (including a sub-fraction thereof in many cases). The centroid location can be determined for example by the moment method disclosed in the Pinkney patent, referenced above.

The target in this case is defined as a contrasting point on the object, and such contrast can be in color as well as, or

US 8,194,924 B2

5

instead of, intensity. Or with some added preprocessing, it can be a distinctive pattern on the object, such as a checkerboard or herringbone.

Subsequent Tracking

To subsequently track the movement of this target image, it is now only necessary to look in a small pixel window composed of a small number of pixels around the target. For example the square **230** shown, as the new position x'y' of the target image cannot be further distant within a short period of time elapsed from the first scan, and in consideration of the small required time to scan the window.

For example, if the window is 100.times.100 pixels, this can be scanned in 1 millisecond or less with such a pixel addressing camera, by interrogating only those pixels in the window, while still communicating with the camera over a relatively slow USB serial link of 12 mb transmission rate (representing 12,000 pixel gray level values in one millisecond).

One thus avoids the necessity to scan the whole field, once the starting target image position is identified. This can be known by an initial scan as mentioned, or can be known by having the user move an object with a target against a known location with respect to the camera such as a mechanical stop, and then indicate that tracking should start either by verbally saying so with voice recognition, or by actuating a control key such as **238** or whatever.

It is noted that if the tracking window is made large enough, then it can encompass a whole group of datums, such as **180-183** on an object.

FIG. 2B Reduction in Acquisition Time

Another application of such a pixel addressing camera is shown in FIG. 2B. One can look at the whole field, x y of the camera, **240**, but only address say every 10.sup.th pixel such as **250, 251** and **252**, in each direction, i.e., for a total 10,000 pixels in a field of 1 million (1000.times.1000, say).

In this case computer **220** simply queries this fraction of the pixels in the image, knowing apriori that the target image such as **260** will have an image size larger than 10.times.10pixels, and must be detectable, if of sufficient contrast, by one of the queried pixels. (For smaller or larger target images, the number and spacing of queried pixels can be adjusted accordingly). This for example, allows one to find approximate location of targets with only ⅟₁₀₀ the pixel interrogation time otherwise needed, for example, plus any gain obtained as disclosed above, by knowing in what region of the image to look (for example during tracking, or given some apriori knowledge of approximate location due to a particular aspect of the physical arrangement or the program in question).

Once a target has been approximately found as just described, the addressing can be optimized for that region of the image only, as disclosed in subsequent tracking section above.

Given the invention, the potential for target acquisition in a millisecond or two thus is achievable with simple pixel addressable CMOS cameras coming on stream now (today costing under $50), assuming the target points are easily identifiable from at least one of brightness (over a value), contrast (with respect to surroundings), color, color contrast, and more difficult, shape or pattern (e.g., a plaid, or herringbone portion of a shirt). This has major ramifications for the robustness of control systems built on such camera based acquisition, be they for controlling displays, or machines or whatever.

It's noted that with new 2000.times.2000 cameras coming on stream, it may only be necessary to look at every 15.sup.th or 20.sup.th pixel in each direction to get an adequate feel for target location. This means every 200.sup.th to 400.sup.th

6

pixel, not enough to cause image rendition difficulties even if totally dark grey (as it might be in a normal white light image if set up for IR wavelengths only).

FIG. 2C

Another method for finding the target in the first place with limited pixel interrogation is to look at pixels near a home point where a person for example indicates that the target is. This could be for example, placing ones fingernail such as **270**, whose natural or artificial (e.g., reflective nail polish) features are readily seen by the camera **275** and determined to be in the right corner of a pad **271** in FIG. 2C which approximately covers the field of view **274** of the camera **275**. The computer **220** analyzes the pixels in the right corner **278** of the image field **279** representing the pad portion **271** with the camera **275**, either continuously, or only when the finger for example hits a switch such as **280** at the edge of the pad, or on command (e.g., by the user pushing a button or key, or a voice message inputted via microphone **285** for example). After such acquisition, the target is then tracked to other locations in xy space of the pad, for example as described above. Its noted that it helps to provide a beep or other sound or indication when acquisition has been made.

Pick Windows in Real Time

Another aspect of the invention is that one can also pick the area of the image to interrogate at any desired moment. This can be done by creating a window of pixels with in the field to generate information, for example as discussed relative to a specific car dashboard application of FIG. **10**.

FIG. 2D—Scan Pattern

A pixel addressing camera also allows a computer such as **220** to cause scans to be generated which are not typical raster scans. For example circular or radial, or even odd shapes as desired. This can be done by providing from the computer the sequential addresses of the successive pixels on the camera chip whose detected voltages are to be queried.

A circular scan of pixels addressed at high speed can be used to identify when and where a target enters a field enclosed by the circular pixel scan. This is highly useful, and after that, the approximate location of the target can be determined by further scans of pixels in the target region.

For example consider addressing the pixels c1 c2 c3 . . . cn representing a circle **282** at the outer perimeter of the array, **285**, of 1000.times.1000 elements such as discussed above. The number of pixels in a full circle is approximately 1000 pi, which can be scanned even with USB (universal serial bus) limits at 300 times per second or better. For targets of ⅟₁₀₀ field in width, this means that a target image entering the field such as circular target image **289** (which is shown intersecting element cm and its neighbors) would have to travel ⅟₁₀₀ the field width in 0.0033 seconds to be totally missed in a worst case. If the image field corresponds to 20 inches in object field width this is 0.2 inches.times.300/sec or 60 inches/second, very fast for human movement, and not likely to be exceeded even where smaller targets are used.

Alternative shapes to circular "trip wire" perimeters may be used, such as squares, zig-zag, or other layouts of pixels to determine target presence. Once determined, a group of pixels such as group **292** can be interrogated to get a better determination of target location.

FIG. 3

Since many applications of the invention concern, or at least have present a human caused motion, or motion of a part of a human, or an object moved by a human, the identification and tracking problem can be simplified if the features of interest, either natural or artificial of the object provide some kind of change in appearance during such motion.

US 8,194,924 B2

7

FIG. **3** illustrates tracking embodiments of the invention using intensity variation to identify and/or track object target datums. In a simple case, a subtraction of successive images can aid in identifying zones in an image having movement of features as is well known. It is also useful to add pixel intensities of successive images in computer **220** for example. This is particular true with bright targets (with respect to their usual surroundings) such as LEDs or retro-reflectors. If the pixels in use by the camera are able to gather light preferentially at the same time a special illumination light is on, this will accentuate the target with respect to background. And if successive frames are taken in this way, not only will a stationary image of the special target build up, but if movement takes place the target image then will blur in a particular direction which itself can become identify-able. And the blur direction indicates direction of motion as well, at least in the 2-D plane of the pixel array used.

Another form of movement can take place artificially, where the target is purposely moved to provide an indication of its presence. This movement can be done by a human easily by just dithering ones finger for example (if a portion of the finger such as the tip is the target in question), or by vibrating an object having target features of interest on it, for example by moving the object up and down with ones hand.

For example consider FIG. **3**A, where a human **301** moves his finger **302** in a rapid up and down motion, creating different image positions sequentially in time of bright target ring **320**, **320'** on his finger, as seen by camera **325**. If the camera can read quickly enough each of these positions such as **326** and **327** in image field **328** can be resolved, other wise a blur image such as **330** is registered on the camera and recorded in the computer **335**.

Instead of using ones finger, it is also possible to create movement of a target for example with a tuning fork or other mechanism mechanically energizing the target movement, on what otherwise might be a static object say. And it is possible for the human, or a computer controlling the movement in question to create it in such a manner that it aids identification. For example, a certain number of moves of ones finger (e.g., 4), or 2 moves/sec of ones finger, or horizontal moves of ones finger etc., any or all of these could indicate to the computer upon analysis of the camera image, that a target was present.

The invention comprehends this as a method for acquiring the datum to be tracked in the first place, and has provided a camera mechanism for tracking fast enough not to lose the data, assuming a sufficiently distinct feature. For example, it is desirable to not require sophisticated image processing routines and the like if possible, to avoid the time it takes to execute same with affordable equipment. And yet in many scenes, finding a target cant be done easily today without some aid, either a high contrast target (contrasting brightness or color or both, for example). Or the aid can be movement as noted, which allows the search for the target to be at least localized to such a region of the field of view, and thence take much less time to run, even if a sophisticated algorithm is employed.

FIG. **3**B illustrates an embodiment wherein a target which blinks optically is used. The simplest case is a modulated LED target such **340** on object **341** shown. Successive frames taken with camera **345** looking at pixel window **346** at **300** scans of the pixels within the window per second where the image **347** of the LED target is located, can determine, using computer **349** (which may be separate from, or incorporated with the image sensor), 5 complete blinks of target **340**, if blinked at a 60 hz rate. Both blink frequency, blink spacing,

8

blink pulse length can all be determined if the scan rate is sufficiently faster than the blink rate, or pulse time.

It should be noted that if the target **340** is a retro-reflector as in FIG. **1**, with an illumination source such as **355** near the axis of the camera, then the LEDs (or other sources) of the illuminator can be modulated, causing the same effect on the target.

Somewhat more sophisticated is the situation shown in FIG. **3**C where a target **380** (on object **360**) illuminated by a light source **365** provides a time variant intensity change in the camera image **368** obtained by camera **370** as the target moves its position and that of the image. This can be achieved naturally by certain patterns of material such as herringbone, or by multifaceted reflectors such as cut diamonds (genuine or glass), which "twinkle" as the object moves. A relative high frequency "twinkle" in the image indicates then the presence of the target in that area of the image in which it is found.

When analog sensors such as PSD (position sensing diode) sensor **369** described in a copending application is used in addition to, or instead of a matrix array in camera **370**, the variation in light intensity or twinkle can be obtained directly from the detected output voltage from the signal conditioning of the sensor as shown in trace **375** corresponding to the movement of diamond target **380** a distance in the camera field. From the PSD one can also determine the position of the detected target image, theoretically at least independent of the intensity fluctuation.

For digital array detectors, the intensity variation can also be detected by subtracting images and observing the difference due to such variation. Such images need to be taken frequently if the twinkle frequency is high, and this can cause problems unless high speed camera scanning is possible. For example, in a twinkle mode, a pixel addressable camera using the invention herein could scan every 5.sup.th pixel in both x and y. This would allow a 1000 frame per second operation of a camera which would normally go 40 frames per second. Such a rate should be able to capture most twinkle effects with the assumption that the light field changes on more than 25 pixels. If less, then scan density would need to be increased to every 3.sup.rd pixel say, with a corresponding reduction in twinkle frequency obtainable.

FIG. **4**

FIG. **4**A illustrates identification and tracking embodiments of the invention using color and color change in a manner similar in some aspects to the intensity variation from object datums described above.

Color can be used as has been noted previously to identify a target, as can a change in color with time. For example, a target can change its color in order to identify itself to successive interrogations of pixels on a color TV camera. This can be accomplished by having a retro-reflector which is illuminated in succession by light from different colored LEDs for example, in the arrangement of FIG. **1**. For example red led **401** illuminates retro reflector target **405** on object **406** during frame **1** (or partial frame, if not all pixels addressed) taken by camera **410**. Then yellow led **402** illuminates target **405** on the next frame, and so forth. For any reading of successive frames, one point in the image will appear to distinctly change color, while all other points will be more or less the same due to the room lighting overwhelming the led source illumination and the natural color rendition of the objects themselves.

To return color variation when moved, one can employ a target which changes color naturally as it moves, even with illumination of constant color. Such a target can contain a diffractive, refractive, or interference based element, for example, a reflective diffraction grating for example, which

US 8,194,924 B2

9 10

splits white light illumination into colors, which are seen differently as the target moves and changes angle with respect to the observer and/or illumination source.

For example, consider FIG. 4B showing reflective grating 440 on object 445 at initial position P. When illuminated by white light for example from lamp 450, it reflects the spectrum such that when the object has moved to a new position P' the color (or colors, depending on the grating type, and angles involved) returning to camera 460 is changed. Such gratings can be purchased from Edmund Scientific company, and are typically made as replicas of ruled or holographic gratings.

Some types of natural features which change color are forms of jewelry which have different colored facets pointing in different directions. Also some clothes look different under illumination from different angles. This could be called then "color twinkle".

FIG. 5

FIG. 5 illustrates special camera designs for determining target position in addition to providing normal color images. As was pointed out in a co-pending application, it may be desirable to have two cameras looking at an object or area one for producing images of a person or scene, the other for feature location and tracking. These may be borne-sight together using beam splitters or the like to look at the same field, or they may just have largely overlapping image fields. The reason this is desirable is to allow one to obtain images of activity in the field of view (e.g., a human playing a game) while at the same time ideally determine information concerning position or other aspects of features on the human or objects associated with him.

It is now of interest to consider a matrix array chip equipped with a special color filter on its face which passes a special wavelength in certain pixel regions, in addition to providing normal color rendition via RGB or other filtering techniques in the remaining regions. The chip could be pixel addressable, but does not have to be.

Version FIG. 5A

One version would have one special pixel filter such as 505, for each square group of 4 pixels in an array 500 (one special pixel filter 505, and 3 pixels, 510-512 filtered for RGB (red green blue) or similar, as is commonly used now for example. In one functional example, the special pixel 505 is purposely not read during creation of the normal image of a scene, but rather read only on alternate frames (or as desired) to determine target locations. If the array can be addressed pixel wise, the actual time lost doing this can be low. Since 25% of the pixels are effectively dead in forming the image in this example, and assuming all pixels are of equal area (not necessarily required), then 25% of the image needs to be filled in. This can be done advantageously in the image displayed, by making the color and intensity of this pixel the same as the resultant color and average intensity value of the other 3 in the cluster.

Version FIG. 5B

In this version, related to FIG. 2 above, and shown in FIG. 5b, isolated pixels such as 530 (exaggerated in size for clarity) on array 531 or clusters of pixels such as 540-543, are used to rapidly find a target with low resolution, such as round dot target image 550. These pixels can ideally have special filters on their face, for example having near IR bandpass filters (of a wavelength which can still be seen by the camera, typically up to 1 um wavelength max). If takes only a few pixels to see the rough presence of a target, then in an image field of 1000.times.1000 pixels there could be one or more target images occupying 10.times.10 pixels or more. Thus in any group of 10.times.10, you could have 5 near IR filtered receptive pixels say, i.e., only 5% of the total pixel count but

sufficient to see the IR targets location to a modest accuracy. Once found, one can also use the "normal" pixels on which the target image also falls to aid in more precise determination of its location, for example using pixel group 555 composed of numerous pixels.

In short by having a camera with certain pixels responsive to selected wavelengths and/or scanned separately one can very rapidly scan for target features, then when found, take a regular picture if desired. Or just take regular pictures, until the necessity arises to determine target location.

Similarly the special filtered pixels such as 505 or 530 could be laser wavelength bandpass filtered for this purpose, used by the array for preferentially detecting laser light projected on an object (while ignoring other wavelengths). In a normal image, such a pixel would be nearly black as little white light passes (except that centered on the laser wavelength). To provide a normal picture using such a camera, the special IR or laser wavelengths pixels readings would be filed in with values and colors of light from the surrounding regions.

Such a laser wavelength filter can be extremely effective, even if a relatively weak laser is used to illuminate a large area, especially where retro-reflectors are used, and the light returned is concentrated by 1000 times or more.

FIG. 6

The embodiments above have dealt with finding just one target, and generally with just one camera, even though two or more cameras may be used for stereo imaging. Where stereo pairs of cameras are used, clearly each camera must see the target, if range via image disparity (the shift in location of a feature in the image in two camera views separated by a baseline) is to be determined.

Using the invention, one camera can be considered a master, the other a slave. The master camera determines target location by any of the means described above. Then the slave need only look at the expected pixel location of the target assuming some a priori knowledge of range which can come from previous target readings, or known range zones where the target has to lie in a given application.

Consider cameras 600 (master) with lens 603 and 601 (slave) having lens 604, the axes of the two cameras separated by baseline 602 and with interfaced to computer 605. The image of target 610 on object 615 is formed at position 620 on array 630 of camera 600, and at position 621 on array 631 of camera 601. The difference in position x in the direction of the baseline, in this simple situation is directly proportional to range z. The knowledge then of target image position 620 found by interrogating some or all of the pixels of camera 600 can as mentioned be used to more rapidly find image 621 in the image field of the "slave" camera 601, and thus the z location of the target 610.

For example if range is known to be an approximate value of z, one can look in the image field of the camera 601 along a line of points at a calculated value x away from the edge of the field, assuming 620 has been found to lie as shown near the corresponding edge of the field of camera 600.

Two or more cameras may be used for stereo image analysis including object range and orientation data as discussed in FIGS. 1 and 6. Range can also be determined via triangulation with a single camera and one target if projected on to the object in question at an angle to the camera axis from a laser say, or by using a single camera and 3 or more points on an object whose relative relationship is known (including the case of a line of points and an external point).

FIG. 7

As stated above, the TV camera of the invention can be used to see either natural or artificial features of objects. The

US 8,194,924 B2

11

former are just the object features, not those provided on the object especially for the purpose of enhancing the ability to determine the object location or other variable using computer analysis of TV camera images. Such natural features, as has been pointed out in many of the co-pending referenced applications, can be holes, corners, edges, indentations, protrusions, and the like of fingers, heads, objects held in the hand, or whatever.

But using simple inexpensive equipment it is often hard to determine the presence or location of such features in a rapid reliable enough manner to insure function of the application in question. In this case, one can employ one or more artificial features, provided on the object by attaching an artificial target onto the object, or manufacturing the object with such a target.

At least three types of artificial features can be employed.

1. The first is to provide special features required for object location, or orientation determination. Such a special feature can be of an optically contrasting material at the wavelength used to that of the object, for example a bright color, or a retroreflector;

2. The second is to provide one artificial feature (typically capable of more easily being found in an image than natural features of the object), and by finding it, localize to the region of that target environs the problem of finding any other features needed nearby; and

3. The third is to find an artificial feature on an object that actually by its shape, location, or coded features, provides a guide to the location of natural or other artificial features which are to be sensed in order to determine position or orientation of the same or related objects. This has been dubbed by me a co-target in co-pending applications incorporated by reference.

As shown in FIG. 7, object 700 has co-target 701 at one end, visible to camera 705. The co-target in this particular instance is a diamond shape, and is of high contrast for easy acquisition. For example it could be a yellow plastic retroreflector formed of molded corner cubes similar to those used on cars for taillights and other safety purposes.

The diamond shape in this case is significant for two reasons. First it is unusual relative to the object or background when used in the context intended, and makes the target still more identifiable (that is novel color, shape and brightness are all present). In addition, in this particular instance it has been chosen that a diamond shape, should indicate that the corners of the object are to be used for 6 axis position and orientation determination and that the choice of color for example, signifies that the object corners are within some predetermined distance from the target. If desired the target location on the object can also point to the corners. For example, in the drawing, the four corners of the diamond, 720-723, point in the general direction of the four corners 730-733 of the rectangular object 700.

FIG. 8

The invention herein and disclosed in portions of other copending applications noted above, comprehends a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use. It also comprehends the combination of these functions with the basic task of generating, storing and/or transmitting a TV image of the scene acquired either in two or three dimensions.

FIG. 8A illustrates control of functions with the invention, using a handheld device which itself has functions (for example, a cell phone). The purpose is to add functionality to

12

the device, without complicating its base function, and/or alternatively add a method to interact with the device to achieve other purposes.

The basic idea here is that a device which one holds in ones hand for use in its own right, can also be used with the invention herein to perform a control function by determining its position, orientation, pointing direction or other variable with respect to one or more external objects, using an optical sensing apparatus such as a TV camera located externally to sense the handheld device, or with a camera located in the handheld device, to sense datums or other information external for example to the device.

This can have important safety and convenience aspects to it, particularly when the device is used while driving a car or operating other machinery. To date voice recognition has been the only alternative to keying data in to small handheld devices, and voice is limited in many cases very limited if some physical movement is desired of the thing being communicated with.

A cellular phone 800 held in the hand of a user can be used to also signal functions in a car using a projected laser spot from built in laser spot projector 801 as in FIG. 14, in this case detected by detector 802 on the dashboard 803. Alternatively and or in conjunction, one may use features such as round dot targets 805-807 on the cell phone which are sensed, for example, by a TV camera 815 located in the car headliner 816 or alternatively for example in the dashboard (in this case the targets would be on the opposite end of the cell phone). More than one set of targets can be used, indeed for most generality, they would be an all sides which point in any direction where a camera could be located to look at them.

Remote control units and dictating units are also everyday examples of some devices of this type which can serve control purposes according to the invention. One of the advantages here is that it keeps the number of switches etc on the device proper to a minimum, while allowing a multitude of added functions, also in noisy environments where voice recognition could be difficult or undesirable for other reasons.

Use of specialized target datums or natural features of devices held in the hand, or used with cameras on such devices, allows photogrammetric techniques such as described in FIG. 1 to be used to determine the location in 6 degrees of freedom of the device with respect to external objects.

As one illustrative example, to signal a fax unit 824 in the car to print data coming through on the phone, the user just points (as illustrated in position 2) the cell phone toward the fax, and the TV camera 815 scans the images of targets 805-807 on the face toward the camera, and the computer 830 connected to the camera analyzes the target images (including successive images if motion in a direction for example is used as an indicator, rather than pointing angle for example), determines the cell phone position and/or orientation or motion and commands the fax to print if such is signaled by the cell phone position orientation or motion chosen. The knowledge in space of the cell phone location and its pointing direction (and motion as pointed out above) provides information as to the fact that the fax was the intended target of the effort. Such data can be taught to the system, after the fact even if the fax or any other item desired to be controlled is added later.

Another version has a camera and requisite computer (and or transmission capability to an external computer) in the handheld device, such as a cell phone or whatever. When pointed at an object, the camera can acquire the image of the object and/or any natural features or special datums on the object which are needed to perform the function desired.

US 8,194,924 B2

13

One function is just to acquire an image for transmission via for example the cell phones own connection. This is illustrated in FIG. 8B, where an image of object 849 acquired by camera 850 of cell phone 851 held by user 852 is transmitted over mobile phone link 853 to a remote location and displayed, for example. While this image can be of the user, or someone or something of interest, for example a house, if a real estate agent is making the call, it is also possible to acquire features of an object and use it to determine something.

For example, one purpose is recognition, for example one can point at the object, and let the computer recognize what it is from its TV image. Or point around in space taking multiple TV frames aiming in different directions, and when computer recognition of a desired object in one of the images takes place, transmit certain data to the object. Or it can be used to acquire and transmit to remote locations, only that data from recognized objects.

Thus the invention can provided on a hand held object for a variety of purposes,

To take images of things;

To determine datums on things; and

To automatically read things.

The combination of any or all of these functions in addition with other object functions such as hand held cell phones, dictation units, telephones, wearable computer devices and the like.

An alternative, shown with phantom lines in FIG. 8A, to the some aspects of the above described operation of the embodiment is to use a laser pointer 801 in for example a cell phone to designate say the fax machine as shown. Then the TV camera 815 simply detects the presence of the laser pointer projected spot 820 on the fax, and via computer memory it is known that this is a device to be energized or connected in connection with the cell phone.

The camera located in a handheld device can also be used to point at a TV screen, such as that on the dashboard of a car, and to utilize data presented there for some purpose. For example, if pointed at a screen saying email message number 5, the camera of the device can be used to obtain this image, recognize it through known character recognition techniques, and process it for transmission if desired. Or it might just say the message to the user of the phone through the speaker of the cell phone. Such a technique is not required if means exist to directly transmit the incoming information to the cell phone, but this may not be possible.

FIG. 9

FIG. 9 illustrates pointing at a displayed image of an object represented on a screen using a finger or laser pointer, and then manipulating the represented object or a portion thereof using the invention. For example, consider user 901 pointing a laser pointer 905 at an image generated by computer 910 on display 912, typically a large screen display (e.g., 5 feet diagonal or more) where control features here disclosed are of most value.

The user with the pointer, can point to an image or portion of the displayed image to be controlled, and then using the action of the pointer move the controlling portion of the image, for example a "virtual" slider control 930 projected on the screen whose lever 935 can be moved from left to right, to allow computer 910 sensing the image (for example by virtue of TV camera 940 looking at the screen as disclosed in copending applications) to make the appropriate change, for example in the heat in a room.

Alternatively one can also point at the object using ones fingers and using other aspects of the invention sense the

14

motions of ones fingers with respect to the virtually displayed images on the screen, such as turning of a knob, moving of a slider, throwing a switch etc.

Such controls are not totally physical, as you don't feel the knob, so to speak. But they are not totally virtual either, as you turn it or other wise actuate the control just as if it was physical. For maximum effect, the computer should update the display as you make the move, so that you at least get visual feedback of the knob turning. You could also get an appropriate sound if desired, for example from speaker 950, like an increase in pitch of the sound as the knob is "moved" clockwise.

FIG. 10

The above control aspects can in some forms be used in a car as well even with a small display, or in some cases without the display.

Or it can be a real knob which is sensed, for example by determining position of a target on a steering wheel or the fingers turning it tracked (as disclosed in co-pending application references).

For example, consider car steering wheel rim 1000 in FIG. 10A. In particular, consider hinged targeted switch, 1010 (likely in a cluster of several switches) on or near the top of the wheel, when the car is pointed straight ahead, and actuated by the thumb of the driver 1011. A camera 1020 located in the headliner 1025, and read out by microcomputer 1025 senses representative target 1030 on switch 1010, when the switch is moved to an up position exposing the target to the camera (or one could cover the target with ones fingers, and when you take a finger off, it is exposed, or conversely one can cover the target to actuate the action).

The camera senses that target 1010 is desired to be signaled and accordingly computer 1025 assures this function, such as turning on the radio. As long as the switch stays in the position, the radio is on. However other forms of control can be used where the switch and target snap back to an original position, and the next actuation, turns the radio off. And too, the time the switch is actuated can indicate a function, such as increasing the volume of the radio until one lets off the switch, and the target is sensed to have swung back to its original position and the increase in volume thus terminated.

In operating the invention in this manner, one can see position, velocity, orientation, excursion, or any other attribute of actuation desired. Because of the very low cost involved in incremental additions of functions, all kinds of things not normally sensed can be economically provided. For example the position of a datum 1040 on manually or alternatively automatically movable plastic air outlet 1041 in the dashboard 1042 can be sensed, indicative of the direction of airflow. The computer 1025 can combine this with other data concerning driver or passenger wishes, other outlets, air temperature and the like, to perfect control of the ambiance of the car interior.

It is also noted that the same TV camera used to sense switch positions, wheel position, duct position, seat position (for example using datum 1045), head rest position (for example using datum 1046), and a variety of other aspects of physical positions or motions of both the car controls and the driver or passengers. And it can do this without wires or other complicating devices such as rotary encoders which otherwise add to the service complexity and cost.

When the camera is located as shown, it can also see other things of interest on the dashboard and indeed the human driver himself, for example his head 1048. This latter aspect has significance in that it can be used to determine numerous aspects such as:

US 8,194,924 B2

15

1. The identity of the driver. For example, if a certain band of height isn't reached, such as point P on the drivers head, the ignition can be interlocked. Much simpler than face recognition, but effective if properly interlocked to prevent repeated retries in a short time period.

2. The position of the head of the driver in case of an accident. As detailed in reference **4**, a camera or cameras can be used to determine head location, and indeed location of the upper torso if the field of view is large enough. This information can be used to control airbag deployment, or head rest position prior to or during an accident (noting too that head-rest position can also be monitored without adding any hardware). Particularly of interest is that the pixel addressing camera of the invention can have the frequency response to be useful in a crash, sensing the movement of the person (particularly severe if unrestrained) within a millisecond or two, and providing a measure of the position for airbag deployment. Additional cameras may also be used to aid the determination, by providing other views or observing other features, for example.

Using a pixel addressing camera for camera **1020** confers additional advantages. For example consider the image of the car interior produced by the camera lens **1021**, on matrix of pixels **1061**, whose addressing and processing is controlled by computer **1025**. In the first instance one can confine the window of view of a certain group of pixels of the total matrix **1061** to be only in the region of the steering wheel, as in window **1065** shown. This allows much faster readout of the more limited number of pixels, and thus of the steering wheel switches, at the expense of not seeing anywhere else in that particular reading. But this may be desirable in some cases, since it may only be required to scan for heater controls or seat positions, every 10 seconds say, while scanning for other more immediate items a hundred times per second or more. A good example are safety related functions. 5 per second might suffice for seeing where the turn signal or windshield washer control was, as an example. Window **1066** dotted lines is illustrative of a window specialized for head, headrest and seat positions, say.

Scans in certain areas of the image can also depend on information obtained. For example one may initiate a scan of a control position, based on the increasing or decreasing frequency of an event occurrence. For example if the persons head is in a different location for a significant number of scans made at 15 second intervals for example, then in case of a crash, this data could be considered unreliable. Thus the camera window corresponding to pixels in the zone of the head location **1048** could be scanned more frequently henceforward, either until the car stopped, or until such action settled down for example. Such action is often the case of a person listening to rock music, for example.

Similarly, if someone is detected operating the heater controls, a scan of predominately heater function controls and related zones like air outlets can be initiated. Thus while normal polling of heater controls might be every 2 seconds say, once action is detected, polling can increase in the window(s) in question to 40 times per second for example. The detection of action can be made first via the camera, or via input from some other input device such as a convention heater knob and electric circuit operable therewith.

Scans in certain areas of the image can also depend on information obtained in other areas of scan, or be initiated by other control actions or by voice. For example, if hard deceleration was detected by an accelerometer, but before a crash occurred, the camera could immediately be commanded to begin scanning as fast as possible in the region of the image occupied by the driver and/or any other humans in

16

its field of view. This would be for the purpose of monitoring movements in a crash, if a crash came, in order to deploy an airbag for example.

One might utilize the invention to actuate a function, based on positions of people or other objects in the vehicle. As one example, suppose the drivers hand is resting on a console mounted gear lever. By scanning the image of this region, one can determine from the image the position of the console shift lever, and use the image thereof to control gear change via computer **1025**. However if the driver rests his hands on the windshield wiper stalk, it could in the same manner, become a column mounted gear lever so to speak. Or just be used for up down gear changes, like a paddle shifter on a racing car. In fact in the latter sense, the camera could be instructed to detect ones finger or hand movement to do this function for example, wherever one desired to rest ones hand (within the camera field of view at least). This function is also useful for physically disabled persons wishing to drive the car. And it can be different for different persons as well, via programming of the control functions associated with any given hand, switch or other position or movement.

FIG. **10**B illustrates alternative types of control mechanisms which can be used with the invention, in this case illustrated on the steering wheel of a car, although as can be appreciated, any suitable function or location may be used or created. And too, combinations of functions can be used. The invention is generic to car steering wheel controls, dishwashers, audio systems in ones home, heating and air conditioning elements and virtually all other forms of human related control functions. The key is that the camera computer combination makes a very inexpensive way to share a wide variety of functions with one or just a few basic systems and over a large population base.

As shown in FIG. **10**B, the steering wheel **1070** has two additional types of controls visible to camera **1020** and able to be sensed and generate the appropriate control function via computer. These are rotating device **1072** built to rotate around the steering wheel rim circular cross section, and expose a continuously variable, or digital step wise increment component to the camera. For example, three bars are shown, short **1075**, medium **1076**, and long **1077**. The computer senses which of the three is visible by comparing the length to pre-stored values (or taught values, see below), and causes the desired action to occur.

The second control **1080** is a sliding device **1081** which can be slid clockwise, or counterclockwise along a circumferential section of the steering wheel at the top, sides or wherever. As before, Its position is determined by camera **1020** again providing more data than just a switch up or down as shown before.

While illustrated on the steering wheel where it is readily at hand, it can be appreciated that the position of either the slider **1081** or the rotary device **1072**, or other similar devices for the purpose at hand could be elsewhere than the wheel, for example on stalk or on a piece of the dash, or other interior component indeed wherever a camera of the invention can view them without excessive obscuration by persons or things in the car. It need not be on a car either, controls of this type can be in the home or elsewhere. Indeed a viewable control datum can even be on a portable component such as ones key chain, phone, or article of clothing apparel, or whatever. Similarly the camera **1020** can view these items for other purposes as well.

The teach-ability of the invention is achieved by showing the camera the code marker in question (e.g., a short bar located on the wheel), and in the computer recording this data along with what it is supposed to signify as a control function

US 8,194,924 B2

| 17 | 18 |

for example, turn rear wiper on to first setting. This added functionality of being easily changed after manufacture is an important advantage in some cases, as for example, today after-market addition of wired in accessories is difficult.

Games Using the Invention

The co-pending referenced applications have described games which can be played with target sensing and touch screen based devices, typically but not necessarily, electro-optically based (e.g., TV camera). The cameras of the invention can be used to, for example: Sense the player or players in the game or portions thereof; sense objects held or manipulated by the players (e.g., a ball, a pistol); sense physical tokens used in the game, such as monopoly game tokens; and sense game accessories such as checkerboards, croquet wickets; compare positions of objects with respect to other objects or players.

In addition, the cameras can be used to take images which can be displayed also a major feature given the ability to create life size displays. And the computer of the invention can be used to control the presentation of background image data from stored images, or even images downloaded from the internet for example.

Some of these aspects will now be illustrated in some representative game illustrations (again noting that some more are in the co-pending applications).

FIG. 11 Board Game

Even today, popular board games such as Monopoly and the like are being provided in computer playable form, with the "board" represented on the screen of the computer monitor. The invention here builds on this by providing various added features which allow a physical nature of the game just as the real game, but with new aspects and providing physical game play which can be transmitted over the internet to others. These features also can be turned off or on at as desired.

In one version shown in FIG. 11A, the player tokens such as 1101 and 1102 are observed by camera of the invention 1110 placed directly overhead of the play board 1115, which can for example be a traditional monopoly board (chess board, checker board, etc). points on the board such as corners 1130, 1131, 1132, and 1133 can also be observed to establish a reference coordinate system for the computer 1140 to track the moves of the markers, either from their natural features, or from specialized datums thereon (e.g., retro-reflective hat top 1141 on marker 1101). For example a train shape 1102 of a marker can be called from memory, or taught to the computer by showing it to the camera. Rotation invariant image analysis programs such as the PATMAX program from Cognex company can be used to identify the marker in any normal orientation, together with its location on the board (the board itself can be taught to the computer using the camera, but is preferably called up from memory).

The board position and relative scale in the field of view is determined easily by knowing the spacing of the corner points 1130-1133 and using this to calibrate the camera (to provide extra contrast, the corners can have retro-reflective glass bead edging or beading as shown). For example if the points are spaced 20 inch on corners of the board, and the camera is positioned so that 20 inches occupies 80% of its field of view, then the field of view is 25 inches square (for a square matrix of camera pixels), and each pixel of 1000 pixels square, occupies 0.025 inches in the object field.

The play of both players (and others as desired) can be displayed on the monitor 1150, along with an image of the board (which also can be called from computer memory). But other displays can be provided as well. For example to lend more realism to the game, the display (and if desired sound from speaker 1155 connected to computer 1140) can also be programmed to show an image or sound that corresponds to the game. For example, when the camera image has provided information that one player has landed on "Boardwalk" (the most valuable property) a big building could be caused to be shown on the screen, corresponding to it also suitable sounds like wow or something provided).

The camera can be used to see monopoly money (or other game accessories) as well, and to provide input so the computer can count it or do whatever.

A large, wall sized for example, screen can add added realism, by allowing one to actually get the feeling of being inside the property purchased, for example.

One of the exciting aspects of this game is that it can be used to turn an existing board game into something different. For example, in the original monopoly the streets are named after those in Atlantic City. By using the computer, and say a DVD disc such as 1160 stored images of any city desired can be displayed, together with sounds. For example, one could land on the Gritti Palace Hotel in Venice, instead of Boardwalk. As shown in FIG. 11B, the TV camera senses the image of train marker 1101, and conveys this information to computer 1140, which causes the display 1150 and speaker of the invention to display the information desired by the program in use.

Making the game in software in this way, allows one to bring it home to any city desired. This is true of a pure (virtual) computer game as well, where the board only exists on the computer screen.

For added fun, for example in a small town context, local stores and properties could be used, together with local images, local personages appearing on the screen hawking them, and the like. A local bank could be displayed to take your money, (even with sounds of the local banker, or their jingle from the radio) etc. This makes the game much more local and interesting for many people. Given the ease of creating such local imagery and sounds with cameras such as digital camcorder 1151 used as an input of display imagery (e.g., from local celebrity 1158) to the game program, one can make any monopoly experience more interesting and fun at low cost.

The same holds true with other well known games, such as Clue, where local homes could be the mystery solving location, for example. One can also create games to order, by laying out ones own board. If one of the persons is remote, their move can be displayed on the screen 1150.

In the above, the display has been treated as sort of backdrop or illustration related. However, one can also create a whole new class of games in which the display and/or computer and the board are intertwined. For example as one takes a trip around the monopoly board, several chance related drawings opportunities occur during play. In this new game, such could be internet addresses one draws, which, via modem 1152, send the board game computer 1140 to any of a large number of potential internet sites where new experiences await, and are displayed in sight and sound on the display.

It should also be noted that the board can be displayed on the screen as well, or alternatively projected on a wall or table (from overhead). A particularly neat mixture of new and old is shown in FIG. 11B, where the board is displayed on a screen pointed vertically upward just as it would be on a table, and indeed in this case physically resident on a table 1165. The board is displayed (from software images or cad models of the board in computer 1166) on a high resolution table top HDTV LCD screen 1167 with a suitable protective plastic shield (not shown for clarity). Play can proceed just as before using

US 8,194,924 B2

19                                                    20

physical tokens such as **1101** and **1102**. In this case the display used to augment the game can actually be shown on the same screen as the board, if desired.

The TV camera **1110** in this context is used to see the tokens and any other objects of the game, the people as desired, and the play, as desired. The camera can be used to see the display screen, but the data concerning the board configuration displayed may be best imputed to the computer program from direct data used to create the display.

A beauty of the invention is that it allows the interaction of both computer generated images and simulations, with the play using physical objects, such as one might be accustomed to for example, or which give a "real" feel, or experience to the game.

FIG. **12** Sports Game

FIG. **12** illustrates a generic physical game of the invention using points such as **1201-1205** on the human (or humans) **1210** sensed by a TV camera such as stereo camera pair **1215** and transmitted to the computer of the invention **1220**. While points can be sensed in 2D, this illustration uses as stereo camera pair located on large screen display **1225** as shown to provide a unitary package built into the screen display (pointed out in other co-pending applications). In this particular instance a 3D display is illustrated, though this isn't necessary to obtain value and a good gaming experience. The human optionally wears red and green filter glasses **1235** such that red images on the screen are transmitted to one eye, green to another, so as to provide a 3D effect. Similarly crossed polarized filter glasses (with appropriate display), and any other sort of stereoscopic, or autosteroscopic method can also be used, but the one illustrated is simple, requires no connecting wires to the human, and can be viewed by multiple uses, say in a gym aerobics room.

The game is generic, in that it totally depends on the program of the computer. For example, it can be an exercise game, in which one walks on a treadmill **1250**, but the image displayed on screen **1225** and sound from speakers **1255** and **1266** carry one through a Bavarian forest or the streets of New York as one walks, for example.

Or it can be a parasail game in which one flies over the water near Wakiki beach, with suitable images and sounds. In any case action determined by sensing position, velocity acceleration, or orientation of points **1201-1206** on the player, **1210** is converted by computer **1220** into commands for the display and sound system. Note in the figure this player is shown viewing the same screen as the treadmill walker. This has been shown for illustration purposes, and it is unlikely the same game could be applied to both, but it is possible.

It is noted that fast sensing, such as provided by the pixel addressing camera method disclosed above is highly desirable to allow realistic responses to be generated. This is especially true where velocities or accelerations need to be calculated from the point position data present in the image (and in comparison to previous images).

For example, consider points **1201** and **1202** on player **1210**. If point **1201** moves to **1201***a*, and **1202** moves to **1202***a* indicative of a quick jerk movement to turn the displayed parasail, this movement could occur in a 0.1 second. But the individual point movements to trace the action would have to be sensed in 0.01 second or quicker for example to even approximately determine the acceleration and thus force exerted on the glider, to cause it to move.

It is important to note that the invention is not only generic in so far as the variety of these games are concerned, but it also achieves the above with virtually no mechanical devices requiring maintenance and creating reliability problems

which can eliminate profits from arcade type businesses especially with ever more sophistication required of the games themselves.

FIG. **13** Bar Game

FIG. **13** illustrates a game which is in a class of gesture based games, in which the flirting game of FIG. **15** is also an example. In such games one senses the position, velocity or acceleration of a part of a person, or an object associated with the person. This can also include a sequence of positions, itself constituting the gesture. The detected data is then related to some goal of the contest. Consider FIG. **13**, wherein the object in ones hand is monitored using the invention, and a score or other result is determined based on the position, velocity, orientation or other variable of the object determined. For example, in a bar one can monitor the position, orientation, and rate of change thereof of drinking glasses.

A two person game is illustrated, but any reasonable number can play as long as the targets can all be tracked sufficiently for the game (in one test over 200 targets were acquired, but as can be appreciated this uses most of the field of view of the camera, and thus speed improvements made possible by pixel addressing become more difficult.

As shown, a single camera **1301** observes one or more targets such as **1305** on glass **1310** held by contestant **1315**, and target **1320** on glass **1325** of contestant **1330**. On a signal, each drinks, and a score is calculated by program resident in computer **1350** based on the time taken to raise the glass, and place it back empty on table **1355**. A display of the score, and an image desired, for example of the winner (taken with camera **1301** or another camera), or a funny image called from computer memory, is displayed on monitor display **1370**.

If the glass features are sufficiently distinct for reliable and rapid acquisition and tracking, for example as might be provided by an orange color, or a distinct shape, then specialized target features are not required.

Alternatively the velocity, path of movement of the glass (or other object), acceleration, or any other variable from which target data is sufficient to calculate, can be used to determine a score or other information to be presented or used.

FIG. **14**

The referenced co-pending applications have described a game where by laser pointers can be used to designate images on a TV screen. In this case of FIG. **14**A, the TV camera of the invention such as **1410** is used in a two player game to see laser pointer spots such as **1420** and **1421** projected by players **1430** and **1431** respectively, using laser pointers **1440** and **1441** respectively. When one player's spot hits the other, the event is recorded in memory of computer **1450** for further analysis and display.

In a somewhat different context, a person can use a laser pointer to point at an object to designate it for some purpose, for example for action. For example consider FIG. **14**B, in which housewife **1460** who points with laser pointer **1462** so as to provide a laser spot **1465** on dishwasher **1470**. TV camera of the invention **1475** in corner of the kitchen **1480** picks up all laser spots in an image of the room (made easier to process in terms of signal to background imagery if one locates a laser wavelength band-pass interference filter **1481** in front of the TV camera as shown) and compares via computer **1483**, the location of the spot detected in the image to stored memory locations of objects such as the dishwasher **1470** or fridge **1485** in the camera field of view, so as to identify the object needing action. In this case too, housewife may signal via a spatially variant laser pointer projection image (see copending referenced applications for further

US 8,194,924 B2

21

examples in other applications), or a series of spots in time, what action is desired, for example to turn the washer on. In this case the computer **1483** can cause a command to do so to be sent to the washer.

Any one with a simple laser pointer can make these commands effective. No learning is needed just point at the item desired, with the TV camera and computer of the invention acquiring the data and interpreting it. This is much simpler than remote controls of today, and a major advantage for those who have difficulty or inclination to learn complex electronic devices and procedures. It should be noted that these pointing procedures can easily be combined with voice recognition to further define the desired control activity for example inputting the housewife's voice in this example by virtue of microphone **1476**.

The stored locations can be taught. For example in a setup mode, one can point a laser pointer at the dishwasher, and indicate to the computer that that spot is the dishwasher. The indication can be provided by keyboard, voice recognition or any other means that is satisfactory.

Clearly other items can be monitored or controlled in this manner. The camera can also detect optical indications provided by other means, for example lights in the appliance itself. And one can detect whether light have been left on at night (or not left on) and cause them to be turned off or on as desired.

Such a camera if it is responsive to normal illumination as well as that of the laser wavelength, can also be used to see movements and locations of people. For example, it can look at the top of the stove, and assure that no movement is near the stove **1486**, or objects on it if programmed to do so, thus sounding an alarm if an infant should get near the stove, for example.

The housewife in the kitchen can also point at a board on which preprogrammed actions are represented. For example consider board **1490**, shown in greater detail in FIG. **14**C, in which 3 squares **1491-1493** are to represent different functions. Thus if **1491** is programmed (via keyboard, voice or whatever) to represent turning on the clothes dryer in the laundry, when the TV camera sees, and via the computer, identifies spot **1496** projected by the user on square **1491**, it causes the dryer to turn on. Operated in this manner, the board **1490**, in combination with a TV camera of the invention (such as **1475** or a more dedicated one for the board alone) and computer such as **1483** can be considered a form of touch screen, where the user, in this case in the kitchen can point at a portion of the board with a finger, or a laser pointer, and register a choice, much like touching an icon on a conventional computer touch screen.

Similarly, squares or other zones representing choices or the like can be on the item itself. For example, a stove can have four areas on its front, which can be pointed at individually for control purposes, what ever they are (e.g., representing heat settings, burner locations or the like). For security, it could be that only a coded sequence of laser pulses would be seen, or as pointed out in co-pending reference Ser. No. 60/133,673, a spatial code, for example representing the user such as an initial could be projected, and sensed on the object by the TV camera.

The laser pointer can be held in the hand of the user, or, like **1497** attached to a finger, such as forefinger **1498**. Or it can be on or in another object, desirably one which is often hand held in the normal course of work, such as a TV remote control, a large spoon, or the like. Or using other aspects of the invention, the finger of the user can be observed to point directly, and the object being pointed at can be determined. For example if finger **1498** is moved 4 times, it could indicate

22

to the TV camera and thence computer that channel four was desired on a TV display not shown.

If a special pointer is used, it can be any workable optical device, not necessarily a laser. The camera and computer of the invention can also be used to observe the user pointing directly, and compute the pointing vector, as has been described in my co-pending applications.

FIG. **15** A "Flirting" Game

Another game type is where the camera looks at the human, and the humans expressions are used in the game. In this case it is facial expressions, hand or body gestures that are the thing most used.

For example, one idea is to have a scene in a restaurant displayed on a display screen **1500**, preferably a large HDTV screen or wall projection to be as lifelike as possible, and preferably life size as well which lends extra realism to some games, such as this one due to the human element involved.

Let us consider that seated at the table in the restaurant displayed on the screen is a handsome man **1501** whose picture (likely a 3D rendered animation, or alternatively photo-imagery called from memory), and the goal for the girl **1510** playing the game is to flirt with this man until he gets up and comes over to say hello, ask her out or what ever (what he does, could be a function of the score obtained, even!).

Player **1510** seated at table **1511** (for authenticity, for example) is observed by TV camera **1515** (or stereo pair as desired, depending whether 3D information is thought required) and computer of the invention **1520**, which through software determines the position of eyebrows, lips, hands, fingers and any other features needed for the game. If necessary, specialized targets can be used as disclosed herein and elsewhere to augment this discrimination, for example such as optically contrasting nail polish, lipstick, eyeliner or other. Contrast can be in a color sense, or in a reflectivity sense such as even retro-reflective materials such as Scotchlite 7615 by 3M company. Even special targets can be used to enhance expressions if desired.

This can be a fun type game, as the response of the displayed person can be all kinds of things even contrary to the actual gestures if desired. Sounds, such as from speaker **1530** can also be added. And voice recognition of players words sensed by microphone **1550** can also be used, if verbal as well as expressive flirting is used.

While the game here has been illustrated in a popular flirting context, it is more generally described as a gesture based game. It can also be done with another contestant acting as the other player. And For example, the contestants can be spaced by the communication medium of the internet. The displayed characters on the screen (of the other player) can be real, or representations whose expressions and movements change due to sensed data from the player, transmitted in vector or other form to minimize communication bandwidth if desired.

Other games of interest might be:

"Down on the Farm" in which a farmer with live animals is displayed on a life size screen, and the children playing the game are to help the farmer by calling the animals to come over to them. This would use recognition of voice and gesture to make the animal images move and make sounds.

A player can find someone in a display and point at him, like the "Whereas Waldo" puzzle game. Then the subject moves, child runs to peek at him, and to find him, say running down a street whose image is displayed on the screen.

One can also use the camera of the invention to monitor the progress made by a child building blocks, and show an Video displayed image of a real skyscraper progressing as he builds

US 8,194,924 B2

23

his little version. Note the benefit of group activity like a board game and children's play with each other.

FIG. 16

FIG. **16** illustrates a version of the pixel addressing camera technique wherein two lines on either side of a 1000 element square array are designated as perimeter fence lines to initiate tracking or other action.

Some "pixel addressing" cameras such as the IVP MAPP 2500 512.times.512 element camera, are smart, that is can process on the same chip. However, in some cases the control of such a camera may not allow one to actually read just one pixel, say, but rather one must read the whole line on which the pixel rests. Now some processing can be in parallel such that no speed is lost, at least in many instances.

If however, one does have a whole line serially into a computer portion, then to fully see a 10.times.10 pixel round target say, one would have to read at least 10 lines.

If two targets both were located on the same lines, the time involved to read would be the same.

In the same vein, if lines of data must be scanned, then the approach of 2*b* wherein every 20.sup.th pixel say is interrogated can be specialized to having such pixels fall on scan lines wherever possible. And where one is restricted to reading all pixels on a scan line and where a target entry zone is anticipated, one can have a scan line oriented to be crossed by such entry. For example in FIG. **16**, the two lines **1601** (line of pixels **3**) and **1602** (line of pixels **997**) of a 1000.times.1000 element pixel array **1610** are designated as perimeter fence lines, to trigger a target tracking or other function on the entry of a target image on to the array, such as **1615** from either the right or left side in the drawing. This is often the case where entry from top or bottom is precluded by constraints of the application, such as a table top at the bottom, or the height of a person at the top. Or in a stereo example such as FIG. **6**, the baseline defines the direction of excursion of a target as z is varied again calling for crossing of scan lines out of the plane of the paper at some point.

The invention herein has provided an exciting method by which common board games can become more fun. The invention provides a link with that past, as well as all of the benefits of the video and computer revolution, also via the internet.

It is envisioned that the same approach may be applied to many card games as well. It is also thought that the invention will find use in creating ones own games, or in downloading from the internet others creations. For example, common everyday objects can become the tokens of the games, and taught to the game computer by presenting them to the video camera. Similarly, the people playing the game can be taught, including their names and interests.

FIG. 17

FIG. **17** illustrates a 3D acoustic imaging embodiment of the invention which at low cost may generate accurate 3D images of the insides of objects, when used in conjunction with ultrasonic transducers and particularly a matrix array of ultrasonic transducers.

As shown in FIG. **17**A, the position in xyz of the ultrasonic imaging head **1700** on wand **1701** held in a users hand **1702** is monitored electro-optically as taught in FIG. **1**, using a single camera **1710** and a simple four dot target set **1715** on the head **1700** at the end of the transducer wand **1701** in contact with the object to be examined **1720**. Alternatively, as also taught in FIG. **1**, a stereo pair for example providing higher resolution in angle can be employed.

Computer **1725** combines ultrasonic ranging data from the ultrasound transducer head **1700** and from the sensor of transducer location (in this case performed optically by camera

24

**1710** using the optically visible targets on the transducer head) in order to create a range image of the internal body of the object **1720** which is thus referenced accurately in space to the external coordinate system in the is case represented by the camera co-ordinates xy in the plane of the TV camera scan, and z in the optical axis of the camera.

In many cases it is also desirable to know the pointing angles of the transducer. One instance is where it is not possible to see the transducer itself due to obscuration, in which case the target may alternately be located at the end **1704** of the wand for example. Here the position and orientation of the wand is determined from the target data, and the known length of the wand to the tip is used, with the determined pointing angle in pitch and yaw (obtained from the foreshortening of the target spacings in the camera image field) to calculate the tip position in space.

This pitch and yaw determination also has another use however, and that is to determine any adjustments that need to be made in the ultrasonic transduction parameters or to the data obtained, realizing that the direction of ultrasound propagation from the transducer is also in the pointing direction. And that the variation in ultrasound response may be very dependent on the relation of this direction **1730** with respect to the normal **1735** of the surface **1736** of the object (the normal vector is shown for clarity pointing inward to the object).

The difference in direction can be calculated by using the TV camera (which could be a stereo pair for greater angular resolution) as well to determine the surface normal direction. This can, for example, be done by placing a target set such as **1740** on the surface in the field of the camera as shown. This can be dynamically or statically accomplished using the photogrammetric method described in the Pinkney references.

Differences in direction between the surface normal and the transducer pointing direction are then utilized by software in the computer **1725** of the invention in analysis of the ultrasound signals detected. The pointing angle and the position of the transducer on the surface of the object are used by the computer in predicting the location of various returns from internal points within the object, using a suitable coordinate transformation to relate them to the external coordinate reference of the TV camera.

All data, including transducer signals and wand location is fed to computer **1725** which then allows the 3D image of the inside of the body to be determined as the wand is moved around, by a human, or by a robot. This is really neat as all the images sequentially obtained in this manner can be combined in the computer to give an accurate 3D picture **1745** displayed on monitor **1750**.

In one preferred embodiment as shown in FIG. **17**C, the transducer head **1700** is comprised of a matrix **1755** of 72 individual transducer elements which send and receive ultrasound data at for example, 5 MHZ. This allows an expanded scan capability, since the sensor can be held steady at each discrete location xyz on the object surface, and a 3D image obtained with out movement of the transducer head, by analyzing the outputs of each of the transducers. Some earlier examples are described in articles such as: Richard E. Davidsen, 1996 IEEE Ultrasonics Symposium, A Multiplexed Two-Dimensional Array For Real Time Volumetric and B-Mode; Stephen W. Smith, 1995 IEEE Ultrasonics Symposium, Update On 2-D Array Transducers For Medical Ultrasound, 1995.

If the wand is now moved in space, fine scan resolution is obtained, due to the operation of the individual elements so positioned with out the need to move the wand in a fine pitch manner to all points needed for spatial resolution of this order.

US 8,194,924 B2

25

This eases the operators task, if manually performed, and makes robotization of such examination much easier from a control point of view.

Consider FIG. 17B which illustrates a transducer as just described, also with automatic compensation at each point for pointing angle, robotically positioned by robot, **1785** with respect to object **1764**. In this case a projection technique such as described in U.S. Pat. No. 5,854,491 is used to optically determine the attitude of the object surface, and the surface normal direction **1760** from the position of target set **1765** projected on the surface by diode laser set **1770**, and observed by TV Camera **1775** located typically near the working end of the robot. Differences between the normal direction and the transducer propagation direction (typically parallel to the housing of the transducer) is then used by computer **1777** to correct the data of the ultrasonic sensor **1780** whose pointing direction in space is known through the joint angle encoders and associated control system **1782** of robot **1785** holding the sensor. Alternatively the pointing direction of this sensor can be monitored by an external camera such as **1710** of FIG. 17A.

It should be noted that the data obtained by TV camera **1775** concerning the normal to the surface and the surface range from the robot/ultrasonic sensor, can be used advantageously by the control system **1782** to position the robot and sensor with respect to the surface, in order to provide a fully automatic inspection of object **1764**. Indeed the camera sensor operating in triangulation can be used to establish the coordinates of the exterior surface of object **1764** as taught for example in U.S. Pat. No. 5,854,491, while at the same time, the acoustic sensor can determine the range to interior points which can be differentiated by their return signal time or other means. In this manner, a complete 3D map of the total object, interior and exterior, can be obtained relative to the coordinate system of the Robot, which can then be transformed to any coordinate system desired.

The invention has a myriad of applications beyond those specifically described herein. The games possible with the invention in particular are limited only by the imagination.

Consider hand held computer **1901** of FIG. 18, incorporating a camera **1902** which can actually be rotated about axis **1905** so as to look at the user or a portion thereof such as finger **1906**, or at objects at which it is pointed. Optionally, and often desirably, a stereo pair of cameras to further include camera **1910** can also be used. It too may rotate, as desired. Alternatively fixed cameras can be used when physical rotation is not desired, for ruggedness, ease of use, or other reasons (noting that fixed cameras have fixed fields of view, which limit versatility in some cases).

When aimed at the user, as shown, it can be used, for example, to view and obtain images of:

Ones self—facial expression etc, also for image reasons—id etc. combined effect.

Ones fingers (any or all), one finger to other and the like. This in turn allows conversing with the computer in a form of sign language which can replace the keyboard of a conventional computer.

One or more objects in ones hand. Includes a pencil or pen—and thus can be used rather than having a special touch screen and pencil if the pencil itself is tracked as disclosed in the above figure. It also allows small children to use the device, and those who cannot hold an ordinary stylus.

Ones gestures.

The camera **1902** (and **1910** if used, and if desired), can also be optionally rotated and used to view points in space ahead of the device, as shown in dotted lines **1902**a. In this position for example it can be used for the purposes described

26

in the previous application. It can also be used to observe or point at (using optional laser pointer **1930**) Points such as **1935** on a wall or a mounted

LCD or projection display such as **1940** on a wall or elsewhere such as on the back of an airline seat.

With this feature of the invention, there is no requirement to carry a computer display with you as with an infrared connection (not shown) such as known in the art one can also transmit all normal control information to the display control computer **1951**. As displays become ubiquitous, this makes increasing sense—otherwise the displays get bigger the computers smaller trend doesn't make sense if they need to be dragged around together. As one walks into a room, one uses the display or displays in that room (which might themselves be interconnected).

The camera unit **1902** can sense the location of the display in space relative to the handheld computer, using for example the four points **1955-1958** on the corners of the display as references. This allows the handheld device to become an accurate pointer for objects displayed on the screen, including control icons. And it allows the objects on the screen to be sensed directly by the camera—if one does not have the capability to spatially synchronize and coordinate the display driver with the handheld computer.

The camera can also be used to see gestures of others, as well as the user, and to acquire raw video images of objects in its field.

A reverse situation also exists where the cameras can be on the wall mounted display, such as cameras **1980** and **1981** can be used to look at the handheld computer module **1901** and determine its position and orientation relative to the display.

Note that a camera such as **1902**, looking at you the user, if attached to hand held unit, always has reference frame of that unit. If one works with a screen on a wall, one can aim the handheld unit with camera at it, and determine its reference frame to the handheld unit. Also can have two cameras operating together, one looking at wall thing, other at you (as **1902** and **1902**a) in this manner, one can dynamically compare ref frames of the display to the human input means in determining display parameters. This can be done in real time, and if so one can actually wave the handheld unit around while still imputing accurate data to the display using ones fingers, objects or whatever.

Use of a laser pointer such as **1930** incorporated into the handheld unit has also been disclosed in the referenced copending applications. For example, a camera on the hand held computer unit such as **1902** viewing in direction **1902**a would look at laser spot such as **1990** (which might or might not have come from the computers own laser pointer **1930**) on the wall display say, and recognized by color and size/shape reference to edge of screen, and to projected spots on screen.

The invention claimed is:

**1**. A handheld device comprising:

a housing;

a computer within the housing;

a first camera oriented to view a user of the handheld device and having a first camera output;

a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view, and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.

**2**. The handheld device of claim **1** wherein the handheld device comprises a mobile phone.

US 8,194,924 B2

27 | 28

**3**. The handheld device of claim **1** wherein the first camera is adapted to acquire an image of at least a portion of the user.

**4**. The handheld device of claim **1** wherein the second camera is adapted to acquire an image of the object.

**5**. The handheld device of claim **1** wherein the second camera is adapted to acquire a video of the object.

**6**. The handheld device of claim **1** wherein the computer is operable to determine a gesture based on at least one of the first camera output and the second camera output.

**7**. The handheld device of claim **1** wherein the computer is operable to determine a facial expression based on at least one of the first camera output and the second camera output.

**8**. The handheld device of claim **1** wherein the computer is adapted to determine at least one of the position and the orientation of the object based on the second camera output.

**9**. The handheld device of claim **6** wherein the gesture is performed by a person other than the user of the handheld device.

**10**. The handheld device of claim **1** wherein the computer is adapted to recognize the object based on the second camera output.

**11**. The handheld device of claim **1** wherein the computer is adapted to generate control instructions for a display that is separate from the handheld device.

**12**. The handheld device of claim **1** wherein the computer is adapted to determine a reference frame of the object.

**13**. The handheld device of claim **1** wherein the computer is adapted to perform a control function based on the first camera output and based on the second camera output.

**14**. The handheld device of claim **1** wherein the computer is adapted to transmit information over an internet connection.

* * * * *

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| In re *Ex Parte* Reexamination of: | ) | |
| | ) | |
| U. S. Patent No. 8,194,924 | ) | Control No.: *To be assigned* |
| | ) | |
| Issue Date: Jun. 5, 2012 | ) | Group Art Unit: *To be assigned* |
| | ) | |
| Inventor: Timothy R. Pryor | ) | Examiner: *To be assigned* |
| | ) | |
| Appl. No. 13/051,698 | ) | Confirmation No.: *To be assigned* |
| | ) | |
| Filing Date: Mar. 18, 2011 | ) | |
| | ) | |
| For:  CAMERA BASED SENSING IN | ) | |
| HANDHELD, MOBILE, GAMING, | ) | |
| OR OTHER DEVICES | ) | |

Mail Stop *Ex Parte* Reexam
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 1.510(b)(5) and 1.903 and M.P.E.P. § 2210, the undersigned attorney for the Requester certifies that he caused a copy of the request for *ex parte* reexamination in its entirety, including the following documents:

1. Request for *Ex Parte* Reexamination of U.S. Patent No. 8,194,924 (90 pages);
2. Form SB/08 (5 pages);
3. Form SB/57 (4 pages);
4. Exhibit PAT-A (39 pages);
5. Exhibit PAT-B (part 1 of 2) (117 pages);
6. Exhibit PAT-B (part 2 of 2) (84 pages);
7. Exhibit PAT-C (18 pages);
8. Exhibit PAT-D (16 pages);
9. Exhibit PA-DEC (142 pages);
10. Exhibit PA-DEC CV (67 pages);

1

11. Exhibit PA-1 (26 pages);

12. Exhibit PA-2 (23 pages);

13. Exhibit PA-3 (14 pages);

14. Exhibit PA-4 (17 pages);

15. Exhibit PA-5 (72 pages);

16. Exhibit PA-6 (7 pages);

17. Exhibit PA-7 (9 pages);

18. Exhibit PA-8 (45 pages);

19. Exhibit PA-9 (2 pages);

20. Exhibit PA-10 (23 pages);

21. Exhibit PA-11 (14 pages);

22. Exhibit PA-12 (20 pages);

23. Exhibit PA-13 (31 pages);

24. Exhibit PA-14 (20 pages);

25. Exhibit PA-16 (17 pages);

26. Exhibit PA-17 (16 pages);

27. Exhibit PA-18 (196 pages);

28. Exhibit PA-19 (148 pages);

29. Exhibit COMPLAINT-1 (22 pages);

30. Exhibit CC-1 (39 pages);

31. Exhibit CC-2 (89 pages);

32. Certificate of Service (2 pages)

to be served by first-class mail on November 11, 2021, on counsel for the patent owner at the following address:

Warner Norcross + Judd LLP
Intellectual Property Group
150 Ottawa Ave. NW, Suite 1500
Grand Rapids, MI 49503

Respectfully submitted,
PAUL HASTINGS LLP

Dated: November 11, 2021               By:  /Joseph E. Palys/
                                       Joseph E. Palys
                                       Reg. No. 46,508

2

**Exhibit CC-2**

Claim Construction Memorandum and Order
(Dkt. No. 93) in Gesture Partners, LLC v.
Huawei Device Co., Ltd., No. 2:21-cv-00040
(E.D. Tex. Oct. 12, 2021) (consolidated with
Gesture Partners, LLC v. Samsung Elecs. Co.,
No. 2:21-cv-0041)

**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| GESTURE TECHNOLOGY PARTNERS, LLC, | § § § | |
| v. | § § | CASE NO. 2:21-CV-40-JRG (LEAD CASE) |
| | § | |
| HUAWEI DEVICE CO., LTD. and HUAWEI DEVICE USA, INC. | § § § | |
| _____ | § § | |
| GESTURE TECHNOLOGY PARTNERS, LLC, | § § § | |
| v. | § § | CASE NO. 2:21-CV-41-JRG (MEMBER CASE) |
| | § | |
| SAMSUNG ELECTRONICS CO., LTD. and SAMSUNG ELECTRONICS AMERICA, INC. | § § § § § | |

## CLAIM CONSTRUCTION
## MEMORANDUM AND ORDER

Before the Court is the Opening Claim Construction Brief (Dkt. No. 64) filed by Plaintiff

Gesture Technology Partners, LLC ("Plaintiff" or "GTP"). Also before the Court is the

Responsive Claim Construction Brief (Dkt. No. 70) filed by Defendants Huawei Device Co.,

Ltd., Huawei Device USA, Inc. (collectively, "Huawei"), Samsung Electronics Co., Ltd., and

Samsung Electronics America, Inc. (collectively, "Samsung") (all, collectively, "Defendants") as

well as Plaintiff's reply (Dkt. No. 72).

The Court held a hearing on September 21, 2021.

whether functional limitations describe the capability of components in apparatus rather than method steps that recite actual use.") (citations omitted).

With that understanding, the Court hereby construes **"oriented to view"** to have its **plain meaning**.

**11. "oriented to view a user"**

| **"oriented to view a user"** ('924 Patent, Claim 1) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Indefinite under *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005). |

(Dkt. No. 55, App'x 1, at 9; Dkt. No. 73, Ex. A, at 8–9.)

<u>(1) The Parties' Positions</u>

Plaintiff argues that "[t]he context of Claim 1 makes clear that it is *not* claiming both an apparatus and method of use . . .," and "[t]he disputed term is merely describing the direction in which the first camera is facing." (Dkt. No. 64, at 16–17.)

Defendants respond that "Claim 1 of the '924 Patent is an apparatus claim with limitations requiring a method of using the claimed device," which "impermissibly mixes an apparatus and a method of using the apparatus." (Dkt. No. 70, at 13 & 16; *see id.* at 13–16.)

Plaintiff replies that "[t]he orientation of the first and second cameras in claim 1 of the '924 Patent makes them capable of viewing the user of the handheld device and an object other than the user of the device, respectively," and "the claim clearly recites capability, not performance of a method step." (Dkt. No. 72, at 6.)

- 44 -

At the September 21, 2021 hearing, Plaintiff emphasized that Defendants bear the burden of showing indefiniteness by clear and convincing evidence. Plaintiff also submitted that although the claim refers to a user, the user is not recited as performing any action. Plaintiff argued that having any part of the user in the field of view is sufficient for this term, and Plaintiff urged that there is simply a factual question regarding how the cameras are arranged. Defendants responded that a person of ordinary skill in the art cannot determine whether an accused device is infringing because the user can change the orientation of the device and its cameras during ordinary use.

(2) Analysis

A single patent may include claims directed to one or more of the classes of patentable subject matter, but no single claim may cover more than one subject matter class. *IPXL Holdings*[*, LLC v. Amazon.com, Inc.*], 430 F.3d [1377,] 1384 [(Fed. Cir. 2005)] (holding indefinite a claim covering both an apparatus and a method of using that apparatus).

*Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008); *see H-W Tech, L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1335 (Fed. Cir. 2014) (finding claim indefinite because "it is unclear when infringement occurs").

Claim 1 of the '924 Patent recites (emphasis added):

1. A handheld device comprising:
        a housing;
        a computer within the housing;
        a first camera *oriented to view a user* of the handheld device and having a first camera output; and
        a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view, and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.

The disputed term relates to configuration of the recited first camera rather than, for example, any user action or any action performed by or on the camera. Defendants' reliance on

*In re Katz*, *H-W Technology*, and *UltimatePointer* is unpersuasive. *See In re Katz*, 639 F.3d at 1318 (finding "interface means for providing automated voice messages . . . to certain of said individual callers, wherein said certain of said individual callers digitally enter data" indefinite); *see also H-W Tech.*, 758 F.3d at 1336 (finding "tangible computer readable medium" claims indefinite because of recitals that "said user completes a transaction" and "said user selects one of said variety of offers"); *UltimatePointer, L.L.C. v. Nintendo Co.*, No. 6:11-CV-496, 2013 WL 2325118, at *22–*23 (E.D. Tex. May 28, 2013) (Davis, J.). Defendants' argument that "[w]hether the camera is oriented to view a user cannot be determined until a user actually uses the device in a particular way" is likewise unavailing. (Dkt. No. 70, at 14; *see id.* at 13–16.) Defendants do not persuasively show that this requires performance of an action by the user rather than a configuration of the device.

Defendants thus have not met their burden to show indefiniteness by clear and convincing evidence. *See Sonix*, 844 F.3d at 1377. The Court therefore hereby expressly rejects Defendants' indefiniteness argument, and Defendants present no alternative proposed construction. To be clear, however, this disputed term refers to actual configuration, not merely a capability.

With that understanding, the Court hereby construes **"oriented to view a user"** to have its **plain meaning**.

## 12. "oriented to view an object other than the user"

<table>
<tr><td colspan="2" align="center"><strong>"oriented to view an object other than the user"</strong><br>('924 Patent, Claim 1)</td></tr>
<tr><td><strong>Plaintiff's Proposed Construction</strong></td><td><strong>Defendants' Proposed Construction</strong></td></tr>
<tr><td>No construction necessary.</td><td>Indefinite under <em>IPXL Holdings, LLC v. Amazon.com, Inc.</em>, 430 F.3d 1377 (Fed. Cir. 2005).</td></tr>
</table>

(Dkt. No. 55, App'x 1, at 9; Dkt. No. 73, Ex. A, at 9.)

(1) The Parties' Positions

Plaintiff argues: "For the same reasons discussed above with respect to 'oriented to view a user,' Defendants' assertion that this claim is indefinite under *IPXL* is also wrong. The term 'oriented to view an object other than the user' is merely describing the orientation of the second camera." (Dkt. No. 64, at 17.)

Defendants respond as to this disputed term together with the term "oriented to view a user," which is addressed above. (Dkt. No. 70, at 13–16.)

Plaintiff replies as to this disputed term together with the term "oriented to view a user," which is addressed above. (*See* Dkt. No. 72, at 5–7.)

(2) Analysis

As set forth above regarding the similar term "oriented to view a user" in the same claim, Defendants have not met their burden to show indefiniteness by clear and convincing evidence. *See Sonix*, 844 F.3d at 1377.

The Court therefore hereby expressly rejects Defendants' indefiniteness argument, and Defendants present no alternative proposed construction. To be clear, however, this disputed term refers to actual configuration, not merely a capability.

With that understanding, the Court hereby construes **"oriented to view an object other than the user"** to have its **plain meaning**.

**13. "wherein the gesture is performed by a person other than the user of the handheld device"**

| **"wherein the gesture is performed by a person other than the user of the handheld device"** ('924 Patent, Claim 9) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary. | Indefinite under *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005). |

(Dkt. No. 55, App'x 1, at 10; Dkt. No. 73, Ex. A, at 14.)

(1) The Parties' Positions

Plaintiff argues that "the term does not recite functional language," and "[i]nstead, it is describing that the gesture detected by the computer is performed by a user other than the user of the handheld device." (Dkt. No. 64, at 18.)

Defendants respond that "Claim 9 does not merely recite the capability of determining a gesture," but rather "Claim 9 further expressly specifies that the gesture *is performed* by a specific person, thereby reciting a method step." (Dkt. No. 70, at 16–17.)

Plaintiff replies: "Claim 9 does nothing more than further define and narrow the scope of the capability recited in claim 6—the computer must be operable to determine a gesture performed by a person other than the user of the handheld device. It does not require actual performance of a gesture." (Dkt. No. 72, at 7.)

# Exhibit PA-DEC

# Declaration of Dr. Gregory D. Abowd

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................1

II.     BACKGROUND AND QUALIFICATIONS ...................................1

III.    MATERIALS REVIEWED ...............................................................4

IV.     PERSON OF ORDINARY SKILL IN THE ART AND THE TIME OF
        THE ALLEGED INVENTION ..........................................................8

V.      TECHNICAL BACKGROUND ........................................................8

        A.      Gestures ....................................................................................9

        B.      Gesture Recognition and Control.........................................12

        C.      Handheld Gesture Sensing Devices .....................................17

VI.     THE '924 PATENT ..........................................................................22

VII.    CLAIM CONSTRUCTION ............................................................24

        A.      "oriented to view" of claim 1 ................................................26

        B.      "a computer within the housing . . . wherein the computer is
                adapted to perform a control function of the handheld device
                based on at least one of the first camera output and the second
                camera output" of claims 1, 6-8, 10, 12, and 14 ................26

        C.      "gesture" of claims 6 and 9 ..................................................27

        D.      "adapted to" of claims 1, 3-5, 8-9, 12, and 14 ...................28

VIII.   OVERVIEW OF THE PRIOR ART ...............................................28

        A.      Overview of *Liebermann* ....................................................28

        B.      Overview of *Tryding* ...........................................................29

        C.      Overview of *Gershman* ........................................................30

        D.      Overview of *Himmel* ............................................................31

        E.      Overview of *Sears* ................................................................32

        F.      Overview of *Kimball* ............................................................35

IX.     THE PRIOR ART DISCLOSES OR SUGGESTS ALL RECITED
        FEATURES OF CLAIMS 1-14 OF THE '924 PATENT..........................36

        A.      SNQ1: *Liebermann* ...........................................................36

i

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

|  | 1. | Claim 1 | 36 |
|  | 2. | Claim 2 | 55 |
|  | 3. | Claim 3 | 56 |
|  | 4. | Claim 4 | 57 |
|  | 5. | Claim 5 | 58 |
|  | 6. | Claim 13 | 59 |
| B. | | SNQ2: *Liebermann* in view of *Tryding* | 61 |
|  | 1. | Claim 11 | 61 |
| C. | | SNQ3: *Liebermann* in view of *Gershman* | 67 |
|  | 1. | Claim 14 | 68 |
| D. | | SNQ4: *Liebermann* in view of *Himmel* | 72 |
|  | 1. | Claim 1 | 72 |
|  | 2. | Claim 2 | 82 |
|  | 3. | Claim 3 | 82 |
|  | 4. | Claim 4 | 83 |
|  | 5. | Claim 5 | 83 |
|  | 6. | Claim 6 | 83 |
|  | 7. | Claim 7 | 85 |
|  | 8. | Claim 8 | 86 |
|  | 9. | Claim 10 | 87 |
|  | 10. | Claim 12 | 89 |
|  | 11. | Claim 13 | 93 |
| E. | | SNQ5: *Liebermann* in view of *Himmel* and *Tryding* | 94 |
|  | 1. | Claim 11 | 94 |
| F. | | SNQ6: *Liebermann* in view of *Himmel* and *Gershman* | 95 |
|  | 1. | Claim 14 | 95 |
| G. | | SNQ7: *Liebermann* in view of *Sears* | 96 |

ii

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

| | | | |
|---|---|---|---|
| | 1. | Claim 1 .................................................................. | 96 |
| | 2. | Claim 2 .................................................................. | 113 |
| | 3. | Claim 3 .................................................................. | 114 |
| | 4. | Claim 4 .................................................................. | 114 |
| | 5. | Claim 5 .................................................................. | 114 |
| | 6. | Claim 6 .................................................................. | 115 |
| | 7. | Claim 7 .................................................................. | 117 |
| | 8. | Claim 8 .................................................................. | 118 |
| | 9. | Claim 10 ................................................................ | 121 |
| | 10. | Claim 12 ............................................................... | 123 |
| | 11. | Claim 13 ............................................................... | 124 |
| H. | | SNQ8: *Liebermann* in view of *Sears* and *Tryding* ........... | 125 |
| | 1. | Claim 11 ............................................................... | 125 |
| I. | | SNQ9: *Liebermann* in view of *Sears* and *Gershman* ........ | 126 |
| | 1. | Claim 14 ............................................................... | 126 |
| J. | | SNQ10: *Liebermann* in view of *Kimball* ......................... | 127 |
| | 1. | Claim 14 ............................................................... | 127 |
| K. | | SNQ11: *Liebermann* in view of *Himmel* and *Kimball* ....... | 131 |
| | 1. | Claim 14 ............................................................... | 131 |
| L. | | SNQ12: *Liebermann* in view of *Sears* and *Kimball* ......... | 132 |
| | 1. | Claim 14 ............................................................... | 132 |
| M. | | SNQ13: *Liebermann* in view of *Himmel* ......................... | 133 |
| | 1. | Claim 9 ................................................................. | 133 |
| N. | | SNQ14: *Liebermann* in view of *Sears* ............................ | 135 |
| | 1. | Claim 9 ................................................................. | 135 |
| X. | | CONCLUSION ....................................................... | 138 |

iii

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

I, Dr. Gregory D. Abowd, declare as follows:

## I.    INTRODUCTION

1.    I have been retained by Samsung America, Inc. ("Samsung") as an independent expert consultant in this proceeding before the United States Patent and Trademark Office ("PTO") regarding U.S. Patent No. 8,194,924 ("the '924 patent") (Ex. PAT-A).  I have been asked to consider whether certain references disclose or suggest the features recited in claims 1-14 ("the challenged claims") of the '924 patent.  My opinions are set forth below.

2.    I am being compensated at a rate of $600/hour for my work in this proceeding.  My compensation is in no way contingent on the nature of my findings, the presentation of my findings in testimony, or the outcome of this or any other proceeding.  I have no other interest in this proceeding.

## II.    BACKGROUND AND QUALIFICATIONS

3.    From 1982-1986, I attended the University of Notre Dame, receiving the degree of Bachelor of Science in Honors Mathematics *summa cum laude*.

4.    I received a Rhodes Scholarship and attended the University of Oxford in England from 1986-1989.   There, I studied formal methods of software engineering applied to the development and analysis of interactive systems, under the supervision of Mr. Bernard Sufrin.  While at the University of Oxford, I received

1

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

the degree of M.Sc. in Computation in 1987 and worked towards the degree of D.

Phil. in Computation.

5.      In 1989, I became a research associate in the Department of Computer

Science at the University of York in England, where I continued my doctoral

research for the University of Oxford.  I received the degree of D. Phil. in

Computation from Oxford in 1991 and became a postdoctoral research associate at

the University of York until September 1992.  As a postdoctoral research associate,

I worked on formal methods applied to interactive systems, in particular a European

project, AMODEUS, under the supervision of Prof. Michael Harrison.

6.      I authored a textbook on the topic of Human-Computer Interaction

with colleagues while I was working at the University of York.

7.      From September 1992 through June 1994, I was a postdoctoral research

scientist at the Software Engineering Institute and School of Computer Science at

Carnegie Mellon University in Pittsburgh, Pennsylvania, where I developed

analytical tools and techniques to examine high-level software architectural designs

and further explored applications of mathematical models to analyze interactive

systems.

8.      In July 1994, I became an Assistant Professor on the faculty in the

College of Computing at the Georgia Institute of Technology in Atlanta.  I received

tenure and became Associate Professor in 2000, and became Full Professor in 2007.

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

I was named a Distinguished Professor at Georgia Tech in 2008 and was promoted

to a University System of Georgia Regents' Professor in 2012.  In 2016, I was named

the J.Z. Liang Endowed Chair in the School of Interactive Computing.

9.     At Georgia Tech, I developed interests in Human-Computer Interaction

(HCI) applied to mobile and ubiquitous computing systems.  I developed the concept

of "living laboratories" research applied to classrooms and homes, and created two

large efforts, Classroom 2000 and the Aware Home.  In the early 2000's, I developed

an interest in health and technology, and have done much work in applications of

mobile and embedded technologies in that space, with an emphasis on autism and

chronic childhood disease.

10.     I have authored or co-authored over 250 research papers and articles,

many of which were presented in prestigious venues such as the ACM SIGCHI

Conference on Human Factors in Computing Systems (CHI), User Interface

and Software Technology (UIST), Mobile HCI, and the major conferences on

wearable, ubiquitous and pervasive computing (ISWC, UbiComp, Pervasive

Computing).  A complete list of my publications is contained in my CV.

11.     I am an elected member of the ACM SIGCHI Academy, the highest

professional distinction for this professional society, and am an elected Fellow of

the ACM, also its highest distinction.  I was awarded the ACM SIGCHI Social

Impact Award in 2007 and the ACM Eugene Lawler Humanitarian Award in 2009,

3

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

both in recognition of my work on human-centered applications of technology for

aging and autism.  I was appointed Associate Dean for Off-Campus and Special

Initiatives in the College of Computing in 2017.  In 2019, I was appointed Associate

Dean for Research, Space, and Off-Campus Initiatives in the College of Computing.

In 2021, I retired from my position at Georgia Tech to become the Dean of the

College of Engineering at Northeastern University, where I also hold an appointment

as Professor in the Department of Electrical and Computer Engineering, with

affiliate appointments in the Khoury College of Computer Sciences and Bouvé

College of Health Sciences.

12.    In the course of my work, I have had experience analyzing patents and

patent claims from the perspective of a person skilled in the art.  I am, however, not

an attorney and do not offer any legal opinions in this Declaration.

## III.    MATERIALS REVIEWED

13.    The opinions contained in this Declaration are based on the documents

I reviewed, my professional judgment, as well as my education, experience, and

knowledge regarding technologies relating to, among other things, gesture

recognition and control.

14.    I have reviewed and am familiar with the specification of the '924

patent.  I understand that the '924 patent resulted from U.S. Application No.

13/051,698, filed on March 18, 2011.  I understand that the '924 patent has been

4

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

provided as Exhibit PAT-A. I will cite to the specification using the following format: (Ex. PAT-A, 1:1-10.) This example citation points to the '924 patent specification at column 1, lines 1-10. Throughout this Declaration, emphasis is added, unless otherwise indicated

15.　In forming my opinions expressed in this Declaration, I reviewed the following materials and information:

| | |
|---|---|
| Ex. PAT-A | U.S. Patent No. 8,194,924 ("the '924 patent") |
| Ex. PAT-B | Prosecution History of the '924 patent |
| Ex. PAT-C | U.S. Patent No. 8,878,949 to Pryor |
| Ex. PAT-D | U.S. Patent No. 6,750,848 to Pryor |
| Ex. PA-1 | U.S. Patent No. 5,982,853 to Liebermann ("*Liebermann*") |
| Ex. PA-2 | U.S. Patent No. 6,115,482 to Sears *et al.* ("*Sears*") |
| Ex. PA-3 | U.S. Patent No. 6,622,015 to Himmel *et al.* ("*Himmel*") |
| Ex. PA-4 | U.S. Patent No. 6,434,403 to Ausems *et al.* ("*Ausems*") |

5

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

| Ex. PA-5 | U.S. Patent No. 6,401,085 to Gershman *et al.* ("*Gershman*") |
|---|---|
| Ex. PA-6 | Microsoft Announces Release of Windows CE 2.0 - Stories |
| Ex. PA-7 | U.S. Patent No. 5,880,732 to Tryding ("*Tryding*") |
| Ex. PA-8 | Ca. Patent App. 2,175,288 to Bushnag ("*Bushnag*") |
| Ex. PA-10 | Logic Reference Guide |
| Ex. PA-11 | U.S. Patent No. 5,953,322 to Kimball ("*Kimball*") |
| Ex. PA-12 | V. Pavlovic *et al.*, *Visual Interpretation of Hand Gestures for Human-Computer Interaction: A Review*, 19 IEEE Transactions on Pattern Analysis and Machine Intelligence 677 (1997). |
| Ex. PA-13 | U.S. Patent No. 5,454,043 to Freeman ("*Freeman*") |
| Ex. PA-14 | U.S. Patent No. 6,256,033 to Nguyen ("*Nguyen*") |
| Ex. PA-16 | U.S. Patent No. 4,988,981 to Zimmerman ("*Zimmerman*") |

6

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

| Ex. PA-17 | U.S. Patent No. 6,147,678 to Kumar ("*Kumar*") |
|---|---|
| Ex. PA-18 | U.S. Patent No. 5,594,469 to Freeman ("*Freeman-469*") |
| Ex. PA-19 | U.S. Patent No. to 6,144,366 to Numazaki ("*Numazaki*") |
| Ex. CC-2 | Claim Construction Memorandum and Order (Dkt. #93) in *Gesture Partners, LLC v. Huawei Device Co.*, No 2-21-CV-00040 (E.D. Tex. Oct. 12, 2021) (consolidated with *Gesture Partners, LLC v. Samsung Elecs. Co.*, No 2-21-CV-00041) |

16.    I also reviewed any other materials I refer to in this Declaration in support of my opinions.

17.    My opinions contained in this declaration are based on the documents I reviewed and my knowledge and professional judgment.  My opinions have also been guided by my appreciation of how a person of ordinary skill in the art would have understood the state of the art, the prior art, and the claims and the specification of the '924 patent at the time of the alleged invention.

18.    I have been asked to initially consider that the time of the alleged invention of the '924 patent is around July 8, 1999, the date of a provisional application, U.S. Provisional Application No. 60/142,777, listed on the cover of the

7

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

'924 patent.  (Ex. PAT-A, Cover.)  My opinions reflect how one of ordinary skill in the art (which I describe below) would have understood the '924 patent, the prior art to the patent, and the state of the art at the time of the alleged invention as I was asked to consider.

19.     Based on my experience and expertise, it is my opinion that the prior art discloses or suggests all the features recited in challenged claims 1-14 of the '924 patent, as I discuss in detail below.

## IV.     PERSON OF ORDINARY SKILL IN THE ART AND THE TIME OF THE ALLEGED INVENTION

20.     All of my opinions in this declaration are from the perspective of one of ordinary skill in the art, during the relevant timeframe (e.g., the time of the alleged invention), which I discussed above as being around July 8, 1999.  My opinions in this declaration are also applicable from the perspective of such a skilled person at other related time frames (e.g., 1998 to 2000 time frames), and thus under the scenario the time of the alleged invention was determined to be in such time frames, my opinions in this declaration would not change.

## V.     TECHNICAL BACKGROUND

21.     Below, I present a brief overview of certain aspects of relevant technology, including gesture and gesture recognition technology, that were known to a person of ordinary skill in the art prior to and at the time of the alleged invention

8

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

of the '924 patent.  The features, functionalities, and concepts I describe below in

this technical background section reflect the state of the art that a person of ordinary

skill in the art would have had knowledge of and understood prior to and at the time

of the alleged invention of the '924 patent.  I rely on, and incorporate as applicable

(even if not expressly mentioned below in Section IX), the following disclosures and

opinions to support my opinions in this Declaration, including those opinions

relating to how the prior art discloses and/or suggests the challenged claims of the

'924 patent and how and why  a person of ordinary skill in the art would have been

motivated to consider and combine the disclosures and suggestions from one or more

prior art references as I explain below in Section IX.  The concepts below would

have been within the knowledge and mindset of a person of ordinary skill in the art

at the time.

### A.    Gestures

22.    Gestures, as understood in the art, refer to various sequences of

positions and movements that convey meaning.  (*See, e.g.*, Ex. PA-12, 677 ("Human

hand gestures are a means of non-verbal interaction among people. They range from

simple actions of using our hand to point at and move objects around to the more

complex ones that express our feelings and allow us to communicate with others.").)

At the time of the alleged invention, commonly recognized gestures included various

hand movements and actions.  (*See, e.g.*, Ex. PA-2, 10:39-55 ("A set of gestural

9

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

movements along with the command interpretations constitutes a gestural user interface. One such interface would comprise the following gestures and commands. One or more fingers moving back and forth would constitute a clear command . . . . Moving a single finger horizontally across a page reads the text in the line above the finger at a rate such that the vocalized texts keeps pace with the movement of the finger, moving the finger vertically reads the single word in each line closest to the finger as the line is passed by the finger."); Ex. PA-13, 10:57-63 ("[I]n one test, a set of 16 gestures requiring hand movement was utilized as the histogram signature base. Such gestures included circular stirring motions by the hand; snapping of fingers; up, down, left, right gesturing for pointing purposes; hand motions to come closer and go away; waving goodbye; and a thumbs up hand gesture.").)

23.    In addition to hand gestures, other types of gestures were also understood.  For example, unnatural eye movements could control laptop functions before the time of the alleged invention.  (Ex. PA-8, 17 (disclosing that various functions of a computer are triggered when laptop cameras detect specific, unnatural eye movements); *id.*, 13 ("Figure 9 illustrates an embodiment of the eye-controlled command system used in conjunction with a conventional portable computer.").) Various bodily movements were also being used to control devices.  (*See, e.g.*, Ex. PA-14, Abstract ("A subject, such as a human being, enters the viewing field of a

10

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

camera connected to a computer and performs a gesture, such as flapping of the

arms. The gesture is then examined by the system one image frame at a time.").)



(*Id.*, FIGs. 3-4 (illustrating various bodily movement gestures); *id.*, Abstract ("A

system and method are disclosed for providing a gesture recognition system for

recognizing gestures made by a moving subject within an image and performing an

operation based on the semantic meaning of the gesture."); *id.*, 3:46-49 ("FIG. 3

shows a series of screen shots showing a human figure performing a gesture, an arm

flap, and the resulting function performed by the system."); *id.*, 3:50-53 ("FIG. 4

11

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

shows another series of screen shots showing a human figure performing another

recognizable gesture, jumping.").)

### B.    Gesture Recognition and Control

24.    Engineers and designers have been interested in natural movement

control of electronic devices since at least the late 1980s.  (*See generally*, Ex. PA-

12, 677 ("[I]n recent years . . . there has been an increased interest in trying to

introduce other human-to-human communication modalities into HCI. This includes

a class of techniques based on the movement of the human arm and hand, or hand

gestures.").)   During the late 1980s and early 1990s, early attempts at gesture

recognition resulted in mechanical glove-type devices that "that directly measure[d]

hand and/or arm joint angles and spatial position."  (*Id.*, 677.)  An example of such

a system is illustrated below.

12

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924



**FIG__I.**

(Ex. PA-16, FIG. 1 (illustrating a glove-type gesture recognition system from 1989).)  However, persons of ordinary skill in the art understood that glove-based gestural interfaces were cumbersome and hindered the "ease and naturalness" consumers desired to interact with their devices.  (Ex. PA-12, 677.)

25.    Early cumbersome attempts at gesture control gave rise to a variety of modern control techniques.  For instance, persons of ordinary skill in the art understood that "any awkwardness in using gloves and other devices" could be overcome with the help of camera-based gesture detection.  (*Id.*, 678.)  In fact, the combination of video cameras and computer vision techniques to interpret gestures resulted in a "burst of . . . activity" in the field prior to the date of invention.  (*Id.*) One such example (of many) is illustrated below.

13

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924



(Ex. PA-17, FIG. 1; *id.*, Abstract ("A video gesture-based three-dimensional computer interface system that uses images of hand gestures to control a computer . . .").)

26.     In the preceding examples and others, various software algorithms were used to process gestures sensed by cameras.  As the '924 patent acknowledges, for example, "known machine vision techniques" were available to determine when a point on a person (such as a hand) was within a certain distance of another person or object.  (Ex. PAT-A, 6:23-33.)  The '924 patent also explains that "software from Integral Vision Corp." could have been used for "pose analysis software or hardware." (*Id.*, 6:6-9.)  And such machine vision processing software would "easily recogniz[e]" user positions and movements under uniform background conditions.

14

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

(*Id.*, 6:63-7:10.)  Further, persons of ordinary skill in the art understood that there

were "many algorithms" that may have been employed to detect gestures.  (Ex. PA-

2, 9:19-26.)   Algorithms were selected to be "more accurate or consume less

computing resources or have other advantages" for the needs of a given gesture

system.  (*Id.*)

27.    Many approaches to camera-based gesture systems "focus[ed] on one

particular aspect of gestures, such as, hand tracking, hand posture estimation, or hand

pose classification."   (Ex. PA-12, 678.)   For instance, various studies were

"undertaken within the context of a particular application, such as using a finger as

a pointer to control a TV, or interpretation of American Sign Language."  (*Id.*)



Fig. 1

15

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

(Ex. PA-18, FIG. 1 (illustrating a television system that could be controlled with natural gestures); *id.*, Abstract ("A system for the control from a distance of machines having displays includes hand gesture detection."); *see also* Ex. PA-1, Abstract; *id.*, ("An electronic communications system for the deaf includes a video apparatus for observing and digitizing the facial, body and hand and finger signing motions of a deaf person.").)

28.     Persons of ordinary skill in the art, however, understood that gesture technology could be applied to a variety of devices.  For instance, the interaction of a computer with one or more cameras allowed a system to be controlled with gestures to change a channel, Ex. PA-18, FIG. 1, operate a camera, Ex. PA-2, 18:33-38, 15:54-56, etc.  If a system was configured with cameras and appropriate processing power, the system could be programmed to perform an operation based on the semantic meaning of a gesture.

16

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924



(Ex. PA-14, FIG. 5a.)  Specific applications of gesture recognition technology—be it a television, a radio, a camera, etc.—were a matter of design choice or preference.

## C.    Handheld Gesture Sensing Devices

29.    In addition to portable desktop computers (illustrated above), smaller devices were also capable of detecting gestures with one or more cameras before the

17

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

time of the alleged invention.  For instance, U.S. Patent No. 6,144,366 disclosed

various portable devices that included one or more sensors for hand control.



(Ex. PA-19, FIG. 78.)   In another example, *Liebermann* disclosed a cellular

telephone that was used to recognize sign language gestures.  (Ex. PA-1, Abstract

("An electronic communications system for the deaf includes a video apparatus for

observing and digitizing the facial, body and hand and finger signing motions of a

deaf person, an electronic translator for translating the digitized signing motions into

18

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

words and phrases, and an electronic output for the words and phrases."); *id.*, FIG.

3 (disclosing a cellular telephone with a camera embodiment).)



(*Id.*, FIG. 6 (disclosing a cellular telephone that includes a camera for sensing hand

sign gestures).)  Gesture-controlled laptops were also becoming more popular.  (Ex.

PA-19, Fig. 74; Ex. PA-8, FIG. 9 (disclosing a portable laptop computer with two

cameras that could be controlled with predetermined unnatural eye movements).)

19

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924



(Ex. PA-19, FIG. 74.)  Persons of ordinary skill in the art understood that small device gesture recognition and control was researched and developed before the time of the alleged invention.

30.    More generally, portable devices were becoming more and more powerful to meet consumer demands and support growing technologies.  For instance, "smart phone[s]" were becoming more popular, with some of such smart phones including complex Intel "Pentium" processing units.  (Ex. PA-3, 5:18-29, FIG. 3.)  Such smart phones could run a Windows operating system and could

20

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

perform a variety of complex processes, such as processing voice commands, electronic documents, display information, etc.  (*Id.*, 5:42-63, FIG. 3.)  Indeed, portable smart phones were "capable of running a variety of application software packages," such as text and/or image editors, web browsers, calculators, and others at the time of the alleged invention.  (Ex. PA-4, 1:12-24, 8:2-6.)

31.    "By utilizing computer technology," smart devices enabled "access to computing functions and resources in a personal, portable device." (Ex. PA-3, 1:24-27.)  It was known to "integrat[e] . . . personal computer technology into phones," *id.*, 1:22-24, and computer "chip[s]" were being used to support gesture recognition and other mobile applications, Ex. PA-2, 7:1-7 ("The main system 35 computer should be of sufficient power to perform the remaining steps of the process. In general, any Intel Pentium or compatible chip of 150 MHz speed will be sufficient, although a faster speed will provide improved results. In addition, other non-Intel processors, such as those that are used in Windows CE Systems, will suffice if they are of a similar performance.").  Persons of ordinary skill understood that discrete computer chips, such as "Intel Pentium" or "non-Intel," processors were ready for implementation in a variety of devices.  (*Id.*)  Indeed, the "Windows CE" (Windows Embedded Compact) and processor platform was designed for such portable purposes.  (*Id.*, 7:1-7; Ex. PA-6, 1 ("Windows CE was designed and built from the ground up as an embedded platform to empower the development of a new range of

21

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

emerging computing appliances, including highly portable and personal computing

devices.").)

## VI.   THE '924 PATENT

32.   The '924 patent generally relates to "simple input devices" for

"optical[] sensing." (Ex. PAT-A, 2:7-11).  The devices operate by "optically sensing

a human input to a display screen or other object and/or the sensing of human

positions or orientations." (*Id.*, 2:8-11.)  The optical sensing devices may use "single

or multiple TV cameras whose output is analyzed and used as input to a computer,

such as a home PC, to typically provide data concerning the location of parts of, or

objects held by, a person or persons." (*Id.*, 2:20-23.)  Alternatively, "suitable electro-

optical sensors" may be used in place of the TV cameras.  (*Id.*, 3:21-22.)

33.   The embodiment disclosed in the context of Figure 18 (reproduced

below) "illustrates an improved handheld computer embodiment of the invention, in

which the camera or cameras may be used to look at objects, screens and the like as

well as look at the user." (*Id.*, 3:11-14.)

22

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924



Fig. 18

(*Id.*, FIG. 18.)   As shown in Figure 18, the handheld computer incorporates "a camera 1902 which can optionally be rotated about axis 1905 so as to look at the user or a portion thereof such as finger 1906, or at objects at which it is pointed." (*Id.*, 25:40-43.)   The camera arrangement can optionally incorporate "a stereo pair of cameras to further include camera 1910," and both cameras can rotate.   (*Id.*, 25:43-45.)   "Alternatively fixed cameras can be used when physical rotation is not desired, for ruggedness, ease of use, or other reasons."   (*Id.*, 25:45-49.)   "When aimed at the user," the cameras can "view and obtain images of: [o]nes self," including facial expressions, "[o]nes fingers," "[o]ne or more objects in ones hand," or "[o]nes gestures."   (*Id.*, 25:50-63.)

34.   "The camera 1902 (and 1910 if used, and if desired), can also be optionally rotated and used to view points in space ahead of the device." (*Id.*, 25:64-

23

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

66.) When rotated, "[t]he camera can also be used to see gestures of others, as well as the user, and to acquire raw video images of objects in its field." (*Id.*, 26:25-27.) Additionally, the stereo cameras can be positioned in this way "to observe or point at (using optional laser pointer 1930) Points such as 1935 on a wall or a mounted LCD or projection display such as 1940 on a wall or elsewhere such as on the back of an airline seat." (*Id.*, 25:64-26:5.) "The camera unit 1902 can sense the location of the display in space relative to the handheld computer, using for example the four points 1955-1958 on the corners of the display as references. This allows the handheld device to become an accurate pointer for objects displayed on the screen including control icons." (*Id.*, 26:16-21.) It also "allows the objects on the screen to be sensed directly by the camera," such that sensing can occur even "if one does not have the capability to spatially synchronize and coordinate the display driver with the handheld computer." (*Id.*, 26:21-24.) In one instance, the '924 patent discloses that a computer may be a processing unit such as a "400 MHz Pentium II" processor. (*Id.*, 3:32-34.) In another instance, a computer may be a device "such as a home PC" that is capable of "providing data concerning the location of parts of, or objects held by, a person or persons." (*Id.*, 2:20-23.)

35.    As explained below, all of the recited features in the challenged claims were well-known in the art.

**VII.  CLAIM CONSTRUCTION**

24

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

36.    I have been informed that claim terms are given their ordinary and customary meanings during this reexamination proceeding.  I understand that this meaning refers to how a person of ordinary skill in the art would have understood a term at the time of the alleged invention, which I have been asked to assume is around July 8, 1999.  In considering the meaning of the claims, I understand that one must consider the language of the claims, the specification, and the prosecution history of record.

37.    I have been informed that during patent examination, the pending claims must be given their broadest reasonable interpretation consistent with the specification.  I understand that the broadest reasonable interpretation standard differs from the ordinary and customary meaning standard applicable here.

38.    I understand that a district court in Texas issued a claim construction order that considered and construed claim terms of the '924 patent.  (Ex. CC-2.)  I have reviewed the district court's claim construction order and have been asked to consider whether the prior art reads on the claims of the '924 patent under the constructions advanced by the patent owner and Samsung, as well as the constructions ordered by the district court.  In addition, I have been asked to assume the constructions of the patent owner and/or the district court (as applicable) for certain terms that may be indefinite ("oriented to view a user" (claim 1); "oriented to view an object other than the user" (claim 1); "wherein the gesture is performed

25

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

by a person other than the user of the handheld device" (claim 9)).  (*See* Ex. CC-2,

44-50.)  Under each of these constructions, my opinion is that the prior art, as

discussed below, reads on the claims of the '924 patent.  However, given how closely

the prior art maps to the claims, the claims would be unpatentable under any

reasonable construction of the terms.  More details regarding what was considered

for specific claim terms follows.

**A.    "oriented to view" of claim 1**

39.    I have been asked to assume that the claimed "oriented to view"

limitation of the '924 patent may mean "having a field of view encompassing."

Accordingly, I have considered how the prior art reads on the claims under this

interpretation.  Further, the patent owner did not express that the "oriented to view"

limitation requires construction.  (Ex. CC-2, 41-44.)  Thus, I have also considered

how the prior art addresses this limitation under patent owner's interpretation, which

also reflects the plain meaning interpretation given by the district court's

construction order.

**B.    "a computer within the housing . . . wherein the computer is
adapted to perform a control function of the handheld device
based on at least one of the first camera output and the second
camera output" of claims 1, 6-8, 10, 12, and 14**

40.    I understand that a "computer" is claimed to perform various functions,

such as to: "perform a control function of the handheld device based on at least one

26

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

of the first camera output and the second camera output" (Claim 1). The dependent

claims add to the function, including: "determine a gesture based on at least one of

the first camera output and the second camera output" (Claim 6); "determine a facial

expression based on at least one of the first camera output and the second camera

output" (Claim 7); "determine at least one of the position and the orientation of the

object based on the second camera output" (Claim 8); "recognize the object based

on the second camera output" (Claim 10); "determine a reference frame of the

object" (Claim 12); and "transmit information over an internet connection" (Claim

14). I have considered how the prior art addresses these limitations under the above

interpretations.

41.    The patent owner has argued in district court that the "computer"

limitations do not require construction. (Ex. CC-2, 51-54.) I have not been asked

to determine whether I agree with patent owner's apparent constructions and

therefore take no position on whether they accurately reflect the claim scope.

Nonetheless, I have also considered how the prior art addresses these limitations

under patent owner's interpretation, which also reflects the plain meaning

interpretation given by the district court's construction order.

### C.    "gesture" of claims 6 and 9

42.    I have been asked to assume that the claimed "gesture" limitation of the

'924 patent may mean "a sequence of positions that conveys a meaning" (as argued

27

by Samsung) or "movement of hands or other body parts that conveys meaning" (as ordered by the district court).  Accordingly, I have considered these constructions, in addition to plain meaning as advanced by the patent owner, in my analysis below.

### D. "adapted to" of claims 1, 3-5, 8-9, 12, and 14

43.     I have been asked to assume that the claimed computer that is "adapted to" operate may be construed to mean a computer that is "programmed to" operate as claimed.  Similarly, I have been asked to assume that the claimed first and second cameras that are "adapted to" operate as claimed may be construed to mean that the first and second cameras, respectively, are "designed to" operate as claimed.  Accordingly, I have considered how the prior art reads on the claims under these interpretations.  Further, the patent owner did not express that the "adapted to" limitations require construction.  (Ex. CC-2, 57-60.)  Thus, I have also considered how the prior art addresses these limitations under patent owner's interpretation, which also reflects the plain meaning interpretations given by the district court's construction order.

## VIII. OVERVIEW OF THE PRIOR ART

### A. Overview of *Liebermann*

44.     Like the '924 patent, *Liebermann* discloses a handheld device that uses one or more cameras to sense hand gestures.  (Ex. PA-1, 13:5-16; FIGs. 1 and 6.) Specifically, *Liebermann* discloses a cellular telephone device and a corresponding

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

housing.  (*Id.*, FIG. 6.)  The cellular telephone may include multiple cameras, with the first camera being oriented to view the "hands and fingers and body and facial motions and expression" of a user.  (*Id.*, 5:62-6:10; 13:5-16.)  A second camera may be positioned at a different angle so as to view a different object.  (*Id.*, 13:5-16.)  The cellular telephone performs various imaging functions, displays data, etc.  (*Id.*, 5:62-6:10, 6:40-52, FIG. 8.)  Moreover, the cellular telephone controls the hardware of the device to perform various functions based on camera data.  (*Id.*, 5:63-6:10, 6:40-52, FIG. 8.)

45.    Thus, *Liebermann* is in the same or similar technical field as the '924 patent, and a person of ordinary skill in the art would have had reason to consider the teachings of *Liebermann*.  (*Id.*, 2:7-21 ("The invention relates to simple input devices for computers . . . . The invention uses single or multiple TV cameras whose output is analyzed and used as input to a computer.").)  Under the scenario *Liebermann* is not within the field of endeavor of the '924 patent (it is), *Liebermann* is reasonably pertinent to problems associated with detecting gestures and/or inputting information to a portable device, problems with which the inventor was involved.  (*Id.*, FIG. 1, 5:62-6:52; Ex. PAT-A, 2:5-35.)

**B.    Overview of *Tryding***

46.    *Tryding* relates to user interfaces for mobile telephones and, more particularly, using a portable computer to control a display.  (Ex. PA-7, 1:8-11 "The

29

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

present invention relates to user interfaces for mobile telephones, and more particularly, to the display of data associated with the mobile telephone display on an external electronic display.").) Thus, *Tryding* is in the same or similar technical field as *Liebermann* and the '924 patent, and a person of ordinary skill in the art would have had reason to consider the teachings of *Tryding* when implementing the *Liebermann* system. Under the scenario *Tryding* is not within the field of endeavor of the '924 patent (it is), *Tryding* is reasonably pertinent to problems associated with displaying data when portable devices were becoming smaller and smaller, a problem with which the inventor was involved. (*Id.*, 1:28-33 (discussing a problem with producing "smaller and smaller hand-held units" is displaying the data); Ex. PAT-A, 26:4-15 (discussing problems of displaying data in light of "the computers smaller trend").)

### C.   Overview of *Gershman*

47.   *Gershman* relates to mobile telephones and display systems and, more particularly, using a mobile phone to connect to the internet. (Ex. PA-5, 1:35-40 "The present invention relates to agent based systems and more particularly to a mobile computing environment that accesses the Internet . . . ."); *id.*, Abstract ("A system is disclosed that facilitates web-based information retrieval and display system. A wireless phone or similar hand-held wireless device with Internet Protocol capability is combined with other peripherals to provide a portable portal into the

30

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

Internet.").) Thus, *Gershman* is in the same or similar technical field as *Liebermann* and the '924 patent, and a person of ordinary skill in the art would have had reason to consider the teachings of *Gershman* when implementing the *Liebermann* system. Under the scenario *Gershman* is not within the field of endeavor of the '924 patent (it is), *Gershman* is reasonably pertinent to problems associated with increasing mobile computing applications and/or communicating targeted information. (*Id.*, 2:50-3:11; Ex. PAT-A, 23:38-42 ("The invention provides . . . all of the benefits of the video and computer revolution, also via the internet.").)

### D.    Overview of *Himmel*

48.    *Himmel* relates to processing data on mobile telephones. (Ex. PA-3, 1:15-16 ("The present invention relates generally to an improved data processing system . . . ."); *id.*, 5:19-21 (In "FIG. 3, a block diagram of a wireless phone computing platform is depicted in accordance with a preferred embodiment of the present invention.").) Thus, *Himmel* is in the same or similar technical field as *Liebermann* and the '924 patent, and a person of ordinary skill in the art would have had reason to consider the teachings of *Himmel* when implementing the *Liebermann* system. (Ex. PAT-A, 11:64-12:3 ("FIG. 8A illustrates control of functions with the invention, using a handheld device which itself has functions (for example, a cell phone). The purpose is to add functionality to the device, without complicating its base function, and/or alternatively add a method to interact with the device to

31

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

achieve other purposes.").)  Under the scenario *Himmel* is not within the field of endeavor of the '924 patent (it is), *Himmel* is reasonably pertinent to problems associated with mobile computing and its applications.  (Ex. PA-3, 1:15-16 ("The present invention relates generally to an improved data processing system."); *id.*, 5:19-21 (disclosing "a wireless phone computing platform"); Ex. PAT-A, 23:38-42 ("The invention provides . . . all of the benefits of the video and computer revolution.").)

### E.    Overview of *Sears*

49.    *Sears* discloses reading machines that are controlled with natural "hand gestures."  (Ex. PA-2, Abstract.)  Similar to *Liebermann*, *Sears* teaches "portable," gesture-controlled machines with multiple cameras.  (*Id.*, Abstract (emphasis added) ("An optical-input print reading device with voice output for people with impaired or no vision in which the user provides input to the system from hand gestures. . . . [A] computer . . . tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning. . . . **Multiple cameras** of the same or different field of view can improve performance. In addition, alternative device configurations allow **portable** operation, including the use of cameras located on worn platforms, such as eyeglasses, or on a fingertip system.").)  For example, Figures 3 and 4 of *Sears* detail embodiments of various portable reading machines.  (*Id.*, 20:67-21:16 (discussing a "portable" version of the reading

32

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

machine depicted in Figure 3); *id.*, (describing an example of a worn reading

machine depicted in Figure 4); *id.*, FIGs. 1, 3-4.)



(*Id.*, FIG. 3.)



(*Id.*, FIG. 4.)

APPX0375

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

50.    *Sears* teaches using gestures to control cameras, turn a device off, and

otherwise control the portable reading device.  In one instance, a fist gesture triggers

a control function that instructs the device to power down.  (*Id.*, 10:29-30 (emphasis

added) ("A closed fist could be used to direct the electronic reader to **shut itself**

**off**.").)  In another instance, a gesture triggers a control function that instructs the

device to stop operating.  (*Id.*, 11:7-9 (emphasis added) ("The particular linkage of

a gesture with a command may be cognitively linked—e.g. a flat hand, like **a "stop"**

**motion, may be used to stop reading.**").)  In another instance, a gesture triggers

the device to snap an image/picture to assist those who may have a disability.  (*Id.*,

15:47-56 (emphasis added) ("In addition, or alternatively, the text and images

captured by the system of the present invention can be used to input the text and

images for storage and use on the main system 35 computer. This might be used, for

instance, as a **low-resolution scanner and text input mechanism for general**

**application by users who may or may not have a disability**. For example, home

or business users can **make manual gestures to copy portions of letters, bills, and**

**advertisements into computer storage files**.").)  Indeed, *Sears* discloses that

"many different gestures may be linked with different commands within the spirit of

the present invention" to control the device itself.  (*Id.*, 11:10-12.)

51.    More generally, *Sears* discloses various gesture detecting devices and

is in the same or similar technical field as the '924 patent.  (*Id.*, Abstract, FIGs. 1, 3-

34

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

4; Ex. PAT-A, 2:7-21 ("The invention relates to simple input devices for computers
. . . . The invention uses single or multiple TV cameras whose output is analyzed and
used as input to a computer.").)   Under the scenario *Sears* is not in the field of
endeavor of '924 patent (it is), *Sears* is reasonably pertinent to problems associated
with controlling devices according to user gestures, problems with which the
inventor was involved.  (Ex. PA-2, FIGs. 3 and 4; Ex. PAT-A, 11:9-11.)

### F.    Overview of *Kimball*

52.    *Kimball* relates to mobile telephones, and more particularly to using a
mobile phone to connect to the internet.  (Ex. PA-11, 1:6-9 "The present invention
pertains to the field of telephones. More particularly, this invention relates to a
cellular telephone that includes functionality for performing both cellular telephone
calls and Internet telephone calls.").)   Thus, *Kimball* is in the same or similar
technical field as *Liebermann* and the '924 patent, and a person of ordinary skill in
the art would have had reason to consider the teachings of *Kimball* when
implementing the *Liebermann* system.  Under the scenario *Kimball* is not within the
field of endeavor of the '924 patent (it is), *Kimball* is reasonably pertinent to
problems associated with communicating information over the internet.  (*Id.*, 1:33-
53; Ex. PAT-A, 23:38-42 ("The invention provides . . . all of the benefits of the video
and computer revolution, also via the internet.").)

35

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

## IX. THE PRIOR ART DISCLOSES OR SUGGESTS ALL RECITED FEATURES OF CLAIMS 1-14 OF THE '924 PATENT

53.     The "SNQ" sections below refer to substantial new questions of patentability. As explained in these sections, the prior art discloses or suggests each feature of claims 1-14 of the '924 patent.

### A.     SNQ1: *Liebermann*

54.     As I explain below, *Liebermann* discloses or suggests the limitations of claims 1-5 and 13 of the '924 patent.

#### 1.     Claim 1

##### a.     [1.a] A handheld device comprising:

55.     I have been asked to assume the preamble of claim 1 is limiting. Under that assumption, it is my opinion that *Liebermann* discloses this limitation.

56.     For example, *Liebermann* discloses a "cellular telephone." (Ex. PA-1, 4:20-21 ("FIG. 6 is a perspective view of the present invention in the form of a cellular telephone."); *see also* Ex. PAT-A, 11:65-67 (describing a "cell phone" as a handheld device).)

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924



*FIG. 6*

(Ex. PA-1, FIG. 6 (annotated).)  As can be seen in Figure 6, the cellular telephone

of *Liebermann* is in a handheld form factor, and indeed *Liebermann* describes the

cellular telephone as being a "portable" device.   (*Id.*, 5:62-65 ("A portable

transmitter/receiver generally designated by the numeral 8 for use by a deaf person

is shown in FIG. 6 and it contains a video camera, the lens 10 of which is disposed

in the upright portion 12.").)

### b.    [1.b] a housing;

57.    In my opinion, *Liebermann* discloses this limitation.

58.    For example, the external surfaces of the cellular telephone depicted in

Figure 6 comprise "a housing" for the internal circuitry of the cellular telephone.

37

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

(*Id.*, FIG. 6.)  *Liebermann* describes the housing of the cellular telephone as

including an "upright portion 12" and a "base portion 13." (*Id.*, 5:62-67.) Moreover,

cellular telephones were well understood to include housings before the time of the

alleged invention.  Such housings ensured the portability of the cellular phone,

protected circuitry from the environment, etc.

### c.    [1.c] a computer within the housing;

59.    In my opinion, *Liebermann* discloses this limitation.

60.    In particular, *Liebermann* discloses that the cellular telephone includes

hardware that works with one or more cameras or sensors to view and obtain images

of hand signs (i.e., one's gestures), performs related "initial processing," and

populates a phone display, among other things:

> ***A portable transmitter/receiver generally designated by the
> numeral 8 for use by a deaf person is shown in FIG. 6 and it contains
> a video camera, the lens 10 of which is disposed in the upright portion
> 12.*** In the base portion 13 are an LCD display panel 14 and a key pad
> 16 for dialing and other functions. Also seen is an antenna 18 for the
> device so that it may be transported and communicate as a wireless
> remote or through a cellular telephone network. ***The device is
> supported in a stable position and the deaf person is positioned so that
> the camera lens 10 will record the signing movement of the hands and
> fingers and body and facial motions and expressions.*** The signing
> motions captured by the camera are converted into digital data for
> processing by the translation software, (i.e., artificial intelligence) to
> produce data representing numbers, words and phrases which are then
> combined into coherent sentences.
> . . . .
> The overall operation of a preferred electronic communications
> system is set forth hereinafter.

38

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

> The deaf person uses sign language in front of the transmitter/receiver device containing the camera. ***The images captured by the camera are of the finger and hand motions and of body motions and of facial expressions and motions captured by a digital device which does initial processing. In the initial processing, each of the frames containing a captured image undergoes a process whereby the image is collapsed into a small set of fixed identifiers.*** At the end of the initial processing, the resulting information is sent as data on a regular and designated phone line using an internal modem in the device to the data processing center.

(*Id.*, 5:62-6:10, 6:40-52 (emphasis added), FIG. 8.) Specifically, the cellular telephone performs functions that a person of ordinary skill in the art would have understood were performed by a computer, such as to control cameras, drive a display, transmit information, receive information, process data, etc. (*Id.*, 5:62-6:47, FIGs 1, 8.) A person having ordinary skill would have appreciated that computers come in various shapes and sizes. The computer term generically describes various processing hardware configurations. A person of ordinary skill would have appreciated that the cellular telephone described by *Liebermann* includes computer hardware that allows it to perform described functions for driving a display, processing inputs, etc.

61. To enable a sign-language friendly device, *Liebermann* discloses that the computer hardware performs the "initial processing" in which "each of the frames containing a captured image undergoes a process whereby the image is collapsed into a small set of fixed identifiers. At the end of the initial processing,

39

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

the resulting information is sent as data." (*Id.*, 6:40-52.)  A person of ordinary skill

in the art would have appreciated that the computer hardware can also control the

screens of the cellular telephone to display "text of what was signed," etc., as

computing hardware is necessary to perform such a function.  (*Id.*, FIG. 8.)  A person

of ordinary skill would have appreciated that the computer of the cell phone allows

it to perform the described complex functions.  Again, computers come in various

shapes and sizes.  A person of ordinary skill in the art would have understood that a

computer of the cellular telephone performs various functions to process data,

display information, etc.



*FIG. 8*

40

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

(*Id.*, FIG. 8.)   Furthermore, a person of ordinary skill in the art would have understood that the computing hardware of the phone is within the cellular telephone and thus within the cell phone housing because the cellular telephone (rather than a remote computer) performs initial processing, controls a display, etc.  (*Id.*, 5:62-6:10, 6:40-52, FIG. 8.)   As discussed above, cellular telephones, such as the one descried by *Liebermann*, package hardware of the device in a housing.

> **d.    [1.d] a first camera oriented to view a user of the handheld device and having a first camera output; and**

62.    In my opinion, *Liebermann* discloses this limitation.

63.    *Liebermann* discloses that the cellular telephone includes a video camera ("first camera") that outputs image data ("having a first camera output"). (*Id.*, 5:62-6:10 (emphasis added) ("A portable transmitter/receiver generally designated by the numeral 8 . . . is shown in FIG. 6 and it contains a video **camera**, the lens 10 of which is disposed in the upright portion 12. . . . **The signing motions captured by the camera are converted into digital data for processing** by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences.").)

41

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924



*FIG. 6*

(*Id.*, FIG. 6.)

64.    The video camera is "oriented to view a user of the handheld device,"
as claimed, to detect sign language gestures.  Specifically, "camera lens 10" of the
video camera views a user and "will record the signing movement of the hands and
fingers and body and facial motions and expressions," where "**[a] deaf person uses
sign language in front of the transmitter/receiver device containing the camera**"
and "[t]he **images captured by the camera are of the finger and hand motions
and of body motions and of facial expressions** and motions captured by a digital
device which does initial processing." (*Id.*, 6:4-47 (emphasis added).)  The cellular
telephone camera, which views the face, hands, and body of a person using the
cellular telephone (to process hand gestures) and thus has a field of view

42

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

encompassing the person using the cellular telephone, is "oriented to view a user of the handheld device." To be sure, the '924 patent refers to a finger as a "portion" of a user. (Ex. PAT-A, 25:40-43.) However, the '924 patent does not require a camera that is "oriented to view a user" to necessarily view a person from head to toe. (*See generally* Ex. PAT-A; *see also* Ex. PAT-A, claim 3 (emphasis added) ("The handheld device of claim 1 wherein the first camera is adapted to acquire an image of at least a ***portion*** of the user").) Therefore, a person of ordinary skill in the art would have understood the *Liebermann* camera, which views the face, hands, and body of a person using a device, is "oriented to view a user of the handheld device." (Ex. PA-1, 6:4-47.)

65.    For similar reasons, it is my opinion that *Liebermann* discloses that the first camera is "oriented to view" a user under the construction discussed above in Section VII.A. For example, the first camera records the "movement of the hands and fingers and body and facial motions and expressions. . . . [A] deaf person uses sign language in front of the transmitter/receiver device containing the camera. The images captured by the camera are of the finger and hand motions and of body motions and of facial expressions and motions captured by a digital device which does initial processing." (*Id.*, 6:4-47.) For similar reasons, it is my opinion that *Liebermann* discloses these features under the plain meanings proposed by patent

43

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

owner and found by the district court's claim construction order.  (*See above at*

Section VII; Ex. CC-2.)

> e.     **[1.e] a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view, and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.**

66.    In my opinion, *Liebermann* discloses or suggests this limitation.

67.    As discussed above in Section IX.A.1.d, *Liebermann* discloses a "first

camera" as claimed.  (Section IX.A.1.d.)  *Liebermann* further discloses that "[i]t may

be **desirable to utilize more than one camera** to allow the signing person 'free'

movement in his or her environment to track down spatial positions in that

environment."  (Ex. PA-1, 13:4-8 (emphasis added).)  As such, a person of ordinary

skill in the art would have been motivated to include a second camera in a cellular

telephone similar to as disclosed in *Liebermann*'s Figure 6 embodiment.

68.    For instance, *Liebermann* explains that when utilizing more than one

camera, "the installation [of multiple cameras] should follow the following criteria,"

including, among other things, that (1) each camera is covering a separate angle, (2)

each camera operates independently of the other(s), (3) angle overlap may or may

44

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

not be permitted according to the pre-signing calibration, (4) integration of input

from multiple camera is performed:

> ***The illustrated embodiments all utilize a single video cameras. It
> may be desirable to utilize more than one camera*** to allow the signing
> person "free" movement in his or her environment to track down spatial
> positions in that environment.
>
> In such a case, the ***installation should follow the following criteria:***
>
> 1. ***Each camera is covering a separate angle.***
>
> 2. ***Each camera operates independently of the other(s).***
>
> 3. ***Angle overlap may or may not be permitted according to the
>    pre-signing calibration.***
>
> 4. ***Integration of input from multiple camera is performed***
>
> 5. A defined figure with signing motions (where applicable) is
>    rendered in conformity with allowable images (for persons). The
>    same technique is useful in defining any objects or, alive,
>    stationary or moving entities, such as animals.
>
> 6. Movements without signing are classified as null figures
>    (coordinates are preserved).
>
> 7. The animated form of the signing figure can be shown in an
>    "abbreviated" form when the person is not signing. That is, a
>    figure not well defined with specific locations of fingers, etc.
>    Such animated figures an occur for all null figures.

(*Id.*, 13:4-28 (emphasis added).)  Accordingly, a person of ordinary skill in the art

would have understood that a configuration with two cameras would have provided

a larger field of view or multiple fields of view, with the output of the cameras

integrated, for capturing the signing person's hands, finger, body movements as well

45

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

as facial expressions.  Indeed, *Liebermann* expressly discloses that having multiple cameras is beneficial as it would have "allow[ed] the signing person 'free' movement in his or her environment to track down spatial positions in that environment." (*Id.*, 13:5-6.)

69.    In my opinion, a person of ordinary skill in the art would have had a reasonable expectation of success in such an implementation because *Liebermann* itself expressly states that two-camera embodiments were "desirable," *id.*, 13:4-8, and provides applicable criteria for such "installation[s]," *id.*, 13:9-28 ("the installation should follow the following criteria").    Similar multi-camera arrangements were explicitly recognized in the art, as such a skilled person would have appreciated.  For example, *Sears*[1] teaches a multiple-camera reading device, wherein the cameras sense gestures to control the device.  (Ex. PA-2, Abstract, 20:65-21:16; *id.*, 22:5-8 ("[I]n these embodiments, the camera received commands, at least in part, from hand and finger gestures of the user that were captured by the camera or cameras.").)    In another example, *Bushnag*[2] teaches a dual camera, gesture-controlled laptop device.  (Ex. PA-8, FIG. 9; *id.,* 22 (disclosing a laptop computer 70 that includes digital cameras 12 and 14); *id.*, 17 (disclosing that specific

---

[1] *Sears* (Ex. PA-2) is cited as evidence supporting the knowledge of a person of ordinary skill in the art before the time of the alleged invention.

[2] *Bushnag* (Ex. PA-8) is cited as evidence supporting the knowledge of a person of ordinary skill in the art before the time of the alleged invention.

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

functions of the system are triggered when the cameras detect specific, unnatural eye gestures); *id.*, 13 ("Figure 9 illustrates an embodiment of the eye-controlled command system used in conjunction with a conventional portable computer.").)

70.    Moreover, such a modification would have involved applying known technologies (e.g., known gesture detection technology and known criteria of installing multiple cameras in a device like those described in *Liebermann*) according to known methods (e.g., known multi-camera gesture detection techniques like those also described in *Liebermann*) to yield the predictable result of a cellular phone implemented with multiple cameras for use in an electronic communication system.    Accordingly, *Liebermann* discloses or suggests a handheld device comprising "a first camera . . .; and **a second camera**."

71.    Furthermore, *Liebermann* discloses or suggests that the "second camera" is "oriented to view an object other than the user of the device."    For example, in the configuration of *Liebermann* discussed above where multiple cameras (including the "second camera") are used, the multiple cameras are positioned at different angles and may be used to define "any objects" or "alive, stationary or moving entities, such as animals" as well as to interpret the signing motions of multiple "person(s)."  (Ex. PA-1, 13:4-16; *see also* Ex. PAT-A, 3:53-54 (describing that "objects" include "persons").)  Thus, the additional cameras are oriented to view "an object other than the user of the device," as claimed.  Moreover,

47

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

*Liebermann* also discloses that a camera may recognize special gloves ("an object

other than the user of the device") and gestures depicted by the glove:

> Turning now to FIGS. 13 and 14, therein illustrated is the benefit in ***using special gloves to enhance the ability of the system to recognize important detail of the hand shapes during the actual gesturing of sign language.*** Many times the hands are overlapping or touching each other. Video separation of left from right is accomplished by color separation using different saturated colors for each hand. For example, the fingers of the right hand can be distinctly green and the fingers of the left hand are distinctly blue. In addition, each glove has a third color (typically red) for left and right palm areas. This allows hand shape and finger details to be seen whenever the hand is closed vs. opened and when palm is disposed toward the camera vs. palm away.

(Ex. PA-1, 12:40-52 (emphasis added); *see also id.*, 13:4-16.)  For this additional

reason, *Liebermann* discloses or suggests that "a second camera oriented to view an

object other than the user of the device."  For similar reasons, it is my opinion that

*Liebermann* discloses or suggests that the second camera is "oriented to view" an

object other than the user of the device under the construction discussed above.  (*See*

*above at* Section VII.A.)  In particular, because *Liebermann*'s "second camera"

defines or recognizes various objects or persons (either of which being "an object

other than the user of the device") as well as their signing motions (*see*, *e.g.*, Ex. PA-

1, 12:40-43, 13:4-16), *Liebermann*'s "second camera" has to have "a field of view

encompassing" these "object[s]."  Accordingly, it is my opinion that *Liebermann*

discloses or suggests this limitation under Samsung's proposed constructions, and

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

the plain meaning proposed by patent owner and found by the district court. (*See above* at Section VII; Ex. CC-2.)

72.    The "second camera" disclosed by *Liebermann* includes "a second camera output" as claimed.  For example, *Liebermann* discloses that an input is provided from its second camera, which as a person of ordinary skill in the art would have understood, corresponds to the claimed "second camera output." (*Id.*, 13:4-16 ("Integration of input from multiple camera is performed.").)  *Liebermann* also discloses that "the first and second cameras include non-overlapping fields of view." For example, *Liebermann* discloses that each of the multiple cameras (including the first camera) "**cover[s] a separate angle**," *id.*, 13:11, and the cameras may not have angle overlap, *id.*, 13:13-14 ("Angle overlap may or may not be permitted according to the pre-signing calibration.").  That is, the two cameras may have: (1) some overlap in FOV, but also include non-overlapping FOVs; or (2) no overlap in their FOVs.  (*Id.*, 13:4-14.)  Accordingly, *Liebermann* discloses "a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view."

73.    *Liebermann* also discloses that "the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output."  With respect to this claimed feature, the '924

49

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

patent discloses that a control function of a handheld device includes controlling the

device "itself" to perform a function, e.g., a base function of the device or a method

to interact with the device to achieve other purposes. (Ex. PAT-A, 11:65-12:3

(emphasis added) ("FIG. 8A illustrates control of functions with the invention, using

**a handheld device which *itself* has functions** (for example, a cell phone). The

purpose is to add functionality to the device, without complicating its **base function**,

and/or alternatively **add a method to interact with the device to achieve other**

**purposes**.").)

74.    *Liebermann* discloses that the phone performs initial processing based

on the camera images and also discloses that the phone screen is controlled to display

the "text of what was signed":

> ***Turning next to FIG. 8, therein illustrated is a layout for the visual
> display*** to present multiple information to the deaf person such as
> ***touchless function buttons, system status indicators, alarms, a printed
> translation, and a playback of the image being recorded, as well as
> the signing images and text of the hearing person's responses.***

> FIGS. 9-12 are schematics of the system software modules for
> converting signing to speech and speech to animation, including system
> training methods.

> The overall operation of a preferred electronic communications
> system is set forth hereinafter.

> ***The deaf person uses sign language in front of the
> transmitter/receiver device containing the camera. The images
> captured by the camera are of the finger and hand motions and of
> body motions and of facial expressions and motions captured by a
> digital device which does initial processing.*** In the initial processing,

50

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

> each of the frames containing a captured image undergoes a process
> whereby the image is collapsed into a small set of fixed identifiers. At
> the end of the initial processing, the resulting information is sent as data
> on a regular and designated phone line using an internal modem in the
> device to the data processing center.

(Ex. PA-1, 6:30-52 (emphasis added); *id.*, FIG. 8 (showing at the bottom of the figure

that the phone displays "text of what was signed").)



*FIG. 8*

(*Id.*, FIG. 8.)  *Liebermann* discloses a computer for the reasons explained for

limitation [1.c] above.

75.    A person of ordinary skill in the art would have understood that

*Liebermann*'s in-phone computer (which drives the display, performs initial

processing of camera images, etc., *see above at* Section IX.A.1.c) is adapted to

51

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

**control the text that is displayed** based on **what was signed**. (Ex. PA-1, 6:30-52,

FIG. 8.) Consistent with the '924 patent (Ex. PAT-A, 11:65-13:26 (disclosing that

the "function" controlled may be a "base function" of the device)), displaying text

is a base function of the cellular telephone in *Liebermann*. Because **what text to**

**display** is controlled based on the output of the at least one of *Liebermann*'s cameras

associated with the signs/gestures, Ex. PA-1, FIG. 8, 6:30-52, *Liebermann* discloses

"the computer is adapted to perform a control function of the handheld device based

on at least one of the first camera output and the second camera output." A person

having ordinary skill in the art would have readily appreciated that the computer

hardware of the cellular telephone can only display what was signed correctly based

on the camera outputs. The computer performs a control function to control the

display based on signed information. Under the scenario performing a control

function of the handheld device "based on at least one of the first camera output and

the second camera output" requires performing a display function based on one

image as opposed to two or more images (note the claim does not make such a

specific distinction and only requires the system to perform a control function based

on at least one camera output), *Liebermann* explains that a single sign (and

corresponding word in the text that is displayed) may correlate with a single image

frame. (*See id.*, 6:30-57, 7:19-21, FIG. 8.) For instance, "[t]he camera in the cellular

phone transmits the image for initial processing in the cellular phone." (*Id.*, 7:19-

52

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

21.)   This image is transmitted as data to the center wherein "[t]he rest of the

processing is completed at the center. This includes identification of the letters,

numbers and words, conversion to standard sign language." (*Id.*, 6:40-57.)  That is,

a person of ordinary skill in the art would have understood that an image may be

translated to a letter, number or word in accordance with sign language, *id.*, and

accordingly displayed on the cellular telephone as claimed, *id.*, FIG. 8.

76.    *Liebermann*'s telephone computer also allows a user to interact with

the device to achieve the purpose of sign language calling communication ("the

computer is adapted to perform a control function of the handheld device") based on

the camera outputs associated with the signs/gestures.  (Ex. PA-1, FIG. 8, 5:62-6:14,

6:53-59.)  *Liebermann* for this additional reason discloses that "the computer is

adapted to perform a control function of the handheld device based on at least one

of the first camera output and the second camera output," as the '924 patent discloses

that the "function" controlled may be "a method to interact with the device to achieve

other purposes."  (Ex. PAT-A, 11:65-12:3.)

77.    *Liebermann* discloses that the claimed "computer is adapted to"

perform identified functions under the construction discussed above, i.e., software

running on a computer that is programmed to perform the claimed function or

equivalents thereof.  (*See above at* Sections VII.B, D.)  For example, *Liebermann*

discloses that the applicable cellular telephone hardware—which a person of

53

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

ordinary skill in the art would have understood as a computer—runs "software" and performs the initial processing required to control what text to display based on the camera output associated with the signs/gestures. (Ex. PA-1, 6:40-52, 7:10-49.) Indeed, *Liebermann* explains that the disclosed device includes "processing hardware and software" required to operate the cellular telephone. (*Id.*, 13:40-66.) Before the time of the alleged invention, it was understood that computers (including the *Liebermann* computer) were programmed with software, etc. to perform various tasks. The *Liebermann* computer hardware, which relies on software as taught by *Liebermann*, is programmed. Without such software programming, the hardware would not operate as described. Here a person of ordinary skill would have understood that programming allows the computer of the cellular telephone to perform a variety of functions. Software computer programming was ubiquitous in cellular telephones before the time of the alleged invention. Thus, as a person of ordinary skill in the art would have understood, *Liebermann*'s cellular telephone computer is programmed with software to perform the various functions, including the claimed "perform[ing] a control function of the handheld device based on at least one of the first camera output and the second camera output." Accordingly, *Liebermann* discloses the claimed "computer" that is "adapted to" perform the identified functions under the above construction. Thus, it is my opinion that *Liebermann* discloses or suggests this limitation under both Samsung's proposed

54

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

constructions, and the plain meaning proposed by patent owner and found by the

district court.  (*See above* at Section VII; Ex. CC-2.)

> ## 2.    Claim 2
>
> ### a.    The handheld device of claim 1 wherein the handheld device comprises a mobile phone.

78.    In my opinion, *Liebermann* discloses this limitation.  For example,

*Liebermann* discloses that the handheld device disclosed in the context of FIG. 6 is

a "cellular telephone" (*id.*, 4:20-21), which a person of ordinary skill in the art would

have recognized is a "handheld device comprises a mobile phone," as claimed.



(*Id.*, FIG. 6.)

55

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

### 3.    Claim 3

**a.    The handheld device of claim 1 wherein the first camera is adapted to acquire an image of at least a portion of the user.**

79.    In my opinion, *Liebermann* discloses this limitation.

80.    As discussed in claim element 1(d), *Liebermann* discloses a "first camera" is oriented to view a user of the device to detect sign language gestures. (*See above at* Section IX.A.1.d.)  Furthermore, *Liebermann* discloses that the first camera "record[s] the signing movement of the hands and fingers and body and facial motions and expressions," where "[a] deaf person uses sign language in front of the transmitter/receiver device containing the camera" and "[t]he **images captured by the camera are of the finger and hand motions and of body motions and of facial expressions** and motions captured by a digital device which does initial processing."  (Ex. PA-1, 6:4-47 (emphasis added); *see also id.*, 4:60-62 ("the deaf person uses sign language in front of a device containing a video camera.").)

81.    Moreover, it is my opinion that *Liebermann* discloses the claimed limitation under the construction above (*see above at* Section VII.D), where the first camera is "designed to" acquire an image of at least a portion of the user for similar reasons described above.  Thus, it is my opinion that *Liebermann* discloses this limitation under both Samsung's proposed constructions, and the plain meaning

56

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

proposed by patent owner and found by the district court.  (*See above* at Section IV;

Ex. CC-2.)

> ### 4.    Claim 4
>
> > a.    **The handheld device of claim 1 wherein the second camera is adapted to acquire an image of the object.**

82.    In my opinion, *Liebermann* discloses this limitation.

83.    As discussed above, *Liebermann* discloses that the multiple cameras (including the "second camera") may be used to define "any objects" or "alive, stationary or moving entities, such as animals" as well as to interpret the signing motions of multiple "person(s)."  (*See above at* Section IX.A.1.e; Ex. PA-1, 13:4-16; *see also* Ex. PAT-A, 3:53-54.)    Furthermore, *Liebermann* discloses that "[i]ntegration of input from multiple camera is performed." (Ex. PA-1, 13:4-16.)  A person of ordinary skill in the art would have understood that, in the context of *Liebermann*'s disclosure, *Liebermann*'s "second camera" is adapted to acquire an image of the object in order to perform the above-noted processes associated with the second camera (e.g., defining any objects as well as to interpret the signing motions of multiple "person(s)").  This is particularly true given that *Liebermann* performs an "initial processing" that involves processing "each of the frames

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

containing a captured image." (*Id.*, 6:47-48.) Thus, it is my opinion that *Liebermann* discloses this limitation.

84.     Moreover, it is my opinion that *Liebermann* discloses the claimed limitation under the construction discussed above in Section VII.D, where the second camera is "designed" to acquire an image of the object for similar reasons described above.  Thus, it is my opinion that *Liebermann* discloses this limitation under both Samsung's proposed constructions, and the plain meaning proposed by patent owner and found by the district court.  (*See above* at Section VII; Ex. CC-2.)

     **5.     Claim 5**

        **a.     The handheld device of claim 1 wherein the second camera is adapted to acquire a video of the object.**

85.     In my opinion, *Liebermann* discloses or suggests this limitation.

86.     *Liebermann* discloses that the first camera of the cellular telephone is a video camera.  (Ex. PA-1, 13:4-8 ("The illustrated embodiments all utilize a single video cameras").)  As discussed above, the second camera of the cellular telephone is oriented to view an object.  (*See above at* Section IX.A.1.e.)  A person of ordinary skill in the art would have understood that when *Liebermann* refers to utilizing more than one camera, as compared to embodiments that "all utilize a *single video camera*," it refers to utilizing multiple *video* cameras.  (Ex. PA-1, 13:4-8.)  For

58

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

instance, *Liebermann* discloses that the additional camera (e.g., the claimed "second camera") would "allow the signing person 'free' movement in his or her environment to track down spatial positions in that environment." (*Id.*, 13:4-8.) As such, a person of ordinary skill in the art would have understood that the second camera, like the first camera, is a video camera that can detect gestures and can increase the field of view a user could sign. (*Id.*, 13:4-8; *id.*, 5:62-65, 13:29-31 (use of multiple "three dimensional video cameras").)

87.     Thus, it is my opinion that *Liebermann* discloses this limitation.

88.     Moreover, it is my opinion that *Liebermann* discloses the claimed limitation under the construction discussed above in Section VII.D, where the second camera is "designed" to acquire a video of the object for similar reasons described above. Thus, it is my opinion that *Liebermann* discloses or suggests this limitation under both Samsung's proposed constructions, and the plain meaning proposed by patent owner and found by the district court. (*See above* at Section VII; Ex. CC-2.)

> **6.     Claim 13**
>
> > **a.     The handheld device of claim 1 wherein the computer is adapted to perform a control function based on the first camera output and based on the second camera output.**

89.     In my opinion, *Liebermann* discloses this limitation.

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

90.    As discussed above for claim 1, *Liebermann* discloses a two-camera system where each camera has a respective camera output. (*See above at* Section IX.A.1.)   The outputs of the cameras are "integrat[ed]," and gesture data is "integrated into a single observable signing" and/or "[s]igning content." (Ex. PA-1, 13:4-21, 7:49-8:26.)  As such, the system is capable of detecting gestures when the user moves across multiple cameras' fields of view (the "first camera" and the "second camera" fields of view) when making signs. (Ex. PA-1, 13:4-21 (disclosing "utilize[ing] more than one camera to allow the signing person 'free' movement in his or her environment").)   Furthermore, as discussed in Section IX.A.1.e, *Liebermann* discloses that the cellular phone computer (discussed above for limitation [1.c]) is adapted to **control what text to display** based on the **text of what was signed**.  (Ex. PA-1, 6:30-52, FIG. 8.)  As discussed, *Liebermann* discloses that the output of the two cameras is integrated and the cameras (i.e., both cameras) capture signing/gesture motions. (*See above at* Section IX.A.1.e.)  Accordingly, in my opinion, *Liebermann* discloses that the "computer is adapted to perform a control function based on the first camera output and based on the second camera output." Moreover, *Liebermann* likewise discloses that "the computer is adapted to perform" the claimed control function under the construction discussed above, i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof. (*See above at* Sections VII.B, D.)  For example, as discussed in

60

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

Section IX.A.1.e, *Liebermann* discloses that its computer runs "software" and performs the initial processing required to control what text to display based on the camera output associated with the signs/gestures, Ex. PA-1, 6:40-52, 7:10-49, and that the disclosed device includes "processing hardware and software" required to operate the cellular telephone, *id.*, 13:40-66.  Thus, it is my opinion that *Liebermann* discloses this limitation under both Samsung's proposed constructions, and the plain meaning proposed by patent owner and found by the district court.  (*See above* at Section VII; Ex. CC-2.)

**B.    SNQ2: *Liebermann* in view of *Tryding***

91.    As I explain below, *Liebermann* and *Tryding* disclose or suggest the limitations of claim 11 of the '924 patent.

**1.    Claim 11**

> **a.    The handheld device of claim 1 wherein the computer is adapted to generate control instructions for a display that is separate from the handheld device.**

92.    As discussed above in Section IX.A.1, *Liebermann* discloses the handheld device of claim 1 and that the computer controls the cellular phone to display data, communicate information, etc. (*see above at* Section IX.A.1), however, *Liebermann* does not explicitly disclose that "the computer is adapted to generate control instructions for a display that is separate from the handheld device."

61

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

Nevertheless, a person of ordinary skill would have been motivated to implement

these features in view of *Tryding*.

93.    *Tryding* discloses a mobile telephone that "generate[s] control

instructions for a display that is separate from [a] handheld device." *Tryding*, like

*Liebermann*, discloses a "mobile telephone" 10:

> Referring now to the drawings, and more particularly to FIG. 1, there is illustrated the apparatus for generating a communications link 5 between a mobile telephone 10 and display monitor 15 to enable the display of mobile telephone data on the display screen 20 of the display monitor 15. A base transceiver station 25 will transmit a variety of data and messages to the mobile telephone 10 through a downlink 30. This information may include alphanumeric data for display upon the phone display 35 of the mobile telephone 10. Unfortunately, due to the small size of the mobile telephone 10, the display 35 presents the data at a size that may make it difficult for the average user to easily view.
>
> The mobile telephone 10 includes a display monitor communications function 40 enabling the generation of the communications link 5 with the monitor 15. The communications link 5 between the mobile telephone 10 and display monitor 15 is through a receiver 45 associated with the display monitor 15. In one embodiment, the display monitor 15 need only include the receiver 45. However, in an alternative embodiment, the display monitor 15 may further include a transmitter 50 enabling data transmission from the display monitor 15 back to the monitor communications function 40 of the mobile telephone 10 through the communications link 5. The transmitter 50 and receiver 45 may also be combined into a single transceiver unit.

(Ex. PA-7, 2:27-51.)  It additionally discloses a "display monitor" 15 that is separate

from mobile device 10 ("a display that is separate from [a] handheld device). (*Id.*,

2:38-44.)

62

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924



(*Id.*, FIG. 1 (annotated).)

94.     *Tryding* explains that "[t]he mobile telephone 10 includes a display monitor communications function 40 enabling the generation of the communications link 5 with the monitor 15." (*Id.*, 2:39-41.)  Through this link, the mobile telephone 10 sends "commands" ("control instructions") to monitor 15 to control what is displayed on remote monitor 15:

> Referring now also to FIG. 2, there is illustrated the display monitor usage command menu 65 available to a user of the mobile telephone 10 enabling a display of mobile telephone information on the display screen 20 of display monitor 15. The display monitor usage command menu 65 initializes activation of the communications link 5 using either a manual activation function 55 or automatic activation function 60. Once the communications link 5 is established, the text display menu 75 enables selection of the various types of text or information which a user desires to have displayed upon the display screen 20 of display

63

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

> monitor 15. Examples of this include all menu text 80, SMS menu text
> 85, all text 90, and incoming call data 95. In this manner, a user may
> selectively program the type of data which is going to be displayed
> upon the display monitor rather than having all types of display data
> presented.
>
> The display monitor usage command menu 65 includes a number of
> commands, such as DISPLAY__TEXT 72 for displaying text
> information, DISPLAY__DIGITS 73 for displaying digits and numeric
> data, and REMOVE__DISPLAYED__DATA 74 for clearing a text
> message from the display monitor. Each of these commands would be
> of a specified length and have associated parameters indicating the
> length of a possible text message, the coding of the message, priority of
> the message, and a clear condition for the message.
>
> Additionally, if the display monitor 15 includes a transmitter for
> responding to commands of the display monitor communication
> function 40, each command transmitted from the mobile telephone 10
> would have an associated confirmation command indicating that the
> message had been received. Thus, in accordance with the previously
> given examples, the following confirmation commands would exist;
> DISPLAY__TEXT__CNF,        DISPLAY__DIGITS__CNF,        and
> REMOVE___DISPLAYED__DATA__CNF.

(*Id.*, 3:17-52.)  For example, the cell phone commands can cause the remote display

15 to show "menu text 80, SMS menu text 85, all text 90, and incoming call data

95." (*Id.*, 3:17-33.)

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924



(*Id.*, FIG. 1 (annotated excerpt); *id.*, 2:27-51.)

95.    In light of *Tryding*'s disclosures, a person of ordinary skill in the art would have been motivated to include a display that is separate from a handheld device when implementing the handheld device similar to as disclosed in *Liebermann*, where the computer of the handheld device is adapted to generate control instructions for the display. For instance, *Tryding* explains that because "the small size of the mobile telephones necessarily causes an associated display to be rather small," "use of small font characters or abbreviations" may be required to "fully present visual information to the user of the cellular telephone." (*Id.*, 1:23-27; *see also id.*, 1:8-33.) However, such configuration "makes the displayed data difficult to read or interpret." (*Id.*, 1:28-30.) As such, a person of ordinary skill in the art would have understood that using a separate display similar to as disclosed in *Tryding* (which is controlled by the handheld device, e.g., controlling what to present

65

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

on the separate display) would have been beneficial. This is because, for example, a separate display, which may be made relatively larger compared to the display on the handheld device (e.g., *Liebermann*'s cellular phone), would have been able to present the data at a size that makes it easier for a user to read. In such a combination, a person having ordinary skill in the art would have understood that the *Liebermann* computer, which controls the cellular telephone, would have also performed the additional external display function using the transmitter of the cellular telephone. The computer hardware is the brain on the cellular telephone and allows it operate as described.

96. A person of ordinary skill in the art would have had a reasonable expectation of success when implementing the above-described configuration. Indeed, *Tryding* expressly discloses how to control and communicate with a separate display using a handheld device, e.g., by the use of "a display monitor communications function 40" that enables the generation of the communication link 5 with the monitor 15. (*Id.*, 2:39-40; *see also id.*, 2:52-61 (explaining that the communication link 5 is based on known communication technology, e.g., infrared communication link or RF communications).) A person of ordinary skill in the art would have understood that functions and configurations to control the separate display (e.g., display monitor communications function 40 as disclosed in *Tryding*) would have been implemented in *Liebermann*'s computer based on software

66

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

programming, particularly when *Liebermann* already discloses using software in the device to perform various functions. (Ex. PA-1, 6:40-52, 7:10-49; *id.*, 13:40-66 (disclosing that the device includes "processing hardware and software" required to operate the cellular telephone).) Such configuration would have involved a combination of known technologies (e.g., as in *Liebermann* and *Tryding*) according to known methods (e.g., known processes to control a separate display) to yield a predictable result, where a computer of a handheld device is adapted to generate control instructions for a display that is separate from the handheld device. Accordingly, the *Liebermann-Tryding* combination discloses and/or suggests this limitation. Moreover, it is my opinion that *Liebermann* discloses that "the computer is adapted to perform" the claimed control function under the construction discussed above in Sections VII.B, D, i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons and as discussed above in Section IX.A.1.e. (*See above at* Section IX.A.1.e (explaining how the *Liebermann* cellular telephone computer is programmed with software to operate).) Thus, it is my opinion that *Liebermann-Tryding* discloses or suggests this limitation under both Samsung's proposed constructions, and the plain meaning proposed by patent owner and found by the district court. (*See above* at Section VII; Ex. CC-2.)

## C.    SNQ3: *Liebermann* in view of *Gershman*

67

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

97.    As I explain below, *Liebermann* and *Gershman* disclose or suggest the limitations of claim 14 of the '924 patent.

### 1.    Claim 14

**a.    The handheld device of claim 1 wherein the computer is adapted to transmit information over an internet connection.**

98.    While not expressly disclosed by *Liebermann*, a person of ordinary skill in the art would have been motivated to adapt a computer of a cellular telephone (such as the *Liebermann* computer) to transmit information over an internet connection in view of *Gershman*. *Gershman* discloses a wireless phone having a computer that is adapted to transmit information over an internet connection. In particular, *Gershman* discloses that wireless phones were known to be connected to the Internet before the time of the alleged invention, e.g., the Nokia 9000 is capable of "access[ing] information through the World Wide Web"

> Wireless PDAs could communicate with computers that were connected to the World Wide Web, and soon led to PDAs capable of Web browsing. One of the first companies to develop Web browsing capabilities for PDAs was Intercom. Intercom's Falcon Mobile Server allowed PDAs with Web functions to directly connect to a host computer. Just by installing the software onto the host server, PDA terminals were able to access information through the World Wide Web. Currently, more integration in mobile computing is desired. Nokia, an Irving Tex. company, has partially addressed the integration issue by developing the Nokia 9000 wireless voice phone. The Nokia 9000 includes a small keyboard, a specialized Web browser from microbrowser vendor Unwired Planet, Inc., and a small VGA monitor.

68

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

Nokia worked with Ericsson Inc, Motorola Inc. and Unwired Planet to establish the Wireless Application Protocol (WAP), a standardized browser technology and server format. WAP gave manufacturers a standard way to put data capability into wireless phones, and allowed carriers to do more over-the-air management. For example, if a carrier wanted a field trial of a new data service, the carrier could implement the service on a server, deliver it to a phone through the microbrowser and adjust the service if they found the service unsatisfactory.

Prior Art FIG. 1A is a diagram of prior art mobile computing solutions based on web portal networks. In the Prior Art, the user 10 must deal separately with each participant of the network. In the Prior Art mobile computing solution, the user 10 utilizes an Internet service provider (ISP) 12 to gain access to a web portal 14. The web portal 14 accesses third party services 16 which provide information directly to the user 10. However, in addition to dealing with the Internet Service Provider 12, the user 10 must purchase the wireless device from the device manufactures or retailers 18. In most cases the user 10 would also have to purchase the browser from the browser provider 20. Generally, the user would have to pay the wireless communication cost, leading to the user needing to deal with the phone company 22. And finally, any web purchases would lead to the user 10 needing to deal with the credit card company 24.

(Ex. PA-5, 1:62-2:35; *see also id.*, 2:1-18, FIG. 1A (showing a mobile phone that connects to Internet Service Provider 12 and a phone company 22); *id.*, 1:62-2:35 (discussing "wireless phones" that had web browsers and mobile computing solutions that "utilize an Internet service provider (ISP) 12 to gain access to a web portal 14" and connect to a phone company 22).)

99.    A person of ordinary skill in the art would have been motivated to include internet access capability when implementing a cellular phone similar to as disclosed in *Liebermann* such that the computer in the cellular phone is adapted to

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

transmit information over the internet connection.  A person of ordinary skill in the

art would have understood connecting the cellular telephone computer to the internet

would "permit a user to access vast amounts of information and services without,

essentially, geographical boundaries." (Ex. PA-5, 2:66-3:2.)  Moreover, connecting

the computer to the internet similar to as described in *Gershman* would increase user

convenience and provide a "rich environment to perform a large number of tasks on

behalf of the user." (*Id.*, 3:2-4.)  For instance, *Gershman* discloses that "a software

agent" may perform a large number of tasks for the user, e.g., the software agent

"could scan the Internet and obtain information ranging from the latest sports news

to a particular graduate thesis in applied physics." (*Id.*, 2:61-3:9; *see also id.*, 43:55-

60 ("A Personal Digital Assistant (PDA) with Internet access can synchronize the

person's calendar, email, contact list, task list and notes on the PDA with the version

stored in the Internet site.").)  As such, a person of ordinary skill in the art would

have been motivated to implement a cellular phone computer (similar to as disclosed

in *Lieberman),* e.g., by including a software agent (like that of *Gershman*) such that

the computer is adapted to transmit information over an internet connection.  Further,

persons of ordinary skill in the art understood that consumers wanted devices that

could connect to the internet before the time of invention and would have been

motivated to include the claimed internet feature for similar reasons.  There was a

burst of activity during this time period to get devices connected to the internet.

70

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

Persons of ordinary skill in the art appreciated that the internet was going to be everywhere around the time of invention and were making devices that could connect to the internet.  Indeed, such skilled persons would have been motivated to include an internet connection at least because it could conveniently and quickly communicate various data on demand.

100.   A person of ordinary skill in the art would have had a reasonable expectation of success in implementing the internet access in a cellular phone computer.  Such an implementation was well-known at the time of the alleged invention.   For example, the Nokia 9000 phone is capable of "access[ing] information through the World Wide Web." (*Id.*, 2:1-18.)  Furthermore, such an implementation would have involved a combination of known technologies (e.g., as in *Liebermann* and *Gershman*) according to known methods (e.g., known processes to transmit information over the Internet) to yield a predictable cell phone computer that is adapted to transmit information over an internet connection.  Accordingly, the *Liebermann-Gershman* combination discloses and/or suggests this limitation.

101.  Moreover, it is my opinion that the *Liebermann-Gershman* combination likewise discloses that "the computer is adapted to perform" the claimed control function under the construction discussed in Sections VII.B, D, i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons and as discussed above in Section

71

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

IX.A.1.e.  (*See above at* Section IX.A.1.e (explaining how the *Liebermann* cellular telephone computer is programmed with software to operate).)   Thus, it is my opinion that *Liebermann-Gershman* discloses or suggests this limitation under both Samsung's proposed constructions, and the plain meaning proposed by patent owner and found by the district court.  (*See above* at Section VII; Ex. CC-2.)

**D.     SNQ4: *Liebermann* in view of *Himmel***

102.   As I explain below, *Liebermann* and *Himmel* disclose or suggest the limitations of claims 1-8, 10, and 12-13 of the '924 patent.

**1.     Claim 1**

**a.     [1.a] A handheld device comprising:**

103.   I have been asked to assume the preamble of claim 1 is limiting.  Under that assumption, it is my opinion that *Liebermann* discloses this limitation for the reasons discussed above in Section IX.A.1.a.

**b.     [1.b] a housing;**

104.   It is my opinion that *Liebermann* discloses and/or suggests this limitation for the reasons discussed above in Section IX.A.1.b.

**c.     [1.c] a computer within the housing;**

105.   While *Liebermann* discloses that the cellular telephone performs "initial processing" and populates a phone display, among other things, see above at Section IX.A.1.c; Ex. PA-1, 5:62-6:10, 6:40-52, FIG. 8, it also discloses that aspects

72

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

of gesture recognition occur on a network server, Ex. PA-1, 6:41-63, FIG. 1.  I have

been asked to assume a scenario where *Liebermann* does not teach this feature, and

in that scenario a person of ordinary skill would have been motivated to implement

the feature.  For example, a person of ordinary skill would have been motivated to

perform all processing steps, including the initial processing and the gesture

recognition process, locally on a computer of the cellular telephone.

106.  In *Liebermann*, the cellular telephone performs initial gesture

processing but uses a network computer to perform the rest of the gesture recognition

process.  (Ex. PA-1, 6:41-63.)  The *Liebermann* communication system converts

sign language gestures to speech that can be transmitted to a person on the other side

of a call.  (*Id.*, FIG. 1; *id.*, 12:30-36 (referring to hand signs as "gesture[s]").)  To do

so, at least one camera of a cellular telephone records a user making hand sign

gestures.  (*Id.*, 5:62-6:9 (describing how the cellular telephone camera records the

signing movement of user hands); *id.*, 13:4-16 (teaching a two-camera embodiment);

*id.*, FIG. 6.)  After performing "initial processing" to collapse gesture images into

small sets of fixed identifiers, the cellular telephone outsources a networked

computer to determine which hand gestures a user makes.  (*Id.*, 6:41-63 (describing

how a network data processing center identifies signing movements to convert the

signs to text); *id.*, 12:30-36 (referring to hand signs as "gesture[s]").)

73

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924



(*Id.*, FIG. 1 (annotated and blurred for emphasis) (disclosing a telephone for the deaf that captures images of hand sign gestures and a center computer that determines what hand sign gestures were made).)

107.   A person of ordinary skill would have been motivated to process camera outputs locally within a cellular telephone computer instead of at the networked computer.   Indeed, *Liebermann* itself suggests that the location where processing occurs is a matter of design choice.   Specifically, *Liebermann* discloses

74

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

that it uses a network computer to process gesture information because it is "economic[]" to do so.  (*Id.*, 6:10-12; *see also id.*, 3:38-42 ("From cost and portability standpoints, the translating means is at a remote location or central station.").)  While a network computer was an economic solution envisioned by *Liebermann*, *id.*, 6:10-12, a person of ordinary skill in the art would have understood that other processing options were also available, and that there would have been reasons motivating such alternatives.

108.    Before the time of the alleged invention, persons of ordinary skill in the art understood that smart phones with computer units were handling a variety of sophisticated processing tasks.  (Ex. PA-3, 5:18-29, FIG. 3)  For example, *Himmel* discloses a "smart phone" that included an Intel "Pentium" processing unit 302 (a "computer"):

> Turning next to FIG. 3, a block diagram of a wireless phone computing platform is depicted in accordance with a preferred embodiment of the present invention. Computing platform 300 is located within a cell phone, mobile phone, satellite phone, or other type of digital smart phone. Computing platform 300 includes a CPU 302, which may be an embedded processor or processor such as a Pentium processor from Intel Corporation. "Pentium" is a trademark of Intel Corporation. Computing platform 300 also includes memory 304, which may take the form of random access memory (RAM) and/or read only memory (ROM).

> Computing platform 300 also contains a storage device unit 306. Storage device unit 306 may contain one or more portable storage devices, e.g., a hard disk drive, such as an IBM MicroDrive, or a flash memory card. Wireless phone computing platform 300 also includes an

75

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

> input/output (I/O) unit 308, which provides connections to various I/O devices. In this example, a GPS receiver 310 is optionally included, as denoted by dotted line 313, within wireless phone computing system 300 and receives signals through antenna 312. Wireless unit 314 provides for two-way communications between computing unit 300 and another data processing system, such as server 104 in FIG. 1, through antenna 316.
>
> Computing unit 300 also includes a display adapter 322, which is connected to display 324. This display may be a touch screen display or an LCD display. Computing unit 300 also includes a microphone 328 and a speaker 330 which provide a user, in addition to standard voice communication, with an ability to enter commands and receive responses through speech I/O unit 326 without having to constantly divert attention to display 324.

(*Id.*, 5:18-49, FIG. 3.)  The processor is "located within a cell phone."  (*Id.*)  Thus it

is my opinion that *Himmel* discloses "a computer within the housing," as claimed.

(*Id.*, 5:20-22.)  The "computer" disclosed in *Himmel* is of a small form factor that is

capable of running a Windows operating system and performing a variety of

complex processes, such as processing voice commands, electronic documents,

display information, etc.  (*Id.*, 5:42-63, FIG. 3.)  A person of ordinary skill in the art

would have understood that *Himmel*'s computer, as integrated in the smart phone,

like others at the time of the alleged invention, was "capable of running a variety of

application software packages," such as text and/or image editors, web browsers,

calculators, and others at the time of the alleged invention.  (Ex. PA-4, 1:12-24, 8:2-

6; *see also* Ex. PA-5, 1:43-2:18 (citing the Nokia 9000 as a smart phone that included

a small keyboard, a specialized web browser, and a small VGA monitor).)  Indeed,

76

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

at the time of the alleged invention, it was known that "[m]obile computing

technology. . . allow[s] the individual to access computer related information at all

times and in all environments." (Ex. PA-5, 1:44-48.)  For instance, a mobile

computer of, e.g., "[a] PDA allowed a user to access computer related information,

yet fitted in the palm of the hand." (*Id.*, 1:49-50.)  Furthermore, a person of ordinary

skill in the art would have understood that "**more integration in mobile computing**

**is desired**." (*Id.*, 2:3-4 (emphasis added).)  "By utilizing computer technology, users

or callers have access to computing functions and resources in a personal, portable

device." (Ex. PA-3, 1:24-27.)  Additionally, at the time of the alleged invention, it

was known to "integrat[e] . . . personal computer technology into phones." (*Id.*,

1:22-24.)  In this fashion, a person of ordinary skill in the art would have understood

that, at the time of the alleged invention, smart phones may at least have possessed

processing/computing capability of personal computers.

109.  The '924 patent does not disclose anything critical about the claimed

"computer within the housing."  Indeed, the '924 patent admits that the alleged

invention "uses single or multiple TV cameras whose output is analyzed and used as

input to a computer, such as a home PC." (Ex. PAT-A, 2:20-23; *see also id.*, 3:32-

34 (disclosing use of "PC computer").)  The '924 patent even identified that an Intel

Pentium processor that was widely used in a personal computer (like the Intel

Pentium processor used in *Himmel*'s smart phone) was capable of executing

77

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

software for performing the claimed features, e.g., recognizing various poses and

gestures in images. (*Id.*, 3:29-34 (disclosing use of "PC computer 106 (integrated in

this case into the monitor housing), for example a 400 Mhz Pentium II"); Ex. PAT-

C, 6:6-19 (discussing that an "Intel Pentium 2" processor was suitable to execute

pose analysis software and analyze when a user made a specific pose).) Thus it is

my opinion that a person of ordinary skill in the art would have similarly understood

that the computing capacity of the Intel Pentium processor used in the *Himmel* smart

phone would have provided a cellular telephone, similar to as discussed in

*Liebermann*, the capability of performing various claimed features, e.g.,

"perform[ing] a control function of the handheld device based on at least one of the

first camera output and the second camera output." (*See below at* Section IX.D.1.e.)

110.    A person of ordinary skill would have been motivated to include a

computer, similar to as disclosed in *Himmel*, within the housing to perform local

image processing and gesture recognition when implementing a cellular telephone

similar to as disclosed in *Liebermann*. As a person of ordinary skill in the art would

have understood, performing the process sign translation or gesture recognition at a

remote server was no more than a design choice based on an economic decision.

(Ex. PA-1, 6:10-12.) While the proposed modification may have required more

expensive hardware, such a skilled person would have appreciated that customers

desired highly-integrated smart phone devices that could perform additional

78

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

functions, e.g., local gesture recognition.  (Ex. PA-5, 2:3-4 (emphasis added) ("**more integration in mobile computing is desired**.").)  Moreover, a potential increase in cost of hardware in implementing a local processing capability would not have deterred a person of ordinary skill from implementing the feature.   In fact, *Liebermann* itself discloses that the cellular telephone device can function as "an **on-site** translator" rather than just a telephone for the deaf.   (Ex. PA-1, 13:37-39 (emphasis added).)

111.   Additionally and alternatively, a person of ordinary skill in the art would have understood that the image processing and gesture recognition features could be implemented using known software based on existing hardware.  (*Id.*, 4:6-9 (disclosing that the remote processing center provides "computer software for translating functions…"); *id.*, 6:6-10 ("The signing motions captured by the camera are converted into digital data for processing by the translation software…to produce data representing numbers, words and phrases which are then combined into coherent sentences."); *id.*, 7:14-17, 7:48-49 ("Software presently used for this purpose is appended hereto and is utilized with Borland C++.").)  Given that, at the time of the alleged invention, it was becoming "more and more pervasive" to integrate "personal computer technology into phones," such a skilled person would have understood that the software-driven features for image process and gesture recognition would have been implemented on those phones having the requisite

79

computing power to operate those features.  (Ex. PA-3, 1:23-25.)  Such a skilled

person would have been motivated to do so as it would have not only provided

additional features and applications to the then-existing cellular phone after-market

but also substantially avoided the cost of implementing a computer in a cellular

phone for the sole purpose of performing the imaging processing and gesture

recognition.

112.  Furthermore, as a person of ordinary skill in the art would have

understood, the proposed modification would have reduced network communication

demands because the cellular telephone could communicate with another individual

directly instead of through an intervening network computer and would have also

improved user conveniences for not requiring communication with a remote

processing center that could require additional telecommunication bandwidth.

113.  A person of ordinary skill in the art would have had a reasonable

expectation of success in modifying *Liebermann* in view of *Himmel*.  Indeed, the

'924 patent discloses that "a home PC" has the processing power required to execute

gesture, pose, etc. recognition software.  (Ex. PAT-A, 2:20-23.)  The '924 patent

even identified that an Intel Pentium processor that was widely used in a personal

computer (like the Intel Pentium processor used in *Himmel*'s smart phone) was

capable of executing software for performing the claimed features, e.g., recognizing

various poses and gestures in images.  (*Id.*, 3:29-34 (disclosing use of "PC computer

80

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

106 (integrated in this case into the monitor housing), for example a 400 Mhz

Pentium II"); Ex. PAT-C, 6:6-19 (discussing that an "Intel Pentium 2" processor was

suitable to execute pose analysis software and analyze when a user made a specific

pose).) Such a skilled person would have had the skill to implement and expectation

of success in achieving such a modification because it would have involved applying

known technologies (e.g., cellular telephone cameras and processors) according to

known methods (e.g., using processors to detect gestures based on camera data) to

yield the predictable result of a cellular phone computer that detects user gestures.

> **d.**     **[1.d] a first camera oriented to view
> a user of the handheld device and
> having a first camera output; and**

114. It is my opinion that *Liebermann* discloses and/or suggests this

limitation for the reasons discussed in Section IX.A.1.d.

> **e.**     **[1.e] a second camera oriented to
> view an object other than the user of
> the device and having a second
> camera output, wherein the first and
> second cameras include non-
> overlapping fields of view, and
> wherein the computer is adapted to
> perform a control function of the
> handheld device based on at least
> one of the first camera output and
> the second camera output.**

115. It is my opinion that *Liebermann* in view of *Himmel* discloses and/or

suggests this limitation for the reasons discussed in Section IX.A.1.e. (*See above at*

81

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

Section IX.A.1.e.)   The modification discussed in claim element 1(c) (where *Liebermann* is modified in view of *Himmel* (*see above at* Section IX.D.1.c)) only affects the disclosure discussed in Section IX.A.1.e to specify *where* the control "computer" is implemented (i.e., on the cellular telephone to control the cellular telephone, recognize gestures, etc.).

116.   Likewise, it is my opinion that the *Liebermann-Himmel* combination discloses or suggests that the claimed "computer is adapted to" perform identified functions under the construction discussed above (*see above at* Sections VII.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the reasons discussed above in Section IX.A.1.e. (*See above at* Section IX.A.1.e.)   Thus, it is my opinion that *Liebermann-Himmel* discloses or suggests this limitation under both Samsung's proposed constructions, and the plain meaning proposed by patent owner and found by the district court. (*See above* at Section VII; Ex. CC-2.)

### 2.   Claim 2

#### a.   The handheld device of claim 1 wherein the handheld device comprises a mobile phone.

117.   It is my opinion that *Liebermann* discloses and/or suggests this limitation for the reasons discussed in Sections IX.A.2 and IX.D.1.

### 3.   Claim 3

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

> **a.    The handheld device of claim 1 wherein the first camera is adapted to acquire an image of at least a portion of the user.**

118. It is my opinion that *Liebermann* discloses and/or suggests this limitation for the reasons discussed in Sections IX.A.3 and IX.D.1.

### 4.    Claim 4

> **a.    The handheld device of claim 1 wherein the second camera is adapted to acquire an image of the object.**

119. It is my opinion that *Liebermann* discloses and/or suggests this limitation for the reasons discussed above in Sections IX.A.4 and IX.D.1.

### 5.    Claim 5

> **a.    The handheld device of claim 1 wherein the second camera is adapted to acquire a video of the object.**

120. It is my opinion that *Liebermann* discloses and/or suggests this limitation for the reasons discussed above in Sections IX.A.5 and IX.D.1.

### 6.    Claim 6

> **a.    The handheld device of claim 1 wherein the computer is operable to determine a gesture based on at least one of the first camera output and the second camera output.**

83

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

121.   It is my opinion that *Liebermann* in view of *Himmel* discloses and/or suggests this limitation.  As discussed in Sections IX.A.1.e and IX.D.1, the computer in the *Liebermann-Himmel* combination can determine gestures based on one or more cameras (i.e., the "first camera," the "second camera" or both) to determine signing motions and gestures.  (*See above at* Sections IX.A.1.e and IX.D.1.)  For example, *Liebermann* discloses that the camera "will record the signing movement of the hands and fingers and body and facial motions and expressions," where "**[a] deaf person uses sign language in front of the transmitter/receiver device containing the camera**" and "[t]he **images captured by the camera are of the finger and hand motions and of body motions and of facial expressions** and motions captured by a digital device which does initial processing." (Ex. PA-1, 6:4-47 (emphasis added).)   Furthermore, *Liebermann* discloses that a camera may recognize special gloves and gestures performed thereby.  (*Id.*, 12:40-43, 13:4-16.) Thus it is my opinion that the computer in the *Liebermann-Himmel* combination (which performs network processing locally as explained above) would have been operable to determine a gesture based on at least one of the first camera output and the second camera output, as claimed in claim 6.

122.   Likewise, it is my opinion that the *Liebermann-Himmel* combination discloses or suggests that the claimed "gesture" under the construction discussed above (*see above at* Section VII.C), i.e., a sequence of positions that conveys a

84

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

meaning, as the various "finger and hand motions" to convey sign language, *id.*, 6:4-47; *id.*, 12:30-36 (referring to hand signs as "gesture[s]"), are gestures. Likewise, the *Liebermann-Himmel* combination discloses or suggests the claimed "gesture" under the district court's construction discussed above (*see above* at Section VII), i.e., movement of hands or other body parts that conveys meaning, as the various "finger and hand motions" to convey sign language, Ex. PA-1, 6:4-47; *id.*, 12:30-36 (referring to hand signs as "gesture[s]"), are gestures. Thus, *Liebermann* discloses or suggests these limitations under Sasmung's proposed constructions, the meanings proposed by patent owner, and the meanings found by the district court. (*See above* at Section VII; Ex. CC-2.)

### 7. Claim 7

      **a.**   **The handheld device of claim 1 wherein the computer is operable to determine a facial expression based on at least one of the first camera output and the second camera output.**

123. It is my opinion that *Liebermann* in view of *Himmel* discloses "the computer is operable to determine a facial expression based on at least one of the first camera output and the second camera output." For example, *Liebermann* discloses that "**images captured by the camera are of the . . . facial expressions**" of a user. (Ex. PA-1, 6:42-47 (emphasis added).) And the facial expressions of a

85

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

hearing challenged user are analyzed to determine raised eyebrow facial expressions,

teeth exposed facial expressions, etc. (*Id.,* 8:30-9:22.)   Thus it is my opinion that

the computer in the modified *Liebermann* cellular phone (which performs network

processing locally as explained above) would have been operable to determine a

facial expression based on at least one of the first camera output and the second

camera output, like that claimed here.

     **8.**    **Claim 8**

         **a.**    **The handheld device of claim 1
wherein the computer is adapted to
determine at least one of the position
and the orientation of the object
based on the second camera output.**

124.   It is my opinion that *Liebermann* in view of *Himmel* discloses "the

computer is adapted to determine at least one of the position and the orientation of

the object based on the second camera output."

125.   For example, *Liebermann* discloses "[i]t may be desirable to utilize

more than one camera to allow the signing person 'free' movement in his or her

environment to **track down spatial positions** in that environment."   (Ex. PA-1,

13:5-8 (emphasis added); *see also id.*, 13:4-23 (explaining that the two-camera

embodiment may determine "coordinates" of an object); *id.*, 13:4-23, 7:19-8:26

(explaining that a second camera may sense signs from another person and location

86

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

data is determined); Ex. PAT-A, 3:53-54 (describing a camera that acquires images of "objects such as persons").)

126.   Consistent with the analysis discussed above in claim 1 associated with using two cameras (*see above at* Section IX.D.1.e), a person of ordinary skill in the art would have understood that *Liebermann*'s disclosure of "utiliz[ing] more than one camera" includes using its first and second cameras.

127.   Thus it is my opinion that the computer in the modified *Liebermann* cellular phone (which performs network processing locally as explained above) would have been adapted to determine at least one of the position and the orientation of the object based on the second camera output, as claimed here.

128.   Likewise, it is my opinion that the *Liebermann-Himmel* combination discloses or suggests that the claimed "computer is adapted to" perform identified functions under the construction discussed above (*see above at* Sections VII.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the reasons discussed above in Section IX.A.1.e. (*See above at* Section IX.A.1.e.).

### 9.    Claim 10

a.    **The handheld device of claim 1 wherein the computer is adapted to recognize the object based on the second camera output.**

87

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

129.    It is my opinion that *Liebermann* in view of *Himmel* discloses and/or

suggests this limitation.    As discussed in Sections IX.A.1.e and IX.D.1.e, the

computer in the *Liebermann-Himmel* combination can determine gestures based on

one or more cameras (i.e., the "first camera," the "second camera" or both) to

determine signing motions and gestures.    (*See above at* Sections IX.A.1.e and

IX.D.1.e.)    For example, *Liebermann* discloses that the multiple cameras (including

the "second camera") may be used to define "any objects" or "alive, stationary or

moving entities, such as animals" as well as to interpret the signing motions of

multiple "person(s)."    (Ex. PA-1, 13:4-16; *see also* Ex. PAT-A, 3:53-54 (describing

that "objects" include "persons").)    Furthermore, *Liebermann* discloses that a camera

may recognize special gloves and gestures performed thereby.    (Ex. PA-1, 12:40-43,

13:4-16.)    Accordingly, the *Liebermann-Himmel* computer (which performs

network processing locally as explained above) is adapted to perform this limitation.

130.    Likewise, it is my opinion that the *Liebermann-Himmel* combination

discloses or suggests that the claimed "computer is adapted to" perform identified

functions under the construction discussed above (*see above at* Sections VII.B, D),

i.e., software running on a computer that is programmed to perform the claimed

function or equivalents thereof, for the reasons discussed above in Section IX.A.1.e.

(*See above at* Section IX.A.1.e.).    Thus, it is my opinion that *Liebermann* in view of

*Himmel* discloses or suggests this limitation under both Samsung's proposed

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

constructions, and the plain meaning proposed by patent owner and found by the

district court.  (*See above* at Section VII; Ex. CC-2.)

> **10.    Claim 12**
>
> > **a.    The handheld device of claim 1 wherein the computer is adapted to determine a reference frame of the object.**

131.  It is my opinion that *Liebermann* in view of *Himmel* discloses or

suggests this limitation for at least two reasons.  **First**, *Liebermann* discloses

"us[ing] special gloves which allow discrimination of the hands from the

background for the image processing system."  (Ex. PA-1, 12:37-39.)  A person of

ordinary skill in the art would have understood that the background is a "reference

frame" of the special glove objects.  Given that the *Liebermann* system is capable of

distinguishing hands/gloves from a background, which requires determining the

background from the gloves that perform signing motions/gestures, and that the

computer performs network processing locally as explained above, the *Liebermann-*

*Himmel* combination discloses that "the computer is adapted to determine a

reference frame of the object."

132.  The above analysis of the claimed "reference frame of the object" is

consistent with the '924 patent.  For example, the '924 patent describes that a

reference frame can be a wall-mounted screen that is separate/distinctive from the

89

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

object/person that performs gestures. (Ex. PAT-A, 26:32-40 (emphasis added) ("Note that a camera such as 1902, looking at you the user, if attached to hand held unit, always has reference frame of that unit. If one works with **a screen on a wall**, one can aim the handheld unit with camera at it, and determine its reference frame to the handheld unit. Also can have two cameras operating together, **one looking at wall thing**, **other at you** (as 1902 and 1902a) in this manner, one can dynamically **compare ref frames of the display to the human input means** in determining display parameters.").)

133. *Liebermann* in view of *Himmel* discloses this limitation for a **second** reason. As discussed above in Sections IX.A.1.e and IX.D.1.e, the second camera is oriented to view an object other than the user of the device. (*See above at* Sections IX.A.1.e and IX.D.1.e.) Furthermore, *Liebermann* details how the system recognizes various objects and corresponding hand gestures in Figures 9 and 10. (Ex. PA-1, 7:44-46 ("The modules for the software effect translation of the signing into and from digital text are set forth in FIGS. 9 and 10.").) Specifically, the system performs an XOR operation on the image frames to detect pauses and movement as a part of the gesture determination process. (*Id.*, FIGs. 9, 10.)

90

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924



(*Id.*, FIG. 9 (annotated and blurred for emphasis).)

91

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924



*FIG. 10*

(*Id.*, FIG. 10 (annotated and blurred for emphasis).) A person of ordinary skill in the art would have understood that the XOR operation disclosed by *Liebermann* involves a comparison between a first data set (e.g., from a first image frame) and a second data set (e.g., from a second data frame). (*See generally* Ex. PA-10, 8 ("Note that the XOR function is true if and only if the operands are different.").) Accordingly, a person of ordinary skill in the art would have understood that XOR operation disclosed by *Liebermann* refers to a comparison function between image

92

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

frames to determine pauses and movement.  (Ex. PA-1, FIGs. 9, 10.)  When the system performs the XOR operation (as the cellular telephone computer performs network processing locally as explained above), a person of ordinary skill in the art would have understood that one of the frames is deemed as the reference frame to be compared with another frame for the XOR comparison operation.  Thus it is my opinion that the computer in the *Liebermann-Himmel* combination would have been adapted to determine a reference frame of the object and thus discloses the limitations of claim 12.  Thus, it is my opinion that *Liebermann* in view of *Himmel* discloses or suggests this limitation under both Samsung's proposed constructions, and the plain meaning proposed by patent owner and found by the district court. (*See above* at Section VII; Ex. CC-2.)

> **11.   Claim 13**

>> a.   **The handheld device of claim 1 wherein the computer is adapted to perform a control function based on the first camera output and based on the second camera output.**

134.   It is my opinion that *Liebermann* in view of *Himmel* discloses and/or suggests this limitation for the reasons discussed above in Sections IX.A.6 and IX.D.1.  The computer in the *Liebermann-Himmel* cellular phone would have been adapted to perform the control function based on the first camera output and second camera output, like that claimed here.  (*See above at* Sections IX.A.6 and IX.D.1.).

93

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

Specifically, the *Liebermann* cellular telephone displays the text of what was signed

in accordance with data from two cameras as claimed, *see above at* Section IX.A.6;

Ex. PA-1, 13:4-21, 7:49-8:26, FIG. 8, and, as modified, the *Himmel* computer of the

*Liebermann* cellular telephone powers/controls the phone the perform the claimed

operation, *see above at* Section IX.D.1, Ex. PA-3, 5:42-63, FIG. 3 (discussing how

the cellular telephone computer controls display information, processes gestures

from cameras, etc.).

135.   Likewise, it is my opinion that the *Liebermann-Himmel* combination

discloses or suggests that the claimed "computer is adapted to" perform identified

functions under the construction discussed above (*see above at* Sections VII.B, D),

i.e., software running on a computer that is programmed to perform the claimed

function or equivalents thereof, for the reasons discussed above in Section IX.A.1.e.

(*See above at* Section IX.A.1.e.).  Thus, it is my opinion that *Liebermann* in view of

*Himmel* discloses or suggests this limitation under both Samsung's proposed

constructions, and the plain meaning proposed by patent owner and found by the

district court.  (*See above* at Section VII.)

### E.    SNQ5: *Liebermann* in view of *Himmel* and *Tryding*

136.   As I explain below, *Liebermann*, *Himmel*, and *Tryding* disclose or

suggest the limitations of claim 11 of the '924 patent.

### 1.    Claim 11

94

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

> **a.    The handheld device of claim 1 wherein the computer is adapted to generate control instructions for a display that is separate from the handheld device.**

137.    It is my opinion that *Liebermann* in view of *Himmel* and *Tryding* discloses and/or suggests this limitation for the reasons discussed above in Sections IX.B and IX.D.1.    The analysis for modifying *Liebermann* in light of *Tryding* (Section IX.B) is applicable to the modified *Liebermann-Himmel* combination discussed above for claim 1 (Section IX.D.1.).    Thus, given that the computer in the modified *Liebermann-Himmel* cellular phone would have controlled the cellular telephone, *see above at* Section IX.D.1, a person of ordinary skill in the art would have been motivated to configure the computer such that it is adapted to perform the display function, like that described by *Tryding*, for the reasons discussed.

### F.    SNQ6: *Liebermann* in view of *Himmel* and *Gershman*

138.    As I explain below, *Liebermann*, *Himmel*, and *Gershman* disclose or suggest the limitations of claim 14 of the '924 patent.

### 1.    Claim 14

> **a.    The handheld device of claim 1 wherein the computer is adapted to transmit information over an internet connection.**

139.    It is my opinion that *Liebermann* in view of *Himmel* and *Gershman* discloses this limitation for the reasons discussed above in Sections IX.C and IX.D.1.

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

The analysis for modifying *Liebermann* in light of *Gershman* (Section IX.C) is applicable to the modified *Liebermann-Himmel* combination discussed above for claim 1 (Section IX.D.1). Thus, given that the computer in the modified *Liebermann-Himmel* cellular phone would have controlled the cellular telephone, *see above at* Section IX.D.1, a person of ordinary skill in the art would have been motivated to configure the computer such that it is adapted to perform the internet function, like that described by *Gershman*, for the reasons discussed. Thus, it is my opinion that *Liebermann* in view of *Himmel* and *Gershman* discloses or suggests this limitation under both Samsung's proposed constructions, and the plain meaning proposed by patent owner and found by the district court. (*See above* at Section VII; Ex. CC-2.)

## G.    SNQ7: *Liebermann* in view of *Sears*

140. As I explain below, *Sears* discloses or suggests the limitations of claims 1-8, 10, and 12-13 of the '924 patent.

### 1.    Claim 1

#### a.    [1.a] A handheld device comprising:

141. It is my opinion that *Liebermann* discloses and/or suggests this limitation for the reasons discussed above in Section IX.A.1.a.

#### b.    [1.b] a housing;

96

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

142.  It is my opinion that *Liebermann* discloses and/or suggests this limitation for the reasons discussed above in Section IX.A.1.b.

### c.    [1.c] a computer within the housing;

143.  While *Liebermann* discloses that the cellular telephone performs "initial processing" and populates a phone display, among other things (*see above at* Section IX.A.1.c; Ex. PA-1, 5:62-6:10, 6:40-52, FIG. 8), it discloses that aspects of gesture recognition occur on a network server, Ex. PA-1, 6:41-63, FIG. 1.  I have been asked to assume a scenario where *Liebermann* does not teach a computer within the housing of the cellular telephone, and in that scenario a person of ordinary skill would have been motivated to implement the feature in view of *Sears*.  For example, a person of ordinary skill would have been motivated to perform all processing steps, including the initial processing and the gesture recognition process, locally on a computer of the cellular telephone.

144.  The *Liebermann* communication system converts sign language gestures to speech that can be transmitted to a person on the other side of a call.  (Ex. PA-1, FIG. 1; *id.*, 12:30-36 (referring to hand signs as "gesture[s]").)  To do so, one or more cameras in the cellular telephone record a user making hand sign gestures.  (*Id.*, 5:62-6:9 (describing how the cellular telephone camera records the signing movement of user hands); *id.*, 13:4-16 (teaching a two-camera embodiment); *id.*, FIG. 6.)  After performing "initial processing" to collapse gesture images into small

97

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

sets of fixed identifiers, the cellular telephone outsources a networked computer to

determine which hand gestures a user makes. (*Id.*, 6:41-63 (describing how a

network data processing center identifies signing movements to convert the signs to

text); *id.*, 12:30-36 (referring to hand signs as "gesture[s]").)



FIG. 1

(*Id.*, FIG. 1 (annotated and blurred for emphasis) (disclosing a telephone for the deaf

that captures images of hand sign gestures and a center computer that determines

what hand sign gestures were made).)

98

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

145.   A person of ordinary skill would have been motivated to process camera outputs locally within a cellular telephone computer instead of at the networked computer.   Indeed, *Liebermann* itself suggests that the location where processing occurs is a matter of design choice.   Specifically, *Liebermann* discloses that it uses a network computer to process gesture information because it is "economic[]" to do so.   (Ex. PA-1, 6:10-12; *see also id.*, 3:38-42 ("From cost and portability standpoints, the translating means is at a remote location or central station.").)   While a network computer was an economic solution envisioned by *Liebermann* (*id.*, 6:10-12), a person of ordinary skill in the art would have understood that other processing options were also available, and that there would have been reasons motivating such alternatives.

146.   For instance, *Sears* discloses a computer that analyzes images to determine when a user makes a hand gesture.   *Sears* discloses that main system 35 includes a "computer."   (Ex. PA-2, 7:1 ("main system 35 computer"); *id.*, 18:11-12 ("the computer located in the main system 35").)   *Sears* also discloses that main system 35 analyzes images from a camera.   (*Id.*, 5:51-54 ("The output digital image, consisting of a two-dimensional array of pixel values (generally either 8-bit gray-scale or 24-bit color) is then sent to a digital computer where the image is analyzed in at least two modes."); *id.*, 18:9-15 (explaining that main system 35 is coupled to cameras and is "engaged in the analysis of images").)   Pertinent to the *Liebermann*

99

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

gesture-detecting system, the computer in *Sears* determines whether a gesture has been performed based on camera images. (*Id.*, 17:55-58 (describing that gestures are tracked "using algorithms previously described"); *id.*, 5:44-6:10, 6:52-7:2 (explaining that main system 35 analyzes camera images to determine when various "gestures" have been performed).)[3]

147.    Furthermore, the computer disclosed by *Sears* was capable of being implemented in a variety of portable housings. *Sears* discloses that the computer can be implemented using a processor "chip." (Ex. PA-2, 7:1-7 (emphasis added) ("The main system 35 computer should be of sufficient power to perform the remaining steps of the process. In general, any **Intel Pentium** or compatible **chip** of 150 MHz speed will be sufficient, although a faster speed will provide improved results. In addition, other **non-Intel processors**, such as those that are used in **Windows CE Systems**, will suffice if they are of a similar performance.").)    A person of ordinary skill in the art would have understood that a discrete computer chip, such an "Intel Pentium" or "non-Intel" processor, *id.*, would have been implemented in a variety of portable devices. Indeed, the "Windows CE" (Windows Embedded Compact) and processor platform identified by *Sears* was designed for

---

[3] *Sears* discloses with reference to the Figure 3 embodiment that gestures are tracked "using algorithms previously described." (Ex. PA-1, 17:55-58.) Thus, a person of ordinary skill in the art would have understood that disclosures associated with gesture determinations disclosed with reference in the preceding embodiments apply to the embodiment associated with Figure 3.

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

such portable purposes.  (Ex. PA-2, 7:1-7; Ex. PA-6, 1 ("Windows CE was designed

and built from the ground up as an embedded platform to empower the development

of a new range of emerging computing appliances, including highly portable and

personal computing devices.").)  And *Sears* discloses several examples of portable

housings that include the computer chip.  (Ex. PA-2, FIGs. 1a, 3; *id.*, 20:65-21:16

(describing portable reading machines (which include a computer)); *id.*, 21:30-33

("The cords 113 lead to a computer that may be carried in various means, including

backpacks, hip packs, shoulder bags or an article of clothing such as a vest.").)



(*Id.*, FIG. 1a (illustrating a housing which includes a main system 35 computer).)

APPX0443

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924



(*Id.*, FIG. 3 (excerpt) (illustrating a housing which includes a main system 35 computer).)

148. The '924 patent does not disclose anything special about the claimed "computer within the housing." Indeed, the '924 patent admits that the alleged invention "uses single or multiple TV cameras whose output is analyzed and used as input to a computer, such as a home PC." (Ex. PAT-A, 2:20-23; *see also id.*, 3:32-34 (disclosing use of "PC computer").) The '924 patent even identified that an Intel Pentium processor that was widely used in a personal computer (like the Intel Pentium processor disclosed by *Sears*) was capable of executing software for performing the claimed features, e.g., recognizing various poses and gestures in images. (*Id.*, 3:29-34 (disclosing use of "PC computer 106 (integrated in this case into the monitor housing), for example a 400 Mhz Pentium II"); Ex. PAT-C, 6:6-19 (discussing that an "Intel Pentium 2" processor was suitable to execute pose analysis

102

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

software and analyze when a user made a specific pose).)  Thus, a person of ordinary

skill in the art would have similarly understood that the computing capacity of the

Intel Pentium processor would have provided a cellular telephone, similar to as

discussed in *Liebermann*, the capability of performing various claimed features, e.g.,

"perform[ing] a control function of the handheld device based on at least one of the

first camera output and the second camera output."  (*See below at* Section IX.G.1.e.)

149.  A person of ordinary skill would have been motivated to include a

computer, similar to as disclosed in *Sears*, within the housing to perform local image

processing and gesture recognition when implementing a cellular telephone similar

to as disclosed in *Liebermann*.  As a person of ordinary skill in the art would have

understood, performing the process sign translation or gesture recognition at a

remote server was no more than a design choice based on an economic decision.

(Ex. PA-1, 6:10-12.)  While the proposed modification may have required more

expensive hardware, such as skilled person would have appreciated that customers

would desire highly-integrated smart phone devices that could perform additional

functions, e.g., local gesture recognition.  (Ex. PA-5, 2:3-4 (emphasis added) ("**more**

**integration in mobile computing is desired**.").)  Moreover, a potential increase in

cost of hardware in implementing a local processing capability would not have

deterred a person of ordinary skill from implementing the feature.   In fact,

*Liebermann* itself discloses that the cellular telephone device can function as "an **on-**

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

**site** translator" rather than just a telephone for the deaf.  (Ex. PA-1, 13:37-39

(emphasis added).)

150.    Additionally and alternatively, a person of ordinary skill in the art

would have understood that the image processing and gesture recognition features

could be implemented using known software based on existing hardware.  (Ex. PA-

1, 4:6-9 (disclosing that the remote processing center provides "computer software

for translating functions…"); *id.*, 6:6-10 ("The signing motions captured by the

camera are converted into digital data for processing by the translation software…to

produce data representing numbers, words and phrases which are then combined into

coherent sentences."); *id.*, 7:14-17, 7:48-49 ("Software presently used for this

purpose is appended hereto and is utilized with Borland C++.").)  At the time of the

alleged invention, it was becoming "more and more pervasive" to integrate "personal

computer technology into phones," Ex. PA-3, 1:23-25, and such a skilled person

would have understood that the software-driven features for image process and

gesture recognition would have been implemented on various computer chips having

the requisite computing power to operate those features (such as those described by

*Sears*).  (Ex. PA-2, 7:1-7.)  Such a skilled person would have been motivated to do

so as it would have not only provided additional features and applications to the

then-existing cellular phone after-market but also substantially avoided the cost of

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

implementing a computer in a cellular phone for the sole purpose of performing the

imaging processing and gesture recognition.

151.    Furthermore, as a person of ordinary skill in the art would have

understood, the proposed modification would have reduced network communication

demands because the cellular telephone could communicate with another individual

directly instead of through an intervening network computer and would have also

improved user conveniences for not requiring communication with a remote

processing center that could require additional telecommunication bandwidth.

152.    A person of ordinary skill in the art would have had a reasonable

expectation of success in modifying *Liebermann* in view of *Sears*.  Indeed, the '924

patent discloses that "a home PC" has the processing power required to execute

gesture, pose, etc. recognition software.  (Ex. PAT-A, 2:20-23.)  The '924 patent

even identified that an Intel Pentium processor that was widely used in a personal

computer (like the Intel Pentium processor used in *Sears*) was capable of executing

software for performing the claimed features, e.g., recognizing various poses and

gestures in images.  (*Id.*, 3:29-34 (disclosing use of "PC computer 106 (integrated in

this case into the monitor housing), for example a 400 Mhz Pentium II"); Ex. PAT-

C, 6:6-19 (discussing that an "Intel Pentium 2" processor was suitable to execute

pose analysis software and analyze when a user made a specific pose).)   A person

of ordinary skill in the art would have had the skill to implement, and expectation of

105

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

success in achieving such a modification because it would have involved applying

known technologies (e.g., cellular telephone cameras and processors) according to

known methods (e.g., using processors to detect gestures based on camera data) to

yield the predictable result of a cellular phone computer that detects user gestures.

> **d.     [1.d] a first camera oriented to view
> a user of the handheld device and
> having a first camera output; and**

153.   It is my opinion that *Liebermann* discloses this limitation for the

reasons discussed above in Section IX.A.1.d.

> **e.     [1.e] a second camera oriented to
> view an object other than the user of
> the device and having a second
> camera output, wherein the first and
> second cameras include non-
> overlapping fields of view, and
> wherein the computer is adapted to
> perform a control function of the
> handheld device based on at least
> one of the first camera output and
> the second camera output.**

154.   As discussed above, it is my opinion that *Liebermann* discloses this

limitation.  (*See above at* Section IX.A.1.e.)  Nonetheless, I have been asked to

assume a scenario where *Liebermann* does not teach "a second camera oriented to

view an object other than the user of the device . . . and wherein the computer is

adapted to perform a control function of the handheld device based on at least one

of the first camera output and the second camera output," and in that scenario a

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

person of ordinary skill would have been motivated to implement the feature in light

of *Sears*.

155.    Similar to *Liebermann*, *Sears* teaches "portable," gesture-controlled

machines with multiple cameras.    (Ex. PA-2, Abstract (emphasis added) ("An

optical-input print reading device with voice output for people with impaired or no

vision in which the user provides input to the system from hand gestures. . . . [A]

computer . . . tracks the location and movement of the hand and fingers in order to

interpret the gestural movements into their command meaning. . . . **Multiple**

**cameras** of the same or different field of view can improve performance. In addition,

alternative device configurations allow **portable** operation, including the use of

cameras located on worn platforms, such as eyeglasses, or on a fingertip system.").)

For instance, *Sears* discloses that the multiple-camera reading machine disclosed in

Figure 3 may be implemented as a "portable version."    (*Id.*, 20:67-21:7, 16:14-15;

*id.*, FIG. 3 (illustrating a reading machine with cameras 87 and 89).)    In the "portable

version" of the reading machine, the device "may be supported on collapsible or

hinged legs, or may even be available in forms without leg supports, and be worn by

the user." (*Id.*, 20:67-21:7.)    Moreover, "the cameras, illuminators and scanners, or

some subset of these, may be worn on a head-mount, such as on a pair of glasses,

telephone headset, headphones, or cap" in the portable version.    (*Id.*)    The reading

machine disclosed in Figure 4 discloses one such portable glasses embodiment.    (*Id.*,

107

21:7-9 ("An example of such a worn reading machine is shown in FIG. 4, a

perspective diagram of an eyeglass reading machine 100."); *id.*, FIG. 4 (illustrating

a reading machine with cameras 103 and 105).)

156.   In particular, *Sears* discloses a first camera that senses user "gestures."

*Sears* discloses in the context of Figure 3 that camera 87 of the reading machine is

configured to detect the gestures of a user.   (Ex. PA-2, 16:14-18 ("A low-

magnification wide-angle FOV camera 87 is used to track command gestures.").)

Camera 103 performs a similar function in the embodiment associated with Figure

4.   (*Id.*, 21:11-13 ("A wide-field camera 103 on one eyeglass earpiece provides

functionality similar to that of the wide-field camera 87 of FIG. 3.").)

157.   *Sears* discloses a main system computer analyzes camera images for

gestures.   In *Sears*, the main system 35 computer within a housing analyzes images

from a camera.   (*See above at* Section IX.G.1.c (explaining that 35 includes a

computer chip inside of a housing); Ex. PA-2, 18:9-38 (explaining that 35 analyzes

camera images).)   The images are analyzed by the computer to determine when a

gesture has been made.   (Ex. PA-2*,* 22:5-8 ("[I]n these embodiments, the camera

received commands, at least in part, from hand and finger gestures of the user that

were captured by the camera or cameras."); *id.*, 17:55-58 (describing that gestures

are tracked "using algorithms previously described"); *id.*, 5:44-6:10, 6:52-7:2

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

(explaining that main system 35 analyzes camera images to determine when various

"gestures" have been performed).)

158. *Sears* discloses that various control functions of the device are triggered

when the computer detects a specific command gesture using the camera(s). Thus,

*Sears* discloses "the computer is adapted to perform a control function of the

handheld device based on at least one of the first camera output and the second

camera output," as claimed. With respect to this claimed feature, the '924 patent

discloses that a control function of a handheld device includes controlling the device

"itself" to perform a function, e.g., a base function of the device or a method to

interact with the device to achieve other purposes. (Ex. PAT-A, 11:65-12:3

(emphasis added) ("FIG. 8A illustrates control of functions with the invention, using

**a handheld device which *itself* has functions** (for example, a cell phone). The

purpose is to add functionality to the device, without complicating its **base function**,

and/or alternatively **add a method to interact with the device to achieve other**

**purposes**.").) *Sears* teaches using gestures to control cameras, turn the device off,

and otherwise control the portable device. In one instance, a fist gesture triggers a

control function that instructs the device to power down. (Ex. PA-2, 10:29-30 ("A

closed fist could be used to direct the electronic reader to shut itself off.").) In

another instance, a gesture triggers a control function that instructs the device to stop

operating. (*Id.*, 11:7-9 ("The particular linkage of a gesture with a command may

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

be cognitively linked—e.g. a flat hand, like a "stop" motion, may be used to stop

reading.").)  In another instance, a gesture triggers a control function that instructs

the device to snap an image/picture for those who may have a disability.  (*Id.*, 15:47-

56 ("In addition, or alternatively, the text and images captured by the system of the

present invention can be used to input the text and images for storage and use on the

main system 35 computer. This might be used, for instance, as a low-resolution

scanner and text input mechanism for general application by users who may or may

not have a disability. For example, home or business users can make manual gestures

to copy portions of letters, bills, and advertisements into computer storage files.");

Ex. PAT-A, 13:20-26 (explaining that a control function includes instructing a

device camera to "take images of things").)  Indeed, *Sears* discloses that "many

different gestures may be linked with different commands within the spirit of the

present invention" to control the device itself.  (*Id.*, 11:10-12.)  A person of ordinary

skill in the art would have understood that the computer, which processes and

responds to gestures, *id*, 18:9-38; *id.,* 22:5-8; *id.*, 17:55-58; *id.*, 5:44-6:10, 6:52-7:2,

at least includes the hardware to perform these control functions based off camera

data.  Moreover, such control functions may occur as a result of a single gesture

image.  (*Id.*, 5:51-58 ("The output digital image, consisting of a two-dimensional

array of pixel values (generally either 8-bit gray-scale or 24-bit color) is then sent to

a digital computer where the image is analyzed in at least two modes. In the first

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

mode, the image is converted into its text representation in an optical character recognition step 55, whereas in the second mode, the image is analyzed for the presence, orientation and movement of a pointer object (e.g. a finger 34, shown in FIG. 1).”); *id.*, 18:9-14, 18:25-45, 22:5-8, 17:55-58 (discussing how the computer performs image analysis of gestures and the image capture steps).)

159.    A person of ordinary skill would have been motivated to implement *Liebermann*’s computer such that it performs a control function of the handheld device based on at least one of the first camera output and the second camera output in view of *Sears*.   For example, one or more of the cameras disclosed in the *Liebermann-Sears* combination (the “first camera,” the “second camera,” or both) would detect gestures based on the images captures by the camera(s) and the cellular telephone computer would, in response, perform control functions to turn the device off, stop operating, snap a picture, etc.  A person of ordinary skill in the art would have been motivated to control the device with gestures for the increased conveniences associated with natural gesture control.  (Ex. PA-2, Abstract (“The use of gestural commands is natural.”).)  Furthermore, as such a skilled person would have understood, such implementation would have provided additional ways to control the cellular phone device, providing flexibility when operating the device. For example, being able to stop the operation of device with gestures would have

111

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

prevented incorrect sign communications from being transmitted to the receiving party.

160.    Such a skilled person would have had a reasonable expectation of success in modifying *Liebermann* in view of *Sears*.  Like *Liebermann*, which discloses a software-driven scheme for gesture detection implemented on its computer, *Sears* discloses using software programs to detect various gestures and perform a host of other functions.  (Ex. PA-2, 27:30-34 ("Because the computer of the main system is generally high performance, this allows considerable 'intelligence' to reside in the software program for tracking text, rather than requiring the user to track it manually."); *id.*, 16:24 (explaining that the computer of main system runs "software"); *id.*, 7:1-11 (expressing that main system may run Windows and other programs); 18:9-15 (explaining that main system 35 controls the cameras); *id.*, 16:17-19 (describing that camera 87 tracks gestures); *id.*, 18:9-13 (describing that main system 35 analyzes images from camera 87); *id.*, 17:55-58 (describing that gestures are tracked "using algorithms previously described"); *id.*, 7:66-67 (referencing "commonly used tracking algorithms").)  Thus, it is my opinion that a person of ordinary skill in the art would have been motivated to implement these software-driven features (e.g., as in *Sears*) in *Liebermann* and would have reasonable expectation of success in doing so.  Moreover, the modification would have involved known technologies (e.g., a handheld device with multiple cameras)

112

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

according to known methods (e.g., using cameras to control a device with gestures)

to yield the predictable result of using the cellular telephone cameras and computer

to perform various control functions for the device itself. The *Liebermann* cellular

telephone includes dual camera hardware, a computer, and detects gestures as

explained above. Using gestures to command the system as described by *Sears*

would have done no more than provide another predictable way to control the

functions of the cellular telephone (turn the device off, etc.).

161.    Likewise, it is my opinion that the *Liebermann-Sears* combination

discloses that the claimed "computer is adapted to" perform identified functions

under the construction discussed above (*see above at* Sections VII.B, D), i.e.,

software running on a computer that is programmed to perform the claimed function

or equivalents thereof, for the same reasons discussed herein.  (*See also above at*

Section IX.A.1.e.).  Thus, it is my opinion that *Liebermann* in view of *Sears*

discloses or suggests this limitation under both Samsung's proposed constructions,

and the plain meaning proposed by patent owner and found by the district court.

(*See* Section VII; Ex. CC-2.)

    **2.**    **Claim 2**

        **a.**    **The handheld device of claim 1 wherein the handheld device comprises a mobile phone.**

113

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

162.  It is my opinion that *Liebermann* discloses and/or suggests this

limitation for the reasons discussed above in Sections IX.A.2 and IX.G.1.

### 3.    Claim 3

> **a.    The handheld device of claim 1 wherein the first camera is adapted to acquire an image of at least a portion of the user.**

163.  It is my opinion that *Liebermann* discloses this limitation for the

reasons discussed above in Sections IX.A.3 and IX.G.1.

### 4.    Claim 4

> **a.    The handheld device of claim 1 wherein the second camera is adapted to acquire an image of the object.**

164.  It is my opinion that *Liebermann* discloses and/or suggests this

limitation for the reasons discussed above in Sections IX.A.4 and IX.G.1.

Regardless of the object that is acquired, *see above at* Sections IX.A.4, IX.G.1, the

*Liebermann* cameras are adapted to acquire an image of the object.

### 5.    Claim 5

> **a.    The handheld device of claim 1 wherein the second camera is adapted to acquire a video of the object.**

165.  It is my opinion that *Liebermann* discloses this limitation for the

reasons discussed above in Sections IX.A.5 and IX.G.1.  Regardless of the object

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

that is acquired, above Sections IX.A.5, IX.G.1.e, *Liebermann* discloses the cameras

are adapted to acquire a video of the object.

### 6.    Claim 6

#### a.    The handheld device of claim 1 wherein the computer is operable to determine a gesture based on at least one of the first camera output and the second camera output.

166.   The analysis above for limitations [1.c] and [1.e] explain how and why

a person of ordinary skill would have been motivated for the computer in the

modified cellular telephone to be operable to determine a gesture based on camera

images like that claimed here ("computer is operable to determine a gesture based

on at least one of the first camera output and the second camera output"). (*See above

at* Sections IX.G.1.c, IX.G.1.e (explaining how the "computer" in the modified

*Liebermann* cellular phone would have been operable to perform a control function

of the handheld device based on at least one of the first camera output and the second

camera output).)  Such operations would have included determining a gesture based

on camera outputs because the *Liebermann* computer—as modified—processes

camera data for gestures to determine when to turn off, stop operating, take a picture,

etc. (*See above at* Section IX.G.1.e.)  As explained, *Sears* discloses that main system

computer 35 analyzes camera images for gestures.  (*Id.*)  When the computer detects

a specific command gesture using the camera(s), various control functions of the

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

device (turn off, stop operating, take a picture, etc.) are triggered.  (*Id.*)  The *Sears*

computer teachings modify *Liebermann* such that the cellular telephone computer—

upon detecting a gesture—can perform a control function of the handheld device

based on at least one of the first camera output and the second camera output.  (*Id.*)

Indeed, the gesture control is based off at least one camera output because the

cameras sense the gestural inputs.  (*Id.* (explaining how cameras sense gestures and

the system responds to various gestures); *see also* Ex. PA-1, 6:6-6:10 (describing

how hand gestures "captured by the camera are converted into digital data for

processing"); *id.*, 13:4-16 (suggesting a multiple camera embodiment); Ex. PA-2*,*

22:5-8 ("[I]n these embodiments, the camera received commands, at least in part,

from hand and finger gestures of the user that were captured by the camera or

cameras."); *id.*, 5:44-6:10, 6:52-7:2 (explaining that main system 35 analyzes camera

images to determine when various "gestures" have been performed); 10:29-11:15

(describing various gestures that can control the system).)

167.    Likewise, it is my opinion that the *Liebermann-Sears* combination

discloses or suggests that the claimed "gesture" under the construction discussed

above (*see above at* Section VII.C), i.e., a sequence of positions that conveys a

meaning, as the various "finger and hand motions" to convey sign language, which

are detected in addition to *Sears* hand gesture controls, Ex. PA-1, 6:4-47; *id.*, 12:30-

36 (referring to hand signs as "gesture[s]"); *see above at* Section IX.G.1, are

116

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

gestures.  Likewise, the *Liebermann-Sears* combination discloses or suggests the

claimed "gesture" under the district court's construction discussed above (*see above*

at Section VII), i.e., movement of hands or other body parts that conveys meaning,

as the various "finger and hand motions" to convey sign language, which are

detected in addition to *Sears* hand gesture controls, Ex. PA-1, 6:4-47; *id.*, 12:30-36

(referring to hand signs as "gesture[s]"); *see above* at Section VIII.G.2, are gestures.

Thus, *Liebermann* in view of *Sears* discloses or suggests this limitation under

Samsung's proposed construction, the meaning proposed by patent owner, and the

meaning found by the district court.  (*See* Section VII; Ex. CC-2.)

   7. **Claim 7**

     a. **The handheld device of claim 1
wherein the computer is operable to
determine a facial expression based
on at least one of the first camera
output and the second camera
output.**

168.  It is my opinion that *Liebermann* in view of *Sears* discloses "the

computer is operable to determine a facial expression based on at least one of the

first camera output and the second camera output."  In one embodiment, "**images

captured by the camera are of the . . . facial expressions**" of a user.  (Ex. PA-1,

6:42-47 (emphasis added).)  And the facial expressions of a hearing challenged user

are analyzed to determine raised eyebrow facial expressions, teeth exposed facial

117

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

expressions, etc. *(Id.,* 8:30-9:22.)    Accordingly, the computer in the modified

*Liebermann* cellular phone (which performs network processing locally as explained

above) would have been operable to perform such processing locally, and thus

determine a facial expression based on at least one of the first or second camera

output discussed above. *(See above at* Section IX.G.1.)

8.    **Claim 8**

a.    **The handheld device of claim 1
wherein the computer is adapted to
determine at least one of the position
and the orientation of the object
based on the second camera output.**

169.  I have been asked to assume a scenario where *Liebermann* does not

teach this limitation, and in that scenario a person of ordinary skill would have been

motivated to configure the computer in the modified *Liebermann* cellular phone to

be adapted to determine at least one of the position and the orientation of the object

based on the second camera output.

170.  The '924 patent explains that objects include persons, hands, and

fingers.  (Ex. PAT-A, 3:52-54 (emphasis added) ("[C]amera 144 can be used for

other purposes, such as acquire images of **objects such as persons.**"); Ex. PAT-D,

1:67-2:2 (incorporated into the '924 patent by reference) (emphasis added)

("cameras according to the invention located on the keyboard surface to observe

**objects such as fingers and hands**").)

118

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

171.   When a second person controls the *Sears* device with gestures, the system determines the position and/or orientation of a finger object.   Like *Liebermann*, *Sears* also discloses that multiple cameras can track user gestures.  (Ex. PA-2, 22:5-8 ("Furthermore, in these embodiments, the camera received commands, at least in part, from hand and finger gestures of the user that were captured by the camera or cameras.").)  *Sears* further discloses that multiple persons can control the device with gestures.  (*Id.*, 6:34 (disclosing that "[m]any users" can use the system).) And *Sears* discloses that the main system computer determines the "position" and/or "orientation" of a finger object when determining whether a gesture has been made. (*Id.*, 5:54-61 ("[I]n the second mode, the image is analyzed for the presence, orientation and movement of a pointer object (e.g. a finger 34, shown in FIG. 1) which is under the influence of the user and which is located on top of the printed material 33, in a pointer tracking step 57."); *id.*, 13:48-51 ("Control for this feedback is provided in a feedback generation step 65, which accepts input from pointer tracking 57 and text selection 59, which contain information about the position and movement of the finger 34."); *id.*, 17:55-58 ("Once the user's hand or finger is identified using algorithms previously described, the hand can be tracked until a command is received, either through hand movement, finger orientation or position, or other input modality."); *see also above at* Section IX.G.1.c (explaining how the computer determines gestures based on camera images).)  So when a second person

119

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

other than the user makes a gesture, a person of ordinary skill in the art would have

understood that the computer determines the position and/or orientation of a finger

object.

172.    A person of ordinary skill would have been motivated before the time

of the alleged invention to have the system computer be adapted to determine at least

one of the position and the orientation of the object based on the second camera

output.  Given that *Liebermann* and *Sears* disclose and/or suggest using two cameras

to sense gestures, Ex. PA-1, 13:4-7 ("The illustrated embodiments all utilize a single

video cameras. It may be desirable to utilize more than one camera to allow the

signing person 'free' movement in his or her environment."); Ex. PA-2, 22:5-8, a

person of ordinary skill in the art would have appreciated that the exact algorithm

used for gesture detection was a design choice motivated by needs for "accura[cy],"

"computing resources," and/or other tradeoffs.  (Ex. PA-2, 9:19-26.)  Here such a

skilled person would have been motivated to use the specific gesture detecting

algorithm disclosed by *Sears* for the benefits associated therewith.

173.    Further, such a skilled person would have been motivated to use the

*Sears* gesture-detecting algorithm as claimed because it would have increased user

convenience by allowing persons to control the device with natural gestures.  (*See*

*above at* Section IX.G.1.e.)

120

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

174.   A person of ordinary skill in the art would have had a reasonable expectation of success in such an implementation because the combination would have involved known technologies (e.g., devices with multiple cameras) according to known methods (e.g., using various algorithms to recognize hand gestures) to yield the predictable result of a device with two cameras that sense gestures.

175.   Likewise, it is my opinion that the *Liebermann-Sears* combination discloses that the claimed "computer is adapted to" perform identified functions under the construction discussed above (*see above at* Sections VII.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons discussed herein.  (*See above at* Sections IX.A.1.e and IX.G.1.e.).

176.   Thus, it is my opinion that *Liebermann* in view of *Sears* discloses or suggests this limitation under both Samsung's proposed constructions, and the plain meaning proposed by patent owner and found by the district court.  (*See* Section VII; Ex. CC-2.)

9.     **Claim 10**

a.     **The handheld device of claim 1 wherein the computer is adapted to recognize the object based on the second camera output.**

121

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

177.   It is my opinion that *Liebermann* in view of *Sears* discloses and/or suggests this limitation.  As modified, the computer of the cellular telephone senses and distinguishes among a variety of different types of user gestures.  (*See above at* Section IX.G.1.)  Further, the second camera is oriented to view objects (including the fingers and hands of another person).  (*See above at* Section IX.G.1.e.)  When the computer distinguishes a first hand gesture object from another gesture based on data from the second camera, a person of ordinary skill in the art would have understood that the computer is adapted to recognize the hand object as a hand making a specific gesture.  (Ex. PA-1, 6:4-10 ("[C]amera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences."); Ex. PA-2, 10:29-30, 11:7-9, 15:47-56 (explaining that a variety of hand gestures can control the system).)  Accordingly, the computer in the modified *Liebermann* cellular phone would have been adapted to recognize the object based on the second camera output, as claimed.

178.   Likewise, it is my opinion that the *Liebermann-Sears* combination discloses that the claimed "computer is adapted to" perform identified functions under the construction discussed above (*see above at* Sections VII.B, D), i.e.,

122

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

software running on a computer that is programmed to perform the claimed function

or equivalents thereof, for the same reasons discussed herein.  (*See above at* Sections

IX.A.1.e and IX.G.1.e.).  Thus, it is my opinion that *Liebermann* in view of *Sears*

discloses or suggests this limitation under both Samsung's proposed constructions,

and the plain meaning proposed by patent owner and found by the district court.

(*See* Section VII; Ex. CC-2.)

> **10.    Claim 12**
>
> > **a.    The handheld device of claim
> > 1 wherein the computer is adapted
> > to determine a reference frame of
> > the object.**

179.  It is my opinion that *Liebermann* in view of *Sears* discloses and/or

suggests this limitation for the reasons discussed above in Sections IX.D.10 and

IX.G.1.  Specifically, *Liebermann* discloses two ways to determine a reference frame

of the object, *see above at* Section IX.D.10, and the *Sears* modification specifies that

the computer is located on the cellular telephone, *see above at* Section IX.G.1.  Thus

it is my opinion that a person of ordinary skill would have been motivated to

configure the computer in the modified *Liebermann* cellular phone to be adapted to

determine a reference frame of the object as claimed for the same reasons explained

above.

APPX0465

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

180.   Likewise, it is my opinion that the *Liebermann-Sears* combination discloses that the claimed "computer is adapted to" perform identified functions under the construction discussed above (*see above at* Sections VII.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons discussed herein.  (*See above at* Sections IX.A.1.e and IX.G.1.e.).  Thus, it is my opinion that *Liebermann* in view of *Sears* discloses or suggests this limitation under both Samsung's proposed constructions, and the plain meaning proposed by patent owner and found by the district court. (*See* Section VII; Ex. CC-2.)

> **11.   Claim 13**
>
> > **a.   The handheld device of claim 1 wherein the computer is adapted to perform a control function based on the first camera output and based on the second camera output.**

181.   I have been asked to assume a scenario where *Liebermann* does not teach this limitation, and in that scenario *Liebermann* in view of *Sears* suggests this limitation.  For instance, both cameras in *Liebermann* may be used to sense user gestures in the modified system.  (*See above at* Section IX.G.1.e; Ex. PA-2, 22:5-8 ("Furthermore, in these embodiments, the camera received commands, at least in part, from hand and finger gestures of the user that were captured by the camera or cameras.").)  And based on the outputs of the gesture-detecting cameras, the

124

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

computer in the modified *Liebermann* would have been configured to perform a variety of control functions based on such camera outputs. (*See above at* Section IX.G.1.e.) Accordingly, for the reasons explained, the computer in the modified *Liebermann* cellular phone would have been adapted to perform a control function based on the first camera output and based on the second camera output, as claimed.

182. Likewise, it is my opinion that the *Liebermann-Sears* combination discloses that the claimed "computer is adapted to" perform identified functions under the construction discussed above (*see above at* Sections VII.B, D), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons discussed herein. (*See above at* Sections IX.A.1.e and IX.G.1.e.). Thus, it is my opinion that *Liebermann* in view of *Sears* discloses or suggests this limitation under both Samsung's proposed constructions, and the plain meaning proposed by patent owner and found by the district court. (*See* Section VII; Ex. CC-2.)

> **H.    SNQ8: *Liebermann* in view of *Sears* and *Tryding***

183. As I explain below, *Liebermann*, *Sears*, and *Tryding* disclose or suggest the limitations of claim 11 of the '924 patent.

> > **1.    Claim 11**
> >
> > > **a.    The handheld device of claim 1 wherein the computer is adapted to generate control instructions for a**

125

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

> **display that is separate from the**
> **handheld device.**

184. It is my opinion that *Liebermann* in view of *Sears* and *Tryding* discloses and/or suggests this limitation for the reasons discussed above in Sections IX.B and IX.G.1. The analysis for modifying *Liebermann* in light of *Tryding* (Section IX.B) are applicable to the modified *Liebermann-Sears* combination discussed above for claim 1 (Section IX.G.1). Thus, given that the computer in the modified *Liebermann-Sears* cellular phone would have controlled the cellular telephone, *see above at* Section IX.G.1, a person of ordinary skill in the art would have been motivated to configure the computer such that it is adapted to perform the display function, like that described by *Tryding*, for the reasons discussed.

## I.    SNQ9: *Liebermann* in view of *Sears* and *Gershman*

185. As I explain below, *Liebermann*, *Sears*, and *Gershman* disclose or suggest the limitations of claim 14 of the '924 patent.

### 1.    Claim 14

> **a.    The handheld device of claim 1**
> **wherein the computer is adapted to**
> **transmit information over an**
> **internet connection.**

186. It is my opinion that *Liebermann* in view of *Sears* and *Gershman* discloses and/or suggests this limitation for the reasons discussed above in Sections IX.C and IX.G.1. The analysis for modifying *Liebermann* in light of *Gershman*

126

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

(Section IX.C) are applicable to the modified *Liebermann-Sears* combination

discussed above for claim 1 (Section IX.G.1). Thus, given that the computer in the

modified *Liebermann* cellular phone would have controlled the cellular telephone,

see above at Section IX.G.1, a person of ordinary skill in the art would have been

motivated to configure the computer such that it is adapted to transmit information

over an internet connection, like that described by *Gershman*.

**J.     SNQ10: *Liebermann* in view of *Kimball***

187.   As I explain below, *Liebermann* and *Kimball* disclose or suggest the

limitations of claim 14 of the '924 patent.

**1.     Claim 14**

**a.     The handheld device of claim 1 wherein the computer is adapted to transmit information over an internet connection.**

188.   While not expressly disclosed, a person of ordinary skill would have

been motivated to adapt a computer of a cellular telephone (such as the *Liebermann*

computer) to transmit information over an internet connection in view of *Kimball*.

For example, *Kimball* discloses a wireless phone that is adapted to transmit

information over an internet connection. (Ex. PA-11, Abstract ("A cellular

telephone that provides the capability of performing Internet telephone calls without

the bulk and expense of Internet telephone computer systems."); *id.*, 6:51-55, FIG.

4.) Specifically, *Kimball* describes how conventional cell phone hardware could be

127

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

programmed with "internet telephony code" to make or receive internet calls,

communicate data packets, etc. over a cellular transceiver. (*Id.*, 7:14-23 ("FIG. 5

illustrates the software elements of the cellular telephone 10 in one embodiment.

The software elements includes cellular telephony code 60 that provides the

functionality of the cellular call subsystem 20 and Internet telephony code 62 that

provides the functionality of the Internet call subsystem 22. The Internet telephony

code 62 may be added to an existing cellular telephone 10 to provide Internet

telephone functionality without requiring hardware upgrades to the cellular

telephone 10."); *id.*, 2:62-64, FIGs. 2A-C (describing various data packets that are

communicated over the internet via a cell phone); *id.*, FIG. 4 (illustrating that the

cellular telephone includes processor 50 and a transceiver).)



(*Id.*, FIG. 5 (illustrating the "internet telephony code" software 62 that allows a cell

phone to communicate over the internet).)

128

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

189.    A person of ordinary skill would have been motivated before the time

of the alleged invention to have the *Liebermann* cellular telephone computer perform

an internet communication as claimed.  As explained above, computer hardware of

the *Liebermann* cellular telephone operates the device, controls displays,

communicates data, etc.  (*See above at* Section IX.A.1.c.)   So the internet

communication software described by *Kimball* would have been processed on the

*Liebermann* computer to communicate over an internet connection (as the software

of a device is executed on the hardware of the device).  (Ex. PA-11, 7:19-23 ("The

Internet telephony code 62 may be added to an existing cellular telephone 10 to

provide Internet telephone functionality without requiring hardware upgrades to the

cellular telephone 10.").)

190.    A person of ordinary skill in the art would have been motivated to

include internet access capability when implementing a cellular phone similar to as

disclosed in *Liebermann* such that the computer in the cellular phone is adapted to

transmit information over the internet connection.  For instance, such a skilled

person would have been motivated to modify *Liebermann* to communicate calls over

the internet as claimed because consumers desired the flexibility and convenience

associated with internet calling.  (*Id.*, 1:9-53.)   *Liebermann* describes a cellular

telephone that communicates data to make a call, Ex. PA-1, 7:21-28, and *Kimball*

suggests a beneficial way of communicating data over the internet to make a call,

129

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

Ex. PA-11, 1:9-53, 7:21-28.  Additionally, using the software techniques disclosed

by *Kimball* would have reduced the size and costs associated with communicating

data over the internet.  (Ex. PA-11, 1:9-53.)  Further, persons of ordinary skill in the

art understood that consumers wanted devices that could connect to the internet

before the time of invention and would have been motivated to include the claimed

internet feature for similar reasons.  Indeed, such a skilled person would have been

motivated to include an internet connection at least because it could conveniently

and quickly communicate various data on demand.

191.  A person of ordinary skill in the art would have had a reasonable

expectation of success in implementing Internet access in a cellular phone computer.

Indeed, *Kimball* discloses that communicating information over an internet

connection of a cell phone required no more than appropriate programming.  (*Id.*,

7:14-23.)  Furthermore, such an implementation would have involved a combination

of known technologies (e.g., as in *Liebermann* and *Kimball*) according to known

methods (e.g., known processes to transmit information over the Internet) to yield a

predictable cell phone computer that is adapted to transmit information over an

internet connection.

192.  Finally, it is my opinion that the *Liebermann-Kimball* combination

likewise discloses that "the computer is adapted to perform" the claimed control

function under the construction discussed above (*see above at* Sections VII.B, D),

130

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons and as discussed above in Section IX.A.1.e. (*See above at* Section IX.A.1.e (explaining how the *Liebermann* cellular telephone computer is programmed with software to operate).) Further, *Kimball* discloses that communicating information over an internet connection of a cell phone as claimed required no more than appropriate software programming. (Ex. PA-11, 7:14-23.) Thus, it is my opinion that *Liebermann* in view of *Kimball* discloses or suggests this limitation under both Samsung's proposed constructions, and the plain meaning proposed by patent owner and found by the district court. (*See above* at Section VII; Ex. CC-2.)

### K.   SNQ11: *Liebermann* in view of *Himmel* and *Kimball*

193.   As I explain below, *Liebermann*, *Himmel*, and *Kimball* disclose or suggest the limitations of claim 14 of the '924 patent.

#### 1.   Claim 14

> **a.   The handheld device of claim 1 wherein the computer is adapted to transmit information over an internet connection.**

194.   It is my opinion that *Liebermann* in view of *Himmel* and *Kimball* discloses and/or suggests this limitation for the reasons discussed above in Sections IX.K and IX.D.1. The analysis for modifying *Liebermann* in light of *Kimball* (Section IX.K) is applicable to the modified *Liebermann-Himmel* combination

131

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

discussed above for claim 1 (Section IX.D.1). Thus, given that the computer in the

modified *Liebermann* cellular phone would have controlled the cellular telephone,

*see above at* Section IX.D.1, a person of ordinary skill in the art would have been

motivated to configure the computer such that it is adapted to transmit information

over an internet connection, like that described by *Kimball*. Thus, it is my opinion

that *Liebermann* in view of *Himmel* and *Kimball* discloses or suggests this limitation

under both Samsung's proposed constructions, and the plain meaning proposed by

patent owner and found by the district court. (*See above* at Section VII; Ex. CC-2.)

### L.    SNQ12: *Liebermann* in view of *Sears* and *Kimball*

195.    As I explain below, *Liebermann*, *Sears*, and *Kimball* disclose or suggest

the limitations of claim 14 of the '924 patent.

#### 1.    Claim 14

##### a.    The handheld device of claim 1 wherein the computer is adapted to transmit information over an internet connection.

196.    It is my opinion that *Liebermann* in view of *Sears* and *Kimball* discloses

and/or suggests this limitation for the reasons discussed above in Sections IX.K and

IX.G.1. The analysis for modifying *Liebermann* in light of *Kimball* (Section IX.K)

is applicable to the modified *Liebermann-Sears* combination discussed above for

claim 1 (Section IX.G.1). Thus, given that the computer in the modified *Liebermann*

cellular phone would have controlled the cellular telephone, *see above at* Section

132

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

IX.G.1, a person of ordinary skill in the art would have been motivated to configure the computer such that it is adapted to transmit information over an internet connection, like that described by *Kimball*.  Thus, it is my opinion that *Liebermann* in view of *Sears* and *Kimball* discloses or suggests this limitation under both Samsung's proposed constructions, and the plain meaning proposed by patent owner and found by the district court.  (*See above* at Section VII; Ex. CC-2.)

**M.    SNQ13: *Liebermann* in view of *Himmel***

**1.    Claim 9**

**a.    The handheld device of claim 6 wherein the gesture is performed by a person other than the user of the handheld device.**

197.    I understand that the district court found the term "wherein the gesture is performed by a person other than the user of the handheld device" to be indefinite. (*See above* at Section VII; Ex. CC-2, 48-50.)  Thus, for purposes of this SNQ, the mapping below demonstrates how the prior art discloses/suggests the limitations of claim 9 under patent owner's position and to the extent the Office does not agree with the district court's findings.  (*See above* at Section VII; Ex. CC-2, 48-50.)

198.    Under the above assumptions, it is my opinion that *Liebermann* in view of *Himmel* discloses and/or suggests the limitations of claims 1 and 6 from which claim 9 depends.  As discussed above in claims 1 and 6, the *Liebermann-Himmel*

133

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

combination suggests the claimed two-camera system that responds to user gestures.

(*See above* at Section IX.D.6 (claim 6); Section IX.D.1 (claim 1).)

199.    As to claim 9, *Liebermann* discloses that the device can be used by multiple persons.  (Ex. PA-1, 13:4-23 ("[a] defined Figure with signing motions . . . is rendered in conformity with allowable images (for **persons**).").)   A person of ordinary skill would have understood that the cellular telephone could accept signing gestures from multiple persons, including a person not the user of the device.  (*Id.*, 12:30-36 (referring to hand signs as "gesture[s]").)  Moreover, such a person would have understood that a user could hold the phone to image a signing person who is not the user of the phone.

200.    Likewise, it is my opinion that the *Liebermann-Himmel* combination discloses that the claimed "computer is adapted to" perform identified functions under the constructions discussed above (*see above* at Section VII), i.e., software running on a computer that is programmed to perform the claimed function or equivalents thereof, for the same reasons discussed herein.  (*See above* at Sections IX.A.1.e and IX.D.1.e.)

201.    Likewise, it is my opinion that the *Liebermann-Himmel* combination discloses or suggests the claimed "gesture" under Samsung's construction discussed above (*see above* at Section VII), i.e., a sequence of positions that conveys a

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

meaning, as the various "finger and hand motions" to convey sign language, Ex. PA-1, 6:4-47; *id.*, 12:30-36 (referring to hand signs as "gesture[s]"), are gestures.

202.    Likewise, it is my opinion that the *Liebermann-Himmel* combination discloses or suggests the claimed "gesture" under the district court's construction discussed above (*see above* at Section VII), i.e., movement of hands or other body parts that conveys meaning, as the various "finger and hand motions" to convey sign language, Ex. PA-1, 6:4-47; *id.*, 12:30-36 (referring to hand signs as "gesture[s]"), are gestures.  Thus, it is my opinion that *Liebermann* in view of *Himmel* discloses or suggests these limitations under the Samsung's proposed constructions, the meanings proposed by patent owner, and the meanings found by the district court. (*See* Section VII.)

**N.    SNQ14: *Liebermann* in view of *Sears***

**1.    Claim 9**

**a.    The handheld device of claim 6 wherein the gesture is performed by a person other than the user of the handheld device.**

203.    I understand that the district court found the term "wherein the gesture is performed by a person other than the user of the handheld device" to be indefinite. (*See above* at Section VII; Ex. CC-2, 48-50.)  Thus, for purposes of this SNQ, the mapping below demonstrates how the prior art discloses/suggests the limitations of

135

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

claim 9 under patent owner's position and to the extent the Office does not agree

with the district court's findings.  (*See above* at Section VII; Ex. CC-2, 48-50.)

204.  It is my opinion that *Liebermann* in view of *Sears* discloses and/or

suggests the limitations of claims 1 and 6 from which claim 9 depends.  As discussed

above in claims 1 and 6, the *Liebermann-Sears* combination suggests the claimed

two-camera system that responds to user gestures.  (*See above* at Section IX.G.6

(claim 6); Section IX.G.1 (claim 1).)

205.  In addition to the *Liebermann-Himmel* combination that renders claim

9 obvious, claim 9 would have been obvious in view of *Liebermann* and *Sears*.  As

explained above, *Liebermann* discloses that the device can be used by multiple

persons.  (Ex. PA-1, 13:4-23 ("[a] defined Figure with signing motions . . . is

rendered in conformity with allowable images (for **persons**).").)  Similarly, a person

of ordinary skill in the art would have understood that the cellular telephone could

accept signing gestures from multiple persons, including a non-user person operating

the device.  (*Id.*, 12:30-36 (referring to hand signs as "gesture[s]").)  Further, such a

person would have understood that a user could hold the phone to image a signing

person who is not the user of the phone.  Moreover, *Sears* discloses that multiple

persons can control the device with gestures.  (Ex. PA-2, 6:34 (disclosing that

"[m]any users" can use the system).)  A person of ordinary skill in the art would

have thus been motivated to configure the *Liebermann-Sears* cellular phone to detect

136

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

gestures from multiple users to benefit from the convenience associated with having

multiple persons being able to input signing gestures.  Such a person would have

had a reasonable expectation of success in such implementation, given it would have

involved known technologies (e.g., hardware for recognizing hand gestures from

persons) according to known methods (e.g., recognizing hand gestures from persons)

to yield the predictable result of a gesture being performed by a person other than

the user of the handheld device.  Thus, the *Liebermann-Sears* combination discloses

and/or suggests claim 9.

206.  Likewise, the *Liebermann-Sears* combination discloses that the

claimed "computer is adapted to" perform identified functions under Samsung's

construction discussed above (*see above* at Section VII.B, D), i.e., software running

on a computer that is programmed to perform the claimed function or equivalents

thereof, for the same reasons discussed herein.  (*See above* at Sections IX.A.1.e and

IX.G.1.e.).

207.  Likewise, the *Liebermann-Sears* combination discloses or suggests the

claimed "gesture" under the construction discussed above (*see above* at Section

VII.C), i.e., a sequence of positions that conveys a meaning, as the various "finger

and hand motions" to convey sign language, which are detected in addition to *Sears*

hand gesture controls, Ex. PA-1, 6:4-47; *id.*, 12:30-36 (referring to hand signs as

"gesture[s]"); *see above* at Section IX.G.1, are gestures.

137

Declaration of Dr. Gregory D. Abowd
U.S. Patent No. 8,194,924

208.    Likewise, the *Liebermann-Sears* combination discloses or suggests the claimed "gesture" under the district court's construction discussed above (*see above* at Section VII.C), i.e., movement of hands or other body parts that conveys meaning, as the various "finger and hand motions" to convey sign language, which are detected in addition to *Sears* hand gesture controls, Ex. PA-1, 6:4-47; *id.*, 12:30-36 (referring to hand signs as "gesture[s]"); *see above* at Section IX.G.1, are gestures. Thus, *Liebermann* in view of *Sears* discloses or suggests these limitations under Samsung's proposed constructions, the meanings proposed by patent owner, and the meanings found by the district court.  (*See* Section VII; Ex. CC-2.)

## X.    CONCLUSION

209.    I declare that all statements made herein of my knowledge are true, and that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Dated:  November 11, 2021        By: _____
                                        Dr. Gregory D. Abowd

138

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,902 | 11/11/2021 | 8194924 | 75281.00085 | 3671 |

184036       7590      12/02/2021
Williams Simons & Landis PLLC/ GTP
The Littlefield Building
601 Congress Ave., Suite 600
Austin, TX 78701

| EXAMINER |
|---|
| RALIS, STEPHEN J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/02/2021 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

PAUL HASTINGS LLP ( GENERAL)
2050 M. STREET NW
WASHINGTON, DC 20036

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/014,902* .

PATENT UNDER REEXAMINATION *8194924* .

ART UNIT *3992* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| ***Order Granting Request For Ex Parte Reexamination*** | **Control No.** 90/014,902 | **Patent Under Reexamination** 8194924 |
|---|---|---|
| | **Examiner** STEPHEN J RALIS | **Art Unit** 3992 | **AIA (FITF) Status** No |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>11/11/2021</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments:  a)☐   PTO-892,       b)☑   PTO/SB/08,      c)☐   Other: _____

1. ☑   The request for *ex parte* reexamination is GRANTED.

   RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

| | | |
|---|---|---|
| | | |

cc:Requester ( if third party requester )

## ORDER GRANTING REEXAMINATION OF U.S. PATENT 8,194,924

### I.    *Notice of Pre-AIA or AIA Status*

The present reexamination is being conducted under the pre-AIA first to invent

provisions.

### II.    *Decision on Request for Ex Parte Reexamination*

In the instant request for reexamination filed 11 November 2021 ("EP Request"),

reexamination of U.S. Patent No. 8,194,924 ("'924 Patent") with respect to claims 1-14 was

requested by a Third Party Requester *i.e.*, **_Samsung Electronics Co., Ltd._**, ("EP Requester")

under 35 U.S.C. §§ 302-307 and C.F.R. § 1.510. A substantial new question of patentability

("SNQ") is raised by the EP Request for reexamination and prior art cited therein for the reasons

set forth below. Accordingly, the EP Request for reexamination is **GRANTED**.

### III.    *Priority*

The '924 Patent issued on 05 June 2012, from U.S. Application No. 13/051,698 ("'698

Application") filed on 18 March 2011, which is a continuation of U.S. Application No.

12/834,281 ("'281 Application") filed on 12 June 2010, now U.S. Patent No. 7,933,431 ("431

Patent"), which is a continuation of U.S. Application No. 12/834,281 ("'281 Application") filed

on 12 June 2010, now U.S. Patent No. 7,933,431 ("431 Patent"), which is a continuation of U.S.

Application No. 11/980,710 ("'710 Application") filed on 31 October 2007, now U.S. Patent No.

7,756,297 ("297 Patent"), which is a continuation of U.S. Application No. 10/893,534 ("'534

Application") filed on 19 July 2004, now U.S. Patent No. 7,401,783 ("783 Patent"), which is a

continuation of U.S. Application No. 09/612,225 ("'225 Application") filed on 07 July 2000,

now U.S. Patent No. 6,766,036 ("036 Patent"), which claims benefit of U.S. Provisional

Application No. 60/142,777 ("'777 Prov Application") filed on 08 July 1999.

The Examiner finds that in the original prosecution of the '698 Application, Owner

provided the Dec 2011 Owner Response that included both the Dec 2011 Drawings Amendment

and Dec 2011 Specification Amendment subject matter to overcome the 35 U.S.C. 112, first

paragraph, rejection. (See § IV *infra*). The Dec 2011 Owner Response asserted that the subject

matter of U.S. Application No. 09/433,297 ("'297 Application") filed on 03 November 1999,

now U.S. Patent No. 6,750,848 ("'848 Patent") was "previously incorporated by reference;" and

thus, "no new matter has been added." (Dec 2011 Owner Response at 7). However, in

examination of the continuity of the '698 Application, the Examiner finds that the "incorporated

by reference" statement of the '297 Application *was provided first* in the '225 Application and

*not in* the '777 Prov Application. From this perspective, the Examiner finds that sufficient

support for the claimed subject matter of the '698 Application, and the instant reexamination

proceeding, was first provided to the Office in the '225 Application.

Thus, the Examiner concludes that for reexamination purposes the instant '924 Patent

qualifies for an effective filing date of 07 July 2000, and not 08 July 1999.


## IV.     *Original Prosecution History*

Owner filed the '698 Application with claims 1-30.

On 14 October 2011, the original examiner issued a non-Final Office action ("Oct 2011 Non Final Office Action") rejecting claims 1-30 under 35 U.S.C. 112, first paragraph, as failing to comply with the written description requirement. (Oct 2011 Non Final Office Action at 2).

On 14 December 2011, Owner filed a "Response" to the Oct 2011 Non Final Office Action ("Dec 2011 Owner Response") including Remarks, a Drawings Amendment ("Dec 2011 Drawings Amendment"), and a Specification Amendment ("Dec 2011 Specification Amendment") to overcome the 35 U.S.C. 112, first paragraph, rejection. The "Dec 2011 Drawings Amendment and Dec 2011 Specification Amendment specifically included information incorporated by reference from U.S. Application No. 09/433,297 ("'297 Application") filed on 03 November 1999, now U.S. Patent No. 6,750,848 ("848 Patent") in the '698 Application. (See '924 Patent at c.1, ll.46-48, 57-59).

On 18 January 2012, the original examiner issued a non-Final Office action ("Jan 2012 Non Final Office Action") rejecting claims 1-4 and 9 under 35 U.S.C. 103(a) as being unpatentable over *Silverbrook* (U.S. Patent No. 6,788,336) in view of *Sumi et al.* (U.S. Patent No. 5,845,006)("*Sumi*"); claims 5, 7, 8, 10-14 and 16-22 under 35 U.S.C. 103(a) as being unpatentable over *Silverbrook*, *Sumi* and *Kumar et al.* (U.S. Patent No. 6,204,852)("*Kumar*"); claim 6 under 35 U.S.C. 103(a) as being unpatentable over *Silverbrook*, *Sumi* and *Umezawa et al.* (U.S. Patent No. 5,491,507)("*Umezawa*"); claims 15 and 23 under 35 U.S.C. 103(a) as being unpatentable over *Silverbrook*, *Sumi*, *Kumar* and *Umezawa*; claims 24 and 26-28 under 35 U.S.C. 103(a) as being unpatentable over *Silverbrook* and *Kimura* (U.S. Patent No. 5,940,126); claim 25 under 35 U.S.C. 103(a) as being unpatentable over *Silverbrook*, *Kimura* and *Umezawa*; and claims 29-30 under 35 U.S.C. 103(a) as being unpatentable over *Silverbrook*, *Kimura* and *Kumar*.

On 18 April 2012, Owner filed a "Response" to the Jan 2012 Non Final Office Action ("April 2012 Owner Response") including Remarks, and a Claim Amendment ("April 2012 Claim Amendment"). The April 2012 Claim Amendment canceled claims 1-23; amended claims 24, 26, 29 and 30; and provided new claims 31-37. Specifically, the April 2012 Claim Amendment amended independent claim 24[1] to now require: the first and second camera to have respective first and second outputs; *the first and second camera including non-overlapping views, and the computer being adapted to perform control functions of the handheld device based on at least one of the first and second camera outputs* (emphasis added). In addition, the April 2012 Owner Response asserted that *Silverbrook*, nor *Kimura*, disclose, teach or suggest a computer adapted to perform a control function based upon the output of first or second cameras having non-overlapping fields of view. (April 2012 Owner Response at 5-6).

The original examiner issued a Notice of Allowance ("April 2012 Notice of Allowance") on 27 April 2012 providing a "reasons for allowance" stating,

> Independent claim 24 is allowed *based upon convincing arguments* presented in the remarks dated 4/18/2012.

(April 2012 Notice of Allowance at 2; emphasis added).

Thus, it appears from the record that the key features missing from the prior art at the time of allowance of independent claim 1 was the computer being adapted to perform a control function based upon the output of at least one of the first or second cameras, which have non-overlapping fields of view.

---

[1] The Examiner finds that original claim 24 was renumbered to claim 1 in the April 2012 Notice of Allowance.

## V.     Other Proceedings

### A.     IPR2021-00923

On 26 May 2021, a First Petitioner (*i.e.*, **Apple, Inc.**) filed a Petition for *Inter Partes* review of claims 1-14 of the '924 Patent, pursuant to 35 U.S.C. §§ 311-319 and 37 C.F.R. § 42.100 *et seq.* (See *Apple, Inc.* vs *Gesture Technology Partners LLC*.  IPR2021-00923-1635 ("923 IPR Proceeding). A decision on whether to institute an *inter partes* review has not yet been determined. Thus, the 923 IPR Proceeding is not yet a "concluded examination(s) or review(s) of the patent." (See MPEP § 2242.II.A)

### B.     IPR2022-00093

On 10 September 2020, a Second Petitioner (*i.e.*, **LG Electronics, Inc.**) filed a Petition for *Inter Partes* review of claims 1-14 of the '924 Patent, pursuant to 35 U.S.C. §§ 311-319 and 37 C.F.R. § 42.100 *et seq.* (See *LG Electronics, Inc. et al.* vs *Gesture Technology Partners LLC*. IPR2021-00923-1635 ("93 IPR Proceeding). In addition, Second Petitioner filed a Motion for Joinder with the 923 IPR Proceeding. (93 IPR Proceedings, Motion for Joinder). A decision on whether to: institute an *inter partes* review; and/or grant the motion to join the 923 IPR Proceeding have not yet been determined. Thus, the 93 IPR Proceeding is not yet a "concluded examination(s) or review(s) of the patent." (See MPEP § 2242.II.A)

## VI.     Information Disclosure Statement(s)

EP Requester's Information Disclosure Statement, filed on 11 November 2021, ("Nov 2021 IDS) has been received and entered into the record.

### VII.    References Cited in EP Request

A total of six references, in certain combinations, have been asserted in the EP Request as providing teachings relevant to the claims of the '924 Patent. The proposed references which make up the combinations are as follows:

- U.S. Patent No. 5,982,853 to *Liebermann* ("***Liebermann***") – **NEW**. [2]

- U.S. Patent No. 6,622,015 to *Himmel et al.* ("***Himmel***") – **NEW**. [3]

- U.S. Patent No. 6,115,482 to *Sears et al.* ("***Sears***") – **NEW**. [4]

- U.S. Patent No. 5,880,732 to *Tryding* ("***Tryding***") – **NEW**. [5]

- U.S. Patent No. 6,401,085 to *Gershman et al.* ("***Gershman***") – **NEW**. [6]

- U.S. Patent No. 5,953,322 to *Kimball* ("***Kimball***") – **NEW**. [7]

### VIII.    Substantial New Questions (SNQ) of Patentability

In view of the prosecution history asserted above, the April 2012 Owner Response and "reasons for allowance" from the '698 Application, as applied to the requested claims, will be utilized to determine whether the cited references raise an SNQ.

---

[2] *Liebermann* has not been previously cited/considered in the original prosecution, nor the IPR proceedings above (*i.e.*, 923 and 093 IPR Proceedings). Thus, the prior art is considered new art and not "old art." (See MPEP § 2242).
[3] *Himmel* has not been previously cited/considered in the original prosecution, nor the IPR proceedings above (*i.e.*, 923 and 093 IPR Proceedings). Thus, the prior art is considered new art and not "old art." (See MPEP § 2242).
[4] *Sears* has not been previously cited/considered in the original prosecution, nor the IPR proceedings above (*i.e.*, 923 and 093 IPR Proceedings). Thus, the prior art is considered new art and not "old art." (See MPEP § 2242).
[5] *Tryding* has not been previously cited/considered in the original prosecution, nor the IPR proceedings above (*i.e.*, 923 and 093 IPR Proceedings). Thus, the prior art is considered new art and not "old art." (See MPEP § 2242).
[6] *Gershman* has not been previously cited/considered in the original prosecution, nor the IPR proceedings above (*i.e.*, 923 and 093 IPR Proceedings). Thus, the prior art is considered new art and not "old art." (See MPEP § 2242).
[7] *Kimball* has not been previously cited/considered in the original prosecution, nor the IPR proceedings above (*i.e.*, 923 and 093 IPR Proceedings). Thus, the prior art is considered new art and not "old art." (See MPEP § 2242).

The italicized/underlined sections of claim 1 below is utilized by the Examiner to determine whether specific teachings of the cited references create a substantial new question of patentability in light of the prosecution history above.

Claim 1:

*A handheld device* comprising:

(a) a housing;

(b) *a computer within the housing*;

(c) a first camera oriented to view a user of the handheld device and having a first camera output; and

(d) a second camera oriented to view an object other than the user of the device and having a second camera output, *wherein the first and second cameras include non-overlapping fields of view*, and *wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output*.

The Examiner finds that prior art which teaches at least one of the italicized/underlined sections of the claim above which is **different** than that taught by the prior art cited in the '698 Application would provide a new, non-cumulative technological teaching raising a substantial new question of patentability.

**A.     *Liebermann; Liebermann* and *Tryding*; *Liebermann* and *Gershman*; *Liebermann* and *Himmel*; *Liebermann* and *Sears*; and *Liebermann* and *Kimball* (SNQ for SNQ1 – SNQ3, SNQ10, SNQ13 and SNQ14 EP Requester designated – See EP Request at §§ V.A-C, J, M, N; VI.B.1-3, 10, 13, 14)**

In the present instance, there exists a SNQ based the publication of *Liebermann*. A discussion of the specifics now follows:

The Examiner finds that *Liebermann* was filed on 23 May 1996, which predates the filing of the '924 Patent. As such, *Liebermann* qualifies as prior art under 35 U.S.C. 102(e) and 102(a).

[8] *Liebermann* was not of record in the original prosecution of the '924 Patent (*i.e.*, see § IV

*supra*). Similarly, *Liebermann* is not present before the PTAB in the 923 IPR Proceeding, nor the

093 IPR Proceeding. (See § V.A-B *supra*).

The EP Request alleges to show that *Liebermann*, for claim 1, teaches *[a]* **handheld**

**device** *comprising: ...* **a computer within the housing***; ... wherein the first and second cameras*

**include non- overlapping fields of view***; and wherein* **the computer is adapted to perform a**

**control function of the handheld device based on at least one of the first camera output and**

**the second camera output***.*

The EP Request specifically alleges to show that *Liebermann* teaches a handheld device

that utilizes one or more cameras to sense facial motion and hand gestures from which

processing hardware/software perform a control function based on at least one of the first and

second camera outputs (EP Request at §§ V.A.1; 2.c, e). The Examiner finds that *Liebermann*

teaches a handheld cellular telephone apparatus having image processing hardware/software

within the handheld cellular telephone that processes facial, hand and finger image data into

identifiers used to control the function of the handheld cellular telephone. (*Liebermann* at

Abstract; c.4, l.60 – c.5, l.5; c.5, l.62 – c.6, l.10; c.6, ll.30-52; c.7, ll.18-21; c.13, ll.4-28; claims

1-3; see Figures 6, 8). The Examiner finds that *Liebermann* teaches the utilization of multiple

cameras (*i.e.*, more than one) operating independently of the others with each camera covering a

separate angle and having no angle overlap according to certain configurations. (*Id.* at c.13, ll.4-

21).

---

[8] The Examiner finds that *Liebermann* was filed 23 May 1996 as a Non-Provisional application and published as a
U.S. Patent on 09 November 1999. As set forth above, the instant '924 Patent qualifies for an effective filing date of
07 July 2000, and not 08 July 1999. (See § III *supra*). Thus, the Examiner finds that *Liebermann* qualifies as prior
art under both 35 U.S.C. 102(e) and 102(a), respectively.

The EP Request appears to show that *Liebermann* presents a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the application that resulted in the patent for which reexamination is requested.

The Examiner concludes that *Liebermann* sufficiently teaches the italicized/underlined sections of claim 1 above to support an SNQ. In light of the conclusion that *Liebermann* sufficiently teaches the italicized/underlined sections of claim 1, the Examiner concludes that an SNQ is additionally raised for claim 2-5, 9, 11, 13 and 14 for the same reasons as set forth above. Thus, it is **AGREED** that the consideration of *Liebermann* raises a substantial new question of patentability of at least claim 1 as pointed out above. There is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether these claims are patentable.

**B.**     *Liebermann* **and** *Himmel; Liebermann*, *Himmel* **and** *Tryding*; *Liebermann*, *Himmel* **and** *Gershman*, **and** *Liebermann*, *Himmel* **and** *Kimball* <u>**or**</u> *Liebermann* **and** *Sears; Liebermann*, *Sears* **and** *Tryding*; *Liebermann*, *Sears* **and** *Gershman*, **and** *Liebermann*, *Sears* **and** *Kimball*

**(SNQ for: SNQ4 – SNQ6, SNQ 11 and SNQ13 EP Requester designated – See EP Request at §§ V.D-F, K, M; VI.B.4-6, 11, 13; <u>or</u> SNQ7 – SNQ9, SNQ 12 and SNQ14 EP Requester designated – See EP Request at §§ V.G-I, L, N; VI.B.4-6, 12, 14)**

In the present instance, there exists a SNQ based the publication of *Liebermann* when taken with the publication of *Himmel* and/or *Sears*. A discussion of the specifics now follows:

As set forth above, the Examiner finds that *Liebermann* was filed on 23 May 1996, which predates the filing of the '924 Patent. As such, *Liebermann* qualifies as prior art under 35 U.S.C.

102(e) and 102(a). [9] *Liebermann* was not of record in the original prosecution of the '924 Patent

(*i.e.*, see § IV *supra*). Similarly, *Liebermann* is not present before the PTAB in the 923 IPR

Proceeding, nor the 093 IPR Proceeding. (See § V.A-B *supra*).

The Examiner finds that *Himmel* was filed on 29 January 1999, which predates the filing

of the '924 Patent. As such, *Himmel* qualifies as prior art under 35 U.S.C. 102(e). [10] *Himmel* was

not of record in the original prosecution of the '924 Patent (*i.e.*, see § IV *supra*). Similarly,

*Himmel* is not present before the PTAB in the 923 IPR Proceeding, nor the 093 IPR Proceeding.

(See § V.A-B *supra*).

The Examiner finds that *Sears* was filed on 22 October 1998, which predates the filing of

the '924 Patent. As such, *Himmel* qualifies as prior art under 35 U.S.C. 102(e). [11] *Sears* was not

of record in the original prosecution of the '924 Patent (*i.e.*, see § IV *supra*). Similarly, *Sears* is

not present before the PTAB in the 923 IPR Proceeding, nor the 093 IPR Proceeding. (See §

V.A-B *supra*).

The EP Request alleges to show that *Liebermann* in view of *Himmel* and/or *Sears* for

claim 1, teaches *[a] **handheld device** comprising: ... **a computer within the housing;** ... **wherein

the first and second cameras include non- overlapping fields of view; and wherein the computer

is adapted to perform a control function of the handheld device based on at least one of the

first camera output and the second camera output**.*

---

[9] The Examiner finds that *Liebermann* was filed 23 May 1996 as a Non-Provisional application and published as a
U.S. Patent on 09 November 1999. As set forth above, the instant '924 Patent qualifies for an effective filing date of
07 July 2000, and not 08 July 1999. (See § III *supra*). Thus, the Examiner finds that *Liebermann* qualifies as prior
art under both 35 U.S.C. 102(e) and 102(a), respectively.
[10] The Examiner finds that *Himmel* was filed 29 January 1999 as a Non-Provisional application. As set forth above,
the instant '924 Patent qualifies for an effective filing date of 07 July 2000, and not 08 July 1999. (See § III *supra*).
Thus, the Examiner finds that *Himmel* qualifies as prior art under 35 U.S.C. 102(e), respectively.
[11] The Examiner finds that *Sears* was filed 22 October 1998 as a Non-Provisional application. As set forth above, the
instant '924 Patent qualifies for an effective filing date of 07 July 2000, and not 08 July 1999. (See § III *supra*).
Thus, the Examiner finds that *Sears* qualifies as prior art under 35 U.S.C. 102(e), respectively.

The EP Request specifically alleges to show that *Liebermann* teaches a handheld device that utilizes one or more cameras to sense facial motion and hand gestures from which processing hardware/software perform a control function based on at least one of the first and second camera outputs (EP Request at §§ V.A.1; 2.c, e). The Examiner finds that *Liebermann* teaches a handheld cellular telephone apparatus having image processing hardware/software within the handheld cellular telephone that processes facial, hand and finger image data into identifiers used to control the function of the handheld cellular telephone. (*Liebermann* at Abstract; c.4, l.60 – c.5, l.5; c.5, l.62 – c.6, l.10; c.6, ll.30-52; c.7, ll.18-21; c.13, ll.4-28; claims 1-3; see Figures 6, 8). The Examiner finds that *Liebermann* teaches the utilization of multiple cameras (*i.e.*, more than one) operating independently of the others with each camera covering a separate angle and having no angle overlap according to certain configurations. (*Id*. at c.13, ll.4-21).

In addition, the EP Request specifically alleges to show that *Himmel* teaches wireless smartphones comprising computer units therein that handles a variety of sophisticated tasks. (EP Request at §§ V.D.1; 2.c, e). The Examiner finds that *Himmel* teaches a wireless cellular telephone apparatus having a computer platform therein, which includes the integration of personal computing technology into phones. (*Himmel* at c.1, ll.23-35). Specifically, *Himmel* teaches computer units within a wireless phone performing a variety of sophisticated tasks including standard voice and texting communications. (*Id*. at c.5, ll.18-29, 42-63).

Moreover, the EP Request specifically alleges to show that *Sears* teaches a system including multiple cameras that capture hand and finger gesturing motion and a computer device to process the captured images to perform certain controlling operations. (EP Request at §§ V.G.1; 2.c, e). The Examiner finds that *Sears* teaches a self-contained optical input reading

device, which captures image gestures of finger and/or hands and, via an included computer,

processes the captured images to interpret and provide command functionality therefrom. (*Sears*

at Abstract; c.5, ll.2-21, 35-43, 51-61; c.7, ll.1-7; c. 10, ll.29-30; c.11, ll.7-14; c.17, ll.55-58;

c.18, ll.9-18; c.20, ll.32-42; see Figures 1a, 1b, 2).

The EP Request appears to show that *Liebermann* in view of *Himmel* and/or *Sears*

presents a new, non-cumulative technological teaching that was not previously considered and

discussed on the record during the prosecution of the application that resulted in the patent for

which reexamination is requested.

The Examiner concludes that *Liebermann* in view of *Himmel* and/or *Sears* sufficiently

teaches the italicized/underlined sections of claim 1 above to support an SNQ. In light of the

conclusion that *Liebermann* in view of *Himmel* and/or *Sears* sufficiently teaches the

italicized/underlined sections of claim 1, the Examiner concludes that an SNQ is additionally

raised for claim 2-14 for the same reasons as set forth above. Thus, it is **AGREED** that the

consideration of *Liebermann* in view of *Himmel* and/or *Sears* raises a substantial new question of

patentability of at least claim 1 as pointed out above. There is a substantial likelihood that a

reasonable examiner would consider these teachings important in deciding whether these claims

are patentable.

## IX.    *Related Prior Art*

### A.    *Tryding, Gershman, and Kimball*

The Examiner finds that *Tryding* is utilized by EP Requester for reading on non-SNQ

claim requirements of claim 11. (See EP Request at §§ V.B, E, H). The non-SNQ claim

requirements depend on the SNQ claim requirement of *Liebermann*, *Liebermann* and *Himmel*, and *Liebermann* and *Sears* which have raised SNQs as asserted above. (See §§ VIII.A-C *supra*).

The Examiner finds that *Gershman* is utilized by EP Requester for reading on non-SNQ claim requirements of claim 14. (See EP Request at §§ V.C, F, I). The non-SNQ claim requirements depend on the SNQ claim requirement of *Liebermann*, *Liebermann* and *Himmel*, and *Liebermann* and *Sears* which have raised SNQs as asserted above. (See §§ VIII.A-C *supra*).

The Examiner finds that *Kimball* is utilized by EP Requester for reading on non-SNQ claim requirements of claim 14. (See EP Request at §§ V.J-L). The non-SNQ claim requirements depend on the SNQ claim requirement of *Liebermann*, *Liebermann* and *Himmel*, and *Liebermann* and *Sears* which have raised SNQs as asserted above. (See §§ VIII.A-C *supra*).

The Examiner finds that *Tryding* was filed on 29 April 1997, which predates the filing of the '924 Patent. As such, *Tryding* qualifies as prior art under 35 U.S.C. 102(e) and 102(b). [12] *Tryding* was not of record in the original prosecution of the '924 Patent (*i.e.*, see § IV *supra*). Similarly, *Tryding* is not present before the PTAB in the 923 IPR Proceeding, nor the 093 IPR Proceeding. (See § V.A-B *supra*).

The Examiner finds that *Gershman* was filed on 05 March 1999, which predates the filing of the '924 Patent. As such, *Gershman* qualifies as prior art under 35 U.S.C. 102(e). [13] *Gershman* was not of record in the original prosecution of the '924 Patent (*i.e.*, see § IV *supra*). Similarly, *Gershman* is not present before the PTAB in the 923 IPR Proceeding, nor the 093 IPR Proceeding. (See § V.A-B *supra*).

---

[12] The Examiner finds that *Tryding* was filed 29 April 1997 as a Non-Provisional application and published as a U.S. Patent on 09 Mar 1999. As set forth above, the instant '924 Patent qualifies for an effective filing date of 07 July 2000, and not 08 July 1999. (See § III *supra*). Thus, the Examiner finds that *Tryding* qualifies as prior art under both 35 U.S.C. 102(e) and 102(b), respectively.

[13] The Examiner finds that *Gershman* was filed 29 January 1999 as a Non-Provisional application. As set forth above, the instant '924 Patent qualifies for an effective filing date of 07 July 2000, and not 08 July 1999. (See § III *supra*). Thus, the Examiner finds that *Gershman* qualifies as prior art under 35 U.S.C. 102(e), respectively.

The Examiner finds that *Kimball* was filed on 31 January 1999, which predates the filing

of the '924 Patent. As such, *Kimball* qualifies as prior art under 35 U.S.C. 102(e) and 102(a). [14]

*Kimball* was not of record in the original prosecution of the '924 Patent (*i.e.*, see § IV *supra*).

Similarly, *Kimball* is not present before the PTAB in the 923 IPR Proceeding, nor the 093 IPR

Proceeding. (See § V.A-B *supra*).


### X.    *Summary*

Claims 1-14 of the '924 Patent will be reexamined as requested in the instant Order.

---

[14] The Examiner finds that *Kimball* was filed 23 May 1996 as a Non-Provisional application and published as a U.S. Patent on 09 November 1999. As set forth above, the instant '924 Patent qualifies for an effective filing date of 07 July 2000, and not 08 July 1999. (See § III *supra*). Thus, the Examiner finds that *Kimball* qualifies as prior art under both 35 U.S.C. 102(e) and 102(a), respectively.

### XI.    Conclusion

**Extensions of Time**

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extensions of time in ex parte reexamination proceedings are provided for in 37 CFR 1.550(c).

**Waiver of Right to File Patent Owner Statement**

In a reexamination proceeding, Patent Owner may waive the right under 37 C.F.R. 1.530 to file a Patent Owner Statement. The document needs to contain a statement that Patent Owner waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement and proof of service in the manner provided by 37 C.F.R. 1.248, if the request for reexamination was made by a third party requester, see 37 C.F.R 1.550. The Patent Owner may consider using the following statement in a document waiving the right to file a Patent Owner Statement:

Patent Owner waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement.

**Amendment in Reexamination Proceedings**

Patent owner is notified that any proposed amendment to the specification and/or claims in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally presented pursuant to 37 CFR § 1.52(a) and (b), and must contain any fees required by 37 CFR § 1.20(c). See MPEP § 2250(IV) for examples to assist in the preparation of proper proposed amendments in reexamination proceedings.

**Service of Papers**

After the filing of a request for reexamination by a third party requester, any document filed by either the patent owner or the third party requester must be served on the other party (or parties where two or more third party requester proceedings are merged) in the reexamination proceeding in the manner provided in 37 CFR 1.248. See 37 CFR 1.550.

**Notification of Concurrent Proceedings**

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No. 8,194,924 throughout the course of this reexamination proceeding. The third party requester is also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

**All** correspondence relating to this ex parte reexamination proceeding should be directed:

| By Mail to: | Mail Stop *Ex Parte* Reexam |
| | Central Reexamination Unit |
| | Commissioner for Patents |
| | United States Patent & Trademark Office |
| | P.O. Box 1450 |
| | Alexandria, VA 22313-1450 |
| | |
| By FAX to: | (571) 273-9900 |
| | Central Reexamination Unit |
| | |
| By hand: | Customer Service Window |
| | Randolph Building |
| | 401 Dulany Street |
| | Alexandria, VA 22314 |
| | |
| By EFS-Web: | |

      Registered users of EFS-Web may alternatively submit such correspondence via the electronic filing system EFS-Web, at

      https://efs.uspto.gov/efile/myportal/efs-registered

      EFS-Web offers the benefit of quick submission to the particular area of the Office that needs to act on the correspondence. Also, EFS-Web submissions are "soft scanned" (i.e., electronically uploaded) directly into the official file for the reexamination proceeding, which offers parties the opportunity to review the content of their submissions after the "soft scanning" process is complete.

      For EFS-Web transmissions, 37 CFR 1.8(a)(1)(i) (C) and (ii) states that correspondence (except for a request for reexamination and a corrected or replacement request for reexamination) will be considered timely filed if (a) it is transmitted via the Office's electronic filing system in accordance with 37 CFR 1.6(a)(4), and (b) includes a certificate of transmission for each piece of correspondence stating the date of transmission, which is prior to the expiration of the set period of time in the Office action.

Any inquiry concerning this communication or earlier communications from the

Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be

directed to the Central Reexamination Unit at telephone number (571) 272-7705.


/Stephen J. Ralis/
Primary Examiner, Art Unit 3992



Conferees:

/JAMES A MENEFEE/
Reexamination Specialist, Art Unit 3992

/HETUL B PATEL/
Supervisory Patent Examiner, Art Unit 3992


SJR
29 November 2021


*Ex Parte Reexamination — Order*

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,902 | 11/11/2021 | 8194924 | 75281.00085 | 3671 |

184036        7590        07/22/2022
Williams Simons & Landis PLLC/ GTP
The Littlefield Building
601 Congress Ave., Suite 600
Austin, TX 78701

| EXAMINER |
|---|
| RALIS, STEPHEN J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 07/22/2022 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

PAUL HASTINGS LLP (GENERAL)
2050 M. STREET NW
WASHINGTON, DC 20036

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/014,902* .

PATENT UNDER REEXAMINATION *8194924* .

ART UNIT *3992* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

# DETAILED ACTION

## Contents

I. Notice of Pre-AIA or AIA Status ................................................................ 4

II. Pertinent Prosecution History ................................................................ 4

III. Priority ................................................................................................ 5

IV. References Cited in EP Request ............................................................ 6

V. Issues Raised in the Request ................................................................ 7

VI. Claim Interpretation ............................................................................ 7

A.    Interpretation of Original Claims ........................................................ 7

B.    Interpretation of Some Claim Terms .................................................... 8

(1)    Oriented To View; Oriented To View a User; and Oriented To View an Object Other than the User ............................................................................................ 9

(2)    Gesture ........................................................................................ 10

(3)    Computer Adapted/Operable to ... ................................................ 11

a.    Computer I ... ................................................................................ 11

b.    Computer II ... .............................................................................. 14

c.    Computer III ... ............................................................................. 17

C.    Lexicographic Definitions .................................................................. 18

D.    35 U.S.C. § 112 6th Paragraph ......................................................... 19

VII. Claim Rejections ................................................................................ 19

A.    Issue/Ground 1 (Based on SNQ 1 – *Liebermann*) ............................ 20

(1)    Claims 1-5 and 13 are rejected under pre-AIA 35 U.S.C. 102(b) as anticipated by or, in the alternative, under pre-AIA 35 U.S.C. 103(a) as being unpatentable over *Liebermann*.......... 20

(2)    Claims 6-10 and 12 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over *Liebermann* in view of *Sears*. ................................................................ 28

(3)    Claim 11 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over *Liebermann* in view of *Tryding*. .......................................................................... 32

(4)    Claim 14 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over *Liebermann* in view of *Gershman*. ....................................................................... 34

(5)    Claim 14 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over *Liebermann* in view of *Kimball*. ........................................................................... 35

VIII. Response to Arguments .................................................................. 37

A.   Jurisdiction.................................................................................. 37

B.   Anticipation Rejections of Claims 1-5 and 13................................ 37

(1)   Preamble ................................................................................ 37

(2)   Element Designated "1e"........................................................ 39

(3)   Claim 2 .................................................................................. 44

(4)   Claims 3-5 and 13 .................................................................. 46

C.   Obvious Rejections of Claims 1-5 and 13 .................................... 46

(1)   *Liebermann* as Analogous Art .............................................. 46

(2)   Preamble and Element "1e" over *Liebermann* ..................... 49

(3)   Claims 2-5 and 13 .................................................................. 50

D.   Obvious Rejections of Claims 6-10 and 12 .................................. 51

(1)   *Sears* as Analogous Art......................................................... 51

(2)   *Liebermann* and *Sears* Combination...................................... 53

(3)   Claims 7-10 and 12 ................................................................ 59

E.   Obvious Rejections of Claim 11 .................................................. 60

F.   Obvious Rejections of Claim 14 .................................................. 60

IX. Conclusion ................................................................................... 62

## I. Notice of Pre-AIA or AIA Status

The present reexamination is being conducted under the pre-AIA first to invent

provisions.

In the event the determination of the status of the application as subject to AIA 35 U.S.C.

5    102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the

statutory basis for the rejection will not be considered a new ground of rejection if the prior art

relied upon, and the rationale supporting the rejection, would be the same under either status.


## II. Pertinent Prosecution History

10        On 11 November 2021, a third party requester, *i.e.*, **Samsung Electronics Co., Ltd.**, ("EP

Requester") filed an *ex parte* reexamination request ("EP Request") in the reexamination control

number 90/014,902 proceedings (" '14902 Proceeding") for claims 1-14 of United States Patent

Number 8,194,924 (""924 Patent"). In the '924 Patent, claim 1 is an independent claim; claims 2-

8 and 10-14 are dependent on claim 1; and claim 9 is dependent on dependent claim 6.

15        On 02 December 2021, the Office mailed an Order granting the *ex parte* reexamination of

the '924 Patent ("2021 Order") in the '14902 Proceedings. In particular, the Office ordered

reexamination of claims 1-14 of the '924 Patent ("Reexamined Claims").

The Office issued a Non-Final Office action on 08 April 2022 ("April 2022 Non-Final

Office Action"). In particular, the April 2022 Non-Final Office Action provided rejections for

20    the Reexamined Claims under 35 U.S.C. 102(b) and 103(a), respectively. [1]

---

[1] The Examiner notes that claims 1-5 and 13 stand rejected under 35 U.S.C. 102(b); and all the Reexamined Claims stand rejected under 35 U.S.C. 103(a).

On 08 June 2022, Owner filed a "Reply Under 37 C.F.R § 1.111" ("June 2022 PO

Response"). The June 2022 PO Response contained "Remarks."

On 08 July 2022, the Office and Applicant had an interview ("July 2022 Interview")

briefly discussing the April 2022 Non-Final Office Action and June 2022 PO Response (see

5      Interview Summary mailed 18 July 2022 ("July 2022 Int Summary")).


### III. Priority

The '924 Patent issued on 05 June 2012, from U.S. Application No. 13/051,698 ("'698

Application") filed on 18 March 2011, which is a continuation of U.S. Application No.

10     12/834,281 ("'281 Application") filed on 12 June 2010, now U.S. Patent No. 7,933,431 ("431

Patent"), which is a continuation of U.S. Application No. 12/834,281 ("'281 Application") filed

on 12 June 2010, now U.S. Patent No. 7,933,431 ("431 Patent"), which is a continuation of U.S.

Application No. 11/980,710 ("'710 Application") filed on 31 October 2007, now U.S. Patent No.

7,756,297 ("297 Patent"), which is a continuation of U.S. Application No. 10/893,534 ("'534

15     Application") filed on 19 July 2004, now U.S. Patent No. 7,401,783 ("783 Patent"), which is a

continuation of U.S. Application No. 09/612,225 ("'225 Application") filed on 07 July 2000,

now U.S. Patent No. 6,766,036 ("'036 Patent"), which claims benefit of U.S. Provisional

Application No. 60/142,777 ("'777 Prov Application") filed on 08 July 1999.

The Examiner finds that in the original prosecution of the '698 Application, Owner

20     provided the Dec 2011 Owner Response that included both the Dec 2011 Drawings Amendment

and Dec 2011 Specification Amendment subject matter to overcome the 35 U.S.C. 112, first

paragraph, rejection. (See § IV *infra*). The Dec 2011 Owner Response asserted that the subject

matter of U.S. Application No. 09/433,297 ("'297 Application") filed on 03 November 1999,

now U.S. Patent No. 6,750,848 ("'848 Patent") was "previously incorporated by reference;" and

thus, "no new matter has been added." (Dec 2011 Owner Response at 7). However, in

examination of the continuity of the '698 Application, the Examiner finds that the "incorporated

by reference" statement of the '297 Application _was provided first_ in the '225 Application and

5       _not in_ the '777 Prov Application. From this perspective, the Examiner finds that sufficient

support for the claimed subject matter of the '698 Application, and the instant reexamination

proceeding, was first provided to the Office in the '225 Application.

        Thus, the Examiner concludes that for reexamination purposes the instant '924 Patent

qualifies for an effective filing date of 07 July 2000, and not 08 July 1999.

10


## IV. References Cited in EP Request

        A total of six references, in certain combinations, have been asserted in the EP Request as

providing teachings relevant to the claims of the '924 Patent. The proposed references which

make up the combinations are as follows:

15      • U.S. Patent No. 5,982,853 to _Liebermann_ ("**_Liebermann_**") – **NEW**. [2]

        • U.S. Patent No. 6,622,015 to _Himmel et al._ ("**_Himmel_**") – **NEW**. [3]

        • U.S. Patent No. 6,115,482 to _Sears et al._ ("**_Sears_**") – **NEW**. [4]

---

[2] _Liebermann_ has not been previously cited/considered in the original prosecution, nor in the _inter partes_ reviews of claims 1-14 of the '924 Patent (see _Apple, Inc._ vs _Gesture Technology Partners LLC._ IPR2021-00923 ("923 IPR Proceeding); _LG Electronics, Inc. et al._ vs _Gesture Technology Partners LLC._ IPR2022-00093 ("93 IPR Proceeding); and _Google LLC_ vs _Gesture Technology Partners LLC._ IPR2022-00361 ("361 IPR Proceeding). Thus, the prior art is considered new art and not "old art." (See MPEP § 2242).
[3] _Himmel_ has not been previously cited/considered in the original prosecution, nor the IPR proceedings above (_i.e._, 923, 093 and 361 IPR Proceedings). Thus, the prior art is considered new art and not "old art." (See MPEP § 2242).
[4] _Sears_ has not been previously cited/considered in the original prosecution, nor the IPR proceedings above (_i.e._, 923, 093 and 361 IPR Proceedings). Thus, the prior art is considered new art and not "old art." (See MPEP § 2242).

- U.S. Patent No. 5,880,732 to *Tryding* ("***Tryding***") – <u>**NEW**</u>. [5]

- U.S. Patent No. 6,401,085 to *Gershman et al.* ("***Gershman***") – <u>**NEW**</u>. [6]

- U.S. Patent No. 5,953,322 to *Kimball* ("***Kimball***") – <u>**NEW**</u>. [7]

5                          *V. Issues Raised in the Request*

A total of six references have been asserted in the EP Request as providing teachings

relevant to the claim of the '924 Patent. In view of the 2021 Order, six references raised a

substantial new question of patentability. The issues raised are as follows:

Issue 1:         Claims 1-5 and 13 in view of ***Liebermann***

10                          Claims 6-10 and 12 in view of ***Liebermann*** and ***Sears***

Claim 11 in view of ***Liebermann*** and ***Tryding***

Claim 14 in view of ***Liebermann*** and ***Gershman***

Claim 14 in view of ***Liebermann*** and ***Kimball***

15                          *VI. Claim Interpretation*

*A.*    *Interpretation of Original Claims*

With respect to the interpretation of claim terms of patents, MPEP 2258(G) states,

G. Claim Interpretation and Treatment: Original patent claims will be examined
only on the basis of prior art patents or printed publications applied under the

---

[5] *Tryding* has not been previously cited/considered in the original prosecution, nor the IPR proceedings above (*i.e.*, 923, 093 and 361 IPR Proceedings). Thus, the prior art is considered new art and not "old art." (See MPEP § 2242).
[6] *Gershman* has not been previously cited/considered in the original prosecution, nor the IPR proceedings above (*i.e.*, 923, 093 and 361 IPR Proceedings). Thus, the prior art is considered new art and not "old art." (See MPEP § 2242).
[7] *Kimball* has not been previously cited/considered in the original prosecution, nor the IPR proceedings above (*i.e.*, 923, 093 and 361 IPR Proceedings). Thus, the prior art is considered new art and not "old art." (See MPEP § 2242).

appropriate parts of 35 U.S.C. 102 and 103. See MPEP § 2217. During
reexamination, claims are given the broadest reasonable interpretation consistent
with the specification and limitations in the specification are not read into the
claims (*In re Yamamoto*, 740 F.2d 1569, 222 USPQ 934 (Fed. Cir. 1984)). In a
5    reexamination proceeding involving claims of an expired patent, claim
construction pursuant to the principle set forth by the court in *Phillips v. AWH
Corp.*, 415 F.3d 1303, 1316, 75 USPQ2d 1321, 1329 (Fed. Cir. 2005) (words of a
claim "are generally given their ordinary and customary meaning" as understood
by a person of ordinary skill in the art in question at the time of the invention)
10   should be applied since the expired claims are not subject to amendment. The
statutory presumption of validity, 35 U.S.C. 282, has no application in
reexamination (*In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed. Cir. 1985)).
(Emphasis in original).

15       Accordingly, the Reexamined Claims herein will be interpreted in accordance with the

decision of *Phillips*, <u>since the patent term has expired</u>.

         In the decision to institute the 923 IPR Proceeding on 06 December 2021 ("Dec 2021 923

IPR Proceeding Institute Decision"), the Patent Trial and Appeal Board (PTAB) asserted that

neither party provided any express claim construction requirements. (Dec 2021 923 IPR

20   Proceeding Institute Decision at 7).[8] To the contrary, the Courts have construed multiple terms of

the '924 Patent. A discussion of the various Court's constructions are presented below to show,

ultimately, that the art applied to reject the claims teaches the claim features within the meaning

of the '924 Patent, given the *Phillips* standard.


25   ***B.    Interpretation of Some Claim Terms***

         As set forth above, the '924 Patent is an expired patent, Thus, the claims should be

examined utilizing the narrowly applied Court's construction.


---

[8] The Examiner asserts that Petitioner provided the 923 IPR Proceeding petition on 26 May 2021 and Owner
provided the 923 IPR Proceeding response on 07 September 2021, both dates being before the Oct 2021 Gesture v
Huawei/Samsung Claim Construction.

Based upon a review of various Court's claim construction and the *Phillips* standard, the

Examiner notes the following:

**(1)  Oriented To View; Oriented To View a User; and Oriented To View an Object**

**Other than the User**

5      With respect to the terms above, the District Court states,

> the specification reveals no special definition that would differ from how
> the phrase "oriented to view" would be used in common parlance, and this
> meaning would be readily understood to refer to orienting to view one thing rather
> than another thing while still allowing for some or all of both to be within the

10    field of view.

(*Gesture Technology Partners, LLC v. Huawei Device Co., LTD., Huawei Device USA, INC., I*

*Samsung Electronics Co., LTD. and Samsung Electronics America, INC.,* No. 2:21cv00040 &

2:21cv00041, Dkt 70, 72 (D Tex. 12 October 2021) ("Oct 2021 Gesture v Huawei/Samsung

15    Claim Construction") at 43). In addition, the District Court asserted that the "term[s] refer to

actual configuration, not merely a capability." (Oct 2021 Gesture v Huawei/Samsung Claim

Construction at 43, 46, 47). Hence, given the *Phillips* standard, one of ordinary skill in the art

would recognize and interpret the term "oriented to view" to mean be it's plain meaning (*i.e.*,

orienting to view one thing rather than another thing *while still allowing for some or all of both*

20    *to be within the field of view*). (*Id.*)

Thus, based on the *Phillips* standard, the Examiner agrees with the Oct 2021 Gesture v

Huawei/Samsung Claim Construction and construes "oriented to view" to mean "orienting to

view one thing rather than another thing while still allowing for some or all of both to be within

the field of view."[9]

---

[9] The Examiner finds that "oriented to view a user" and "oriented to view an object other than the user" can both
include user and/or object.

*Ex parte Reexamination – Final Office Action*

(2)       *Gesture*

The District Circuit court construed "gesture" to mean,

"movement of hands or other body parts that conveys meaning."

(Oct 2021 Gesture v Huawei/Samsung Claim Construction at 54-57).

Utilizing the *Phillips* standard, the Examiner finds that the '924 Patent states,

In such games *one senses the position, velocity or acceleration of a part of a person, or an object associated with the person. This can also include a sequence of positions, itself constituting the gesture*.

('924 Patent at c.20, ll.7-10; emphasis added);

Another game type is where *the camera looks at the human, and the humans expressions are used in the game. In this case it is facial expressions, hand or body gestures that are the thing most used*.

(*Id*. at c.22, ll.9-12; emphasis added);

Consider hand held computer **1901** of FIG. 18, incorporating a camera **1902** which can optionally be rotated about axis **1905** so as to look at the user or a portion thereof such as finger **1906**, or at objects at which it is pointed…

*When aimed at the user, as shown, it can be used, for example, to view and obtain images of*:
Ones self--facial expression etc., also for image reasons--id etc. combined effect.

*Ones fingers (any or all), one finger to other and the like. This in turn allows conversing with the computer in a form of sign language which can replace the keyboard of a conventional computer*.

One or more objects in ones hand. Includes a pencil or pen--*and thus can be used rather than having a special touch screen and pencil if the pencil itself is tracked as disclosed in the above figure*. It also allows small children to use the device, and those who cannot hold an ordinary stylus.

*Ones gestures*.

(*Id*. at c.25, ll.40-63; emphasis added);

*Ex parte Reexamination – Final Office Action*

Thus, from this perspective, the Examiner agrees with the Oct 2021 Gesture v

Huawei/Samsung Claim Construction and construes a "*gesture*" to mean "movement of hands or

other body parts that conveys meaning," respectively.

    **(3)**       *Computer Adapted/Operable to …*

5        The District Circuit court found that the term "computer" did not invoke  35 U.S.C. § 112

6th paragraph, because "[a]lthough the term 'computer' may refer to a broad class of structures,

this breadth does not necessarily render the term non-structural." (Oct 2021 Gesture v

Huawei/Samsung Claim Construction at 51-54). In light of that conclusion, the District Circuit

court construed "computer…" to have its "*plain meaning*." (*Id*. at 54). The Examiner agrees with

10    the Oct 2021 Gesture v Huawei/Samsung Claim Construction.

        From this perspective, the Examiner finds that claims 1-14 require a computer within the

housing having certain functionality. The Examiner finds that the computer is divided into three

computer components:

    **a.**  *Computer I …*

15        Claims 1, 11 and 13 (and included in each of dependent claims 2-14) which recite "a

computer adapted to…"

        *perform a control function of the handheld device based on at least one of*
        *the first camera output and the second camera output*

20    [claim 1; emphasis added];

*generate control instructions for a display that is separate from the handheld device*

[claim 11; emphasis added]; and

*perform a control function of the handheld device based the first camera output and the second camera output*

[claim 13; emphasis added]. Utilizing the *Phillips* standard, the Examiner finds that the'924

Patent states,

FIG. 8A illustrates control of functions with the invention, using a handheld device which itself has functions (for example, a cell phone). *The purpose is to add functionality to the device, without complicating its base function, and/or alternatively add a method to interact with the device to achieve other purposes*.

('924 Patent at c.6, ll.14-32; emphasis added). With respect to this functionality, the '924 Patent

discloses,

[a]nother version has a camera and requisite computer (and or transmission capability to an external computer) in the handheld device, such as a cell phone or whatever. *When pointed at an object, the camera can acquire the image of the object and/or any natural features or special datums on the object which are needed to perform the function desired.*

*One function is just to acquire an image for transmission via for example the cell phones own connection*. This is illustrated in FIG. 8B, where an image of object 849 acquired by camera **850** of cell phone **851** held by user **852** is transmitted over mobile phone link **853** to a remote location and displayed, for example. While this image can be of the user, or someone or something of interest, for example a house, if a real estate agent is making the call, *it is also possible to acquire features of an object and use it to determine something*.

For example, one purpose is recognition, for example *one can point at the object, and let the computer recognize what it is* from its TV image. Or point around in space taking multiple TV frames aiming in different directions, and when computer recognition of a desired object in one of the images takes place, transmit certain data to the object. *Or it can be used to acquire and transmit to remote locations, only that data from recognized objects*.

*Thus the invention can provided on a hand held object for a variety of purposes,*

*To take images of things;*

*To determine datums on things; and*

> *To automatically read things*.

5
> *The combination of any or all of these functions in addition with other object functions* such as hand held cell phones, dictation units, telephones, wearable computer devices and the like.

(*Id*. at c.12, l.62 – c.13, l.28; emphasis added; also see c.13, ll.). The Examiner finds that the '924

Patent also disclose the utilization of the handheld device as a pointer device. (*Id*. at c.13, l.29 –

10    c.14, l.13). In summary, the '924 Patent states,

> Consider *hand held computer **1901** of FIG. 18, incorporating a camera **1902** which can optionally be rotated about axis **1905** so as to look at the user or a portion thereof such as finger **1906**, or at objects at which it is pointed. Optionally, and often desirably, a stereo pair of cameras to further include camera **1910** can also be used. It too may rotate, as desired*. Alternatively fixed
15   cameras can be used when physical rotation is not desired, for ruggedness, ease of use, or other reasons (noting that fixed cameras have fixed fields of view, which limit versatility in some cases).

20
> *When aimed at the user, as shown, it can be used, for example, to view and obtain images of*:

> *Ones self--facial expression etc., also for image reasons--id etc. combined effect*.

25
> *Ones fingers (any or all), one finger to other and the like. This in turn allows conversing with the computer in a form of sign language which can replace the keyboard of a conventional computer*.

30
> *One or more objects in ones hand*. Includes a pencil or pen--and thus can be used rather than having a special touch screen and pencil if the pencil itself is tracked as disclosed in the above figure. It also allows small children to use the device, and those who cannot hold an ordinary stylus.

> *Ones gestures*.
35
> The camera **1902** (and **1910** if used, and if desired), *can also be optionally rotated and used to view points in space ahead of the device, as shown in dotted lines **1902a***. In this position for example it can be used for the purposes described in the previous application. *It can also be used to observe or point at* (using optional
40   laser pointer **1930**) *Points* such as **1935** on a wall or a mounted LCD or projection display such as **1940** on a wall or elsewhere such as on the back of an airline seat.

(*Id.* at c.12, l.62 – c.13, l.28; emphasis added; also see c.13, ll.). The Examiner finds that the '924

Patent discloses the control functions being functions, as highlighted above, that are in addition

to the normal functionality of the handheld device. The Examiner finds that the handheld

computer **1901** comprises a CPU therein, as is illustrated in Figure 18. Hence, the Examiner

5    concludes that the CPU of the handheld held computer **1901** has some software thereon that

controls the additional functions based upon the input received from either the first or second

camera.

Thus, based on the *Phillips* standard, the Examiner construes a computer...," for claims

1, 11 and 13 (and each of dependent claims 2-14), to mean a *CPU/processor/hardware with*

10    *software thereon performing control functions, in addition to the normal control functions of the*

*handheld device, based upon input provided by the first and/or second cameras*.

### b.   Computer II …

Claims 6, 7, 8, 10 and 12 (and included in dependent claim 9) which recite "a computer

operable/adapted to…"

> *determine a gesture based on at least one of the first camera output and
> the second camera output*

[claim 6; emphasis added];

> *determine a facial expression based on at least one of the first camera
> output and the second camera output*

[claim 7; emphasis added]:

> *determine at least one of the position and the orientation of the object
> based on the second camera output*

[claim 8; emphasis added];:

> *recognize the object based on the second camera output*

[claim 10; emphasis added]; and

> *determine a reference frame of the object*

[claim 12; emphasis added]. Utilizing the *Phillips* standard, the Examiner finds that

the '924 Patent states,

> FIG. 8A illustrates control of functions with the invention, using a handheld
> device which itself has functions (for example, a cell phone). <u>*The purpose is to*
> *add functionality to the device, without complicating its base function, and/or*
> *alternatively add a method to interact with the device to achieve other purposes*</u>.

('924 Patent at c.6, ll.14-32; emphasis added). Utilizing the *Phillips* standard, the Examiner finds

that the '924 Patent states,

> Consider <u>*hand held computer 1901 of FIG. 18, incorporating a camera 1902*
> *which can optionally be rotated about axis 1905 so as to look at the user or a*
> *portion thereof such as finger 1906, or at objects at which it is pointed.*
> *Optionally, and often desirably, a stereo pair of cameras to further include*
> *camera 1910 can also be used. It too may rotate, as desired*</u>. Alternatively fixed
> cameras can be used when physical rotation is not desired, for ruggedness, ease of
> use, or other reasons (noting that fixed cameras have fixed fields of view, which
> limit versatility in some cases).

> *When aimed at the user, as shown, it can be used, for example, to view and obtain images of*:

> *Ones self--facial expression etc., also for image reasons--id etc. combined effect.*

> *Ones fingers (any or all), one finger to other and the like. This in turn allows conversing with the computer in a form of sign language which can replace the keyboard of a conventional computer.*

> *One or more objects in ones hand*. Includes a pencil or pen--and thus can be used rather than having a special touch screen and pencil if the pencil itself is tracked as disclosed in the above figure. It also allows small children to use the device, and those who cannot hold an ordinary stylus.

> *Ones gestures*.

> The camera **1902** (and **1910** if used, and if desired), *can also be optionally rotated and used to view points in space ahead of the device, as shown in dotted lines **1902a***. In this position for example it can be used for the purposes described in the previous application. *It can also be used to observe or point at* (using optional laser pointer **1930**) *Points* such as **1935** on a wall or a mounted LCD or projection display such as **1940** on a wall or elsewhere such as on the back of an airline seat.

(*Id*. at c.25, l.40 – c.26, l.5; emphasis added). The Examiner finds that the handheld held

computer **1901** comprises a CPU therein, as is illustrated in Figure 18. The Examiner finds that

the'924 Patent discloses,

> In such games *one senses the position, velocity or acceleration of a part of a person, or an object associated with the person*. *This can also include a sequence of positions, itself constituting the gesture*.

('924 Patent at c.20, ll.7-10; emphasis added);

> Another game type is where *the camera looks at the human, and the humans expressions are used in the game*. *In this case it is facial expressions, hand or body gestures that are the thing most used*.

(*Id*. at c.22, ll.9-12; emphasis added);

> Consider hand held computer **1901** of FIG. 18, incorporating a camera **1902** which can optionally be rotated about axis **1905** so as to look at the user or a portion thereof such as finger **1906**, or at objects at which it is pointed...

*When aimed at the user, as shown, it can be used, for example, to view and
obtain images of:*
    Ones self--facial expression etc., also for image reasons--id etc. combined
effect.

5

    *Ones fingers (any or all), one finger to other and the like. This in turn allows
conversing with the computer in a form of sign language which can replace the
keyboard of a conventional computer.*

10      One or more objects in ones hand. Includes a pencil or pen--*and thus can be
used rather than having a special touch screen and pencil if the pencil itself is
tracked as disclosed in the above figure*. It also allows small children to use the
device, and those who cannot hold an ordinary stylus.

15      *Ones gestures.*

(*Id*. at c.25, ll.40-63; emphasis added). The Examiner finds that the '924 Patent discloses utilizing

image processing techniques to calculate position and orientation of features and subsequent

tracking thereof (*i.e.*, facial expressions, gestures, position, orientation, etc. being potentially

20   calculated utilizing the photographic techniques of *Pinkney*). ('924 Patent at c.3, l.57 – c.4, l.24;

c.4, ll.59-65). Hence, the Examiner concludes that the '924 Patent only simply discloses the CPU

of the handheld held computer **1901** having software thereon that utilizes image processing

techniques to determine gestures, facial expression, position and orientation of features and

subsequent tracking thereof.

25      Thus, based on the *Phillips* standard, the Examiner construes a "computer…," for claims

6-10 and 12 (and dependent claim 9), to mean a *CPU/processor/hardware with software thereon*

*utilizing image processing techniques to determine gestures, facial expression, position and*

*orientation of features and subsequent tracking thereof.*


30      *c.  Computer III …*

    Claim 13 which recites "a computer adapted to…"

*transmit information over an internet connection*

[claim 13; emphasis added]. Utilizing the *Phillips* standard, the Examiner has reviewed the

prosecution history and the relevant prior art of record herein and finds that a "computer" would

be "generic" computer and software combination in the hand held device that simply transmits

information from the hand held device over an internet connection. ('924 Patent at c.13, ll.1-10).

Thus, based on the *Phillips* standard, the Examiner construes a "computer…," for claim

13, to mean a *CPU/processor/hardware with software thereon that simply transmits information*

*from the hand held device over an internet connection.*

#### C.    *Lexicographic Definitions*

A first exception to the prohibition of reading limitations from the specification into the

claims is when the Owner for patent has provided a lexicographic definition for the term. See

MPEP § 2111.01(IV). After careful review of the original specification, the prosecution history,

and unless expressly noted otherwise by the Examiner, the Examiner finds that he is unable to

locate any lexicographic definitions (either express or implied) with reasonable clarity,

deliberateness, and precision. Because the Examiner is unable to locate any lexicographic

definitions with reasonable clarity, deliberateness, and precision, the Examiner concludes that

Owner is not his/her own lexicographer. See MPEP §2111.01 IV.

**D.       35 U.S.C. § 112 6th Paragraph**

A second exception to giving words in the claims their ordinary and customary meaning

is when a claimed phrase is interpreted in accordance with 35 U.S.C. § 112 6th paragraph. See

MPEP § 2181 et seq.

5          The Examiner finds that because the Reexamined Claims do not recite "step," "means" or

a claim term used as a substitution for "means" (*i.e.*, a generic placeholder for "means"), the

Examined Claims fail Prong (A) as set forth in MPEP §2181. Because the fourteen (14)

Reexamined Claims fail Prong (A) as set forth in MPEP §2181 I., the Examiner concludes that

all Reexamined Claims do not invoke 35 U.S.C. §112, 6th paragraph. See also *Ex parte*

10   *Miyazaki*, 89 USPQ2d 1207, 1215-16 (B.P.A.I. 2008)(precedential).


### *VII. Claim Rejections*


### *Claim Rejections – 35 USC § 102*

15         The following is a quotation of the appropriate paragraphs of pre-AIA 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in
> public use or on sale in this country, more than one year prior to the date of application for patent in the
> United States.


### *Claim Rejections – 35 USC § 103*

25         The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the

invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

5      The factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459

(1966) ("*Graham*"), that are applied for establishing a background for determining obviousness

under pre-AIA 35 U.S.C. 103(a) are summarized as follows:

   1. Determining the scope and contents of the prior art.

   2. Ascertaining the differences between the prior art and the claims at issue.

10      3. Resolving the level of ordinary skill in the pertinent art.

   4. Considering objective evidence present in the application indicating obviousness or

nonobviousness.

   This application currently names joint inventors. In considering patentability of the

claims under pre-AIA 35 U.S.C. 103(a), the Examiner presumes that the subject matter of the

15   various claims was commonly owned at the time any inventions covered therein were made

absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to

point out the inventor and invention dates of each claim that was not commonly owned at the

time a later invention was made in order for the examiner to consider the applicability of pre-

AIA 35 U.S.C. 103(c) and potential pre-AIA 35 U.S.C. 102(e), (f) or (g) prior art under pre-AIA

20   35 U.S.C. 103(a).


A.      *Issue/Ground 1 (Based on SNQ 1 – Liebermann)*


   *(1)*      Claims 1-5 and 13 are rejected under pre-AIA 35 U.S.C. 102(b) as anticipated by

or, in the alternative, under pre-AIA 35 U.S.C. 103(a) as being unpatentable over *Liebermann*.

25      With respect to the limitations of claim 1, *Liebermann* discloses

### a.  [a] handheld device comprising:

In this regard, the Examiner finds that *Liebermann* discloses a portable

transmitter/receiver telephone **8** for the deaf. (*Liebermann* at Title; Abstract; c.1, ll.10-15; c.3,

5    ll.11-23; c.4, ll.20-21; c.5, l.62 – c.6, l.10; see Figure 6).

### b.  a housing;

In this regard, the Examiner finds that *Liebermann* discloses a portable

10   transmitter/receiver telephone **8** having un upright portion **12** and a base portion **13** that

constitutes part of a frame/housing for the portable transmitter/receiver telephone **8**. (*Id*. at c.5,

ll.62-67; see Figure 6).

### c.  a computer within the housing;

15   As set forth *supra*, the Examiner construes a "computer" as a CPU/processor with

software thereon performing control functions, additional to the normal control functions of the

handheld device, based upon input provided by the first and/or second cameras. (See § VI.B.(3).a

*supra*).

20   From this perspective, the Examiner finds that *Liebermann* discloses a portable

transmitter/receiver telephone **8**: a) capturing finger/hand motions, body motions and facial

expression motions by cameras; b) converting them into a digital format; c) performing initial

processing to provide small sets of fixed identifiers; d) transmitting the small sets of fixed

identifiers to a system to perform translation/conversion into equivalent text content; and e)

25   receiving the translated/converted equivalent text content; and displaying it to the user.

(*Liebermann* at c.4, l.60 – c.5, l.11; c.5, l.62 – c.6, l.10; c.6, ll.40-62; c.7, ll.18-43; c.12, l.53 –

c.13, l.3; also see claims 1, 12 – elements (a), (d), (f)). The Examiner finds that *Liebermann* discloses software modules performing the processing which would inherently include a computer/processor/CPU/hardware performing the instructions of the software modules. (*Id*. at c.6, ll.36-38; c.7, ll.44-48; c.9, ll.28-30; c.12, l.53 – c.13, l.3;  claims 3, 28; see Figures 8-12).

5    The Examiner finds that the *Liebermann* discloses the processing steps of a) – e) being accomplished by hardware of the portable transmitter/receiver telephone **8**, thus, within the housing of the portable transmitter/receiver telephone **8**. (*Id.*)


       **d.   a first camera oriented to view a user of the handheld device and having a**
10          **first camera output;**

         As set forth *supra*, the Examiner construes "oriented to view" to mean "orienting to view one thing rather than another thing while still allowing for some or all of both to be within the field of view." [10] (See § VI.B.(1) *supra*).

15        From this perspective, the Examiner finds that *Liebermann* discloses a portable transmitter/receiver telephone **8** comprises a video camera and lens **10** capturing images to be processed in digital format. (*Liebermann* at c.4, l.60 – c.5, l.11; c.5, l.62 – c.6, l.10; c.13, ll.4-15; see Figures 6, 8). The Examiner finds that the video camera and lens **10** being "oriented to view the user of the device" while the user provides finger/hand motions, body motions and facial

20    expression motions. (*Id*.; also see Declaration of Gregory D. Abowd filed 11 November 2021 ("Nov 2021 Abowd Declaration") at ¶¶ 64-65).

---

[10] The Examiner finds that "oriented to view a user" and "oriented to view an object other than the user" can both include user and/or object.

     **e.  a second camera oriented to view an object other than the user of the device
and having a second camera output, wherein the first and second cameras
include non-overlapping fields of view; and**

5       As set forth *supra*, the Examiner construes "oriented to view" to mean "orienting to view

one thing rather than another thing while still allowing for some or all of both to be within the

field of view." [11] (See § VI.B.(1) *supra*).

       From this perspective, and as set forth above, the Examiner finds that *Liebermann*

discloses a portable transmitter/receiver telephone **8** comprises a video camera and lens **10**

10    capturing images to be processed in digital format. (*Liebermann* at c.4, l.60 – c.5, l.11; c.5, l.62 –

c.6, l.10; c.13, ll.4-15; see Figures 6, 8). The Examiner finds that the video camera and lens **10**

being "oriented to view the user of the device" while the user provides finger/hand motions,

body motions and facial expression motions. (*Id.*; also see Nov 2021 Abowd Declaration at ¶¶

64-65).

15       In addition, the Examiner finds that *Liebermann*  discloses a second camera may be used.

Specifically, the Examiner finds that *Liebermann*  discloses "more than one camera" may be

utilized with each camera covering a separate angle, operating independently of the other(s), in

which angle overlap may or may not be permitted. (*Id.* at. c.13, ll.4-15). The Examiner finds that

*Liebermann*  discloses rendering the user with signing motion, any objects or, alive, stationary or

20    moving entities, such as animals (*Id.* at c.13, ll.16-20). The Examiner finds that *Liebermann*

discloses utilizing gloves on the hands of users to enhance the ability of the system to recognize

important details of the hand shapes during the gesturing actions. (*Id.* at c.12, ll.40-52; see

Figures 13A, 13b, 14A, 14B). Since the second camera is configured to cover a separate angle

and operate independently of the other(s), in which angle overlap may or may not be permitted,

---

[11] *Id.*

the Examiner finds that the second camera of *Liebermann* may be directed towards one or both gloves of the user as well as another object in the background, hence, viewing an object other than the user even though the user is still in the image. (See Nov 2021 Abowd Declaration at ¶¶ 70-71).

5

**Alternatively Obvious**

To the degree a reviewing body finds that second camera (*i.e.*, one or more cameras) *above* is not inherent in *Liebermann*, the following alternative to this feature is provided as set forth below:

10          The Examiner finds that it should be appreciated that *Liebermann* clearly describes utilizing "more than one camera" with each camera covering a separate angle, operating independently of the other(s), in which angle overlap may or may not be permitted. (*Id*. at. c.13, ll.4-15).

It would have been obvious for a person of ordinary skill in the art to use a second

15 camera (*i.e.*, one or more cameras) to gather proper image information related to a user various motion profiles as described in *Liebermann* in the handheld device of *Liebermann* .

A person of ordinary skill in the art would be motivated to incorporate a second camera (*i.e.*, one or more cameras) to gather proper image information related to a user various motion profiles, since *Liebermann* explicitly teaches such a mechanism provides a means to allow a

20 user "free movement" in their environment and to properly track down spatial positions in that environment. (*Id*. at c.13, ll.4-8). In other words, such a modification would have provided a that can effectively communication in any environment independent of a user's movement, thereby increasing the operational efficiency of handheld communication device. In addition, this

combination of references satisfies at least rationale C identified by the Supreme Court in *KSR*:

"Use of known technique to improve similar devices (methods, or products) in the same way."

(See MPEP § 2143; see Nov 2021 Abowd Declaration at ¶¶ 64-65.)

5    **f.    wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output**

As set forth *supra*, the Examiner construes a "computer" as a CPU/processor/hardware

10    with software thereon performing control functions, additional to the normal control functions of

the handheld device, based upon input provided by the first and/or second cameras. (See §

VI.B.(3).a *supra*.)

From this perspective, the Examiner finds that *Liebermann* discloses a portable

transmitter/receiver telephone **8**: a) capturing finger/hand motions, body motions and facial

15    expression motions by cameras; b) converting them into a digital format; c) performing initial

processing to provide small sets of fixed identifiers; d) transmitting the small sets of fixed

identifiers to a system to perform translation/conversion into equivalent text content; and e)

receiving the translated/converted equivalent text content; and displaying it to the user. (See §

VII.A.(1).c *supra*). The Examiner finds that functions a) – e) indicated above are functions that

20    are in addition to the normal functions of the portable transmitter/receiver telephone **8** and are

performed based upon inputs from the video camera and lens **10** and the second camera (*i.e.*, one

or more cameras). (See *Liebermann* at c.4, l.60 – c.5, l.11; c.5, l.62 – c.6, l.10; c.6, ll.40-62; c.7,

ll.18-43; c.7, l.49 – c.8, l.26; c.12, l.53 – c.13, l.3; c.13, ll.4-21; see claims 1, 12 – elements (a),

(d), (f); also see Nov 2021 Abowd Declaration at ¶¶ 74-77).

25

With respect to the limitations of claim 2, *Liebermann* teaches and/or renders obvious

**g.  wherein the handheld device comprises a mobile phone.**

In this regard, the Examiner finds *Liebermann* discloses the portable transmitter/receiver

5   telephone **8** being a cellular telephone. (*Liebermann* at c.4, ll.20-21; see Figure 6).

With respect to the limitations of claim 3, *Liebermann* teaches and/or renders obvious

**h.  wherein the first camera is adapted to acquire an image of at least a portion
of the user.**

10

In this regard, the Examiner finds that *Liebermann* discloses a portable

transmitter/receiver telephone **8** comprises a video camera and lens **10** capturing images to be

processed in digital format. (*Liebermann* at c.4, l.60 – c.5, l.11; c.5, l.62 – c.6, l.10; c.13, ll.4-15;

see Figures 6, 8). The Examiner finds that the video camera and lens **10** is configured to acquire

15   finger/hand motions, body motions and facial expression motions of a user. (*Id*.)

With respect to the limitations of claims 4 and 5, *Liebermann* teaches and/or renders

obvious

**i.  wherein the second camera is adapted to acquire an image of the object.**
20   **j.  wherein the second camera is adapted to acquire an video of the object.**

In this regard, the Examiner finds that *Liebermann*  teaches and/or renders obvious "more

than one camera" may be utilized with each camera covering a separate angle, operating

independently of the other(s), in which angle overlap may or may not be permitted. (*Id*. at. c.13,

25   ll.4-15). The Examiner finds that *Liebermann*  discloses rendering the user with signing motion,

any objects or, alive, stationary or moving entities, such as animals (*Id* at c.13, ll.16-20). The

Examiner finds that *Liebermann*  discloses utilizing gloves on the hands of users to enhance the

ability of the system to recognize important details of the hand shapes during the gesturing

actions. (*Id*. at c.12, ll.40-52; see Figures 13A, 13b, 14A, 14B). Since the second camera is

configured to cover a separate angle and operate independently of the other(s), in which angle

overlap may or may not be permitted, the Examiner finds that the second camera of *Liebermann*

5   may be directed towards one or both gloves of the user as well as another object in the

background, hence, viewing an object other than the user even though the user is still in the

image. (See Nov 2021 Abowd Declaration at ¶¶ 70-71, 83).

   With respect to the second camera being adapted to acquire a video of the object, the

Examiner finds that the portable transmitter/receiver telephone **8** comprises a video camera and

10  lens **10** capturing images to be processed in digital format. (*Liebermann* at c.4, l.60 – c.5, l.11;

c.5, l.62 – c.6, l.10; c.13, ll.4-15; see Figures 6, 8). The Examiner finds that the second camera

(*i.e.*, "more than one camera") would be the same camera since it is utilized in the same manner

as the first (*i.e.*, each camera covering a separate angle, operating independently of the other(s),

in which angle overlap may or may not be permitted.) (*Id*. at. c.13, ll.4-15). The Examiner finds

15  that *Liebermann* disclose the video camera specification being configured with real-time

operation having 30-frames/sec. (*Id*. at c.12, ll.7-14).


   With respect to the limitations of claim 13, *Liebermann* teaches and/or renders obvious

**k.  wherein the computer is adapted to perform a control function of the**
20  **handheld device based on the first camera output and the second camera
    output**

   As set forth *supra*, the Examiner construes a "computer" as a CPU/processor with

software thereon performing control functions, additional to the normal control functions of the

handheld device, based upon input provided by the first and/or second cameras. (See § VI.B.(3).a

*supra*).

From this perspective, the Examiner finds that *Liebermann* discloses a portable

transmitter/receiver telephone **8**: a) capturing finger/hand motions, body motions and facial

5    expression motions by cameras; b) converting them into a digital format; c) performing initial

processing to provide small sets of fixed identifiers; d) transmitting the small sets of fixed

identifiers to a system to perform translation/conversion into equivalent text content; and e)

receiving the translated/converted equivalent text content; and displaying it to the user. (See §

VII.A.(1).c *supra*). The Examiner finds that the *Liebermann* discloses the processing steps of a)

10    – e) being accomplished by hardware of the portable transmitter/receiver telephone **8**, thus,

within the housing of the portable transmitter/receiver telephone **8**. (*Id.*) The Examiner finds that

functions a) – e) indicated above are functions that are in addition to the normal functions of the

portable transmitter/receiver telephone **8** and are performed based upon inputs from the video

camera and lens **10** and the second camera (*i.e.*, one or more cameras). (See *Liebermann* at c.4,

15    l.60 – c.5, l.11; c.5, l.62 – c.6, l.10; c.6, ll.40-62; c.7, ll.18-43; c.7, l.49 – c.8, l.26; c.12, l.53 –

c.13, l.3; c.13, ll.4-21; see claims 1, 12 – elements (a), (d), (f); also see Nov 2021 Abowd

Declaration at ¶¶ 89-90).


   *(2)*        Claims 6-10 and 12 are rejected under pre-AIA 35 U.S.C. 103(a) as being

20    unpatentable over ***Liebermann*** in view of ***Sears***.

   <u>With respect to the limitations of claims 6-10 and 12,</u>

    a. **wherein the computer is operable to determine a gesture based on at least one of the first camera output and the second camera output** (claim 6);

    b. **wherein the computer is operable to determine a facial expression based on at least one of the first camera output and the second camera output.** (claim 7);

    c. **wherein the computer is adapted to determine at least one of the position and the orientation of the object based on the second camera output** (claim 8);

    d. **wherein the gesture is performed by a person other than the user of the handheld device** (claim 9)[12];

    e. **wherein the computer is adapted to recognize the object based on the second camera output** (claim 10); and

    f. **wherein the computer is adapted to determine a reference frame of the object** (claim 12).

As set forth *supra*, the Examiner construes a "computer" as a CPU/processor/hardware with software thereon utilizing image processing techniques to determine gestures, facial expression, position and orientation of features and subsequent tracking thereof. (See § VI.B.(3).b *supra*). In addition, the Examiner construes a "*gesture*" to mean "movement of hands or other body parts that conveys meaning." (See § VI.B.(2) *supra*)

In this light, as set forth above, the Examiner finds that *Liebermann* discloses the portable transmitter/receiver telephone **8**: a) capturing finger/hand motions, body motions and facial expression motions by cameras; b) converting them into a digital format; c) performing initial processing to provide small sets of fixed identifiers; d) transmitting the small sets of fixed identifiers to a system to perform translation/conversion into equivalent text content; and e) receiving the translated/converted equivalent text content; and displaying it to the user. (See § VII.A.(1).c *supra*). The Examiner finds that *Liebermann* discloses software modules performing

---

[12] The Examiner finds that dependent claim 9 is dependent from dependent claim 6. Claim 6 is an apparatus claim in which the Examiner construes "a computer…" to mean a CPU/processor/hardware with software thereon utilizing image processing techniques to determine gestures, facial expression, position and orientation of features and subsequent tracking thereof. In examination of dependent claim 9, the Examiner finds that claim provides an actual use claim requirement not any structure and/or configuration to further limit the "computer" of claims 1 and 6. As such, since the claim requirement of claim 9 only adds actual use and not any further structure or configuration to the structure of claims 1 and 6, the Examiner finds that Liebermann in view of Sears satisfies the structure of both claim 6 and 9.

*Ex parte Reexamination – Final Office Action*

the processing which would inherently include a computer/processor/CPU/hardware performing

the instructions of the software modules. (*Id*. at c.6, ll.36-38; c.7, ll.44-48; c.9, ll.28-30; c.12, l.53

– c.13, l.3;  claims 3, 28; see Figures 8-12). The Examiner finds that the *Liebermann* discloses

the processing steps of a) – e) being accomplished by hardware of the portable

5    transmitter/receiver telephone **8**, thus, within the housing of the portable transmitter/receiver

telephone **8**. (*Id*.)

  With respect to the hardware/software combination performing the translation/conversion

into equivalent text; and processing of gesturing, object position/orientation, frame reference and

facial expression information, the Examiner finds that *Liebermann* discloses the preference of

10   utilizing hardware/software modules at a separate central processing facility (*i.e.*, the Center) to

perform the translation/conversion into equivalent text content; and processing of gesturing,

object position/orientation, frame reference and facial expression information. (*Liebermann* at

c.4, l.60 – c.5, l.13; c.6, ll.6-12, 42-52; c.7, l.44 – c.12, l.6). Specifically, the Examiner finds that

*Liebermann* discloses tracking the position/orientation motion of objects, finger/hand motions,

15   body motions and facial expression motions utilizing the hardware/software modules. (*Id*.)

  While *Liebermann* discloses all the limitations as set forth above, *Liebermann* is silent to

specifically calling for the hardware/software combination on the computer of the handheld

device performing the translation/conversion into equivalent text; and processing of gesturing,

object position/orientation, frame reference and facial expression information locally instead of

20   on a separate hardware/software combination.

  However, a hardware/software combination on the computer of a device performing the

translation/conversion into equivalent text; and processing of gesturing, object

position/orientation, frame reference and facial expression information locally instead of on a

separate hardware/software combination is known in the art. The Examiner finds that *Sears*, for

example, teaches a main system **35** comprising either a personal computer *separate from* the

system **35** or an embedded computer *within* the system **35** for the use of capturing image data,

digitizing the image data and processing the image data (*i.e.*, conversion into text and analyzing

5    the image data for the presence, orientation and movement of objects in the image data. (*Sears* at

Abstract; c.5, ll.2-12, 35-44, 51-61; c.18, ll.9-18 (emphasis on c. 5, ll.35-44; c.7, ll.13-23 for

equivalence; for hand gesturing, see c.3, ll.19-21; c.9, l.54 – c.11, l.12; c.5, l.44 – c.6, l.10; c.9,

l.54 – c.11, l.12; c.17, ll.55-60)). The Examiner finds that *Sears* teaches the main system **35**

computer being implemented as a single chip processor which is sufficient to perform the steps

10   of process. (*Id.* at c.7, ll.1-12).

        The Examiner finds that it would have been obvious to one of ordinary skill in the art at

the time of the invention to incorporate the hardware/software combination on the computer of

the device performing the translation/conversion into equivalent text; and processing of

gesturing, object position/orientation, frame reference and facial expression information locally

15   instead of on a separate hardware/software combination as described in *Sears* in the computer

within the handheld device of *Liebermann*.

        A person of ordinary skill in the art would be motivated to incorporate the

hardware/software combination on the computer of the device performing the

translation/conversion into equivalent text; and processing of gesturing, object

20   position/orientation, frame reference and facial expression information locally instead of on a

separate hardware/software combination, since *Sears* explicitly teaches such a mechanism

provides a means to save time. (*Id.* at c.2, ll.6-6-7; also see Nov 2021 Abowd Declaration at ¶

149-152). In other words, such a modification would have provided a handheld device with

faster real-time processing times, thereby increasing the operational efficiency of the handheld

device. (*Id.*)

     In  addition, because these two configurations of the hardware/software and functionality

thereof (*i.e.*, the hardware software being either: 1) on the computer of device itself; 2) or on a

5    computer separate from the device) were art-recognized equivalents before the invention was

made, one of ordinary skill in the art would have found obvious to substitute the hardware

software being on the computer of device itself for the hardware software being on a computer

separate from the device.

     In addition, the Examiner finds that simple substitution of one known element/method for

10   another would obtain predictable results. That is, the substitution of one known element/method

(a hardware software being on the computer of device itself as shown in *Sears*) for another

(hardware software being on a computer separate from the device as shown in *Sears*) would have

been obvious to one of ordinary skill in the art at the time of the invention since the substitution

of hardware software being on the computer of device itself in *Liebermann* would have yielded

15   predictable results, namely, providing hardware software being on the computer of device itself

in *Liebermann* to decrease processing time and provide for a more real-time processing

environment, thus, increasing the functionality and operational efficiency of the handheld device.

     *(3)*     Claim 11 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over

20   ***Liebermann*** in view of ***Tryding***.

     <u>With respect to the limitations of claim 11,</u>

    **a.  wherein the computer is adapted to generate control instructions for a
display that is separate from the handheld device.**

As set forth *supra*, the Examiner construes a "computer" as a CPU/processor with

software thereon performing control functions, additional to the normal control functions of the

handheld device, based upon input provided by the first and/or second cameras. (See § VI.B.(3).a

*supra*).

5        In this light, *Liebermann* discloses all the limitations, as previously set forth, except for

specifically calling for the computer within a handheld device beings adapted to generate control

instructions for a display that is separate from the handheld device.

However, a computer within a handheld device being adapted to generate control

instructions for a display that is separate from the handheld device is known in the art. The

10      Examiner finds that *Tryding*, for example, teaches a mobile telephone **10** including display

monitor control function **40** generating a communications link **5** with a separate and remote

display monitor **15**. (*Tryding* at c.1, ll.8-11; c.2, ll.27-31, 39-44; c.3, ll.17-49; see Figure 1). The

Examiner finds that *Tryding* teaches commands (*i.e.*, control functions) being sent by the display

monitor control function **40**, via the communications link **5**, to the separate and remote display

15      monitor **15** to control what is exactly displayed on the separate and remote display monitor **15**.

(*Id.*)

The Examiner finds that it would have been obvious to one of ordinary skill in the art at

the time of the invention to incorporate the computer within a handheld device to be adapted to

generate control instructions for a display that is separate from the handheld device as described

20      in *Tryding* in the computer within the handheld device of *Liebermann*.

A person of ordinary skill in the art would be motivated to incorporate the computer

within a handheld device to be adapted to generate control instructions for a display that is

separate from the handheld device, since *Tryding* explicitly teaches such a mechanism provides a

means to display data in a larger format. (*Id.* at c.1, ll.23-35; c.1, l.65 – c.2, l.3; also see Nov

2021 Abowd Declaration at ¶¶ 95-96). In other words, such a modification would have provided

a handheld device with the ability to present a user with more easily readable visual display of

data residing on the handheld device, thereby increasing the operational efficiency of the

5    handheld device. (*Id.*)


   *(4)*        Claim 14 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over

*Liebermann* in view of *Gershman*.

   <u>With respect to the limitations of claim 14</u>,

10    **a.  wherein the computer is adapted to transmit information over an internet
      connection.**

   As set forth *supra*, the Examiner construes a 'computer as simply hardware and/or

software in the hand held device that transmits information over an Internet connection. (See §

15    VI.B.(3).c *supra*).

   In this light, *Liebermann* discloses all the limitations, as previously set forth, except for

specifically calling for the computer within a handheld device beings adapted to transmit

information over an internet connection.

   However, a computer within a handheld device beings adapted to transmit information

20    over an internet connection is known in the art. The Examiner finds that *Gershman*, for example,

teaches a handheld Personal Digital Assistant (PDA) that allows a user to access computer

related information within the palm of the user's hand. (*Gershman* at c.1, ll.36-40, 45-52; c.1,

l.62 – c.2, l.35; c.2, l.66 – c.3, l.9; c.43, ll.55-60; see Figures 1A, 17). The Examiner finds that

*Gershman* teaches hardware/software on the PDA providing the ability to transmit information over the Internet. (*Id.*; also see Nov 2021 Abowd Declaration at ¶ 101)

The Examiner finds that it would have been obvious to one of ordinary skill in the art at the time of the invention to incorporate the computer within a handheld device to be adapted to transmit information over an internet connection as described in *Gershman* in the computer within the handheld device of *Liebermann*.

A person of ordinary skill in the art would be motivated to incorporate the computer within a handheld device to be adapted to g transmit information over an internet connection, since *Gershman* explicitly teaches such a mechanism provides a means to have access to computer related information at all time and in all environments without any geographical boundaries. (*Id.* at c.1, ll.36-48; c.2, l.62 – c.3, l.3; c.2, l.66 – c.3, l.4; c.43, ll.55-60; also see Nov 2021 Abowd Declaration at ¶¶ 99-100). In other words, such a modification would have provided a handheld device with the ability to access information via the World Wide Web regardless of location, thereby increasing the operational efficiency of the handheld device. (*Id.*)

*(5)*        Claim 14 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over *Liebermann* in view of *Kimball*.

With respect to the limitations of claim 14,

**a.  wherein the computer is adapted to transmit information over an internet connection.**

As set forth *supra*, the Examiner construes a 'computer as simply hardware and/or software in the hand held device that transmits information over an Internet connection. (See § VI.B.(3).c *supra*).

In this light, *Liebermann* discloses all the limitations, as previously set forth, except for specifically calling for the computer within a handheld device beings adapted to transmit information over an internet connection.

However, a computer within a handheld device beings adapted to transmit information over an internet connection is known in the art. The Examiner finds that *Kimball*, for example, teaches a cellular telephone with Internet communication functionality. (*Kimball* at Title; Abstract; c.2, ll.35-40; c.6, ll.50-55; c.7, ll.14s-23; see Figure 4, 5; also see Nov 2021 Abowd Declaration at ¶ 188). The Examiner finds that *Kimball* teaches the cellular phone **10** including a cellular call subsystem **20** and Internet call subsystem **22** utilizing Internet telephony code **62** on processor **50** to provide Internet functionality. (*Id*.).

The Examiner finds that it would have been obvious to one of ordinary skill in the art at the time of the invention to incorporate the computer within a handheld device to be adapted to transmit information over an internet connection as described in *Kimball* in the computer within the handheld device of *Liebermann*.

A person of ordinary skill in the art would be motivated to incorporate the computer within a handheld device to be adapted to g transmit information over an internet connection, since *Kimball* explicitly teaches such a mechanism provide both cellular and Internet functionality on a single device. (*Id*. at c.1, ll.6-9, 39-42; c.1, l.54 – c.2, l.5; c.7, ll.19-22; also see Nov 2021 Abowd Declaration at ¶¶ 189-190). In other words, such a modification would have provided a handheld device with the ability to access information via the Internet without requiring hardware upgrades, thereby increasing the operational efficiency of the handheld device. (*Id*.)

### VIII. Response to Arguments

#### A.    Jurisdiction

Owner contends that the Office has no jurisdiction over expired patents. (June 2022 PO Response at 1-2).

5

The Examiner respectfully disagrees. The Office's position is that the Office has jurisdiction so long as the patent remains enforceable. (See 37 CFR 1.510(a); and MPEP 2211). This is clearly the case for the '924 Patent, which remains involved in pending litigation. It is not clear why this is inconsistent with *Oil States*, as Owner retains some manner of rights even after the patent is expired, the right to sue and gain enforcement against previous infringement; reexamination is no longer possible once all rights have been extinguished, *i.e.* when the patent is no longer enforceable. But in any event, the Examiner has no authority to determine that a validly of this issue, therefore Owner must go higher if it wants to persist in this argument.

10

15 #### B.    Anticipation Rejections of Claims 1-5 and 13

##### (1)    Preamble

Owner contends that *Liebermann* does not anticipate the preamble of claim 1. Specifically, Owner contends that the "portable transmitter/receiver" of *Liebermann* is not "handheld" because it is required to record movement of both hands, thus, cannot be handheld; and it is required to rest on a flat/stable surface, and not be handheld, so that the device "can be supported in a stable position" when functioning. (June 2022 PO Response at 3-4).

20

The Examiner respectfully disagrees. The Examiner finds that claim 1 recites "a

*handheld* device comprising…." ('924 Patent at claim 1; emphasis added). Foremost, the

Examiner finds that that the term "handheld" modifies the device with a purpose and/or intended

use of a device since "the body of a claim fully and intrinsically sets forth all of the limitations of

5    the claimed invention." MPEP § 2111.02.II states,

> [t]he claim preamble must be read in the context of the entire claim. The
> determination of whether preamble recitations are structural limitations or mere
> statements of purpose or use "can be resolved only on review of the entirety of the
> [record] to gain an understanding of what the inventors actually invented and
> 10    intended to encompass by the claim" as drafted without importing "'extraneous'
> limitations from the specification." *Corning Glass Works*, 868 F.2d at 1257, 9
> USPQ2d at 1966. ***If the body of a claim fully and intrinsically sets forth all of
> the limitations of the claimed invention, and the preamble merely states, for
> example, the purpose or intended use of the invention, rather than any distinct***
> 15    ***definition of any of the claimed invention's limitations, then the preamble is not
> considered a limitation and is of no significance to claim construction.*** *Pitney
> Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305, 51 USPQ2d 1161,
> 1165 (Fed. Cir. 1999). See also *Rowe v. Dror*, 112 F.3d 473, 478, 42 USPQ2d
> 1550, 1553 (Fed. Cir. 1997) ("where a patentee defines a structurally complete
> 20    invention in the claim body and uses the preamble only to state a purpose or
> intended use for the invention, the preamble is not a claim limitation");

(MPEP § 2111.02.II; emphasis added). In this light, while one of ordinary skill in the art would

recognize that a device being "handheld" does require certain size constraints in order for it to be

25    handheld, the Examiner finds that a "prior art [device] structure which is capable of performing

the intended use as recited in the preamble meets the claim." (*Id.*) Thus, the Examiner finds that

the preamble reciting a device being "handheld" is for the purpose and intended use of the

invention being handheld.

From this perspective, the Examiner finds that that *Liebermann* discloses an apparatus

30    which enables a deaf person to communicate through the use of sign language. (*Liebermann*

Abstract; c.1, ll.10-15; c.3, ll.11-23; c.4, ll.20-21; c.5, l.62 – c.6, l.10; see Figure 6). Specifically,

the Examiner finds that *Liebermann* discloses a portable transmitter/receiver telephone **8** for the

deaf which is a "cellular telephone" unit. (*Id*. at c.4, ll.20-21; c.5, l.62 – c.6, l.10; c.7, ll.18-43;

see Figure 6). The Examiner finds that one of ordinary skill in the art would recognize that a

cellular telephone is recognized as a handheld mobile radiotelephone. While, *Liebermann*

requires the portable transmitter/receiver telephone **8** to be "supported in a stable position" when

5    functioning in order for the camera len(s) to record signing movements of the hands and fingers

and body and facial motion and expressions, the Examiner can find insufficient teaching,

requirement or suggestion of placing the portable transmitter/receiver telephone **8** on a flat

surface for stability. In addition, the Examiner finds that *Liebermann* provides no teaching,

requirement or suggestion that both hands are always required for signing. To support the

10    Examiner's position, the Examiner finds that *Liebermann* discloses a full image being taken by

the portable transmitter/receiver telephone **8** of a single hand/right half of the body. (*Id*. at Figure

14A, 14B). Accordingly, *Liebermann* provides contrary evidence to the fact that both hands are

required for signing movements of the hands and fingers and body and facial motion and

expressions.

15            Thus, the Examiner concludes and maintains that, not only is the portable

transmitter/receiver "cellular telephone" of *Liebermann* handheld, but also that the portable

transmitter/receiver telephone is for the purpose and intended use of the portable

transmitter/receiver "cellular telephone" being handheld (*i.e.*, capable of being handheld).

20        *(2)*        ***Element Designated "1e"[13].***

              Owner contends that *Liebermann* does not anticipate the element designated as "*1e*" of

---

[13] The Examiner finds that "1e" is designated as the claim requirement "a second camera oriented to view an object
other than the user of the device and having a second camera output, wherein the first and second cameras include
non-overlapping fields of view."

claim 1. Specifically, Owner contends that the Examiner disregarded the phrases "other than the user of the device" and "the first and second cameras include non-overlapping fields of view." (June 2022 PO Response at 4-9).

5          The Examiner respectfully disagrees. As set forth in the April 2022 Non-Final Office Action and in the instant Final Office action, the Examiner has explicitly addressed the phrase "oriented to view an object other than the user of the device." (April 2022 Non-Final Office Action at § VI.B.(1)). Specifically, the Examiner finds that the '924 Patent term is expired and the Reexamined Claims are interpreted in accordance with the decision of *Phillips*. While, the

10        Examiner recognizes Owner's attempt to limit the phrase to completely exclude one thing from another in light of the "non-overlapping" views," the Examiner finds this contention is misplaced in that the claim requirement of "to view an object other than the user of the device" is independent from the claim requirement of "the first and second cameras include non-overlapping fields of view." From this perspective, the Examiner acknowledges that the first and

15        second cameras may be oriented to view a different object other than the user, however, there is no special definition in the claims, nor in the '924 Patent, that justifies the narrow interpretation of the user not explicitly being in the "oriented view" when directed to the object other than the user." To support the Examiner's position, the Examiner finds guidance from the District Court that found that the term "oriented to view" to mean be it's plain meaning (*i.e.*, orienting to view

20        one thing rather than another thing *while still allowing for some or all of both to be within the field of view*). Thus, the Examiner concludes and maintains that the April 2022 Non-Final Office Action did not disregard the phrase "other than the user of the device" and, instead, provided Owner with explicit direction to how the phrase will be interpreted.

*Ex parte Reexamination – Final Office Action*

With respect to the claim requirement of "the first and second cameras include non-overlapping fields of view," as set forth in the April 2022 Non-Final Office Action and in the instant Final Office action, the Examiner finds that the '924 Patent term is expired and the Reexamined Claims are interpreted in accordance with the decision of *Phillips*. (April 2022 Non-

5  Final Office Action at § VI.A). With this guidance, the Examiner has explicitly addressed the phrase "the first and second cameras include non-overlapping fields of view." (April 2022 Non-Final Office Action at § VII.A.(1).e). However, Owner's contention that the non-overlapping views interpretation must be the single embodiment in which the second camera is disclosed as being oriented ahead of the device instead of at the user is misplaced.

10  From this perspective, in response to Owner's argument that the references fail to show certain features of Owner's invention, it is noted that the features upon which Owner relies (*i.e.*, the single embodiment in which the second camera is disclosed as being oriented ahead of the device instead of at the user) are not recited in the rejected claim(s). Although the claims are interpreted in light of the specification, limitations from the specification are not read into the

15  claims. See *In re Van Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993). Moreover, the Examiner finds that it is improper to import limitations from the specification into the claims. Specifically, "'[t]hough understanding the claim language may be aided by explanations contained in the written description, it is important not to import into a claim limitations that are not part of the claim. For example, a particular embodiment appearing in the written description

20  may not be read into a claim when the claim language is broader than the embodiment.' *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875, 69 USPQ2d 1865, 1868 (Fed. Cir. 2004)." (See MPEP 2111.01(II); emphasis added).

In this light, and in examination of claim 1, the Examiner finds that the claim limitation

requires the second camera to be "orient[ed] to view one thing rather than another thing *while still allowing for some or all of both to be within the field of view*" with the first and second cameras having non-overlapping views. The Examiner finds that the '924 Patent supports such an interpretation. To support the Examiner's position, the Examiner finds that the '924 Patent

5    states,

Consider hand held computer **1901** of FIG. 18, *incorporating a camera 1902 which can optionally be rotated about axis 1905 so as to look at the user or a portion thereof such as finger 1906, or at objects at which it is pointed. Optionally, and often desirably, a stereo pair of cameras to further include*
10   *camera 1910 can also be used. It too may rotate, as desired…* When aimed at the user, as shown, it can be used, for example, to view and obtain images of:

Ones self–facial expression etc., also for image reasons–id etc. combined effect.

15

Ones fingers (any or all), one finger to other and the like. This in turn allows conversing with the computer in a form of sign language which can replace the keyboard of a conventional computer.

20            *One or more objects in ones hand. Includes a pencil or pen–and thus can be used rather than having a special touch screen and pencil if the pencil itself is tracked as disclosed in the above figure. It also allows small children to use the device, and those who cannot hold an ordinary stylus*.

25           Ones gestures.
The camera **1902** (and **1910** if used, and if desired), can also be optionally rotated and used to view points in space ahead of the device, as shown in dotted lines **1902a**. In this position for example *it can be used for the purposes described in the previous application*.
30
('924 Patent at c.25, l.40 – c.26, l.1); and

*The camera can also be used to see gestures of others, as well as the user*, and to acquire raw video images of objects in its field

35   ('924 Patent at c. 26, ll.25-27). The Examiner finds that the '924 Patent discloses two

embodiments of the second camera of the handheld device with the camera being "orient[ed] to

view one thing rather than another thing *while still allowing for some or all of both to be within*

*the field of view*" and with non-overlapping views: 1) with the first camera having a field of view and orientation of the user; and the second camera having a field of view and orientation of the user and the one or more objects in the users' hand, and 2) with the first camera having a field of view and orientation of the user; and the second camera having a field of view and orientation of one or more objects, with no view of the user whatsoever. In addition, as set forth above, *Liebermann* discloses seeing gestures of others, in addition to the user. (*Id.*) Thus, as evidence above, the Examiner concludes and maintains that "the first and second cameras having non-overlapping views" is not limited to the second embodiment (*i.e.*, "2)" as indicated), but also encompasses the first embodiment (*i.e.*, "1)" as indicated).

Moreover, in light of the discussion above, Owner's contention that the non-overlapping views interpretation must be the single embodiment in which the second camera is disclosed as being oriented ahead of the device instead of at the user is misplaced. The Examiner finds that the April 2022 Non-Final Office Action provided a finding of fact that *Liebermann* sufficiently meets the first embodiment of claim requirement of "*1e*" (*i.e.*, the first camera having a field of view and orientation of the user; and the second camera having a field of view and orientation of the user and the one or more objects in the users' hand). Specifically, the April 2022 Non-Final Office Action found that,

> *Liebermann* discloses ***"more than one camera" may be utilized with each camera covering a separate angle***, operating independently of the other(s), in which ***angle overlap*** may or ***may not be permitted***. (*Id.* at. c.13, ll.4-15)… *Liebermann* discloses rendering the user with signing motion, any objects or, alive, stationary or moving entities, such as animals (*Id.* at c.13, ll.16-20). [and]… *Liebermann* discloses utilizing gloves on the hands of users to enhance the ability of the system to recognize important details of the hand shapes during the gesturing actions. (*Id.* at c.12, ll.40-52; see Figures 13A, 13b, 14A, 14B). Since the second camera is configured to cover a separate angle and operate independently of the other(s), in which angle overlap may or may not be permitted, the Examiner finds that the second camera of *Liebermann* may be directed towards one or both gloves of the user as well as another object in the

background, hence, viewing an object other than the user even though the user is
still in the image.

(April 2022 Non-Final Office Action at § VII.A.(1).e, pp. 22-23). In addition, *Liebermann*

5    discloses seeing gestures of others, in addition to the user. ('924 Patent at c. 26, ll.25-27). From

this perspective, the Examiner finds that *Liebermann* sufficiently discloses the second camera

having a field of view and orientation (*i.e.*, separate angle from the first camera in which angle

overlap is not permitted) of: the user and the glove on the user's hand; on another person's hand;

as well as any other object around the user. (See *Liebermann* at Figures 14A, 14B).

10    Thus, the Examiner concludes and maintains that *Liebermann* sufficiently discloses "a

second camera oriented to view an object other than the user of the device and having a second

camera output, wherein the first and second cameras include non-overlapping fields of view"

limitation recited in claim 1 under the *Phillips* standard.

15    **(3)    *Claim 2***

Owner contends that *Liebermann* does not anticipate the preamble of claim 2.

Specifically, Owner contends that the portable transmitter/receiver cellular telephone is not a

phone because it does not include audio output for the user to listen to. (June 2022 PO Response

at 9-11).

20

The Examiner respectfully disagrees. In response to Owner's argument that the

references fail to show certain features of Owner's invention, it is noted that the features upon

which Owner relies (*i.e.*, the telephone device must include audio output for the user to listen to)

are not recited in the rejected claim(s). Although the claims are interpreted in light of the

specification, limitations from the specification are not read into the claims. See *In re Van*

*Geuns,* 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993). Moreover, the Examiner finds that it

is improper to import limitations from the specification into the claims. Specifically, "'[t]hough

understanding the claim language may be aided by explanations contained in the written

5      description, it is important not to import into a claim limitations that are not part of the claim. For

example, a particular embodiment appearing in the written description may not be read into a

claim when the claim language is broader than the embodiment.' *Superguide Corp. v. DirecTV*

*Enterprises, Inc.*, 358 F.3d 870, 875, 69 USPQ2d 1865, 1868 (Fed. Cir. 2004)." (See MPEP

2111.01(II); emphasis added). In this light, the Examiner finds that it is not required for the

10     mobile phone of *Liebermann* to have audio output for the user to listen to.

From this perspective, the Examiner finds that *Liebermann* explicitly discloses the

portable transmitter/receiver telephone **8** for the deaf being a "cellular telephone" unit that is

mobile. (*Id*. at c.4, ll.20-21; c.5, l.62 – c.6, l.10; c.7, ll.18-43; see Figure 6).

To the degree a reviewing body finds that it is required for the cellular telephone of

15     *Liebermann* to have audio output for the user to listen to in order for *Liebermann* to inherently be

a mobile telephone, the Examiner finds that *Liebermann* explicitly discloses the portable

transmitter/receiver telephone **8** comprising a microphone and speaker to function as a

communicator to "double the usefulness of the device." (*Id*. at c.7, ll.29-39).

Subsequently, and in view of the discussion above, the Examiner concludes and

20     maintains that *Liebermann* sufficiently discloses "the handheld device compris[ing] a mobile

phone" limitation recited in claim 2 under the *Phillips* standard.

       *(4)*        ***Claims 3-5 and 13***

Owner contends that "[a]s discussed above, *Liebermann* does not anticipate clam 1. Thus, *Liebermann* does not anticipate dependent claims 3-5 and 13 for at least the same reasons, and withdrawal of this rejection is respectfully requested." (June 2022 PO Response at 11).

The Examiner respectfully disagrees. The Examiner finds this contention the same as previously set forth by Owner. (June 2022 PO Response at 3-9). Thus, the Examiner finds this argument addressed above. (See §§ VIII.B.(1)-(2) *supra*).

**C.**       ***Obvious Rejections of Claims 1-5 and 13***

       *(1)*        ***Liebermann as Analogous Art***

Owner contends the Examiner has failed to establish that *Liebermann* is analogous art and thus cannot be utilized in an obviousness rejection. (June 2022 PO Response at 11-13). In addition, Owner contends that *Liebermann* does not satisfy the first and second tests for analogous art. (*Id*. at 12-13).

The Examiner respectfully disagrees. First, in making an obviousness rejection, the Examiner has the burden to establish a *prima facie* case of obvious and then the burden shifts to the patentee to provide evidence, in the prior art or beyond it, or argument sufficient to rebut the examiner's evidence. (see MPEP § 2142). While the MPEP requires that "the [E]xaminer must determine what is 'analogous prior art' for the purpose of analyzing the obviousness of the subject matter at issue" (MPEP . § 2141.01(a)), the MPEP does not require such a determination

analysis be presented in an obviousness rejection, only that the determination analysis is done.

(*Id.*) Consequently, since the April 2022 Non-Final Office Action provides a *prima facie* case of

obvious, the Examiner concludes that an analogous determination was performed, with respect to

*Liebermann*, or the obviousness rejection over *Liebermann* would not have been presented to

5    Owner. Thus, in the '14902 Proceeding and to the degree a reviewing body finds that second

camera (*i.e.*, one or more cameras) is not inherent in *Liebermann*, the Examiner has presented

Owner with an established *prima facie* case of obviousness to add a second camera, and its

functionality, to a first camera configuration of *Liebermann*. (See April 2022 Non-Final Office

Action at § VII.A.(1).(e)).

10

If Owner is arguing that *Liebermann* is not analogous art, it has been held that a prior art

reference must either be in the field of applicant's endeavor or, if not, then be reasonably

pertinent to the particular problem with which the applicant was concerned, in order to be relied

upon as a basis for rejection of the claimed invention. See *In re Oetiker*, 977 F.2d 1443, 24

15    USPQ2d 1443 (Fed. Cir. 1992).

As is often the case, whether art is analogous depends on how broadly or how narrowly

the field of endeavor or problem facing the inventor is defined. The Examiner finds that the'924

Patent does not explicitly define these. However, in order to expedite prosecution, the Examiner

will hypothesize the "field of endeavor" and "problem faced by inventor." From examination of

20    the '924 Patent, the Examiner finds that Owner's field of endeavor is "a handheld camera device

for optically sensing human and/or object input positions/orientations." ('924 Patent at Title;

Abstract; c.2, ll.8-24; c.3, ll.1-14; c.25, l.40 – c.26, l.51; see Figure 18). In addition, the

Examiner finds that problem being solved by Owner is providing "embodiments for improving

the sensing of objects for displays and control purposes." (*Id.* at Abstract; c.2, ll.8-24; c.25, l.40 – c.26, l.51). With this as guidance, the Examiner finds that *Liebermann* is both in the "field of endeavor" and "pertinent to the problem faced by the inventor."

       With respect to the "field of endeavor, "the Examiner finds that *Liebermann* explicitly

5     discloses "a handheld camera device for optically sensing human and/or object input positions/orientations." Specifically, the Examiner finds that *Liebermann* discloses the portable transmitter/receiver cellular telephone **8** that is deemed handheld[14] which comprises the video camera and lens **10** capturing images to be processed in digital format. (*Liebermann* at c.4, l.60 – c.5, l.11; c.5, l.62 – c.6, l.10; c.13, ll.4-15; see Figures 6, 8). The Examiner finds that the video

10    camera and lens **10** being "oriented to view the user of the device" while the user provides finger/hand motions, body motions and facial expression motions. (*Id.*; also see Nov 2021 Abowd Declaration at ¶¶ 64-65). In addition, the Examiner finds that *Liebermann* discloses a second camera may be used. Specifically, the Examiner finds that *Liebermann* discloses "more than one camera" may be utilized with each camera covering a separate angle, operating

15    independently of the other(s), in which angle overlap may or may not be permitted. (*Id.* at. c.13, ll.4-15). The Examiner finds that *Liebermann* discloses rendering the user with signing motion, any objects or, alive, stationary or moving entities, such as animals (*Id.* at c.13, ll.16-20). From this perspective, *Liebermann* explicitly discloses a handheld portable transmitter/receiver cellular telephone comprising one or more cameras to optically sense human and/object input positions

20    and/or orientations. As such, the Examiner concludes that *Liebermann* is in Owner's "field of endeavor."

---

[14] The Examiner finds that the portable transmitter/receiver cellular telephone **8** is "handheld." (See §§ VIII.B.(1)-(2) *supra*).

Similarly, with respect to the "problem being solved by Owner," the Examiner finds that
*Liebermann* explicitly discloses providing an "embodiment for improving the sensing of objects
for displays and control purposes." Again, and as set forth *supra*, *Liebermann* provides a
portable transmitter/receiver cellular telephone **8** embodiment that is deemed handheld[15] which

5   comprises video cameras and lens **10** capturing images to be processed in digital format.
(*Liebermann* at c.4, l.60 – c.5, l.11; c.5, l.62 – c.6, l.10; c.13, ll.4-15; see Figures 6, 8). The
Examiner finds that the video camera and lens **10** being "oriented to view the user of the device"
while the user provides finger/hand motions, body motions and facial expression motions. (*Id*.;
also see Nov 2021 Abowd Declaration at ¶¶ 64-65). The Examiner finds that *Liebermann*

10   discloses rendering the user with signing motion, any objects or, alive, stationary or moving
entities, such as animals for communication purposes. (*Id*. at c.13, ll.16-20). From this
perspective, *Liebermann* teaches an embodiment of a handheld portable transmitter/receiver
cellular telephone comprising one or more cameras for display and control functionality. As
*Liebermann* teaches the things which the inventor stated were lacking, the Examiner concludes

15   that *Liebermann* is "pertinent to the problem faced by the inventor."

Thus, *Liebermann* is deemed analogous art.


### (2)    *Preamble and Element "1e" over Liebermann*

Owner contends "[a]s discussed above in Section IV, *Liebermann* fails to teach or

20   suggest at least the preamble of claim 1 and claim element l[e]. Accordingly, *Liebermann* does
not render claim 1 obvious." (June 2022 PO Response at 13). In addition, Owner contends that

---

[15] The Examiner finds that the portable transmitter/receiver cellular telephone **8** is "handheld." (See §§ VIII.B.(1)-
(2) *supra*).

since *Liebermann* has a different purpose of being utilized for a deaf person's communication,

*Liebermann* cannot render the utilization of a second camera, and its functionality, obvious. (*Id.*

at 13-14)

5        The Examiner respectfully disagrees. The Examiner finds this contention the same as

previously set forth by Owner. (June 2022 PO Response at 3-9). Thus, the Examiner finds this

argument addressed above. (See §§ VIII.B.(1)-(2) *supra*).

In response to Owner's argument that *Liebermann* has a different purpose of being

utilized for a deaf person's communication, thus, the utilization of a second camera, and its

10      functionality, cannot be obvious, the fact that applicant has recognized another advantage which

would flow naturally from following the suggestion of the prior art cannot be the basis for

patentability when the differences would otherwise be obvious.  See *Ex parte Obiaya*, 227

USPQ 58, 60 (Bd. Pat. App. & Inter. 1985).

15      **(3)        Claims 2-5 and 13**

Owner contends that "[a]s discussed above, *Liebermann* does not render clam 1 obvious.

Accordingly, *Liebermann* does not render dependent claims 2-5 and 13 obvious for at least the

same reasons, and withdrawal of this rejection is respectfully requested." (June 2022 PO

Response at 14).

20

The Examiner respectfully disagrees. The Examiner finds this contention the same as

previously set forth by Owner. (June 2022 PO Response at 11-14). Thus, the Examiner finds this

argument addressed above. (See §§ VIII.C.(1)-(2) *supra*).

*Ex parte Reexamination – Final Office Action*

**D.     *Obvious Rejections of Claims 6-10 and 12***

**(1)     *Sears as Analogous Art***

Owner contends the Examiner has failed to establish that *Sears* is analogous art and thus cannot be utilized in an obviousness rejection. (June 2022 PO Response at 15-16). In addition, Owner contends that *Sears* does not satisfy the first and second tests for analogous art. (*Id.*)

The Examiner respectfully disagrees. First, in making an obviousness rejection, the Examiner has the burden to establish a *prima facie* case of obvious and then the burden shifts to the patentee to provide evidence, in the prior art or beyond it, or argument sufficient to rebut the examiner's evidence. (see MPEP § 2142). While the MPEP requires that "the [E]xaminer must determine what is 'analogous prior art' for the purpose of analyzing the obviousness of the subject matter at issue" (MPEP . § 2141.01(a)), the MPEP does not require such a determination analysis be presented in an obviousness rejection, only that the determination analysis is done. (*Id.*) Consequently, since the April 2022 Non-Final Office Action provides a *prima facie* case of obvious, the Examiner concludes that an analogous determination was performed, with respect to *Sears*¸ or the obviousness rejection over *Liebermann* over *Sears* would not have been presented to Owner. Thus, in the '14902 Proceeding, the Examiner has presented Owner with an established *prima facie* case of obviousness to incorporate the hardware/software combination on the computer of the device performing the translation/conversion into equivalent text; and processing of gesturing, object position/orientation, frame reference and facial expression information locally instead of on a separate hardware/software combination as described by *Sears* in the computer within the handheld device of *Liebermann*. (See April 2022 Non-Final Office Action at §§ VII.A.(2).(a)-(f)).

If Owner is arguing that *Sears* is not analogous art, it has been held that a prior art

reference must either be in the field of applicant's endeavor or, if not, then be reasonably

pertinent to the particular problem with which the applicant was concerned, in order to be relied

5    upon as a basis for rejection of the claimed invention. See *In re Oetiker*, 977 F.2d 1443, 24

USPQ2d 1443 (Fed. Cir. 1992).

As is often the case, whether art is analogous depends on how broadly or how narrowly

the field of endeavor or problem facing the inventor is defined. The Examiner finds that the '924

Patent does not explicitly define these. However, in order to expedite prosecution, the Examiner

10    will hypothesize the "field of endeavor" and "problem faced by inventor." From examination of

the '924 Patent, the Examiner finds that Owner's field of endeavor is "a handheld camera device

for optically sensing human and/or object input positions/orientations." ('924 Patent at Title;

Abstract; c.2, ll.8-24; c.3, ll.1-14; c.25, l.40 – c.26, l.51; see Figure 18). In addition, the

Examiner finds that problem being solved by Owner is providing "embodiments for improving

15    the sensing of objects for displays and control purposes." (*Id.* at Abstract; c.2, ll.8-24; c.25, l.40 –

c.26, l.51). From this perspective, the Examiner finds that *Sear* is "pertinent to the problem faced

by the inventor."

With respect to the "problem being solved by Owner," the Examiner finds that *Sears*

teaches providing an "embodiment for improving the sensing of objects for displays and control

20    purposes." Specifically, *Sears* teaches a main system **35** comprising either a personal computer

*separate from* the system **35** or an embedded computer *within* the system **35** for the use of

capturing image data, digitizing the image data and processing the image data (*i.e.*, conversion

into text and analyzing the image data for the presence, orientation and movement of objects in

the image data. (*Sears* at Abstract; c.5, ll.2-12, 35-44, 51-61; c.18, ll.9-18 (emphasis on c. 5,

ll.35-44; c.7, ll.13-23 for equivalence; for hand gesturing, see c.3, ll.19-21; c.9, l.54 – c.11, l.12;

c.5, l.44 – c.6, l.10; c.9, l.54 – c.11, l.12; c.17, ll.55-60)). *Sears* teaches an embodiment in which

all control functionality is performed on the computer of the main system instead of a separate

5    system. As *Sears* teaches the things which the inventor stated were lacking, the Examiner

concludes that *Sears* is "pertinent to the problem faced by the inventor."

Thus, *Sears* is deemed analogous art.


### (2)        *Liebermann and Sears Combination*

10                a.   ***Owner contends "the Examiner's proposed combination of Liebermann and
                     Sears violates Liebermann's principal of operation."***

Since *Liebermann* teaches an off-line and separate processing center for performing the

sophisticated translation processing, Owner contends that placing the processing of the

15   sophisticated translation processing onto the processor of the portable transmitter/receiver

cellular telephone would violate the principle operation of *Liebermann*. (June 2022 PO Response

at 17-19).


The Examiner respectfully disagrees. In response to Owner's argument that placing the

20   processing of the sophisticated translation processing onto the processor of the portable

transmitter/receiver cellular telephone would violate the principle operation of *Liebermann*, the

test for obviousness is not whether the features of a secondary reference may be bodily

incorporated into the structure of the primary reference; nor is it that the claimed invention must

be expressly suggested in any one or all of the references. Rather, the test is what the combined

teachings of the references would have suggested to those of ordinary skill in the art. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981).

The Examiner finds that "disclosed examples and preferred embodiments do not constitute a teaching away from a broader disclosure or nonpreferred embodiments. *In re Susi*,

5    440 F.2d 442, 169 USPQ 423 (CCPA 1971)." (See MPEP § 2123). From this perspective, the Examiner finds that *Liebermann* discloses <u>a preference to</u> performing the sophisticated translation processing at a designated off-line processing center for economic reasons, not the requirement to. (*Liebermann* at c.5, ll.2-13, 35-40; c.6, ll.6-12, 53-63). *Liebermann* further provides evidence to the location of the sophisticated translation processing being a preferred

10   embodiment by the claim differentiation of claims 1 and 4 of *Liebermann*. Claim 1 of *Liebermann* requires a "means for translating said spoken words and phrases into a visual form which may be observed by the deaf person." (*Id.* at claim 1). In addition, the Examiner finds that claim 4 is dependent from claim 1 and further defines where the "translating means" is located (*i.e.*, at a central station). (*Id.* at claim 4). The Examiner finds that the principle of claim

15   differentiation creates a presumption that claim 1 is not limited to the where the location of the "translating means" is expressly recited in claim 4, which depends from claim 1. Thus, while claim 4 provides an example of where the "translating means" may be located, the Examiner finds that claim 1 is not limited to that location and, as such, may cover broader locations, such as at the portable transmitter/receiver cellular telephone. Accordingly, the Examiner concludes

20   that *Liebermann*, alone, provides evidence to the fact that the proposed combination of *Liebermann* and *Sears* would not violate the principle operation of *Liebermann*.

Moreover, the Examiner finds that *Sears* supports the preference of these embodiments as well. Similar to *Liebermann*, *Sears* teaches a preference to the main system **35** being a separate

off-line system to reduce the cost of the system. (*Sears* at c.7, ll.13-17). However, as noted

above, "disclosed examples and preferred embodiments do not constitute a teaching away from a

broader disclosure or nonpreferred embodiments. *In re Susi*, 440 F.2d 442, 169 USPQ 423

(CCPA 1971)." (See MPEP § 2123). While *Sears* teaches <u>a preference to</u> the main system being

5    a separate off-line system, *Sears* teaches alternatives as well. For example, *Sears*, teaches a main

system **35** comprising either a personal computer <u>separate from</u> the system **35** or an embedded

computer <u>within</u> the system **35** for the use of capturing image data, digitizing the image data and

processing the image data (*i.e.*, conversion into text and analyzing the image data for the

presence, orientation and movement of objects in the image data. (*Sears* at Abstract; c.5, ll.2-12,

10   35-44, 51-61; c.18, ll.9-18 (emphasis on c. 5, ll.35-44; c.7, ll.13-23 for equivalence; for hand

gesturing, see c.3, ll.19-21; c.9, l.54 – c.11, l.12; c.5, l.44 – c.6, l.10; c.9, l.54 – c.11, l.12; c.17,

ll.55-60). Accordingly, the Examiner concludes that *Sears* provides further evidence to the fact

that the proposed combination of *Liebermann* and *Sears* would not violate the principle

operation of *Liebermann*.

15

        **b.   Owner contends "the Examiner's proposed combination of Liebermann and
           Sears lacks both articulated reasoning and rationale underpinning."**

      Owner contends the Examiner did not provide proper suggestion and motivation for the

20   combination *Liebermann* and *Sears*. (June 2022 PO Response at 19-22). Owner further contends

that *Liebermann's* teaching of an off-line and separate processing center for performing the

sophisticated translation processing would dissuade one of ordinary skill in the art from placing

the processing of the sophisticated translation processing onto the processor of the portable

transmitter/receiver cellular telephone. (June 2022 PO Response at 21-22).

25

The Examiner respectfully disagrees. The MPEP provides guidance to the Examiner with exemplary rationales that may support a conclusion of obviousness. (See MPEP § 2143.I). While the Examiner recognizes that many rationales are applicable rationales to support a conclusion of obviousness in the combination of *Sears* with another reference (*i.e.*, rationales ( C)-(G) (see

5    MPEP § 2143.I.C-G)), the Examiner finds that the April 2022 Non-Final Office Action utilized rationale (G) (*i.e.*, "some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention" (MPEP § 2143.I.G)) and rationale (B) (*i.e.*, "simple substitution of one known element for another to obtain predictable results" (MPEP § 2143.I.B))

10    as the rationales to support the conclusion of obviousness. (See April 2022 Non-Final Office Action at §§ VII.B.(2).(a)-(f), pp.28-31; emphasis on pp. 30-31 for suggestion and motivation).

With respect to rationale (G), the Examiner finds that *Sears* recognizes a delay with respect to processing being caused by the required time necessary to transfer large amounts of information to a computer. (*Sears* at c.2, ll.6-7). Thus, while Owner directs the Examiner to how

15    this delay is solved by another means, *Sears* teaches "[a]dditional objects, advantages and novel features of this invention shall be set forth in part in the description that follows, and will become apparent to those skilled in the art upon examination of the following specification or may be learned through the practice of the invention." (*Id*. at c.3, ll.58-62). From this perspective, the Examiner finds that one of ordinary skill in the art would recognize that performing the

20    translation/conversion into equivalent text; and processing of gesturing, object position/orientation, frame reference and facial expression information locally on computer of the device itself, in lieu of on a separate stand-alone hardware/software combination, would inherently provide a decrease in the processing time because there is no requirement to transfer

any data to a separate system (*i.e.*, bandwidth limitation). Thus, the Examiner concludes that

*Sears* does provide "some teaching, suggestion, or motivation in the prior art that would have led

one of ordinary skill to modify the prior art reference or to combine prior art reference teachings

to arrive at the claimed invention."

5        With respect to rationale (B), the Examiner finds that *Sears* recognizes performing the

translation/conversion into equivalent text; and processing of gesturing, object

position/orientation, frame reference and facial expression information locally instead of on a

separate hardware/software combination obtains predictable results. The elements of the *Graham*

factual inquiry for supporting a finding of obviousness based on this rationale are provided

10    below:

> (1)  A finding that the prior art (*Liebermann*) contained a "device" (a system for
> optically sensing human and/or object input positions/orientations) upon which
> the claimed device by the substitution of hardware/software combination on the
> computer of the device performing the translation/conversion into equivalent text;
> and processing of gesturing, object position/orientation, frame reference and
> facial expression information locally instead of of on a separate hardware/software
> combination.

> (2)  A finding that the prior art (*Sears*) utilizes a hardware/software combination
> on the computer of the device performing the translation/conversion into
> equivalent text; and processing of gesturing, object position/orientation, frame
> reference and facial expression information locally instead of on a separate
> hardware/software combination in order to provide faster real-time processing
> times.

> (3)  A finding that one of ordinary skill in the art could have "substituted one
> element for another" and the results would have been predictable to one of
> ordinary skill in the art. Here, because *Liebermann* indicates that system for
> optically sensing human and/or object input positions/orientations having
> software modules and an inherent computer/processor/CPU/hardware performing
> the instructions of the software modules and *Sear* teaches a manner for improving
> this, the results would be predictable. In other words, the *Sears* successful
> implementation or providing a hardware/software combination on the computer of
> the device performing the translation/conversion into equivalent text; and
> processing of gesturing, object position/orientation, frame reference and facial
> expression information locally instead of on a separate hardware/software

combination proves that the implementation is both successful and entirely
predictable. In *Liebermann*, a system for optically sensing human and/or object
input positions/orientations modified according to *Sears* would be capable of
incorporating a hardware/software combination on the computer of the device
performing the translation/conversion into equivalent text; and processing of
gesturing, object position/orientation, frame reference and facial expression
information locally instead of on a separate hardware/software combination to
carry out the function of faster real-time processing times, as evidenced by the
success in the *Sears* system for optically sensing human and/or object input
positions/orientations.

(4)  Whatever additional findings based on the *Graham* factual inquiries may be
necessary, in view of the facts of the case under consideration, to explain a
conclusion of obviousness. There are not additional findings necessary, here.

In that regard, the Examiner asserts the simple substitution of one known element for

another is obvious to one of ordinary skill in the art. That is, the manner of enhancing a particular

device (faster real-time processing times including a hardware/software combination on the

computer of the device performing the translation/conversion into equivalent text; and

processing of gesturing, object position/orientation, frame reference and facial expression

information locally instead of on a separate hardware/software combination) was made part of

the ordinary capabilities of one skilled in the art based upon the teaching of such simple

substitution in *Sears*. Accordingly, one of ordinary skill in the art would have been capable of

applying this known "simple substitution of one known element for another" in the same manner

to the prior art system for optically sensing human and/or object input positions/orientations of

*Liebermann* and the results would have been predictable to one of ordinary skill in the art,

namely, one skilled in the art would have readily recognized that faster real-time processing

times including a hardware/software combination on the computer of the device performing the

translation/conversion into equivalent text; and processing of gesturing, object

position/orientation, frame reference and facial expression information locally instead of on a

separate hardware/software combination in *Liebermann* would positively provide a means to

carry out a new function faster real-time processing times, since such functionality is taught to be highly desirable by *Sears*, as set forth above.

Thus, the rationale to support a conclusion that the claim would have been obvious is that the substitution of one known element for another yields predictable results to one of ordinary

5    skill in the art. If any of these findings cannot be made, then this rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

Accordingly, the Examiner concludes and maintains the one of ordinary skill in the art would recognize the April 2022 Non-Final Office Action, and the instant Final Office Action, provides sufficient finding of fact of an exemplary rationale to support a conclusion of

10   obviousness for the combination of *Sears* with another reference.


With respect to Owner's contention that *Liebermann* would dissuade one of ordinary skill in the art from placing the processing of the sophisticated translation processing onto the processor of the portable transmitter/receiver cellular telephone, the Examiner finds this

15   contention the same as previously set forth by Owner. (June 2022 PO Response at 17-19). Thus, the Examiner finds this argument addressed above. (See § VIII.D.(2).a *supra*).


*(3)    Claims 7-10 and 12*

Owner contends that "[a]s discussed above, no motivation exists to combine *Liebermann*

20   and *Sears*, and thus *Liebermann* render dependent claims 7-10 and 12 obvious for at least the same reasons, and withdrawal of this rejection is requested." (June 2022 PO Response at 22-23).

The Examiner respectfully disagrees. The Examiner finds this contention the same as

previously set forth by Owner. (June 2022 PO Response at 19-22). Thus, the Examiner finds this

argument addressed above. (See § VIII.D.(2).b *supra*).

5    ### E.    *Obvious Rejections of Claim 11*

Owner contends that "[a]s discussed above, *Liebermann* does not teach or suggest each

and every limitation of independent claim 1. *Tryding* does not cure the deficiencies of

*Liebermann* regarding claim 1 and the Action does not so assert. See Action, pp. 32-33.

Accordingly, the combination of *Liebermann* and *Tryding* does not render claim 1 obvious.

10   Claim 11 depends from and adds limitations to claim 1. Accordingly, the combination of

*Liebermann* and *Tryding* does not render claim 11 obvious for at least the same reasons, and

withdrawal of this rejection is respectfully requested." (June 2022 PO Response at 23).

The Examiner respectfully disagrees. The Examiner finds this contention the same as

15   previously set forth by Owner. (June 2022 PO Response at 3-9). Thus, the Examiner finds this

argument addressed above. (See §§ VIII.B.(1)-(2) *supra*).

### F.    *Obvious Rejections of Claim 14*

Owner contends that "[a]s discussed above, *Liebermann* does not teach or suggest each

20   and every limitation of independent claim 1. Neither *Gershman* nor *Kimball* cures the

deficiencies of *Liebermann* regarding claim 1 and the Action does not so assert. See Action, pp.

33-35. Accordingly, the combination of *Liebermann* and *Gershman* or *Kimball* does not render

claim 1 obvious. Claim 14 depends from and adds limitations to claim 1. Accordingly, the

combination of *Liebermann* and *Gershman* or *Kimball* does not render claim 14 obvious for at

least the same reasons, and withdrawal of this rejection is respectfully requested." (June 2022 PO

Response at 23).

5

The Examiner respectfully disagrees. The Examiner finds this contention the same as

previously set forth by Owner. (June 2022 PO Response at 3-9). Thus, the Examiner finds this

argument addressed above. (See §§ VIII.B.(1)-(2) *supra*).

10

### IX. Conclusion

**THIS ACTION IS MADE FINAL.**

A shortened statutory period for response to this action is set to expire *TWO (2)*

*MONTHS* from the mailing date of this action.

**Extensions of time under 37 C.F.R. § 1.136(a) do not apply in reexamination**

**proceedings**. The provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding. Further, in 35 U.S.C. 305 and in 37 CFR 1.550(a), it is required that

reexamination proceedings "will be conducted with special dispatch within the Office."

**Extensions of time in reexamination proceedings are provided for in 37 C.F.R. §**

**1.550(c).** A request for extension of time must be filed on or before the day on which a response

to this action is due, and it must be accompanied by the petition fee set forth in 37 C.F.R. §

1.17(g). The mere filing of a request will not effect any extension of time. An extension of time

will be granted only for sufficient cause, and for a reasonable time specified.

The filing of a timely first response to this final rejection will be construed as including a

request to extend the shortened statutory period for an additional month, which will be granted

even if previous extensions have been granted. In no event however, will the statutory period for

response expire later than SIX MONTHS from the mailing date of the final action. See MPEP §

2265.

The patent owner is reminded of the continuing responsibility under 37 C.F.R. § 1.565(a),

to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Patent No. 8,194,924 throughout the course of this reexamination proceeding. See MPEP §§

2207, 2282 and 2286.

**All** correspondence relating to this *ex parte* reexamination proceeding should be directed:

By Mail to:        Mail Stop *Ex Parte* Reexam
                   Central Reexamination Unit
                   Commissioner for Patents
                   United States Patent & Trademark Office
5                  P.O. Box 1450
                   Alexandria, VA 22313-1450


By FAX to:         (571) 273-9900
                   Central Reexamination Unit
10

By hand:           Customer Service Window
                   Randolph Building
                   401 Dulany Street
                   Alexandria, VA 22314

15   By EFS-Web:

         Registered users of EFS-Web may alternatively submit such correspondence via the
     electronic filing system EFS-Web, at

20              https://efs.uspto.gov/efile/myportal/efs-registered


         EFS-Web offers the benefit of quick submission to the particular area of the Office that
     needs to act on the correspondence. Also, EFS-Web submissions are "soft scanned" (i.e.,
25   electronically uploaded) directly into the official file for the reexamination proceeding, which
     offers parties the opportunity to review the content of their submissions after the "soft scanning"
     process is complete.

*Ex parte Reexamination – Final Office Action*

     Any inquiry concerning this communication or earlier communications from the

Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be

directed to the Central Reexamination Unit at telephone number (571) 272-7705.


5    /Stephen J. Ralis/
Primary Examiner, Art Unit 3992



10


Conferees:

15
/Ovidio Escalante/
Reexamination Specialist, Art Unit 3992

/HETUL B PATEL/
20   Supervisory Patent Examiner, Art Unit 3992




25




30




35




40   SJR
7/12/2022




*Ex parte Reexamination – Final Office Action*

| *Office Action in Ex Parte Reexamination* | **Control No.**<br>90/014,902 | **Patent Under Reexamination**<br>8194924 | |
|---|---|---|---|
| | **Examiner**<br>STEPHEN J RALIS | **Art Unit**<br>3992 | **AIA (FITF) Status**<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a. ☑ Responsive to the communication(s) filed on 08 June 2022.
     ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

b. ☑ This action is made FINAL.

c. ☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire 2 month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination
certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days
will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

  1. ☐ Notice of References Cited by Examiner, PTO-892.    3. ☐ Interview Summary, PTO-474.

  2. ☐ Information Disclosure Statement, PTO/SB/08.    4. ☐ _____.

Part II    SUMMARY OF ACTION

  1a. ☑ Claims 1-14 are subject to reexamination.

  1b. ☐ Claims _____ are not subject to reexamination.

  2. ☐ Claims _____ have been canceled in the present reexamination proceeding.

  3. ☐ Claims _____ are patentable and/or confirmed.

  4. ☑ Claims 1-14 are rejected.

  5. ☐ Claims _____ are objected to.

  6. ☐ The drawings, filed on _____ are acceptable.

  7. ☐ The proposed drawing correction, filed on _____ has been (7a) ☐ approved (7b) ☐ disapproved.

  8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. 119(a)-(d) or (f).

    a) ☐ All  b) ☐ Some*  c) ☐None    of the certified copies have

    1 ☐ been received.

    2 ☐ not been received.

    3 ☐ been filed in Application No. _____.

    4 ☐ been filed in reexamination Control No. _____.

    5 ☐ been received by the International Bureau in PCT application No. _____.

    * See the attached detailed Office action for a list of the certified copies not received.

  9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal
    matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D.
    11, 453 O.G. 213.

  10. ☐ Other: _____.

cc: Requester (if third party requester)

PTO/AIA/31 (05-22)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## NOTICE OF APPEAL FROM THE EXAMINER TO
## THE PATENT TRIAL AND APPEAL BOARD

**Docket Number (Optional)**

I hereby certify that this correspondence is being facsimile transmitted to the USPTO, transmitted via the USPTO's patent electronic filing system, or deposited with the United States Postal Service with sufficient postage in an envelope addressed to "Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450" [37 CFR 1.8(a)]

on _September 22, 2022_ .

Signature _/Mark McCarthy/_

Typed or printed name _Mark McCarthy_

| First Named Inventor Timothy Pryor | |
|---|---|
| Application Number 90/014,902 | Filed November 11, 2021 |
| For Camera based sensing in handheld, mobile, gaming or other devices | |
| Art Unit 3992 | Examiner Stephen Ralis |

Applicant hereby **appeals** to the Patent Trial and Appeal Board from the last decision of the examiner.

The fee for this Notice of Appeal is (37 CFR 41.20(b)(1))      $ 840.00

☐ Applicant asserts small entity status. See 37 CFR 1.27. Therefore, the fee shown above is reduced by 50%, and the resulting fee is:      $ _____

☐ Applicant certifies micro entity status. See 37 CFR 1.29. Therefore, the fee shown above is reduced by 75%, and the resulting fee is:      $ _____
Form PTO/SB/15A or B or equivalent must either be enclosed or have been submitted previously.

☐ A check in the amount of the fee is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☑ The Director is hereby authorized to charge any fees which may be required, or credit any overpayment to Deposit Account No. _604293_ .

☑ Payment made via USPTO's patent electronic filing system (Patent Center or EFS-Web).

☐ A petition for an extension of time under 37 CFR 1.136(a) (PTO/AIA/22 or equivalent) is enclosed.
For extensions of time in reexamination proceedings, see 37 CFR 1.550.

**WARNING:  Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the

☐ applicant      ☑ attorney or agent of record
                      Registration number _69,575_

☐ attorney or agent acting under 37 CFR 1.34
   Registration number _____

Signature _/Mark McCarthy/_

Typed or printed name _Mark McCarthy_

Telephone Number _(512) 717-6583_

Date _September 22, 2022_

**NOTE:** This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. Submit multiple forms if more than one signature is required, see below*.

☐ * Total of _____ forms are submitted.

A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with an information collection subject to the requirements of the Paperwork Reduction Act of 1995, unless the information collection has a currently valid OMB Control Number. The OMB Control Number for this information collection is 0651-0031. Public burden for this form is estimated to average 12 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the information collection. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the Chief Administrative Officer, United States Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450 or email InformationCollection@uspto.gov. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO:  Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. The United States Patent and Trademark Office (USPTO) collects the information in this record under authority of 35 U.S.C. 2. The USPTO's system of records is used to manage all applicant and owner information including name, citizenship, residence, post office address, and other information with respect to inventors and their legal representatives pertaining to the applicant's/owner's activities in connection with the invention for which a patent is sought or has been granted. The applicable Privacy Act System of Records Notice for the information collected in this form is COMMERCE/PAT-TM-7 Patent Application Files, available in the Federal Register at 78 FR 19243 (March 29, 2013). https://www.govinfo.gov/content/pkg/FR-2013-03-29/pdf/2013-07341.pdf

Routine uses of the information in this record may include disclosure to: 1) law enforcement, in the event that the system of records indicates a violation or potential violation of law; 2) a Federal, state, local, or international agency, in response to its request; 3) a contractor of the USPTO having need for the information in order to perform a contract; 4) the Department of Justice for determination of whether the Freedom of Information Act (FOIA) requires disclosure of the record; 5) a Member of Congress submitting a request involving an individual to whom the record pertains, when the individual has requested the Member's assistance with respect to the subject matter of the record; 6) a court, magistrate, or administrative tribunal, in the course of presenting evidence, including disclosures to opposing counsel in the course of settlement negotiations; 7) the Administrator, General Services Administration (GSA), or their designee, during an inspection of records conducted by GSA under authority of 44 U.S.C. 2904 and 2906, in accordance with the GSA regulations and any other relevant (i.e., GSA or Commerce) directive, where such disclosure shall not be used to make determinations about individuals; 8) another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)); 9) the Office of Personnel Management (OPM) for personnel research purposes; and 9) the Office of Management and Budget (OMB) for legislative coordination and clearance.

If you do not furnish the information requested on this form, the USPTO may not be able to process and/or examine your submission, which may result in termination of proceedings, abandonment of the application, and/or expiration of the patent.

**Additional Uses**

Additional USPTO uses of the information in this record may include disclosure to: 1) the International Bureau of the World Intellectual Property Organization, if the record is related to an international application filed under the Patent Cooperation Treaty;  2) the public i) after publication of the application pursuant to 35 U.S.C. 122(b), ii) after issuance of a patent pursuant to 35 U.S.C. 151, iii) if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections, or an issued patent, or iv) without publication of the application or patent under the specific circumstances provided for by 37 CFR 1.14(a)(1)(v)-(vii); and/or 3) the National Archives and Records Administration, for inspection of records.

Reexam of Patent No. 8,194,924
Control No. 90/014,902

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

*In re* Reexam of: U.S. Patent No. 8,194,924

Control No.: 90/014,902

Confirmation No.: 3671; Art Group 3992

Filed: November 11, 2021

Title: CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING, OR

OTHER DEVICES

### APPEAL BRIEF UNDER 37 C.F.R. § 41.37

Mail Stop *Ex Parte* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Filed on behalf of Patent Owner by:

Todd E. Landis (Reg. No. 44,200)
2633 McKinney Ave., Suite 130
Dallas, TX 75204

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite A #453
Philadelphia, PA 19103

Adam B. Livingston (Reg. No. 79,173)
601 Congress Avenue, Suite 600
Austin, TX 78701

Mark J.E. McCarthy (Reg. No. 69,575)
601 Congress Avenue, Suite 600
Austin, TX 78701

**WILLIAMS SIMONS & LANDIS PLLC**

Reexam of Patent No. 8,194,924
Control No. 90/014,902

## TABLE OF CONTENTS

I.     REAL PARTY IN INTEREST ................................................................1

II.    RELATED APPEALS, INTERFERENCES, AND TRIALS...............2

III.   SUMMARY OF CLAIMED SUBJECT MATTER ...........................4

IV.    ARGUMENT .......................................................................................5

    A.    Claim Construction ..................................................................... 5

        1.    The preamble of claim 1...................................................5

        2.    "wherein the first and second cameras include non-overlapping fields of view" ...............................................7

        3.    "oriented to view a user" and "oriented to view an object other than the user"...........................................11

        4.    "mobile phone"...............................................................13

    B.    Ground 1 — U.S. Patent No. 5,982,853 ("*Liebermann*") Does Not Anticipate Claims 1-5 and 13........................................ 14

        1.    *Liebermann* does not anticipate independent claim 1. ...15

            a.   *Liebermann* fails to disclose the preamble of claim 1 ..............................................................15

            b.   *Liebermann* fails to disclose claim element 1[e]. ......19

        2.    *Liebermann* does not anticipate dependent claim 2. ......24

        3.    *Liebermann* does not anticipate dependent claims 3-5 and 13................................................................................26

    C.    Ground 2 — *Liebermann* Does Not Render Obvious Claims 1-5 and 13........................................................................ 26

        1.    *Liebermann* is non-analogous art and cannot be cited in any obviousness rejection...........................................26

        2.    *Liebermann* does not render claim 1 obvious. ..............29

        3.    *Liebermann* does not render dependent claim 2 obvious.............................................................................31

        4.    *Liebermann* does not render dependent claims 3-5 and 13 obvious..............................................................31

    D.    Ground 3 — *Liebermann* and U.S. Patent No. 6,115,482 ("*Sears*") Do Not Render Obvious Claims 6-10 and 12 .............31

i

1.    *Sears* is non-analogous art and thus cannot be cited in any obviousness rejection. ...............................................32

2.    The combination of *Liebermann* and *Sears* does not render dependent claim 6 obvious. .................................33

  a.  By virtue of its dependency from independent claim 1, the combination of *Liebermann* and *Sears* does not render claim 6 obvious......................33

  b.  The Examiner's proposed combination of *Liebermann* and *Sears* violates *Liebermann*'s principle of operation. ...............................................34

  c.  The Examiner's proposed combination of *Liebermann* and *Sears* lacks both articulated reasoning and rational underpinning. .......................41

3.    The combination of *Liebermann* and *Sears* does not render dependent claim 7 obvious. ...........................................46

4.    The combination of *Liebermann* and *Sears* does not render dependent claim 8 obvious. ...............................47

5.    The combination of *Liebermann* and *Sears* does not render dependent claim 10 obvious. ...............................48

6.    The combination of *Liebermann* and *Sears* does not render dependent claims 9 and 12 obvious....................50

E.    Ground 4 — *Liebermann* and U.S. Patent No. 5,880,732 ("*Tryding*") Do Not Render Obvious Claim 11......................50

F.    Ground 5 — *Liebermann* and U.S. Patent No. 6,401,085 ("*Gershman*") Do Not Render Obvious Claim 14....................51

G.    Ground 6 — *Liebermann* and U.S. Patent No. 5,953,322 ("*Kimball*") Do Not Render Obvious Claim 14. ......................51

H.    The USPTO Has No Jurisdiction Over Expired Patents ..........52

V.    NO SUBSTANTIAL NEW QUESTION (SNQ) OF PATENTABILITY EXISTS .................................................54

VI.    CONCLUSION ..................................................................56

VII.    CLAIMS APPENDIX ........................................................57

ii

Reexam of Patent No. 8,194,924
Control No. 90/014,902

## TABLE OF AUTHORITIES

**Cases**

*Acceleration Bay, LLC v. Activision Blizzard, Inc.*,
   908 F.3d 765 (Fed. Cir. 2018) ...................................................................5

*ACTV, Inc. v. Walt Disney Co.*,
   346 F.3d 1082 (Fed. Cir. 2003) ................................................................12

*Bettcher Indus. v. Bunzl USA, Inc.*,
   661 F.3d 629 (Fed. Cir. 2011) ..................................................................20

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed. Cir. 2002) ...................................................................5

*Donner Technology, LLC v. Pro Stage Gear, LLC*,
   979 F.3d 1353 (Fed. Cir. 2020) ................................................................27

*Ex parte Obiaya*,
   227 USPQ 58 (Bd. Pat. App. & Inter. 1985) ............................................30

*Georgetown Rail Equip. Co. v. Holland L.P.*,
   867 F.3d 1229 (Fed. Cir. 2017) .................................................................5

*In re Berg*,
   320 F.3d 1310 (Fed. Cir. 2003) ................................................................40

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006) ..................................................................41

*In re Klein*,
   647 F.3d 1343 (Fed. Cir. 2011) ................................................................27

*In re Montgomery*,
   677 F.3d 1375 (Fed. Cir. 2012) ................................................................20

*In re Rijckaert*,
   9 F.3d 1531 (Fed. Cir. 1993) ....................................................................21

*In re Susi*,
   440 F.2d 442 (CCPA 1971) ......................................................................39

iii

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*,
    821 F.3d 1359 (Fed. Cir. 2016) ...........................................................43

*KSR Int'l Co. v Teleflex Inc.*,
    550 U.S. 398 (2007) ...........................................................................41

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ...........................................................................40

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
    138 S. Ct. 1365 (2018) .......................................................................52

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999) .........................................................6, 7

*Plas-Pak Indus. v. Sulzer Mixpac AG*,
    2015 U.S. App. LEXIS 1456 (Fed. Cir. Jan. 27, 2015) .......................35

*Wasica Fin. GmbH v. Cont'l Auto. Sys.*,
    853 F.3d 1272 (Fed. Cir. 2017) ..........................................................22

**Statutes**

35 U.S.C. § 103 ...........................................................................................35

**Other Authorities**

MPEP § 2111 ............................................................................................6, 19
MPEP § 2123 ...............................................................................................39
MPEP § 2143 ......................................................................................... passim

iv

## I.    REAL PARTY IN INTEREST

Gesture Technology Partners, LLC ("Patent Owner") is the sole owner of U.S.

Patent No. 8,194,924 (the "'924 Patent").  Patent Owner is the real party in interest.

1

## II.    RELATED APPEALS, INTERFERENCES, AND TRIALS

The following matters may be related to, directly affect, or be directly affected by or have a bearing on the Board's decision in the pending appeal:

*Gesture Technology Partners, LLC v. Huawei Device Co., Ltd.*, 2:21-cv-00040, in the United States District Court for the Eastern District of Texas.

*Gesture Technology Partners, LLC v. Samsung Electronics Co., Ltd.*, 2:21-cv-00041, in the United States District Court for the Eastern District of Texas.

*Gesture Technology Partners, LLC v. Apple Inc.*, 6:21-cv-00121, in the United States District Court for the Western District of Texas.

*Gesture Technology Partners, LLC v. Lenovo Group Ltd.*, 6:21-cv-00122, in the United States District Court for the Western District of Texas.

*Gesture Technology Partners, LLC v. LG Electronics, Inc.*, 6:21-cv-00123, in the United States District Court for the Western District of Texas.

*Gesture Technology Partners, LLC v. Motorola Mobility LLC*, 1:22-cv-03535, in the Northern District of Illinois, Eastern Division.

*Gesture Technology Partners, LLC v. Katherine K. Vidal*, in her official capacity as Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark office, C.A. No. 1:22-cv-622, in the United States District Court for the Eastern District of Virginia.

*Gesture Technology Partners, LLC v. Unified Patents, LLC*, No. IPR2021-00917, before the Patent and Trial Appeal Board (institution granted November 22, 2021; Paper 11)

*Gesture Technology Partners, LLC v. Apple Inc.*, No. IPR2021-00920, before the Patent and Trial Appeal Board (institution granted December 6, 2021; Paper 12)

*Gesture Technology Partners, LLC v. Apple Inc.*, No. IPR2021-00921, before the Patent and Trial Appeal Board (institution granted December 13, 2021; Paper 8).

*Gesture Technology Partners, LLC v. Apple Inc.*, No. IPR2021-00922, before the Patent and Trial Appeal Board (institution granted November 29, 2021; Paper 10).

*Gesture Technology Partners, LLC v. Apple Inc.*, No. IPR2021-00923, before the Patent and Trial Appeal Board (institution granted December 6, 2021; Paper 10).

*Ex Parte* Reexamination No. 90/014,900 of U.S. Patent No. 8,553,079, before the United States Patent and Trademark Office (reexam ordered December 20, 2021).

*Ex Parte* Reexamination No. 90/014,901 of U.S. Patent No. 7,933,431, before the United States Patent and Trademark Office (reexam ordered January 11, 2022).

*Ex Parte* Reexamination No. 90/014,903 of U.S. Patent No. 8,878,949, before the United States Patent and Trademark Office (reexam ordered December 2, 2021).

## III.    SUMMARY OF CLAIMED SUBJECT MATTER

Independent claim 1 is directed to a handheld device including a computer, a first camera having a first output, and a second camera having a second output.  *See, e.g.*,'924 Patent, 11:65-12:12, 12:62-13:47, 25:40-26:43, Figs. 8A, 8B, 18 (elements 1901, 1902a, 1910).  The first camera is oriented to view a user of the handheld device, and the second camera is oriented to view an object other than the user of the device, wherein the first and second cameras have non-overlapping fields of view.  *See, e.g.*, '924 Patent, Fig. 18 (elements 1901, 1902a, 1910).  The computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.  *See, e.g.*, '924 Patent, 11:65-12:12, 12:62-13:47, 25:40-26:43, Fig. 18 (elements 1901, 1902a, 1910).

4

## IV.    ARGUMENT

### A.    Claim Construction

#### 1.    The preamble of claim 1.

The preamble of claim 1 recites "[a] handheld device comprising." '924 Patent, claim 1. The preamble of claim 1 should be limiting. "A preamble limits the invention if it recites essential structure or steps, or is 'necessary to give life, meaning, and vitality' to the claim." *Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 770 (Fed. Cir. 2018) (citing *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)). *See also Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017) ("Whether to treat a preamble as a limitation is a determination resolved only on review of the entire patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim" (emphasis added) (cleaned up)).

The body of independent claim 1 recites "a user of the handheld device" and "a control function of the handheld device." '924 Patent, claim 1 (emphasis added). The antecedent basis for "the handheld device" in the body of claim 1 is "[a] handheld device" in the preamble of claim 1. Thus, the preamble of claim 1 recites essential structure and limits the scope of claim 1.

Further, the '924 Patent discloses different embodiments of Dr. Pryor's invention. In some embodiments, the invention is provided in the form of a non-

5

handheld device (e.g., computer within an automobile). *See, e.g.*, '924 Patent, Fig. 10A. In some other embodiments, the invention is provided in a handheld device, such as a cellphone. *See id.* at 11:65-12:12, 25:40-26:27, Fig. 8A, Fig. 8B, Fig. 18. Claim 1 purposely recites a "handheld device" to claim the handheld-device embodiments disclosed in the specification. Thus, the preamble is necessary to give life, meaning, and vitality to claim 1, consistent with the embodiments that the inventor intended to claim. Accordingly, the preamble of claim 1 should be limiting.

The Examiner contends that "the term 'handheld' modifies the device with a purpose and/or intended use of a device since 'the body of a claim fully and intrinsically sets forth all of the limitations of the claimed invention.'" Final Office Action dated July 22, 2022 ("Action"), p. 38 (quoting MPEP § 2111.02). Although not entirely clear, the Examiner seems to be relying on *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999), to argue that the preamble of claim 1 merely states the purpose or intended use of the invention and thus is not a claim limitation. *See* Action, p. 38. The Examiner is misguided.

As explained by the Federal Circuit in *Pitney Bowes, Inc.*, if

the body of the claim <u>fully and intrinsically</u> sets forth the complete invention, including all of its limitations, <u>and</u> the preamble offers no distinct definition of any of the claimed invention's limitations, but rather <u>merely</u> states, for example, the purpose or intended use of the invention, <u>then the preamble is of no significance</u> to claim construction because it cannot be said to constitute or explain a claim limitation.

6

*Pitney Bowes, Inc.*, 182 F.3d at 1305 (emphasis added). But in the present case, as discussed above, the preamble of claim 1 provides the antecedent basis for "the handheld device." Thus, the body of claim 1 does <u>not</u> fully and intrinsically set forth the complete invention. Accordingly, the preamble of claim 1 should be limiting.

Further, by virtue of reciting "handheld device," the preamble of claim 1 places size requirements/restrictions on the claimed components (i.e., housing, specifically configured computer, and specifically configured two cameras). This is even acknowledged by the Examiner. *See* Action, p. 38 ("one of ordinary skill in the art would recognize that a device being 'handheld' does require <u>certain size constraints</u> in order for it to be handheld") (emphasis added). Thus, the preamble does <u>not</u> merely state the purpose or intended use of the invention, but rather imposes structural limitations on the claimed apparatus. Accordingly, the preamble of claim 1 should be limiting.

> **2.    "wherein the first and second cameras include non-overlapping fields of view"**

Claim element 1[d] recites, in part, "a first camera." '924 Patent, claim 1. Claim element 1[e] recites, in part, "a second camera . . . wherein the first and second cameras include <u>non-overlapping</u> fields of view." *Id*. (emphasis added). Patent Owner asserts a POSITA would interpret this claim language to mean there

7

is <u>zero</u> overlap between the field of view of the first camera and the field of view of the second camera.

In general, a POSITA would recognize that each camera has one field of view (FOV). For example, camera A has $FOV_A$ and camera B has $FOV_B$. When both camera A and camera B are present, there are three possible configurations. In the first configuration, camera A and camera B have the same/identical field of view (i.e., $FOV_A = FOV_B$). Everything (e.g., a person, a pet, a car, etc.) in $FOV_A$ is also in $FOV_B$. In the second configuration, the two FOVs partially overlap (e.g., 0.5% overlap, 45% overlap, 99.9% overlap), but $FOV_A$ includes something that is not present in $FOV_B$ (or vice versa). The human eyes are an example of the second configuration. As a corollary, a pair of cameras involved in producing stereoscopic images is also an example of the second configuration. In the third configuration, $FOV_A$ and $FOV_B$ are non-overlapping, meaning there is 0% overlap between $FOV_A$ and $FOV_B$. In this third configuration, anything that appears in $FOV_A$ does not appear in $FOV_B$ (and vice versa). For example, if camera A of a handheld device is pointed due east and if camera B of the handheld device is pointed due west, then the two cameras have non-overlapping fields of view. The plain language of claim element 1[e] requires this third configuration (i.e., zero overlap between $FOV_A$ and $FOV_B$).

This interpretation is also confirmed by the prosecution history of the '924 Patent. The '924 Patent issued from U.S. Patent Application Serial No. 13/051,698 (the "'698 Application'"). '924 Patent, element (21). During prosecution of the '698 Application, independent claim 24[1] was amended to recite "wherein the first and second cameras include non-overlapping fields of view," to overcome an obviousness rejection citing U.S. Patent No. 6,788,336 ("*Silverbrook*"). Office Action Response dated April 18, 2012, pp. 2, 4. As argued by the Applicant, "Silverbrook does <u>not</u> disclose a control function based on camera output, <u>let alone a camera output from at least one of two cameras having non-overlapping fields of view</u>. Silverbrook <u>instead</u> discloses using the output of two area image sensors to produce '<u>stereoscopic 3D prints</u>.'" *Id.*, p. 5 (citing *Silverbrook*, 149:49) (emphasis added). *Silverbrook's* two "area image sensors" (the Examiner-identified "first and second cameras") have at least partially overlapping fields of view because they are used to produce "stereoscopic 3D prints." Stereoscopic vision necessarily requires overlapping fields of view (i.e., the second configuration discussed above). Thus, the added claim language "non-overlapping fields of view" means zero overlap between the fields of view (i.e., the third configuration, discussed above).

---

[1] Independent claim 24 in the '698 Application was renumbered as independent claim 1 in the '924 Patent.

9

Otherwise, the added claim language could not be used by Applicant to argue the claimed "first and second cameras" are distinguishable from *Silverbrook's* two "area image sensors."

Further, the requirement that there is no overlap between the fields of view of the claimed first and second cameras in a handheld device is disclosed in a single embodiment in the specification of the '924 Patent—the embodiment shown in Figure 18 (reproduced below).



'924 Patent, Fig. 18 (annotated). Figure 18 "illustrates an improved handheld computer embodiment of the invention," consistent with claim 1. '924 Patent at 3:11-14. In Figure 18, the first camera (1910) is oriented to view a user of the device (1906). A second camera 1902 is also provided. Figure 18 then provides two sub-embodiments: one sub-embodiment where the second camera is oriented to view

10

the user and having an overlapping field of view with the first camera (labeled 1902 and not claimed) and another sub-embodiment (labeled 1902a) where the second camera is oriented to view an object other than the user without an overlapping field of view with the first camera (the claimed sub-embodiment).  As a result, there is no overlap between the first and second cameras.  Claim element 1[e] captures the teachings of this sub-embodiment.

Accordingly, for these reasons, claim 1 should be construed that there is no overlap between the fields of view of the claimed first and second cameras.

### 3.    "oriented to view a user" and "oriented to view an object other than the user"

Claim element 1[d] recites, in part, "a first camera oriented to <u>view a user</u>." '924 Patent, claim 1 (emphasis added).  Claim element 1[e] recites "a second camera oriented to <u>view an object other than the user</u> . . . wherein the first and second cameras include non-overlapping fields of view." *Id.* (emphasis added).  The phrase "other than" means "with the exception of."  *See, e.g.*, https://www.merriam-webster.com/dictionary/other%20than.  Synonyms for "other than" include "except," "except for," "excluding," and "exclusive of."  *See id.*  Thus, under the plain meaning of the phrase "other than," the field of view of the second camera must exclude the user.  *See id.*  This is consistent with the requirement that the

11

claimed first and second cameras have non-overlapping fields of view (discussed above).

In the Action, the "Examiner finds that 'oriented to view a user' and 'oriented to view an object other than the user' can <u>both include</u> the user and/or object." Action, p. 22 n.10 (emphasis added).  To support the Examiner's position, "the Examiner finds guidance from the District Court that found that the term 'oriented to view' to mean be it's [*sic*] plain meaning (i.e., orienting to view one thing rather than another thing *while still allowing for some or all of both to be within the field of view*)."  Action, p. 40 (emphasis in original).  This may indeed be the meaning of "oriented to view" when considered in a vacuum, ignoring the rest of the claim.  But "the context of the <u>surrounding words</u> of the claim also <u>must be considered</u> in determining the ordinary and customary meaning" of the claim terms at the center of the claim construction debate.  *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) (emphasis added).  Because claim element 1[e] recites "wherein the first and second cameras include non-overlapping fields of view," the Examiner's interpretation cannot be correct.  As discussed above, it is simply not possible for the first and second cameras to both view the user because the first and second cameras have "non-overlapping fields of view."  Accordingly, under a proper claim construction, the field of view of the second camera must exclude the user.

12

### 4.    "mobile phone"

Dependent claim 2 recites "wherein the handheld device comprises a mobile phone."  A POSITA would understand the ordinary meaning of "mobile phone" as being a handheld computing device capable of at least answering a voice telephone call from another individual operating another phone device.    In fact, the specification of the '924 Patent repeatedly discloses a cellphone as an example of a mobile phone.  *See generally* '924 Patent, 11:65-13:10.  A POSITA would also understand that the claimed "mobile phone" has an audio output (e.g., built-in speaker, earphone jack, etc.) so that the user of the claimed "mobile phone" can listen to the other individual (speaking into the other phone device) during the voice telephone call.

The Examiner takes the remarkable position that it is "not required for the mobile phone . . .  to have an audio output for the user to listen to."  Action, p. 45.  According to the Examiner, "the features upon which [Patent] Owner relies (*i.e.*, the telephone device must include audio output for the user to listen to) are not recited in the rejected claim(s) . . . [and] it is improper to import limitations from the specification into the claims."  *Id.* at 44-45.  Patent Owner is not attempting to import limitations from the specification.  Instead, a POSITA would recognize that the audio output (e.g., built-in speaker, earphone jack, etc.), as described above, is a fundamental feature of the claimed "mobile phone" and thus would necessarily be

13

present within the claimed "mobile phone."  In fact, at the time of the invention, voice calling was the main feature of a mobile phone.

The Examiner provides no evidence that a POSITA would understand the audio output (e.g., built-in speaker, earphone jack, etc.), discussed above, as being an optional feature of the claimed "mobile phone."  *See* Action at 44-45.  This lack of evidence is unsurprising, because it is illogical for the ordinary meaning of "phone" (landline or mobile) to exclude such an audio output.  Accordingly, the "mobile phone" of claim 2 should have its plain and ordinary meaning, which necessarily includes (*i*) being capable of answering a voice telephone call from another individual operating another phone device, and (*ii*) having an audio output (e.g., built-in speaker, earphone jack, etc.) so that the user of the claimed "mobile phone" can listen to the other individual (speaking into the other phone device) during the voice telephone call.  There should be no reasonable dispute that a person of ordinary skill in the art would recognize that a "mobile phone" includes those two capabilities.  The Examiner has provided no evidence that would warrant departing from the plain and ordinary meaning of the term "mobile phone."

### B.    Ground 1 — U.S. Patent No. 5,982,853 ("*Liebermann*") Does Not Anticipate Claims 1-5 and 13.

*Liebermann* does not anticipate claims 1-5 and 13.

Reexam of Patent No. 8,194,924
Control No. 90/014,902

1. ***Liebermann* does not anticipate independent claim 1.**

a. ***Liebermann* fails to disclose the preamble of claim 1.**

The preamble of claim 1 recites "[a] handheld device comprising." '924 Patent, claim 1. As discussed above in Section IV(A)(1), the preamble of claim 1 is limiting. The fundamental disagreement between Patent Owner and the Examiner is whether *Liebermann* discloses a "handheld device," as required by the preamble of claim 1. *Liebermann* discloses "a portable transmitter/receiver . . . for use by a deaf person." *Liebermann*, 5:62-63. Figure 6 of *Liebermann* is reproduced below:



*Liebermann*, Fig. 6 (annotated). The "portable transmitter/receiver" of Figure 6 is "supported in a stable position and the deaf person is positioned so that the camera

15

lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing." *Liebermann*, 6:2-7.

The Examiner mapped the "portable transmitter/receiver" in *Liebermann's* Figure 6 to the claimed "handheld device." Action, p. 21. But *Liebermann's* "portable transmitter/receiver" is <u>not</u> handheld. Again, *Liebermann* discloses the "device is supported in <u>a stable position</u> and the deaf person is positioned so that the camera lens 10 will record the signing movement of the <u>hands</u> and fingers and body and facial motions and expressions." *Liebermann*, 6:2-6 (emphasis added). Because *Liebermann's* "portable transmitter/receiver" is recording, with a camera, the movement of both "hands" of the deaf person, *Liebermann's* "portable transmitter/receiver" is <u>not</u> being held in either of the deaf person's hands, and thus *Liebermann's* "portable transmitter/receiver" is <u>not</u> a handheld device, as required by claim 1, because it cannot be operated while being handheld. *Id*. And "portable" does not equate to "handheld." There are many "portable" things in the world, for example a suitcase, that cannot be "handheld."

According to the Examiner, "*Liebermann* provides no teaching, requirement or suggestion that both hands are always required for signing. To support the Examiner's position, the Examiner finds that *Liebermann* discloses a full image being taken by the portable transmitter/receiver telephone 8 of a single hand/right

16

half of the body."  Action, p. 39 (citing *Liebermann*, Fig. 14A, 14B).  But even if

this is true, *Liebermann* still does <u>not</u> disclose that *Liebermann's* "portable

transmitter/receiver" is held in the user's free hand (i.e., non-signing hand).  Indeed,

there is no indication in *Liebermann's* Figures 14A and 14B, which allegedly show

the user performing "finger spelling" with his right hand, that *Liebermann's*

"portable transmitter/receiver" is in the user's left hand.  Again, *Liebermann's*

"portable transmitter/receiver" is <u>not</u> a handheld device.  This is contrary to the

requirements of claim 1.

Further, as shown in Figure 6, the "base portion 13" of *Liebermann's*

"portable transmitter/receiver" is designed to rest on a flat/stable surface that can

support *Liebermann's* "portable transmitter/receiver" in "a stable position."  *Id*. at

5:65-6:6, Fig. 6.  Because a user's hand is not a flat/stable surface, *Liebermann*'s

"portable transmitter/receiver" would not be placed there, and would be contrary to

the teachings of *Liebermann*.  This only reinforces that *Liebermann's* "portable

transmitter/receiver" is <u>not</u> the claimed "handheld device."

According to the Examiner, there is "insufficient teaching, requirement or

suggestion [in *Liebermann*] of placing the portable transmitter/receiver telephone 8

on a flat surface for stability."  Action, p. 39.  Even if this is true, *Liebermann* still

does not disclose that a user's hand (or even multiple hands) can keep *Liebermann's*

"device [] supported in a stable position."  *Liebermann*, 6:2-6.  At bottom, the term

17

"stable position" appears exactly once within *Liebermann*, to describe a device that is clearly designed to be positioned on a flat surface during use. *Liebermann*, 6:2-6; *see also id.* at Fig. 6. In the very same sentence, *Liebermann* also discloses the "deaf person is positioned so that camera lens 10 will record the signing movement of the <u>hands</u>." *Id*. (emphasis added). If "camera lens 10" is recording both "hands" of the deaf user, the device is not being held in either of the deaf user's hands. Accordingly, the "stable position" does not correspond to holding *Liebermann's* "portable transmitter/receiver" in one hand.

According to the Examiner, *Liebermann* "discloses a portable transmitter/receiver telephone 8 for the deaf which is a 'cellular telephone' unit. The Examiner finds that one of ordinary skill in the art would recognize that a cellular telephone is recognized as a handheld mobile radiotelephone." Action, pp. 38-39 (citations omitted). While an ordinary cellphone may be recognized as "handheld" when operated by a hearing user, *Liebermann*'s "portable transmitter/receiver" is <u>not</u> an ordinary cellphone. But more importantly, there are no embodiments disclosed in *Liebermann* that show *Liebermann's* "portable transmitter/receiver" being operated while being held in a user's hand. The fact that the title of *Liebermann* is, in part, "telephone for the deaf," and the fact that *Liebermann* discloses communication "through a cellular telephone network" is of no import. Nowhere in *Liebermann* is the "portable transmitter/receiver" used by a person holding it. The

18

Examiner's position contradicts the express teachings of *Liebermann* that the "portable transmitter/receiver" must be in a "stable position" when in use. The Examiner's position also contradicts the undisputed fact that deaf users use both hands to communicate via sign language, so the device cannot be "handheld" during use.

Further, the Examiner contends "that a 'prior art [device] structure which is capable of performing the intended use as recited in the preamble meets the claim.'" Action, p. 38 (quoting MPEP § 2111.02(II)) (emphasis added). The Examiner's reliance on MPEP § 2111.02(II) is misplaced because, as discussed above in Section IV(A)(1), the preamble of claim 1 recites structural limitations, not mere statements of purpose or use. *Liebermann* does not disclose the structural limitations in the preamble of claim 1, and thus does not anticipate claim 1.

For these reasons, *Liebermann* fails to disclose a "handheld device" as required by claim 1. Thus, *Liebermann* fails to anticipate claim 1.

### b.    *Liebermann* fails to disclose claim element 1[e].

Claim element 1[e] recites "a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view," whereas claim element 1[d] recites "a first camera oriented to view a user of the handheld device." As discussed above in Sections IV(A)(2) and IV(A)(3), the claim language requires that

19

the fields of view associated with the first and second cameras do not overlap, and that the user is excluded from the field of view of the second camera.

To meet claim element 1[e], the Examiner contends that *Liebermann* discloses a second camera "directed towards one or both gloves of the user as well as another object in the background, hence, viewing an object other than the user even though the user is still in the image." Action, p. 24. As a threshold matter, that is <u>not</u> actually disclosed by *Liebermann*. *Liebermann* merely discloses "it may be desirable to utilize more than one camera," with "each camera covering a separate angle," and "angle overlap may or may not be permitted." *Liebermann*, 13:5-13. But these disclosures do <u>not</u> mean *Liebermann's* "portable transmitter/receiver" includes a second camera "directed towards one or both gloves of the user as well as another object in the background, hence, viewing an object other than the user even though the user is still in the image," as alleged by the Examiner. Action, p. 24. Accordingly, *Liebermann* fails to disclose this claim element.

To the extent that the Examiner is relying on inherency to show that *Liebermann* discloses claim element 1[e], the Examiner has not met his burden. "The keystone of the inherency doctrine is inevitability." *In re Montgomery*, 677 F.3d 1375, 1384 (Fed. Cir. 2012) (Lourie, J., dissenting). Inherency requires more than probabilities or possibilities. *Bettcher Indus. v. Bunzl USA, Inc.*, 661 F.3d 629, 639 (Fed. Cir. 2011). The fact that a certain result or characteristic may occur or be

present in the prior art is not sufficient to establish the inherency of that result or characteristic. *In re Rijckaert*, 9 F.3d 1531, 1534 (Fed. Cir. 1993). Accordingly, the mere suggestion, if it even exists, that *Liebermann* has the second camera required by claim element 1[e] is insufficient for anticipation by inherency.

Further, the Examiner's reasoning for why claim element 1[e] is allegedly disclosed in *Liebermann* is that the second camera in *Liebermann* can view the user and other objects: "the Examiner finds that the second camera of *Liebermann* may be directed towards one or both gloves of the user as well as another object in the background, hence, <u>viewing an object other than the user even though the user is still in the image</u>." Action, p. 24 (emphasis added). But the claim provides that the first and second cameras are for viewing different things—the first camera views the user and the second camera views an <u>object other than the user</u>. They do this by having non-overlapping fields of view. The claim language excludes the exact scenario the Examiner relies on to reject claim 1. And, under the Examiner's scenario, both cameras would view both the user and the other object because according to the Examiner, the other object is "in the background." *Id.* Accordingly, *Liebermann* fails to disclose this claim element.

The Examiner also appears to disregard the claim language that requires that "the first and second cameras include <u>non-overlapping</u> fields of view." '924 Patent, claim 1 (emphasis added). This claim language requires that the fields of view

21

associated with each of the first and second cameras do not overlap. The Action cites no portions of *Liebermann* pertaining to the field of view of the alleged first and second cameras, let alone the relationship therebetween. *See* Action, pp. 23-24. This is unsurprising considering *Liebermann* does not even discuss "field of view," let alone disclose any embodiment describing, discussing or analyzing fields of view. *Liebermann* does disclose "each camera is covering a separate angle" and "angle overlap may or may not be permitted." *Liebermann*, 13:11-14. But the meaning of "angle" and its relationship, if any, to "field of view" is unclear and undisclosed. Anticipation requires that a single reference describe the claimed invention with sufficient precision and detail to establish that the subject matter existed in the prior art. *Wasica Fin. GmbH v. Cont'l Auto. Sys.*, 853 F.3d 1272, 1284 (Fed. Cir. 2017). "For this reason, it has long been understood that ambiguous references do not, as a matter of law, anticipate a claim." *Id*. Accordingly, *Liebermann* does not anticipate claim 1.

Again, the Examiner "finds that the second camera of *Liebermann* may be directed towards one or both gloves of the user as well as another object in the background, hence, viewing an object other than the user even though the user is

still in the image." Action, p. 24.[2]  It is physically impossible for the first and second

cameras to have non-overlapping fields of view if both the first and second cameras

can view the user of the device.   Further, it is unclear whether the Examiner has

mapped *Liebermann's* "gloves" or "another object in the background" to the claimed

"object other than the user."   Regardless, this is contrary to the requirements of claim

element 1[e].  The "gloves" in *Liebermann* are being worn by the user of the system.

*Liebermann*, Figs. 13A and 13B.  They are not an object <u>other than the user</u>.  The

alleged "second camera" of *Liebermann* would be oriented to view the user wearing

the gloves, not an object other than the user of the device, as is required by the claims.

Similarly, even if there is "another object in the background," the purpose of

the camera(s) in *Liebermann* is to capture images of the deaf person signing.  *See*

*Liebermann*, 3:28-30 ("a video apparatus for observing and digitizing the signing

motions, and means for translating the digitized motions into words and phrases"),

4:60-61 ("the deaf person uses sign language in front of a device containing a video

camera"), 6:4-6 ("camera lens 10 will record the signing movement of the hands and

fingers and body and facial motions and expressions"), 6:42-46 ("[t]he deaf person

uses sign language in front of the transmitter/receiver device containing the camera.

---

[2] The Examiner's reliance on extrinsic evidence of the Abowd Declaration, rather than the express disclosure of *Liebermann*, to support an anticipation rejection is also improper.

23

The images captured by the camera are of the finger and hand motions and of body motions and of facial expressions and motions"). Accordingly, the alleged "second camera" of *Liebermann* would be oriented to view the user, not an object other than the user of the device, as required by the claims.

For these reasons, *Liebermann* fails to disclose claim element 1[e] and thus fails to anticipate claim 1.

### 2.    *Liebermann* does not anticipate dependent claim 2.

Claim 2 depends directly from and adds limitations to independent claim 1. As discussed above, *Liebermann* does not anticipate claim 1. Thus, *Liebermann* does not anticipate dependent claim 2 for at least the same reasons.

Further, as discussed above in Section IV(A)(4), the "mobile phone" of claim 2 should be given its plain and ordinary meaning, which necessarily includes (*i*) being capable of answering a voice telephone call from another individual operating another phone device, and (*ii*) having an audio output (e.g., built-in speaker, earphone jack, etc.) so that the user of the claimed "mobile phone" can listen to the other individual (speaking into the other phone device) during the voice telephone call. The Examiner mapped *Liebermann's* "portable transmitter/receiver" in Figure 6 to the claimed "mobile phone" of claim 2. Action, p. 26. This is improper.

*Liebermann's* "portable transmitter/receiver" is a specialized telephone for the deaf. *See Liebermann*, 5:62-63 ("A portable transmitter/receiver . . . *for use by*

24

*a deaf person* is shown in Fig. 6."). *See also Liebermann*, Title ("Telephone *for the deaf* and method of using same").  Accordingly, *Liebermann's* "portable transmitter/receiver" does <u>not</u> include an audio output for the user (i.e., a deaf person) to listen to the other individual (speaking into the other phone device) during a voice telephone call. *Liebermann* is unsurprisingly silent regarding this specialized "portable transmitter/receiver" including an audio output for the deaf user. Instead, *Liebermann's* "portable transmitter/receiver" has an "LCD display panel" for communicating with the deaf user. *See Liebermann*, 6:15-23 ("verbal expressions are translated by the artificial intelligence into digital data for signs. These signs are displayed on the LCD panel 14."). Accordingly, *Liebermann* does not disclose a "mobile phone" as recited by claim 2, and thus does not anticipate claim 2.

The Examiner "finds that *Liebermann* explicitly discloses the portable transmitter/receiver telephone 8 comprising a microphone and speaker to function as a <u>communicator</u> to 'double the usefulness of the device.'" Action, p. 45 (quoting *Liebermann*, 7:29-39) (emphasis added).  This is misleading. *Liebermann* discloses

> When the phone for the deaf is equipped with a microphone and a speaker instead of, or in addition to a second telephone channel, it may be turned into a <u>communicator</u> . . . The <u>communicator</u> enables the deaf person to conduct a "conversation" with any normally hearing person in the <u>close proximity</u>. The signing motion of the deaf person are processed by the center and is transmitted back to the device as a normal voice transmission which the speaker renders as speech to the normally hearing person.

25

*Liebermann*, 7:33-40 (emphasis added). Accordingly, the built-in "speaker" is <u>not</u> involved when a voice telephone call is received from another individual operating another phone device, and the built-in "speaker" does <u>not</u> render the voice of the other individual (speaking into the other phone device) during the voice telephone call. Accordingly, even when *Liebermann's* "portable transmitter/receiver" is acting as a "communicator," *Liebermann's* "portable transmitter/receiver" still does not meet requirements (*i*) and (*ii*) of the claimed "mobile phone." Thus, *Liebermann* fails to anticipate claim 2.

### 3. *Liebermann* does not anticipate dependent claims 3-5 and 13.

Claims 3-5 and 13 depend directly from and add limitations to independent claim 1. As discussed above, *Liebermann* does not anticipate claim 1. Thus, *Liebermann* does not anticipate dependent claims 3-5 and 13 for at least the same reasons.

### C. Ground 2 — *Liebermann* Does Not Render Obvious Claims 1-5 and 13.

*Liebermann* does not render obvious claims 1-5 and 13.

### 1. *Liebermann* is non-analogous art and cannot be cited in any obviousness rejection.

*Liebermann* is non-analogous art and thus *Liebermann* cannot be cited in an obviousness rejection of any claim in the '924 Patent. A reference qualifies as prior art for an obviousness determination only when it is analogous to the claimed

invention. *See In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011). Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved. *Donner Technology, LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1359 (Fed. Cir. 2020). When addressing whether a reference is analogous art with respect to a claimed invention under a reasonable-pertinence theory, the problems to which both relate must be identified and compared. *Id*.

Regarding the first test for analogous art, *Liebermann* discloses the "present invention relates to electronic apparatus for communication by the deaf, and, more particularly, to such apparatus which enables the deaf person to communicate through use of sign language." *Liebermann*, 1:10-15. In contrast, the field of endeavor for the '924 Patent is controlling functions of handheld devices using images captured by the handheld devices. *See generally*, '924 Patent, Title, 11:65-12:12, 12:62-13:47, 25:40-26:43, Figs. 8A, 8B, 18, claim 1. This is not the same field of endeavor as *Liebermann*, and thus *Liebermann* fails the first test for analogous art.

According to the Examiner, "[w]ith respect to the field of endeavor, the Examiner finds that *Liebermann* explicitly discloses 'a handheld camera device for

27

optically sensing human and/or object input.'" Action, p. 48 (cleaned up). But this cannot be an accurate description of *Liebermann's* field of endeavor because it completely omits references to communication involving deaf users, which is the entire focus of *Liebermann*. *See Liebermann*, Title ("Telephone for the deaf and method of using same"). Again, for the reasons discussed above, *Liebermann* fails the first test for analogous art.

Regarding the second test for analogous art, *Liebermann* discloses "deaf persons have substantial difficulties in communicating with persons at remote locations," *id.* at 1:30-31, and provides solutions including "an electronic communication system wherein the deaf person and the person communicating with the deaf person do so through a central facility containing a translating means for processing elements of digitized image data" and "a system in which a hearing person may have his speech converted into digitized signing motions which are displayed to the deaf person." *Liebermann*, 3:14-24. In contrast, the problems to which the '924 Patent relates include determining touchless user input commands to handheld devices and controlling functions within handheld devices. *See generally*, '924 Patent, 2:6-13, 11:65-12:12, 12:62-13:47, 25:40-26:43, Figs. 8A, 8B, 18, claim 1. These are not the problems to which *Liebermann* relates, thus *Liebermann* fails the second test for analogous art.

According to the Examiner, "[a]s *Liebermann* teaches the things which the inventor stated were lacking, the Examiner concludes that *Liebermann* is 'pertinent to the problem faced by the inventor.'" Action, p. 49 (emphasis added). The Examiner is misguided. The inventor never stated that something was lacking. Again, for the reasons discussed above, *Liebermann* fails the second test for analogous art.

Thus, *Liebermann* is non-analogous art and cannot be cited in any obviousness rejection.

### 2.    *Liebermann* does not render claim 1 obvious.

As discussed above in Section IV(B)(1), *Liebermann* fails to teach or suggest at least the preamble of claim 1 and claim element 1[e]. Accordingly, *Liebermann* does not render claim 1 obvious.

In addition, to meet claim element 1[e], the Examiner contends that a "person of ordinary skill in the art would be motivated to incorporate a second camera . . . such a modification would have provided a that [*sic*] can effectively communicat[e] in any environment independent of a user's movement." Action, p. 24. Even if this is true, the purpose of the camera(s) in *Liebermann* is to capture images of the deaf person signing. *See Liebermann*, 3:28-30 ("a video apparatus for observing and digitizing the signing motions, and means for translating the digitized motions into words and phrases"), 4:60-61 ("the deaf person uses sign language in front of a

29

device containing a video camera"), 6:4-6 ("camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions"), 6:42-46 ("[t]he deaf person uses sign language in front of the transmitter/receiver device containing the camera. The images captured by the camera are of the finger and hand motions and of body motions and of facial expressions and motions"). Accordingly, the second camera, like all cameras in *Liebermann*, is oriented to view the deaf user. The second camera is <u>not</u> oriented to view "an object other than the user," as required by claim element 1[e]. The Action fails to identify any support in *Liebermann* in which a camera is "oriented to view an object other than the user of the device" related to the alleged motivations identified by the Examiner. Thus, *Liebermann* fails to teach or suggest claim element 1[e].

The Examiner's reliance on *Ex parte Obiaya*, 227 USPQ 58 (Bd. Pat. App. & Inter. 1985), is misplaced. *See* Action, p. 50. In *Ex parte Obiaya*, the Board held that "[t]he fact that appellant has recognized another advantage which would flow naturally from following the suggestion of the prior art cannot be the basis for patentability when the differences would otherwise be obvious." *Ex parte Obiaya* at 60. In the present case, Patent Owner is not relying on "another advantage" as the basis for patentability. Patent Owner asserts claim 1 is patentable because the differences between independent claim 1 and *Liebermann* are not obvious. *Ex parte Obiaya* is inapposite to the present situation.

30

In view of the above, *Liebermann* fails to teach or suggest each and every limitation of claim 1.  Thus, *Liebermann* does not render claim 1 obvious.

### 3.    *Liebermann* does not render dependent claim 2 obvious.

Claim 2 depends from and adds limitations to claim 1.  As discussed above, *Liebermann* does not render claim 1 obvious.  Accordingly, *Liebermann* does not render dependent claim 2 obvious for at least the same reasons.

Further, as discussed above in Section IV(B)(2), *Liebermann* fails to teach or suggest the claimed "mobile device" of claim 2.  Accordingly, *Liebermann* does not render claim 2 obvious.

### 4.    *Liebermann* does not render dependent claims 3-5 and 13 obvious.

Claims 3-5 and 13 depend from and add limitations to claim 1.  As discussed above, *Liebermann* does not render claim 1 obvious.  Accordingly, *Liebermann* does not render dependent claims 3-5 and 13 obvious for at least the same reasons, and withdrawal of this rejection is respectfully requested.

### D.    Ground 3 — *Liebermann* and U.S. Patent No. 6,115,482 ("*Sears*") Do Not Render Obvious Claims 6-10 and 12.

The combination of *Liebermann* and *Sears* does not render obvious claims 6-10 and 12.

31

1.      ***Sears* is non-analogous art and thus cannot be cited in any obviousness rejection.**

*Sears* is non-analogous art and thus *Sears* cannot be cited in an obviousness rejection of any claim in the '924 Patent.  As discussed above in Section IV(C)(1), there are two tests for analogous art.  Regarding the first test, *Sears* describes itself as relating to "an electronic reading system for converting text to synthesized speech that may be used by low-vision and blind people . . . and more particularly relat[ing] to an electronic reading system that includes improved functionality for allowing the user to navigate within the text." *Sears*, 1:23-29.  In contrast, the field of endeavor for the '924 Patent is controlling functions of handheld devices using images captured by the handheld devices. *See generally*, '924 Patent, Title, 11:65-12:12, 12:62-13:47, 25:40-26:43, Figs. 8A, 8B, 18, claim 1.  This is not the same field of endeavor as *Sears*, and thus *Sears* fails the first test for analogous art.

Regarding the second test for analogous art, *Sears* discloses it is solving "the problems of the prior art, both with regards to OCR-based electronic reading machines as well as electronic magnifying system." *Sears*, 3:12-15.  In contrast, the problems to which the '924 Patent relates include determining touchless user input commands to handheld devices and controlling functions within handheld devices. *See generally*, '924 Patent, 2:6-13, 11:65-12:12, 12:62-13:47, 25:40-26:43, Figs. 8A,

32

8B, 18, claim 1.  These are not the problems to which *Sears* relates, and thus *Sears*

fails the second test for analogous art.

According to the Examiner, "[a]s *Sears* teaches the things which the <u>inventor</u>

<u>stated were lacking</u>, the Examiner concludes that *Sears* is 'pertinent to the problem

faced by the inventor.'"  Action, p. 53 (emphasis added).  The Examiner is

misguided.  The inventor never stated that something was lacking.  Again, for the

reasons discussed above, *Sears* fails the second test for analogous art.

Thus, *Sears* is non-analogous art and cannot be cited in any obviousness

rejection.

### 2. The combination of *Liebermann* and *Sears* does not render dependent claim 6 obvious.

The combination of *Liebermann* and *Sears* does not render dependent claim

6 obvious.

### a. By virtue of its dependency from independent claim 1, the combination of *Liebermann* and *Sears* does not render claim 6 obvious.

As discussed above, *Liebermann* does not teach or suggest each and every

limitation of claim 1.  *Sears* does not cure the deficiencies of *Liebermann* regarding

claim 1 and the Action does not so assert.  *See* Action, pp. 28-32.  Accordingly, the

combination of *Liebermann* and *Sears* does not render claim 1 obvious.  Claim 6

depends from and adds limitations to claim 1.  Accordingly, the combination of

*Liebermann* and *Sears* also does not render dependent claim 6 obvious for at least the same reasons.

> **b.** **The Examiner's proposed combination of *Liebermann* and *Sears* violates *Liebermann's* principle of operation.**

Dependent claim 6 recites "[t]he handheld device of claim 1 wherein the computer is operable to determine a gesture based on at least one of the first camera output and the second camera output." '924 Patent, claim 6. The "computer" is a component of the "handheld device." '924 Patent, claim 1. As discussed above, the Examiner mapped *Liebermann's* "portable transmitter/receiver" to the claimed "handheld device." Action, p. 21.

Although the Examiner acknowledges that *Liebermann's* "portable transmitter/receiver" does <u>not</u> "determine a gesture," as required by claim 6, the Examiner contends that *Liebermann* teaches "a separate central processing facility (i.e., the Center) to perform the . . . processing of gesturing." Action, p. 30. The Examiner also contends that *Sears* teaches "the processing of gesturing . . . locally instead of on a separate [computer]." *See* Action, p. 31. To meet claim 6, the Examiner argues it would have been obvious, based on these teachings of *Liebermann* and *Sears*, to incorporate the "processing of gesturing" into *Liebermann's* "portable transmitter/receiver" instead of *Liebermann's* "central processing facility (i.e., the Center)." Action, p. 31-32.

The fundamental disagreement between Patent Owner and the Examiner is whether it would be obvious to relocate *Liebermann's* "sophisticated computer equipment, databases, and neural networks," *Liebermann,* 5:37-38, from *Liebermann's* "central processing facility" (also referred to as "the Center") to *Liebermann's* "portable transmitter/receiver" to meet the requirements of claim 6. Patent Owner asserts such a modification would not be obvious, especially when obviousness must be evaluated "at the time the invention was made."  35 U.S.C. § 103(a) (pre-AIA).  The effective filling date of the '924 Patent is July 8, 1999, so the Examiner's rejection rests on the assertion that it would have been obvious in 1999 to condense the "sophisticated equipment, databases, and neural networks" that occupied a physical building (i.e., the "Center") into a "handheld device."  That assertion is untenable, which is why the Examiner cites no evidence in support. *See* Action, pp. 29-32.  The Examiner's assertion is nothing more than impermissible hindsight.

"Combinations that change the basic principles under which the prior art was designed to operate, or that render the prior art inoperable for its intended purpose, fail to support a conclusion of obviousness." *Plas-Pak Indus. v. Sulzer Mixpac AG*, 2015 U.S. App. LEXIS 1456, at *5 (Fed. Cir. Jan. 27, 2015) (cleaned up).

35

Reexam of Patent No. 8,194,924
Control No. 90/014,902

*Liebermann* is a distributed system in which the processing, including gesture recognition, occurs in the physically separate "central processing facility." Figures 2 and 3 of *Liebermann* are reproduced below:



*Liebermann*, Fig. 2 (annotated).

APPX1011

Reexam of Patent No. 8,194,924
Control No. 90/014,902



*Liebermann*, Fig. 3 (annotated).  *Liebermann* discloses it is an "<u>object</u> [of the invention] to provide such an electronic communication system wherein the deaf person and the person communicating with the deaf person <u>do so through a central facility</u> containing a translating means for processing elements of digitized image data." *Liebermann*, 3:14-18 (emphasis added).  *Liebermann's* "<u>present invention</u> includes a <u>processing center</u> containing the sophisticated computer equipment, databases and neural networks to effect the signing/verbal translations, and the communications are <u>conducted through this center</u>.  As seen in FIG. 2, a caller (or receiver) and deaf person are <u>actually communicating through such a center</u>." *Id*. at

37

5:35-41 (emphasis added), Fig. 2.  The "center receives the input from the video device of the deaf person and provides an audible output to the hearing person who is using a telephone. The hearing person speaks into the telephone and the center provides a video output to the video device of the deaf person." *Id*. at 5:53-47 (emphasis added). *See also id.* at 6:6-12 ("The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences. As previously indicated, such translation is most economically effected in a dedicated central computer facility.") (emphasis added), 6:50-54 ("the resulting information is sent as data on a regular and designated phone line using an internal modem in the device to the data processing center.  The rest of the processing is completed at the center.") (emphasis added).

In short, the existence and use of *Liebermann's* "central processing facility" as a necessary intermediary between the deaf user and the hearing user is found in every disclosed embodiment.  Thus, the "central processing facility," its functions, and the exchange of data between the "central processing facility" and the deaf user and the hearing user are key features of *Liebermann's* distributed architecture and thus key features of *Liebermann's* principle of operation.  Modifying *Liebermann* by abolishing the "central processing facility," as proposed by the Examiner, would

violate *Liebermann's* principle of operation. Accordingly, the required modification of *Liebermann* is far too drastic to be considered obvious, and thus the combination of *Liebermann* and *Sears* fails to render claim 6 obvious.

The Examiner's reliance on *In re Susi*, 440 F.2d 442 (CCPA 1971) and MPEP § 2123 is misplaced. Action, p. 54. First, Patent Owner is <u>not</u> arguing that *Liebermann* "teaches away" from the Examiner's proposed combination of *Liebermann* and *Sears*. To the contrary, Patent Owner asserts the proposed combination of *Liebermann* and *Sears* changes *Liebermann's* principle of operation, and thus is too drastic of a modification to be obvious. This is different from a "teaching away" argument.

Second, both *In re Susi* and MPEP § 2123 address the scenario where a prior art reference discloses both preferred embodiments and non-preferred embodiments. The Examiner contends that "performing the sophisticated translation processing at [the Center]" is merely the preferred embodiment and that performing the same on *Liebermann's* "portable transmitter/receiver" is a non-preferred embodiment. *See* Action, p. 54. But unlike *In re Susi* and MPEP § 2123, *Liebermann* does <u>not</u> actually disclose this alleged non-preferred embodiment. *In re Susi* and MPEP § 2123 are inapposite to the present situation.

39

In fact, the Examiner must resort to extreme tactics to allegedly find a mere

suggestion that *Liebermann* performs gesture detection on *Liebermann's* "portable

transmitter/receiver." According to the Examiner,

> Claim 1 of *Liebermann* requires a "means for translating said spoken
> words and phrases into a visual form which may be observed by the
> deaf person." (*Id.* at claim 1). In addition, the Examiner finds that
> claim 4 is dependent from claim 1 and further defines where the
> "translating means" is located (*i.e.*, at a central station). (*Id.* at claim
> 4). The Examiner finds that the <u>principle of claim differentiation</u>
> creates a presumption that claim 1 is not limited to the where the
> location of the "translating means" is expressly recited in claim 4,
> which depends from claim 1. Thus, while claim 4 provides an example
> of where the "translating means" may be located, the Examiner finds
> that claim 1 is not limited to that location and, as such, may cover
> broader locations, such as at the portable transmitter/receiver cellular
> telephone.

Action, p. 54 (emphasis added). This is wholly improper. What the prior art teaches

is a question of fact. *In re Berg*, 320 F.3d 1310, 1312 (Fed. Cir. 2003). The doctrine

of claim differentiation is a canon of claim construction, which is a matter of law

reserved for court decision. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898,

905 (2014). Moreover, claim construction is performed on the patent being

reexamined or litigated, <u>not</u> on the prior art. Accordingly, a factfinder would not be

performing claim differentiation to determine the content of *Liebermann*.

For these reasons, the combination of *Liebermann* and *Sears* does not render

claim 6 obvious.

40

> c. **The Examiner's proposed combination of *Liebermann* and *Sears* lacks both articulated reasoning and rational underpinning.**

"[R]ejections on obviousness cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v Teleflex Inc.*, 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). "The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in *KSR* noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit." MPEP §2143.

The Examiner contends that the motivation to make the proposed modifications to *Liebermann* based on *Sears* is "to save time," as "explicitly" described in *Sears*. Action, pp. 31-32 (citing *Sears*, 2:6-7). This is a mischaracterization of *Sears*. *Sears* discloses

> [E]lectronic reading machines have comprised personal computers outfitted with computer scanners, optical character recognition software, and computerized text-to-voice hardware or software . . . These reading machine systems, unfortunately, suffer from a variety of operational insufficiencies that limit their effectiveness. For instance, before the reading machine can begin to read a page, the user must typically wait over a minute. This delay is due primarily to three causes. Firstly, scanning a page is a mechanical action that takes time to move the electro-optical components over the page. Secondly, the large amounts of information in the scanned image [of the page] require time to be transmitted to the computer. Thirdly, optical

41

> character recognition of <u>an entire page</u> can take considerable time. Thus, if a user wanted to scan through a newspaper or a magazine, considerable time would be needed simply to wait for [] <u>each page</u> . . . of text to process to the extent that it could begin audibly reading the text.

*Sears*, 1:47-2:13 (emphasis added). In other words, *Sears* discloses that in pre-*Sears* electronic reading machines, there is a significant delay because the <u>entire page</u> must be scanned. In contrast, *Sears'* system does <u>not</u> require a scan of the entire page, allegedly resulting in a time savings. *Sears*, 27:34-51. But the time savings in *Sears* is <u>not</u> the result of where (i.e., in which computing device) processing takes place. Thus, it is not rational to use the alleged time savings in *Sears* as the motivation to move gesture processing from *Liebermann's* "central processing facility" to *Liebermann's* "portable transmitter/receiver."

Additionally, *Sears* discloses that time is required to transmit scanned image data from a personal scanner to a personal computer. *Sears*, 2:6-7. According to the Examiner, this provides "some teaching, suggestion, or motivation" to move gesture processing from *Liebermann's* "central processing facility" to *Liebermann's* "portable transmitter/receiver." Action, pp. 56-57 (quoting MPEP § 2143(I)(G)). Specifically, the proposed modification would "inherently provide a decrease in the processing time because there is no requirement to transfer any data" from *Liebermann's* "portable transmitter/receiver" to *Liebermann's* "central processing facility." *Id.*

42

As a threshold matter, Patent Owner asserts this disclosure in *Sears* is insufficient to provide the necessary motivation to relocate the "sophisticated computer equipment, databases, and neural networks," *Liebermann*, 5:37-39, from *Liebermann's* "central processing facility" to *Liebermann's* "portable transmitter/receiver." The Examiner has <u>not</u> compared the type and quantity of data transmitted in *Liebermann* with the type and quantity of data transmitted in *Sears*. The Examiner has also <u>not</u> compared the connection speed in *Liebermann* with the connection speed in *Sears*. Further, considering *Liebermann's* distributed architecture is already handling live telephone calls between a deaf person and a hearing person, any processing delay must already be minimal.

Further, in an obviousness inquiry, motivation to combine and reasonable expectation of success are distinct requirements that must be independently considered. *Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016) ("One must have a motivation to combine accompanied by a reasonable expectation of achieving what is claimed" and "the Board conflated two different legal concepts—reasonable expectation of success and motivation to combine"); *see also* MPEP § 2143(I)(G) (To reject a claim based on this rationale, the Examiner must articulate "a finding that there was a reasonable expectation of success."). In the present case, *Liebermann* expressly discloses "[f]rom cost and <u>portability standpoints</u>, the translating means is at a remote location or <u>central station</u>

43

and there is included transmission means for transmitting the digitized signing motions or their digital identifiers to the translating means." *Liebermann*, 3:38-41 (emphasis added). This shows that the "sophisticated computer equipment, databases, and neural networks" of *Liebermann's* "central processing facility" cannot exist as components of *Liebermann's* "portable transmitter/receiver" without jeopardizing its portability. Accordingly, the Examiner's proposed modification to *Liebermann* has no reasonable expectation of success.

Further, the Examiner has not provided any metrics showing the processing times before and after the proposed modifications to *Liebermann* based on *Sears*. Thus, there is no evidence that the proposed modifications to *Liebermann* would actually result in improved (i.e., reduced) processing times.

The Examiner also contends that the proposed combination of *Liebermann* and *Sears* is obvious because it is merely the "simple substitution of one known element for another to obtain predictable results." Action, pp. 56-59 (citing MPEP § 2143(I)(B)). Patent Owner disagrees. The Examiner's proposed modification to *Liebermann* results in a complete dismantling of *Liebermann's* distributed architecture. It is unclear what, if any, purpose *Liebermann's* "central processing facility" would serve following the Examiner's proposed modification. This cannot be considered a "simple substitution." Accordingly, there is no motivation to modify *Liebermann* in view of *Sears* as proposed by the Examiner.

44

Further still, *Liebermann's* "central processing facility" is accessible to multiple deaf users and hearing users who wish to communicate with the deaf users. *Liebermann's* "central processing facility" performs its functions, including gesture processing, using a "database" and "translation means [which] includes artificial intelligence" (e.g., algorithms). *Liebermann*, 3:44-48. By performing gesture processing at the "central processing facility," any update to the "database" or "translation means" (e.g., algorithms) only needs to be done in one place.

As discussed above, the Examiner's proposed modifications to *Liebermann* include moving the gesture processing from *Liebermann's* "central processing facility" to the "portable transmitter/receiver" of each deaf user. Following such a modification, any update/patch to the "database" and/or "translation means" would need to be propagated to every deaf user's "portable transmitter/receiver." This would unnecessarily complicate the update process and risk different users having different and out-of-date versions of the "database" and "translation means." Thus, there is no motivation for the Examiner's proposed combination/modification.

In view of the above, the Examiner's *prima facie* case of obviousness lacks articulated reasoning and rational underpinning. There is no motivation to combine *Liebermann* and *Sears*, and thus *Liebermann* and *Sears* do not render claim 6 obvious. Withdrawal of this rejection is respectfully requested.

45

### 3. The combination of *Liebermann* and *Sears* does not render claim 7 obvious.

Claim 7 recites "[the] handheld device of claim 1 wherein the computer is operable to determine a facial expression based on at least one of the first camera output and the second camera output." As discussed above, *Liebermann* does not teach or suggest each and every limitation of claim 1. *Sears* does not cure the deficiencies of *Liebermann* regarding claim 1 and the Action does not so assert. *See* Action, pp. 28-32. Accordingly, the combination of *Liebermann* and *Sears* does not render claim 1 obvious. Claim 7 depends from and adds limitations to claim 1. Accordingly, the combination of *Liebermann* and *Sears* also does not render dependent claim 7 obvious for at least the same reasons.

Further, to meet dependent claim 7, the Examiner uses the same reasoning that was relied upon for dependent claim 6. *See* Action, pp. 29-32. As discussed above, no motivation exists to combine *Liebermann* and *Sears*, and thus *Liebermann* and *Sears* do not render dependent claim 6 obvious. *Liebermann* and *Sears* do not render dependent claim 7 obvious for at least the same reasons.

Further still, as discussed above, the Examiner relies on rationale (B) in MPEP § 2143 to support a conclusion of obviousness. Action, pp. 56-59 (citing MPEP § 2143(I)(B)). Under rationale (B) (*i.e.*, "Simple Substitution of One Known Element for Another To Obtain Predictable Results"), the Examiner must articulate

46

"a finding that the substituted components and their functions were known in the art." MPEP § 2143(I)(B)(2). The Examiner contends, while performing the analysis under rationale (B), that *Sears* "utilizes a hardware/software combination on the computer of the device . . . [for processing] facial expression information locally." Action, p. 57. But this is simply not true. *Sears* does <u>not</u> process facial expressions at all. This is unsurprising considering *Sears* is directed to OCR-based electronic reading machines. *Sears*, Abstract, 3:12-15. Accordingly, the combination of *Liebermann* and *Sears* does not render claim 7 obvious.

**4.    The combination of *Liebermann* and *Sears* does not render dependent claim 8 obvious.**

Claim 8 recites "[t]he handheld device of claim 1 wherein the computer is adapted to determine at least one of the position and the orientation of the object based on the second camera output." As discussed above, *Liebermann* does not teach or suggest each and every limitation of claim 1. *Sears* does not cure the deficiencies of *Liebermann* regarding claim 1 and the Action does not so assert. *See* Action, pp. 28-32. Accordingly, the combination of *Liebermann* and *Sears* does not render claim 1 obvious. Claim 8 depends from and adds limitations to claim 1. Accordingly, the combination of *Liebermann* and *Sears* also does not render dependent claim 8 obvious for at least the same reasons.

47

Further, to meet dependent claim 8, the Examiner uses the same reasoning that was relied upon for dependent claim 6. *See* Action, pp. 29-32. As discussed above, no motivation exists to combine *Liebermann* and *Sears*, and thus *Liebermann* and *Sears* do not render dependent claim 6 obvious. *Liebermann* and *Sears* do not render dependent claim 8 obvious for at least the same reasons.

Further, the "object" in claim 8 is something "other than the user of the device." *Compare* dependent claim 8 *with* independent claim 1 ("a second camera oriented to view an object other than the user of the device and having a second camera output"). *Liebermann* does not teach "determine[ing] at least one of the position and the orientation of the object based on the second camera output," as required by claim 8. The "gloves" in *Liebermann* are being worn by the user of the system. *Liebermann*, Figs. 13A and 13B. They are not an object <u>other than the user</u>. *Sears* also does not teach this requirement. Accordingly, the combination of *Liebermann* and *Sears* does not render claim 8 obvious.

### 5. The combination of *Liebermann* and *Sears* does not render dependent claim 10 obvious.

Claim 10 recites "[t]he handheld device of claim 1 wherein the computer is adapted to recognize the object based on the second camera output." As discussed above, *Liebermann* does not teach or suggest each and every limitation of claim 1. *Sears* does not cure the deficiencies of *Liebermann* regarding claim 1 and the Action

does not so assert. *See* Action, pp. 28-32. Accordingly, the combination of *Liebermann* and *Sears* does not render claim 1 obvious. Claim 10 depends from and adds limitations to claim 1. Accordingly, the combination of *Liebermann* and *Sears* also does not render dependent claim 10 obvious for at least the same reasons.

Further, to meet dependent claim 10, the Examiner uses the same reasoning that was relied upon for dependent claim 6. *See* Action, pp. 29-32. As discussed above, no motivation exists to combine *Liebermann* and *Sears*, and thus *Liebermann* and *Sears* do not render dependent claim 6 obvious. *Liebermann* and *Sears* do not render dependent claim 10 obvious for at least the same reasons.

Further, the "object" in claim 10 is something "other than the user of the device." *Compare* dependent claim 10 *with* independent claim 1 ("a second camera oriented to view an object other than the user of the device and having a second camera output"). *Liebermann* does not teach "the computer is adapted to recognize the object based on the second camera output," as required by claim 10. The "gloves" in *Liebermann* are being worn by the user of the system. *Liebermann*, Figs. 13A and 13B. They are not an object <u>other than the user</u>. *Sears* also does not teach this requirement. Accordingly, the combination of *Liebermann* and *Sears* does not render claim 10 obvious.

49

6. **The combination of *Liebermann* and *Sears* does not render dependent claims 9 and 12 obvious.**

As discussed above, *Liebermann* does not teach or suggest each and every limitation of claim 1. *Sears* does not cure the deficiencies of *Liebermann* regarding claim 1 and the Action does not so assert. *See* Action, pp. 28-32. Accordingly, the combination of *Liebermann* and *Sears* does not render claim 1 obvious. Claims 9 and 12 depend, either directly or indirectly, from and add limitations to claim 1. Accordingly, the combination of *Liebermann* and *Sears* also does not render dependent claims 9 and 12 obvious for at least the same reasons.

Further, to meet dependent claims 9 and 12, the Examiner uses the same reasoning that was relied upon for dependent claim 6. *See* Action, pp. 28-32. As discussed above, no motivation exists to combine *Liebermann* and *Sears*, and thus *Liebermann* and *Sears* do not render dependent claim 6 obvious. *Liebermann* and *Sears* do not render dependent claims 9 and 12 obvious for at least the same reasons.

E. **Ground 4 — *Liebermann* and U.S. Patent No. 5,880,732 ("*Tryding*") Do Not Render Obvious Claim 11.**

The combination of *Liebermann* and *Tryding* does not render claim 11 obvious. As discussed above, *Liebermann* does not teach or suggest each and every limitation of independent claim 1. *Tryding* does not cure the deficiencies of *Liebermann* regarding claim 1 and the Action does not so assert. *See* Action, pp. 32-34. Accordingly, the combination of *Liebermann* and *Tryding* does not render

claim 1 obvious. Claim 11 depends from and adds limitations to claim 1. Accordingly, the combination of *Liebermann* and *Tryding* does not render claim 11 obvious for at least the same reasons, and withdrawal of this rejection is respectfully requested.

### F. Ground 5 — *Liebermann* and U.S. Patent No. 6,401,085 ("*Gershman*") Do Not Render Obvious Claim 14.

The combination of *Liebermann* and *Gershman* does not render claim 14 obvious. As discussed above, *Liebermann* does not teach or suggest each and every limitation of independent claim 1. *Gershman* does not cure the deficiencies of *Liebermann* regarding claim 1 and the Action does not so assert. *See* Action, pp. 34-35. Accordingly, the combination of *Liebermann* and *Gershman* does not render claim 1 obvious. Claim 14 depends from and adds limitations to claim 1. Accordingly, the combination of *Liebermann* and *Gershman* does not render claim 14 obvious for at least the same reasons, and withdrawal of this rejection is respectfully requested.

### G. Ground 6 — *Liebermann* and U.S. Patent No. 5,953,322 ("*Kimball*") Do Not Render Obvious Claim 14.

The combination of *Liebermann* and *Kimball* does not render claim 14 obvious. As discussed above, *Liebermann* does not teach or suggest each and every limitation of independent claim 1. *Kimball* does not cure the deficiencies of *Liebermann* regarding claim 1 and the Action does not so assert. *See* Action, pp.

51

35-36.  Accordingly, the combination of *Liebermann* and *Kimball* does not render claim 1 obvious.  Claim 14 depends from and adds limitations to claim 1.  Accordingly, the combination of *Liebermann* and *Kimball* does not render claim 14 obvious for at least the same reasons, and withdrawal of this rejection is respectfully requested.

### H.    The USPTO Has No Jurisdiction Over Expired Patents

In *Oil States*, the Supreme Court explained that the "decision to *grant* a patent is a matter involving public rights—specifically, the grant of a public franchise." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) (emphasis in original).  "Specifically, patents are public franchises that the Government grants to the inventors of new and useful improvements." *Id*. (internal quotation marks omitted).  The Court explained that "Congress [has] significant latitude to assign [the] adjudication of public rights to entities other than Article III courts." *Id*. at 1368.  In exercising its "significant latitude," Congress grants public franchises "subject to the qualification that the PTO has the authority to reexamine— and perhaps cancel—a patent claim in an inter partes review." *Id*. at 1368, 1374 (internal quotation marks omitted).  Accordingly, so long as the public franchise exists, the PTO may have jurisdiction to amend and cancel the claims of the patent (e.g., via *ex parte* reexamination).

When a patent expires, however, the public franchise ceases to exist and the franchisee (e.g., the patent owner) no longer has the right to exclude others.  At most, the franchisee may be entitled to collect damages from the public franchise that formerly existed through an infringement action in district court.  But because the public franchise no longer exists, the USPTO has nothing in its authority to cancel or amend.  Expiration removes the patent from the USPTO's jurisdiction and returns it to the sole jurisdiction of the Article III courts, which have exclusive authority to govern claims for damages.  If this were not so, the USPTO would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

The '924 Patent issued in June 2012, and expired in July 2020, long before the *ex parte* reexamination request was filed in November 2021.  With the expiration of the '924 Patent in July 2020, the USPTO ceased to have jurisdiction over the '924 Patent, and the order granting reexamination should be vacated as a result.

## V.     NO SUBSTANTIAL NEW QUESTION (SNQ) OF PATENTABILITY EXISTS

Patent Owner respectfully asserts that no SNQs of patentability exist and thus the reexamination order should be vacated. Patent Owner previously requested reconsideration of the SNQ issue by the Examiner in the Reply under 37 C.F.R. § 1.111 filed on June 8, 2022.

In the order dated December 2, 2021 ("Reexam Order") granting the request for *ex parte* reexamination of the '924 Patent, the Office noted that the "<u>key features missing from the prior art at the time of allowance [of the '924 Patent] of independent claim 1 was the computer being adapted to perform a control function based upon the output of at least one of the first or second cameras, which have non-overlapping fields of view</u>." Reexam Order, p. 5 (emphasis added). The Office asserts that *Liebermann* or a combination of *Liebermann* and *Sears* raises a SNQ of patentability because *Liebermann* or the combination of *Liebermann* and *Sears* appears to teach the key features of independent claim 1 missing from the art cited during the original prosecution. Reexam Order, pp. 7-13. Patent Owner disagrees.

As discussed above, *Liebermann* does not disclose a handheld device with two cameras having non-overlapping fields of view. In other words, *Liebermann* does not provide the "key features" that were missing from the art during the original prosecution of the '924 Patent. As also discussed above, *Sears* does not cure these

deficiencies of *Liebermann*.    Thus, a reasonable examiner would not consider *Liebermann* and/or *Sears* to be important in deciding whether one or more claims of the '924 Patent are patentable, and *Lieberman* alone or combined with *Sears* does not raise a SNQ of patentability.    The order for *ex parte* reexamination should be vacated.

## VI.    CONCLUSION

The order for *ex parte* reexamination of the '924 Patent should be vacated because the USPTO has no jurisdiction over expired patents and/or there is no SNQ of patentability.  Additionally, or alternatively, the cited art fails to render claims 1-14 unpatentable.

The Director is hereby authorized to charge any fees which may be required by this Appeal Brief to Deposit Account No. 604293.

DATED:  November 22, 2022                     Respectfully submitted,

                                              By: /Todd E. Landis/
                                              Todd E. Landis
                                              Registration No. 44,200
                                              Counsel for Patent Owner

56

## VII.  CLAIMS APPENDIX

The following claims are involved in the appeal of the '924 Patent:

1.     A handheld device comprising:

a housing;

a computer within the housing;

a first camera oriented to view a user of the handheld device and having a first camera output; and

a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view, and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.

2.     The handheld device of claim 1 wherein the handheld device comprises a mobile phone.

3.     The handheld device of claim 1 wherein the first camera is adapted to acquire an image of at least a portion of the user.

57

4.     The handheld device of claim 1 wherein the second camera is adapted to acquire an image of the object.


5.     The handheld device of claim 1 wherein the second camera is adapted to acquire a video of the object.


6.     The handheld device of claim 1 wherein the computer is operable to determine a gesture based on at least one of the first camera output and the second camera output.


7.     The handheld device of claim 1 wherein the computer is operable to determine a facial expression based on at least one of the first camera output and the second camera output.


8.     The handheld device of claim 1 wherein the computer is adapted to determine at least one of the position and the orientation of the object based on the second camera output.


9.     The handheld device of claim 6 wherein the gesture is performed by a person other than the user of the handheld device.

10.    The handheld device of claim 1 wherein the computer is adapted to

recognize the object based on the second camera output.

11.    The handheld device of claim 1 wherein the computer is adapted to generate

control instructions for a display that is separate from the handheld device.

12.    The handheld device of claim 1 wherein the computer is adapted to

determine a reference frame of the object.

13.    The handheld device of claim 1 wherein the computer is adapted to perform

a control function based on the first camera output and based on the second camera

output.

14.    The handheld device of claim 1 wherein the computer is adapted to transmit

information over an internet connection.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,902 | 11/11/2021 | 8194924 | 75281.00085 | 3671 |

184036      7590      03/15/2023
Williams Simons & Landis PLLC/GTP
The Littlefield Building
601 Congress Ave., Suite 600
Austin, TX 78701

| EXAMINER |
|---|
| RALIS, STEPHEN J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 03/15/2023 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

PAUL HASTINGS LLP ( GENERAL)
2050 M. STREET NW
WASHINGTON, DC 20036

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/014,902* .

PATENT UNDER REEXAMINATION  *8194924* .

ART UNIT *3992* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

Application Number: 90/014,902
Filing Date: 11 Nov 2021
Appellant(s): U.S. Patent No. 8,194,924

_____

Todd E. Landis
For Appellant

## EXAMINER'S ANSWER

This is in response to the appeal brief filed 22 November 2022 ("2022 App Br").

*(1)    Grounds of Rejection to be Reviewed on Appeal*

Every ground of rejection set forth in the Office action dated 22 July 2022 ("July 2022 Final Office Action") from which the appeal is taken is being maintained by the examiner except for the grounds of rejection (if any) listed under the subheading "WITHDRAWN

5   REJECTIONS." New grounds of rejection (if any) are provided under the subheading "NEW GROUNDS OF REJECTION."

*(2)    Response to Argument*

*A. Claim Construction*

10      *(1)    Claim 1 Preamble*

Appellant contends that the term "handheld" in the preamble of claim 1 (*i.e.*, "a handheld device comprising") recites essential structure and is more than functional use, thus, further limiting. (2022 App Br at 5-7).

15      The Examiner respectfully disagrees. Foremost, the Examiner finds that that the term "handheld" modifies the device with a purpose and/or intended use of a device since "the body of a claim fully and intrinsically sets forth all of the limitations of the claimed invention." MPEP § 2111.02.II states,

> [t]he claim preamble must be read in the context of the entire claim. The
> 20   determination of whether preamble recitations are structural limitations or mere
> statements of purpose or use "can be resolved only on review of the entirety of the
> [record] to gain an understanding of what the inventors actually invented and
> intended to encompass by the claim" as drafted without importing "'extraneous'
> limitations from the specification." *Corning Glass Works*, 868 F.2d at 1257, 9
> 25   USPQ2d at 1966. ***If the body of a claim fully and intrinsically sets forth all of***

*the limitations of the claimed invention, and the preamble merely states, for*
*example, the purpose or intended use of the invention, rather than any distinct*
*definition of any of the claimed invention's limitations, then the preamble is not*
*considered a limitation and is of no significance to claim construction.* Pitney
Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305, 51 USPQ2d 1161,
1165 (Fed. Cir. 1999). See also *Rowe v. Dror*, 112 F.3d 473, 478, 42 USPQ2d
1550, 1553 (Fed. Cir. 1997) ("where a patentee defines a structurally complete
invention in the claim body and uses the preamble only to state a purpose or
intended use for the invention, the preamble is not a claim limitation");

(MPEP § 2111.02.II; emphasis added). Specifically, the Examiner finds that the device recited in

claim 1 explicitly requires a housing, a computer, a first camera, and a second camera without

further claim requirements limiting "handheld." ('924 Patent at claim 1). To support the

Examiner's position, the Examiner finds that the invention of claim 1 is directed to Figure 18. In

explanation of a portion of Figure 18 below, the '924 Patent states,

> Consider **_hand held_ _computer_** **1901** of FIG. 18, _incorporating_ _a camera_ **1902**
> which can optionally be rotated about axis **1905** so as to look at the user or a
> portion thereof such as finger **1906**, or at objects at which it is pointed.
> _Optionally_, and often desirably, _a stereo pair of cameras to further include_
> _camera 1910 can also be used_.



**FIG. 8A**

*Figure 8A of '924 Patent (portion thereof)*

Application/Control Number: 90/014,902                                    Page 4
Art Unit: 3992

('924 Patent at c.25, ll.40-45). The Examiner finds that the "924 Patent explicitly defines the



**Figure 18 of '924 Patent (portion thereof)**

computer of the invention functioning as a handheld device. Moreover, with respect to another

completely different embodiment, the '924 Patent states,

> FIG. 8A illustrates control of functions with the invention, using _a handheld device_
> which itself has functions (_for example, a cell phone_).

(_Id_. at c.11, ll.65-67). While one of ordinary skill in the art would recognize that a device being

"handheld" does require certain size constraints in order for it to be handheld, as is indicated by

the finger within Figure 18 and the hand holding the device in Figure 8A, both included above,

the Examiner finds that claim 1 clearly defines a structurally complete device (_i.e._. a device with

the claim requirements of a housing, computer, and first and second cameras) and intends for the

device to be used in a handheld manner. The Examiner finds that the structure of claim 1,

asserted above, fully and intrinsically sets forth the complete invention and the term "handheld"

does not provide any further distinct definition of the claimed invention's limitation, only its

intended use of being capable of being handheld. In addition, the Examiner finds that claim 1

only further recites "the handheld device" to satisfy the antecedent basis requirement and not to

further define the intended use of being handheld.

Thus, the Examiner concludes and maintains that the term "handheld" in the preamble of

claim 1 (*i.e.*, "a handheld device comprising") does not recite essential structure and is nothing

5      more than a functional use, thus, not further limiting.

### *(2)    First and Second Camera Non-Overlapping Views*

Appellant contends that, in order for the first and second camera to include non-

overlapping field of views, there can be no overlap whatsoever between the first and second field

10    of views. (2022 App Br at 7-10). Appellant further contends that the non-overlapping views

interpretation must be based upon the single embodiment in which the second camera is

disclosed as being oriented ahead of the device instead of at the user. (*Id*. at 10-11).

The Examiner respectfully disagrees. Foremost, the Examiner finds that the '924 Patent

15    term is expired and the Reexamined Claims are interpreted in accordance with the decision of

*Phillips*. (July 2022 Final Office Action at § VI.A). From this perspective, the Examiner finds

that the claim requirement of ""wherein the first and second cameras *include* non-overlapping

fields of views" is "inclusive or open-ended and does not exclude additional, unrecited elements

or method steps." (See MPEP §§ 2111.03.I; also see 2163.II.A.1). With this guidance, the

20    Examiner finds that the first and second camera of the claim 1 are not limited to including only

"non-overlapping field of views," but also including "partially overlapping views" and

"overlapping views." To support the Examiner's position, the Examiner finds that the '924

Patent states,

Consider hand held computer **1901** of FIG. 18, _incorporating **a camera 1902**_
_which **can optionally be rotated about axis 1905** so as to look at the user or a_
_portion thereof such as finger **1906**, or at objects at which it is pointed._
_Optionally, and often desirably, a stereo pair of cameras to **further include**_
5   _**camera 1910 can also be used. It too may rotate, as desired**_… When aimed at the
user, as shown, it can be used, for example, to view and obtain images of:

Ones self–facial expression etc., also for image reasons–id etc. combined
effect.

10

Ones fingers (any or all), one finger to other and the like. This in turn
allows conversing with the computer in a form of sign language which can
replace the keyboard of a conventional computer.

15      _One or more objects in ones hand. Includes a pencil or pen–and thus can_
_be used rather than having a special touch screen and pencil if the pencil itself is_
_tracked as disclosed in the above figure. It also allows small children to use the_
_device, and those who cannot hold an ordinary stylus_.

20      Ones gestures.
The camera **1902** (and **1910** if used, and if desired), can also be optionally
rotated and used to view points in space ahead of the device, as shown in dotted
lines **1902a**. In this position for example _it can be used for the purposes described_
_in the previous application_.

25
('924 Patent at c.25, l.40 – c.26, l.1); and

_The camera can also be used to see gestures of others, as well as the user_,
and to acquire raw video images of objects in its field

30   (_Id_. at c. 26, ll.25-27). From this perspective, the Examiner finds that the first and second

cameras of claim 1 are required to be rotated about their respective axes and capable of being

configured into many different field of views, which include overlapping, partially overlapping,

and non-overlapping fields of view. While one of ordinary skill in the art can agree that the first

and second cameras must have the ability to be configured to have "non-overlapping field of

35   views," the Examiner concludes that the claim requirement is not limited to having only "non-

overlapping field of views," but also may have capability of any of overlapping view, partially

overlapping or non-overlapping fields of view.

With respect to Appellant's contention that the non-overlapping views interpretation must be the single embodiment in which the second camera is disclosed as being oriented ahead of the device instead of at the user, the Examiner finds this argument misplaced. In this regard, in

5    response to Appellant's argument that the references fail to show certain features of Appellant's invention, it is noted that the features upon which Appellant relies (*i.e.*, the single embodiment in which the second camera is disclosed as being oriented ahead of the device instead of at the user) are not recited in the rejected claim(s). Although the claims are interpreted in light of the specification, limitations from the specification are not read into the claims. See *In re Van*

10   *Geuns,* 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993). Moreover, the Examiner finds that it is improper to import limitations from the specification into the claims. Specifically, "'[t]hough understanding the claim language may be aided by explanations contained in the written description, it is important not to import into a claim limitations that are not part of the claim. For example, a particular embodiment appearing in the written description may not be read into a

15   claim when the claim language is broader than the embodiment.' *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875, 69 USPQ2d 1865, 1868 (Fed. Cir. 2004)." (See MPEP 2111.01(II); emphasis added).

In this light, and in examination of claim 1, the Examiner finds that the claim limitation requires the second camera to be "orient[ed] to view one thing rather than another thing *while*

20   *still allowing for some or all of both to be within the field of view*" with the first and second cameras *having non-overlapping views*. ( See July 2022 Final Office Action at § VI.B.(1)). The Examiner finds that the '924 Patent supports such an interpretation. To support the Examiner's position, the Examiner finds that the '924 Patent states,

 Consider hand held computer **1901** of FIG. 18, *incorporating a camera **1902**
which can optionally be rotated about axis **1905** so as to look at the user or a
portion thereof such as finger **1906**, or at objects at which it is pointed.
Optionally, and often desirably, a stereo pair of cameras to **further include
camera 1910** can also be used. **It too may rotate, as desired**…* When aimed at the
user, as shown, it can be used, for example, to view and obtain images of:

  Ones self–facial expression etc., also for image reasons–id etc. combined
effect.

  Ones fingers (any or all), one finger to other and the like. This in turn
allows conversing with the computer in a form of sign language which can
replace the keyboard of a conventional computer.

  *One or more objects in ones hand. Includes a pencil or pen–and thus can
be used rather than having a special touch screen and pencil if the pencil itself is
tracked as disclosed in the above figure. It also allows small children to use the
device, and those who cannot hold an ordinary stylus.*

  Ones gestures.
  The camera **1902** (and **1910** if used, and if desired), can also be optionally
rotated and used to view points in space ahead of the device, as shown in dotted
lines **1902a**. In this position for example *it can be used for the purposes described
in the previous application*.

('924 Patent at c.25, l.40 – c.26, l.1); and

  *The camera can also be used to see gestures of others, as well as the user*,
and to acquire raw video images of objects in its field

('924 Patent at c. 26, ll.25-27). The Examiner finds that the '924 Patent discloses two

embodiments of the second camera of the handheld device with the camera being "orient[ed] to

view one thing rather than another thing *while still allowing for some or all of both to be within

the field of view*" and *with non-overlapping views* (July 2022 Final Office Action at § VI.B.(1) :

1) with the first camera having a field of view and orientation of the user; and the second camera

having a field of view and orientation of the user and the one or more objects in the users' hand,

and 2) with the first camera having a field of view and orientation of the user; and the second

camera having a field of view and orientation of one or more objects, with no view of the user

whatsoever. In addition, as set forth above, the '924 Patent discloses seeing gestures of others, in

addition to the user. ('924 Patent at c. 26, ll.25-27).

    Thus, as evidence above, the Examiner concludes and maintains that "the first and second

cameras having non-overlapping views" is not limited to the second embodiment (*i.e.*, "2") as

5   indicated by Appellant, but also encompasses the first embodiment (*i.e.*, "1") as indicated by the

Examiner.


### (3)    *Oriented to View A User/An Object Other Than The User*

    In light of the claim requirement for the first and second camera to include "non-

10  overlapping field of views" (*i.e.*, no overlap of field of views of each respective camera),

Appellant contends that that the user cannot be in the field of view of the second camera (*i.e.*,

"must exclude the user"). (2022 App Br at 11-12).


    The Examiner respectfully disagrees. While, the Examiner recognizes Appellant's

15  attempt to limit the phrase to completely exclude one thing from another in light of the "non-

overlapping" views," the Examiner finds this contention is misplaced in that the claim

requirement of "to view an object other than the user of the device" does not preclude the user

being in the field of view of the second camera. The Examiner finds that the '924 Patent supports

such an interpretation. To support the Examiner's position, the Examiner finds that the '924

20  Patent states,

> Consider hand held computer **1901** of FIG. 18, *incorporating a camera **1902**
> *which can optionally be rotated about axis **1905** so as to look at the user or a*
> *portion thereof such as finger **1906**, or at objects at which it is pointed.*
> *Optionally, and often desirably, a stereo pair of cameras to further include*
> 25   *camera **1910** can also be used. It too may rotate, as desired*… When aimed at the

user, as shown, it can be used, for example, to view and obtain images of:

5

> Ones self–facial expression etc., also for image reasons–id etc. combined effect.

> Ones fingers (any or all), one finger to other and the like. This in turn allows conversing with the computer in a form of sign language which can replace the keyboard of a conventional computer.

10

> *One or more objects in ones hand. Includes a pencil or pen–and thus can be used rather than having a special touch screen and pencil if the pencil itself is tracked as disclosed in the above figure. It also allows small children to use the device, and those who cannot hold an ordinary stylus*.

15

> Ones gestures.
> The camera **1902** (and **1910** if used, and if desired), can also be optionally rotated and used to view points in space ahead of the device, as shown in dotted lines **1902a**. In this position for example *it can be used for the purposes described in the previous application*.

20

('924 Patent at c.25, l.40 – c.26, l.1); and

> *The camera can also be used to see gestures of others, as well as the user*, and to acquire raw video images of objects in its field

25 ('924 Patent at c. 26, ll.25-27). From this perspective, the Examiner acknowledges that the first and second cameras may be oriented to view a different object other than the user, however, there is no special definition in the claims, nor in the '924 Patent, that justifies the narrow interpretation of the user not explicitly being in the "oriented view" when directed to the object other than the user." To further support the Examiner's position, the Examiner finds guidance

30 from the District Court that found that the term "oriented to view" to mean be it's plain meaning (*i.e.*, orienting to view one thing rather than another thing *while still allowing for some or all of both to be within the field of view*). (See July 2022 Final Office Action at § VI.B.1).

Thus, as evidenced above, the Examiner concludes and maintains that "a second camera oriented to view an object other than the user of the device" does not preclude the user being in

35 the field of view of the second camera.

### (4)      *Mobile Phone*

Appellant contends that a mobile phone must have the capabilities of (i) being capable of

answering a voice telephone call from another individual operating another phone device, and

5    (ii) having an audio output (*e.g.*, built-in speaker, ear phone jack, etc.) so that the claimed

"mobile phone" can listen to the other individual (speaking into the other phone device) during a

phone call. (2022 App Br at 13-14).


The Examiner respectfully disagrees. Foremost, the Examiner finds that the '924 Patent

10   term is expired and the Reexamined Claims are interpreted in accordance with the decision of

*Phillips*. (July 2022 Final Office Action at § VI.A). With respect to a "mobile phone," the

Examiner finds that the '924 Patent states,

> FIG. 8A illustrates control of functions with the invention, using *a handheld device*
> which itself has functions (*for example, a cell phone*).

15   (*Id*. at c.11, ll.65-67). The '924 Patent does not provide any further delineation of the structural

requirements of the cell phone device (*i.e.,* built-in speaker, earphone jack, etc.), only to the

handheld device being a cell phone. Thus, a mobile phone, given its ordinary and customary

meaning as understood by one of ordinary skill in the art at the time of the invention, would be a

20   cell phone structure itself.

### B.  Anticipation Rejections of Claims 1-5 and 13

#### (1)      Preamble

Appellant contends that *Liebermann* does not anticipate the preamble of claim 1.

Specifically, Appellant contends that the "portable transmitter/receiver" of *Liebermann* is not

5     "handheld" because it is required to record movement of both hands, thus, cannot be handheld;

and it is required to rest on a flat/stable surface, and not be handheld, so that the device "can be

supported in a stable position" when functioning. (2022 App Br at 15-19).


The Examiner respectfully disagrees. As set forth above, the Examiner finds that the term

10    "handheld" in the preamble of claim 1 (*i.e.*, "a handheld device comprising") does not recite

essential structure and is nothing more than a functional use, thus, not further limiting. From this

perspective, the Examiner finds that that *Liebermann* discloses an apparatus which enables a deaf

person to communicate through the use of sign language. (*Liebermann* Abstract; c.1, ll.10-15;

c.3, ll.11-23; c.4, ll.20-21; c.5, l.62 – c.6, l.10; see Figure 6). Specifically, the Examiner finds

15    that *Liebermann* discloses a portable transmitter/receiver telephone **8** for the deaf which is a

"cellular telephone" unit. (*Id*. at c.4, ll.20-21; c.5, l.62 – c.6, l.10; c.7, ll.18-43; see Figure 6).

While *Liebermann* discloses the portable transmitter/receiver telephone **8** comprising a base

portion **13** having a flat surface on the bottom thereof, one of ordinary skill in the art would

recognize the portable transmitter/receiver telephone **8** of *Liebermann* as being a handheld

20    device. To support the Examiner's position, in examination of Figures 8A and 18 of the '924

Application/Control Number: 90/014,902                                      Page 13
Art Unit: 3992

Patent and Figure 6 of *Liebermann* below, the Examiner finds that both the cell phone **800** and

handheld computer **1901** versions of the '924 Patent have a flat surface on the bottom thereof

just like *Liebermann*. Furthermore, just as the '924 Patent discloses a handheld device is a "cell

phone," the Examiner finds that *Liebermann* explicitly discloses Figure 6 as being the "cellular



**FIG. 8A**           FIG. 18           FIG. 6

Figure 8A of '924 Patent     Figure 18 of '924 Patent     Figure 6 of *Liebermann*

5     telephone version." (*Compare* '924 Patent at c.11, ll.65-67, with *Liebermann* at c.4, ll.20-21; c.5,

l.62 – c.6, l.10; c.7, ll.18-43). Moreover, *Liebermann* discloses the transmitter /receiver **8** being

"portable" and "transported." (*Liebermann* at c.5, ll.61-62; c.6, l.1-2).

   Accordingly, the Examiner concludes and maintains that, not only is the portable

transmitter/receiver "cellular telephone" of *Liebermann* handheld, but also that the portable

10     transmitter/receiver telephone is for the purpose and intended use of the portable

transmitter/receiver "cellular telephone" being handheld (*i.e.*, capable of being handheld).


   With respect to the contention that the *Liebermann*'s portable transmitter/receiver

telephone device **8** is not handheld because it cannot be operated while being handheld, it is

15     noted that the features upon which applicant relies (*i.e.*, device must be operated when being

handheld) are not recited in the rejected claim(s). Although the claims are interpreted in light of

the specification, limitations from the specification are not read into the claims. (See *In re Van*

*Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993)). Moreover, it is improper to import

limitations from the specification into the claims. Specifically, "'[t]hough understanding the

claim language may be aided by explanations contained in the written description, it is important

5    not to import into a claim limitations that are not part of the claim. For example, a particular

embodiment appearing in the written description may not be read into a claim when the claim

language is broader than the embodiment.' *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358

F.3d 870, 875, 69 USPQ2d 1865, 1868 (Fed. Cir. 2004)." (See MPEP 2111.01(II); emphasis

added). Furthermore, "disclosed examples and preferred embodiments do not constitute a

10    teaching away from a broader disclosure or nonpreferred embodiments. *In re Susi*, 440 F.2d 442,

169 USPQ 423 (CCPA 1971)." (See MPEP § 2123). In addition, "[a] reference may be relied

upon for all that it would have reasonably suggested to one having ordinary skill the art,

including nonpreferred embodiments." *Merck & Co. v. Biocraft Laboratories*, 874 F.2d 804, 10

USPQ2d 1843 (Fed. Cir.), cert. denied, 493 U.S.975 (1989). (*Id.*)

15        From this perspective, while *Liebermann* discloses "the device [being] supported in a

stable position so that the camera lens **10** will record the signing movement of hands and fingers

and body and facial motions and expression" (*Liebermann* at c.6, ll.2-6), the Examiner can find

insufficient teaching, requirement or suggestion of placing the portable transmitter/receiver

telephone **8** on a flat surface for stability. Again, as evidence by the comparison of Figures 8A

20    and 18 of the '924 Patent and Figure 6 of *Liebermann* above, the Examiner finds that the 'that

both the cell phone **800** and handheld computer **1901** versions of the '924 Patent have a flat

surface on the bottom thereof just like *Liebermann*. Just as the '924 Patent discloses, the flat

surface of *Liebermann* is not like that of a suitcase and does not inhibit the device form being

held in the hand of a deaf person, but instead provides sufficient structure that is easily held by a

deaf person. In addition, the Examiner finds that *Liebermann* provides no teaching, requirement

or suggestion that both hands are always required for signing. To support the Examiner's

position, the Examiner finds that *Liebermann* discloses a full image being taken by the portable

5    transmitter/receiver telephone **8** of a single hand/right half of the body. (*Id.* at Figure 14A, 14B).

Accordingly, *Liebermann* provides contrary evidence to the fact that both hands are required for

signing movements of the hands and fingers and body and facial motion and expressions.

Thus, in this context, and again as set forth above, the Examiner concludes and maintains

that, not only is the portable transmitter/receiver "cellular telephone" of *Liebermann* handheld,

10    but also that the portable transmitter/receiver telephone is for the purpose and intended use of the

portable transmitter/receiver "cellular telephone" being handheld (*i.e.*, capable of being

handheld).


### *(2)    Element Designated "1e"[1].*

15    Appellant contends that *Liebermann* does not anticipate the element designated as "*1e*" of

claim 1. Specifically, Appellant contends that "as discussed above in sections IV(A)(2) and

IV(A)(3), the claim requires that the fields of view associated with the first and second cameras

do not overlap, and that the user is excluded from the field of view of the seconds camera."

(2022 App Br at 19-20). Appellant contends that the teachings of *Liebermann* (*i.e.*, "utilizing

20    more than one camera," "each camera having a separate angle," and "angle overlap may or may

not be permitted" (*Liebermann* at c.13, ll.5-13)) do not teach the claim element 1e. (2022 App Br

---

[1] The Examiner finds that "1e" is designated as the claim requirement "a second camera oriented to view an object
other than the user of the device and having a second camera output, wherein the first and second cameras include
non-overlapping fields of view."

at 20-21). Appellant contends that the Examiner disregarded the phrases "other than the user of

the device" and "the first and second cameras include non-overlapping fields of view." (*Id.* at 21-

24).

5          With respect to the contention that "as discussed above in sections IV(A)(2) and

IV(A)(3), the claim requires that the fields of view associated with the first and second cameras

do not overlap, and that the user is excluded from the field of view of the seconds camera, the

Examiner respectfully disagrees. The Examiner finds this contention the same as previously set

forth by Appellant. (2022 APP Br at §§ IV(A)(2) and IV(A)(3)). Thus, the Examiner finds this

10   argument addressed above. (See §§ (2).A.(2)-(3), *supra*).

From this perspective, while the claim requirement of "the first and second cameras

include non-overlapping fields of view" may require the first and second cameras to have the

capability to include non-overlapping views, the claim requirement is not limited the first and

second cameras having only "non-overlapping field of views," but the first and second cameras

15   also may have capability of overlapping and partially overlapping, in addition to non-

overlapping fields of view. In addition, since the claim requirement of "the first and second

cameras *include* non-overlapping fields of view" only requires the first and second cameras to

have the capability to include non-overlapping views, the Examiner finds that first and second

camera outputs based upon the various "oriented to view" claim requirements are not required to

20   be from the non-overlapping field of views.

Moreover, the first and second cameras having non-overlapping views is not limited to

the second embodiment (*i.e.*, "2")[2] as indicated by Appellant, but also encompasses the first

---

[2] The first camera having a field of view and orientation of the user; and the second camera having a field of view
and orientation of one or more objects, with no view of the user whatsoever. (See § (2).A.(2), *supra*).

embodiment (*i.e.*, "1")[3] as indicated by the Examiner.


With respect to the contention that the teachings of *Liebermann* (*i.e.*, "utilizing more than

one camera," "each camera having a separate angle," and "angle overlap may or may not be

5    permitted" (*Liebermann* at c.13, ll.5-13)) do not teach the claim element 1e, the Examiner

respectfully disagrees. *Liebermann* discloses,

> [t]he illustrated embodiments all utilize a single video cameras. It may be
> desirable *to utilize more than one camera* to allow the signing person "free"
> movement in his or her environment to track down spatial positions in that
10   environment.
>       In such a case, the installation should follow the following criteria:
>             1. ***Each camera is covering a separate angle***.
>             2. Each camera operates independently of the other(s).
>             3. ***Angle overlap may or may not be permitted*** *according to the pre-*
15   *signing calibration*…
>       5… A defined figure with signing motion…(for persons). The same
> technique is useful in ***defining any objects*** or, alive stationary or moving entities,
> such as animals

20   (*Liebermann* at c.13, ll.4-15). From this perspective, the Examiner finds that each camera's angle

of coverage is the field of view of that particular camera, and each field of view can be defined

by a separate or different field of view, meaning the field of view of each camera is different

(*i.e.*, the field of view of one camera can comprise a smaller/larger of the field of view of the

other cameras, etc.). In addition, the angle of overlap (*i.e.*, field of view overlap) may be present

25   or not. In this context, the first camera and second camera may be configured to have 1)

complete overlapping field of views, 2) partially overlapping field of views, and 3) non-

overlapping field of views. Thus, the Examiner maintains that concludes that *Liebermann*

---

[3] The first camera having a field of view and orientation of the user; and the second camera having a field of view
and orientation of the user and the one or more objects in the users' hand. (See § (2).A.(2), *supra*).

sufficiently teaches "the first and second cameras include non-overlapping views" given the

claim requirements ordinary and customary meaning.


With respect to the contention that *Liebermann* does not teach "a second camera oriented

to view an object other than the user of the device," the Examiner respectfully disagrees. As set

forth above, the Examiner finds that the claim requirement of "a second camera oriented to view

an object other than the user of the device" does not preclude the user being in the field of view

of the second camera, (see § (2).(A.(3), *supra*). Similarly, since the claim requirement of "the

first and second cameras *include* non-overlapping fields of view" only requires the first and

second cameras to have the capability to include non-overlapping views, the Examiner finds that

first and second camera outputs based upon the various "oriented to view" claim requirements

are not required to be from the non-overlapping field of views. However, the Examiner finds that

*Liebermann* satisfies both scenarios of: 1) the first and second camera outputs of the various

"oriented to view" claim *requirements **are not** required to be from the non-overlapping field of*

*views*; and 2) the first and second camera outputs of the various "oriented to view" claim

requirements ***are*** *required to be from the non-overlapping field of views*.

From this perspective, the Examiner finds that *Liebermann* teaches both 1) the first and

second cameras having the potential to capture non-overlapping fields of view *with the*

*orientation of the second camera being an overlapping or potentially overlapping field of view*

with the first camera in which the object, rather than the user within the field of view of the

second camera, is being viewed *while still allowing for some or all of both the object and user to*

*be within the field of view* (July 2022 Final Office Action at § VI.B.(1)); and 2) the first and

second cameras having the potential to capture non-overlapping fields of view *with the*

*orientation of the second camera being a non-overlapping field of view* with the first camera in

which the object, rather than the user within the field of view of the second camera, is being

viewed *while still allowing for some or all of both the object and user to be within the field of*

*view*. To support the Examiner's position, *Liebermann* discloses "images captured by the camera

5    are of the finger and hand motions and of body motions and of facial expression and motions.

(*Liebermann* at c.6, ll.43-46). *Liebermann* further discloses the video apparatus "observing the

images of facial and hand and finger signing motions of a deaf persons." (*Liebermann* at claim 1,

ll.43-45). In examination of Figure 13A of *Liebermann*, *Liebermann* discloses a deaf person

being completely within the captured image with the "illustrated embodiments all utiliz[ing] a

10    single video camera[s]." (*Id.* at c.13, ll.4-5). As one of ordinary skill in the art recognizes,

*Liebermann* discloses that the hand and finger signing motions of a deaf person is based upon the

American Sign Language ("ASL") standard which takes in handshape, the motion, and spatial

location to the rest of the body. (*Liebermann* at c.10, ll.54-67). Moreover, *Liebermann* discloses

that "further grammatical delineation is contributed by facial expressions." (*Id* at c.11, ll.3-11).

15    Since *Liebermann* discloses: *the separate analysis* of facial expressions and hand/body motion

(also see *id.* at c.7, l.49 – c.8, l.26 for signing with a single camera; and c.8, l.50 – c.9, l.27 for

emotional content analysis similar to signing); and the "more than one camera" may be utilized

with each camera covering a *separate angle*, *operating independently* of the other(s), *in which*

*angle overlap may or may not be permitted* (*id.* at. c.13, ll.4-15), one of ordinary skill in the art

20    would recognize that *Liebermann* discloses separately capturing images of: 1) the gloves/hands

of the user and the user; or 2) the face of the user and the gloves/hands of the user. In light of the

camera of *Liebermann* having the capability to capture images of persons and separate objects

(*id*. at c.13, ll.4-15), the Examiner finds that other image capturing configuration scenarios are further within the scope of the *Liebermann* disclosure.

In this context, the Examiner finds that *Liebermann* discloses orienting the first camera towards the user and orienting the second camera towards the gloves/hands of the user in which

5  the gloves/hands of the user, rather than the user within the field of view of the second camera, is being viewed *while still allowing for some or all of both the gloves/hands of the user and user to be within the field of view*. (See July 2022 Final Office Action at § VI.B.(1)). The Examiner finds that this configuration satisfies 1) above, in that the first and second cameras having the potential to capture non-overlapping fields of view *with the orientation of the second camera being an*

10  *overlapping or potentially overlapping field of view* with the first camera.

Similarly, the Examiner finds that *Liebermann* discloses orienting the first camera towards the user's face and orienting the second camera towards the gloves/hands of the user in which the hands of the user, rather than the user's face within the field of view of the second camera, is being viewed *while still allowing for some or all of both the gloves/hands of the user*

15  *and user's face to be within the field of view*. (*Id*.) The Examiner finds that this configuration satisfies 2) above, in that the first and second cameras having the potential to capture non-overlapping fields of view *with the orientation of the second camera being a non-overlapping field of view* with the first camera.

Thus, the Examiner concludes and maintains that *Liebermann* sufficiently discloses "a

20  second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view" limitation recited in claim 1 under the *Phillips* standard.

### (3)    *Claim 2*

Appellant contends that *Liebermann* does not anticipate the preamble of claim 2.

Appellant contends that a mobile phone should be given its plain and ordinary meaning, and in

that light, *Liebermann* does not anticipate a mobile phone (2022 App Br at 24-26). Specifically,

5    Appellant contends that the portable transmitter/receiver cellular telephone of *Liebermann* is not

a phone because it does not include audio output for the user to listen to. (*Id*.)


With respect to the contention that "as discussed above in sections IV(A)(4), the 'mobile

phone' of claim 2 should be given its plain and ordinary meaning, the Examiner respectfully

10    disagrees. The Examiner finds this contention the same as previously set forth by Appellant.

(2022 APP Br at § IV(A)(4)). Thus, the Examiner finds this argument addressed above. (See §

(2).A.(4), *supra*).

From this perspective, the Examiner concludes and maintains that a mobile phone, given

its ordinary and customary meaning as understood by one of ordinary skill in the art at the time

15    of the invention, would be a cell phone structure itself.


In response to Appellant's argument that the references fail to show certain features of

Appellant's invention, it is noted that the features upon which Appellant relies (*i.e.*, the telephone

device must include audio output for the user to listen to, etc.) are not recited in the rejected

20    claim(s). Although the claims are interpreted in light of the specification, limitations from the

specification are not read into the claims. See *In re Van Geuns*, 988 F.2d 1181, 26 USPQ2d 1057

(Fed. Cir. 1993). Moreover, the Examiner finds that it is improper to import limitations from the

specification into the claims. Specifically, "'[t]hough understanding the claim language may be

aided by explanations contained in the written description, it is important not to import into a

claim limitations that are not part of the claim. For example, a particular embodiment appearing

in the written description may not be read into a claim when the claim language is broader than

the embodiment.' *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875, 69

5      USPQ2d 1865, 1868 (Fed. Cir. 2004)." (See MPEP 2111.01(II); emphasis added). In this light,

the Examiner finds that it is not required for the mobile phone of *Liebermann* to have audio

output for the user to listen to.

From this perspective, the Examiner finds that *Liebermann* explicitly discloses the

portable transmitter/receiver telephone **8** for the deaf being a "cellular telephone" unit that is

10     mobile. (*Liebermann* at c.4, ll.20-21; c.5, l.62 – c.6, l.10; c.7, ll.18-43; see Figure 6). In addition,

the Examiner finds that *Liebermann* discloses the line of deaf person's station arranges for

transmission of voice and data on the dedicated line. (*Id.* at c.7, ll.3-9, 18-28).

Subsequently, and in view of the discussion above, the Examiner concludes and

maintains that *Liebermann* sufficiently discloses "the handheld device compris[ing] a mobile

15     phone" limitation recited in claim 2 under the *Phillips* standard.


### *(4)    Claims 3-5 and 13*

Appellant contends that "[a]s discussed above, *Liebermann* does not anticipate clam 1.

Thus, *Liebermann* does not anticipate dependent claims 3-5 and 13 for at least the same

20     reasons." (2022 App Br at 26).

The Examiner respectfully disagrees. The Examiner finds this contention the same as

previously set forth by Appellant. (*Id*. at § IV(B)(1)),  at 14-24). Thus, the Examiner finds this

argument addressed above. (See §§ (2).B.(1)-(2), *supra*).

5       *C. Obvious Rejections of Claims 1-5 and 13*

        *(1)       Liebermann as Analogous Art*

        Appellant contends the Examiner has failed to establish that *Liebermann* is analogous art

and thus cannot be utilized in an obviousness rejection. (2022 App Br at 26-29). In addition,

Appellant contends that *Liebermann* does not satisfy the first and second tests for analogous art.

10      (*Id*. at 27-28).


        The Examiner respectfully disagrees. With respect to Appellant contention that

*Liebermann* is not analogous art, it has been held that a prior art reference must either be in the

field of applicant's endeavor or, if not, then be reasonably pertinent to the particular problem

15      with which the applicant was concerned, in order to be relied upon as a basis for rejection of the

claimed invention. See *In re Oetiker*, 977 F.2d 1443, 24 USPQ2d 1443 (Fed. Cir. 1992).

        As is often the case, whether art is analogous depends on how broadly or how narrowly

the field of endeavor or problem facing the inventor is defined. The Examiner finds that the'924

Patent does not explicitly define these. However, in order to expedite prosecution, the Examiner

20      will hypothesize the "field of  endeavor" and "problem faced by inventor." From examination of

the '924 Patent, the Examiner finds that Appellant's field of endeavor is "a simple input device

for optically sensing human and/or object input positions/orientations." ('924 Patent at Title;

Abstract; c.2, ll.8-24; c.3, ll.11-14; c.25, l.40 – c.26, l.51; see Figure 18). In addition, the

Examiner finds that problem being solved by Appellant is providing "embodiments for

improving the sensing of objects for displays and control purposes." (*Id.* at Abstract; c.2, ll.8-24;

c.25, l.40 – c.26, l.51). With this as guidance, the Examiner finds that *Liebermann* is both in the

"field of endeavor" and "pertinent to the problem faced by the inventor."

5          With respect to the "field of endeavor, "the Examiner finds that *Liebermann* explicitly

discloses "a simple input device for optically sensing human and/or object input

positions/orientations." Specifically, the Examiner finds that *Liebermann* discloses the portable

transmitter/receiver cellular telephone **8** that is deemed handheld[4] which comprises the video

camera and lens **10** capturing images to be processed in digital format. (*Liebermann* at c.4, l.60 –

10      c.5, l.11; c.5, l.62 – c.6, l.10; c.13, ll.4-15; see Figures 6, 8). The Examiner finds that the video

camera and lens **10** being "oriented to view the user of the device" while the user provides

finger/hand motions, body motions and facial expression motions. (*Id.*; also see Nov 2021

Abowd Declaration at ¶¶ 64-65). In addition, the Examiner finds that *Liebermann* discloses a

second camera may be used. Specifically, the Examiner finds that *Liebermann* discloses "more

15      than one camera" may be utilized with each camera covering a separate angle, operating

independently of the other(s), in which angle overlap may or may not be permitted. (*Id.* at. c.13,

ll.4-15). The Examiner finds that *Liebermann* discloses rendering the user with signing motion,

any objects or, alive, stationary or moving entities, such as animals (*Id.* at c.13, ll.16-20). From

this perspective*, Liebermann* explicitly discloses a handheld portable transmitter/receiver cellular

20      telephone comprising one or more cameras to optically sense human and/object input positions

and/or orientations. As such, the Examiner concludes that *Liebermann* is in Appellant's "field of

endeavor."

---

[44] The Examiner finds that the portable transmitter/receiver cellular telephone **8** is "handheld." (See §§ (2).A.(1),
(2).B.(1), *supra*).

Similarly, with respect to the "problem being solved by Appellant," the Examiner finds

that *Liebermann* explicitly discloses providing an "embodiment for improving the sensing of

objects for displays and control purposes." Again, and as set forth *supra*, *Liebermann* provides a

portable transmitter/receiver cellular telephone **8** embodiment that is deemed handheld[5] which

5    comprises video cameras and lens **10** capturing images to be processed in digital format.

(*Liebermann* at c.4, l.60 – c.5, l.11; c.5, l.62 – c.6, l.10; c.13, ll.4-15; see Figures 6, 8). The

Examiner finds that the video camera and lens **10** being "oriented to view the user of the device"

while the user provides finger/hand motions, body motions and facial expression motions. (*Id.*;

also see Nov 2021 Abowd Declaration[6] at ¶¶ 64-65). The Examiner finds that *Liebermann*

10    discloses rendering the user with signing motion, any objects or, alive, stationary or moving

entities, such as animals for communication purposes. (*Id.* at c.13, ll.16-20). From this

perspective, *Liebermann* teaches an embodiment of a handheld portable transmitter/receiver

cellular telephone comprising one or more cameras for display and control functionality. As

*Liebermann* teaches the things which the inventor stated were lacking, the Examiner concludes

15    that *Liebermann* is "pertinent to the problem faced by the inventor."

Thus, *Liebermann* is deemed analogous art.


### *(2)     Preamble and Element "1e" over Liebermann*

Appellant contends "[a]s discussed above in Section IV(B)(1), *Liebermann* fails to teach

20    or suggest at least the preamble of claim 1 and claim element l[e]. Accordingly, *Liebermann*

does not render claim 1 obvious." (2002 App Br at 29). In addition, Appellant contends that

---

[5] *Id.*
[6] Declaration of Gregory D. Abowd filed 11 November 2021 ("Nov 2021 Abowd Declaration").

since *Liebermann* has a different purpose of being utilized for a deaf person's communication,

*Liebermann* cannot render the utilization of a second camera, and its functionality, obvious. (*Id.*

at 29-30)

5          The Examiner respectfully disagrees. The Examiner finds this contention the same as

previously set forth by Appellant. (2022 App Br at § IV(B)(1)). Thus, the Examiner finds this

argument addressed above. (See §§ (2).B.(1)-(2), *supra*).

      In response to Appellant's argument that *Liebermann* has a different purpose of being

utilized for a deaf person's communication, thus, the utilization of a second camera, and its

10    functionality, cannot be obvious, the fact that applicant has recognized another advantage which

would flow naturally from following the suggestion of the prior art cannot be the basis for

patentability when the differences would otherwise be obvious. See *Ex parte Obiaya*, 227

USPQ 58, 60 (Bd. Pat. App. & Inter. 1985).

15          *(3)     Claims 2-5 and 13*

      Appellant contends that "[a]s discussed above, *Liebermann* does not render clam 1

obvious. Accordingly, *Liebermann* does not render dependent claims 2-5 and 13 obvious for at

least the same reasons, and withdrawal of this rejection is respectfully requested." (2022 App Br

at 31).

20

      The Examiner respectfully disagrees. The Examiner finds this contention the same as

previously set forth by Appellant. (2022 App Br at § IV(B)(1)). Thus, the Examiner finds this

argument addressed above. (See §§ (2).B.(1)-(2), *supra*).

### D.  Obvious Rejections of Claims 6-10 and 12

#### (1)      Sears as Analogous Art

Appellant contends the Examiner has failed to establish that *Sears* is analogous art and

thus cannot be utilized in an obviousness rejection. (2022 App Br at 31-33). In addition,

Appellant contends that *Sears* does not satisfy the first and second tests for analogous art. (*Id.*)

The Examiner respectfully disagrees. With respect to Appellant's contention that *Sears* is

not analogous art, it has been held that a prior art reference must either be in the field of

applicant's endeavor or, if not, then be reasonably pertinent to the particular problem with which

the applicant was concerned, in order to be relied upon as a basis for rejection of the claimed

invention. See *In re Oetiker*, 977 F.2d 1443, 24 USPQ2d 1443 (Fed. Cir. 1992).

As is often the case, whether art is analogous depends on how broadly or how narrowly

the field of endeavor or problem facing the inventor is defined. The Examiner finds that the '924

Patent does not explicitly define these. However, in order to expedite prosecution, the Examiner

will hypothesize the "field of endeavor" and "problem faced by inventor." From examination of

the '924 Patent, the Examiner finds that Appellant's field of endeavor is "a simple input device

for optically sensing human and/or object input positions/orientations." ('924 Patent at Title;

Abstract; c.2, ll.8-24; c.3, ll.1-14; c.25, l.40 – c.26, l.51; see Figure 18). In addition, the

Examiner finds that problem being solved by Appellant is providing "embodiments for

improving the sensing of objects for displays and control purposes." (*Id.* at Abstract; c.2, ll.8-24;

c.25, l.40 – c.26, l.51). From this perspective, the Examiner finds that *Sear* is "pertinent to the

problem faced by the inventor."

With respect to the "field of endeavor, "the Examiner finds that *Sears* explicitly discloses "a simple input device for optically sensing human and/or object input positions/orientations." Specifically, the Examiner finds that *Sears* teaches a main system **35** comprising either a personal computer *separate from* the system **35** or an embedded computer *within* the system **35**

5      for the use of capturing image data, digitizing the image data and processing the image data (*i.e.*, conversion into text and analyzing the image data for the presence, orientation and movement of objects in the image data). (*Sears* at Abstract; c.5, ll.2-12, 35-44, 51-61; c.18, ll.9-18 (emphasis on c. 5, ll.35-44; c.7, ll.13-23 for equivalence; for hand gesturing, see c.3, ll.19-21; c.9, l.54 – c.11, l.12; c.5, l.44 – c.6, l.10; c.9, l.54 – c.11, l.12; c.17, ll.55-60)). From this perspective, *Sears*

10     explicitly discloses a simple input camera and computer system to optically sense human and/object input positions and/or orientations. As such, the Examiner concludes that *Sears* is in Appellant's "field of endeavor."

With respect to the "problem being solved by Appellant," the Examiner finds that *Sears* teaches providing an "embodiment for improving the sensing of objects for displays and control

15     purposes." Specifically, *Sears* teaches a main system **35** comprising either a personal computer *separate from* the system **35** or an embedded computer *within* the system **35** for the use of capturing image data, digitizing the image data and processing the image data (*i.e.*, conversion into text and analyzing the image data for the presence, orientation and movement of objects in the image data. (*Sears* at Abstract; c.5, ll.2-12, 35-44, 51-61; c.18, ll.9-18 (emphasis on c. 5,

20     ll.35-44; c.7, ll.13-23 for equivalence; for hand gesturing, see c.3, ll.19-21; c.9, l.54 – c.11, l.12; c.5, l.44 – c.6, l.10; c.9, l.54 – c.11, l.12; c.17, ll.55-60)). *Sears* teaches an embodiment in which all control functionality is performed on the computer of the main system instead of a separate

system. As *Sears* teaches the things which the inventor stated were lacking, the Examiner

concludes that *Sears* is "pertinent to the problem faced by the inventor."

Thus, *Sears* is deemed analogous art.

5       *(2)       Liebermann and Sears Combination*

   a.  *Appellant contends "the Examiner's proposed combination of Liebermann
        and Sears violates Liebermann's principal of operation."*

Since *Liebermann* teaches an off-line and separate processing center for performing the

10   sophisticated translation processing, Appellant contends that placing the processing of the

sophisticated translation processing onto the processor of the portable transmitter/receiver

cellular telephone would violate the principle operation of *Liebermann*. (2022 App Br at 35-38).

Appellant contends that Examiner's rejection in nothing more than impermissible hindsight. (*Id*.

at 35). Appellant additionally argues that the Examiner's position with respect to "teaching

15   away" and "claim differentiation" are improper. (*Id*. at 39-40).

In response to Appellant's argument that the Examiner's conclusion of obviousness is

based upon improper hindsight reasoning, it must be recognized that any judgment on

obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning.  But so

20   long as it takes into account only knowledge which was within the level of ordinary skill at the

time the claimed invention was made, and does not include knowledge gleaned only from the

applicant's disclosure, such a reconstruction is proper. See *In re McLaughlin*, 443 F.2d 1392, 170

USPQ 209 (CCPA 1971).

   With respect to the contention that the "teaching away" and "claim differentiation"

positions of the July 2022 Final Office Action are improper. The Examiner respectfully agrees.

   However, with respect to the contention that the proposed combination of *Liebermann*

and *Sears* changes *Liebermann's* principal of operation, the Examiner respectfully disagrees.

5    In this regard, *Liebermann* is directed to a "telephone for the deaf and method of using

[the] same." (*Liebermann* at Title). From this perspective, the Examiner finds that the principal

operation of *Liebermann* is an electronic communication system for the deaf that provides the

capability of observing and digitizing the facial, body and hand and finger signing motions of a

deaf person and translating them into words and phrases; and translating spoken words and

10    phrases into signing motions for communication purposes. (*Id*. at Abstract). While one of

ordinary skill in the art recognizes that Figures 1 and 2 of *Liebermann* disclose the cellular

telephone of the deaf person providing image capture and initial image processing and a central

processing facility (*i.e.*, the Center) performing further processing (*id*. at c.4, ll.60 – c.5, l.48), the

Examiner finds that this is just a design preference. To support the Examiner's position, the

15    Examiner finds that *Liebermann* discloses a design choice to perform the sophisticated

translation processing at a designated off-line processing center *for economic reasons*, not the

requirement to. (*Liebermann* at c.5, ll.2-13, 35-40; c.6, ll.6-12, 53-63). The Examiner finds that

whether the data is further processed on the cellular phone or at the Center would not render

*Liebermann* inoperable for its intended purpose because the end result of the process would be

20    the same, either the communication of signing motion to spoken words and phrases, or vice-

versa. Moreover, the Examiner finds that *Liebermann* teaches a communicator embodiment that

supports placing the additional processing unto the portable transmitter/receiver cellular

telephone **8**. To support the Examiner's position, *Liebermann* states,

When the phone for the deaf is equipped with a microphone and a speaker instead of, or in addition to a second telephone channel, it may be turned into a **_communicator_**. Obviously, one can opt to have both of these options to double the usefulness of the device. _The communicator enables the deaf person to conduct a "conversation" with any normally hearing person in the close proximity_. The signing motion of the deaf person are processed by the center and is transmitted back to the device as a normal voice transmission which the speaker renders as speech to the normally hearing person. His or her speech in turn, is picked up by the microphone and sent to the center for processing. The result is an animated content on the LCD of the communicator which portrays in sign language the spoken content of the normally hearing person.

(_Liebermann_ at c.7, ll.29-43). From this perspective, one of ordinary skill in the art would

recognize the necessity of practical real-time communications in order to provide the true

"conversation" functionality of the portable transmitter/receiver cellular telephone **8**, thus

placing the additional processing unto the portable transmitter/receiver cellular telephone **8**

would be obvious to one of ordinary skill in the art since "currently, more integration in mobile

computing is desired." (See Nov 2021 Abowd Declaration at 149, and citation to _Gershman et al._

(U.S. Patent No. 6,401,085) ("_Gershman_")). Accordingly, the Examiner concludes that

_Liebermann_, alone, provides evidence to the fact that the proposed combination of _Liebermann_

and _Sears_ would not violate the principle operation of _Liebermann_.

Moreover, the Examiner finds that _Sears_ supports the preference of these embodiments as

well. Similar to _Liebermann_, _Sears_ teaches a design preference to the main system **35** being a

separate off-line system to reduce the cost of the system. (_Sears_ at c.7, ll.13-17). However,

"disclosed examples and preferred embodiments do not constitute a teaching away from a

broader disclosure or nonpreferred embodiments. _In re Susi_, 440 F.2d 442, 169 USPQ 423

(CCPA 1971)." (See MPEP § 2123). While _Sears_ teaches _a design preference to_ the main system

being a separate off-line system, _Sears_ teaches alternatives as well. For example, _Sears_, teaches a

main system **35** comprising either a personal computer _separate from_ the system **35** or an

embedded computer _within_ the system **35** for the use of capturing image data, digitizing the

image data and processing the image data (_i.e._, conversion into text and analyzing the image data

for the presence, orientation and movement of objects in the image data. (_Sears_ at Abstract; c.5,

ll.2-12, 35-44, 51-61; c.18, ll.9-18 (emphasis on c. 5, ll.35-44; c.7, ll.13-23 for equivalence; for

5    hand gesturing, see c.3, ll.19-21; c.9, l.54 – c.11, l.12; c.5, l.44 – c.6, l.10; c.9, l.54 – c.11, l.12;

c.17, ll.55-60). Accordingly, the Examiner concludes that _Sears_ provides further evidence to the

fact that the proposed combination of _Liebermann_ and _Sears_ would not violate the principle

operation of _Liebermann_.


10       **b.   Appellant contends "the Examiner's proposed combination of _Liebermann_
              and _Sears_ lacks both articulated reasoning and rationale underpinning."**

         Appellant contends the Examiner did not provide proper suggestion and motivation for

the combination _Liebermann_ and _Sears_. (2022 App Br at 41-45). Specifically, Appellant

15   contends that _Sears'_ teaching for saving time is not based upon where the processing is, but

instead based upon scanning time. (_Id_. at 42). Appellant further contends that _Liebermann's_

teaching of an off-line and separate processing center for performing the sophisticated translation

processing would dissuade one of ordinary skill in the art from placing the processing of the

sophisticated translation processing onto the processor of the portable transmitter/receiver

20   cellular telephone. (_Id_. at 43-45).


         The Examiner respectfully disagrees. While one of ordinary skill in the art recognizes

that _Sears'_ teaching is based upon the scanning of images, _Sears'_ teaching is still relevant to the

issue at hand. _Sears_ recognizes a delay with respect to processing being caused by the required

25   time necessary to transfer large amounts of information to a computer. (_Sears_ at c.2, ll.6-7).

Thus, while Appellant directs the Examiner to how this delay is solved by another means, *Sears* teaches "[*a*]*dditional objects, advantages and novel features of this invention* shall be set forth in part in the description that follows, and will become apparent to those skilled in the art upon examination of the following specification or *may be learned through the practice of the*

5   *invention.*" (*Id.* at c.3, ll.58-62). From this perspective, the Examiner finds that one of ordinary skill in the art would recognize that performing the translation/conversion into equivalent text; and processing of gesturing, object position/orientation, frame reference and facial expression information locally on the computer of the device itself, in lieu of on a separate stand-alone hardware/software combination, would inherently provide a decrease in the processing time

10  because there is no requirement to transfer any data to a separate system (*i.e.*, bandwidth limitation). To support, the Examiner's position, one of ordinary skill in the art would recognize the "conversation" of a deaf person with another person in *Liebermann*, albeit over the phone lines or in the same proximity, is inherently based upon the quantity of the data being transported to the Center via telephone lines and the bandwidth thereof. When processing any information,

15  albeit locally only, or in the combination of locally and remotely, an operational insufficiency, such as delay introduced by the transfer of information to and from a local device to a remote device, provides slower response times for the device to interact with a user. *Liebermann* acknowledge the real time communication issue stating "there is a substantial problem in effectuating real time transmission of the data as to images because the need for compression

20  even after discarding superfluous information." (*Liebermann* at c.12, ll.7-10; also see c.12, ll.7-10 *et seq*). The Examiner finds that one of ordinary skill in the art would recognize that providing all processing locally on the *Liebermann* device, instead of the combination of locally and remotely, prevents any delay of the conversation between the user and a third-party that is

inherent to the communication bandwidth and protocol issues. Thus, *Sears* teaching of

performing the translation/conversion into equivalent text; and processing of gesturing, object

position/orientation, frame reference and facial expression information locally instead of on a

separate hardware/software combination would provide for faster real-time processing times,

5       thereby, providing a more real-time conversation. Moreover, the Examiner finds that July 2022

Final Office Action provided additional support including the rationale of "simple substitution of

one known element for another to obtain predictable results" (See July 2022 Final Office Action

at 57-59).


10          In response to Appellant's argument that the sophisticated components of *Sears* cannot

exist in *Liebermann*; and the modification of *Liebermann* would require a complete dismantling

of *Liebermann*, the test for obviousness is not whether the features of a secondary reference may

be bodily incorporated into the structure of the primary reference; nor is it that the claimed

invention must be expressly suggested in any one or all of the references. Rather, the test is what

15      the combined teachings of the references would have suggested to those of ordinary skill in the

art. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981).

        From this perspective, *Sears* teaches

        [in] general, any <u>*Intel Pentium or compatible chip*</u> of 150 MHz speed will be
        sufficient, <u>*although a faster speed will provide improved results*</u>. In addition,
20      other non-Intel processors, such as those that are used in Windows CE systems,
        will suffice if they are of a similar performance.

(*Sears* at c.7, ll.1-7). The Examiner finds that this is similar to the PC and processor the '924

Patent discloses. ('924 Patent at c.2, ll.20-23; c.3, ll.32-34, 400 Mhz Pentium II). The Examiner

25      concludes this must be the CPU designated in the instant invention of the '924 Patent of Figure

18 of the handheld device. The Examiner finds that one of ordinary skill in the art would

recognize the process of placing a Pentium processor or compatible chip, performing the

required claim requirements, in the *Liebermann* device, at the time of invention, would simply be

engineering expediency, as is evidenced by *Sears*. "While the proposed modification may have

required more expensive hardware, such as skilled person would have appreciated that customers

5    would desire highly-integrated smart phone devices that could perform additional functions, *e.g.*,

local gesture recognition". (See Nov 2021 Abowd Declaration at 149, and citation to *Gershman*,

"currently, more integration in mobile computing is desired").


    **c.  *Appellant contends "combination of Liebermann and Sears does not render***
10       ***claim 7 obvious."***

        Appellant contends "as discussed above *Liebermann* does not teach or suggest each and

every limitation of claim 1." (2022 App Br at 46). Appellant contends "as discussed above no

motivation exists to combine *Liebermann*  and *Sears*, and thus *Liebermann* and *Sears* do not

15   render dependent claim 6 obvious." (*Id*.) Appellant further contends that since *Sears* does not

teach processing facial expression, the combination of *Liebermann* and *Sears* is not obvious.


        With respect to the "as discussed above…" contentions, the Examiner respectfully

disagrees. The Examiner finds these contention the same as previously set forth by Appellant.

20   (2022 APP Br at §§ IV(B), IV(C)(2), IV(D)(2)). Thus, the Examiner finds this argument

addressed above. (See §§ (2).B.(1)-(2); (2).C.(2); (2).D.(2).a-b, *supra*).


        In response to Appellant's arguments against the references individually (*i.e.*, *Sears* does

not teach facial expression analysis), one cannot show nonobviousness by attacking references

25   individually where the rejections are based on combinations of references. See *In re Keller*, 642

F.2d 413, 208 USPQ 871 (CCPA 1981); *In re Merck & Co.,* 800 F.2d 1091, 231 USPQ 375

(Fed. Cir. 1986).

From this perspective, the Examiner finds that *Liebermann* discloses the preference of

utilizing hardware/software modules at a separate central processing facility (*i.e.,* the Center) to

5    perform the translation/conversion into equivalent text content; and processing of gesturing,

object position/orientation, frame reference *and facial expression information.* (*Liebermann* at

c.4, l.60 – c.5, l.13; c.6, ll.6-12, 42-52; c.7, l.44 – c.12, l.6; emphasis added). Specifically, the

Examiner finds that *Liebermann* discloses tracking the position/orientation motion of objects,

finger/hand motions, body motions and facial expression motions utilizing the hardware/software

10   modules. (*Id.*)

The Examiner finds that *Sears,* for example, teaches a main system **35** comprising either

a personal computer *separate from* the system **35** or an embedded computer *within* the system **35**

for the use of capturing image data, digitizing the image data and processing the image data (*i.e.,*

conversion into text and analyzing the image data for the presence, orientation and movement of

15   objects in the image data. (*Sears* at Abstract; c.5, ll.2-12, 35-44, 51-61; c.18, ll.9-18 (emphasis

on c. 5, ll.35-44; c.7, ll.13-23 for equivalence; for hand gesturing, see c.3, ll.19-21; c.9, l.54 –

c.11, l.12; c.5, l.44 – c.6, l.10; c.9, l.54 – c.11, l.12; c.17, ll.55-60)).

The Examiner finds that it would have been obvious to one of ordinary skill in the art at

the time of the invention to incorporate the hardware/software combination on the computer of

20   the device performing the translation/conversion into equivalent text; and processing of

gesturing, object position/orientation, frame reference and facial expression information locally

instead of on a separate hardware/software combination as described in *Sears* in the computer

within the handheld device of *Liebermann.*

### d. Appellant contends "combination of Liebermann and Sears does not render claim[s] 8/10 obvious."

5      Appellant contends "as discussed above *Liebermann* does not teach or suggest each and every limitation of claim 1." (2022 App Br at 47/49). Appellant contends "as discussed above no motivation exists to combine *Liebermann* and *Sears*, and thus *Liebermann* and *Sears* do not render dependent claim 6 obvious." (*Id*. at 48/49). Appellant further contends that the "gloves" in *Liebermann* do not equate to the Object as claimed. (*Id*. at 48).

10

With respect to the "as discussed above…" contentions, the Examiner respectfully disagrees. The Examiner finds these contention the same as previously set forth by Appellant. (2022 APP Br at §§ IV(B), IV(C)(2), IV(D)(2)). Thus, the Examiner finds this argument addressed above. (See §§ (2).B.(1)-(2); (2).C.(2); (2).D.(2).a-b, *supra*).

15

In response to Appellant's arguments against the references individually, one cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); *In re Merck & Co.,* 800 F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986).

20      With respect to argument that the "gloves" do not constitute an "object," the Examiner respectfully disagrees. The Examiner finds that the '924 Patent discloses objects as being something in one's hand, an object ahead of a user, or another person. ('924 Patent at c.25, ll.58-62; c.26, ll.1-5, 25-27). *Liebermann* discloses,

25      [t]he illustrated embodiments all utilize a single video cameras. It may be desirable *to utilize more than one camera* to allow the signing person "free" movement in his or her environment to track down spatial positions in that

environment.
     In such a case, the installation should follow the following criteria:
          1. ***Each camera is covering a separate angle***.
          2. Each camera operates independently of the other(s).
5        3. ***Angle overlap may or may not be permitted*** *according to the pre-*
*signing calibration*…
          5… ***A defined figure*** with signing motion…(***for persons***). The same
     technique is useful in ***defining any objects*** or, alive stationary or moving entities,
     such as animals

10 (*Liebermann* at c.13, ll.4-15). From this perspective, the Examiner finds that *Liebermann*

discloses objects other than person being viewable. In addition, *Liebermann* discloses utilizing

gloves on the hands of users to enhance the ability of the system to recognize important details of

the hand shapes during the gesturing actions. (*Id*. at c.12, ll.40-52; see Figures 13A, 13b, 14A,

15  14B). Since the objects are not the user proper, the Examiner finds that the "gloves" of

*Liebermann* sufficiently satisfy the objects and, thus, the *Liebermann* and *Sears* computer

combination sufficiently satisfies the computer (*i.e.*, CPU/processor/hardware with software

thereon utilizing image processing techniques to determine gestures, facial expression, position

and orientation of features and subsequent tracking thereof)[7] "determin[ing] at least one of the

20  position and the orientation of the object based on the second camera output."


### a.  *Appellant contends "combination of Liebermann and Sears does not render claims 9 and 12 obvious."*

25       Appellant contends "as discussed above *Liebermann* does not teach or suggest each and

every limitation of claim 1." (2022 App Br at 50). Appellant contends "as discussed above no

motivation exists to combine *Liebermann*  and *Sears*, and thus *Liebermann* and *Sears* do not

render dependent claim 6 obvious." (*Id*.)


---

[7] See July 2022 Final Office Action at §§ VI.B.(3).b, VII.A.(2)).

With respect to the "as discussed above…" contentions, the Examiner respectfully

disagrees. The Examiner finds these contention the same as previously set forth by Appellant.

(2022 APP Br at §§ IV(B), IV(C)(2), IV(D)(2)). Thus, the Examiner finds this argument

5    addressed above. (See §§ (2).B.(1)-(2); (2).C.(2); (2).D.(2).a-b, *supra*).


**E.     *Obvious Rejections of Claim 11***

Appellant contends that "[a]s discussed above, *Liebermann* does not teach or suggest

each and every limitation of independent claim 1. *Tryding* does not cure the deficiencies of

10    *Liebermann* regarding claim 1 and the Action does not so assert. See Action, pp. 32-34.

Accordingly, the combination of *Liebermann* and *Tryding* does not render claim 1 obvious.

Claim 11 depends from and adds limitations to claim 1. Accordingly, the combination of

*Liebermann* and *Tryding* does not render claim 11 obvious for at least the same reasons, and

withdrawal of this rejection is respectfully requested." (2022 App Br at 50-51).

15

The Examiner respectfully disagrees. The Examiner finds this contention the same as

previously set forth by Appellant. (*Id*. at §§ IV(B), IV(C)(2), IV(D)(2)). Thus, the Examiner

finds this argument addressed above. (See §§ (2).B.(1)-(2); (2).C.(2); (2).D.(2).a-b, *supra*).

### F.    Obvious Rejections of Claim 14

Appellant contends that "[a]s discussed above, *Liebermann* does not teach or suggest each and every limitation of independent claim 1. *Kimball*[8] does not cure the deficiencies of *Liebermann* regarding claim 1 and the Action does not so assert. See Action, pp. 35-36.

5      Accordingly, the combination of *Liebermann* and *Kimball* does not render claim 1 obvious. Claim 14 depends from and adds limitations to claim 1. Accordingly, the combination of *Liebermann* and *Kimball* does not render claim 14 obvious for at least the same reasons, and withdrawal of this rejection is respectfully requested." (2002 App Br at 51-52).

10      The Examiner respectfully disagrees. The Examiner finds this contention the same as previously set forth by Appellant. (*Id.* at §§ IV(B), IV(C)(2), IV(D)(2)). Thus, the Examiner finds this argument addressed above. (See §§ (2).B.(1)-(2); (2).C.(2); (2).D.(2).a-b, *supra*).

### G.    Jurisdiction

15      Appellant contends that the Office has no jurisdiction over expired patents. (2022 App Br at 52-53).

The Examiner respectfully disagrees. Appellant argues the Office has no jurisdiction over expired patents. The Office's position is that the Office has jurisdiction so long as the patent

20      remains enforceable. 37 CFR 1.510(a); MPEP 2211. Indeed, the statute permits reexamination "at any time." 35 U.S.C. 302. The '924 Patent remains enforceable as it is involved in pending

---

[8] The Examiner finds the rejection of claim 14 was over *Liebermann* and *Gershman*, not *Liebermann* and *Kimball*

litigation. It is not clear why this is inconsistent with *Oil States*, as the patent owner retains some

manner of rights even after the patent is expired, the right to sue and gain enforcement for

damages against previous infringement; reexamination is no longer possible once all rights have

been extinguished, *i.e.* when the patent is no longer enforceable.

5          See also the discussions in the related IPR Proceedings, in which the patent owner

similarly argued that the Office has no jurisdiction over expired patents in IPR Proceedings, and

the Board disagreed. (See  Final Written Decision mailed on 02 December 2022, '923 IPR

Proceeding [9], '93 IPR Proceeding [10], IPR2022-00361[11] at 16-18 (2022 Board Dec). The Board's

reasoning seems to be similarly relevant to reexaminations.

10

### H.    *Substantial New Question of Patentability*

          Appellant contends that no Substantial New Questions ("SNQs") of patentability exist

and thus the reexamination order should be vacated. (2022 App Br at 54-55). Specifically,

Appellant contends that *Liebermann* does not discloses a handheld device with two camera

15    having non-overlapping fields of view.


          The Examiner respectfully disagrees. The Examiner finds that *Liebermann* teaches a

handheld device with two camera having non-overlapping fields of view for the reasons set forth

above. Additionally, this does not address any of the other findings presented in the Order as

20    reasons for granting the Request.

---

[9] *Apple, Inc.* vs *Gesture Technology Partners LLC.*  IPR2021-00923 (" '923 IPR Proceeding)
[10] *LG Electronics, Inc. et al.* vs *Gesture Technology Partners LLC.*  IPR2021-00093 (" '93 IPR Proceeding)
[11] *Google LLC.* vs *Gesture Technology Partners LLC.*  IPR2022-00361 (" '361 IPR Proceeding)

*Ex parte Reexamination – Examiner's Answer*

*I.*     *Final Written Decisions*

     The Examiner points out that the Board issued the 2022 Board Dec, in the joined

'923/'93/'361 Proceedings, holding no claims of the '924 Patent unpatentable. None of the art

from the IPR Proceedings is used in the instant '14902 Proceeding.

5

Application/Control Number: 90/014,902                                     Page 43
Art Unit: 3992

For the above reasons, it is believed that the rejections should be sustained.

Respectfully submitted,

/Stephen J. Ralis/
Primary Examiner, Art Unit 3992

5

Conferees:

/JAMES A MENEFEE/
10   Reexamination Specialist, Art Unit 3992

/HETUL B PATEL/
Supervisory Patent Reexamination Specialist, Art Unit 3992

15

**Requirement to pay appeal forwarding fee.**  In order to avoid dismissal of the instant appeal in

any application or ex parte reexamination proceeding, 37 CFR 41.45 requires payment of an

20   appeal forwarding fee within the time permitted by 37 CFR 41.45(a), unless appellant had timely

paid the fee for filing a brief required by 37 CFR 41.20(b) in effect on March 18, 2013.

Reexam of Patent No. 8,194,924
Control No. 90/014,902

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

*In re* Reexam of: U.S. Patent No. 8,194,924 (Control No. 90/014,902)

Filed: November 11, 2021

Appellant: Gesture Technology Partners, LLC

Art Group: 3992

Title: CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING, OR

OTHER DEVICES

**REPLY BRIEF UNDER 37 C.F.R. § 41.41**

Mail Stop *Ex Parte* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Filed on behalf of Patent Owner by:

Todd E. Landis (Reg. No. 44,200)
2633 McKinney Ave., Suite 130
Dallas, TX 75204

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite A #453
Philadelphia, PA 19103

Mark J.E. McCarthy (Reg. No. 69,575)
601 Congress Avenue, Suite 600
Austin, TX 78701

**WILLIAMS SIMONS & LANDIS PLLC**

Reexam of Patent No. 8,194,924
Control No. 90/014,902

**TABLE OF CONTENTS**

I.    ARGUMENTS ............................................................................................1

      A.    Claim Construction.............................................................................1

            1.    The preamble of independent claim 1.......................................1

            2.    "wherein the first and second cameras include non-
                  overlapping fields of view"..........................................................4

            3.    "oriented to view a user" and "oriented to view an object
                  other than the user" ...................................................................7

            4.    "mobile phone" ..........................................................................7

      B.    *Liebermann* does not anticipate independent claim 1...........................9

            1.    *Liebermann* does not disclose the preamble of independent
                  claim 1 .......................................................................................9

            2.    *Liebermann* does not disclose claim element 1[e]...................12

      C.    *Liebermann* does not anticipate dependent claim 2. ...........................15

      D.    *Liebermann* does not render claims 1-5 and 13 obvious. ...................17

            1.    *Liebermann* is non-analogous art and cannot be cited in any
                  obviousness rejection of claims 1-5 and 13 .............................17

      E.    *Liebermann* and *Sears* do not render claims 6-10 and 12
            obvious. ...........................................................................................21

            1.    *Liebermann* is non-analogous art and cannot be cited in any
                  obviousness rejection of claims 6-10 and 12 ...........................21

i

2.  *Sears* is non-analogous art and cannot be cited in any obviousness rejection of claims 6-10 and 12. ...........................21

3.  *Liebermann* and *Sears* do not render claim 6 obvious. ............26

4.  *Liebermann* and *Sears* do not render claims 8 and 10 obvious. .......................................................................................31

II.  CONCLUSION ............................................................................32

ii

# TABLE OF AUTHORITIES

## Cases

*Airbus S.A.S. v. Firepass Corp.*,
   941 F.3d 1374 (Fed. Cir. 2019) ................................................. 18, 22

*Donner Technology, LLC v. Pro Stage Gear, LLC*,
   979 F.3d 1353 (Fed. Cir. 2020) ................................................. 19, 24

*In re Buchner*,
   929 F.2d 660 (Fed. Cir. 1991) ..........................................................8

*In re Fought*,
   941 F.3d 1175 (Fed. Cir. 2019) ........................................................1

*In re Lee*,
   277 F.3d 1338 (Fed. Cir. 2002) ......................................................31

*In re Susi*,
   440 F.2d 442 (CCPA 1971) ............................................................10

*In re Van Geuns*,
   988 F.2d 1181 (Fed. Cir. 1993) ......................................................10

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*,
   821 F.3d 1359 (Fed. Cir. 2016) ......................................................28

*Merck & Co. v. Biocraft Laboratories*,
   874 F.2d 804 (Fed. Cir. 1989) ........................................................10

*Rowe v. Dror*,
   112 F.3d 473 (Fed. Cir. 1997) ..........................................................2

*Spectra-Physics, Inc. v. Coherent, Inc.*,
   827 F.2d 1524 (Fed. Cir. 1987) ........................................................8

*Storage Tech. Corp. v. Cisco Sys.*,
   329 F.3d 823 (Fed. Cir. 2003) ........................................................10

*Superguide Corp. v. DirecTV Enterprises, Inc.*,
   358 F.3d 870 (Fed. Cir. 2004) ........................................................10

*Verdegaal Bros. v. Union Oil Co. of California*,
    814 F.2d 628 (Fed. Cir. 1987) ...............................................................................14

### Other Authorities

*Unified Patents, LLC, v. Gesture Technology Partners, LLC*,
    IPR2021-00917, Paper 31 (P.T.A.B. Nov. 21, 2022) ...........................................4

iv

## I.    ARGUMENTS

In the *ex parte* reexamination of U.S. Patent No. 8,194,924 ("the '924 Patent"), Gesture Technology Partners, LLC ("Patent Owner") presents the following arguments in reply to the Examiner's Answer dated March 15, 2023 ("Answer").

### A.    Claim Construction

#### 1.    The preamble of independent claim 1.

The preamble of independent claim 1 recites "[a] handheld device comprising." '924 Patent, claim 1. In the Answer, the Examiner maintains that the preamble is not limiting. *See* Answer, pp. 2-5. Patent Owner disagrees.

It is beyond dispute that the body of claim 1 repeatedly recites "<u>the</u> handheld device." '924 Patent, claim 1 (emphasis added). Both Patent Owner and the Examiner agree that the antecedent basis for "the handheld device" in the body of claim 1 is "[a] handheld device" in the preamble of claim 1. *See* Answer, pp. 4-5 (claim 1 "recites 'the handheld device' to satisfy the antecedent basis requirement"). That alone should resolve the disagreement between Patent Owner and the Examiner: "We have repeatedly held a preamble limiting when it serves as antecedent basis for a term appearing in the body of a claim." *In re Fought*, 941 F.3d 1175, 1178 (Fed. Cir. 2019). Accordingly, the preamble of claim 1 is limiting.

1

Notwithstanding that result, the Examiner continues to assert that the preamble of claim 1 "does not recite essential structure and is nothing more than a functional use, thus, not further limiting." Answer, p. 5. The Examiner is misguided.

"The determination of whether preamble recitations are structural limitations or mere statements of purpose or use can be resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and <u>intended to encompass by the claim</u>. The inquiry involves examination of the entire patent record <u>to determine what invention the patentee intended to define and protect</u>." *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997) (cleaned up) (emphasis added).

The '924 Patent discloses multiple embodiments of the invention. Some disclosed embodiments take the form of non-handheld devices (e.g., automobiles or robotic arms). *See, e.g.,* '924 Patent, Fig. 10A, Fig. 17B. Other disclosed embodiments take the form of handheld devices, such as cellphones. *See id*. at 11:65-12:12, 25:40-26:27, Fig. 8A, Fig. 8B, Fig. 18. If the patentee had intended to protect all devices, the patentee could have easily drafted the preamble of claim 1 to recite "a device comprising" or "an apparatus comprising." Instead, patentee decided to only protect devices that are limited in size/weight and designed for operation by a user while being held in at least one of the user's hands—i.e., handheld devices. This is reinforced by dependent claim 2, which recites "wherein

2

the handheld device comprises a mobile phone." '924 Patent, claim 2. Accordingly,

the preamble of claim 1 does <u>not</u> merely state the purpose or intended use of the

invention, but rather identifies the specific type of device that the patentee intended

to be protected/encompassed by the claim. Thus, the preamble recitation is a

structural limitation that should be given patentable weight.

Further, the '924 Patent is a continuation of U.S. Patent No. 7,933,431 ("the

'431 Patent"). *See* '924 Patent, cover page. Independent claim 7 of the '431 Patent

recites

> <u>Handheld computer apparatus</u> comprising:
>     a housing;
>     a camera means associated with said housing for obtaining an
> image using reflected light of at least one object positioned by a user
> operating said object;
>     computer means within said housing for analyzing said image to
> determine information concerning a position or movement of said
> object; and
>     means for controlling a function of <u>said apparatus</u> using said
> information.

'431 Patent, claim 7 (emphasis added). The preamble of claim 7 of the '431 Patent

(i.e., "[h]andheld computer apparatus comprising") is very similar to the preamble

of claim 1 of the '924 Patent (i.e., "[a] handheld device comprising"). Further, like

the preamble of claim 1 of the '924 Patent, the preamble of claim 7 of the '431 Patent

serves as antecedent basis for a term (i.e., "said apparatus") in the body of claim 7.

In its Final Written Decision regarding the '431 Patent, the Board found that the

3

preamble of claim 7 (i.e., "[h]andheld computer apparatus comprising") was limiting because the "last clause of claim 7 refers back to the preamble and is understood with reference thereto" and because the preamble "is 'necessary to give life, meaning, and vitality' to claim 7." *Unified Patents, LLC, v. Gesture Technology Partners, LLC*, IPR2021-00917, Paper 31 at pp. 9-10 (P.T.A.B. Nov. 21, 2022). The same reasoning holds true for the preamble of claim 1 of the '924 Patent, which again, is a continuation of the '431 Patent. Thus, the preamble of claim 1 of the '924 Patent is limiting.

In view of the above, the preamble of independent claim 1 of the '924 Patent is limiting and should be given patentable weight.

### 2. "wherein the first and second cameras include non-overlapping fields of view"

Claim element 1[d] recites, in part, "a first camera." '924 Patent, claim 1. Claim element 1[e] recites, in part, "a second camera . . . wherein the first and second cameras include non-overlapping fields of view." *Id*. (emphasis added). As discussed in the Appeal Brief, this means the field of view of the first camera and the field of view of the second camera have zero overlap. *See* Appeal Brief dated November 22, 2022 ("Appeal Brief"), pp. 7-11.

In the Answer, the Examiner "finds that the first and second camera of the claim 1 are not limited to including only 'non-overlapping field of views,' but also

4

including 'partially overlapping views' and 'overlapping views.'"   Answer, p. 5

(emphasis added).  The Examiner's position seems to be based on the "inclusive or

open-ended" nature of the term "include."  *Id*.  The Examiner is misguided.

At any given time, two fields of view can have only one of the three

configurations—"non-overlapping,"   "partially   overlapping,"   or   "[fully]

overlapping."   In other words, these three configurations are mutually exclusive.

Independent claim 1 expressly captures the scenario where the two fields of view

are in the "non-overlapping" configuration.   Even though independent claim 1

recites "wherein the first and second cameras include non-overlapping fields of

view," the use of "include" cannot override the reality that the three configurations

(i.e., "non-overlapping," "partially overlapping," and "[fully] overlapping") are

mutually exclusive, and thus cannot exist at the same time.

In the Answer, the Examiner "finds that the first and second cameras of claim

1 are required to be rotated about their respective axes and capable of being

configured into many different field of views [*sic*], which include overlapping,

partially overlapping, and non-overlapping fields of view."  Answer, p. 6 (emphasis

added).   Again, the Examiner is misguided.   Independent claim 1 has no such

requirement(s).   The Examiner is improperly reading limitations into claim 1.

Remarkably, in the very next paragraph, the Examiner "finds that it is improper to

5

import limitations from the specification into the claims." Answer, p. 7. Yet this is exactly what the Examiner is attempting to do here.

According to the Examiner,

the '924 Patent discloses two embodiments of the second camera of the handheld device with the camera being "orient[ed] to view one thing rather than another thing while still allowing for some or all of both to be within the field of view" <u>and</u> with non-overlapping views[:] . . . [Embodiment] 1) with the first camera having a field of view and orientation of the <u>user</u>; and the second camera having a field of view and orientation of the <u>user</u> and the one or more objects in the users' hand . . . the Examiner concludes and maintains that . . . [claim 1] also encompasses the first embodiment (i.e., "1") as indicated by the Examiner.

Answer, pp. 8-9 (emphasis added). The Examiner is misguided. Independent claim 1 does not cover Examiner-identified "Embodiment 1." Specifically, if both cameras can view the user, then the two cameras have partially overlapping fields of view (i.e., the two cameras do <u>not</u> have non-overlapping fields of view). This contradicts what claim 1 requires.

For these reasons, Patent Owner maintains that "wherein the first and second cameras include non-overlapping fields of view," as recited by independent claim 1, should be interpreted as the field of view of the first camera and the field of view of the second camera have <u>zero</u> overlap.

6

3.    **"oriented to view a user" and "oriented to view an object other than the user"**

Claim element 1[d] recites, in part, "a first camera oriented to <u>view a user</u>." '924 Patent, claim 1 (emphasis added).  Claim element 1[e] recites "a second camera oriented to <u>view an object other than the user</u> . . . wherein the first and second cameras include <u>non-overlapping</u> fields of view."  *Id*. (emphasis added). The Examiner argues "the claim requirement of 'to view an object other than the user of the device' does not preclude the user being in the field of view of the second camera." Answer, p. 9.  Patent Owner disagrees.

If the first and second cameras have non-overlapping fields of view (i.e., zero overlap), as claim 1 requires, and if the user is within the field of view of the first camera, as claim 1 also requires, then the user <u>cannot</u> be in the field of view of the second camera.  As discussed in the Appeal Brief, this is also consistent with the meaning of "other than."  *See* Appeal Brief, p. 11.  Thus, "the second camera oriented to view an object other than the user" <u>cannot</u> mean the second camera can see the object as well as the user.

4.    **"mobile phone"**

Claim 2 recites "wherein the handheld device comprises a mobile phone." '924 Patent, claim 2.  The Examiner disagrees that the claimed "mobile phone" necessarily includes (*i*) being capable of answering a voice telephone call from another individual operating another phone device, and (*ii*) having an audio output

7

(e.g., built-in speaker, earphone jack, etc.) so that the user of the claimed "mobile phone" can listen to the other individual (speaking into the other phone device) during the telephone call. *See* Answer, p. 11. According to the Examiner, "[t]he '924 Patent does not provide any further delineation of the structural requirements of the cell phone device (i.e., built-in speaker, earphone jack, etc.), only to the handheld device being a cell phone." *Id*. Although not entirely clear, the Examiner seems to be arguing that because the '924 Patent does not expressly disclose features/capabilities (*i*) and (*ii*), the claimed "mobile phone" would not necessarily have features/capabilities (*i*) and (*ii*). *See id*.

But there is no need for the '924 Patent to expressly disclose capabilities/features (*i*) and (*ii*). Both (*i*) and (*ii*) are fundamental and well-known features/capabilities of an ordinary "mobile phone," and a "patent need not teach, and preferably omits, what is well known in the art." *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1534 (Fed. Cir. 1987); *see also In re Buchner*, 929 F.2d 660, 661 (Fed. Cir. 1991) ("The specification need not disclose what is well known in the art."). The Examiner provides zero evidence that capabilities/features (*i*) and (*ii*) were not well-known in the art on the effective filing date of the '924 Patent (i.e., July 1999). Accordingly, Patent Owner maintains that the claimed "mobile phone" necessarily includes capabilities/features (*i*) and (*ii*).

8

The Examiner also argues that "a mobile phone, given its ordinary and customary meaning as understood by [a POSITA], would be a cell phone structure itself." Answer, p. 11. It is unclear how a "cell phone structure" differs from a "cell phone." To the extent the Examiner is arguing that the claimed "mobile phone" should be construed as "a cell phone structure," the Examiner still provides no evidence that a "cell phone structure," whatever that may be, does not include capabilities/features (*i*) and (*ii*).

Accordingly, although the '924 Patent might not expressly disclose features/capabilities (*i*) and (*ii*), Patent Owner asserts features/capabilities (*i*) and (*ii*) were well-known in the art on the effective filing date of the '924 Patent, and that the claimed "mobile phone" necessarily includes features/capabilities (*i*) and (*ii*).

### B. *Liebermann* does not anticipate independent claim 1.

#### 1. *Liebermann* does not disclose the preamble of independent claim 1.

The preamble of independent claim 1 recites "[a] handheld device comprising." '924 Patent, claim 1. As discussed above, the preamble of independent claim 1 is limiting.

The Examiner argues that "the features upon which applicant relies (i.e., device must be operated when being handheld) are not recited in the rejected claim(s). Although the claims are interpreted in light of the specification, limitations from the specification are not read into the claims . . . it is improper to import

9

limitations from the specification into the claims." Answer, pp. 13-14 (citing *In re Van Geuns*, 988 F.2d 1181 (Fed. Cir. 1993); *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870 (Fed. Cir. 2004)). The Examiner is misguided.

Patent Owner is not attempting to read limitations from the specification into the claims. Instead, Patent Owner is relying on the specification of the '924 Patent to interpret the term "handheld device," which is expressly recited in both the preamble and body of independent claim 1. As explained by the Federal Circuit, "interpreting what is meant by a word in a claim is not to be confused with adding an extraneous limitation," only the later of which "is improper." *Storage Tech. Corp. v. Cisco Sys.*, 329 F.3d 823, 831 (Fed. Cir. 2003) (cleaned up). Accordingly, *In re Van Geuns* and *Superguide Corp.* are inapposite to the present situation.

The Examiner's reliance on *In re Susi* and *Merck & Co. v. Biocraft Laboratories* for claim construction is even more misplaced. *See* Answer, p. 14 (citing *In re Susi*, 440 F.2d 442 (CCPA 1971); *Merck & Co. v. Biocraft Laboratories*, 874 F.2d 804 (Fed. Cir. 1989)). *In re Susi* and *Merck & Co.* clarify that both the preferred embodiments <u>and</u> the nonpreferred/alternative embodiments disclosed in a reference constitute prior art. *See In re Susi*, 440 F.2d at 446 (explaining that disclosed examples and preferred embodiments do not constitute a teaching away from nonpreferred embodiment); *see also Merck & Co.*, 874 F.2d at 807 ("the fact that a specific [embodiment] is taught to be preferred is not controlling, since all

10

disclosures of the prior art, including unpreferred embodiments, must be considered"). But *In re Susi* and *Merck & Co.* are inapposite to the present situation of interpreting an expressly recited claim term (i.e., "handheld device").

In the Answer, the Examiner argued a POSITA "would recognize the portable transmitter/receiver telephone 8 of *Liebermann* as being a handheld device. To support the Examiner's position, in examination of Figures 8A and 18 of the '924 Patent and Figure 6 of *Liebermann* [], the Examiner finds that both the cell phone 800 and handheld computer 1901 versions of the '924 Patent have a flat surface on the bottom thereof just like *Liebermann*." Answer, pp. 12-13 (emphasis added). Although not entirely clear, the Examiner seems to be arguing that having a "flat surface on the bottom" is a necessary and sufficient condition to be a "handheld device." This is simply not true. Laser printers have a "flat surface on the bottom" but a POSITA would not consider a laser printer to be a "handheld device." "[C]ell phone 800 and handheld computer 1901" in the '924 Patent are handheld devices because they are designed for operation by a user while being held in at least one of the user's hands. In fact, Figure 8A even shows "cell phone 800" being held in the user's hand during operation. '924 Patent, Fig. 8A. *Liebermann's* "portable transmitter/receiver" is not designed to be operated while in the hand of a user and thus is not a "handheld device," as independent claim 1 requires.

11

According to the Examiner, "*Liebermann* discloses the transmitter/receiver 8 being 'portable' and 'transported.'" Answer, p. 13. But as discussed in the Appeal Brief, "portable" or "transported" do not equate to "handheld." *See* Appeal Brief, p. 16.

According to the Examiner, "*Liebermann* explicitly discloses Figure 6 as being the 'cellular telephone version.'" Answer, p.13. Again, as discussed in the Appeal Brief, while an ordinary cellphone may be recognized as "handheld" when operated by a hearing user, *Liebermann's* "portable transmitter/receiver" is not an ordinary cellphone. *See* Appeal Brief, pp. 18-19.

For these reasons, *Liebermann* fails to disclose the preamble of claim 1, and thus fails to anticipate claim 1.

## 2. *Liebermann* does not disclose claim element 1[e].

Claim element 1[e] recites "a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view," whereas claim element 1[d] recites "a first camera oriented to view a user of the handheld device." Both the "first camera" and the "second camera" are components of the same "handheld device." *Compare* preamble of claim 1 *with* claim element 1[d] and claim element 1[e]. To meet the requirements of claim element 1[e], the Examiner (*a*) relies on *Liebermann*, 13:5-13 (*see* Answer, p. 17), and (*b*) composes several "image

12

capturing configuration scenarios" (*see* Answer, p. 20).  But both (*a*) and (*b*) only confirm *Liebermann* is <u>not</u> disclosing a "handheld device" with two cameras, contrary to the requirements of claim element 1[e].

Regarding (*a*), *Liebermann* discloses it "may be desirable to utilize more than one camera to allow the <u>signing person 'free' movement in his or her environment</u> to track down spatial positions in that environment." *Liebermann,* 13:5-8 (emphasis added).  This means *Liebermann's* "portable transmitter/receiver" (with multiple cameras) is stationary, while the "signing person" can move around (e.g., walk around) his or her environment and continue to sign, and still have the signing captured by one or more of the cameras.  But this also means *Liebermann's* "portable transmitter/receiver" (with multiple cameras) is <u>not</u> being held by the "signing person" during operation (i.e., it is not a "handheld device").  In fact, if the "signing person" has been granted "'free' movement in his or her environment," *Liebermann's* "portable transmitter/receiver" with multiple cameras is likely beyond the physical reach of the "signing person" who is moving around.  At bottom, all of this confirms that *Liebermann's* "portable transmitter/receiver" with multiple cameras is <u>not</u> operated while held in one or more hands of the user, and thus *Liebermann's* "portable transmitter/receiver" is <u>not</u> a "handheld device" with two cameras, as claim element 1[e] requires.

13

Regarding (*b*), the Examiner argued that *Liebermann* discloses multiple "image capturing configuration scenarios" which include "orienting the second camera towards the gloves/hands of the user." Answer, p. 20 (emphasis added). As a threshold matter, even if these "image capturing configuration scenarios" satisfy the requirements of claim element 1[e]—and Patent Owner does <u>not</u> concede these "image capturing configuration scenarios" satisfy the requirements of claim element 1[e]—these "image capturing configuration scenarios" are a creation of the Examiner and <u>not</u> something expressly or inherently disclosed by *Liebermann.* This falls drastically short of the requirements for anticipation. *See Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987) ("A claim is anticipated only if each and every element as set forth in the claim is found, either <u>expressly or inherently described,</u> in a single prior art reference.") (emphasis added).

Further, in these "image capturing configuration scenarios," the Examiner concedes that the "second camera" of *Liebermann's* "portable transmitter/receiver" is oriented to view <u>both</u> "hand<u>s</u> of the user" during operation. Answer, p. 20. Again, if *Liebermann's* "portable transmitter/receiver" with multiple cameras is viewing or recording <u>both</u> "hands of the user," then *Liebermann's* "portable transmitter/receiver" is <u>not</u> being held in the user's hand(s) during operation. Thus, *Liebermann's* "portable transmitter/receiver" is <u>not</u> a "handheld device" with two cameras, as claim element 1[e] requires.

14

Further still, the Examiner mapped the "gloves" in *Liebermann* to the claimed "object." Answer, pp. 19-20. Patent Owner asserts the "gloves" in *Liebermann* are being <u>worn by the user</u> of the system. *See Liebermann*, Figs. 13A and 13B. Patent Owner maintains these "gloves" are not an object <u>other than the user</u>, as claim element 1[e] requires. In the Answer, the Examiner "finds that the '924 Patent discloses objects as being <u>something in one's hand</u>, an object ahead of a user, or another person." Answer, p. 37 (emphasis added). But "gloves" are not "something in one's hand." The user wears the "gloves" and the "gloves" encase the user's hand.

For these reasons, *Liebermann* fails to disclose claim element 1[e], and thus *Liebermann* fails to anticipate independent claim 1.

## C.    *Liebermann* does not anticipate dependent claim 2.

Claim 2 recites "wherein the handheld device comprises a mobile phone." As discussed in the Appeal Brief, *Liebermann* fails to disclose a "mobile phone" that (*i*) is capable of answering a voice telephone call from another individual operating another phone device, <u>and</u> (*ii*) has an audio output (e.g., built-in speaker, earphone jack, etc.) so that the user of the claimed "mobile phone" can listen to the other individual (speaking into the other phone device) during the telephone call, as claim 2 requires. *See* Appeal Brief, pp. 24-26.

In the Answer, the Examiner argues that "*Liebermann* discloses the line of deaf person's station arranges for transmission of voice and data on the dedicated

15

line." Answer, p. 22 (citing *Liebermann*, 7:3-9 and 18-18). But this does <u>not</u> mean

that *Liebermann's* "portable transmitter/receiver" (the Examiner-identified "mobile

phone") has an audio output (e.g., built-in speaker, earphone jack, etc.), as discussed

above. In fact, *Liebermann* discloses

> The normally hearing person who calls a deaf person dials the deaf
> person's phone number. However, at the deaf person's station, his or
> her call is connected to the center on a single line which is the deaf
> person's <u>designated line to the center</u>. The deaf person's device
> arranges for switching and enables both the caller and his or her station
> to be on line as a "party call". The <u>deaf person's station also arranges</u>
> <u>for the simultaneous transmission of both voice and data on the</u>
> <u>dedicated line</u> . . .
>
> The normally hearing person's voice undergoes speech
> recognition in the center and is transformed into the equivalent signing
> content and then into textual material. The <u>text is sent from the center</u>
> <u>to the deaf person's device via telephone lines</u>. Software in the device
> converts the text into reduced identifying pointers for each gesture,
> which are then <u>converted into animated images</u> which portray in sign
> language the content of the speech processed in the center.

*Liebermann*, 6:64-7:17 (emphasis added). In other words, while *Liebermann's*

"dedicated line" does carry "voice," the "voice" is transmitted to *Liebermann's*

"center," and the equivalent in text is then transmitted back to *Liebermann's*

"portable transmitter/receiver" (the Examiner-identified "mobile phone") for display

as animated images. This only reinforces that *Liebermann's* "portable

transmitter/receiver" does not have the necessary audio output, discussed above, to

16

be the claimed "mobile phone." Accordingly, *Liebermann* fails to anticipate claim 2.

### D. *Liebermann* does not render claims 1-5 and 13 obvious.

#### 1. *Liebermann* is non-analogous art and cannot be cited in any obviousness rejection of claims 1-5 and 13.

In the Answer, with respect to *Liebermann's* field of endeavor, the Examiner "finds that *Liebermann* explicitly discloses 'a simple input device for optically sensing human and/or object input positions/orientations.'" Answer, p. 24. The Examiner's position is flawed because the Examiner arbitrarily excludes phones for the deaf from the Examiner-identified field of endeavor for *Liebermann*. The Examiner's position is clearly contrary to the *Liebermann* reference, which is replete with references to phones for the deaf: *Liebermann's* Title, Abstract, "Background Art" section, "Brief Description of the Drawings" section, "Detailed Description" section, drawings, and independent claims all disclose or reference phones for the deaf. *See, e.g., Liebermann* at Title ("Telephone for the deaf and method of using same") (emphasis added), Abstract ("An electronic communications system for the deaf") (emphasis added), 1:10-15 ("The present invention relates to electronic apparatus for communication by the deaf, and, more particularly, to such apparatus which enables the deaf person to communicate through use of sign language.") (emphasis added), 3:14-18 ("It is also an object to provide such an electronic communication system wherein the deaf person and the person communicating with

17

the <u>deaf person</u> do so through a central facility") (emphasis added), 4:12-17 ("FIG.

4 is a schematic presentation of the several steps in the intervention and operation of

the processing center when <u>a call is received by the deaf person's telephone</u>; FIGS.

5a-5c are perspective views of a <u>deaf person's receiver/transmitter installation</u>

embodying the present invention") (emphasis added), 6:64-65 ("The normally

hearing person who <u>calls a deaf person dials the deaf person's phone number</u>.")

(emphasis added), 13:37-38 ("The system may function as a <u>telephone for the deaf</u>")

(emphasis added), independent claim 1 ("An electronic communications system for

the <u>deaf</u>") (emphasis added), independent claim 12 ("In a method for electronic

communication for the <u>deaf</u>") (emphasis added), independent claim 26 ("An

electronic communications system for the <u>deaf</u>") (emphasis added).  In fact, the term

"deaf" appears more than 120 times within *Liebermann*.  It is improper for the

Examiner to disregard the substance of the *Liebermann* reference to maintain a

baseless position.  Accordingly, *Liebermann*' field of endeavor necessarily includes

phones for the deaf.  *See Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1380-81

(Fed. Cir. 2019) (the court finding the PTAB's reliance on the title, specification,

and claims of a prior art reference to determine the reference's field of endeavor

reasonable).

    In contrast, Patent Owner maintains that the field of endeavor for the '924

Patent is controlling functions of handheld devices using images captured by the

handheld devices. *See generally*, '924 Patent, Title, 11:65-12:12, 12:62-13:47, 25:40-26:43, Figs. 8A, 8B, 18, claim 1. There is no reasonable dispute that the field of endeavor for the '924 Patent is not telephones for the deaf. In fact, the terms "deaf," "hearing impaired," "hearing loss," and "hard of hearing" are completely absent from the '924 Patent. This only reinforces that the field of endeavor for the '924 Patent is not telephones for the deaf. Thus, *Liebermann* and the '924 Patent are not from the same field of endeavor, so *Liebermann* fails the first test for analogous art.

Regarding the second test for analogous art, according to the Examiner, "[a]s *Liebermann* teaches the things which the inventor stated were lacking, the Examiner concludes that *Liebermann* is 'pertinent to the problem faced by the inventor.'" Answer, p. 25. This is improper. The Examiner is misapplying the second test for analogous art. As explained by the Federal Circuit,

> Although the dividing line between reasonable pertinence and less-than-reasonable pertinence is context dependent, it <u>ultimately rests</u> on the extent to which the reference of interest and the claimed invention <u>relate to a similar problem or purpose</u> . . . Thus, when addressing whether a reference is analogous art with respect to a claimed invention under a reasonable-pertinence theory [(i.e., the second test for analogous art)], the <u>problems to which both relate must be identified and compared</u>.

*Donner Tech., LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1359 (Fed. Cir. 2020) (emphasis added). In other words, under the second test for analogous art, the

19

Examiner must identify the problem being solved by the '924 Patent, identify the problem being solved by *Liebermann*, and compare the two problems.

The Examiner argues that "*Liebermann* provides a portable transmitter/receiver cellular telephone 8 embodiment that is deemed handheld[] which comprises video cameras and lens 10 capturing images to be processed in digital format." Answer, p. 25. Even if that is true—and Patent Owner does <u>not</u> concede that is true—the Examiner still has not identified the problem being solved by *Liebermann*, as required by the second test for analogous art. Accordingly, the Examiner has not established that *Liebermann* passes the second test for analogous art.

*Liebermann* expressly discloses "deaf persons have <u>substantial difficulties</u> in communicating with persons at remote locations," (*Liebermann*, 1:30-31 (emphasis added)), and then discloses solutions to the "substantial difficulties" including "an electronic communication system wherein the deaf person and the person communicating with the deaf person do so through a central facility containing a translating means for processing elements of digitized image data" and "a system in which a hearing person may have his speech converted into digitized signing motions which are displayed to the deaf person." *Liebermann*, 3:14-24. Accordingly, *Liebermann* is directed towards solving the problems faced by deaf persons trying to communicate with other persons at remote locations.

20

In contrast, the problems to which the '924 Patent relates include determining touchless user input commands to handheld devices and controlling functions within handheld devices. *See generally*, '924 Patent, 2:6-13, 11:65-12:12, 12:62-13:47, 25:40-26:43, Figs. 8A, 8B, 18, claim 1. These are not the problems to which *Liebermann* relates, thus *Liebermann* also fails the second test for analogous art.

As *Liebermann* fails both tests for analogous art, *Liebermann* is non-analogous art and cannot be cited in any obviousness rejection of claims 1-5 and 13.

### E. *Liebermann* and *Sears* do not render claims 6-10 and 12 obvious.

#### 1. *Liebermann* is non-analogous art and cannot be cited in any obviousness rejection of claims 6-10 and 12.

As discussed above, *Liebermann* is non-analogous art and thus cannot be cited in any obviousness rejection of claims 6-10 and 12.

#### 2. *Sears* is non-analogous art and cannot be cited in any obviousness rejection of claims 6-10 and 12.

In the Answer, with respect to *Sears'* field of endeavor, the Examiner "finds that *Sears* explicitly discloses 'a simple input device for optically sensing human and/or object input positions/orientations.'" Answer, p. 28. The Examiner's position is flawed because the Examiner arbitrarily excludes "electronic reading machines" from the Examiner-identified field of endeavor for *Sears*. The Examiner's position is clearly contrary to the *Sears* reference, which is replete with references to "electronic reading machines:" *Sears'* Title, Abstract, "Technical

21

Field" section, "Background Art" section, "Summary of the Invention" section, and

independent claims all disclose or reference electronic reading machines. *See Sears*

at Title, Abstract ("An optical-input print reading device with voice output for

people with impaired or no vision") (emphasis added), 1:23-29 ("The present

invention relates to an electronic reading system for converting text to synthesized

speech") (emphasis added), 3:12-15 ("It was our intention to solve the problems of

the prior art, both with regards to OCR-based electronic reading machines as well as

electronic magnifying systems") (emphasis added), 4:12-19 ("The present invention

is also directed to an electronic reading apparatus for converting text to spoken words

for a user.") (emphasis added), independent claim 1 ("A method for electronically

reading text") (emphasis added), independent claim 31 ("An electronic reading

apparatus for converting text to spoken words for a user") (emphasis added), and

independent claim 33 ("A method for electronically reading aloud text under

interactive control by a user with a computer-based system") (emphasis added). It

is improper for the Examiner to disregard the substance of the *Sears* reference to

maintain a baseless position. Accordingly, *Sears'* field of endeavor necessarily

includes electronic reading machines. *See Airbus S.A.S. v. Firepass Corp.*, 941 F.3d

1374, 1380-81 (Fed. Cir. 2019) (the court finding the PTAB's reliance on the title,

specification, and claims of a prior art reference to determine the reference's field of

endeavor reasonable).

22

Further, the term "optical character recognition" or "OCR" appears more than 40 times in *Sears*, and the terms "text-to-speech," "text-to-voice," "text to spoken word," or "speech synthesis" appear at least ten times in *Sears*. It is well known that that electronic reading machines perform these processes (i.e., "OCR," "text-to-speech," etc.). *See Sears*, 1:45-51. The numerous references to "OCR," "text-to-speech," etc. only reinforce that *Sears'* field of endeavor includes electronic reading machines.

In contrast, Patent Owner maintains that the field of endeavor for the '924 Patent is controlling functions of handheld devices using images captured by the handheld devices. *See generally*, '924 Patent, Title, 11:65-12:12, 12:62-13:47, 25:40-26:43, Figs. 8A, 8B, 18, claim 1. There is no reasonable dispute that the field of endeavor for the '924 Patent is <u>not</u> "electronic reading machines." Further, the terms "text-to-voice," "text-to-speech," "speech synthesis," and "text to spoken word" are absent from the '924 Patent. This only reinforces that the field of endeavor for the '924 Patent is <u>not</u> "electronic reading machines." Thus, *Sears* and the '924 Patent are <u>not</u> from the same field of endeavor, so *Sears* fails the first test for analogous art.

Regarding the second test for analogous art, according to the Examiner, "[a]s *Sears* teaches the things which the inventor stated were lacking, the Examiner concludes that *Sears* is 'pertinent to the problem faced by the inventor.'" Answer,

23

p. 29.  This is improper.  The Examiner is misapplying the second test for analogous art.

As discussed above, under the second test for analogous art, the Examiner must identify the problem being solved by the '924 Patent, identify the problem being solved by *Sears*, and compare the two problems.  *See Donner Tech.*, 979 F.3d at 1359.  The Examiner argued that "*Sears* teaches a main system 35 comprising either a personal computer separate from the system 35 or an embedded computer within the system 35 for the use of capturing image data, digitizing the image data and processing the image data."  Answer, p. 28.  Even if that is true—and Patent Owner does not concede that is true—the Examiner still has not identified the problem being solved by *Sears*, as required by the second test for analogous art.  Accordingly, the Examiner has not established that *Sears* passes the second test for analogous art.

Further, *Sears* expressly discloses

> reading machine systems, unfortunately, suffer from a variety of operational insufficiencies that limit their effectiveness. For instance, before the reading machine can begin to read a page, the user must typically wait over a minute. . .

> Another insufficiency of conventional reading machines is that scanners are limited in the size of page they can process, and reading a newspaper page would require multiple passes through the scanner. Furthermore, the keypad navigation of current reading machines requires that the user move through the text in the same order in which the computer organizes the data . . .

24

For example, the mechanisms [in conventional magnifying systems] for tracking lines of text are <u>often difficult to use</u>, since they are manually-guided mechanical systems that require relatively precise and steady hand movements to guide the movement.

This requirement <u>is difficult</u> for certain people, especially the elderly who have fine motor problems, but also because it involves cognitive feedback control at the same time that considerable effort is being devoted to interpreting the images on the screen. Furthermore, when short columns of text are being read, the user must engage in frequent control of both vertical and horizontal mechanical guiding systems. Also, because of the small field of view of the camera and the limited movement of the mechanical system, the page must often be repositioned on the mechanical guides. Because of the small field of view of these systems, it is difficult for the user to understand the overall structure of text and graphics on a complexly formatted page. In addition, the system depends entirely on the user's vision, even though this vision may be adequate only for very slow reading . . .

It was <u>our intention to solve the problems of the prior art, both with regards to OCR-based electronic reading machines as well as electronic magnifying systems,</u> that gave rise to the current invention.

*Sears*, 1:66-3:15 (emphasis added). Accordingly, *Sears* is directed towards solving the problems associated with existing electronic reading machines and magnifying systems.

In contrast, the problems to which the '924 Patent relates include determining touchless user input commands to handheld devices and controlling functions within handheld devices. *See* generally, '924 Patent, 2:6-13, 11:65-12:12, 12:62-13:47, 25:40-26:43, Figs. 8A, 8B, 18, claim 1. These are not the problems to which *Sears* relates, thus *Sears* fails the second test for analogous art.

25

As *Sears* fails both tests for analogous art, *Sears* is non-analogous art and cannot be cited in any obviousness rejection of claims 6-10 and 12.

### 3.    *Liebermann* and *Sears* do not render claim 6 obvious.

In the Answer, the Examiner argued while "*Liebermann* disclose[s] the <u>cellular telephone of the deaf person</u> providing image capture and initial image processing and a central processing facility (i.e., the Center) performing further processing (id. at c.4, 11.60 — c.5, 1.48), the Examiner finds that this is <u>just a design preference</u>. To support the Examiner's position, the Examiner finds that *Liebermann* discloses a design choice to perform the sophisticated translation processing at a designated off-line processing center for economic reasons, <u>not the requirement to</u>." Answer, p. 30 (emphasis added).  Patent Owner disagrees.

*Liebermann* expressly discloses "[f]rom cost and <u>portability standpoints</u>, the <u>translating means is at a remote location or central station</u> and there is included transmission means for <u>transmitting</u> the digitized signing motions or their digital identifiers <u>to the translating means</u>." *Liebermann*, 3:38-43 (emphasis added).  In other words, for *Liebermann's* <u>portable</u> embodiments including *Liebermann's* "<u>portable</u> transmitter/receiver," which the Examiner relies on extensively, *Liebermann* discloses that it is a requirement that the "sophisticated <u>translation</u> processing" take place at *Liebermann's* "central processing facility."  Contrary to the Examiner's contentions, it is <u>not</u> a design choice.  Accordingly, *Liebermann's*

principle of operation necessarily includes *Liebermann's* "central processing facility" to perform the "sophisticated translation processing."

In the Answer, the Examiner argued "whether the data is further processed on the cellular phone or at the Center would not render *Liebermann* <u>inoperable for its intended purpose</u> because the end result of the process would be the same, either the communication of signing motion to spoken words and phrases, or vice-versa." Answer, p. 30 (emphasis added). Patent Owner did not argue that the Examiner's proposed modification to *Liebermann* would render *Liebermann* inoperable for its intended purpose. *See* Appeal Brief, pp. 34-39. Patent Owner argued that the Examiner's proposed modification to *Liebermann* would "violate *Liebermann's* principle of operation . . . and [thus] is far too drastic to be considered obvious." *Id*., p. 39. The Examiner is conflating two different rebuttals to obviousness (i.e., "renders prior art inoperable for its intended purpose" vs. "changes prior art's principle of operation").

In the Answer, the Examiner argued "*Liebermann* teaches a communicator embodiment that supports placing <u>the additional processing</u> unto the portable transmitter/receiver cellular telephone 8." Answer, p. 30 (emphasis added). To the extent "the additional processing" means the "sophisticated translation processing" performed by *Liebermann's* "central processing facility," Patent Owner disagrees. *Liebermann* discloses

27

> [t]he <u>communicator</u> enables the deaf person to conduct a "conversation" with any normally hearing person in the close proximity [*sic*]. The signing motion of the deaf person are [*sic*] <u>processed by the center</u> and is transmitted back to the device as a normal voice transmission which the speaker renders as speech to the normally hearing person. His or her speech in turn, is picked up by the microphone and <u>sent to the center for processing</u>.

*Liebermann*, 7:33-40 (emphasis added). In other words, the "communicator embodiment" <u>still</u> requires that the "sophisticated translation processing" take place at *Liebermann's* "central processing facility" (i.e., Center). Accordingly, *Liebermann's* "communicator embodiment" does not support the Examiner's proposal to relocate the "sophisticated translation processing" (i.e., artificial intelligence algorithms with neural networks) from *Liebermann's* "central processing facility" to *Liebermann's* "portable transmitter/receiver."

In the Answer, the Examiner argues that a POSITA "would recognize that providing all processing locally on the *Liebermann* device, instead of the combination of locally and remotely, prevents any delay of the conversation between the user and a third-party that is inherent to the communication bandwidth and protocol issues." Answer, pp. 33-34. But obviousness requires both a reason to modify or combine prior art to achieve a claimed invention <u>and</u> a reasonable expectation of success. *See Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016) ("One must have a motivation to combine accompanied by a <u>reasonable expectation</u> of achieving what is claimed" and "the

28

Board conflated two different legal concepts—<u>reasonable expectation of success</u> and motivation to combine") (emphasis added). The Examiner's proposed modification to *Liebermann* has no reasonable expectation of success.

As discussed above, *Liebermann* even discloses that *Liebermann's* portable embodiments (e.g., *Liebermann's* "portable transmitter/receiver," which the Examiner relies on extensively) require the heavy processing (e.g., artificial intelligence algorithms) be executed by *Liebermann's* "central processing facility." *See Liebermann*, 3:38-48 ("[f]rom cost and <u>portability</u> standpoints, the translating means is at a remote location or <u>central station</u> . . . translating means also includes <u>artificial intelligence</u> for interpreting and converting the translated motions into words and phrases and into coherent sentences.") (emphasis added).

Further, the Examiner's reliance on *Sears* is misplaced. *See* Answer, pp. 33-35. *Sears* is only processing a very small set of navigation command gestures involving one hand. *See Sears*, 10:66-11:7 ("we have described a number of gestural movements that can be distinguished by processing of visual images by a computer (e.g. one, two or more fingers placed flat, wiggling one or more fingers left to right, tapping a finger, curling a finger inwards, making a fist, etc.)"). In contrast, *Liebermann* is processing the "signing movement of the hands <u>and</u> fingers <u>and</u> body <u>and</u> facial motions <u>and</u> expressions" corresponding to all the words of an entire language. *Liebermann*, 6:4-6 (emphasis added). The processing power required by

29

*Liebermann* is simply not comparable to the minimal processing power in *Sears*.

Accordingly, even if *Sears* teaches local gesture processing, there is no reason to expect the Examiner's proposed modification to *Liebermann*, which includes relocating *Liebermann's* "sophisticated computer equipment, databases, and neural networks" (*Liebermann*, 5:37-38) from *Liebermann's* "central processing facility" to *Liebermann's* "portable transmitter/receiver," to be successful, much less technically feasible. Accordingly, the Examiner's obviousness arguments are fatally flawed.

In the Answer, the Examiner

finds that [*Sears'* Intel Pentium or compatible chip of 150MHz speed] is similar to the PC and processor the '924 Patent discloses. The Examiner concludes this must be the CPU designated in the instant invention of the '924 Patent of Figure 18 of the handheld device. The Examiner finds that one of ordinary skill in the art would recognize the process of placing a Pentium processor or compatible chip, performing the required claim requirements, in the *Liebermann* device, at the time of invention, would simply be engineering expediency, as is evidenced by *Sears*.

Answer, pp. 34-35 (citations omitted). This is wrong for multiple reasons.

First, it is unclear how this renders the Examiner's proposed modification to *Liebermann* obvious (i.e., relocating *Liebermann's* "sophisticated computer equipment, databases, and neural networks" (*Liebermann*, 5:37-38) from *Liebermann's* "central processing facility" to *Liebermann's* "portable transmitter/receiver"). Second, the Examiner provides zero evidence that

30

*Liebermann's* "sophisticated computer equipment, databases, and neural networks" are comparable to and/or could be executed on "a Pentium processor or compatible chip." Third, the Examiner provides zero evidence that *Liebermann's* "portable transmitter/receiver" is compatible with "a Pentium processor or compatible chip." And Fourth, the Examiner cannot rely on the '924 Patent for evidence that a POSITA would have combined *Liebermann* and *Sears*: "It is improper, in determining whether a person of ordinary skill would have been led to this combination of references, simply to [use] that which the inventor taught against its teacher." *In re Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002) (cleaned up).

For these reasons, the Examiner's combination of *Liebermann* and *Sears* does not render claim 6 obvious.

### 4. *Liebermann* and *Sears* do not render claims 8 and 10 obvious.

The Examiner mapped the "gloves" in *Liebermann* to the claimed "object." Answer, pp. 37-38. Patent Owner asserts the "gloves" in *Liebermann* are being <u>worn by the user</u> of the system. *See Liebermann*, Figs. 13A and 13B. Patent Owner maintains these "gloves" are not an object <u>other than the user</u>, as claims 8 and 10 require.

In the Answer, the Examiner "finds that the '924 Patent discloses objects as being <u>something in one's hand</u>, an object ahead of a user, or another person."

31

Answer, p. 37 (emphasis added).  But "gloves" are not "something in one's hand."

"Gloves" are worn by the user and encase the user's hand.

For these reasons, the Examiner's combination of *Liebermann* and *Sears* does

not render claims 8 and 10 obvious.

## II.    CONCLUSION

For the aforementioned reasons, and all the reasons mentioned in the Appeal

Brief, the cited art fails to render claims 1-14 unpatentable.  The Director is hereby

authorized to charge any fees which may be required by this Reply Brief to Deposit

Account No. 604293.

DATED:  May 15, 2023                                Respectfully submitted,

                                                   By: /Todd E. Landis/
                                                   Todd E. Landis
                                                   Registration No. 44,200
                                                   Counsel for Patent Owner

Case: 24-1585    Document: 16    Page: 567    Filed: 10/02/2024



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,902 | 11/11/2021 | 8194924 | 75281.00085 | 3671 |

184036     7590     12/06/2023

Williams Simons & Landis PLLC/GTP
The Littlefield Building
601 Congress Ave., Suite 600
Austin, TX 78701

| EXAMINER |
|---|
| RALIS, STEPHEN J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/06/2023 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

Case: 24-1585     Document: 16     Page: 568     Filed: 10/02/2024

RECORD OF ORAL HEARING

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

*Ex parte* LIT-US CHISUM 21-A LLC

———————

Appeal 2023-002523
Application 90/014,902
Technology Center 3900

———————

Oral Hearing Held:  November 27, 2023

———————

Before ALLEN R. MACDONALD, MICHAEL J. ENGLE, and
BRENT M. DOUGAL, *Administrative Patent Judges*.

APPEARANCES:

ON BEHALF OF THE APPELLANT:

  JOHN WITTENZELLNER, ESQUIRE
  TODD E. LANDIS, ESQUIRE
  Williams Simons & Landis PLLC
  The Littlefield Building
  601 Congress Avenue
  Suite 600
  Austin, Texas 78701

  The above-entitled matter came on for hearing on Monday,
November 27, 2023, commencing at 1:03 p.m., at the U.S. Patent and
Trademark Office, 600 Dulany Street, Alexandria, Virginia.

1       P R O C E E D I N G S

2                - - - - -

3       THE CLERK:  Good morning, Judges.  Good morning, Attorney and

4   Court Reporter.  We are now going on record with Appeal Number 2023-

5   002523.

6       Judge MacDonald, it's now in your hands.

7       JUDGE MACDONALD:  Thank you.  Before we begin, just a few

8   preliminary items.  First, thank you for your flexibility in conducting this

9   video hearing today.  We know it's a departure from the normal in the

10  hearing room practice.  We want to clarify a few items.

11      First, our primary concern is your right to be heard.  If at any time

12  during the proceeding you encounter technical or other difficulties that you

13  feel fundamentally undermines your ability to adequately represent your

14  client, please let us know immediately, for instance, by contacting the team

15  members who provided you with connection information.

16      Second, and this is for everybody, the Judges included, when not

17  speaking, please mute yourself.

18      Third, please identify yourself each time you speak.  Again, that's for

19  the Judges.  This helps the court reporter.

20      Fourth, we have the entire record, including demonstratives.  When

21  referring to those or papers or other things in the record, please do so clearly

22  and explicitly by slide or page number.  Also, pause a few seconds to give us

23  a chance to bring it up on our screens at this end.

24      Lastly, be aware that members of the public may be listening to the

25  oral hearing.  And you have 20 minutes, and you may begin as -- now.

26      MR. WITTENZELLNER:  Thank you, Your Honor.  Good afternoon.

2

Case: 24-1585    Document: 16    Page: 569    Filed: 10/02/2024

1   I view this appeal as having four issues. I'm cognizant of the limited amount

2   of time I have today, so I'd like to focus on things that stuck out to me during

3   my preparation that may not have been clear in the briefing, as well as to

4   address any questions that the Board may have.

5         I'd like to start today with slide 6 of the demonstratives that we

6   submitted. And the first issue has to do with the term "handheld device".

7         JUDGE MACDONALD: May I interrupt for a second? And let you

8   know that I think the issue you're raising here, I think you're correct that

9   handheld has to be looked at as the preamble is not extraneous. It is --

10   because I think, in addition, the term appears in the claim itself. So if you --

11   you don't need to go into depth as to the claim construction. If you're going

12   to discuss handheld, I would suggest it's with respect to the prior art, the

13   application of prior art.

14         MR. WITTENZELLNER: Thank you, Your Honor. I appreciate that.

15   With that note, I think we can move to slide 7.

16         And the device in *Liebermann* is a device for allowing a deaf or hard

17   of hearing person to communicate via sign language. So, not surprisingly,

18   the device is designed to be positioned such that the user can sign with both

19   hands. That's a requirement of American Sign Language. It's also a

20   requirement when you read the reference, because it repeatedly refers to the

21   person using their hands, plural, not hand. And that's depicted in figure 6 of

22   the *Liebermann* reference, which is on slide 7, as well as the text that states

23   that the device is supported in a stable position by the user.

24         Now, my understanding of the Examiner's position is that the

25   *Liebermann* device is handheld because it can be held in one hand while the

26   deaf or hard of hearing user signs with the other hand. I would submit that

1   trying to sign and hold the device steady at the same time is not a stable

2   position, and it also precludes the user from fully using sign language

3   because, again, they cannot use both hands. And that's why it's our position

4   that the device of *Liebermann* is not a handheld device as is required by the

5   claims.

6          The handheld term also comes into play with dependent claim 6, and

7   I'd like to move to slide 12 of our demonstratives. And claim 6 differs from

8   claim 1 in that claim 6 further limits what actions are controlled or limits the

9   claim such that there's control based on a gesture being performed within the

10  fields of view of one of the cameras. And it's the computer, again, that is

11  within that handheld device that is performing those necessary calculations.

12         As the briefing shows, there's no real dispute that the hardware and

13  software necessary to interpret sign language is located in what's a

14  physically separate building containing computer hardware and software

15  that's called the "Center" in *Liebermann*. The Examiner was unable to

16  identify any such disclosure of the Center being located in the device itself.

17  That's because there's just -- there's no disclosure and it's repeatedly referred

18  to the Center being a physically separate building.

19         What was interesting, and that came up during preparation, is that the

20  Examiner resorted to construing the claims of *Liebermann* to argue that

21  *Liebermann* is broader or has disclosure of the Center actually potentially

22  being in a device. And this would be page 54 of, I believe, the most recent

23  action.

24         And specifically, the Examiner relied on the doctrine of claim

25  differentiation, stating, and this is a quote, "The Examiner finds that the

26  principle of claim differentiation creates a presumption that claim 1 is not

4

Case: 24-1585   Document: 16   Page: 571   Filed: 10/02/2024

Case: 24-1585    Document: 16    Page: 572    Filed: 10/02/2024

1  limited to where the location of the translating means is expressly recited in

2  claim 4, which depends from claim 1."

3      So in claim 1 of *Liebermann* you have a means for translating, and

4  then claim 4 says that gives a specific location, a central station for that

5  means. What we said in our briefing is that we believe it's improper for the

6  Examiner to be construing claims to find disclosure. But putting that aside,

7  we also wanted to note, I don't think this necessarily came through clearly in

8  the briefing, that the Examiner's application of the doctrine of claim

9  differentiation is also incorrect.

10     The Federal Circuit has repeatedly said that claim differentiation does

11  not apply to means plus function terms. In a case that is really clear on this

12  point is *Laitram Corp. v. Rexnord*, and that was reported at 939 Federal 2nd,

13  page 1,533, Federal Circuit for 1991, and the pincite is page 1,538. And

14  there the Federal Circuit said, "A means plus function limitation is not made

15  open-ended by the presence of another claim specifically claiming the

16  disclosed structure, which underlies the means clause or an equivalent of

17  that structure."

18     And they also stated in the same section, "We hold that one cannot

19  escape the mandate of 35 U.S.C. 112(6) by merely adding a claim or claims

20  specifically writing structure or structures." So even if we were to accept it

21  as proper for the Examiner to try to find another embodiment of the Center

22  in *Liebermann* by construing the claims, claim differentiation does not apply

23  here because the claims aren't means plus function claims.

24     So moving on to slide 13, Your Honors, this brings us to the

25  Examiner's position that in 1999, it would have been obvious to collapse

26  *Liebermann* Center, which is a whole building full of computers and

5

Case: 24-1585    Document: 16    Page: 573    Filed: 10/02/2024

1  software, into a handheld device. All of the hardware that is necessary to

2  perform this is described in *Liebermann* as sophisticated computer

3  equipment, databases, and neural networks. And those are necessary to use

4  artificial intelligence to interpret gestures. And the Examiner contends that a

5  person of ordinary skill in the art would have had a reasonable expectation

6  of success in 1999 of, again, collapsing all that equipment into a single

7  handheld device.

8      The Examiner has no support for that position, which is not

9  surprising, because that claim seems to be incorrect on its face. But I think

10  some context really illustrates the issue with the claim. I do not believe that

11  we have adopted a definition of a "person of ordinary skill in the art" in this

12  specific proceeding, but in the IPR proceeding on the same patent, and that

13  would be IPR2021-00923, the Board defined the "person of ordinary skill in

14  the art" as having a bachelor's degree in electrical engineering or an

15  equivalent with at least one year of experience in the field. So --

16      JUDGE MACDONALD: Excuse me. This is Judge McDonald. Was

17  that raised in the appeal brief?

18      MR. WITTENZELLNER: I do not believe this was raised, Your

19  Honor.

20      JUDGE MACDONALD: Okay.

21      MR. WITTENZELLNER: But I think it just provides some context as

22  to what the Examiner is contending. Basically, what the Examiner is

23  contending is that someone fresh out of college, a year out of college with an

24  EE degree would have a reasonable expectation of success of, again,

25  collapsing all that hardware and software that occupies a building into a

26  handheld device.

6

1    JUDGE MACDONALD: Why are you saying it occupies a building?

2    I don't quite understand that.

3    MR. WITTENZELLNER: Well, that's what's disclosed in

4    *Liebermann.* We have -- it's 1999, and that is the --

5    JUDGE MACDONALD: I understand it discloses the location of it is

6    at the building, but you're describing as filling the building, and I'm not quite

7    clear on where that is in the reference.

8    MR. WITTENZELLNER: Sure, Your Honor. That may be some

9    sloppiness on my part, frankly, with the language, but I think it's still in a

10    building as opposed to the device and --

11    JUDGE MACDONALD: Well, also the idea that the artificial

12    intelligence can't fit within a handheld device, even in the mid-'90s, they

13    were putting artificial intelligence in cameras to control focusing and other

14    aspects of the cameras without ever saying that because it wasn't a

15    commercial, popular thing in the United States, but in other countries, they

16    were very clear that that was included in the devices. So this idea of it can't

17    be moved to a port -- I'm a little unclear on, you know, just saying it is

18    sufficient to, you know, carry the day without some explanation of why it's

19    not possible to put an artificial intelligence system in a handheld device.

20    MR. WITTENZELLNER: Certainly, Your Honor. So I would

21    disagree that something such as autofocus falls into the context of artificial

22    intelligence, I think, a much simpler process. But to the point, interpreting

23    gestures --

24    JUDGE MACDONALD: Well, let me say that I was a senior

25    Examiner in artificial intelligence, and there are simple artificial intelligence

26    systems and they do fit in those kinds of devices and they were available in

7

1   the '90s. So, again, I think it requires more than what we saw in the briefing

2   argument to carry the day that, oh, no, this is too much of a modification.

3       But please continue with the argument on this point, but my reaction

4   is you might want to move on to your next point.

5       MR. WITTENZELLNER: Sure, Your Honor. I would just touch on

6   the fact that interpreting a gesture of somebody moving part of their body or

7   making a facial movement is a significantly more complex task than

8   something like autofocus. And there's also support in the reference in and of

9   itself where the device is performing. I'm sorry, I'm misplacing the term

10  right now, but I think it's markers or identifiers are being pulled from the

11  image and those are being transmitted to the Center for the further analysis.

12  And I think that in and of itself shows that there is evidence that there was

13  not that capability. Because you are doing very simple calculations in the

14  device, I would say potentially akin to the autofocus that you discussed

15  earlier, but there's recognition in *Liebermann* that you actually have to ship

16  that information off to a more complex system to be able to perform the

17  analysis necessary to analyze gestures.

18      The next point I would like to touch on would be the issue with

19  respect to fields of view. And I'll be moving to slide 8 of the demonstratives

20  that we submitted.

21      JUDGE MACDONALD: I believe this is a point where also we

22  thought that your discussion of non-overlapping and the requirements of

23  that, that we agreed with your view on that and the reference needed to teach

24  in the sense that you were discussing non-overlapping.

25      MR. WITTENZELLNER: Thank you, Your Honor. So just so that

26  I'm not covering ground that is unnecessary, is it the Board's position or

8

Case: 24-1585    Document: 16    Page: 575    Filed: 10/02/2024

1    Your Honor's position that this term means there's no overlap whatsoever,

2    which is our position in the briefing?

3         JUDGE MACDONALD: With respect to the images collected by

4    each camera, yes, that it would have to be distinct. And I don't know if that

5    term will appear in the decision, but I think you may have used it correctly,

6    am I correct, in the brief?

7         MR. WITTENZELLNER: I believe so, Your Honor.

8         JUDGE MACDONALD: Yeah, then it will appear in the decision,

9    but it does have to be distinct to be non-overlapping.

10        MR. WITTENZELLNER: Right, right. And then so it's our position,

11   based on that construction and the meaning of the claims, that *Liebermann*

12   does not disclose cameras where there are non-overlapping fields of view.

13   The cameras in *Liebermann*, frankly, the disclosure is rather vague when it

14   comes to multiple cameras.

15        When you look at, for example, the handheld device, and this is in

16   figure 6 of *Liebermann*, there's a single camera shown. It's item 10. Not

17   surprisingly, it's on the face of the device that would face the user as they're

18   signing in front of it. And there is some discussion of the fact that more than

19   one camera can be used, but there's really no disclosure that I'm aware of

20   that discusses cameras having non-overlapping fields of view. I think it's

21   vague.

22        JUDGE MACDONALD: I thought that in column 13 cited by the

23   Examiner that it did show each camera as covering a separate angle and an

24   angle overlap may or may not be permitted. I agree with you that the word

25   "camera" -- sorry, it may not talk about what's in the images here, but it

26   certainly strikes me as an artisan reading this would understand that you

9

1  have separate cameras and the fields of view do not overlap.

2      MR. WITTENZELLNER: So, Your Honor, I think I'll pull this up so

3  that I'm in the same location you are.

4      JUDGE MACDONALD: I'm reading items starting at line 11 of

5  column 13 in *Liebermann*, where, you know, it's items 1 and 3, essentially.

6  Two, also, cameras operate independently of each other.

7      MR. WITTENZELLNER: Right. So, I have -- Your Honor, I think

8  there's a difference there between angle and field of view. And so --

9      JUDGE MACDONALD: I agree with that, but I think, you know,

10  inherent in that is when you look at what the field of view would be for each

11  angle, I think at that point you end up with different distinct fields of view if

12  you have angles that do not overlap.

13      MR. WITTENZELLNER: I do not believe that's necessarily true. So

14  I like to use, and this came up as part of the prosecution history, stereoscopic

15  vision. And so if I'm looking at something off-center, the actual angle to any

16  one position will be different between each of my eyes.

17      JUDGE MACDONALD: Yeah, but it's using the word "overlap". I

18  think it has to be read that they're not overlapping as they would be in a

19  stereoscopic device.

20      MR. WITTENZELLNER: Well, even then, if the angles are not

21  overlapping, there's nothing that necessarily says that the fields of view are

22  not including some overlapping portion. And I think we have to take a step

23  back to the context of the device again, where we have a person signing in

24  front of the device. And so I really can't contemplate a use where you would

25  want to be viewing something with a camera.

26      JUDGE MACDONALD: I certainly can, where one camera's left

10

Case: 24-1585     Document: 16     Page: 577     Filed: 10/02/2024

1   hand and one camera's right hand. I think the way you're reading the claim,

2   you're looking at each camera has -- one camera has to be not looking at the

3   user. And I think there is where the problem comes in with respect to

4   application of the prior art because you're reading that as a structural

5   limitation when, in fact, it's merely indicating a capability of the system.

6   And what you require here is two cameras, they each can do separate fields

7   of view, distinct fields of view. And beyond that, you know, specifying as a

8   user does not make the structure any different than, you know, specifying it's

9   looking at a table, it's looking at one leg on a table, and the second camera is

10   looking at a different leg on the table. It's the same device because this

11   claim is directed to the apparatus and the capabilities of it may or may not

12   change the structure and that's what has to be looked at.

13       MR. WITTENZELLNER: Right, and I think in the example Your

14   Honor gave, there would be a camera looking at a left hand and a camera

15   looking at a right hand. And in that instance, the cameras would still both be

16   viewing the user and --

17       JUDGE MACDONALD: I may not be making it clear. I'm trying to

18   make clear that that's not going to result in a structural difference. The

19   language in the claim that's user and not user is not a structural difference,

20   you know, it doesn't distinguish over the prior art. The case law is pretty

21   clear on that, that you have to look at, is it a real functional change?

22   Essentially the device coming from the factory, a camera coming in from the

23   factory, if you have two of them, they are capable of looking at separate

24   images, distinct images. So it's not something that changes the structure of

25   the device by saying user and not user.

26       MR. WITTENZELLNER: I understand Your Honor's position, but

Case: 24-1585    Document: 16    Page: 579    Filed: 10/02/2024

1 going back to *Liebermann*, I think we still run into the issue of no disclosure

2 of actually having these cameras not having overlapping fields of view and

3 configured as such.

4      JUDGE MACDONALD: I think I understand that's the position you

5 have and you understand how I'm looking at it, which is column 13. But I

6 think that focuses on the key issue, which is the structural and functional

7 difference of the device as opposed to the user not user, which I don't think

8 in the claim is indicating a structural or a functional purpose. I think the

9 non-overlapping is. I think other than, I agree, the images have to be the

10 field of view resulting -- the images that result from the fields of view have

11 to be distinct. I think that's a functional requirement of the claim. But I

12 think the content of the images is not.

13      And I do understand that this was not something that either the

14 Examiner raised or seems to have been brought forth in the prosecution. But

15 it is, I think, the proper construction of the claim given the case law.

16      MR. WITTENZELLNER: I understand, Your Honor. I think then

17 my fallback will just be that column 13, I would interpret angle to be

18 different and such that there's no necessity that the fields are not

19 overlapping, even though --

20      JUDGE MACDONALD: And I can give some weight to that in the

21 sense of, okay, but what we're looking for here with respect to the '102,

22 maybe, but with respect to the '103, we're just looking for a suggestion. And

23 I think there's more than sufficient here for at least a suggestion of non-

24 overlapping fields of view.

25      MR. WITTENZELLNER: Your Honor, I may have missed it in the

26 Examiner's answer. I wasn't aware of there being an obviousness rejection

12

1  addressing this specific issue. If there was, I apologize.

2       JUDGE MACDONALD: Well, there's an obviousness rejection

3  based on this reference.

4       MR. WITTENZELLNER: Sure, absolutely.

5       JUDGE MACDONALD: On the claims. So I think even if I adopt

6  your position that field of view, it has to be explicit in order for this

7  reference to be a '102, that only results in the '102 being reversed. It doesn't,

8  I don't think, results in the '103 being reversed.

9       MR. WITTENZELLNER: I understand, Your Honor. The point I

10 was just trying to make is that if it was not presented to us with respect to the

11 Examiner contending that this specific issue would have been obvious based

12 on the disclosure of *Liebermann*, then we would appreciate some

13 opportunity to respond.

14      JUDGE MACDONALD: There is always the opportunity for a

15 rehearing request.

16      MR. WITTENZELLNER: Thank you, Your Honor. That would be

17 the only point I'd make there.

18      JUDGE MACDONALD: We have reached the 20-minute mark, but

19 I'm going to give you another three minutes in order to wrap everything up

20 or make any other points that you need.

21      MR. WITTENZELLNER: Thank you, Your Honor. I appreciate that.

22 And I appreciate the questions from the bench.

23      I think the last point that I would like to touch on would be claims 8

24 and 10. And here we have slide 14 of the demonstratives. Here the

25 Examiner is contending that these claims are met when the user in

26 *Liebermann* is disclosing the use of gloves on the user's hands. It's our

13

Case: 24-1585     Document: 16     Page: 581     Filed: 10/02/2024

1    position that gloves are basically just the user's hands.  They're being

2    covered.  It's the same as if the user had nail polish or something else on

3    their hands.  It's not the detection of the position and orientation of an object

4    other than the user.

5         I'll pause here to see if the Board has any questions on that issue.

6         JUDGE MACDONALD:  No, I think this one, though, I think you're

7    correct, it requires looking at a position and orientation.  But, again, I don't

8    think I would look at this as the -- it is, again, the object in the discussion

9    between the Examiner during prosecution with the user focus, and I think it

10   has to be looked at in terms of, you know, the prior discussion we had on

11   user versus other than the user.  But, of course, the position and orientation

12   is critical here, the functional things that have to be looked at in terms of the

13   *Liebermann* reference.

14        MR. WITTENZELLNER:  Certainly, Your Honor.  I have nothing

15   further unless the Board has more questions.

16        JUDGE MACDONALD:  Judge Engle, do you have any questions?

17        JUDGE ENGLE:  No questions from me, thank you.

18        JUDGE MACDONALD:  Judge Dougal, do you have any questions?

19        JUDGE DOUGAL:  No.

20        JUDGE MACDONALD:  I have no further questions.  Thank you.

21   We're off the record.

22        MR. WITTENZELLNER:  Thank you.

23             (Whereupon, the proceedings at 1:30 p.m. were concluded.)

24

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

*In re* Reexam of: U.S. Patent No. 8,194,924 (Control No. 90/014,902)

Reexam Request Filed: November 11, 2021

Appellant: Gesture Technology Partners, LLC

Art Group: 3992

Title:  CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING, OR
OTHER DEVICES

### PATENT OWNER'S NOTICE OF APPEAL
### TO THE COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Mail Stop *Ex Parte* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Filed on behalf of Patent Owner by:

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite A #453
Philadelphia, PA 19103

Mark J.E. McCarthy (Reg. No. 69,575)
601 Congress Avenue, Suite 600
Austin, TX 78701

**WILLIAMS SIMONS & LANDIS PLLC**

Reexam of Patent No. 8,194,924
Control No. 90/014,902

Pursuant to 35 U.S.C. §§ 141 and 142 and 37 C.F.R. §§ 90.2 and 90.3, Patent Owner hereby provides notice that it appeals to the United States Court of Appeals for the Federal Circuit from the Patent Trial and Appeal Board's "Decision on Appeal" dated January 19, 2024, in the *ex parte* reexamination of U.S. Patent No. 8,194,924 (Control No. 90/014,902; Appeal No. 2023-002523).

Patent Owner's issues on appeal include at least (i) the Board's affirmation of the Examiner's rejections under 35 U.S.C. §§ 102 and 103, (ii) the USPTO's jurisdiction over expired patents, (iii) the existence of a substantial new question of patentability, and (iv) any finding or determination supporting or related to the aforementioned issues, including claim constructions, that are adverse to Patent Owner.

Copies of Patent Owner's Notice of Appeal are being filed simultaneously with the Director of the United States Patent and Trademark Office, the Patent and Trial Appeal Board, and the United States Court of Appeals for the Federal Circuit.

DATED: March 19, 2024

Respectfully submitted,

By: /John Wittenzellner/
John Wittenzellner
Registration No. 61,662
Counsel for Patent Owner

Priority Mail Express Mailing Label No. EI 955 780 889 US

1

Reexam of Patent No. 8,194,924
Control No. 90/014,902

## CERTIFICATE OF SERVICE

The undersigned certifies that, in addition to being electronically filed via the Patent Center, a true and correct copy of this Notice of Appeal was filed via U.S.P.S. Priority Mail Express with the Director of the United States Patent and Trademark Office at the following address:

Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

The undersigned also certifies that a true and correct copy of this Notice of Appeal was filed electronically with the Clerk's Office of the United States Court of Appeals for the Federal Circuit.

Respectfully submitted,

By: /John Wittenzellner/
John Wittenzellner
Registration No. 61,662
Counsel for Patent Owner

Priority Mail Express Mailing Label No. EI 955 780 889 US

2

**Exhibit PA-1**

**U.S. Patent No. 5,982,853 to Liebermann ("Liebermann")**

US005982853A

# United States Patent [19]

## Liebermann

[11] Patent Number: **5,982,853**

[45] Date of Patent: **Nov. 9, 1999**

[54] **TELEPHONE FOR THE DEAF AND METHOD OF USING SAME**

[76] Inventor: **Raanan Liebermann**, 79 Bayard Ave., North Haven, Conn. 06473

[21] Appl. No.: **08/653,732**

[22] Filed: **May 23, 1996**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/396,554, Mar. 1, 1995, abandoned.

[51] **Int. Cl.⁶** ................................................. **H04M 11/00**
[52] **U.S. Cl.** ........................... **379/52;** 704/271; 704/3; 379/93.15
[58] **Field of Search** ............................ 379/93.14, 93.15, 379/93.17, 52, 53; 348/14, 17; 395/751–757, 924; 704/2, 3, 271, 260, 235

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,546,383 | 10/1985 | Abramatic et al. | 379/52 |
| 5,163,081 | 11/1992 | Wycherley et al. | 379/52 |
| 5,283,833 | 2/1994 | Church et al. | 379/52 |
| 5,313,522 | 5/1994 | Slager | 379/52 |
| 5,473,705 | 12/1995 | Abe et al. | 704/271 |
| 5,481,454 | 1/1996 | Inoue et al. | 395/753 |
| 5,544,050 | 8/1996 | Abe et al. | 395/753 |
| 5,659,764 | 8/1997 | Sakiyama et al. | 395/753 |
| 5,689,575 | 11/1997 | Sako et al. | 382/118 |
| 5,734,794 | 3/1998 | White | 704/260 |

### OTHER PUBLICATIONS

The article "Application of Artificial Neural Networks IV" by Steven K. Rogers, pp. 587–599, Apr. 1993.
The article "Bidirectional Translation Between Sign Language and Japanese for Communication with Deaf–Mute People" by Kuwokawa, pp. 1109–1114, 1993.

*Primary Examiner*—Stella Woo

[57] **ABSTRACT**

An electronic communications system for the deaf includes a video apparatus for observing and digitizing the facial, body and hand and finger signing motions of a deaf person, an electronic translator for translating the digitized signing motions into words and phrases, and an electronic output for the words and phrases. The video apparatus desirably includes both a video camera and a video display which will display signing motions provided by translating spoken words of a hearing person into digitized images. The system may function as a translator by outputting the translated words and phrases as synthetic speech at the deaf person's location for another person at that location, and that person's speech may be picked up, translated, and displayed as signing motions on a display in the video apparatus.

**32 Claims, 16 Drawing Sheets**





*FIG. 1*



*FIG. 2*



*FIG. 3*



*FIG. 4*



PC VERSION

*FIG. 5A*

SET-TOP BOX

*FIG. 5B*

KIOSK VERSION FOR
PUBLIC ACCESS

*FIG. 5C*



CELLULAR
TELEPHONE
VERSION

*FIG. 6*



FIG. 7



TELEPHONE FOR THE DEAF VIDEO MONITOR SCREEN LAYOUT

*FIG. 8*



*FIG. 9*



*FIG. 10*



FIG. 11



*FIG. 12*



*FIG. 13A*



*FIG. 13B*



SIGN FOR LETTER "K"
FULL IMAGE

*FIG. 14A*



SIGN FOR LETTER "V"
FULL IMAGE

*FIG. 14B*



THE SIGN FOR LETTER "K"
BINARY IMAGE

*FIG. 14C*



THE SIGN FOR LETTER "V"
BINARY IMAGE

*FIG. 14D*



*FIG. 15*



*FIG. 16*

5,982,853

1

## TELEPHONE FOR THE DEAF AND METHOD OF USING SAME

### CROSS REFERENCE TO RELATED APPLICATION

The present application is a continuation-in-part of our application Ser. No. 08/396,554 filed Mar. 1, 1995, now abandoned.

### BACKGROUND OF THE INVENTION

The present invention relates to electronic apparatus for communication by the deaf, and, more particularly, to such apparatus which enables the deaf person to communicate through use of sign language.

Deaf people are employed in almost every occupational field. They drive cars, get married, buy homes, and have children, much like everyone else. Because of many inherent communication difficulties, most deaf people are more comfortable when associating with other deaf people. They tend to marry deaf people whom they have met at schools for the deaf or through deaf clubs. Most deaf couples have hearing children who learn sign language early in life to communicate with their parents. Many deaf people tend to have special electronics and telecommunications equipment in their homes. Captioning decoders may be on their televisions, and electrical hook-ups may flash lights to indicate when the baby is crying, the doorbell is ringing, or the alarm clock is going off.

However, deaf persons have substantial difficulties in communicating with persons at remote locations. One technique which is employed utilizes a teletype machine for use by the deaf person to transmit his message and also to receive messages, and the person with whom the deaf person is communicating also has such a teletype machine so that there is an effective connection directly between them. In another method, the deaf person utilizes a teletype machine, but the person who is communicating with the deaf person is in contact with a communications center where a person reads the transmission to the hearing person over the telephone and receives the telephone message from the hearing person and transmits that information on the teletype machine to the deaf person. Obviously, this teletype based system is limited and requires the deaf person to be able to manipulate a teletype machine and to understand effectively the written information which he or she receives on the teletype machine. Processing rapidly received written information is not always effective with those who have been profoundly deaf for extended periods of time. Moreover, a system based upon such teletype transmissions is generally relatively slow.

The widespread availability of personal computers and modems, has enabled direct communication with and between deaf persons having such computers. However, it is still required that the deaf person be able to type effectively and to readily comprehend the written message being received.

Deaf persons generally are well schooled in the use of finger and hand signing to express themselves, and this signing may be coupled with facial expression and/or body motion to modify the words and phrases which are being signed by the hands and to convey emotion. As used herein, "signing motions" include finger and hand motions, body motions, and facial motions and expressions to convey emotions or to modify expressions generated by finger and hand motions. A written message being received on a teletype machine or computer may not convey any emo-

2

tional content that may have been present in the voice of the person conveying the message.

Profoundly deaf people communicate among themselves by this sign language on a face to face basis, and utilize a Tele-Typewriter (TTY) for telephone communication. The TTY itself leaves much to be desired, since their sign language is a modified syntax of the spoken language, resulting in a smaller vocabulary and lessened ease of reading printed text as a whole (e.g. definite and indefinite articles ["the", "a", "an"] are omitted most of the time and possessives and plurals are not usually distinguished.

When it comes to communication of profoundly deaf persons and normally hearing persons, the problem intensifies. Only a negligible percentage of the non-deaf population is versed in sign language. Thus, some deaf people read lips and utter words similar enough in their vocal resemblance to enable them to be understood. Beyond this tedious and taxing effort, there is virtually no form for such communication except exchanging some written notes or having an interpreter involved.

A number of methods as to how to achieve sign recognition have been proposed in the literature. However, in spite of the apparent detail of such articles, they do not go beyond general suggestions, which fail when tested against the development of enabling technology. Major problems have been impeding the success of such enabling technology.

The Kurokawa et al article entitled "Bi-Directional Transmission Between Sign Language And Japanese For Communication With Deaf-Mute People" Proceedings of the 5th International Conference on Human Computer Interaction, 2, 1109 (1993) described how limited recognition can be achieved of static gestures utilizing electromechanical gloves which are sensor based and Kurokawa digitizes the electromechanical output of sensors. Capturing images with a camera is a well known art, but interpreting such images in a consistent way without relying on the human brain for direct interpretation (i.e., machine interpreted images) has alluded researchers. The Rogers article entitled "Proceedings SPIE-The International Society For Optical Engineering: Applications of Artificial Neural Networks", IV, 589 (1993), suggests various approaches which cannot work when tested in a real life situation, such as utilizing infrared for signal interpretation. Unfortunately, one cannot combine the technology of Rogers and Kurokawa to solve the problem because the technologies employed are mutually exclusive. If one uses images as Rogers proposes, one cannot obtain from them the information provided by the sensors of the data gloves of Kurokawa; if one uses Kurokawa's gloves, one cannot utilize the camera images to provide any intelligence, knowledge or information beyond what the sensors in the DataGloves provide. Therefore, a fresh approach to the problem is necessary.

Displaying signed motions presents another challenge. A simple database of all possible signed motions which is an intuitive approach is rather problematic. To create a lucid signing stream, one needs a smooth movement from one word or phrase to another. Otherwise, the signing is jerky at best if not totally unintelligible. Although there may have been suggestions for such a database of signing images, this is not a realistic resolution due to the fact that, for every signed image in the database, one will need to have an enormous amount of connecting movements to other potential gestures, increasing dramatically the size of the database. To select a signing stream, inclusive of all the proper intermediary connecting gestures between previous and current images needed for lucid signing presentation, from such

5,982,853

**3**

an enormous database puts search algorithms to an unrealistic challenge.

Attempts have also been made to transmit digitized signing motions to a central station as disclosed in Jean-Francois Abramatic et al, U.S. Pat. No. 4,546,383. Even when images are transmitted as proposed by Abramatic et al, the edge detection performed fails to enunciate detail of overlapping hands, or to differentiate between finger spelling and signed motions. All such attempts are restricted by available bandwidth which curtails wide use of such methods.

It is an object of the present invention to provide a novel electronic communication system for use by deaf persons to enable them to communicate by signing.

It is also an object to provide such an electronic communication system wherein the deaf person and the person communicating with the deaf person do so through a central facility containing a translating means for processing elements of digitized image data.

Another object is to provide such a system in which a hearing person may have his speech converted into digitized signing motions which are displayed to the deaf person.

A further object is to provide a unique method utilizing such an electronic communication system to enable communication by and to deaf persons.

### SUMMARY OF THE INVENTION

It has now been found that the foregoing and related objects may be readily attained in an electronic communications system for the deaf comprising a video apparatus for observing and digitizing the signing motions, and means for translating the digitized motions into words and phrases. Also included are means for outputting the words and phrases in a comprehensible form to another hearing person, generally as artificial speech.

In a telephone type system, the other person is at a remote location, although the system may also be used as a translator for communication with a person in the immediate vicinity. Generally, the video apparatus is a video camera.

From cost and portability standpoints, the translating means is at a remote location or central station and there is included transmission means for transmitting the digitized signing motions or their digital identifiers to the translating means.

In addition to use of a database of words and phrases corresponding to digitized motions, the translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases and into coherent sentences.

The outputting means may convert the coherent sentences into synthetic speech or present the words and phrases in written form.

To enable communication of the deaf person, the system includes means for the other or hearing person to transmit words and phrases. The translating means is effective to translate said words and phrases into digitized signing motions, and the video apparatus includes a display screen which provides an output of the digitized signing motions on the display screen for viewing by the deaf person.

There is included means for translating speech into digital data representing words and phrases and such digital data into digitized signing motions. Desirably, the video apparatus includes a display screen to provide an output of the digitized motions as signing motions on the display screen for viewing by the deaf person. The video apparatus also includes a microphone and speaker whereby a deaf person may communicate with another person in the immediate vicinity.

**4**

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic presentation of the steps performed in an electronic communication system embodying the present invention;

FIG. **2** is a schematic representation of a method for connecting an incoming call on the deaf person's telephone to a processing center providing the computer software for the translating functions of the present invention;

FIG. **3** is a schematic representation of the functions when utilizing such a processing center;

FIG. **4** is a schematic presentation of the several steps in the intervention and operation of the processing center when a call is received by the deaf person's telephone;

FIGS. **5**a–**5**c are perspective views of a deaf person's receiver/transmitter installation embodying the present invention in three different forms using a personal computer and video camera, using a television set with a video camera, and as a public telephone kiosk;

FIG. **6** is a perspective view of the present invention in the form of a cellular telephone;

FIG. **7** is a schematic of representation of artificial intelligence used to determine and translate the emotional content in the speech of a hearing person communicating with a deaf person;

FIG. **8** is a diagrammatic representation of the manner in which the screen of a display unit may be divided into sections presenting elements of information in addition to signing motions;

FIG. **9** is a schematic representation of the modules of the artificial intelligence for converting signing into speech;

FIG. **10** is a schematic representation of the modules for creating multiple neural networks and collecting the necessary examples for training these networks;

FIG. **11** is a schematic representation of the modules for controlling the conversion of text to signing animation;

FIG. **12** is a schematic representation of the modules for capturing and compressing the images to be used during the playback of sign language animation;

FIGS. **13** illustrates a user of the device wearing special gloves to enhance the ability of the system to identify the signing of the deaf person;

FIGS. **14**a–**14**d illustrate the manner in which the unique shape of the glove makes it possible to recognize the differences between two very similar signs;

FIG. **15** is a schematic representation of the steps to effect translation of English text to American Sign Language (ASL); and

FIG. **16** is a schematic representation of the steps to effect translation of American Sign Language to English text.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Turning first to FIG. **1** of the attached drawings, therein illustrated schematically is an electronic communications system embodying the present invention.

Generally, the deaf person uses sign language in front of a device containing a video camera. The images captured by the camera at 20–30 frames/second are processed by a digital device which does initial and extended image processing. In the processing, each of the frames containing a captured image undergoes a process whereby the image is transformed into manageable identifiers. It is the set of identifiers, in the form of tables of numbers, that travels the

5,982,853

5                                                6

normal telephone lines to the central processing facility (i.e., the Center). These identifiers, and not the images themselves, are then correlated with a database of vocabulary and grammar by using artificial intelligence at the Center. Subsequently, syntax rebuilding occurs, again utilizing artificial intelligence, resulting in a complete verbal text which is equivalent to the signed language content. The text then undergoes a text-to-synthesized-speech transformation and the speech is sent as an analog signal to any ordinary telephone utilized by a hearing person by existing copper or fiberoptic telephone lines. Part of the artificial intelligence referred to above consists of neural networks which are trained for these specific applications.

On the other end of the telephone line, the normally hearing person talks on his or her conventional telephone in the normal and regular way of spoken language. His or her voice is carried on line (in whatever method of transport is utilized by the telephone carrier) to the Center where speech recognition algorithms convert the spoken word to text. The Center will accommodate appropriate speech recognition (i.e., automatic, continuous and speaker independent). The recognized speech is then transformed into its equivalent signing content vocabulary and then into text. The text is sent via the telephone lines to the device used by the deaf person and converted to signing animation. Depending upon the transmission line and computer capability of the deaf person's location, the text may be sent as reduced identifiers which are converted into animated images by the deaf person's computer or as completely formatted animated images. The sign images then appear on the screen of a monitor viewed by the deaf person, resulting in a continuous dynamic set of animated sign language motions which portray the content of the spoken language uttered as speech by the normally hearing person.

In view of the computer processing requirements, a preferred form of the present invention includes a processing center containing the sophisticated computer equipment, databases and neural networks to effect the signing/verbal translations, and the communications are conducted through this center. As seen in FIG. 2, a caller (or receiver) and deaf person are actually communicating through such a center. The method of employment of the center is illustrated in FIG. 3 wherein the center receives the input from the video device of the deaf person and provides an audible output to the hearing person who is using a telephone. The hearing person speaks into the telephone and the center provides a video output to the video device of the deaf person.

To avoid excessive costs for a hearing caller, the telephone installation of the deaf person receiving a call may automatically call the center and switch the incoming call to a routing through the center as is illustrated in FIG. 4.

In FIG. 5a, the deaf person's station comprises a personal computer 30 including the monitor 32 and a video camera 34. In FIG. 5b, a computer unit 36 and a video camera 38 is utilized on top of a standard television set 40 so as to be at hand level. In FIG. 5c, a public kiosk 42 has built into it, a video camera 44, a video monitor 46, and lamps 48 to ensure adequate lighting of the user's hands, face and body. To place the call, there is a keypad 50, and a credit card reader may be combined therewith.

A portable transmitter/receiver generally designated by the numeral 8 for use by a deaf person is shown in FIG. 6 and it contains a video camera, the lens 10 of which is disposed in the upright portion 12. In the base portion 13 are an LCD display panel 14 and a key pad 16 for dialing and other functions. Also seen is an antenna 18 for the device so that it may be transported and communicate as a wireless remote or through a cellular telephone network. The device is supported in a stable position and the deaf person is positioned so that the camera lens 10 will record the signing movement of the hands and fingers and body and facial motions and expressions. The signing motions captured by the camera are converted into digital data for processing by the translation software, (i.e., artificial intelligence) to produce data representing numbers, words and phrases which are then combined into coherent sentences. As previously indicated, such translation is most economically effected in a dedicated central computer facility. The translated message is then conveyed to the "listener" in either verbal or written form.

The other party may speak into a telephone receiver (not shown) and the verbal expressions are translated by the artificial intelligence into digital data for signs. These signs are displayed on the LCD panel 14.

Since the emotional content of the speech of the other party is not conveyed by signs, the artificial intelligence in the system may provide an analysis of the emotional content of the speech and convey this to the LCD display panel as a separate output. Indicative of the functions of the artificial intelligence software for doing so is the diagrammatic presentation in FIG. 7.

This is portrayed to the deaf either as a separate image in a corner of the screen which he or she is watching or incorporated into facial expressions of animated signing figures.

Turning next to FIG. 8, therein illustrated is a layout for the visual display to present multiple information to the deaf person such as touchless function buttons, system status indicators, alarms, a printed translation, and a playback of the image being recorded, as well as the signing images and text of the hearing person's responses.

FIGS. 9–12 are schematics of the system software modules for converting signing to speech and speech to animation, including system training methods.

The overall operation of a preferred electronic communications system is set forth hereinafter.

The deaf person uses sign language in front of the transmitter/receiver device containing the camera. The images captured by the camera are of the finger and hand motions and of body motions and of facial expressions and motions captured by a digital device which does initial processing. In the initial processing, each of the frames containing a captured image undergoes a process whereby the image is collapsed into a small set of fixed identifiers. At the end of the initial processing, the resulting information is sent as data on a regular and designated phone line using an internal modem in the device to the data processing center.

The rest of the processing is completed at the center. This includes identification of the letters, numbers and words, conversion to standard sign language, and the conversion to spoken language which results in the equivalent text of the signed content. The text then undergoes a text to synthesized speech transformation and the speech is sent as an analog content to the normally hearing person. The voice content may leave the center as data if packet switching (64 kb or 56 Kb service) is utilized directly from the center. Processing in the center utilizes artificial intelligence such as neural networks trained for the specific applications of the device.

The normally hearing person who calls a deaf person dials the deaf person's phone number. However, at the deaf person's station, his or her call is connected to the center on a single line which is the deaf person's designated line to the

5,982,853

**7**

center. The deaf person's device arranges for switching and enables both the caller and his or her station to be on line as a "party call". The deaf person's station also arranges for the simultaneous transmission of both voice and data on the dedicated line. Thus, the line between the normally hearing person and the deaf person is analog for voice content only, while the line between the deaf person (and now the normally hearing person too) is analog but transfers both voice and data.

The normally hearing person's voice undergoes speech recognition in the center and is transformed into the equivalent signing content and then into textual material. The text is sent from the center to the deaf person's device via telephone lines. Software in the device converts the text into reduced identifying pointers for each gesture, which are then converted into animated images which portray in sign language the content of the speech processed in the center.

In a cellular phone, the operation is much the same in its operation as the hard wired telephone. The camera in the cellular phone transmits the image for initial processing in the cellular phone. From there the reduced data is transmitted to the center for processing. The same switching occurs here as well, and voice/data is sent to the center on the dedicated line assigned for the deaf person. However, in this case the cellular phone maintains two cellular connections on line, one to the center (voice/data) and one to the caller. The deaf person sees the content of the call to him by viewing the display LCD on his cellular phone unit.

When the phone for the deaf is equipped with a microphone and a speaker instead of, or in addition to a second telephone channel, it may be turned into a communicator. Obviously, one can opt to have both of these options to double the usefulness of the device. The communicator enables the deaf person to conduct a "conversation" with any normally hearing person in the close proximity. The signing motion of the deaf person are processed by the center and is transmitted back to the device as a normal voice transmission which the speaker renders as speech to the normally hearing person. His or her speech in turn, is picked up by the microphone and sent to the center for processing. The result is an animated content on the LCD of the communicator which portrays in sign language the spoken content of the normally hearing person.

The modules for the software effect translation of the signing into and from digital text are set forth in FIGS. **9** and **10** and those to recognize animation are set forth in FIGS. **11** and **12**. Software presently used for this purpose is appended hereto and is utilized with Borland C++.

A person engaging in the development of other software should consider the following with respect to figure tracking:

A. The groups listed below are captured in separate forms, then added to integrated forms. The integrated forms are then integrated into a single observable signing (i.e. our normalized signing with a single camera), while location information are kept in a separate log. The separate log can have various usages which may not be in their entirety related to signing on the phone. Such can be the case of activating an ATM machine or food billboard in a drive-in situation.

a. Definitions:

L(h):=Left hand
L(a):=Left arm
R(h):=Right hand
R(a):=Right arm
L(H):=Left side of the head

**8**

R(H):=Right side of the head
L(T):=Left side of torso
R(T):=Right side of torso
L(T):=Left side of torso
R(f):=Right femur
L(f):=Left femur
R(t):=Right tibia
L(t):=Left tibia

B. Section addition with recognition takes place:

b.1. $A=L(h)+L(a)$
$B=R(h)+R(a)$
$C=L(H)+R(H)$
$D=L(T)+R(T)$
$E=L(t)+L(f)$
$G=R(t)+R(f)$

c. Signing content (Sc):

$S=A+B$

d. Emotional content (Ec):

$Ec=C+D$

e. Pointing and activation (PA):

$PA=A+B$

f. Location in space (Ls):

$Ls=E+G+(C+D+A+B)$

In seeking to have the software recognize emotional content in the signing or in the speech, the following should be considered:

Our emotional content is divided into two separate segments:

A. The hearing person segment

B. The hearing challenged segment

A. The hearing person segment.

In this segment we analyze in the speech four distinct elements:

A.1. Changes in various speech output elements.

A.2. Duration of changes recognized in A.1.

A.3. Frequency of the changes appearing in A.1.

A.4. Frequency of the duration of changes appearing in A.2. The elements that are analyzed by A.1., through A.4. are:

    a. Pitch
    b. Volume
    c. Non words elements for which the system is trained (e.g., gasps of air, emitting the word "ah, chuckle, crying, etc.)
    d. Repetitions of words and/or word parts (indicating stuttering).

B. The hearing challenged person segment.

This segment analyzes combination of intrafacial positions, where the system utilizes the training similar to signing, but with different attributes and meanings.

a. Definitions and variables status;

U(l):=Upper lip [showing=1, not showing=0]
LL.(1):=Lower lip [showing=1, not showing=0] (m):=Left part of mouth [compressed=1, uncompressed=0]
R(m):=Right part of mouth [compressed=1, uncompressed=0]
M(  ):=Complete mouth as a unit [Opened wide=1, closed=0;
    compressed and drawn in=4;
    compressed and downward=5;
    stretched flat=6;
    opened with teeth showing=7]
U(t):=Upper front teeth [showing=1; not showing=0]

5,982,853

| 9 | 10 |

LL.(t):=Lower front teeth [showing=1; not showing=0]

t():=Frontal teeth as a whole [shown=1; not shown=0]

R(n):=Right nostril [expanded=1; unexpanded=0]

L(n):=Left nostril [expanded=1; unexpanded=0]

L(cb):=Left cheek bone [raised=1; unraised=0]

R(cb):=Right cheek bone [raised=1; unraised=0]

LO(e):=Left Open eye as a whole [distance above pupil=1; no distance above pupil=0]

RO(e):=Right Open eye as a whole [distance above pupil=1; no distance above pupil=0]

LC(e):=Left closed eye

RC(e):=Right closed eye

LN(e):=Left eye narrowed

RN(e):=Right eye narrowed

R(b):=Right eye brow [raised=1; not raised=0]

L(b):=Left eye brow [raised=1; not raised=0]

N(b):=Nose bridge [two states: compressed=1; uncompressed=0]

F(f):=Frontal forehead [compressed=1; uncompressed=0]

In addition to the emotional content variable Ec, we analyze other combinations as they pertain to emotional expressions of a cultural group. For example:

The state of (i.e, showing of) to=1 and n(b)=1

means "anger".

Computer software for speech recognition and conversion to digital data presently exists and may be modified and enhanced for use in the communications system. Exemplary of such software is that of International Business Machines designated "IBM Continuous Speech Recognition Program". Similarly, commercial software may be used to convert digital data into artificial speech.

Because commercial speech recognition software is not completely accurate, it may be desirable to develop a corrective addon to increase the accuracy as set forth hereinafter:

Algorithmic Steps

a. Duplicate each incoming analog stream to provide two segments:

   1. An untouched segment (Segment A).

   2. A processed segment (Segment B).

b. Tag each segment with respect to position in the incoming stream.

c. Each segment (Segment A) can have variable length.

d. Digitize incoming analog stream.

e. operate speech recognition kernel on Segment B.

   e.1. Speech recognition kernel.

   e.2. Spell checker for word.

   e.3. Grammatic checks.

   e.4. If recognized and proper tag as Ra

   If unrecognized or improper tag as Ua

f. Tag each fully (i.e., 100%) recognized word as to its position in Segment B.

g. Deduct the recognized words of Segment B in their appropriate position in Segment B from Segment A. The result is Segment C.

   g.1. Segment C is tagged to identify its position in Segment A (Position 1).

h. Segment C is inserted into a prepared digitized speech section (which contains a message to the speech originator)

i. Digital to Analog conversion takes place.

j. The resulting analog speech segment is sent to the speech originator.

k. Return from speech originator is digitized (Segment D).

l. Segment D is inserted in position 1 in Segment A.

m. Segment A is declared 100% recognized segment and is moved to signing dispatch.

Corrective Measures

   Corrective measures fall into the following.

A. Topic Assisted/using Trap words

B. Intermediary Agent Assisted

C. Speaker Assisted.

D. Spell Checker assistance.

E. Grammatic Assistance.

   A. Topic Assisted

1. Invoking the most common nine words to decide:

   1.a. Accent/Country/Location

   1.b. Channel to subgroup section [divided into geographic and demographic (cultural) groups

2. Invoke Trap words to locate area of discussion

3. Utilize B-tree [C++,V4+] for list of words possibly matching word in question.

First Level of Assistance

1. This level utilizes trap words in order to determine personal speech patterns.

2 Big Nine words are evaluated in 4 tiers: Word [i.j.k.l] i=l, . . . ,n; n=n(a)+n(b) where n(a)=6, and n(b)=6.

   Values of n(a) or n(b) can be modified per specific situation.

   i determines the group most appropriate to determine any of the nine words.

   S=Total number of words

$$S = \sum_{i=1}^{9} \text{Word } [i] = 9$$

Second Level of Assistance

1. This level traps words to determine area of discussion.

   j=1, . . . ,10 i.e. Ten words for each area of concentration

   k=1, . . . ,12 i.e. Twelve areas of concentration

$$S(j, k) = \sum_{j=1}^{10} \sum_{K=1}^{12} \text{Word } [j, k] = 120$$

Third Level of Assistance

1. This level compares unrecognized words against groups of 20 words describing each of the 12 areas.

$$S(i, j, k, l) =$$
$$\sum_{i=1}^{9} \sum_{j=1}^{10} \sum_{K=1}^{12} \sum_{l=1}^{20} \text{Word } [i, j, k, l] = 9 \times 10 \cdot 12 \cdot 20 = 21,600 \text{ words}$$

If the signer uses American Sign Language, there is a need to effect linguistic analysis beyond what was recognized by William Stokoe in Semantics and Human Sign Language, Mouton (1971), and Sign Language Structure, Linstok Press (1978).

ASL is a visual-spatial language requiring simultaneous, multiple, dynamic articulations. At any particular instant, one has to combine information about the handshape (Stokoe's dez), the motion (Stokoe's sig) and the spatial location of the hands relative to the rest of the body (Stokoe's tab). Supplementing such information and by dynamically articulating a word or a meaning, are grammatical cues provided in context and requiring attention to detail.

5,982,853

**11**

Repetition of words indicates plurality, vibrations signify intensity, and relative spatial distance between cooperating hands specifies magnitude. Further grammatical delineation is contributed by facial expressions. Some of the facial cues are intuitive to human emotions and simplify such correlation. For example, the eyebrows when raised indicate surprise but when drawn down in a frown like manner signify negation or suspicion. Other facial expressions have no such immediate and intuitive affect. Such as the case of utilizing tongue position. A protruding tongue synchronized with the sign "late" turns the meaning into "not yet".

Isolated grammatical similarities exist between the two languages, although their utilization in translation differs. Utilizing a number system with its siblings of ordinal numbers, age, or time as well as compounds are examples of such similarities.

Translation of compound words in a spoken language is benefited by its written presentation as a single unit, or when spoken, presentation in a continuous utterance, guarantees a unique interpretation which begets a correct translation. "Homework", "businessman", "classroom", "babysitter" are all in daily usage as independent words.

Compounds in ASL are no different than their spoken counterparts, albeit the fact that no manual dexterity is required in rapid concatenation of the components. However, in the absence of external cues accorded the spoken compound in its rapid utterance, a machine translation of ASL compound word requires a resolving algorithm.

Other routines are mandatory for quality translation involving ASL. For example, word order in the context of a spoken language should be observed. It is set by rules which are consistently applied as a way to achieve unambiguous meaning. Such a strict rule set does not exist in ASL. However, the appearance that ASL is more lax and forgiving in its scrutiny for order and thus leading to ambiguity in the resulting meaning is misleading. There are rules in ASL for breaking the rules. In fact, a particular word order rule is a corollary of a prevailing situation conveyed by the signer. Hence, there is a rule for selecting the rule of a particular word order, which together employ supplemental meaning to the sentence, while enabling a shorter exposition. The economy of exposition achieved contributes to a more efficient communication for the signing parties. Subtle but clear message is conveyed by such order. Sentences with classifiers indicating locations appear with the order of Object, Subject, Verb, while Subject preceding Object which precedes Verb singularly indicates inflected verbs. Translation algorithms which treat even the most subtle of ASL idiosyncrasies as rules, emanated from and borne out of a need to improve efficient and economic communication will attain a higher level of comprehensive quality.

The software in FIGS. **15** and **16** handles various translation issues which need resolution before an acceptable translation can follow. Issues or word order in ASL, such as the word order just discussed, are germane to the language itself.

Cultural issues require attention right from the outset. The ASL finger spelled letter "T" viewed in Europe, or ASL signs spatially located relative to the person's midsection viewed in China, will be locally construed a pejorative. Hence, identification of the expression in the context of the intended recipient, may cause the format of delivery to undergo an appropriate substitution. Therefore, the algorithms as related to telephone communication, try to identify the recipient's cultural base or geography prior to dispatch, so that the algorithmic routines for appropriate adjustments can be invoked.

**12**

Notwithstanding such efforts, the advanced group of algorithms is far from being comprehensive, and represents only the first step in a much deserving subject. FIG. **15** shows the essential components of an English to ASL translation algorithm, while FIG. **16** shown the ASL to English translation algorithm.

As will be appreciated, there is a substantial problem in effectuating real time transmission of the data as to images because of the need for compression even after discarding superfluous information. If we consider a video camera with 640 horizontal pixels and 480 lines, this means that a single frame amounts to 307,200 Bytes or 2.4576 Mbits. When considering a real time operation of 30-frames/sec, this would require 73.728 Mbits/Sec. Obviously, a bottleneck will result in the transfer to and from any acceptable storage media. Furthermore, to utilize telephone lines in a meaningful way, such as at 56 kilobits/second or even at 64 kilobits/second, it would take close to 20 minutes to transfer one second of video data. Using compression would mean a compression rate of over 1,000:1. Even resorting to compressing the data by utilizing wavelets, the level of resulting quality would be questionable. The other alternative is typically to transmit fewer frames per second, but this is an unacceptable method as it results in jerky motions and becomes difficult to interpret visual signing gestures.

In the present invention, the preferred approach is to avoid the conventional approach of trying to force some compression scheme on the data, and instead bring the data down from the frame level to a Reduced Data Set (RDS).

It will be appreciated that another significant aspect of the invention is the requirement that finger spelling be captured by the camera, undergo the RDS process, and still be recognized once artificial intelligence procedures are invoked. This task can be difficult because the frame grabber has to capture the signed gesture against the ambient surroundings, other body parts of the signing person, and clothes. Preferably, the system uses special gloves which allow discrimination of the hands from the background for the image processing system.

Turning now to FIGS. **13** and **14**, therein illustrated is the benefit in using special gloves to enhance the ability of the system to recognize important detail of the hand shapes during the actual gesturing of sign language. Many times the hands are overlapping or touching each other. Video separation of left from right is accomplished by color separation using different saturated colors for each hand. For example, the fingers of the right hand can be distinctly green and the fingers of the left hand are distinctly blue. In addition, each glove has a third color (typically red) for left and right palm areas. This allows hand shape and finger details to be seen whenever the hand is closed vs. opened and when palm is disposed toward the camera vs. palm away.

The same type of RDS is utilized in recreating images, frame by frame, in real time, which will be displayed on the deaf person's monitor. These images will appear as smooth, continuous animation which will be easy to recognize. This is because the recreation of this animation is a result of actual frame by frame information which has been captured from a live subject and put into memory. The RDS takes up minimal memory and yet is completely on demand, interactive, and operates at real time speed.

At the end of the speech recognition, from the hearing persons' voice and text building procedure, the various words will be assembled into their counterpart animated signing gestures, starting with the table of data generated from the text that was transmitted from the center doing the frame by frame recreation for each gesture, employing

5,982,853

**13**

special algorithms for transitional frames between gestures and then displaying them in sequence on the deaf persons' monitor.

The illustrated embodiments all utilize a single video cameras. It may be desirable to utilize more than one camera to allow the signing person "free" movement in his or her environment to track down spatial positions in that environment.

In such a case, the installation should follow the following criteria:

1. Each camera is covering a separate angle.
2. Each camera operates independently of the other(s).
3. Angle overlap may or may not be permitted according to the pre-signing calibration.
4. Integration of input from multiple camera is performed
5. A defined figure with signing motions (where applicable) is rendered in conformity with allowable images (for persons). The same technique is useful in defining any objects or, alive, stationary or moving entities, such as animals.
6. Movements without signing are classified as null figures (coordinates are preserved).
7. The animated form of the signing figure can be shown in an "abbreviated" form when the person is not signing. That is, a figure not well defined with specific locations of fingers, etc. Such animated figures an occur for all null figures.

Recently, three dimensional video cameras have been developed. The use of such devices may facilitate recognition of signing motions by enhancing spatial differences.

Thus, it can be seen that the electronic communications system of the present invention provides an effective means for translating signing motions to speech or text for a hearing party using only a normal telephone at the hearing party's end of the line, and for translating speech to signing motions which are conveyed to the deaf party. The system may function as a telephone for the deaf, or as an on-site translator.

Having thus described the invention, what is claimed is:

**1**. An electronic communications system for the deaf comprising:

(a) a video apparatus for visually observing the images of facial and hand and finger signing motions of a deaf person and converting the observed signing motions into digital identifiers;

(b) means for translating said digital identifiers of said observed signing motions into words and phrases;

(c) means for outputting said words and phrases generated by the visual observation of said signing motions in a comprehensible form to another person;

(d) a receiver for receiving spoken words and phrases of another person and transmitting them;

(e) means for translating said spoken words and phrases into a visual form which may be observed by the deaf person; and

(f) means for outputting said visual form of said spoken words and phrases on said video apparatus for viewing by the deaf person.

**2**. The electronic communications system in accordance with claim **1** wherein said another person is at a remote location.

**3**. The electronic communications system in accordance with claim **1** wherein said video apparatus includes a video camera and image capture and processing hardware and software.

**14**

**4**. The electronic communications system in accordance with claim **1** wherein said translating means is located at a central station with which said video apparatus and said receiver and outputting means are in communication.

**5**. The electronic communications system in accordance with claim **1** wherein said translating means also includes artificial intelligence for interpreting and converting the translated signing motions into words and phrases and into coherent sentences.

**6**. The electronic communications system in accordance with claim **5** wherein said outputting means converts said coherent sentences into synthetic speech.

**7**. The electronic communications system in accordance with claim **1** wherein said outputting means converts said spoken words and phrases into written form.

**8**. The electronic communications system in accordance with claim **1** wherein said video apparatus includes a display screen.

**9**. The electronic communications system in accordance with claim **8** wherein said video apparatus provides an output of said spoken words and phrases as signing motions on said display screen for viewing by the deaf person.

**10**. The electronic communications system in accordance with claim **1** wherein said video apparatus includes a display screen to provide an output of said spoken words and phrases as signing motions on said display screen for viewing by the deaf person, and wherein said video apparatus includes a microphone and speaker whereby a deaf person may communicate with another person in the immediate vicinity.

**11**. The electronic communications system in accordance with claim **10** wherein said translating means is located at a central station with which said video apparatus and said receiver and outputting means are in communication.

**12**. In a method for electronic communication for the deaf comprising:

(a) visually observing the images of facial and hand and finger signing motions of a deaf person and converting the observed signing motions into digital identifiers;

(b) translating said digital identifiers of said observed signing motions into words and phrases;

(c) outputting said words and phrases in a comprehensible form to another person;

(d) receiving speech from said another person;

(e) translating said speech of said another person into signing motions; and

(f) displaying said signing motions representing said speech to said deaf person.

**13**. The electronic communications method in accordance with claim **12** wherein said another person is at a remote location.

**14**. The electronic communication method in accordance with claim **13** wherein said step of outputting at a remote location is effected by transmission of said translated words and phrases to a communications device receiver at said remote location.

**15**. The electronic communication method in accordance with claim **12** wherein said step of observing and converting the signing motions is effected by a video camera.

**16**. The electronic communication method in accordance with claim **12** including the step of transmitting said digital identifiers of said motions and said speech electronically to a central station where said translating steps are performed.

**17**. The electronic communication method in accordance with claim **12** wherein said outputting step provides such words and phrases as synthetic speech.

5,982,853

**15**

**18**. The electronic communication method in accordance with claim **12** wherein said outputting step provides said words and phrases in written form to said another person.

**19**. The electronic communication method in accordance with claim **12** wherein said displaying step provides said words and phrases in written form.

**20**. The electronic communication method in accordance with claim **12** wherein said translating step utilizes artificial intelligence.

**21**. The electronic communication method and software in accordance with claim **20** wherein said intelligence is developed with the use of multiple neural networks automatically created and assigned by gesture type.

**22**. The electronic communication method in accordance with claim **12** wherein said another person and said displaying step are at the same location as said deaf person and wherein said visually observing and converting step utilizes a video apparatus.

**23**. The electronic communication method in accordance with claim **22** wherein said receiver and outputting steps are conducted by components of an installation including said video apparatus.

**24**. The electronic communication method in accordance with claim **22** wherein said translating steps are conducted at a remote center.

**25**. The electronic communication method in accordance with claim **12** wherein said translating steps are conducted at a remote center.

**26**. An electronic communications system for the deaf comprising:

 (a) a video apparatus for visually observing the images of facial and hand and finger signing motions of a deaf person and converting the observed signing motions into digital identifiers;

 (b) means for translating said digital identifiers of said observed signing motions into words and phrases;

 (c) means for outputting said words and phrases generated by the visual observations of said signing motions in a comprehensible form to another person;

**16**

 (d) a receiver for receiving spoken words and phrases of another person and transmitting them;

 (e) means for translating said spoken words and phrases into signing motions which may be observed by the deaf person; and

 (f) means for outputting said signing motions on said video apparatus for viewing by the deaf person, said translating means being located at a central station with which said video apparatus and receiver are in communication.

**27**. An electronic communications system for the deaf in accordance with claim **26** wherein said another person is at a remote location.

**28**. An electronic communications system for the deaf in accordance with claim **26** wherein said video apparatus includes a video camera and image capture and processing hardware and software.

**29**. An electronic communications system for the deaf in accordance with claim **26** wherein said translating means also includes artificial intelligence for interpreting and converting the translated motions into words and phrases into coherent sentences.

**30**. An electronic communications system for the deaf in accordance with claim **28** wherein said outputting means converts said coherent sentences into synthetic speech.

**31**. An electronic communications system for the deaf in accordance with claim **26** wherein said video apparatus includes a display screen.

**32**. An electronic communications system for the deaf in accordance with claim **26** wherein said video apparatus includes a display screen to provide an output of said spoken words and phrases as signing motions on said display screen for viewing by the deaf person, and wherein said video apparatus includes a microphone and speaker whereby a deaf person may communicate with another person in the immediate vicinity.

\*   \*   \*   \*   \*

**Exhibit PA-2**

**U.S. Patent No. 6,115,482 to Sears et al.
("Sears")**

US006115482A

# United States Patent [19]

## Sears et al.

[11] **Patent Number:** **6,115,482**

[45] **Date of Patent:** **Sep. 5, 2000**

[54] **VOICE-OUTPUT READING SYSTEM WITH GESTURE-BASED NAVIGATION**

[75] Inventors: **James T. Sears**; **David A. Goldberg**, both of Boulder, Colo.

[73] Assignee: **Ascent Technology, Inc.**, Boulder, Colo.

[21] Appl. No.: **09/176,999**

[22] Filed: **Oct. 22, 1998**

**Related U.S. Application Data**

[63] Continuation-in-part of application No. 08/930,156, filed as application No. PCT/US97/02079, Feb. 11, 1997, abandoned.

[60] Provisional application No. 60/063,135, Oct. 22, 1997, provisional application No. 60/068,713, Dec. 29, 1997, and provisional application No. 60/011,561, Feb. 13, 1996.

[51] Int. Cl.[7] ................................................... **G06K 9/00**

[52] U.S. Cl. .......................... **382/114**; 382/103; 382/173; 348/62

[58] Field of Search ................................ 382/103, 173, 382/177, 114; 348/62; 235/472; 345/173, 157

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 287,021 | 12/1986 | Johnson | D16/1 |
| 3,676,938 | 7/1972 | Trehub | 35/35 A |
| 4,520,501 | 5/1985 | DuBrucq | 381/48 |
| 4,793,812 | 12/1988 | Sussman et al. | 434/116 |
| 4,972,501 | 11/1990 | Horyu | 382/53 |
| 5,091,865 | 2/1992 | Yamada et al. | 395/153 |
| 5,165,897 | 11/1992 | Johnson | 434/113 |
| 5,168,531 | 12/1992 | Sigel | 382/48 |
| 5,186,629 | 2/1993 | Rohen | 434/114 |
| 5,222,160 | 6/1993 | Sakai et al. | 382/57 |
| 5,223,828 | 6/1993 | McKiel, Jr. | 340/825.19 |
| 5,233,333 | 8/1993 | Borsuk | 340/731 |
| 5,287,102 | 2/1994 | McKiel, Jr. | 340/825.19 |
| 5,306,152 | 4/1994 | Shimoda | 434/114 |
| 5,374,924 | 12/1994 | McKiel, Jr. | 340/825.19 |
| 5,438,630 | 8/1995 | Chen et al. | 382/159 |
| 5,461,416 | 10/1995 | Bettinardi | 348/62 |
| 5,475,399 | 12/1995 | Borsuk | 345/130 |
| 5,633,674 | 5/1997 | Trulaske et al. | 348/63 |
| 5,687,333 | 11/1997 | Dobashi et al. | 395/336 |
| 5,736,978 | 4/1998 | Hasser et al. | 345/173 |
| 5,875,428 | 2/1999 | Kurzweil et al. | 704/260 |

OTHER PUBLICATIONS

Linvill, "A Direct Translation Reading Aid for the Blind", Proceedings of the IEEE, Jan. 1966, pp. 40–52.

Vanderheiden, Boyd, Mendenhall, Jr., & Ford, "Development of a Multisensory Nonvisual Interface to Computers for Blind Users", Proceedings of the Human Factors Society 35th Annual Meeting—1991, pp. 315–318.

Converso & Hocek, "Optical Character Recognition", Journal of Visual Impairment & Blindness, Dec. 1990, pp. 507–509.

Optacon II System Brochure, Date Unknown.

*Primary Examiner*—Matthew Bella
*Attorney, Agent, or Firm*—Robert G. Crouch; Holland & Hart LLP

[57] **ABSTRACT**

An optical-input print reading device with voice output for people with impaired or no vision in which the user provides input to the system from hand gestures. Images of the text to be read, on which the user performs finger- and hand-based gestural commands, are input to a computer, which decodes the text images into their symbolic meanings through optical character recognition, and further tracks the location and movement of the hand and fingers in order to interpret the gestural movements into their command meaning. In order to allow the user to select text and align printed material, feedback is provided to the user through audible and tactile means. Through a speech synthesizer, the text is spoken audibly. For users with residual vision, visual feedback of magnified and image enhanced text is provided. Multiple cameras of the same or different field of view can improve performance. In addition, alternative device configurations allow portable operation, including the use of cameras located on worn platforms, such as eyeglasses, or on a fingertip system. The use of gestural commands is natural, allowing for rapid training and ease of use. The device also has application as an aid in learning to read, and for data input and image capture for home and business uses.

**33 Claims, 6 Drawing Sheets**







*Fig. 2*



Fig. 3

*Fig. 4*

103
107
109
111
101
105
107
109
113
100



Fig. 5a

Fig. 5b

Fig. 5c

Fig. 5d



*Fig. 6*

6,115,482

1

# VOICE-OUTPUT READING SYSTEM WITH GESTURE-BASED NAVIGATION

## CROSS-REFERENCE TO RELATED PATENT APPLICATIONS

This application is related to and claims priority from U.S. Provisional patent application Ser. No. 60/063,135, filed Oct. 22, 1997, titled "Voice-Output Reading System with Gesture-Based Navigation," and from U.S. Provisional patent application Ser. No. 60/068,713, filed Dec. 29, 1997, titled "Voice-Output Reading System with Gesture-Based Navigation," the contents of each which are incorporated herein by reference. This application is also a Continuation-in-Part of co-pending U.S. patent application Ser. No. 08/930,156, filed Oct. 9, 1997, titled "Tactilely-Guided, Voice-Output Reading Device", which is incorporated herein by reference, which claims priority from U.S. Provisional patent application Ser. No. 60/011,561, filed Feb. 13, 1996, which is a 371 of PCT application Ser. No. PCT/US97/02079, filed Feb. 11, 1997.

## TECHNICAL FIELD

The present invention relates to an electronic reading system for converting text to synthesized speech that may be used by low-vision and blind people, as well as others that have difficulty reading printed text, and more particularly relates to an electronic reading system that includes improved functionality for allowing the user to navigate within the text.

## BACKGROUND ART

Our daily lives are filled with the need for reading printed material at any time and in any place. Utility bills and mail at home, food labels at the supermarket, clothes labels at the department store, textbooks at school, manuals and reports at work, and menus at restaurants are but a few examples. Nearly 10 million people in the United States have visual impairments which prevent them from reading books or the newspaper, even with the assistance of reading glasses, contacts or magnifiers, and millions more have mental and learning disabilities that severely limit their reading. To these people, their inability to read these materials in the places they are encountered puts them at a severe disadvantage.

Electronic reading machines using computer-based optical character recognition (OCR) have been used since the late 1980's to assist these reading-impaired people. In general, electronic reading machines have comprised personal computers outfitted with computer scanners, optical character recognition software, and computerized text-to-voice hardware or software. Currently, machines are sold by a variety of companies, including Telesensory of Mountain View, Calif., Arkenstone of Sunnyvale, Calif., and Kurzweil Educational Systems of Waltham, Mass. In general, the operation of these systems involves placing text on a scanner and obtaining a pixel bitmap of the page to be read, converting that image to text using an OCR program in the personal computer to which the scanner is attached, and generating speech output of the interpreted text using a text-to-speech software program. In order to navigate through the text on the page, the user either presses keys on the computer keyboard or keys on a special keypad in order to skip forward or backward by word, sentence or paragraph, repeat a section, or otherwise move through the formatted text.

These reading machine systems, unfortunately, suffer from a variety of operational insufficiencies that limit their

2

effectiveness. For instance, before the reading machine can begin to read a page, the user must typically wait over a minute. This delay is due primarily to three causes. Firstly, scanning a page is a mechanical action that takes time to move the electro-optical components over the page. Secondly, the large amounts of information in the scanned image require time to be transmitted to the computer. Thirdly, optical character recognition of an entire page can take considerable time. Thus, if a user wanted to scan through a newspaper or a magazine, considerable time would be needed simply to wait for the each page or scanned sections of text to process to the extent that it could begin audibly reading the text.

Another insufficiency of conventional reading machines is that scanners are limited in the size of page they can process, and reading a newspaper page would require multiple passes through the scanner. Furthermore, the keypad navigation of current reading machines requires that the user move through the text in the same order in which the computer organizes the data. At best, the user can skip over some paragraphs quickly, but the way in which the user is forced to apprehend the data is in the same linear fashion that the computer stores the information. This difficulty is less important in most books, in which the information is largely along a single narrative track, but can be quite limiting with highly formatted text such as newspapers, magazines, scientific journals, bus schedules, utility bills, and advertisements.

The majority of vision-impaired individuals have some residual vision, and many of these people use electronic magnifiers instead of OCR-based electronic reading machines. These magnifying systems generally consist of an electronic video capture system (usually with a CCD camera) connected to a video display. The book to be read is placed on a mechanical tracking mechanism beneath the video capture system, and assists the user in moving the book horizontally so as to keep the current line of text within the field of view of the camera. Means are generally provided to the user to adjust the contrast of the image, invert the colors of the image, and adjust the focus through manual controls on the face of the magnifying systems.

Because people with residual vision feel empowered using their remaining vision, and because they can use the magnifying systems to see information that is outside the scope of reading machines (e.g. seeing graphics on a page), and because they are generally less expensive than electronic reading machines, magnifying systems currently enjoy a far larger market than electronic reading machines. The are a large number of such magnifying systems currently available, including ones from Telesensory of Mountain View, Calif., Magnisight of Colorado Springs, Colo., and Optelec of Westford, Mass. However, conventional magnifying systems suffer from a number of problems.

For example, the mechanisms for tracking lines of text are often difficult to use, since they are manually-guided mechanical systems that require relatively precise and steady hand movements to guide the movement.

This requirement is difficult for certain people, especially the elderly who have fine motor problems, but also because it involves cognitive feedback control at the same time that considerable effort is being devoted to interpreting the images on the screen. Furthermore, when short columns of text are being read, the user must engage in frequent control of both vertical and horizontal mechanical guiding systems. Also, because of the small field of view of the camera and the limited movement of the mechanical system, the page

6,115,482

**3**

must often be repositioned on the mechanical guides. Because of the small field of view of these systems, it is difficult for the user to understand the overall structure of text and graphics on a complexly formatted page. In addition, the system depends entirely on the user's vision, even though this vision may be adequate only for very slow reading. Yet furthermore, the image manipulations afforded by these systems (e.g. contrast, brightness, zoom and focus) are generally limited, since they depend on mechanical systems and analog electronics, rather than the much greater range of possible effects of a digital system.

It was our intention to solve the problems of the prior art, both with regards to OCR-based electronic reading machines as well as electronic magnifying systems, that gave rise to the current invention.

### SUMMARY OF THE INVENTION

It is an object of this invention to provide a system to permit users to designate text to be read and to specify control system parameters through manual gestures.

It is also an object of the present invention to provide a system with both magnification and reading capabilities.

It is in addition an object of the present invention to provide a system that is affordable.

It is another object of the present invention to provide a system that allows a user to easily and rapidly select for reading text sequences that are distributed across widely separated regions of the current page.

It is additionally an object of the present invention to provide a system that allows a user to read from highly formatted pages of text.

It is still another object of the present invention to provide a system that reads text very shortly after the text is placed in the view of the system.

It is further an object of the present invention to provide a system that can be easily used from a seated position.

It is also an object of the present invention to provide a system that allows a user to read text from a large page, such as that a newspaper.

It is still further an object of the present invention to provide a system that is easy to learn to operate.

It is yet another object of the present invention to provide a system that can be used by people with difficulties in fine motor control.

It is additionally an object of the present invention to provide a system that can read text printed in a wide variety of formats on a wide variety of substrates, including medicine bottles, food packaging, and informative signs, as well as paper.

It is a yet further object of the invention to provide a device that can have many applications in daily life, including enabling reading-disabled people to read, helping children learn to read, and as a data input device for home and office.

Additional objects, advantages and novel features of this invention shall be set forth in part in the description that follows, and will become apparent to those skilled in the art upon examination of the following specification or may be learned through the practice of the invention. The objects and advantages of the invention may be realized and attained by means of the instrumentalities, combinations, and methods particularly pointed out in the appended claims.

To achieve the foregoing and other objects and in accordance with the purposes of the present invention, as embod-

**4**

ied and broadly described therein, the present invention is directed to a method for electronically reading text under interactive control by a user. The method includes obtaining a digital image that includes text to be read, performing symbology recognition on the digital image, determining a command signal from a sequence of user-generated spatial configurations of at least one pointer, choosing a subset of the recognized symbology to read on the basis of the determined command signals, and converting the chosen subset of recognized symbology into a humanly perceptible version.

The present invention is also directed to an electronic reading apparatus for converting text to spoken words for a user. The apparatus includes a digital imaging device that converts text to a digital imaging signal, and a character recognizer receptive of the digital imaging signal, the recognizer generating a recognized character signal comprising the symbolic identity of the recognized text and the location of the recognized text relative to the digital imaging signal. The apparatus also includes a pointer that is operated by the user to indicate commands, wherein commands are encoded in the location and movement of the pointer, and a pointer tracker receptive of the pointer location and movement, the tracker generating a pointer location and movement signal. The apparatus further includes a command interpreter receptive of the pointer location and movement signal and the recognized character signal, the interpreter generating a command signal, and a controller receptive of the command signal and the recognized character signal, the controller generating an output signal representative of at least portions of the text recognized. In addition, the apparatus includes a transducer receptive of the output signal for converting the output signal to a humanly-perceptible form.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1a is a perspective view of a device incorporating the first embodiment of the present invention.

FIG. 1b is a perspective view from below of the camera mount depicted in FIG. 1a.

FIG. 2 is a flow diagram of the steps of information processing of the device of FIG. 1a.

FIG. 3 is a perspective view of a device incorporating the second embodiment of the present invention.

FIG. 4 is a perspective view of a device incorporating the third embodiment of the present invention.

FIG. 5a is a side view of a device incorporating the fourth embodiment of the present invention.

FIG. 5b is a side view of the device of FIG. 5a, with the finger in a different configuration.

FIG. 5c is a front view of the device of FIG. 5a.

FIG. 5d is a side view of a variation of the device of FIG. 5a, with a cut-away view of the lens system.

FIG. 6 is a flow diagram of the steps of pointer tracking, as used in the flow diagram of FIG. 2.

### BEST MODE FOR CARRYING-OUT THE INVENTION

#### Overview of the First Preferred Embodiment

FIG. 1a is a perspective diagram of the first preferred embodiment of the present invention. The electronic reading machine 29 is mounted on top of a video monitor 31 with the field of view onto the surface below on which printed material 33 is placed. The printed material 33 can be text in a variety of formats on a variety of substrates, including

6,115,482

**5**

books, magazines, newspapers, food packaging, medicine bottles, bus schedules, utility bills, or CD-ROM labels. The electronic reading machine **29** comprises a main system **35**, from which a camera mount **33** protrudes. The camera mount **37** comprises one or more electronic imaging devices (such as CCD or CMOS **35** cameras).

A view of the camera mount **37** from the underside is shown in FIG. 1*b*, a perspective diagram. A camera **39**, which may comprise a CCD or CMOS imaging sensor **41** along with an attached lens **43**, is angled away from the main system **35**, so that it is directed towards the printed material **33**.

Optionally, the camera mount **37** may incorporate one or more illumination sources, so as to provide constant illumination over the field of view. In FIG. 1*b*, such illumination is provided by two rows of illumination sources **45** along the lateral edges of the mount **37**. These illumination sources **45** may comprise rows of LEDs, thin fluorescent sources (such as T1 lamps often used as illumination for backlit displays on portable computers), or may be other sources including incandescent sources. Optionally, these illumination sources **45** may be combined with reflectors behind the source and may also be optionally combined with focusing lenses, which may comprise Fresnel optics or lenses, to provide relatively even illumination on the surface of the printed material **33**. Additionally, diffusing means may be optionally included, in order to provide for even illumination on the paper. It should be appreciated that the arrangement of illumination sources need not be in rows, as shown in FIG. 1*b*, but may also comprise point sources or sources located in varied arrangements around the camera **39**. In general, it is convenient to juxtapose the illumination source and camera, so that any shadows thus formed by the illumination source will be minimized or absent in the image formed by the camera assembly.

The image or images obtained by the camera **39** are transmitted to an electronic computing device located within the main system **35**. The device may comprise either a general-purpose personal computer, or an embedded computer optimized for use in the reading system. The computing device processes the images in order to optimize the contrast and brightness of the image, and then further processes the image in order to extract textual information (e.g. by optical character recognition (OCR)) or to interpret graphical information.

FIG. 2 is a flow diagram that depicts the use of the system described in FIGS. 1*a* and 1*b* for reading text on the printed material **33**. The user places printed information into the field of view of the camera assembly, comprising the image sensor **41** and lens **43**. During an image capture step **51**, the image is read by the image sensor **41**, and is then converted to a digital signal and processed during video digitizing **53**. The output digital image, consisting of a two-dimensional array of pixel values (generally either 8-bit gray-scale or 24-bit color) is then sent to a digital computer where the image is analyzed in at least two modes. In the first mode, the image is converted into its text representation in an optical character recognition step **55**, whereas in the second mode, the image is analyzed for the presence, orientation and movement of a pointer object (e.g. a finger **34**, shown in FIG. 1) which is under the influence of the user and which is located on top of the printed material **33**, in a pointer tracking step **57**. It should be understood that the pointer that is being tracked in the tracking step **57** may alternatively comprise an object attached to a finger or hand, such as a colored dot or a blinking light, or may be an object held by the user, such as a wooden, plastic or metal rod, which may have passive or active markings to make it more easily tracked.

**6**

The combined results of optical character recognition **55** and pointer tracking **57** is both a text representation of the printer material **33**, as well as an indication of the text to be read from the pointer tracker **57**. As to be described below, the user indicates the text to be read through pointer gestures, that might include presenting his finger **34** in a particular orientation, forming a distinctive shape with two or more fingers **34**, waving his finger **34** back and forth, or tapping his finger **34** at a location. During pointer tracking **57**, the movements of the pointer are interpreted, and the text that is indicated to be read is determined.

This text to be read is converted to speech during speech synthesis **63**. In general there will be a prior or concurrent step of speech rate adjustment **61**, during which time the rate of speech will be adjusted according parameters such as pointer movements detected during pointer tracking **57**, user preferences, the difference in the location of the pointer and the location of the text currently being read, and other parameters.

In addition to determining the text to be read, pointer tracking **57** also supplies input to a step of feedback generation **65** through a step of feedback transduction **69**, which is used to indicate to the user information other than the vocalized text on the page supplied through the steps of text selection **59**, speech rate adjustment **61**, and speech synthesis **63**. This feedback comes in a variety of different forms. For instance, sounds could be used to indicate whether the printed material **33** was oriented properly, whether the paper **33** needed to be moved in order to place additional text within the field of view of the image sensor **41**, or the manner in which the pointer **34** is aligned with respect to existing text (e.g. whether it is pointing at text or not).

Many users of the system will have residual vision that can be used to supplement the synthetic speech output from speech synthesis **63** and feedback transduction **69**. The images captured during image capture **51** are fed through image enhancement **73**, which can improve image readability using analog or digital enhancement techniques such as increasing contrast, changing the image brightness, emphasizing edges, inverting color polarity (e.g. from black on white to white on black), changing the bit-depth (e.g. from gray-scale to black and white through binarization), or the like. This image may be combined in a step of video mixing **67** with an overlay of feedback information, which could include placing a box around the text currently being vocalized. The combined signals are presented then to the user in a step of video display **71**.

*Detailed Description of the First Preferred Embodiment*

The step of image capture **51** can involve either color or black and white images. The advantage of color images is balanced by the higher data throughput required to transmit the image to the computing device present within the main system **35**. Either CMOS or CCD sensors may be used for the image sensor **41**, and are selected on the basis of cost, pixel density, noise and other variables. The image sensor may communicate through various means with the main system **35** computer, including parallel, universal serial bus (USB), IEEE 1394, or 16-bit (PCMCIA) or 32-bit (CardBus) connections, or through a special frame grabber which integrates directly with the system bus, preferably with a direct memory access (DMA) interface (e.g. Matrox Meteor cards from Matrox, Montreal, Canada). The choice of communications interface is made on the basis of cost, throughput, and DMA capabilities.

6,115,482

7

The main system **35** computer should be of sufficient power to perform the remaining steps of the process. In general, any Intel Pentium or compatible chip of 150 MHz speed will be sufficient, although a faster speed will provide improved results. In addition, other non-Intel processors, such as those that are used in Windows CE systems, will suffice if they are of a similar performance. While Windows 98 and Windows NT 4.0 operating systems are suitable for system operation, other operating systems such as Windows CE are also suitable, if support programs for functions such as optical character recognition and speech synthesis are available.

It should be understood that the computer of the main system **35** may be part of a separate system, such as an office or home desktop computer. The use of such a general purpose computer greatly reduces the cost of a system of the present invention. Thus, only the imaging system and certain feedback output systems to be discussed later need to be provided to the user, and the main computing functions of the desktop computer (processor, power supply, mother-board functions, etc.), as well as input from microphones and output from speakers and video displays integrated with the computer can be used.

The number of pixels to be obtained during image capture **51** is determined by the size of the area to be read, and the requirements of the optical character recognition (OCR) program. In general, the higher the pixel density, the better the accuracy of the OCR. It is preferred to have a pixel density of 125 pixels per inch (dpi), which is slightly less than most facsimile (FAX) machines, although pixel densities of 300 dpi or better provide even better OCR accuracy. In order to reach this pixel density, the image sensor **41** must have a sufficient number of pixels, and the optics of the lens **43** must allow a small FOV at short operating distances.

The DVC-323 digital camera from Kodak (Rochester, N.Y.) has minimal but sufficient operating characteristics for the present invention. The camera operates in "still" mode, capturing images of 640 by 480 pixels with a "macro" image size of 4.7 by 3.5 inches, translating to about 140 dpi with the standard lens. The camera transfers the image to the host computer via a USB connection. It should also be noted, and will be discussed later, that the DVC-323 may also be operated in a video mode wherein the pixel density is lowered to 320 by 240 pixels, or less, in order to facilitate faster transfer of images through the USB connection.

Video digitizing **53** includes analog-to-digital conversion, if it is not an integral part of the image sensor **41** (many CMOS sensors include integral analog-to-digital converters). Once the image is transferred to the main system **35**, it can be digitally manipulated to make the input more appropriate for subsequent interpretation. For example, the signal may be converted from a color image to a gray-scale or binarized black-and-white image, since many OCR programs operate most effectively on such images. In addition, the image may be gain adjusted, despeckled, and otherwise manipulated to improve the image for subsequent processing.

The optical character recognition step **55** is carried out in the main system **35** using standard OCR algorithms, such as those employed by the Tiger program of Cognitive Technology of Corte Madera, Calif. These programs not only convert the image to its text representation, but also identify the location of particular letters, the font sizes and styles used, and basic text formatting such as indenting and paragraph margins.

The pointer tracking step **57** operates using commonly used tracking algorithms. While many pointers may be used,

8

it is most convenient for the pointer object to be part of the users hand, since it is always available, it is easily placed in the vicinity of the printer material **33**, and fingers and hands are naturally used to point at objects, and have ranges of both large scale and small scale motion appropriate for that task. More specifically, for purposes of this description, the use of one or more fingers of the user's hand will be used as illustration of pointer tracking and basic gesture-based navigational commands, as shown using the finger **34** of FIG. **1**.

Since, for the most part, the printed material will be roughly stationary, changes in the image will be linked to movement of the finger **34**. These changes can be easily identified using means of comparing without the finger **34**, and with the finger **34** present. In general, as the printed material **33** is placed under the camera mount **37**, the printed material **33** can be seen free from the presence of the finger **34**. To assist in this, the user may be verbally instructed to keep their fingers and hands from the area under the camera mount **37** until an identifying sound (e.g. a "beep" emitted from a speaker **47** on the main system **35**) indicates that they may place their hands within the field of view of the image sensor **41**. Then, when a new image is subtracted from the original image of the printed material **33**, most of the difference image will be blank, except for the presence of finger **34**.

FIG. **6** is a flow diagram of the steps of an alternative method of pointer tracking **57**, in this case for tracking a finger. The input to a step of edge detection **161** is the digitized video image from video digitizing **53**. Edge detection finds large positional changes in pixel value, which may be performed by convolving the image using multipoint edge enhancement operators, or by simpler arithmetic manipulation of adjacent pixels. This edge enhanced image is then subtracted from a similarly edge enhanced image of the sheet without the finger, taken before the finger is placed into the field of view, in a step of image subtraction **163**. This image should have small amounts of noise due to changes in illumination and movement of the printed material **33** that occurs between the time that the two images were taken. Therefore noise, determined by both the magnitude of the residual pixel information, as well as its degree of localization, is removed in a thresholding and signal extraction step **165**. In addition, the continuous values present until this point are converted into binary (black versus white) values through thresholding. Individual pixels are now grouped together into lines in an edge chaining step **167**, using an algorithm that looks for increasing variance of points around a line, until the variance exceeds a predetermined threshold. This groups all of the pixels into a smaller number of discreet lines, which are easier to handle in later steps. Because thicker lines are resolved by edge detection **161** into parallel lines along each edge, an edge thinning step **169** looks for such parallel and closely spaced lines, and resolves them into a single line, generally at the midpoint.

Now the image has been reduced to lines representing the current position of the pointer, and in a step **177**, these lines can be compared with biometric information **177**, which indicates norms for finger length, width, and the like. From these comparisons, finger position and orientation can be established. The current finger information is stored in a finger database **175**, sorted on the basis of time. In particular, while the index finger **34** may be inserted to varying degrees within the field of view of the image sensor **41**, its width should be roughly between 12 and 25 mm in width, whereas two fingers **34** should be between 30 and 50 mm in width (it should be noted that these widths ranges do not overlap). Thus, it is possible to easily distinguish between one and two

6,115,482

**9**

fingers **34** placed on the printed material **33**, and by extension, between two fingers **34** and an entire flat hand on the page.

The current finger information is then compared with past finger position and orientation in a finger motion detection step **173**, in order to determine the motion of the finger over time. For example, if the finger travels first in one direction and then the other direction over a period of one-half a second, a wagging motion of 2 hertz would be returned.

If a color camera **39** is employed, the finger **34** could be identified on the basis of its color in distinction with the color of the background-printed material **33**. This would still require an initial detection of the finger in order to determine the skin color for later use, but this could happen in a calibration stage where the finger **34** is brought in front of a white background. In operation, the pointer tracking **57** could look for colors with the known hue of the finger, and use this to determine the location of the finger **34**.

It should be appreciated that there are many algorithms that may be employed for the detection of the presence, location, orientation and movement of the finger **34**, and the algorithm of FIG. **6** is only an indication of a method that will provide the necessary information. Other algorithms may be more accurate or consume less computing resources or have other advantages over the method given.

Tapping motions by fingers **34** can be readily detected by a variety of means. For instance, the apparent width of the finger **34** slightly increases as it is raised, and then decreases as it is lowered. In a subtraction of successive images, this is seen as an outline difference of the finger **34**, especially since the finger **34** will not be moving in general directly in the direction of the image sensor **41**. In addition or alternatively, as the finger **34** is raised, depending on the orientation of illumination sources, it casts a shadow on the paper that is visible as a darkened area. Also, in addition or alternatively, as the finger **34** is raised and lowered, while the overall shape of the finger **34** is retained, the detailed distribution of skin features and nail position will move a large amount relative to their size making it easy to see.

On any sheet or object containing textual information, there is considerable content to be read. The user selects the textual components to be read by the system by pointing with his hand at the text to be read. The position and movement of the pointer finger **34** is combined with the location and presence of the text on the printed material **33** in order to select specific text to be read in the text selector step **59**. The finger **34** locator defines a "reading window" comprising text that is contextually related. For instance, text within a paragraph is more closely related than text in a prior or succeeding paragraph. Text in the same column generally has (except for tables) a closer relationship than text in adjacent columns.

When the pointer is moved to text, the text within the reading window, determined by the text selector **59** through input from the OCR step **55** and the pointer tracking step **57**, comprises that text to be immediately read, and is linked to text to be successively read. The user indicates through gestural movements the manner in which the text is to be read. For example, text may be read continuously, either at a fast or slow rate, single lines or paragraphs of text may be read, words may be spelled out, paragraphs may be skipped, etc. The gestural movements interpreted by the text selector **59** allows the user fine control over the reading behavior.

For example, moving one finger **34** back and forth sideways over text may indicate that the text should be read continuously. Tapping on the text may indicate that only a

**10**

single line of text should be read. Curling the finger up (bringing the fingernail vertically under the hand) could indicate that a paragraph of text should be skipped. The placement of two fingers on the page without movement could indicate that reading should temporarily halt.

It may be useful to read individual text elements, such as words or numbers, when the user cannot understand these elements as spoken by the reading system, when the user wishes to repetitively vocalize certain speech, or when the user wishes to vocalize individual text elements (such as page numbers). In such cases, the user may make a short horizontal stroke rightward along the text underneath the element to be vocalized. The lack of continuous horizontal or vertical motion would indicate to the system that an individual element is to be vocalized.

It should be understood that the gestural movements could be used not only to select the text to be read, but also the manner in which the text output should be generated, or other parameters of the electronic reading process. For instance, the speed with which the single finger **34** moves back and forth across the page, as described above, could be used to determine the rate at which synthesized speed is read. Alternatively, or in addition to this speech rate control, the user could move his finger **34** down the page through the text, and the system would adjust speech rate in order that the current speech output would be approximately at the text which is in front of the finger **34**. Spreading two fingers apart (e.g. the index finger and thumb) could be used to set the auditory volume of speech output. A closed fist could be used to direct the electronic reader to shut itself off.

Using gestural methods such as these, the step of speech rate adjustment **61** sets a rate of speech output. In addition to the gestural inputs described above, the system will also use other information, such as a predetermined default rate, generally chosen from the range of 80–160 words per minute, which may be user selected, as well as range limits beyond which speech recognition by the user will be challenging.

A set of gestural movements along with the command interpretations constitutes a gestural user interface. One such interface would comprise the following gestures and commands. One or more fingers moving back and forth would constitute a clear command, stopping any current reading. To read the whole page, 4 fingers would be laid on the printed material **33** until reading begins, where such reading could be stopped with the clear command as described above. To magnify a section of text, the user would put his thumb and index finger together to form a "C". The section between the fingers defines the location and field of view of the image obtained by the camera **39**. Moving a single finger horizontally across a page reads the text in the line above the finger at a rate such that the vocalized texts keeps pace with the movement of the finger; moving the finger vertically reads the single word in each line closest to the finger as the line is passed by the finger. Moving a double finger (two fingers extended side-by-side) vertically through the text reads the text at a rate whose speed is roughly proportional to the speed of the hand, but which has lower and higher predetermined rates which may not be exceeded. Moving a triple finger (three fingers extended side-by-side) vertically through the text reads the text at a rate "without limits", reading at the speed that the fingers move. If the speech synthesis cannot keep up with the rate of finger movement, words or lines are skipped and replaced by short beeps or clicks to indicate that information was skipped.

In the preceding discussion, we have described a number of gestural movements that can be distinguished by process-

6,115,482

**11**

ing of visual images by a computer (e.g. one, two or more fingers placed flat, wiggling one or more fingers left to right, tapping a finger, curling a finger inwards, making a fist, etc.), as well as commands which the user wishes to make with these gestures (e.g. read the text above the finger, move to the next block of text, read the text faster, read more loudly, stop reading, remember this text). The particular linkage of a gesture with a command may be cognitively linked—e.g. a flat hand, like a "stop" motion, may be used to stop reading. However, many different gestures may be linked with different commands within the spirit of the present invention. Furthermore, the gesture-based commands may be supplemented with physical controls (such as buttons, knobs, sliders and keyboards) to allow other modes of input.

In step **63**, the speech selected in text selection **59** will be synthesized at a rate determined by speech rate adjustment **61**. The means of synthesizing speech may include both software and hardware components. A preferred method of speech generation would use software programs such as Lernhout & Hauspie's Text-to-Speech (Burlington, Mass.). The output speech is encoded by the speech synthesis software in an appropriate format, such as 16-bit linear PCM encoding, and then output through a speaker **47** (see FIG. **1**) located on the main system **35**. If the user wishes for more privacy when operating the system, a jack **46** is provided into which headphones may be inserted.

It is important for the user to know where text is located on the page. This not only allows the user to knowledgeably select which text to be read, but in addition, by perceiving the spatial layout of textual information, thereby gain information about the type of textual content on the page. For example, listings, tables, graphics, utility bills, restaurant menus, and other textual information commonly encountered in daily living have characteristic layouts with important encoded information.

The locational information is provided to the user by way of feedback means, which may comprise tactile, audio and visual feedback, or a combination of these different modalities.

Tactile—The tactile feedback mechanism may comprise a worn, held or sub-surface (below the printed material **33**) transducer that vibrates in response to the presence of textual information within the reading window. In the case of a worn transducer, the transducer may be attached or clipped to the tip of the finger. Vibrating pins or rotating eccentrics would generate the skin deflection associated with a tactile feeling. The held transducer may be cupped or grasped within the user's hand that is directing the reading process (i.e. on which the finger locator is based), and includes similar vibration means as for the worn device described above. The sub-surface transducer comprises one or more vibratory transducers which is located beneath the surface of the textual information. For instance, a raised reading platform could be placed within the field of view, delimiting the extent of the field of view, and additionally incorporate tactile feedback means that transmits tactile feedback through the reading material. The tactile feedback means incorporates movement transducers that may be cam-based, eccentric-based, magnetic-based, electro-rheologically based, or other such mechanisms that can provide different vibration vectors (e.g. shear vibrations in different directions, pressure vibrations or physical displacement).

Information is provided by the tactile means through the presence or absence of vibration, the intensity of vibration, the frequency of vibration, the periodic timing of vibrations, and the direction of vibration. Combinations and variations

**12**

of the vibrational characteristics can thereby convey information about the density of text (e.g. lines per inch), the size of the text font, closeness of the locator finger to the text direction of the closest text outside of the reading window, alignment of the text relative to the horizontal of the camera assembly image, and other such information as is useful to navigate through textual information. For instance, if there is no text within the reading window, a characteristic pulsing vibration would indicate nearby text, and the frequency and intensity of this pulsing vibration would guide the user to the text. In addition, characteristic vibratory patterns can indicate when the reading window is positioned over graphics. The use of tactile information to guide the user in reading is also described in PCT patent application PCT/US97/02079 to Sears, titled "Tactilely-Guided, Voice-Output Reading Device," which is incorporated herein by reference.

Alternatively, or in addition to tactile feedback through vibration, a finger-mounted tactile unit may produce displacement of a movable member underneath the tip of the finger locator, giving the perception to the user that their finger is moving over a topologically elevated text. Thus, as the finger moved over a line, the member would push up on the finger from below, raising the finger, and giving the impression that the line of text was raised relative to the surrounding surface. Thus, by moving their finger over the entire surface, the user would receive rapid, intuitive and spatially encoded information about the distribution of text element over the page. In addition to encoding text location by perceived elevation only, the mechanical actuator may also provide physical tilt to the perceived elevated component. For example, the physical actuator may have two vertical actuator elements beneath an inflexible, relatively horizontal cross-member. As the height of the two vertical actuator elements changes, the slope of the joining cross-member will change, resulting in the perception of slope. This reinforces the perception described previously in this paragraph of traversing up and over an elevated line of text, which in actuality is flat.

If a tactile feedback mechanism is attached to the user's finger **34**, this provides a convenient platform for means to locate and track the finger. For example, a blinking LED facing upwards towards the image sensor **41** may be placed on the tactile transducer housing, wherein the blinking is synchronized with image capture **51** such that during successive image captures, the LED is on and then off. By comparing the two successive images, the location of the finger can be easily tracked.

Audible—The audible feedback means includes the generation of sounds of various volumes, frequencies, timbres, repetition frequency and directional source location (with the use of multiple speakers and techniques to produce three-dimensional holographic sound, such as that provided from SRS 3D Sound from SRS Labs of Santa Ana, Calif.) that conveys information such as that described for tactile feedback means. For instance, if there is no textual information within the reading window, the frequency and/or intensity of a sound can increase as the finger locator is brought closer to readable text. In addition, spoken information may be used to guide or inform the user. For example, the word "graphic" can be enunciated to indicate the presence of graphical information. Simultaneously, perceptually distinctive background sounds can indicate the density of graphical information (e.g. keyed to the spatial frequencies within the graphic or the distribution of color densities).

Visual—Many potential users of this system have complete vision, yet have trouble reading (e.g. the learning

6,115,482

**13**

disabled, dyslexic, or alexic), or have low vision where acuity is insufficient for reading common printed text sizes. In such cases, the residual vision may be well employed to guide the user through the text information. In such cases, the system would incorporate either a monitor (such as a computer display or television screen) or alternatively, a visual display that might comprise a bank of LEDs, a liquid crystal display or scanned laser beams projected onto the printed material **33**.

In the case of a high-resolution monitor, the image of the printed material is presented to the user. This image may be enhanced by affecting the brightness and contrast of the image. In addition, a magnified view of the image around the reading window may be called upon through a signal input by the user. This signal may be input either by a pressure-sensitive button attached under the tip of the finger locator, or alternatively, may be a visual gestural cue interpretable by the computer. For instance, the thumb and index finger may be spread apart to indicate the desired horizontal or diagonal extent of the field of view in the magnified image. In the case of closely spaced text, that text which is currently within the reading window may be indicated through changing the text color or by highlighting the text which comprises the reading window. The image displayed on the screen need not be real-time captured by the camera assembly, including the finger locator, but may be derived from a previously captured image in which the finger is not present, so that a clean image of just the source reading material is displayed. Alternatively, the image of the user's finger may be replaced with an icon representing the finger locator, a box representing the reading window, or a muted image of the finger locator that allows viewing of the image beneath the finger.

If the visual feedback means is a visual display that does not directly project pixel images from the camera input, then that display may be located on the directing finger or hand, or may be at a fixed location, such as being incorporated into the camera assembly housing. Location on the directing hand allows the user to simultaneously view the material being read, as well as the visual feedback information. A preferred embodiment of this form of visual feedback means would be a pair of rows of LEDs, operating similarly to the tactile display pins and lights described in PCT patent application PCT/US97/02079 to Sears titled "Tactilely-guided voice-output reading apparatus." However, instead of the LEDs being pointed back towards user, as in the patent application referenced above, the lights would preferably by pointing forwards, illuminating the text currently in the field of view that is to be vocalized.

Control for this feedback is provided in a feedback generation step **65**, which accepts input from pointer tracking **57** and text selection **59**, which contain information about the position and movement of the finger **34**, as well as the location of text elements on the printed material **33** and the text elements being read. The feedback so generated is provided through feedback transduction **69**, via either tactile, audible or visual signals as previously described. In addition, output may be through a step of video display **71**, in forms of visual feedback as previously described, such as the highlighting of certain text. In general, this video feedback is performed in conjunction with display of images from the step of image capture **51**, and thus may require a step of video mixing **67** of the original video images with the images of feedback generation **65**. Alternatively, the digitized video images from the digitizing **53** may be digitally altered in the feedback generation **65**, and then provided as digital images for video display **71**.

It should be noted that an important and challenging feedback is to allow the user to follow a single line of text.

**14**

That is, if the finger locator were to move diagonally across the page, and the reading window were to follow closely, a single contiguous line of text would not be read. Thus, it is important to either give feedback information to the user, to allow their finger locator to track a contiguous line of text, or to incorporate user input that directs the reading system to automatically track text parsed into sentences and paragraphs. This is accomplished according to the present invention in two different ways.

Firstly, the feedback device, whether tactile, audible or visual, or a combination of these, can direct the user how to move their finger locator along the text line of which the current reading window is a part, which we will call here the "track line." With such means, feedback is given to the user to indicate when the finger locator is moving off of the track line. For instance, the intensity and/or frequency of tactile or audible feedback can peak when the finger locator is located precisely below the track line, and drop off in intensity and/or frequency in rough perceptual proportion to the distance from the current track line. With a visual feedback means, the icon representing the finger locator may change in color, size or intensity depending on the distance of the finger locator from the track line. In these ways, the user can be directed to maintain the same track line as their finger traverses horizontally, instead of skipping to a new line.

Alternatively, or in addition to the feedback described in the preceding paragraph, the user may direct the reading system to read according to parsed textual content. That is, that the reading system will read blocks of contiguous text at a preset rate until some selection delimiter is reached. This selection delimiter may either be intrinsic to the text (such as the end of a paragraph), or it may be bounded by a cue provided by the user. For instance, the user may direct the system to provide continuous speech through the use of two fingers instead of one, and stroke the fingers vertically along the section of the text to be read. When the reading system reaches the end of the delimited section, an audible cue (such as a beep) indicates that the user should further instruct the system as to the next section.

In addition to the hand-position and movement signals mentioned above, there are numerous input signals that may be required from the user. For example, as mentioned above, input from the user may be obtained from pressure-sensitive buttons located beneath the tip of the locator finger. Alternatively, or in addition, buttons may be available in a unit accessible to the free hand on which the finger locator is not located. This keyboard may include positional navigation keys (such as arrow keys), contextual navigation keys (e.g. "next word" or "previous paragraph" keys) or mode selection keys (e.g. "read continuously" or "check spelling" keys). Alternatively, or in addition, a microphone on the main system **35** may be positioned so as to receive vocal input from the user, which allows the user to select different modes of action or to navigate through the computer interpreted text using spoken commands.

It should be noted that electronic cameras have limited resolution, set by the number of pixel capture elements and by the communications bandwidth for transmitting images from the image sensor **41** to the main system **35**. Because of the large area of most pages of text, the resolution of the imaging device may be less than optimal for interpretation of the image by a conventional optical character recognition software program. There are other limitations of these OCR programs and images input to these programs, including lighting, contrast, tilted text, page distortion (e.g. page buckling as the user runs their hand over the page), smudges on the text, colored text or background, and more. It is useful

6,115,482

15

for multiple images of the reading material to be obtained and interpreted by the OCR program. For instance, images can be obtained under different exposures, which alter the thickness of lines in the text. In addition, given the distance of the image sensor **41** from the text, vibrations on the surface on which the reading machines or the printed material **33** are placed will cause very slight changes in the placement of text within the pixel image, which will generate different OCR solutions. Such multiple images allow the OCR program to sample the text under slightly different conditions, some of which will aid in improving the accuracy of text interpretation by the OCR program of at least some subset of the text. Letters interpreted from different images of the same text selection may be compared on the basis of confidence factors generated by the OCR program, by spelling programs, or by context analysis (e.g. grammatical checkers). Successive analyses using these factors can be incorporated into increasingly accurate interpretations of every portion of the reading material in the field of view, even before it is called on by the user to be vocalized. This allows the reading system to operate with camera resolutions and inadequacies in reading material quality that would otherwise not be able to be tolerated.

In order to provide systems with large fields of view, using inexpensive cameras of small size, multiple cameras with partial overlap may be used. For example, with the DVC-323 camera previously mentioned, the field of view in macro mode is 4.7 by 3.5 inches, providing a resolution near the lowest possible for optical character recognition. Four cameras arranged in a rectangular arrangement with minimal 0.2 inch overlap in their fields of view would provide a composite field of view of 9.0 by 6.6 inches, which is adequate to cover a standard 8.5 by 11 page with 1 inch margins. Additional cameras or cameras with higher pixel counts could cover even larger fields of view.

It is understood that this invention could also be used for machine translation of text from one language to another. Thus, when presented with a book in a foreign language, the apparatus and methods of the present invention would allow a person to hear the text in their native language. Language translation would occur after the OCR program interpretation of the captured image into text input. Because the entire image from the reading material is input prior to vocalization, the computer may correct for syntax and other language construction differences in order to create proper speech in the native language of the user (this is opposed, for instance, to word-by-word translation, which would be a separate option). In addition, or alternatively, the text and images captured by the system of the present invention can be used to input the text and images for storage and use on the main system **35** computer. This might be used, for instance, as a low-resolution scanner and text input mechanism for general application by users who may or may not have a disability.

For example, home or business users can make manual gestures to copy portions of letters, bills, and advertisements into computer storage files they designate. The advantages over existing scanner systems such as PaperPort system produced by Visioneer (Freemont, Calif.) is that localized portions of pages may be classified independently, that valuable desktop surface is not consumed with a bulky scanner, the system of the present invention may be used while sitting at a work desk, and that the time required for scanning is not required. The user, for example, can open the letter, visually scan it for pertinent data, manually gesture for the data to keep, speak into a computer voice recognition system to indicate the disposition of the data, and then dispose of the letter.

16

Furthermore, for a portable system of the present invention, to be described later, a user in a warehouse could point to a bar code to read. The system, using a digital image instead of a conventional laser scanning bar code reader to obtain printed information, would then read the one-dimensional or two-dimensional bar code, and enter it into the system. Because the user would not need to hold a bar code scanner in his hand, this would permit more efficient two-handed movement in the inventory system, and thereby permit increased speeds of data input.

### An Alternative Embodiment of the Present Invention

FIG. **3** is a perspective diagram of a reading machine that incorporates two cameras. A multiplicity of legs **83** supports a platform **85** over the printed material **33** to be read. A low-magnification wide-angle FOV camera **87** is used to track command gestures. This camera **87** may be fixed in its orientation, provided that the field of view is sufficiently large to capture images from the entire printed material of interest. In order to provide a sufficient FOV, the camera **87** may be outfitted with a wide-angle lens that may have a constant non-linear distortion (e.g. a barrel or fish-eye effect). In this case, software within the computer would be required to remove this constant distortion. In the figure, the extent of the field of view of the fixed wide-angle camera encompasses the entire printed material **33**. This range may be large enough to allow an entire unfolded page of newspaper to be read without repositioning of the paper.

In this embodiment, a pan-tilt camera **89** is provided with a generally smaller FOV than the wide-angle camera **87** previously mentioned. This camera **89** may or may not be outfitted with zoom capability, and if the camera **89** does have zoom capability, the range of magnifications needed will be more limited than in a single camera embodiment, since many low-magnification requirements are satisfied by the low-magnification wide-angle FOV camera used to track command gestures. In the figure, the extent of the field of view of the pan-tilt camera is shown by the area **91** on the printed material **33**. This area is of such a size that the pixel density on the imaging sensor of the camera **89** allows for accurate optical character recognition of text in the field of view.

Optionally, a laser scanning mechanism **95** can be mounted in such a way as to be able to illuminate small sections of all printed material to be read. The purpose of the laser scanner **95** is to highlight the words being read and spoken, providing feedback to partially-sighted users as to what is currently being read. The scanning mechanism **95** is controlled to produce an illuminated box **93** around or fully including the current word being read. In this way, the user can ensure that the process is detecting the proper words for reading. In order that the scanning illumination not interfere with optical character recognition, the laser scanning may be timed so as not to overlap in time with the exposure of the cameras **87** and **89**. It should be understood that instead of highlighting single words, larger sections of text representing sentences or paragraphs may alternatively be highlighted. In addition, the word or words of interest may be shown on a display screen, as described previously for other embodiments of the present invention, in order to provide feedback to users. It should be understood that this laser scanning mechanism **95** could also be used other reading systems such as that of FIG. **1**.

Furthermore, the laser scanner **95** may have the additional function of highlighting text that is searched for under

6,115,482

17 | 18

direction from the user. For example, the user may direct the system to search for a specific word such as "pay" or for classes of words or text, such as those dealing with currency (e.g. text preceded by a currency symbol such as 'S', which involves a number with two decimal digits, or which contains the word "dollars", or alternatively to scan for non-text symbology such as a bar code or location encoded data such as the page number, which is located in generally predictable locations on a page). When the system successfully detects the search text, then the text could be illuminated by the laser scanning mechanism **95**.

In order to limit the range of motion or illumination required by the laser scanner **95**, it may be affixed to the pan-tilt mechanism of the high-resolution camera **89**, so that the laser is always pointing roughly in the direction of the camera **89** field of view. In this way, the laser scanner **95** will need a smaller range of motion.

Additional illumination of the text to be read is provided by a wide-field illuminator **97**, which is mounted on the platform **85** near to the location of the cameras, and pointed in such a direction as to illuminate text beneath the platform **85**. The range of the illuminator **97** is such as to provide light that is incident on the widest physical range accessible by both the wide-field and pan-tilt cameras **87** and **89**. In FIG. 3, the wide-field illuminator **97** is a fluorescent lamp with reflector and optics to spread the light roughly evenly over the largest field of view of the wide-field camera **87**.

The pan-tilt mechanism of the camera **89** should preferably be oriented so that movement along either the pan or the tilt axis scans horizontally across the printed material, roughly following a text line, while movement in the other axis scans roughly vertically across the page. While this orientation of the camera **89** is not required, it will generally reduce the amount of complex combined pan-tilt movement as text in a line is read. It should also be understood that the mechanism pointing the camera may be served by gimbal mechanisms different from pan-tilt mechanisms, as long as accurate control in two-dimensions is available, and that a sufficient range of motion is provided. Instead of moving the camera **89**, it is also within the spirit of the present invention to rotate one or more mirrors, while the camera **89** remains fixed in location and orientation.

It should be emphasized that the two cameras **87** and **89** may be replaced by a single camera with zoom capabilities. In reading text newly placed under the camera, the camera may be in low magnification zoom, where large areas of the page can be observed within a frame. In this low magnification mode, the camera can scan the observed page for control signals in the form of user hand signals or motion. During this time before the user has indicated a command, the camera may scan both horizontally and vertically over the area of the page looking for the presence of the user's hand.

Once the user's hand or finger is identified using algorithms previously described, the hand can be tracked until a command is received, either through hand movement, finger orientation or position, or other input modality. At this point, the magnification of the camera is increased to an extent that allows the text to be reliably interpreted by the OCR program. Thus, the zoom mechanism will magnify large font headline text to a lesser extent than small fonts, for example in a footnote.

As the magnification of the camera increased, the amount of light reaching the image sensor **41** will be decreased. A light mounted on the camera assembly, which is oriented in the direction of the camera field of view, may provide

additional illumination whose intensity can be variably increased as the magnification of the zoom element of the camera increases. The actual control of the illumination source intensity is through feedback involving analysis of the images captured by the camera. Alternatively, the exposure time of the camera can be increased in response to changes in the magnification in order to compensate for the available light at different magnifications.

It should be noted that the coordinated action of the cameras **87** and **89**, as well as the laser scanner **95** are preferably controlled by the computer located in the main system **35** that is engaged in the analysis of images from the camera. Thus, all of these elements are generally, though not necessarily, connected electronically to the main system **35**, which may be located on the platform **85**. Additionally, instead of being separately mounted on the platform **85**, as shown in the figure, the elements will likely be placed within a common housing.

The zoom camera is particularly valuable if the image captured by the camera is projected on a computer screen, since the hardware zoom can present a magnification with full pixel information to the user, without need for variable software magnification, which may be of lower quality due to the use of smaller numbers of pixels.

It should be noted that the operation of the system with multiple cameras could admit many different sequences of optical character recognition (OCR) **55** and pointer tracking **57**. For example, when printed material **33** is placed within the field of view of the image capture **51** means, OCR **55** may begin immediately, before gestural input from the user has begun. Image capture **51**, video digitizing **53** and OCR **55** may proceed opportunistically given text within the field of view, and if the gestural command directs the system to read text already interpreted, vocalization of the text through speech synthesis **63** can begin almost immediately. If the text to be read is not among that already interpreted, then image capture **51** of the indicated text using high pixel densities suitable for OCR **55** can begin. This mixing of optical character recognition **55** and pointer tracking **57** can be performed by a single camera with zoom capabilities, changing rapidly from narrow to wide field in order to both capture text and gestural commands, but the use of two cameras allows high resolution text capture to occur simultaneous with low resolution, wide field image capture **51**.

In addition, because images of the text to be read may be already captured before gestural commands are interpreted, the reading system can read text that is obscured by the user's hand during gestural commands. For instance, if the system has begun reading a passage, and the user inadvertently covers some of the text to be read with his hand, the information under his hand may already be stored. Thus, not only can text vocalization continue, but also images of the text where the user's hand is currently placed can be shown in video display **71**, even though current unobscured images of the text are not available.

Optionally, the user may view the text on a video display, similar to that used in the first embodiment. FIG. 3 shows the use of a touch-screen video display **32**, which may be alternatively used. With the touch screen display **32**, instead of making the gesture-based navigational commands within the field of view of the imaging system, the commands are placed directly via finger **34** movements on a touch-sensitive surface **50** of the touch-screen video display **32**. The touch-sensitive surface **50** can use capacitive, resistive, surface acoustic wave or other techniques to determine the presence and motion of fingers on the screen, such as resistive digital

6,115,482

**19**

touch screens manufactured by Jayco of Orange, Calif. While these surfaces **50** generally allow feedback of a single point, and are therefore generally incapable of interpreting the differences between a single finger and multiple fingers used gesture-based commands, even the use of a single point allows the system to distinguish left-right versus up-down motion, tapping motions, and even back-and-forth motions from moving, lifting, returning, and moving motions. This provides a vocabulary of motions that can be used in commanding the system. Instead of having to interpret images for gesture-based commands, the system must interpret only the presence or absence of touch contact, and the motion of this point of contact. In the future, when touch screens are able to completely describe multiple points of contact, then the use of more complex gesture-based commands involving multiple fingers and even the orientation of repose may be used with such a system.

When using the touch-screen display **32**, the text within the system field of view is presented on the touch screen **32**, and the user indicates by gesture-based commands not only the text to read, but the manner and speed of reading, as well. Because the user interacts with an image, rather than the actual printed material **33**, only a single view is permitted at a time. This encourages the use of a single camera with pan, tilt and zoom capabilities, rather than the multiple cameras shown in FIG. **3**. The user can control the pan and tilt by appropriate command gestures on the touch screen **32** (e.g. dragging a finger in the direction of panning, or "drawing" a circle of smaller or larger radius to increase or decrease the zoom), or the system can automatically track lines of text through OCR-based motion control. It should be noted that the image shown on the screen need not necessarily be the current field of view of the currently active camera, but may be instead a stored image, allowing the cameras **87** and **89** to be capturing images of the printed material **33** for later reading.

Using a touch screen display **32**, the user may interact with text that is modified in the step of image enhancement **73**, which may render it more visible to users with residual vision than the printed material **33** from which the text comes. This enhancement may include, as previously discussed, contrast and brightness control, and the image may be further modified by highlighting certain text (such as the text or text line currently being read).

It should be noted that operation using a touch screen display **32** even allows for the use of a flat-bed scanner to obtain images of the printed material **33**, with the user providing gesture-based commands through the touch screen display **32**. This mode of operation has the virtue of using inexpensive flatbed scanners, but suffers from the difficulty of using scanners described in the background section above. Most importantly, scanners require up to a minute or more to scan a standard page of text, whereas image capture using digital cameras supports near immediate reading once the printed material **33** is placed in the field of view of the system.

Another enhancement of this embodiment of the present invention is to import images for optical character reading directly from the screen image buffer of the computer of the main system **35**. Consider, for example, that the computer of the main system **35** is connected to the World Wide Web graphic interface to the Internet (hereinafter referred to simply as the Web). Much of the text interface to the Web is graphic in nature—that is, is presented as pixel images of text, rather than as text which is displayed through Hypertext Markup Language (HTML) text primitives. Web interface software (e.g. Web browsers) typically are unable to provide

**20**

access to this graphics based, non-HTML text to vision-impaired or blind users.

It is within the teachings of the present invention to access a screen image buffer of the computer of the main system **35**, which contains a pixel image of the screen, as the equivalent of the digitized image output of video digitizing **53**, for use in optical character recognition **55**. This allows text to be read both from normal HTML text primitives, as well as from graphics images downloaded from the Web, making all text accessible to vision-impaired users in spoken form. In order to adjust the pixel density of the images for use in OCR **55**, the settings of the video display in the graphics memory of the computer could be variably set, using user-adjustable controls such as is found in the Display settings of the Control Panel in the Settings menu in the Windows 98 operating system from Microsoft Corporation of Redmond, Wash.

The system preferentially operates in hybrid mode, where text displayed in HTML-code is directly interpreted from the code, whereas text displayed as graphics is interpreted through OCR **55** of the present invention. The reason for this is to avoid the need to OCR-interpret text whose symbology is already known to the system.

The user could input gestures for navigating through this text in many ways. One method would be to use a touch screen display **32**, in which the position touched by the user is directly mapped onto the pixels beneath the user's finger. The effect then becomes directly comparable to that of the user making gestural commands on printed material **33**, except that the text is present on a screen rather than paper. An alternative method of interfacing with the screen-based text is to use the cameras **87** and **89** to record gestural movements made within their field of view, without respect to material beneath the gestures. That is, there may or may not be printed material **33** within the field of view of the cameras **87** and **89**, and what is there is ignored by the system. Instead, the system maps the position of the user's fingers within the field of view, and maps the location of the hand and fingers relative to the field of view to the relative positions of recognized text from the screen image in the field of view. Thus, if the user's index fingertip is about 12% from the left of the field of view, and 47% from the top of the field of view of the wide-angle camera **87**, the system would treat it as if it were on top of whatever text was 12% from the left of the screen and 47% from the top of the screen of the displayed text, irrespective of the printed material (if any) beneath the user's hand. This latter method has the advantage of being able to interpret a wider range of gestures (e.g. those involving multiple fingers, or the orientation of fingers) than can be interpreted by most conventional touch screen displays.

This embodiment of the present invention may also be used as a reading device for children, both for its entertainment effects as well as educational value. A child user who could not currently read would bring their favorite children's book to the system of the present invention, and place it in the field of view of the system. The system could not only read the book for the child, but also highlight words as they are being spoken through use of the laser scanner **95**, thereby providing feedback to the child useful for gaining the ability to read.

A Third Embodiment of the Present Invention

Smaller versions of this embodiment may be created to scan single book pages, still within the spirit of the present invention. A smaller reader would be particularly useful for

6,115,482

21

a portable version of the device. In this case, the platform **85** may be supported on collapsible or hinged legs, or may even be available in forms without leg supports, and be worn by the user. For example, the cameras, illuminators and scanners, or some subset of these, may be worn on a head-mount, such as on a pair of glasses, telephone headset, headphones, or cap.

An example of such a worn reading machine is shown in FIG. **4**, a perspective diagram of an eyeglass reading machine **100**. An eyeglass frame **101** provides the basic platform for the reading machine. A wide-field camera **103** on one eyeglass earpiece provides functionality similar to that of the wide-field camera **87** of FIG. **3**, and a narrower field camera **105** provides functionality similar to that of the pan-tilt camera **89**. Suitable cameras for this embodiment of the present invention include the DXC-LS1 lipstick camera from Sony (Japan).

On each earpiece, more proximal to the ears, is a speaker **107** which provides audible feedback to the user, which may be stereo encoded. For instance, to direct the user to turn their head to the right thereby repainting the cameras **103** and **105** fields of view, a noise may be fed through the right speaker. This audible feedback is supplemented or replaced by tactile feedback transducer **109** that vibrates one or more pins **111** on the inside surface of the earpiece, against the bones above the ear. The power and communications are brought to this reading machine **100** through a pair of cords **113** that feed along the earpiece. These cords can be incorporated into an eyeglass support (not shown) that lies along the back of the user's neck, preventing the eyeglass reading apparatus from dropping. The cords **113** lead to a computer that may be carried in various means, including backpacks, hip packs, shoulder bags or an article of clothing such as a vest.

The major functional difference between this embodiment and that described in FIG. **3** above is that the narrow-field camera **105** does not require a pan or tilt capability, and thus the user must point the camera at the proper area on the page in order for the field of view of the camera to be properly placed. This requires continuous and rapid feedback from the system, either through audible feedback from the speakers **107**, or tactile feedback through the tactile transducers **109**. Optionally, these feedback means may be supplemented by a laser pointer on the eyeglass oriented so that its light falls near to or directly on the center of the field of view of the narrow field camera **105**. This will allow users with residual vision to identify the field of view of this camera **105**, and thus track lines of text. If combined with a pan and tilt mechanism, this laser could also be used to highlight text on the page in the manner of the laser scanner **95** in FIG. **3** above.

It should be noted that this embodiment of the present invention leaves the hands of the user free to hold and manipulate the text, and also to perform the gestural commands described above. Also, because of the portability of the device of FIG. **4**, it may also be used to interpret text not located on printed material brought to the system, but rather may also include text on public signage, computer screens, directions affixed to a wall, or book covers on a library shelf, to which the reading apparatus has been brought. The ability to read such text will be conditioned by either a variable focussing means or through use of a camera with a very great depth of field (e.g. a "pinhole" camera), so that text at various distances can be read.

A Fourth Embodiment of the Present Invention

An alternative embodiment of the present invention is to have the camera assembly mounted on the user's hand, as in

22

a portable system. In the previous embodiments of the present invention, the camera or cameras capturing the images of text to be read are either at a fixed location, or located relatively distantly from the text (e.g. mounted on the user's head or chest). Furthermore, in these embodiments, the camera received commands, at least in part, from hand and finger gestures of the user that were captured by the camera or cameras.

FIG. **5***a* and FIG. **5***b* presents side views of a fourth embodiment of the present invention, and FIG. **5***c* presents a frontal view of the device. In this embodiment, a camera is mounted directly on the user's fingertip **121** in a finger housing **123**. When the finger **121** is pointed at text to be read, the camera in the finger housing **123** is naturally pointing in the same direction. Images are then transferred by a cable **125** connecting the finger housing to a general-purpose or special purpose computer, such as contained in the main system **35**, as in the previous embodiments. The following paragraphs describe the structure and function of the finger housing **123**, as well as the special algorithms used to interpret images and commands from this embodiment of the present invention.

The finger housing **123** is strapped onto the user's index finger **121** with two straps, a medial strap **127** encircling the middle segment of the index finger, and a distal strap **129** which encircles the distal segment of the index finger. The medial strap **127** is longer in the longitudinal finger direction, and is the primary structural stabilizer of the finger housing **123** on the index finger **121**. The medial strap **127** is conveniently fabricated from fabric or plastic. The finger-housing **123** rests on top of the finger **121**, with a lens **131** above the distal-most segment, and points along the axis of the finger **121**, roughly in the same direction as the user perceives the finger to point. The camera that is part of the finger-housing **123** does not necessarily point directly in the same direction as the finger tip, but may be inclined so that the image taken by the camera is directed more vertically (i.e. with the lens pointing somewhat downward). Optionally, a supporting member **139**, made of a less flexible material, connects the medial and distal straps **127** and **129**, so as to provide support for the distal strap **129**, as well as to maintain a fixed distance between the two straps. In order to aid in slipping the device over the finger, as well as provide a more stylish exterior, a Spandex or other fabric sheath may be placed around the finger housing **123** and associated straps **127** and **129** and supporting member **139**.

Illumination is provided for the camera by illuminators **133** around the periphery of the camera, pointing the same direction as the camera, as can be seen in FIG. **5***c*. The illuminators **133** are conveniently light-emitting diodes (LEDs), and may be of different colors to aid in the discrimination of different colored text, or text on different colored backgrounds. In the case of different colored LEDs, the LEDs **133** would be turned on in sequence or in combination to provide illumination with the greatest contrast of text to its background. One such arrangement of LEDs is shown in FIG. **5***c*, although a smaller number or different topological arrangement of LEDs is within the spirit of the present invention. Depending on the aperture of the camera lens **131**, the sensitivity of the camera, and the amount of ambient light expected, ambient illumination may be sufficient to provide images of the text without additional illumination from the device.

The user's finger **121** will generally be inclined to the page at an angle of greater than 45 degrees, as shown in FIG. **5***a*. However, because the camera is angled to the text, the captured image will not be square and will appear distorted

6,115,482

23

if compensation is not made either in the optical hardware, the camera positioning or image capture software. Thus, the optical path within the finger housing 123 may include either tilted mirrors or prisms to remove some or most of the optical distortion caused by the non-orthogonal camera angle. However, these methods cannot entirely remove the non-orthogonal image, since the angle with which the user positions the camera cannot be entirely controlled or predicted, and small amounts of distortion may remain.

This final distortion may be somewhat compensated for by image processing software within the computer, which may detect the angle of the camera position by assessing various features of the image. For example, in general, the lighting from the illuminators, described above, can be known and calibrated for a vertical camera arrangement. If the camera is angled, that portion of the image that is divergent will generally also have less reflected light, since the incident light from the illuminators is spread over a larger area. Thus, the variation in illumination intensity can be used to detect spreading of the image, and provide the information necessary to remove the distortion. In order to assist in the compensation for camera tilt, a miniature tilt sensor, such as those that use a fluid sensing device, may be used to detect camera tilt. With knowledge of the tilt, the image processing software within the computer may remove the effects of tilt. Alternatively, or in conjunction with the means described above, a circular beam of light of known spread may be projected during certain image captures, and the tilt and distance of the surface can be unambiguously determined from the size and shape of the beam captured in the images. Using this method, the illumination spread angle must be different and preferably smaller than the camera field-of-view in order to distinguish distance.

Other means of determining the angle of camera tilt can include looking at the divergence of angle in vertical parts of letters, such as the vertical bars on "h", "l", "b", "K", and many other letters. If the camera is not orthogonal to the text, the angle of the vertical bars will vary within different parts of the image.

For larger text, the user may want to pull the camera away from the printed text in order to increase the field of view of the camera. Because the lens system of the camera will generally operate with a very short focal length, it is generally hard to allow the lens to accommodate a very large range of focal depth. In part, this can be accomplished by using a very small lens aperture, creating a pinhole camera with large depth of field. This strategy, however, is limited by the reduced light capturing of such a pinhole lens system, and the need to compensate for this effect with higher illumination than may be available.

Alternatively, the camera can be outfitted with a movable lens system, which provides variable focus. One example of such an apparatus can be seen FIGS. 5a through 5c, where the user changes the camera focus naturally by flexing his finger away from the text. As mentioned above, the finger housing 123 is primarily positioned and stabilized on the middle segment of the index finger 121 by the medial strap 127. As the hand is pulled away from the page and the finger 121 flexes, curling the finger into the hand, the strap 129 on the distal segment pulls a stiff actuator 135 which is attached tangentially to the camera lens 131, and thus rotates the lens 131 which is attached to the camera by a screw mechanism. Thus, the distance from the lens 131 to the camera is adjusted, thereby changing the focal point of the camera assembly.

It should be noted that a number of different mechanisms for varying the focus of the camera lens 131 are allowed

24

within the present invention. For instance, an actuator may extend from the bottom of the lens 131 and rest on the distal finger 121 segment under the influence of spring pressure. As the finger 121 flexes, the actuator would move downward to rest on the new position of the finger 121, changing the focus.

Unlike the previous embodiments of the present invention, the camera does not capture images containing the user's finger or hand, and so images of user hand or finger gestures cannot be used directly to communicate commands to the computer. Instead, three different methods, used in isolation or in combination, are used to allow the user to issue hand-based commands to the computer. In the first case, a small button 137 may be placed on the distal strap 129 on the finger housing 123, located in such a way that when the user taps his finger 121 on the surface of the printed material, the button 137 is actuated. The electrical connections for this button may be transmitted through wires placed within the distal and medial straps 127 and 129, and the support member 139. The button 137 permits both single and double "clicking" as command inputs. For example, the user may click once to activate reading, and a second click would stop reading. Double clicking could command activation of voice input, change lighting, or indicate another function.

Alternatively, the sequences of images from the camera can indicate special finger gestures as command inputs. For example, by analyzing images captured from the camera, the camera can detect changes in illumination, and by detecting offsets of common image elements from frame to frame, determine direction and speed of finger movement. For example, if the user's finger 121 is above the page, and then brought down rapidly in a tapping motion, the illumination intensity on the page from the LEDs 133 will increase rapidly, as the lights are brought closer to the paper. Then, as the finger 121 is brought into contact with the surface of the reading material, the increase in illumination will abruptly stop.

Sideways motion can be detected by comparing contiguous image frames, comparing the locations of like elements within the frames, and then by computing the offset, compute the linear motion and direction across the page. Complex gestures could be interpreted from sequences of different finger moves. For example, consider a double-click followed by rapid movement in one direction followed by a slow return movement. If the rapid motion were in the direction of text lines, this could command the device to increase the rate of speech, whereas rapid movement in the opposite direction could command the device to decrease the rate of speech.

Accelerometers located within or on the finger housing 123 can detect and communicate the direction and magnitude of acceleration. Thus a tapping motion down would be detected as a moderate acceleration downwards, followed by a very sharp, impulsive upwards acceleration as the finger strikes the page surface and stops. Such accelerometer devices are widely available in piezoelectric, piezoresistive and variable capacitor form from companies such as Endevco of San Juan Capistrano, Calif. The use of the button, or image analysis, and of accelerometer information, or other methods of determining finger position and movement, may all be used to determine and interpret finger gestures for user input of commands to the system.

In many instances, it is useful to have an accurate method for determining the distance from the lens 131 to the printed material, in the direction of camera pointing. As mentioned

6,115,482

25

above, this information may be used to determine the location and movement of the hand, for interpreting hand gestural commands to the computer. Additionally, this information might be used for an automatic focusing mechanism, in which either the camera or the lens were moved according to the dictates of the object distance. By varying the distance from the lens to the camera imaging sensor, different focal points may be accommodated.

A convenient method for determining the distance from the camera face to the reading material is the common triangulation technique used in industrial photoelectric sensors and handheld cameras. In this method, a roughly collimated beam that is co-aligned with the camera line of sight, but offset by a small distance, is projected onto the printed material. Depending on the object distance, the location of the beam contact with the printed material within the camera image will vary predictably. By measuring the location of the projected beam within the image, the distance from the camera to the printed material may be computed. In order to reliably detect the beam within a relatively complex image, the beam may be switched on and off between successive camera frames, and through the process of image subtraction, the location of the beam within the image will be easily identified.

In order to conveniently create a collimated beam, two methods are preferred. In the first, a diode laser with a collimating lens is placed within the finger housing. Alternatively, a narrow-output beam LED can be placed within a hole in the finger housing, such that a roughly collimated beam emerges from the hole. The diode laser has the advantage of a longer working distance, although the LED system has the advantage of cost and size in its favor.

It should be noted that multiple beams measuring distance, the beams being located at different radial offsets form the line of sight, can be used to additionally determine tilt and curvature of the images surface.

It should be noted that other means of communicating commands to the computer are useful, most notably verbal commands that are input to the computer using a microphone and interpreted by a voice recognition program. This microphone will generally be integrated near, on, or in the computer system to which the system is connected by cord 125. Other input may be available through one or more buttons 141 located on the exterior of the finger housing 123. These buttons may be used to "wake up" the system, when the system is in a sleep or power-saving mode, turn the system off, alert the system that audible input from the microphone is to be entered by the user, or other such commands.

This embodiment of the present invention allows most or all of the audible, visual and tactile feedback modalities described above in reference to the embodiments of the present invention described previously. Thus, for example, a tactile interface 143 could be included in the finger housing for this embodiment, and the audible and visual feedbacks can be handled by the computer in the same manner as the previous embodiments. The tactile feedback stimulators 143 on the device may be located at a number of positions within the spirit of the present invention. For example, one or more stimulators 143 may be located on the inside surface of the straps 127 and 129 used to attached the finger housing to the user's index finger. Alternatively, the tactile stimulators 143 may be located on the underside of the finger housing 123, against the dorsal surface of the finger 121. It should be understood that the sensitivity of the finger 121 varies substantially with position, and the highest sensitivity occurs

26

on the ventral surface of the distal segment of the finger, which is the optimal location for the positioning of the tactile sensors, although other locations may suffice. For users with fall or residual vision, colored LEDs on the rear surface of the finger housing may also provide feedback information to the user.

It should be appreciated that the feedback mechanisms described here are very similar to those described for tactile feedback of the first embodiment of the present invention. Thus, the mechanisms for tactile feedback described here can be used for the first embodiment, and visa versa. For example, the function of the laser scanner 95 can be replaced with a laser scanner mounted on the finger housing 123, and highlight the words being spoken in a manner similar to that of other embodiments of the present invention.

While the finger housing 123 in FIG. 5a through FIG. 5c is shown resting primarily on the dorsal surface of the finger 121, it is within the spirit of the present invention for the finger housing 123 to be both more substantial in size, as well as encompass a wider range of circumference around the finger 121. In this case, the user's finger would insert in a hole in the device, and electronics would be placed around the finger 121. Tactile stimulators 143 would face in through the radial dimension of this device to contact the user's finger 121.

Furthermore, within the spirit of the present invention, the finger housing 123 may be located on any segment of the finger, and may be conveniently located not on the middle segment, as shown in FIG. 5l through 5c, but rather on the proximal segment, closer to the knuckle, with the finger 121 held in an orientation similar to that of FIG. 5a. FIG. 5d presents a side view of this embodiment of the present invention, in which the optics of the camera are presented in schematic cross-section. The finger housing 123 is located on the proximal finger 121 segment, secured to the finger via a housing strap 145. In the optical path of the camera located within the housing 123 is a bellows arrangement 151 (shown in cross-section) which holds a prism 147 and a lens 149. The prism 147 redirects the light from a field of view 155 near the tip of the finger to the input path to the finger housing 123. The bellows is secured to the medial strap 127 by a bellows attachment 153, so that as the finger 121 flexes, it extends and wraps the bellows 151 around the finger, rotating the lens 149 and the prism 147 so as to maintain the light path to the finger housing 123. It should be noted that the prism 147 may alternatively be a fluid-filled prism, so that as the finger 121 moves, instead of moving the prism 147, it changes the relative angle of the faces of the prism, thereby adjusting the optics in the required manner.

The placement of elements shown in FIG. 5d has a number of advantages, including a larger field of view, given the larger distance to the printed material, a larger depth of field, greater comfort (since the weight of the device is closer to the point of rotation at the knuckle, and therefore presents less torque around the knuckle), and some of the weight of the device may be carried not on the finger but over the knuckle.

### Benefits and Advantages of the Present Invention

In light of these and other examples of prior art, the present invention provides a number of advantages relative to magnifying and electronic reading devices practiced in the prior art, including:

The systems may be used with general-purpose computers, which are becoming ubiquitous in office and home environments. These computer systems pro-

6,115,482

27

vide both the computing power necessary, as well as ancillary input and output devices, including video displays and audio feedback. Thus, the price of the system for the end-user who already has a suitable computer will be very inexpensive. Furthermore, as the power of these consumer and business computers rises, the performance of the reading systems will correspondingly improve.

The systems use natural gestures to control the reading machine. For instance, when children are first learning, it is natural for them to use their fingers to follow the text, and this is the same movement used in Braille text reading. The use of finger pointing and hand movements, being so common and natural, makes learning to use the system rapid. This contrasts with current reading devices, which require the user to learn and become comfortable with specialized keypads or keyboard sequences. These control gestures make the system particularly useful for teaching young children to read, since it uses gestures that are naturally used by children.

The use of pointing allows very fine control by the user of the text to be read, and allows reading of highly formatted text, such as in bills, menus, technical literature, and more. Current magnification devices require physically moving text into the field of view of the camera. This is both physically challenging to some users, and further may be difficult to do when the user can see only a small amount of the formatted text. Because the computer of the main system is generally high performance, this allows considerable "intelligence" to reside in the software program for tracking text, rather than requiring the user to track it manually.

Because the system does not need to read in an entire page before OCR and speech synthesis, as are required by current systems, text reading can begin before the system is able to obtain high density pixel images of the entire field of view. Instead, low resolution, wide field images are used to interpret gestural commands, indicating the text to be read, and the system then needs only to maintain image capture and OCR rates faster than the text can be spoken, which is generally available with systems of even relatively modest performance (for example, a 166 MHz Pentium MMX system will generally meet this criterion). Thus, instead of waiting 60 or more seconds before the first line of text can be read, as is found with most current electronic reading systems, the present invention can begin reading almost as soon as the page is placed in front of the device. Consider, for example, trying to find a particular page in a book or newspaper. With the current device, the page can be placed in front of the system, and almost instantly, the user can point to the place where the page number is always located, and know the number of the page.

The system of the present invention can be used from a sitting position, as the printed material need be placed only on the desktop, rather than in a raised scanner of current reading machines. In addition, the third (eyeglass) and fourth (fingertip) embodiments of the present invention are easily made portable, so that reading can be performed wherever and whenever printed material is encountered, whether at school, at work, at the store or at a restaurant.

Current reading machines are limited to conventional scanners, which often can scan legal-sized paper.

28

Larger printed material, such as both pages of an opened magazine or a single newspaper page, can not be read without repeated and complex repositioning. This is particularly annoying to many users, since frequently, the entire contents of a page must be scanned when only a single article is to be read. The present invention, on the other hand, can accommodate large pieces of paper, and only that text which needs to be read is scanned. Even for systems of the present invention with a smaller field of view, in order to bring text into the field of view, it simply must be slipped into the field of view, and may be nearly instantly read.

Systems of the present invention have both magnification and reading capabilities. Because the images are dealt with digitally, as opposed to current magnification systems that generally deal with only analog signals, the signals may be enhanced and sent directly to the video display of the attached computer. Thus, for users with residual vision, they can have for prices similar or less than current magnification systems, systems that provide both magnification and electronic reading. Furthermore, the possibilities of digital enhancement of the image are far greater than the enhancement currently available with analog magnification devices.

It should be apparent to one skilled in the art that the above-mentioned embodiments are merely illustrations of a few of the many possible specific embodiments of the present invention. Numerous and varied other arrangements can be readily devised by those skilled in the art without departing from the spirit and scope of the invention.

What is claimed is:

1. A method for electronically reading text under interactive control by a user, the method comprising:

obtaining a first digital image of at least a portion of the text to be read;

performing symbology recognition on the first digital image;

capturing a temporal sequence of digital images of user-generated spatial configurations of at least one pointer;

determining a command signal from the temporal sequence of digital images;

choosing a subset of the recognized symbology to read at a spatial location on the text to be read on the basis of the determined command signal;

feeding back to the user the spatial location of the chosen subset to be read and the spatial location of at least one pointer relative to the recognized text, wherein the spatial location of the chosen subset and the pointer aids the user in selecting the text to be read; and

converting the chosen subset of recognized symbology into a humanly understandable version.

2. A method as defined in claim 1, wherein the pointer is comprised of a finger on the user's hand.

3. A method as defined in claim 1, wherein a portion of the spatial configurations are comprised of the relative locations and orientations of two or more pointers.

4. A method as defined in claim 1, wherein the spatial configurations are comprised of the locations of the pointer relative to the text.

5. A method as defined in claim 1, wherein the pointer is attached to the user's hand.

6. A method as defined in claim 1, wherein the spatial configurations of the pointer are determined from the digital image.

7. A method as defined in claim 1, wherein the digital image is obtained from a means attached to the user's hand.

6,115,482

**29**

**8**. A method as defined in claim **7**, wherein determining command signals comprises analyzing the relative location of text within the digital image from successive frames in order to determine the location and motion of the means of obtaining the digital image relative to the text.

**9**. A method as defined in claim **1**, wherein a camera is used to obtain digital images and a second camera is used to capture temporal sequences of digital images.

**10**. A method as defined in claim **9**, wherein the cameras have substantially different sized fields of view.

**11**. A method as defined in claim **1**, wherein a single camera is used to both obtain the first digital image and to capture the temporal sequence of digital images.

**12**. A method as defined in claim **1**, wherein the operation of feeding back includes providing feedback directly on the text to be read.

**13**. A method as defined in claim **1**, wherein the operation of feeding back includes providing feedback through an electronic display of at least a portion of the digital image.

**14**. A method as defined in claim **1**, wherein a flatbed scanner is used to obtain digital images.

**15**. A method as defined in claim **1**, wherein digital images are obtained from an internal computer video buffer of a screen image.

**16**. A method as defined in claim **1**, wherein the spatial configurations of the pointer are determined from the interaction of a proximity-sensitive display with the pointer.

**17**. A method as defined in claim **1**, wherein the act of obtaining digital images can be accomplished via an imaging device worn by the user.

**18**. A method as defined in claim **17**, wherein the imaging device is incorporated into glasses worn by the user.

**19**. A method as defined in claim **1**, including additionally displaying enhanced images of the text to the user.

**20**. A method as defined in claim **19**, wherein the degree of enhancement is controlled by the user.

**21**. A method as defined in claim **20**, wherein the degree of image enhancement is controlled by the command signal.

**22**. A method as defined in claim **19**, wherein the image enhancement is a magnification of the text.

**23**. A method as defined in claim **19**, wherein the image enhancement comprises affecting a property of the image chosen from the group consisting of: contrast, brightness, bit-depth, and color polarity.

**24**. A method as defined in claim **1**, including additionally providing the user feedback information about the layout of text within the digital image.

**25**. A method as defined in claim **1**, wherein the spatial information is fed back via tactile information.

**26**. A method as defined in claim **25**, wherein the tactile information is transduced by vibrating pins.

**27**. A method as defined in claim **25**, wherein the tactile information is transduced by a force-feedback mouse.

**28**. A method as defined in claim **1**, wherein the spatial information is fed back via visual information.

**29**. A method as defined in claim **28**, wherein the visual information is displayed on the text using a laser scanner.

**30**. A method as defined in claim **1**, wherein the spatial information is fed back via audible information.

**31**. An electronic reading apparatus for converting text to spoken words for a user, comprising:

a pointer that is operated by the user to indicate commands, wherein commands are encoded in the location and movement of the pointer relative to the text;

**30**

a digital imaging device that converts text to a digital imaging signal and which additionally captures a temporal sequence of digital images of the pointer, wherein the temporal sequence of images contains information about the location and movement of the pointer relative to the text;

a character recognizer receptive of the digital imaging signal, the recognizer generating a recognized character signal comprising the symbolic identity of the recognized text and the location of the recognized text relative to the digital imaging signal;

a pointer tracker that determines the pointer location and movement, the tracker generating a pointer location and movement signal relative to the text;

a command interpreter receptive of the pointer location and movement signal and the recognized character signal, the interpreter generating a command signal indicating the text to be converted to spoken words;

a feedback device receptive of the command signal, and providing feedback to the user about the location of the text to be converted to spoken words and the location of the pointer relative to recognized text;

a controller receptive of the command signal and the recognized character signal, the controller generating an output signal representative of at least portions of the text recognized; and

a transducer receptive of the output signal for converting the output signal to speech.

**32**. A device as defined in claim **31**, wherein the feedback device is additionally receptive of the recognized character signal and provides feedback to the user about the location of recognized text.

**33**. A method for electronically reading aloud text under interactive control by a user with a computer-based system, the method comprising:

obtaining a first image of at least a portion of the text and converting the image to a first signal representative thereof;

capturing a temporal sequence of images of at least one pointer under the control of the user and converting the temporal sequence of images to a second signal representative thereof;

supplying the first and second signals to the computer-based system;

performing symbology recognition on the first signal;

determining the position and movement of the pointer relative to the text from the first and second signals;

choosing a subset of the recognized symbology to read aloud on the basis of the determined position and movement of the pointer relative to the text and generating a command signal;

converting the chosen subset of recognized symbology into speech, additionally including providing feedback to the user of the particular subset of recognized symbology chosen and of the location of the pointer relative to the recognized symbology.

* * * * *